## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **RAEANN BAYLESS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CASE NO: 6:20-cv-831-Orl-37GJK** |
| | ) |
| **BOSTON SCIENTIFIC CORPORATION;** | ) |
| **and COLOPLAST CORP.,** | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT BOSTON SCIENTIFIC'S DISPOSITIVE
## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

This product liability action was directly filed in the United States District Court for the Southern District of West Virginia in *In re: Boston Scientific Corp., Pelvic Repair System Products Liability Litigation*, MDL 2326, and transferred to this Court on April 28, 2020 (Doc. 51). Plaintiff asserts claims against Boston Scientific and Coloplast Corp. arising out of her pelvic floor surgery, which involved the implantation of two medical devices: Boston Scientific's Advantage Fit™ Transvaginal Mid-Urethral Sling System ("Advantage Fit") and Coloplast's Restorelle® Y ("Restorelle Y"). Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, Boston Scientific is entitled to summary judgment as to all claims alleged in Plaintiff's Short Form Complaint (Doc. 1),[1] for the following reasons:

- **All claims.** Plaintiff cannot establish causation because her expert's opinions are *inadmissible* under *Daubert* and her expert's testimony does not create a genuine issue of material fact with regard to specific causation.

---

[1] As confirmed by Plaintiff's counsel, Jeff Haberman, by telephone on September 30, 2020, Plaintiff has agreed to drop her claims for manufacturing defect as it pertains to Count I (negligence) and Count III (strict liability), and the entirety of Count VII (discovery rule, tolling, fraudulent concealment). Accordingly, these claims are not addressed in this motion,

- **Failure to Warn (Count I: Negligence and Count IV: Strict Liability – Failure to Warn).** Plaintiff's failure-to-warn claims (whether based on strict liability or negligence) fail because Boston Scientific adequately warned Plaintiff's implanting surgeon (the learned intermediary) of the risks that Plaintiff claims to have experienced, and Plaintiff's surgeon had independent knowledge of those risks.

- **Plaintiff's claim for punitive damages (Count IX: Punitive Damages).** Under Florida's choice-of-law rules, the law of Massachusetts (where Boston Scientific is headquartered and made its decisions concerning the design, labeling, marketing, and distribution of the Advantage Fit) governs Plaintiff's punitive damages claim. Plaintiff's punitive damages claim fails as a matter of law under Massachusetts law, which bars punitive damages unless expressly authorized by statute.

As discussed in depth below, the Court should grant final summary judgment as to all claims alleged against Boston Scientific.

## I.    STATEMENT OF MATERIAL UNDISPUTED FACTS

### A.    The Advantage Fit sling

Boston Scientific manufactures and markets the Advantage Fit, a prescription medical device that was cleared by the Food and Drug Administration ("FDA") in 2002. *See* Advantage Fit FDA Clearance Letter, BSCM00100000002-04, attached as **Exhibit A**. The Advantage Fit is a midurethral polypropylene mesh sling surgically implanted by a physician for the treatment of stress urinary incontinence ("SUI"). *See* Advantage Fit System Directions for Use, BSCM00800000546–597, attached as **Exhibit B**, at 2. The Advantage Fit is available by prescription only. *See id*.

Federal regulations dictate the manner and content of warnings that must accompany a medical device sold in the United States. *See* 21 C.F.R. 801.109. As required by federal regulations, the Advantage Fit is accompanied by a package insert known as the Directions for Use, or the DFU. *See id*. The Advantage Fit DFU outlines the product's intended use, operational instructions, and contraindications. **Ex. B** at 2–3. It also provides multiple warnings, including

2

both general warnings and a list of possible adverse events associated with the midurethral sling placement. *Id.* at 3–4.

At the time of Plaintiff's 2013 implantation surgery, the DFU provided as follows:

## ADVERSE EVENTS

The following complications have been reported due to the suburethral sling placement, but are not limited to:

- As with all implants, local irritation at the wound site and/or foreign body response may occur.
- Tissue responses to the implant could include vaginal erosion/extrusion, erosion through the urethra or other surrounding tissue, migration of the device from the desired location, fistula formulation and inflammation. The occurrence of these responses may require removal of the entire mesh.
- Like all foreign bodies, the mesh may potentiate an existing infection.
- Excess tension may cause temporary or permanent lower urinary tract obstruction and retention.
- Perforation or laceration of vessels, nerves, bladder, urethra or bowel may occur during placement and may require surgical intervention.
- Known risks of surgical procedures for the treatment of incontinence include pain, infection, erosion of the vaginal or urethral mucosa or bladder wall, device migration, complete failure of the procedure resulting in incontinence and mild to moderate incontinence due to incomplete support or overactive bladder.
- In addition to the above listed potential complications, allergic reaction, fistula, abscess, detrusor instability, pelvic and vaginal pain, dyspareunia, vaginal bleeding, vaginal discharge, dehiscence of vaginal incision, bruising/hematoma, edema and erythema at the wound site, have been reported due to suburethral sling procedures.

*Id.* at 4.

### B.    Plaintiff's medical history, implantation surgery, and treatment.

The Plaintiff had multiple pelvic conditions related to the relevant surgeries here: (1) uterine prolapse (a fallen uterus, a type of pelvic organ prolapse ("POP")); (2) cystocele (a prolapsed or fallen bladder, a type of POP); and (3) SUI, as well as a history of many other medical issues including rectocele (herniation of the rectal wall into the vagina), fecal

incontinence, diverticular disease, hypertension, 30-year tobacco abuse, hepatitis C, gonorrhea and other STDs, 25-year cocaine drug abuse, nine prior pregnancies, hot flashes, pain with intercourse, gallbladder/gallstones surgery, tubal ligation, abdominal adhesions, and others. *See* Case-Specific Report of Dr. Bruce Rosenzweig, dated June 4, 2016, attached as **Exhibit C**, at 3–5; Deposition of Dr. Bruce Rosenzweig, dated August 17, 2020, attached as **Exhibit D**, at 60:23–72:16; Deposition of Dr. Kathy Y. Jones, dated September 12, 2018, attached as **Exhibit E**, at 25:8–26:13, 28:14–29:5, 32:8–11, 49:9-20; Plaintiff Raeann Bayless' Medical Records, attached as **Exhibit F**, at BAYLESSR PLTF 000003–10, 000065, 000202–06.

Ms. Bayless's multiple pelvic conditions were diagnosed after she was evaluated by urogynecologist Dr. Kathy Jones in 2012–2013. **Ex. E** at 25:8–26:13, 28:14–29:5. Ms. Bayless signed extensive consent forms which identified the risks associated with the pelvic floor surgery and, specifically, the risks associated with the surgical implantation of a synthetic mesh sling like the Advantage Fit. Deposition of Raeann Bayless, dated June 6, 2018, attached as **Exhibit G**, at 85:3–86:4 and Ex. 2 thereto (attached as **Exhibit H** to this submission). The signed consent forms warn of *every* complication that Ms. Bayless (and her expert) now complain of in this lawsuit—vaginal exposure/erosion, infection, bleeding, and dyspareunia (painful intercourse). **Ex. H** at 1, 4–5. In addition to the consent forms, Dr. Jones testified that she discussed the risks and benefits of the Advantage Fit sling with Ms. Bayless at every encounter, and would have discussed the risks in detail at the preoperative appointment. **Ex. E** at 31:21–25, 32:15–33:4. Despite being warned of the risks associated with the pelvic floor surgery and medical devices, Ms. Bayless opted to undergo surgery utilizing the Advantage Fit and Restorelle Y. **Ex. E** at 27:21–29:5, 31:12–15; **Ex. G** at 82:6–83:13.

On August 9, 2013, Dr. Jones performed two procedures: one to address Ms. Bayless's pelvic organ prolapse (POP) and another to address her SUI. For reference, the normal anatomy (without Ms. Bayless's issues) is as follows:



First, to address Ms. Bayless's POP, Dr. Jones used laparoscopic abdominal surgery to perform several procedures, including hysterectomy (removal of the uterus and cervix, which had been prolapsing into the vaginal canal), anterior colporrhaphy (repair of the cystocele with sutures), and "sacrocolpopexy" (a procedure to preserve the vagina's position within the abdomen after removal of the uterus and cervix, keeping the vaginal vault from collapsing).[2] **Ex. E** at 79:7–20, 97:21:25, 105:6-10; **Ex. F** at BAYLESSR_PLTF_000031-32, 000056-58, 000065-69. The sacrocolpopexy was performed using Coloplast's Restorelle Y-mesh, a forked ribbon of polypropylene mesh. In this procedure, after the uterus and cervix are cut away from their supporting ligaments and from the muscular tube of the vagina and removed, the cut edges

---

[2] The term "sacrocolpopexy" looks daunting, but just means tethering ("-pexy") the vagina ("-colpo-") to the tailbone ligament ("sacro-").

of the top (or "cuff") of the vaginal canal are sewn (sutured) together to close the apex; then the two arms of the Y-mesh are sutured to the front (anterior) and back (posterior) surfaces of the vagina near the apex; and finally the tail of the Y-mesh is sutured to the sacral (tailbone) ligament, to flexibly suspend the vagina within the abdomen, restoring the vagina to its normal position. **Ex. E** at 105:21–111:21; **Ex. F** at BAYLESSR_PLTF_000055, 000066–67. These procedures, including repair of uterine prolapse, are illustrated and described in a brochure prepared by the American Urogynecologic Society, attached as **Ex. I** (available at https://www.voicesforpfd.org/assets/2/6/Sacrocolpopexy.pdf).Second, to relieve Ms. Bayless's SUI (urine leakage), Dr. Jones performed a transvaginal procedure, which was simpler and completely separate from the abdominal procedures used to treat her prolapse issues. Using a tiny vaginal incision between Ms. Bayless's labia and next to her urethral opening, Dr. Jones implanted an Advantage Fit midurethral sling under her urethra to support it. **Ex. F** at BAY-LESSR_PLTF_000068. This procedure is illustrated and described in a brochure prepared by the American Urogynecologic Society, attached as **Exhibit J** (available at https://www.voic-esforpfd.org/assets/2/6/Mid-urethral_Sling.pdf).

Plaintiff's first post-operative visit—occurring six weeks after surgery—notes that Ms. Bayless's incision at the top of the vaginal canal (where the Coloplast Restorelle Y product had been placed) had not healed. **Ex. F** BAYLESSR_PLTF_00214–00216. Ms. Bayless there-after intermittently complained to her health care providers of pain near the top of her vagina or abdomen, vaginal bacterial infections, and irregular bleeding after intercourse. **Ex. F** at BAYLESSR_BHA_MDR00004–00017    and    00034–00046;    BAYLESSR_PARRMC_

MDR00045–00051, 00116–00122, and 00177–00180. To date, Plaintiff has produced no evidence of undergoing any additional surgeries related to her pelvic complaints.

Plaintiff now contends that she suffers from mesh exposure or erosion in her vagina, which causes pain, infections, and bleeding with intercourse. **Ex. G** at 52:20–23, 102:13–103:11, 110:10–111:25; Plaintiff Amended Fact Sheet, attached as **Exhibit K**, at 7–8.

### C.    Procedural history.

Plaintiff filed her Complaint in MDL 2326 on February 5, 2016 (Doc. 1). After transfer to this Court, Plaintiff withdrew her Breach of Express Warranty and Breach of Implied Warranty claims (Doc. 97), and has now agreed to drop her manufacturing defect claims (Counts I and III) and Count VII (*see* n.1 above), leaving the following claims against both defendants: Negligence (Count I); Strict Liability – Design Defect (Count II); Strict Liability – Failure to Warn (Count IV); and Punitive Damages (Count IX). This Court authorized the parties to depose case-specific experts and set a deadline of October 1, 2020 for dispositive and *Daubert* motions (Doc. 98). Fact and expert discovery is now closed.

### D.    Plaintiff's expert testimony on specific causation.

Plaintiff has disclosed one expert, Dr. Bruce Rosenzweig, to opine on specific causation. *See* Plaintiffs' Designation and Disclosure of Case-Specific Expert Witnesses, attached as **Exhibit L**. Boston Scientific requested Dr. Rosenzweig's deposition on this report during the MDL proceedings (*see* Boston Scientific's Notice of Videotape Deposition Duces Tecum of Dr. Bruce Rosenzweig, dated Oct. 3, 2018, attached as **Exhibit M**), but Dr. Rosenzweig was not produced for deposition about his case-specific opinions until August 17, 2020, after remand. *See* **Ex. D.** In his case-specific report, Dr. Rosenzweig states that based on his review

of Ms. Bayless's medical records, she has suffered "mesh erosions/exposures, vaginal bleeding and infection" resulting from **both** the Coloplast Restorelle Y-mesh used in her POP surgery and the Boston Scientific Advantage Fit sling used in her SUI surgery. Rosenzweig case-specific report, **Ex. C** at 9–10. At his August 17, 2020 deposition, however, Dr. Rosenzweig testified that the mesh exposure and other issues involved **only** the Restorelle Y-mesh (used at the apex of the vagina), and not the Advantage Fit mesh sling (implanted under the urethra in the distal area of the vagina near its opening). **Ex. D** at 207:12–209:22; 213:7–15. Specifically, Dr. Rosenzweig testified:

> [The erosion was] at the apex. More likely than not that was the Restorelle Y-mesh.
> . . . .
> [M]ore likely than not the erosions, the vaginal discharge and the bleeding is from the Restorelle Y-mesh.
> . . . .
> She had no problems healing the site where the [Advantage Fit] sling was placed, [or] where the ports were placed for the robotic surgery. The only place where she did not — where she had mesh exposure . . . was with the Restorelle Y-mesh.
> . . . .
> The only finding was that there was mesh erosion from the Y-mesh.

*Id.* at 207:24–208:1, 209:16–18, 213:10–15, 221:8–9. Dr. Rosenzweig repeatedly testified that the incision at the apex of Ms. Bayless's vagina—where its cut edges were sutured together after removal of the uterus and cervix—separated, exposing the Restorelle Y mesh. *Id.* at 151:17–18, 177:2–15, 181:1–22. He also testified that there was erythema (redness, inflammation) **only** where the Restorelle Y was attached. *Id.* at 292:22–293:22. With respect to the Advantage Fit, Dr. Rosenzweig agreed that Ms. Bayless was "quite satisfied with the sling surgery." *Id.* at 294:23. Although he believed that the Advantage Fit contributed "secondarily" to

Plaintiff's claimed dyspareunia (painful intercourse) as a "minimal contributor" (*id*. at 211:1–8, 287:4–9, 290:9–291:3), he acknowledged that "[t]here is no specific medical record or testimony that links the dyspareunia to the Advantage Fit." *Id.* at 295:7–8.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Not every factual dispute will prevent summary judgment: there must at a "*genuine* dispute of *material* fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (emphasis in original). Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations or unsupported speculation is insufficient to preclude the granting of a summary judgment motion. *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## III.   ARGUMENT

### A.   Plaintiff cannot establish specific causation as to any of her claims.

To prevail on claims of negligence and strict liability, Plaintiff must establish both that the product was defective and that that defect was the proximate cause of her injuries. *Dimieri v. Medicis Pharms. Corp.*, 2014 WL 3417364, at *5 (M.D. Fla. July 14, 2014) (Polster

Chappell, J.) (dismissing failure to warn, design defect and manufacturing defect claims for lack of proof of injury-causing defect). With respect to the causation element, a plaintiff must show both that exposure to the product can cause a particular injury (general causation), and that exposure to the product was a cause of her individual injury (specific causation). *Guinn v. AstraZeneca Pharm. LP,* 598 F. Supp. 2d 1239, 1242 (M.D. Fla. 2009) (Conway, J.) ("*Guinn I*"), *aff'd*, 602 F.3d 1245 (11th Cir. 2010) ("*Guinn II*"). Thus, in this action, Ms. Bayless must establish that the Advantage Fit can generally cause the kinds of injuries she complains of and that the Advantage Fit was in fact a specific cause of her complaints. Because causation here involves complex medical questions, Plaintiff must prove causation through expert testimony. *Salinero v. Johnson & Johnson*, 400 F. Supp. 3d 1334, 1343 (S.D. Fla. 2019). Causation must be proved "to a reasonable degree of medical certainty." *Small v. Amgen, Inc.,* No. CV 2:12-476-PAM-MRM, 2017 WL 5444003, at *3 (M.D. Fla. Mar. 22, 2017) (Magnuson, J.), *aff'd,* 723 F. App'x 722 (11th Cir. 2018).

Plaintiff's sole expert on the issue of specific causation is Dr. Bruce Rosenzweig. If the Court excludes Dr. Rosenzweig's case-specific opinions based upon Boston Scientific's Motion to Exclude filed contemporaneously with this motion, summary judgment should be granted in favor of Boston Scientific. *Guinn II*, 602 F.3d at 1256 (upholding summary judgment based upon the exclusion of the Plaintiff's sole expert as to specific causation).

Even if the Court rules that Dr. Rosenzweig's opinions are admissible under *Daubert*, summary judgment should nonetheless be granted because his testimony does not create a genuine issue of material fact with regard to specific causation. *See Guinn II*, 602 F.3d at 1256. Under Florida law, the mere possibility that a product caused Plaintiff's injury is not enough.

*McCasland v. Pro Guard Coatings, Inc.*, No. 8:17-CV-990-T-27AEP, 2018 WL 5786164, at *2 (M.D. Fla. Nov. 5, 2018) (Whittemore, J.), *aff'd*, 799 F. App'x 731 (11th Cir. 2020). Rather, "Florida courts follow the 'more likely than not standard for causation in products liability actions.'" *Id. See also Cox v. St. Josephs Hosp.*, 71 So. 3d 795, 799–800 (Fla. 2011) ("Florida follows the 'more likely than not' standard in proving causation," and this standard "applies to medical experts."). Plaintiff must therefore prove causation by "evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a *substantial factor* in bringing about the result." *McCasland*, 2018 WL 5786164, at *2. (emphasis in original) (citing *Guinn I*, 598 F. Supp. 2d at 1242); *Guinn II*, 602 F.3d at 1256 (citing *Gooding v. Univ. Hosp. Bldg.*, 445 So. 2d 1015, 2018 (Fla. 1984)). When a plaintiff is unable to establish that the product was **more likely than not a substantial factor** in bringing about the Plaintiff's injury, summary judgment should be granted in favor of the defendant. *Guinn II,* 602 F.3d at 1257.

Although Dr. Rosenzweig opined in his expert report that Plaintiff's injuries were caused by mesh erosion of both the Advantage Fit and Restorelle Y, **Ex. C** at 9 ¶ 1, he conceded at his deposition that nothing in Plaintiff's medical records links any of her complaints to Boston Scientific's Advantage Fit sling. *Id.*; **Ex. D** at 294:23, 295:7–8. When asked in deposition whether he "attribute[d] Ms. Bayless's alleged symptoms to both the Advantage Fit and the Restorelle Y-mesh," he testified that "more likely than not the erosions, the vaginal discharge and the bleeding is from the Restorelle Y-mesh." **Ex. D** at 207:24–208:1, 209:16–18, 213:10–15, 221:8–9.

As for Plaintiff's claim of dyspareunia/painful intercourse (which is not mentioned in Dr. Rosenzweig's report), he posited at his deposition that the Advantage Fit may be a "minimal contributor" to that condition, *id.* at 211:1–8, 287:4–9, 290:9–291:3, but not a substantial factor as the law requires. *See McCasland,* 2018 WL 5786164, at *2. And Dr. Rosenzweig further conceded that "[t]here is no specific medical record or testimony that links the dyspareunia to the Advantage Fit." *Id.* at 295:7–8.

At bottom, Dr. Rosenzweig never testified that the Advantage Fit was "more likely than not" a "*substantial* factor" in causing *any* of Ms. Bayless's alleged injuries. He testified the **opposite:** that the Advantage Fit sling did not cause mesh erosions/exposures, vaginal bleeding, or infection at all, and that it was at most "a minimal contributor" to the (improper) new claim of dyspareunia.[3] **Ex. D** at 200:19–22. In fact, he acknowledged that Ms. Bayless was "quite satisfied with the sling surgery." *Id.* at 294:23. Because Plaintiff's sole expert on specific causation has not opined and cannot opine that the Advantage Fit was **more likely than not a substantial factor** in bringing about the Plaintiff's claimed injuries, summary judgment should be granted in favor of Boston Scientific.

---

[3] Dr. Rosenzweig's opinion about dyspareunia is improper because it was not disclosed in his Case-Specific Report. Fed. R. Civ. P. 26(a)(2)(B) requires expert reports to include "a complete statement of all opinions the witness will express and the basis and reasons for them," and Rule 26(a)(2)(D) and 26(e)(2) require supplementation. Offering new opinions in deposition is untimely. *See, e.g.*, *Romero v. Drummond Co.,* 552 F.3d 1303, 1323 (11th Cir. 2008) Indeed, Ms. Bayless herself did not even list dyspareunia on her Plaintiff Fact Sheet (**Ex. K**) as one of her claimed injuries, and in fact she told her doctors that she experienced dyspareunia before her August 9, 2013 surgery. *See* **Ex. F** at BAYLESSR_PLTF_000203. In any event, a "minimal contributor" is far less than a "substantial causative factor."

**B.**   **Plaintiff's failure-to-warn claims against Boston Scientific fail as a matter of law.**

Plaintiff's claims based on strict liability and negligent failure to warn fail as a matter of law because (1) Boston Scientific owed no duty to warn Plaintiff directly; (2) its warnings to Plaintiff's surgeon were adequate as a matter of law; and (3) and Plaintiff cannot establish that any alleged inadequate warnings were the proximate cause of her alleged injuries.

**1.**   **Boston Scientific did not owe a duty to warn Plaintiff directly.**

Under Florida's "learned intermediary doctrine," a medical device manufacturer's duty to warn runs to the physician, not to the patient. *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir. 1995); *Baker v. Danek Med.*, 35 F. Supp. 2d 875, 881 (N.D. Fla. 1998); *Buckner v. Allergan Pharm., Inc.*, 400 So. 2d 820, 822-23 (Fla. 5th DCA 1981). To the extent Plaintiff alleges that Boston Scientific owed and breached a duty to warn her directly of the potential risks associated with the Advantage Fit, that claim fails because a prescription medical device manufacturer has no duty to warn a patient directly. *See, e.g., Cutter Labs.*, 53 F.3d at 1192; *Buckner*, 400 So. 2d at 822. A prescription medical device manufacturer like Boston Scientific owes a duty to warn only the prescribing physician of potential risks associated with the device's use, and it is up to the physician to communicate those risks to the patient. *Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) (holding that the "manufacturer's duty to warn of the drug's dangerous side effects is directed to the physician rather than the patient"); *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1365-70 (S.D. Fla. 2007).

### 2.   The Advantage Fit DFU unambiguously warned Dr. Jones of the complications alleged by Ms. Bayless.

To establish a failure-to-warn claim, "a plaintiff must show (1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact suffered an injury from using the product." *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321 (11th Cir. 2017). When the claim involves a prescription medical product, a plaintiff must present sufficient expert testimony as to how the manufacturer's warnings were inadequate. *Nunez v. Coloplast Corp.*, — F. Supp. 3d —, 2020 WL 2561364, at *3 (S.D. Fla. May 20, 2020). However, the question of the adequacy of warnings can be resolved as a matter of law "where the warning is accurate, clear, and unambiguous." *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 105 (Fla. 1989); *Nunez*, 2020 WL 2561364, at *3.

Whether a failure-to-warn claim is grounded in strict liability or negligence, the critical inquiry "is whether [the warning] was adequate to warn *the physician* of the possibility that the [medical device] may cause the injury alleged by the plaintiff." *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1367 (M.D. Fla. 2015) (Steele, J.) (emphasis added) (citing *Upjohn*, 562 So. 2d at 683), *aff'd*, 723 F. App'x 722 (11th Cir. 2018).

The undisputed facts show that Boston Scientific adequately warned Plaintiff's surgeon, Dr. Jones, of the risks associated with the Advantage Fit sling, including the very injuries claimed by Plaintiff. Plaintiff's claimed injuries include mesh exposure, infection, bleeding, pain, and dyspareunia (painful intercourse). **Ex. G** at 52:20-23, 102:13-103:11, 110:10-111:25; **Ex. K** at 7–8. The Advantage Fit DFU—which was provided with the packaging of each Advantage Fit sling and publicly available—warns of ***all*** these risks, among other potential complications. *See* **Ex. B** at 7 (listing infection, pelvic and vaginal pain, vaginal bleeding,

dyspareunia, incontinence, inflammation, and erosion). Because the Advantage Fit DFU warned of the complications that Plaintiff claims she experienced with the Advantage Fit sling, the warnings are adequate as a matter of law, and Boston Scientific is entitled to summary judgment. *Felix*, 540 So. 2d at 102; *Beale*, 492 F. Supp. 2d at 1369; *Nunez*, 2020 WL 2561364, at *4 (granting summary judgment on failure to warn claims where the court "reviewed the [Instructions for Use] extensively and f[ound] them to be adequate as a matter of law").

### 3.   Any alleged inadequacies in Boston Scientific's warnings were not the proximate cause of Plaintiff's injuries.

Even if this Court declines to find that the Advantage Fit warnings were adequate as a matter of law, Plaintiff's failure-to-warn claims nonetheless fail because any alleged inadequacy in the warnings did not affect Dr. Jones's use of the medical device. "[T]he adequacy of the warning is irrelevant if the prescribing physician . . . has knowledge of the risks and benefits of the drug and would have prescribed the drug anyway had the warnings been different." *Chase v. Novartis Pharm. Corp.*, 740 F. Supp. 2d 1295, 1296-97 (M.D. Fla. 2006) (Lazzara, J.); *see also Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1335 (M.D. Fla. 2015) (Morales Howard, J.) ("failure of the manufacturer to provide the physician with an adequate warning is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that an adequate warning should have communicated").

Here, the undisputed evidence demonstrates that Dr. Jones knew of the risks and benefits associated with the Advantage Fit sling—gathered over 20 years of implanting the Advantage Fit sling and other polypropylene mesh slings—and additional warnings would not have changed her decision to utilize the Advantage Fit to treat Plaintiff's SUI.

15

**First**, Dr. Jones' deposition testimony establishes her extensive knowledge of the risks and potential complications associated with the Advantage Fit sling based on information sources other than Boston Scientific. These sources included her personal experience implanting slings; her training of other physicians on how to implant mesh slings; her training alongside other physicians; and continuing medical education. *See* **Ex. E** at 20:1–2; 21:4–8 (Dr. Jones has implanted over 500 slings over her 20-year career), 24:1–2, 127:8-14.

Dr. Jones testified that she was aware of the risks associated with the Advantage Fit sling, including the precise risks that Plaintiff claims to have experienced here. *See id*. at 31:21–25, 32:15–25, 33:21–34:3, 65:8–11 (testifying about the risk associated with cigarette smoking), 127:25–128:17 (identifying risk of continued SUI, urinary retention, erosion, exposure pain, and dyspareunia). Dr. Jones also testified that she informed Plaintiff of the risks associated with implantation of the Advantage Fit sling and that she believed Ms. Bayless understood all the potential risks. *Id.* at 133:21–134:12; *see also* **Ex. H** (signed consents). Dr. Jones also testified that it was her routine to read and relay to patients the 2011 FDA warnings related to the use of polypropylene mesh in pelvic surgeries. **Ex. E** at 132:2–8 (available online at 2011 FDA Safety Communication).

Furthermore, the consent forms provided by Dr. Jones—and signed by Ms. Bayless—unequivocally establish that Dr. Jones was aware of the risks associated with the implantation of polypropylene mesh slings like the Advantage Fit. **Ex. H**. The signed consent form titled "Augmentation Graft Consent Form" provides as follows:

> In the case of synthetic mesh, this material is permanent and is routinely used in general surgery to repair abdominal wall hernias. **When mesh is used in gynecological surgery, there is a 5-10% chance that this mesh can cause delayed healing and**

> **eventually erode into the vagina, requiring a second surgery
> to remove it.**

**Ex. H** at 6 (emphasis in original). Other signed consent forms warn of numerous risks including bleeding, infection, pain with sexual intercourse, damage to the urinary system, worsening incontinence, and even death. **Ex. H** at 1, 4–5. At bottom, these consent forms provided by Dr. Jones to Plaintiff establish that Dr. Jones was aware of the risks associated with the Advantage Fit. Dr. Jones's independent knowledge of the risks forecloses any conclusion that any alleged failure to warn by Boston Scientific proximately caused Plaintiff's injuries. *See Small*, 134 F. Supp. 3d at 1371–72 ("[A]ny representations made by defendants' sales representative are irrelevant if [prescribing doctor] had independent knowledge of the possibility that [defendant] could cause the injuries sustained by [plaintiff]. [Plaintiff's doctor's] testimony clearly shows that she knew of the risks associated with Enbrel before she spoke to the sales representative."); *Baker*, 35 F. Supp. 2d at 881–82 (granting summary judgment on failure-to-warn claims where implanting surgeon "was fully aware of all the risks and benefits of implant[ing] the defendant's devices" based on his extensive training and experience with the product).

     **Second**, Plaintiff is also unable to demonstrate that the disclosure of any additional risks by Boston Scientific would have changed Dr. Jones's prescribing decision. On the contrary, Dr. Jones testified that that any additional warning would ***not*** have changed her decision to prescribe the Advantage Fit sling for Plaintiff's SUI. **Ex. E** at 40:5–21. Dr. Jones testified that her risk-benefit conversation in 2008-09 is the same risk-benefit discussion she would have had in 2014–15. *Id.* at 34:8–19. Appreciating the known risks, Dr. Jones believed that Plaintiff "was a candidate for these procedures." *Id.* at 28:20–29:5. This is because the

Advantage sling was not only "an appropriate treatment option for Ms. Bayless," but the "gold standard" for treatment of SUI. *Id*. at 31:21–25, 125:10–16; 125:17–126:6.

In sum, summary judgment should be entered on Plaintiff's failure-to-warn claims because Dr. Jones was aware of the risks associated with the Advantage Fit; Dr. Jones rejected any notion that additional warnings would have altered her selection of the product; and Dr. Jones believed—and continues to believe—that the Advantage Fit and similar polypropylene mesh midurethral slings are the gold standard for treatment of SUI. *See Timmons v. Purdue Pharm. Co.*, No. 8:04-CV-1479-T-26MAP, 2006 WL 263602, at *4 (M.D. Fla. Feb. 2, 2006) (Lazzara, J.) (summary judgment was appropriate when plaintiffs' treating physicians did not "purport to say that had the written warnings and promotional materials contained different [warnings], it would have made a difference in their selection" of treatment); *Beale*, 492 F. Supp. 2d at 1371 (where surgeon testified "he was aware of all the risks associated with the device, and that he believed — and still believes — that the Plaintiffs were appropriate candidates for the device . . . the causal link is broken" and failure-to-warn claims fail as a matter of law).

### C.    Plaintiff's punitive damages claim fails under Massachusetts law.

The Court should reject Plaintiff's punitive damages claim (Count IX). Under Florida's choice-of-law rules, Plaintiff's punitive damages claim is governed by Massachusetts law, and Massachusetts prohibits punitive damages unless expressly authorized by statute. Because no Massachusetts statute provides for recovery of punitive damages in an action alleging product liability, Plaintiff's punitive damages claim fails as a matter of law.

1.      **Massachusetts law governs punitive damages.**

Under Florida's choice-of-law rules (applicable in diversity), punitive damages are governed by the law of the state where the defendant was headquartered and made its decisions concerning the design, labeling, marketing, and distribution of the product. *Salinero*, 400 F. Supp. 3d at 1357. The U.S. District Court for the Southern District of Florida (Judge Ursula Ungaro) recently reached this result in the *Salinero* pelvic mesh case. *Id.*

*Salinero* recognized that in a diversity case the Court must apply Florida's conflict of law principles in determining which state's law applies, and that Florida has adopted the "significant relationship test" set forth in the Restatement (Second) of Conflict of Laws §§ 145–146. *Salinero*, 408 F. Supp. 3d at 1356. Under that test, the Court must (1) "identify the sovereigns with interests in applying their laws to the . . . dispute," (2) determine whether a true conflict exists between the laws of the interested jurisdictions, and if so (3) "determine which sovereign's interest is the most 'significant.'" *Id.* at 1356–57.

On the first two prongs, the Court concluded that the states interested in the punitive damages issue, whose laws conflicted, were Florida (where the plaintiff resided and the mesh was implanted) and New Jersey (where the defendant was headquartered and conducted its "corporate activities and decision-making as to the design, labeling, marketing, and distribution of [the mesh]"). *Id.* On the third prong, the Court held that, in determining which state's interest is the most significant, it must consider "'the purpose sought to be achieved by the rule of tort law involved" and "[i]f this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule

is designed primarily to compensate the victim for his injuries.'" *Id.* at 1357 (quoting Restatement (Second) of Conflict of Laws § 145, cmt. e). The Court concluded that "[b]ecause punitive damages are meant to deter or punish misconduct, the state where the allegedly defective product was designed and manufactured—that is, New Jersey—has a superior interest here." *Id.*

   *Salinero* cited several cases reaching the same conclusion in similar circumstances: *Dopson-Troutt v. Novartis Pharms. Corp.*, No. 8:06-CV-1708-T-24-EAJ, 2013 WL 3808205 at *4 (M.D. Fla. July 22, 2013) (Bucklew, J.); *Krause v. Novartis Pharms. Corps.*, 926 F. Supp. 2d 1306, 1310–12 (N.D. Fla. 2013); *Bellew v. Ethicon, Inc.*, No. 2:13-cv-22473, 2014 WL 6674433, at *2 (S.D.W. Va. Nov. 24, 2014) (applying Arizona conflicts-of-law principles, also based on the Second Restatement, and concluding that New Jersey law applies to punitive damages claims); and *Lewis v. Ethicon, Inc.* (*In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*), MDL No. 2327, Nos. 2:12-MD-02327, 2:12-cv-4301, 2014 WL 186869, at *9–10 (S.D.W. Va. Jan. 15, 2014) (applying Texas conflicts-of-law principles, also based on the Second Restatement, and concluding that New Jersey law applies to punitive damages claims), *rev'd in part on other grounds*, 2014 WL 457551 (S.D.W. Va. Feb. 3, 2014). *See Salinero*, 408 F. Supp. 3d at 1357–58. The discussion of this issue in *Krause* (also involving a medical product) is especially pertinent:

   > Defendant argues that although the injuries occurred in Florida, and thus compensatory damages are governed by Florida law, New Jersey has a more significant relationship to the issue of punitive damages than Florida because the conduct giving rise to the claim seeking to punish the defendant for a failure to warn occurred at its place of business. The court agrees that this factor favors application of New Jersey law on this issue, because, in relation to the issue of punitive damages, the relevant misconduct occurred in New Jersey and the place where the injury occurred is "simply fortuitous" to the failure to warn

claim. . . . The corporate decisions with respect to labeling, packaging, and warning were made at the corporation's offices in New Jersey, and thus the conduct relevant to the claim of failure to warn or to educate . . . medical professionals . . . occurred in New Jersey. . . .

Other courts that have applied the Restatement (Second) Conflict of Laws analysis in similar circumstances have chosen to apply the punitive damages law of the state in which the tortfeasor's alleged wrongful conduct occurred as having the most significant relationship. . . . The court finds the reasoning articulated in these cases to be sound. Moreover, it is consistent with commentary of the Restatement, which instructs, "when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." Restatement (Second) Conflict of Laws § 145, cmt. e.

*Krause*, 926 F. Supp. 2d at 1310–12 (case citations omitted).

Many other Florida federal diversity cases with similar circumstances have applied the same reasoning to choose the punitive damages law of the state where the defendant's alleged conduct occurred. *See Davis v. Main St. Family Pharmacy, LLC,* No. 5:16CV45-MW/GRJ, 2017 WL 3597509, at *2 (N.D. Fla. Apr. 4, 2017) ("The alleged misconduct to be punished by a punitive-damage award—that is, Defendant's decisions as to the manufacturing, labeling, and [other] efforts—all occurred in Tennessee. . . . Thus, despite the fact that Plaintiff's injuries occurred in Florida, the state with the most significant relationship to the punitive-damages issue in this case is Tennessee."); *Kirchman v. Novartis Pharm. Corp.*, No. 8:06-CV-1787-T-24, 2014 WL 2722483, at *4 (M.D. Fla. June 16, 2014) (Bucklew, J.); *Dopson-Troutt*, 2013 WL 3808205, at *4; *Guenther v. Novartis Pharm. Corp.*, No. 6:08-CV-456-ORL-31, 2013 WL 1225391, at *2 (M.D. Fla. Mar. 27, 2013) (Presnell, J.); *Chiles v. Novartis Pharm. Corp.*, 923 F. Supp. 2d 1330, 1333 (M.D. Fla. 2013) (Adams, J.).[4] This conclusion faithfully follows the

---

[4] *Eghnayem v. Bos. Sci. Corp.,* No. 2:13-CV-07965, 2014 WL 5386731, at *3–5 (S.D.W. Va. Oct. 21, 2014), in applying Florida's choice-of-law rules, reached the opposite conclusion from

Second Restatement's directive that "when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." Restatement (Second) of Conflict of Laws § 145, cmt. e.

Here, there is no dispute that Boston Scientific is headquartered in Massachusetts (*see* Master Long Form Complaint at ¶ 3, Attachment 4 to MDL Doc. 60 and attached hereto as **Exhibit N)**, where it made all the decisions regarding the design and warnings regarding the Advantage Fit sling at issue. Nor is there any dispute that a true conflict exists between Florida and Massachusetts law regarding punitive damages. Florida law allows punitive damages, subject to caps. Fla. Stat. § 768.72–73. Massachusetts law allows punitive damages only if expressly authorized by statute. *Flesner v. Tech. Commc'ns Corp.*, 410 Mass. 805, 813 (1991). As discussed below, no such Massachusetts statute applies here.

A jurisdiction may have the most significant interest even if it does not allow punitive damages. *See Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1570–71 (11th Cir. 1990) (recognizing that defendant's home state of Michigan, which does not allow punitive damages, "has a strong interest in applying its rules" since its "punitive damage prohibition is informed by the economic desire to 'encourage socially useful enterprise by relieving entrepreneurs from what the legislature regards as an oppressive risk of liability.'") (quoting B. Currie, Selected Essays on the Conflict of Laws 704 (1963)); *Sergeon v. Gen. Motors Corp.*, No. 3:04CV301J99HTS, 2005 WL 1711093, at *4 (M.D. Fla. July 20, 2005) (Schlesinger, J.) ("Michigan law, which bars punitive damages, must be applied to this case" under Florida choice-of-law rules, when the alleged defective design occurred in Michigan). That is true here.

---

these Florida federal district courts.

Massachusetts protects its citizens, including its manufacturers, from punitive damages under common law. *Int'l Fid. Ins. Co. v. Wilson,* 443 N.E.2d 1308, 1317 n.20 (Mass. 1983). Punitive damages are available only if expressly authorized by statute, which, as explained *infra*, is not the case here. *See id.* (holding "under Massachusetts law, punitive damages may be awarded only by statute"); Mass. G.L. c. 93A, § 9 (authorizing exemplary damages under the Consumer Protection Act in certain actions for unfair and deceptive trade acts involving fraud and concealment, and requiring pre-suit notice); Mass. G.L. c. 229 (authorizing punitive damages under wrongful death statute for gross negligence or malicious, willful, wanton, or reckless conduct). This "tort rule" is designed to protect Massachusetts's citizens "from excessive liability and thus to encourage businesses to locate and conduct economic affairs in the jurisdiction." *Freeman v. World Airways, Inc*., 596 F. Supp. 841, 846 (D. Mass. 1984).

Citizens of Massachusetts, like Boston Scientific, therefore "reasonabl[y] expect[] that Massachusetts law [will] govern [their] conduct and risk." *Dean ex rel. Estate of Dean v. Raytheon Corp*., 399 F. Supp. 2d 27, 33 (D. Mass. 2005). "Under § 6 of the Restatement, respect should be given to a policy decision of the state of the alleged misconduct as to when to permit punitive damages and when to deny them." *Id*. (domiciliary state's interest in the issue of punitive damages is generally regarded as weaker than its interest in compensatory damages); *see In re Air Crash Disaster Near Chi., Ill.,* 644 F.2d 594, 612–13 (7th Cir. 1981) ("[D]omiciliary states [do not] have an interest in imposing punitive damages on the defendants. The legitimate interests of these states, after all, are limited to assuring that the plaintiffs are adequately compensated . . . ."); *Emmart v. Piper Aircraft Corp.*, 659 F. Supp. 843, 846 (S.D. Fla. 1987) (Florida has no interest in punishing a foreign corporation where the majority of its conduct

underlying plaintiff's request for punitive damages did not occur in Florida); *Chiles*, 923 F. Supp. at 1332–33 (granting defendant's motion to apply New Jersey law because the relevant conduct at issue primarily took place in New Jersey).

This Court should adopt the same reasoning applied by the Court in *Salinero* (and many other Florida federal courts) and find that Massachusetts law, not Florida law, governs Plaintiff's claims for punitive damages.

> ## 2.   Massachusetts law does not authorize an award of punitive damages under these circumstances.

Massachusetts law does not permit an award of punitive damages "unless expressly authorized by statute." *Flesner*, 575 N.E.2d at 1112. No Massachusetts statute provides for recovery of punitive damages in an action alleging product liability. Therefore, punitive damages are barred unless brought along with a concomitant claim for wrongful death under Massachusetts General Laws chapter 229, Section 2, or a concomitant claim for unfair and deceptive acts or practices under the consumer protection statute, Massachusetts General Laws chapter 93A.

Under the Massachusetts wrongful death statute, punitive damages are permitted "where the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant." *Alea v. SLB Toys USA, Inc.*, 995 N.E.2d 740, 753–54 (Mass. 2013) (internal citations omitted). This statute is inapplicable here.

To assert a claim under the Massachusetts consumer protection statute, a plaintiff must show unfair and deceptive trade practices that are "willful and knowing" or show that "refusal to grant relief [as requested in a pre-suit demand letter] was made in bad faith with knowledge or reason to know that the act or practice complained of violated [chapter 93A]." Mass. Gen.

Laws Ann. Ch. 93A, § 9. Plaintiff has not pled a claim under chapter 93A. All of her substantive claims (negligence, strict liability design defect, and strict liability failure-to-warn) have been pled under, and are governed by, Florida substantive law.

Nor could she assert a Massachusetts consumer protection claim. A plaintiff who brings a product liability action under chapter 93A must send the prospective defendant a demand letter at least 30 days before filing suit. Mass. Gen. Laws Ann. Ch. 93A, § 9(3). Failure to send a demand letter is an absolute defense in a Consumer Protection Act claim. *Heller v. Silverbranch Constr. Corp.*, 382 N.E.2d 1065, 1070 (Mass. 1978); *Nader v. Citron*, 360 N.E.2d 870, 873–75 (Mass. 1977) (abrogated on other grounds); *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 204 (Mass. 1975) ("A demand letter . . . is a prerequisite to suit . . . , the absence of which is a bar to suit."). Here, no demand letter was sent before the Plaintiff filed suit in 2019. Thus, under Massachusetts law, punitive damages are not authorized in this case.

## CONCLUSION

For these reasons, the Court should grant Boston Scientific's Dispositive Motion for Summary Judgment on each of the remaining claims in Plaintiff's Short Form Complaint.

Dated: October 1, 2020.

*/s/ Traci T. McKee*
Traci T. McKee, Esq., Attorney No. 53088
FAEGRE DRINKER BIDDLE & REATH LLP
1050 K Street NW, Suite 400
Washington, DC 20001
Telephone: (202) 312-7028
traci.mckee@faegredrinker.com
*Admitted only in Florida; supervision by principals of the firm admitted to the D.C. bar*

**Attorneys for Defendant**
**Boston Scientific Corporation**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 1, 2020, I filed the foregoing in the CM/ECF

system, which will serve electronic copies upon all counsel of record.

/s/ ***Traci T. McKee***_____

Traci T. McKee, Esq., Attorney No. 53088

## LIST OF EXHIBITS

A.  Advantage Fit FDA Clearance Letter (BSCM00100000002-04)

B.  Advantage Fit System Directions for Use (BSCM00800000546-597)

C.  Dr. Bruce Rosenzweig's Case-Specific Expert Report (June 4, 2018)

D.  Deposition of Dr. Bruce Rosenzweig (Aug. 17, 2020)

E.  Deposition of Kathy Jones, M.D. (Sept. 12, 2018)

F.  Medical records (excerpts), including Aug. 9, 2013 Operative Report

G.  Deposition of Raeann Bayless (June 6, 2018)

H.  Surgical consent forms signed by Raeann Bayless (Ex. 2 to Deposition of Raeann Bayless)

I.  AUGS (American Urogynecologic Society) brochure, "Sacrocolpopexy" (available at https://www.voicesforpfd.org/assets/2/6/Sacrocolpopexy.pdf)

J.  AUGS (American Urogynecologic Society) brochure, "Mid-urethral Sling for Stress Urinary Incontinence" (available at https://www.voicesforpfd.org/assets/2/6/Mid-urethral_Sling.pdf)

K.  Amended Plaintiff Fact Sheet

L.  Plaintiffs' Designation and Disclosure of Case-Specific Expert Witnesses (July 13, 2018)

M.  Boston Scientific's Notice of Videotape Deposition Duces Tecum of Dr. Bruce Rosenzweig (Oct. 3, 2018)

N.  Master Long Form Complaint filed in MDL 2326 (Doc. 60, attachment 4)