# EXHIBIT D

Bruce Rosenzweig, M.D.

1            IN THE UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                  ORLANDO DIVISION

4

5    RAEANN BAYLESS,              )

6              Plaintiff,   )

7       -vs-                 ) Case No.

8    BOSTON SCIENTIFIC CORP.    ) 6:20-cv-00831-RBD-GHK

9    and COLOPLAST CORP.,       )

10             Defendants. )

11

12                  August 17, 2020

13        DEPOSITION OF BRUCE ROSENZWEIG, M.D.

14

15        Remote oral deposition of

16   BRUCE ROSENZWEIG, M.D., conducted at the location

17   of the witness in Chicago, Illinois, commencing at

18   9:04 a.m., on the above date, before CORINNE T.

19   MARUT, C.S.R. No. 84-1968, Registered Professional

20   Reporter, Certified Realtime Reporter and Notary

21   Public.

22

23            GOLKOW LITIGATION SERVICES

         877.370.3377 ph / 917.591.5672 fax

24                deps@golkow.com

Page 2

1 APPEARANCES VIA VIDEOCONFERENCE:
2  ON BEHALF OF THE PLAINTIFF AND THE DEPONENT:
3    SCHLESINGER LAW OFFICES, P.A.
       1212 S.E. 3rd Avenue
4      Fort Lauderdale, FL 33316
       954-467-8800
5    BY: JEFFREY L. HABERMAN, ESQ.
        jhaberman@schlesingerlaw.com
6
7
8  ON BEHALF OF DEFENDANT BOSTON SCIENTIFIC CORP.:
9    FAEGRE DRINKER BIDDLE & REATH LLP
       2200 Wells Fargo Center
10     90 South 7th Street
       Minneapolis, Minnesota 55402
11     612-766-7000
     BY: DANIEL J. CONNOLLY, ESQ.
12      daniel.connolly@faegredrinker.com
13
14 ON BEHALF OF DEFENDANT COLOPLAST CORP.
15   KING & SPALDING LLP
       1180 Peachtree Street, NE, Suite 1600
16     Atlanta, Georgia 30309
       404-572-4600
17   BY: W. RAY PERSONS, ESQ.
        rpersons@kslaw.com
18
        -and-
19
     KING & SPALDING LLP
20     500 West 2nd Street, Suite 1800
       Austin, Texas 78701
21     512-457-2000
     BY: ZACHARY C. BURNETT, ESQ.
22      zburnett@kslaw.com
23
24 REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

Page 3

1         I N D E X
2 BRUCE ROSENZWEIG, M.D.          EXAMINATION
3   BY MR. PERSONS................ 9
    BY MR. CONNOLLY............... 249
4   BY MR. HABERMAN............... 301
5
6
7         E X H I B I T S
8 ROSENZWEIG DEPOSITION EXHIBIT     MARKED FOR ID
9 No. 1   5/7/12 medical record;      58
          COL PLTF 000460 RBAYLESS -
10        COL PLTF 000463 RBAYLESS
11 No. 2  5/31/2012 medical record;   73
          COL-RBAYLESS-ORLANDO-000033
12        and 000034
13 No. 3  12/10/12 medical record;    79
          COL-RBAYLESS-BREVARD-000004 -
14        000006
15 No. 4  5/28/13 medical record;     86
          COL-RBAYLESS-ORLANDO-000015 -
16        000018
17 No. 5  Consent Form, "Procedure:  102
          Anterior and/or Posterior
18        Colporrhaphy";
          COL-RBAYLESS-ORLANDO-000024
19
   No. 6  Consent Form, "Augmentation  113
20        Graft Consent Form";
          COL-RBAYLESS-ORLANDO-000026
21
   No. 7  Consent Form, "Hysterectomy  118
22        Surgical Consent Form";
          COL-RBAYLESS-ORLANDO-000023
23
24

Page 4

1          E X H I B I T S
2 ROSENZWEIG DEPOSITION EXHIBIT     MARKED FOR ID
3 No. 8   Consent Form, "Informed    124
          Consent and Request for Repair
4         of Relaxation of Pelvic Organs
          and/or Urinary Incontinence";
5         COL-RBAYLESS-ORLANDO-000021
          and 000022
6
   No. 9  8/9/13 Operative Report;    134
7         COL PLTF 000066 RBAYLESS -
          COL PLTF 000070 RBAYLESS
8
   No. 10 9/24/13 medical record;     140
9         COL-RBAYLESS-ORLANDO-000013 -
          000015
10
   No. 11 3/7/14 medical record;      158
11        COL PLTF 000019 RBAYLESS -
          COL PLTF 000022 RBAYLESS
12
   No. 12 7/24/14 medical record;     166
13        COL PLTF 000008 RBAYLESS -
          COL PLTF 000011 RBAYLESS
14
   No. 13 9/5/14 medical record;      173
15        COL PLTF 000376 RBAYLESS -
          COL PLTF 000379 RBAYLESS
16
   No. 14 5/22/15 medical record;     185
17        COL PLTF 000014 RBAYLESS -
          COL PLTF 000017 RBAYLESS
18
   No. 15 6/11/15 medical record;     187
19        COL PLTF 000244 RBAYLESS -
          COL PLTF 000250 RBAYLESS
20
   No. 16 6/18/15 "Cumulative Discharge  199
21        Summary Report";
          COL PLTF 000270 RBAYLESS
22
23
24

Page 5

1      MR. PERSONS: This is a virtual deposition
2 taken in accordance with Federal Rules of Civil
3 Procedure, specifically Rule 30.
4       The deponent, Court Reporter, Counsel
5 examining the deponent and Counsel representing the
6 deponent shall be visible to all participants and
7 their statements shall be audible to all
8 participants at all times while on the record.
9       All other persons attending the
10 deposition shall make their presence known to all
11 other participants and they shall keep their
12 microphones on mute unless and until they wish to
13 speak and after having spoken, they shall go back
14 on mute.
15      Under no circumstances may a person
16 attend the deposition remotely in any manner
17 without identifying themselves on the record at the
18 commencement of the deposition.
19      Each individual participating in the
20 deposition, whether participating in person or
21 remotely, must use an active video stream and phone
22 line for the duration of the deposition.
23      Recognizing that depositions may cover
24 confidential material, each participant shall

Bruce Rosenzweig, M.D.

Page 6

1 attend from a quiet, private location with a
2 neutral background.
3      No counsel shall engage in any form of
4 private communication with any deponent while the
5 deposition is on the record, including, but not
6 limited to, SMS, text messages, electronic mails or
7 messages sent through any chat feature that may be
8 available through the videoconferencing system used
9 to conduct the deposition remotely.
10      In the event Counsel intends to initiate
11 a private communication with any deponent for
12 purposes of determining whether a privilege should
13 be asserted, Counsel shall state his or her
14 intention on the record before initiating such
15 communication.
16      And nothing that I have said is intended
17 to alter any local rules governing communications
18 with witnesses during a deposition.
19      I just thought I'd put that on there.
20      Another thing I'd like to put on the
21 record is any objection by any party is preserved
22 for all other parties on the same side without the
23 need to join in the same.  So, while any party may
24 assert an objection that the defending counsel does

Page 7

1 not assert, Counsel need to -- can obviate the need
2 to repeat or join an objection already made by
3 another lawyer.
4      And, so, I just wanted to put that.
5 That's just from the proposed protocol that we had
6 circulated earlier, but I just wanted to have that
7 for the record.
8      Is there anything anyone else would like
9 to put on the record before we get underway with
10 the examination of this witness?
11      All right.  Has the witness been sworn?
12 THE REPORTER:  No.
13 MR. PERSONS:  Will you swear the witness,
14 please, ma'am.
15      (WHEREUPON, the witness was duly
16      sworn.)
17 THE REPORTER:  All parties to this deposition
18 are appearing remotely and have agreed to the
19 witness being sworn in remotely.
20      Due to the nature of remote reporting,
21 please pause briefly before speaking to ensure all
22 parties are heard completely.
23      Counsel, please state your appearance
24 and your stipulation to the remote swearing in of

Page 8

1 the witness.
2     MR. PERSONS: Ray Persons. I'm sorry. Go
3 ahead.
4     MR. HABERMAN:  Sorry.  Jeffrey Haberman from
5 Schlesinger Law Offices on behalf of the Plaintiff
6 and the witness.
7     MR. PERSONS:  Ray Persons from King & Spalding
8 on behalf of Defendant Coloplast.  I agree to the
9 stipulation.
10     MR. BURNETT:  Zach Burnett of King & Spalding
11 on behalf of Coloplast.  I also agree to the
12 stipulation.
13     MR. CONNOLLY:  Dan Connolly on behalf of
14 Boston Scientific, and I also agree to the
15 stipulation.
16     THE REPORTER:  Mr. Haberman, do you also agree
17 to the remote swearing in of the witness?
18     MR. HABERMAN:  Yes.
19     THE REPORTER:  Thank you.
20
21
22
23
24

Page 9

1      BRUCE ROSENZWEIG, M.D.,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4        EXAMINATION
5 BY MR. PERSONS:
6     Q.  Okay.  Dr. Rosenzweig, again, good
7 morning.  My name is Ray Persons, and I represent
8 Coloplast.  You and I just met this morning, and I
9 will have some questions for you.
10      Now, you're familiar with the ground
11 rules for giving a deposition because you've done
12 over 100 depositions I understand.
13     A.  Correct.
14     Q.  What year did you start getting paid to
15 write litigation reports in lawsuits against mesh
16 manufacturers?
17     A.  2012.
18     Q.  All right, sir.  Approximately how many
19 have you written as of today?
20     A.  I don't think I can give you an accurate
21 number.
22     Q.  Is it more than 50?
23     A.  Yes.
24     Q.  It would probably be more than 100,

Bruce Rosenzweig, M.D.

Page 10

1 then, wouldn't it?
2     A.   Correct.
3     Q.   All right.  In the mesh litigation,
4 you've only testified as an expert for Plaintiffs,
5 correct?
6     A.   Correct.
7     Q.   Never as an expert for any mesh
8 manufacturer?
9     A.   Correct.
10     Q.   And never as an expert for Coloplast?
11     A.   Correct.
12     Q.   Have you ever given a deposition as a
13 Defendant in a case?
14     A.   Regarding mesh?
15     Q.   No, more broadly.  Regarding anything.
16     A.   Yes.
17     Q.   And what circumstances were those?
18     A.   That was a med mal case.
19     Q.   Was that just on one occasion?
20     A.   Yes.
21     Q.   And were you the treating physician?
22     A.   Yes.
23     Q.   I assumed as much, but I'd thought I'd
24 ask.

Page 11

1         Have you ever given a deposition as an
2 expert in any other kind of case, in a non-mesh
3 context?
4     A.   Yes.
5     Q.   What other kinds of cases have you given
6 a deposition as an expert in?
7     A.   Med mal, wrongful death, workmen's comp.
8     Q.   All right.  What about trial testimony?
9 Have you ever testified in trial?
10     A.   Yes.
11     Q.   Approximately how many times?
12     A.   In mesh or non-mesh litigation?
13     Q.   Both, and then we'll break it out.
14     A.   Probably 30 to 35 times.
15     Q.   All right, sir.  And how many of those
16 were mesh cases?
17     A.   Approximately 20.
18     Q.   All right.  And what other kinds of
19 cases were they?
20     A.   Med mal, wrongful death and workmen's
21 comp.
22     Q.   Okay.  All right.
23         Now, you mentioned you testified in a
24 case, a med mal case where you were a Defendant.

Page 12

1 Is that the only time you've ever been sued in a
2 professional capacity?
3     A.   Yes.  I was named as a respondent in
4 discovery in two other cases.
5     Q.   Do you have your expert report in this
6 case?
7     A.   Yes.
8     Q.   The litigation report.
9         And this is a case-specific report that
10 you prepared in the Raeann Bayless case.  Yes?
11     A.   Correct.
12     Q.   And if you would, sir -- let's see.
13 Turn to the last page.
14         This says it was signed on the 4th day
15 of June 2018?
16     A.   Correct.
17     Q.   Is that your signature at the bottom?
18     A.   Yes.
19     Q.   All right.  Have you made any changes to
20 this report since you signed it on that date?
21     A.   No, I have not.
22     Q.   All right, sir.
23         You have a list of materials I believe
24 as Exhibit C, which is the very last page of this

Page 13

1 document?
2     A.   Yes.
3     Q.   And it says "Materials Reviewed."  Do
4 you see that?
5     A.   Yes.
6     Q.   And you list medical and billing
7 records, Brevard Health Alliance, Florida Hospital,
8 Orange County Medical Center, Orlando
9 Urogynecology, Dr. Kathy Jones.
10         And you understand Dr. Kathy Jones was
11 the surgeon who performed Ms. Bayless' August 9,
12 2013 hysterectomy and implant procedures?
13     A.   Correct.
14     Q.   And you also list Parrish Hospital.
15         Is that a complete listing?
16     A.   Yes.
17     Q.   Is it fair to say, sir, that if a record
18 or document isn't discussed in your report, you
19 didn't rely on it to reach your case-specific
20 litigation opinions?
21     MR. HABERMAN:  Objection.
22 BY THE WITNESS:
23     A.   At the time that I authored the report.
24 Subsequently I've reviewed both Dr. Jones' and

Bruce Rosenzweig, M.D.

Page 14

1 Ms. Bayless' deposition and the exhibits that were
2 attached to those depositions.
3 BY MR. PERSONS:
4     Q.   All right.  So, you're aware that
5 Ms. Bayless' deposition -- well, it was given after
6 you wrote your report?
7     A.   Correct.  I think it was June 6, 2018.
8     Q.   All right.  So, it's fair to say you
9 couldn't have relied on Ms. Bayless' deposition
10 testimony to reach any of the opinions contained in
11 your litigation report.  Fair?
12     A.   Correct.
13     Q.   And you're aware obviously that
14 Dr. Jones was deposed subsequent to your report.
15 She was deposed on September the 12th, 2018.
16          So, again, you could not have relied on
17 Dr. Kathy Jones' testimony to reach any of the
18 opinions contained in your litigation report,
19 correct?
20     A.   Correct.
21     Q.   Is there anything in your litigation
22 report you feel that you need to revise or update
23 based on Ms. Bayless' testimony?
24     A.   The only thing would be I would add as

Page 15

1 one of her injuries dyspareunia.
2     Q.   And I'll ask the same thing with respect
3 to Dr. Kathy Jones.  Is there anything in your
4 litigation report that you feel you need to revise
5 or update based on Dr. Jones' testimony?
6     A.   No.  I think there are some issues that
7 I think we'll discuss that were clarified in her
8 deposition.
9     Q.   You have not personally examined
10 Ms. Bayless, have you?
11     A.   I have not.
12     Q.   In fact, you've never met her, have you,
13 Doctor?
14     A.   That is correct.
15     Q.   You wouldn't recognize her if she walked
16 into the room right now, would you?
17     A.   Would be unusual.  But, yes, that would
18 be correct.
19     Q.   All right.  Have you talked to her on
20 the phone?
21     A.   No, I have not.
22     Q.   All right.  Have you spoken with any of
23 Ms. Bayless' treating physicians?
24     A.   No, I have not.

Page 16

1     Q.   I want to ask you some questions now
2 that pertain to both vaginal pain and dyspareunia.
3          To assess or understand a patient's
4 complaints of either vaginal pain or dyspareunia,
5 you'd need to know the following things:  You'd
6 need to know how long she's been experiencing that
7 vaginal pain or dyspareunia, wouldn't you?
8     MR. HABERMAN:  Objection.
9 BY THE WITNESS:
10     A.   That would be a salient factor in the
11 discussion of pain complaint.
12 BY MR. PERSONS:
13     Q.   So, the answer is yes?
14     A.   Well, yes if the patient is able to
15 articulate it.
16     Q.   Let's assume the patient is able to talk
17 and communicate with you.  That's something you'd
18 want to know from the patient, correct?
19     A.   Correct, to the best of their
20 recollection.
21     Q.   All right.  You'd need to know where the
22 vaginal pain or dyspareunia is localized, wouldn't
23 you?
24     A.   To the best that the patient can

Page 17

1 articulate that, yes.
2     Q.   You'd need to know whether it's at the
3 introitus or whether it's with deep thrusting,
4 you'd need to know those things?
5     A.   Again, if the patient can be able to
6 localize where they have the maximum amount of
7 pain, yes.
8     Q.   All right.  And specifically with
9 respect to vaginal pain, you'd want to know whether
10 that vaginal pain is associated with any physical
11 activity?
12     A.   Yes, you would want to know factors that
13 worsen the pain or alleviate the pain and what are
14 associated factors.  Again, to the best that the
15 patient can articulate that.
16     Q.   All right.  You would need to know
17 whether any current diagnoses or conditions might
18 influence the vaginal pain or dyspareunia, wouldn't
19 you?
20     A.   Well, that would be part of the history
21 that would be obtained to the best that the patient
22 can articulate that.
23     Q.   So, yes?
24     A.   Again, to the best --

Bruce Rosenzweig, M.D.

Page 18

1    MR. HABERMAN:  Objection.
2  BY THE WITNESS:
3    A.   -- that the patient can articulate that.
4  BY MR. PERSONS:
5    Q.   Is the answer yes or no?
6    MR. HABERMAN:  Objection; asked and answered.
7  BY MR. PERSONS:
8    Q.   I'm sorry.  Assume -- let's assume the
9  patient can talk and the patient can tell you her
10 symptoms and describe them.
11   A.   Well --
12   Q.   Would you want to know whether the
13 patient has any current condition that might
14 influence, in other words, exacerbate her vaginal
15 pain or her dyspareunia?
16   MR. HABERMAN:  Objection.
17 BY THE WITNESS:
18   A.   Again, yes, that would be part of the
19 history that you obtain and to the best that the
20 patient can tell you what are those factors that
21 are associated with her pain complaint.
22 BY MR. PERSONS:
23   Q.   All right.  You'd want to know whether
24 the patient, for instance, whether the patient has

Page 19

1  menopause, such as menopause, is that associated
2  with it, did it have its onset with menopause, for
3  instance.  That's something you'd want to know?
4    A.   If the pain started with menopause?
5    Q.   Yes.
6    A.   Well, yes, that would be, you know, the
7  question that you asked before, the timing.
8    Q.   Right.  And, of course, menopause, that
9  can lead to pain with intercourse, can't it?
10   A.   Menopause in and of itself, no.  The
11 associated -- the genitourinary symptoms of
12 menopause can be.
13       And we're talking about dyspareunia, not
14 pelvic pain?
15   Q.   That's right.  That's what we are
16 talking about, pain with intercourse, dyspareunia.
17   A.   Okay.
18   Q.   Yes.  Vaginal infections, you'd want to
19 know whether the patient has suffered from vaginal
20 infections?
21   A.   Suffered from or is currently suffering?
22   Q.   Suffering from and that suffering was
23 associated with the vaginal pain or dyspareunia.
24   A.   Correct, if they had either a vaginal

Page 20

1  infection or pelvic inflammatory disease.  Usually
2  women with a vaginal infection or pelvic
3  inflammatory disease don't want to have intercourse
4  because they have -- they're in pain, the majority
5  of them are in pain from that while the disorder is
6  active.
7        But, yes, you would want to know if
8  there was a history of infections that involve the
9  pelvis.
10   Q.   All right.  You would want to know
11 whether any current behaviors might influence -- of
12 the patient might influence the patient's vaginal
13 pain or dyspareunia?
14   A.   That I don't understand your question.
15 Current behavior.  I mean, that would be the
16 exacerbating or relieving factors that we
17 discussed.
18   Q.   Let me be a little more precise.
19   A.   Okay.
20   Q.   For instance, the frequency of
21 intercourse, whether that's associated with the
22 pain?
23   A.   So, the frequency with which intercourse
24 causes pain or the frequency with which she has

Page 21

1  intercourse, period?
2    Q.   The frequency with which the intercourse
3  causes pain.  That's what I'm trying to get at is
4  things that are related to pain, whether it's
5  dyspareunia or pelvic pain.  That's something you'd
6  want to know?
7    A.   Well, with -- again, this would be the
8  frequency of intercourse that causes pain with
9  intercourse, that would just be the dyspareunia.
10   Q.   Okay.
11   A.   Because the pelvic pain would be
12 something that, you know, if a woman says, "Well, I
13 have intercourse and it exacerbates my pelvic
14 pain," that's dyspareunia.
15   Q.   That's fine.  But that's something you'd
16 want to know?
17   A.   Again, I don't think you clarified the
18 question of whether it's the frequency with which
19 the intercourse causes pain or just the frequency
20 with which she has intercourse, period.
21   Q.   We're talking about things that are
22 pain-related.  The frequency with which intercourse
23 causes pain.
24   A.   Okay.  Yes.

Bruce Rosenzweig, M.D.

Page 22

1    Q.   That's something you'd -- I'm sorry.  I
2 didn't mean to talk over you.
3         That's something you'd want to know?
4    A.   Correct.
5    Q.   Okay.  You'd want to know the number of
6 partners with whom she's engaging in sexual
7 activity or intercourse, wouldn't you, as it
8 relates to dyspareunia?
9    MR. HABERMAN:  Objection.
10 BY THE WITNESS:
11   A.   The number of sexual partners I don't
12 think is really as salient.  I mean, there -- a
13 woman could have a lot of sexual partners but have
14 very infrequent intercourse or just have one sexual
15 partner and be having intercourse five times a day.
16        So, it would be the frequency -- again,
17 that would go back to your past question -- the
18 frequency with which intercourse causes pain and
19 the frequency that she's having intercourse.
20        If a woman is having intercourse once a
21 month and that always causes pain, that's different
22 from someone that has intercourse three times a
23 week and has this pain once a month.  So, they both
24 say I have pain with intercourse once a month, but

Page 23

1 there are different corollaries associated with it.
2 BY MR. PERSONS:
3    Q.   You would review previous medical
4 records of the patient?
5    A.   If they're available, yes.
6    Q.   Okay.  To assess the cause of a
7 patient's vaginal pain complaints or complaints,
8 painful intercourse or dyspareunia, you'd agree
9 that it's important to consider a patient's medical
10 history, correct?
11   A.   Correct.
12   Q.   Any history of preexisting vaginal pain
13 or dyspareunia.  Yes?
14   A.   Well, that's a difficult question to
15 answer because, again, if you're looking at remote
16 causes that are no longer active, sure, you would
17 want to get that in the history as best as you can.
18        But as far as a remote event that more
19 likely than not had a very acute onset and an acute
20 resolution, I mean, it would be important to know,
21 it would be part of your differential but, you
22 know, again, looking at the current complaint, that
23 wouldn't be nearly as salient.
24   Q.   The patient's other diagnosed medical

Page 24

1 conditions, you'd want to know about those, for
2 instance, vaginal stenosis?
3    A.   Correct.
4    Q.   Reduced vaginal length is something
5 you'd be interested in knowing about, wouldn't it?
6    A.   Well, that would be based on, you know,
7 again, prior exams.  If it was noted to be quite
8 short and the patient states that because of the
9 shortness of her vagina, that's what leads to pain.
10   Q.   So, yes?
11   A.   Again, if that's a salient feature.
12   Q.   Reduced vaginal caliber is something
13 that would be important to know in taking a
14 patient's medical history for assessing vaginal
15 pain or dyspareunia.  Yes?
16   A.   Well, vaginal caliber, vaginal stenosis
17 and vaginal length don't lead to vaginal pain
18 unless there's a corollary associated with that.
19 But that would be more important for looking at
20 dyspareunia if that is part of their complaint.
21   Q.   And vaginal atrophy would be something
22 that you would want to take into account in
23 assessing a patient's complaints of dyspareunia?
24   A.   Particularly the degree of vaginal

Page 25

1 atrophy.
2    Q.   And the same would go -- would be true
3 for vaginal dryness, would it not?
4    A.   Well, vaginal dryness is a symptom, you
5 know, a genitourinary symptom of menopause.  Not
6 all patients with atrophy have dryness.  Not all
7 patients that have dryness have atrophy.  So...
8         But, yes, dryness can be a -- you know,
9 that could be one of the symptoms of a sexual
10 dysfunction, lack of arousal, which would then lead
11 to diminished lubrication.
12   Q.   You would consider a patient's recurrent
13 vaginal infections in assessing the cause of a
14 patient's vaginal pain for complaints of
15 dyspareunia.  Yes?
16   A.   Well, again, that would be one of the
17 corollaries.  Most patients do not engage in
18 intercourse with an active vaginal infection and
19 the type of vaginal infection, whether it's a
20 bacterial vaginosis, which does not lead to
21 inflammation like candidiasis does.  But that would
22 be part of the historical factors.
23   Q.   Okay.  Another historical factor would
24 be a history of sexually transmitted diseases or

Bruce Rosenzweig, M.D.

Page 26

1  disease or infections.  Yes?
2      A.  Correct, if there were sequelae from
3  that.  If it was an acute infection that resolved
4  without leading to any upper tract disorders, then
5  it would be an historical factor.  But for current
6  complaints, if they don't have an active sexually
7  transmitted disease, it wouldn't be as relevant.
8      Q.  But it would be relevant if they had an
9  active sexually transmitted disease such as
10  gonorrhea or chlamydia?
11      A.  Correct.
12      Q.  You would want to know about the
13  patient's past surgical history, for instance,
14  whether they had prior pelvic surgeries like a
15  tubal ligation.  Yes?
16      A.  Well, tubal ligation wouldn't
17  necessarily be considered a pelvic surgery but it
18  would be an organ of the pelvis since the, you
19  know, the tubes are technically higher than the
20  pelvis.
21          But a tubal ligation history would be
22  important.  There's something called a post-tubal
23  ligation syndrome where women get cysts and those
24  can be painful while the cysts are active.

Page 27

1      Q.  So, that's something you'd want to know
2  about?
3      A.  Correct.
4      Q.  And you'd want to know about previous
5  abdominal surgeries such as gallbladder removal.
6  Yes?
7      A.  That would be an important -- obtaining
8  a surgical history is important.  Again, that
9  wouldn't be relevant in the differential diagnosis
10  of pelvic pain or dyspareunia.
11      Q.  You'd want to know about surgical
12  procedures related to childbirth such as an
13  episiotomy?
14      A.  Again, that would be an important -- or
15  it would be something to obtain in the history.
16  Importance to pelvic pain and dyspareunia, unless
17  there was a significantly difficult repair, which
18  led to some degree of mutilation of the perineum or
19  the vaginal introitus, then it wouldn't be as
20  relevant, no.
21      Q.  But in order to determine those things,
22  you'd want to know about whether there had been a
23  previous episiotomy, wouldn't you?
24      A.  Well, again, the number of women that

Page 28

1  have episiotomies with their first delivery is over
2  60%, so you would want to see the sequelae from it
3  on a pelvic exam.
4      Q.  Okay.  Whether the patient has had a
5  total hysterectomy would be something that would be
6  worthy of note in assessing the cause of a
7  patient's pelvic pain or dyspareunia, wouldn't it?
8      A.  Correct.
9      Q.  A total hysterectomy in which the cervix
10  was also removed can result in reduced vaginal
11  length, can't it, Doctor?
12      MR. HABERMAN:  Objection.
13  BY THE WITNESS:
14      A.  Not a routine hysterectomy.  Radical
15  hysterectomies can, if there is a reason for taking
16  off part of the apex of the vagina, aside from a
17  radical hysterectomy for cervical cancer, such as
18  endometriosis that's present on the apex of the
19  vagina.
20          But the vast majority of hysterectomies,
21  abdominal, laparoscopic or vaginal, don't decrease
22  the vaginal length, because the cervix does come
23  down about 1 to 2 centimeters inside the vagina and
24  when you cut the cervix off at what becomes the

Page 29

1  cuff, then that is 1 or 2 centimeters higher than
2  where the cervix was.
3          So, the length that the patient
4  perceives is fairly equal unless you do a more,
5  again, radical hysterectomy or if there is a
6  specific reason for taking off top of the cuff.
7  BY MR. PERSONS:
8      Q.  And if the top of the cuff is taken off,
9  it can result in reduced vaginal length, correct?
10      A.  If it is -- if there is part of the cuff
11  removed, yes.  But, again, that's not -- but that's
12  not standard for a routine hysterectomy.
13      Q.  And a shortened vagina can result in
14  dyspareunia?  I think we discussed that earlier.
15      A.  Significantly shortened, yes.
16      Q.  Hysterectomies can also lead to scar
17  tissue that forms at the cuff of the vagina, can't
18  they?
19      A.  It can.
20      Q.  And that can elicit pain during
21  intercourse, correct?
22      A.  It can.
23      Q.  And that scar tissue can also elicit
24  pain during physical activity, giving the sensation

Bruce Rosenzweig, M.D.

Page 30

1  of a stretching or pulling?
2      A.   Well, so, adhesions are scarification
3  that is between two exposed serosal surfaces.  So,
4  it depends on what surface that the adhesions are
5  attached to.
6          The vast majority of adhesions, unless
7  they're put on stretch, so like bowel adhesions,
8  something is going through the bowel, that can lead
9  to expansion and contraction and that can cause
10  pain.
11          Pain -- adhesions at the vaginal cuff
12  being put on stretch during activity is a very
13  unlikely cause of pain because it wouldn't be
14  stretching from a fixed structure unless the bowel
15  is fairly fixed inside the pelvis, and that would
16  be something like, you know, a severe endometriosis
17  or someone that's had severe pelvic inflammatory
18  disease.  So, not really.
19      Q.   Okay.  But you'd agree that scar tissue
20  can under certain circumstances elicit pain during
21  physical activity?
22      A.   Abdominal adhesions, yes, because your
23  abdominal wall could be -- could be fixed.
24      Q.   So, to treat a patient's vaginal pain or

Page 31

1  dyspareunia, you'd want to know about the things we
2  just discussed?
3      A.   To treat it?
4      Q.   To treat, yes, the patient's vaginal
5  pain or dyspareunia, you'd want to know the medical
6  history that we've just talked about?
7      A.   Well, again, before you treat any
8  patient, you want to get a medical history.  You
9  want to do a physical exam.
10          Now, treatment, unfortunately there
11  aren't that many treatment options that you have
12  available.  And, again, you'd start with the least
13  invasive and move up to the most invasive.
14          So, you know, it is -- I mean, if your
15  exam and your history lead to one most likely
16  etiology, then, yes, you can focus on that.
17          But if it -- if you -- let's say you
18  don't see severe vulvovaginal atrophy, which would
19  be treated with an intravaginal hormone
20  preparation.
21          Most of vaginal pain I treat with a
22  topical insertion of a Valium preparation.  So, I
23  mean, the treatments non-surgical are fairly
24  limited, physical therapy, Valium suppositories,

Page 32

1  occasionally Botox injections.
2          Again, if you can target something, you
3  know, you see, again, a shortened vagina, I mean, I
4  wouldn't go to like a Z-plasty or a neovaginal
5  procedure early on in the treatment modalities
6  because those don't usually work very well except
7  if someone is of a young age.  It's important, but
8  there are corollaries associated with it.
9      MR. PERSONS:  Well, with all due respect, move
10  to strike as non-responsive.
11  BY MR. PERSONS:
12      Q.   My question was whether you'd want to
13  know the medical history that we discussed, when we
14  discussed the things that could occasion vaginal
15  pain or dyspareunia, you'd want to know those
16  things in order to prescribe a mode of treatment
17  for the patient.  Yes or no.
18      MR. HABERMAN:  Objection; asked and answered.
19  BY THE WITNESS:
20      A.   Well, yes, you get a history and you do
21  a physical exam.  But, again, the treatment for
22  those entities, there aren't a significant number
23  that are readily available.
24  BY MR. PERSONS:

Page 33

1      Q.   Okay.  Let's talk about vaginal
2  infections.
3          To assess the cause of a patient's
4  recurrent vaginal infection, such as bacterial
5  vaginosis, you'd agree that it's important to
6  consider a patient's medical history, including how
7  frequent the patient experiences or contracts an
8  infection?  Yes or no.
9      A.   To diagnose it?
10      Q.   To assess it, yes.  To evaluate it.
11      A.   I mean, to diagnose it, you'd use a
12  culture, and we have very good cultures available
13  that can tell you whether your -- a discharge is
14  associated with gonorrhea, chlamydia,
15  trichomoniasis, mycoplasma, ureaplasma, candidiasis
16  or bacterial vaginosis.
17          To determine the length of therapy, it
18  would -- you know, the frequency becomes important.
19  So, if a woman is getting frequent bacterial
20  vaginosis or frequent candidal infections, you
21  wouldn't just treat a one- or two-day for Candida
22  or a seven-day for bacterial vaginosis.  You would
23  give them a longer, you know, treatment like
24  once-a-month therapy or four-week therapy.

Bruce Rosenzweig, M.D.

Page 34

1 So, frequency will tell you how it's
2 best to, you know, treat that. But the diagnosis
3 is made on a culture.
4 Q. My question was a little different.
5 My question was: To assess the cause of
6 recurrent vaginal infections, such as bacterial
7 vaginosis, you would want to know how frequent the
8 patient experiences or contracted these infections.
9 We are talking about recurrent infections is what I
10 was asking about.
11 A. So, you know that the cause of bacterial
12 vaginosis, bacterial vaginosis is an entity that is
13 an overgrowth of the normal bacteria inside the
14 vagina.
15 Q. Yes.
16 A. It's caused by the pH of the vagina
17 getting elevated. That leads to the overgrowth of
18 the bacteria.
19 Now, there are reasons why the pH of the
20 vagina could go up or the good bacteria, the
21 lactobacillus, which makes hydrogen peroxide, goes
22 down. And that could be related to the semen in
23 the ejaculate. That can be related to using
24 condoms that are lubricated because lubricant is

Page 35

1 the nonoxynol-9.
2 So, yes, there -- I mean, what -- what
3 causes a candidal infection versus what causes
4 bacterial vaginosis or mycoplasma or a gonorrhea
5 infection, I mean, gonorrhea and chlamydia are
6 sexually transmitted. Bacterial vaginosis is
7 associated with sexual intercourse because of the
8 rise of pH. Candida is -- there is some anecdotal
9 evidence that it could be transmitted sexually.
10 Trichomoniasis, there is weak evidence that it's
11 sexually transmitted.
12 I mean, that's why it's -- your question
13 is -- yeah, it's easy for me to diagnose it by
14 doing a culture. A woman comes in and says, "I
15 have a discharge." I do a vaginal culture, wait
16 for it to come back and then I treat the patient
17 appropriately.
18 If she says, I'm getting this," you
19 know, "every month," then I would talk to her
20 about, you know, is she cleaning her vagina after
21 intercourse, getting rid of the semen inside of her
22 vagina, is she using a condom that's lubricated and
23 use a non-lubricated condom with a lubricant.
24 If she is getting frequent candidal

Page 36

1 infections, that would be something that you would
2 look at, does she have diabetes that is not very
3 well controlled, does she have poor hygiene.
4 Mycoplasma and ureaplasma, there is
5 really no good evidence of an etiologic factor.
6 So, the assessment, yes, is based -- how
7 you treat it is based on the history but what you
8 treat is based on culture.
9 Q. Let's put aside treatment. We are just
10 talking about assessing.
11 The patient comes in and has recurrent
12 vaginal infections. And wouldn't it be important
13 to consider how frequent the patient experiences or
14 contracts the vaginal infections in assessing the
15 condition?
16 A. Yes, but that is more based on how
17 you're going to treat it and maybe how you prevent
18 it.
19 Now, again, not all, you know,
20 discharges are the same. So, that's why culture
21 becomes important. And most people don't do a very
22 good job of doing a culture on what's, you know --
23 I mean, there are certain characteristics that, you
24 know -- like a mucopurulent discharge is --

Page 37

1 (WHEREUPON, Zoom videoconference
2 unexpectedly terminated.
3 Recess was had from
4 9:45 to 9:50 a.m.)
5 (WHEREUPON, the record was read
6 by the reporter as follows:
7 A. Yes, but that is more based on
8 how you're going to treat it and
9 maybe how you prevent it.
10 Now, again, not all, you know,
11 discharges are the same. So,
12 that's why culture becomes
13 important. And most people don't
14 do a very good job of doing a
15 culture on what's, you know -- I
16 mean, there are certain
17 characteristics that, you know --
18 like a mucopurulent discharge
19 is --)
20 BY THE WITNESS:
21 A. Like a mucopurulent discharge is
22 associated with chlamydia. White homogeneous
23 discharge is associated with bacterial vaginosis.
24 A cheesy discharge is associated with Candida.

Bruce Rosenzweig, M.D.

Page 38

1    So, I mean, someone says, "I get
2 frequent vaginal infections," that doesn't really
3 give you an idea of what they are unless she says,
4 yes, they were proven to be, all be BV or Candida
5 or I had, you know, one chlamydial infection and
6 then it turned out to be BV.
7    So, yes, it's a -- the frequency is
8 important but also, you know, what it actually
9 turned out to be is equally important, and that's
10 where culture becomes important.
11 BY MR. PERSONS:
12    Q.  You'd agree that the cause of bacterial
13 vaginosis is often -- recurrent bacterial vaginosis
14 is often unclear?
15    A.  No, it is pretty clear that it's an
16 overgrowth of the normal bacteria of the vagina
17 that is due to an elevated vaginal pH.
18    Q.  But that can be occasioned by many
19 different things; not just one thing that can cause
20 the elevated pH in the vagina?
21    A.  Well, that would be the normal -- either
22 an external source of an alkaline pH or a
23 diminution in the good bacteria, the lactobacillus
24 that is creating an acidic environment.

Page 39

1    Q.  And that can be caused by more than one
2 thing?
3    A.  Correct.
4    Q.  You'd want to know about the patient's
5 social behaviors, whether the patient has engaged
6 in unprotected sex.  Yes?
7    A.  Yes.  The mode of contraception does
8 become important.
9    Q.  You'd want to know the number of sexual
10 partners that the patient has?
11    A.  Again, that is a -- the increase in the
12 number of sexual partners just increases your odds
13 of being exposed to something that can cause an
14 infection.
15    Q.  Right.  To assess or understand a
16 patient's complaints of mesh exposure, you'd need
17 to know where the exposure is.  Yes?
18    A.  Yes.
19    Q.  You'd want to know the patient's history
20 of estrogen use?
21    A.  If they're menopausal.
22    Q.  Yes.  Whether the patient complied with
23 post-op restrictions concerning vaginal
24 intercourse, you'd want to know that?

Page 40

1    A.  Again, if the -- I would say that is
2 important for the timing of the mesh erosion.
3    Q.  Okay.  You'd also want to perform a
4 physical examination of the patient, wouldn't you?
5    A.  Well, that would tell you where the mesh
6 erosion is.
7    Q.  So, yes?
8    A.  Yes.
9    Q.  You would want to review -- medical
10 records?
11    A.  Can I --
12       (Simultaneous crosstalk.)
13 BY MR. PERSONS:
14    Q.  I'm sorry?
15    A.  Yes.  Because the medical records, if
16 the erosion happened prior, you would look at the
17 medical records to see what other people have
18 found.
19    Q.  You'd also want to know all those things
20 before you rendered an opinion about the cause of
21 the exposure, extrusion, erosion of the mesh?
22    MR. HABERMAN:  Objection.
23 BY THE WITNESS:
24    A.  I don't understand your question.

Page 41

1 BY MR. PERSONS:
2    Q.  Well, you'd want to know about the
3 things we just talked about.  You'd want to know
4 where the exposure is?
5    A.  Correct.
6    MR. HABERMAN:  Objection.
7 BY MR. PERSONS:
8    Q.  You'd want to know about the history of
9 estrogen use.  I think you answered yes to that
10 question.
11    You'd want to know whether the patient
12 was compliant with post-op instructions, and the
13 example we used was refraining from engaging in
14 sexual intercourse.  I think you told us you'd want
15 to know that.
16    A.  Correct.
17    Q.  You'd want to know about the previous
18 medical records.
19    And my question was, you'd want to know
20 about those things before you rendered an opinion
21 about the cause of the erosion, exposure or
22 intrusion?  Yes or no.
23    MR. HABERMAN:  Objection.
24 BY THE WITNESS:

Bruce Rosenzweig, M.D.

Page 42

1  A.  Again, the cause is the mesh.  You're
2 talking about corollaries that can make an
3 exposure, erosion or extrusion more likely.
4 BY MR. PERSONS:
5  Q.  Yes.
6  A.  Okay.
7  Q.  So, you agree, you'd need to know these
8 things that we talked about that I just enumerated?
9  MR. HABERMAN:  Asked and answered.
10 BY THE WITNESS:
11  A.  As a corollary, correct.
12 BY MR. PERSONS:
13  Q.  Now, when discussing surgical options
14 for treatment of prolapse with a patient, you agree
15 you should advise the patient that each subsequent
16 surgery can lead to increased complications.  Yes?
17  MR. HABERMAN:  Objection.
18 BY THE WITNESS:
19  A.  I -- again, that question is so broad.
20 It really would be very difficult to answer in a
21 yes-or-no fashion.
22 BY MR. PERSONS:
23  Q.  Well, would you agree that if you
24 undertook surgical treatment, treatment of

Page 43

1 prolapse, that each subsequent surgery could lead
2 to increased complications, as a general
3 proposition?
4  A.  Again, it all depends on what -- you
5 know, if you do an abdominal procedure and then you
6 followed it up with a Le Fort, no, that really
7 wouldn't increase your risk of surgical
8 complications.
9  If you do an abdominal procedure and you
10 follow that up with an abdominal procedure, then,
11 yes, there could be an increased risk of
12 complications.
13  So, again, it's not -- in a general
14 sense, I would tend to agree with you.  In a
15 specific sense, I would need -- it would be
16 important to know exactly what, you know, the
17 subsequent procedures are going to be.
18  Q.  Okay.  Chronic hypertension can increase
19 the risk of surgery, can't it?
20  A.  Would increase the risk of anesthesia.
21  Q.  And chronic hypertension can impact
22 wound healing, can't it?
23  A.  In and of itself, no.
24  Q.  But it can?

Page 44

1  A.  In and of itself, no.
2  MR. HABERMAN:  Objection.
3 BY MR. PERSONS:
4  Q.  Combined with other factors it could, it
5 could contribute to it?
6  MR. HABERMAN:  Objection; vague.
7 BY THE WITNESS:
8  A.  Now, we are --
9  MR. HABERMAN:  What other factors?
10 BY THE WITNESS:
11  A.  Right.  I would need to know like what
12 other factors you're talking about.
13 BY MR. PERSONS:
14  Q.  All right.  Well, for instance --
15  A.  First of all, how -- is the hypertension
16 controlled or uncontrolled.
17  Q.  No.  Let's --
18  A.  What medications the patient is taking
19 for the hypertension, you know.  So, again --
20  Q.  Sir.
21  A.  Yes, sir.
22  Q.  Go ahead.  Go ahead.
23  Let's say the patient has uncontrolled
24 hypertension and the patient is a heavy smoker.

Page 45

1 Couldn't that affect the healing?
2  A.  An uncontrolled hypertension, patient
3 wouldn't get in the operating room because they are
4 at risk for anesthesia.
5  So, I mean, there is really an
6 exceedingly rare number of emergent prolapse cases
7 that you would operate on someone who is not well
8 controlled, such as with, you know, pulmonary
9 issues, hypertension, uncontrolled diabetes.
10  So, you know, I mean, I understand what
11 you're saying, yes.  Someone that has got
12 uncontrolled medical issues would be at risk for
13 surgery, which is why you don't take someone with
14 uncontrolled issues to the operating room.  You get
15 them -- you get them maximized so that they can
16 tolerate being asleep for the length of time that
17 you need to keep them asleep and then you would
18 monitor their medical conditions to keep them under
19 control during the postoperative period.  So...
20  Q.  All right.  Vaginal atrophy, menopause,
21 can increase the risk of pelvic reconstructive
22 surgeries, can't it?
23  MR. HABERMAN:  Objection.
24 BY THE WITNESS:

Bruce Rosenzweig, M.D.

Page 46

1    A.   Depends on the severity and underlying
2  cause of the atrophy.  Is it medically induced or
3  is it a natural menopause or a surgically induced
4  menopause?
5        A natural menopause, no, we operate on
6  women that are menopausal all the time.  Someone
7  that is a surgically induced menopause or a
8  medically induced menopause such as a woman with
9  breast cancer who's on an aromatase inhibitor,
10  those are women, yes, I definitely advise them
11  against having surgical procedures on the vagina
12  because of the risk of poor healing.
13        But those are -- you know, I've got
14  maybe a half a dozen women like that in my practice
15  right now that have a surgical condition that I
16  warn against doing surgery because they are on an
17  aromatase inhibitor, which essentially drops their
18  estrogen level down to zero, and you can't treat
19  them with estrogen to try to build up their vaginal
20  tissue or to treat them postoperatively.
21  BY MR. PERSONS:
22    Q.   Do you agree that smoking tobacco can
23  raise the risk of a poor surgical outcome because
24  it contributes to poor wound healing?

Page 47

1    A.   It can also lead to upper respiratory
2  problems due to intubation and can lead to
3  pneumonia.  But, yes, it can be associated with
4  poor wound healing.
5        But you would see a general wound
6  healing.  You wouldn't see just a poor wound
7  healing in one location if someone was a smoker.
8  So, I mean, if they had poor healing, they would
9  have poor healing generally, not locally.
10    MR. PERSONS:  Move to strike the
11  non-responsive portion of that answer.
12  BY THE WITNESS:
13    A.   Well, sir, you asked me about wound
14  healing and I was explaining to you that, yes, if
15  you're going to have poor wound healing from
16  smoking, it would be on all the surgical wounds,
17  not just one surgical wound.  So, I mean, that's an
18  important part of my answer.
19  BY MR. PERSONS:
20    Q.   Well, you might think it's important.
21  You answered the question.  Generally speaking,
22  does smoking contribute to poor wound healing?
23    MR. HABERMAN:  Objection; asked and answered.
24  BY MR. PERSONS:

Page 48

1    Q.   Does the effect of nicotine on the
2  circulatory system and the 80 compounds in tobacco
3  smoke inhibit wound healing?
4    A.   For all --
5    MR. HABERMAN:  Objection; asked and answered.
6  BY THE WITNESS:
7    A.   For all surgical wounds it can, yes.
8  BY MR. PERSONS:
9    Q.   That was the question.
10    A.   Okay.
11    Q.   Using illicit drugs can affect
12  cardiovascular health and can also raise the risk
13  of a poor surgical outcome, can it not?
14    MR. HABERMAN:  Objection; vague.
15  BY THE WITNESS:
16    A.   The poor surgical outcome meaning that
17  they can have an event, you know, cardiovascular
18  event, during the surgery.
19  BY MR. PERSONS:
20    Q.   Right.
21    A.   So, you know, yes.  I would prefer to
22  make sure that if I'm going to operate on someone
23  with a history of significant drug use, such as
24  cocaine, that I have a negative tox screen before I

Page 49

1  would operate on that patient.
2    Q.   You'd also advise that patient of the
3  importance of disclosing all health-related issues
4  prior to surgery?
5    A.   Correct.
6    Q.   Now, on page 3 of your report, under
7  III, "Findings Related to Raeann Bayless."
8        Do you have your report in front of you?
9    A.   Yes.
10    Q.   Starting there, you go on and you list
11  roughly 12 medical records on pages 3 through 7?
12    A.   Correct.
13    Q.   Now, you reviewed these records for the
14  purpose of writing your report, correct?
15    A.   I reviewed the records, yes, to provide
16  opinions in Ms. Bayless' case, yes.
17    Q.   Was this the totality of the records
18  that you had in your possession at that time?
19    A.   No.
20    Q.   How did you go about selecting these
21  records or determining that these records were
22  pertinent to your opinions and others were not,
23  just generally speaking?
24    A.   Well, this is just a summary of her

Bruce Rosenzweig, M.D.

Page 50

1 medical treatment.

2      Q.   All right.  Have you requested

3 additional medical records?

4      A.   If there are new medical records that

5 are obtained, I hope that I get sent new medical

6 records.  If new medical records are obtained and

7 they impact my opinion, I would be happy to give

8 you the opportunity to come back and see how any

9 new medical records changed my opinions.

10      Q.   We'd reserve the right to reopen and

11 conduct another deposition.

12           All right.  Is it fair to say that if

13 you didn't include a record, a medical record, on

14 pages 3 through 7, that you didn't think that

15 particular record was pertinent to your opinions?

16      A.   No.

17      MR. HABERMAN:  Objection.

18 BY THE WITNESS:

19      A.   That's not correct.  All the medical

20 records are pertinent to my opinions.  This is a

21 summary of the medical records I reviewed and

22 relied upon, all the medical records that are on my

23 reliance list, and I subsequently reviewed and

24 relied upon the depositions that we discussed

Page 51

1 earlier and the exhibits associated with those.

2 BY MR. PERSONS:

3      Q.   All right.  Now, you understand to the

4 extent you relied on a medical record, it should

5 have been delineated or set forth in your report.

6 You understand that?

7      A.   No, this is a summary of the medical

8 treatment.  If I was to add all the medical

9 records, that would be the -- my report would be as

10 long as the medical records are.

11      Q.   On page 3 of your litigation report,

12 under III, you write, "Ms. Bayless is a current

13 smoker."

14           Do you see that?

15      A.   Right.

16      Q.   And then she has a medical history that

17 includes hepatitis C, heart murmur, gonorrhea,

18 trichomonas and hypertension.

19           Do you see that?

20      A.   Correct.

21      Q.   Now, that's Ms. Bayless' medical history

22 prior to her August 9, 2013 implantation surgery

23 involving the Advantage Fit and the Restorelle Y,

24 correct?

Page 52

1      A.   That was disclosed in the medical

2 records, correct.

3      Q.   But that was medical history prior to

4 the time she underwent the August 9, 2013 surgical

5 procedure.  Yes?

6      A.   As I state on page 4, she also has a

7 history of drug abuse.

8      Q.   All of these things predated the

9 surgery?  Yes or no.

10      A.   Correct.

11      Q.   Okay.  You'd agree that understanding a

12 patient's medical history is critical to a sound

13 differential diagnosis, as a general proposition?

14      A.   Correct.

15      Q.   And that's why you included this

16 paragraph about Ms. Bayless' past medical history

17 in your report?

18      A.   And also throughout the rest of my

19 report, correct.

20      Q.   Do you recall, in terms of the smoking,

21 do you recall for how long Ms. Bayless has been a

22 smoker?  That's not mentioned here in your report.

23      A.   As she stated in her deposition, if I

24 recall, she smoked for approximately 30 years.

Page 53

1      Q.   All right.

2      MR. HABERMAN:  You know, Ray, can we take a

3 five-minute break?  We have been going for about an

4 hour.

5      MR. PERSONS:  Sure.  Absolutely.  Okay.  How

6 long?

7      MR. HABERMAN:  Five, ten minutes.  Just have

8 to use the restroom.

9      MR. PERSONS:  Sure.  We can do that.  That's

10 fine with everybody?

11      THE WITNESS:  Sure, five minutes is great.

12      MR. PERSONS:  All right.  We'll take five.

13 Thank you.

14           (WHEREUPON, a recess was had

15            from 10:09 to 10:17 a.m.)

16 BY MR. PERSONS:

17      Q.   Doctor, you'd agree that the longer a

18 patient smokes, the more negatively it affects the

19 patient's health?

20      A.   Correct.

21      Q.   And those negative effects include

22 things like --

23      MR. HABERMAN:  Objection.

24 BY MR. PERSONS:

Bruce Rosenzweig, M.D.

Page 54

1    Q.   -- poor wound healing?
2    MR. HABERMAN:  Been over this already.
3 BY THE WITNESS:
4    A.   I don't think there is a very good
5 degree of evidence on a cumulative effect on wound
6 healing like there is a cumulative effect on
7 pulmonary function, the risk of lung cancer.
8        So, the fact that a person is a smoker
9 can lead to, you know, microcirculatory factors.
10 But the effect on the lungs would be more of a
11 cumulative effect.
12   Q.   Okay.  Well, setting aside the lungs
13 since this isn't a lung case, poor circulation
14 could be a consequence of long-term cigarette
15 smoking?
16   A.   Cigarette smoking in general, correct.
17   Q.   And worsening hypertension could be one
18 of the long-term effects of cigarette smoking?
19   A.   Hypertension, yes.  The hypertension,
20 diabetes, smoking go hand in hand.
21   Q.   You would agree that if a patient didn't
22 have wound healing issues when they started
23 smoking, they may have experienced those issues
24 after continuing to smoke for a long time, a long

Page 55

1 time being 20, 30 years?
2    A.   It would -- you know, one would need to
3 look at what the event was, you know, earlier in
4 life to see what that was associated with.
5    Q.   But you would agree that smoking,
6 long-term smoking, adversely affects the
7 microcirculatory system; that can impact wound
8 healing?
9    A.   As I state in my report, yes.
10   Q.   Now, in addition to past medical
11 history, you'd also consider a patient's past
12 surgical history to be critical to any differential
13 diagnosis.  Yes?
14   A.   Correct.
15   Q.   So, in the next sentence in this
16 paragraph in your report you point out that
17 Ms. Bayless' surgical history is remarkable for
18 tubal ligation, three abortions,
19 gallbladder/stones, robotic-assisted total
20 laparoscopic hysterectomy, abdominal sacral
21 colpopexy, retropubic midurethral sling using the
22 Advantage Fit and cystoscopy.
23       Do you see that?
24   A.   Yes.

Page 56

1    Q.   Do you know how Ms. Bayless' abortions
2 were performed, whether they were transvaginal?
3    A.   Well, that would be -- the vast majority
4 of an abortion would be surgical.  I mean, it would
5 have been in the record that she would have had a
6 hysterotomy if the termination was done later in
7 the pregnancy for a very specific reason like, you
8 know, severe eclampsia or a uterine infection or,
9 you know, some other obstetrical emergency.
10   Q.   All right.  Other than those three
11 abortions, Ms. Bayless' surgeries were all
12 performed transabdominally, correct?
13   A.   Yes.
14   Q.   And you'd agree that multiple abdominal
15 surgeries can increase the risk for adhesions?
16   A.   Well, if they're open procedures, there
17 is some limited data on the degree of adhesions
18 that multiple surgeries caused.  But with
19 laparoscopic procedures, the amount of adhesions
20 would be limited.
21       Now, the gallbladder surgery, it depends
22 on the severity of the gallbladder disorder and,
23 you know, if there was a preceding infection,
24 severe infection, or a postceding infection.

Page 57

1        But, no, a laparoscopic surgery, even
2 multiple laparoscopic surgeries, I wouldn't
3 anticipate that there would be a significant risk
4 of adhesion formation.
5    Q.   All right.  Adhesions can be treated
6 surgically, right?
7    A.   Correct.
8    Q.   And if they aren't treated, they can
9 become painful.  Yes?
10   A.   Not always but they can.
11   Q.   They can and they can feel like
12 stretching or pulling inside the abdomen, can't
13 they?
14   A.   We already had that discussion
15 previously.
16   Q.   So, yes?
17   A.   Well, all depends on what organs are
18 adhesed to what.
19   Q.   So, yes, it can feel like stretching or
20 pulling?
21   A.   Again, that is such a broad question
22 that would -- the simple answer is there can be a
23 stretch sensation, particularly with adhesions that
24 are to an abdominal wall incision, not a

Bruce Rosenzweig, M.D.

Page 58

1  laparoscopic incision.
2      So, in a very broad and general sense,
3  yes.
4      Q.   All right.  Now, your litigation report
5  goes on to provide a summary of Ms. Bayless'
6  medical care starting on March 7, 2012 and ending
7  June 11, 2015.
8      A.   May 7, 2012, but yes.
9      Q.   I know.  I think it's a typo.  It said
10 2014 in here, but the records say 2012.
11     You'd agree with that?
12     A.   No.  The first record is May 7, 2012
13 through June 2015.
14     Q.   Right.  Okay.  So, let's go to the --
15 those records.
16     MR. PERSONS:  And if we could, Zach, go to tab
17 1, please.
18 BY MR. PERSONS:
19     Q.   And this is -- the first record noted in
20 your report is from May 7, 2012, and let's mark
21 that Exhibit 1.
22         (WHEREUPON, Rosenzweig Deposition
23          Exhibit No. 1 was marked for
24          identification: 5/7/12 medical

Page 59

1          record; COL PLTF 000460 RBAYLESS -
2          COL PLTF 000463 RBAYLESS.)
3  BY MR. PERSONS:
4      Q.   Do you recognize this as a copy of that
5  record?
6      A.   As soon as Zach gets it up, I will.
7      MR. BURNETT:  It should be marked now.  Just
8  as a reminder, once I introduce a new exhibit, if
9  you all just hit refresh on your browser, it should
10 pop up.  So, if you have the link open already, hit
11 refresh, you should see Exhibit 001.
12     THE WITNESS:  Now, I've got it.
13 BY THE WITNESS:
14     A.   Yes.
15 BY MR. PERSONS:
16     Q.   Did you receive this record in its
17 entirety?
18     MR. HABERMAN:  I'm sorry.  I'm trying to
19 locate it.
20     MR. BURNETT:  The link is in the chat, in the
21 Zoom chat, if you look at the window.  I sent the
22 link out.  It may have been right before you
23 joined.
24     MR. HABERMAN:  I don't see the -- I don't have

Page 60

1  it in my chat.
2      MR. BURNETT:  Can we go off the record for one
3  moment.
4      MR. PERSONS:  Sure.
5          (WHEREUPON, discussion was had off
6           the record.)
7  BY MR. PERSONS:
8      Q.   All right.  Did you review any records
9  related to Ms. Bayless' medical treatment that
10 predate May 7, 2012, Doctor?
11     A.   Not that I specifically recall.
12     Q.   Okay.  To the extent any medical
13 treatment or condition is not discussed in the
14 records that you did review, is it fair to say that
15 your opinions in this case could not have accounted
16 for any medical treatment or condition Ms. Bayless
17 may have had prior to May 7, 2012?
18     MR. HABERMAN:  Objection.
19 BY THE WITNESS:
20     A.   Unless it was discussed in her
21 deposition.
22 BY MR. PERSONS:
23     Q.   Okay.  Now, this record reflects that
24 Ms. Bayless' visit to Orlando Health was due to

Page 61

1  complaints of vaginal prolapse and urinary
2  incontinence.  Do you see that?
3      A.   Yes.
4      Q.   And it indicates that Ms. Bayless has
5  been dealing with this for over seven years.
6          Do you see that?
7      A.   Correct.
8      Q.   And having read her deposition, you're
9  aware that Ms. Bayless testified that she began
10 experiencing symptoms of prolapse after the birth
11 of her second child?
12     A.   Correct.
13     Q.   Are you aware that she testified that
14 she was able to see her bladder at the opening of
15 the vagina?
16     A.   Correct.
17     Q.   All right.  Now, in the last line of the
18 first paragraph of Exhibit 1, the provider, I want
19 to say Dr. Bukkapatnam, also noted Ms. Bayless
20 stated that she had some dyspareunia lately?
21     A.   Correct.
22     Q.   And it goes on to describe her OB
23 history.  Do you see that?
24     A.   Yes.

Page 62

1    And if we can go back to this last line.
2 She was asked about that in her deposition and she
3 said when the penis hit the cervix, that was what
4 was causing her pain.
5    Q.   Yes.  And she -- in terms of the OB
6 history, it goes through the nine pregnancies, and
7 talks about four full term, three abortions and two
8 miscarriages.  You see that?
9    A.   Yes.
10    Q.   She delivered all four of her children
11 vaginally, correct?
12    A.   Correct.
13    Q.   And you'd agree that vaginal delivery is
14 a major risk factor for prolapse?
15    A.   And stress incontinence, correct.
16    Q.   You agree that vaginal delivery
17 requiring an episiotomy can also lead to
18 dyspareunia?
19    A.   No.
20    Q.   Okay.  Under --
21    A.   I mean, it can be uncomfortable while
22 the episiotomy is healing.  But unless there was
23 some untoward event with the episiotomy or the
24 repair, no.

Page 63

1    Q.   So, if there is some untoward event, it
2 can lead to dyspareunia.  That's your opinion?
3    A.   If there is a poor repair of the
4 episiotomy, it could.
5    Q.   Okay.  Under "Gynecological History,"
6 this record notes that Ms. Bayless had a tubal
7 ligation.  And you noted that in your litigation
8 report, didn't you?
9    A.   Correct.
10    Q.   And that's a procedure that's performed
11 abdominally, isn't it?
12    A.   It is -- can be done either through a
13 telescope.  It can be done through what's called a
14 mini-lap immediately postpartum where there's a 3
15 or 4 centimeter incision made underneath the
16 bellybutton because the tubes are at that level,
17 you know, one to two days after delivery.  Can also
18 be done -- years ago we used to do it
19 transvaginally.
20    But the vast majority are done through a
21 small bellybutton incision.  Almost all of them.
22    Q.   Abdominally?
23    A.   Excuse me?
24    Q.   Abdominally, then, aren't they?

Page 64

1    A.   Correct.
2    Q.   And abdominal surgeries can lead to
3 adhesions?
4    A.   Abdominal surgeries can.  But, again,
5 this was more likely than not done laparoscopically
6 and the chances of this leading to adhesions is
7 very, very rare.
8    Q.   But we don't know, do we?
9    A.   Yeah, we actually do.
10    Q.   Okay.  So, you do know how it was done,
11 the tubal ligations.
12    A.   Oh, no, that it didn't lead to
13 adhesions.  I mean, if you look at Dr. Jones'
14 surgical report, there were some adhesions between
15 the left colon and the sidewall, which she stated
16 were more likely than not due to the findings of
17 diverticulosis.
18    Q.   Further down under "Sexual Activity"
19 next to "Comments," a note that Ms. Bayless
20 represented that she had over 100 partners
21 lifetime.  That's noted here.
22    Do you see that?
23    A.   Yes.
24    Q.   And then you see "STD History" notes

Page 65

1 gonorrhea?
2    A.   Correct.
3    Q.   The symptoms of gonorrhea can include
4 vaginal discharge, correct?
5    A.   Correct.
6    Q.   And foul odor, correct?
7    A.   Usually the gonorrheal discharge is not
8 associated with odor.
9    Q.   Okay.  Can also include dysuria?
10    A.   Yes.
11    Q.   Vaginal itching?
12    A.   No.
13    Q.   Vaginal burning?
14    A.   Not characteristic with gonorrhea.
15    Q.   Okay.  You agree that patients who
16 engage in sexual intercourse with multiple partners
17 are at higher risk for contracting STDs?
18    A.   Correct.
19    Q.   Especially if they don't consistently
20 use protection?
21    A.   Well, the only protection would be a
22 condom.  I mean, cervical caps, diaphragms don't --
23 while they do cover the cervix and do decrease
24 transmission of both chlamydia and gonorrhea, which

Bruce Rosenzweig, M.D.

Page 66

1 live in the columnar epithelial cells of the
2 cervix, it wouldn't do anything to decrease the
3 transmission of something like human papilloma
4 virus and it would not or it could depending on if
5 a nonoxynol-9 preparation increased the risk of
6 bacterial vaginosis.
7     MR. PERSONS: Move to strike as
8 non-responsive.
9 BY MR. PERSONS:
10    Q.   Going back to the tubal ligation, we
11 don't know how Ms. Bayless' tubal ligation was
12 performed, do we?  Whether it's done
13 laparoscopically or not, we don't know, do we?
14    A.   It is not described in the records,
15 correct.
16    Q.   Okay.  Now, going -- now, coming back to
17 the what we were just discussing about the medical
18 record here under "Sexual History," you'd agree
19 that repeated STDs can lead to longer term health
20 complications?
21    A.   Repeated STDs of gonorrhea and chlamydia
22 can lead to tubal damage, infertility.  But at the
23 time of her hysterectomy, that was not noted.  It
24 can lead to endomyometritis, but on the pathology

Page 67

1 report that was not noted.  The only thing that was
2 noted on the pathology report for the hysterectomy
3 was chronic cervicitis.
4     MR. PERSONS: Move to strike as unresponsive.
5 BY MR. PERSONS:
6     Q.   Repeated STDs can result in a high
7 propensity to develop vaginal infections, can't it?
8 Yes or no.
9     A.   I can't answer that question yes or no.
10    Q.   Okay.  And chronic conditions -- it can
11 lead to a chronic condition like pelvic
12 inflammatory disease, can't it?
13    A.   Yes.
14    Q.   Ms. Bayless' sexual activity also refers
15 to a history of sexual abuse.  Do you see that?
16    A.   Yes.
17    Q.   She was molested at 12 years old by a
18 friend's brothers.
19        Do you see that?
20    A.   Yes.
21    Q.   Patients who have experienced sexual
22 abuse are at a high risk of experiencing chronic
23 pelvic pain, aren't they?
24    A.   That usually starts in the vicinity of

Page 68

1 the sexual abuse, correct.
2     Q.   And they are at a high risk of
3 experiencing chronic dyspareunia, aren't they?
4     A.   That starts after the sexual abuse,
5 correct.
6     Q.   And the relationship between a history
7 of sexual abuse and chronic pelvic pain or
8 dyspareunia is unclear, isn't it?
9     A.   I -- can you repeat the question?
10    Q.   Yes.  The relationship between a history
11 of sexual abuse and pelvic pain and dyspareunia is
12 unclear?
13    A.   Correct, in the general sense.  In
14 Ms. Bayless' case, we know how she testified to
15 that because of the dyspareunia that she was having
16 prior to her hysterectomy, which was the penis
17 hitting the cervix, as she testified to.
18    Q.   But generally it's agreed there's a
19 psychological component between sexual abuse and
20 dyspareunia and pelvic pain?
21    A.   There can be if it manifests that way.
22    Q.   On the second page of this record under
23 "Past Medical History," it's noted that Ms. Bayless
24 has hypertension and positive for hepatitis C.  Do

Page 69

1 you see that?
2     A.   Correct.
3     Q.   And further down under "Psychosocial
4 History," it describes Ms. Bayless' history of
5 smoking and substance abuse?
6     A.   Correct.
7     Q.   She was smoking around a half pack per
8 day at that time and had a history of crack use for
9 25 years, now for clean for two.
10        Do you see that?
11    A.   Correct.
12    Q.   Are you aware that she began using crack
13 cocaine around 1999, according to her deposition?
14    A.   Yes.
15    Q.   And you did not think that was relevant
16 to your opinions?
17    A.   Well, it was in the medical records, so
18 of course I considered it.  But she had been not
19 using it at the present time and it didn't appear
20 again in the records I think until 2014.
21        So, around the time of her surgery she
22 was not using, by what's based on the records,
23 using cocaine; and if I recall, she did not state
24 that she was using it at the time of her surgery.

Bruce Rosenzweig, M.D.

Page 70

1    Q.   You would agree that long-term crack
2  cocaine use impacts circulation, though, don't you?
3    A.   It can while someone is using it.
4    Q.   And a long-term crack cocaine use also
5  carries other negative health consequences.  You'd
6  agree with that?
7    A.   While someone is using it, correct.
8    Q.   Such as worsening hypertension?
9    A.   While someone is using it, correct.
10   Q.   And impaired neurocognitive function.
11 You'd agree with that?
12   A.   While someone is using it, correct.
13   Q.   So, it's your testimony that if someone
14 uses cocaine for 20 plus years and stops using it,
15 then there are no long-term consequences of the
16 long-term use.  That's your testimony?
17   A.   Well, the acute effects would not be
18 manifesting.
19   Q.   On page 3 of this record, next to
20 "Comment," where it says, "Patient has a moderate
21 cystocele, halfway to the introitus."
22        Do you see that?
23   A.   Yes.
24   Q.   Now, the severity of Ms. Bayless'

Page 71

1  prolapse wasn't noted anywhere in your report, was
2  it?
3    A.   Yes, it was.  That at the time of
4  surgery was a stage II.  On page 5.
5    Q.   The severity of the prolapse is relevant
6  to your opinions or is it not relevant to your
7  opinions?
8    A.   The severity of the prolapse was an
9  indication for the surgery.  She had a stage II
10 prolapse that came down towards the introitus.
11 According to Dr. Bukkapatnam on May 7, 2012, this
12 would be a Baden-Walker classification, which would
13 be a stage I.
14   Q.   Are you aware that she testified that
15 her bladder prolapse was visible at her introitus?
16   A.   Yes, she did testify to that, which
17 would be a stage II, which is what Dr. Jones noted
18 at the time of her surgery.
19   Q.   Under -- at the bottom of page 3 under
20 "Assessment/Plans" it says, "Mixed incontinence,
21 cystocele, hypertension, hep C, a history of ISC,"
22 I assume that's intermittent self-catheterization?
23   A.   No, no, no.  No.  That is laparoscopic
24 cholecystectomy.

Page 72

1    Q.   Okay.  So, that's LSC?
2    A.   Yes.
3    Q.   And then a history of the bilateral
4  tubal ligation?
5    A.   Yes.
6    Q.   History of drug abuse.  You see all of
7  that?
8    A.   Yes, correct.
9    Q.   And underneath that it says "Plan," the
10 plan was to conduct a urodynamic study?
11   A.   Correct.
12   Q.   Urine culture?
13   A.   Correct.
14   Q.   And that was in regards to Ms. Bayless'
15 urinary incontinence, correct?
16   A.   Correct.
17   Q.   And then she was given a referral to a
18 Dr. Kathy Jones for evaluation?
19   A.   Correct.
20   Q.   All right.
21   MR. PERSONS:  Let's go to tab 2, Zach, and
22 that's the May 31, 2012 medical record and let's
23 mark this Exhibit 2.
24        (WHEREUPON, Rosenzweig Deposition

Page 73

1        Exhibit No. 2 was marked for
2        identification:  5/31/2012 medical
3        record; COL-RBAYLESS-ORLANDO-000033
4        and 000034.)
5  BY MR. PERSONS:
6    Q.   This particular record is not referenced
7  in your report --
8    A.   Correct.
9    Q.   -- Dr. Rosenzweig, but you did include
10 the August 12 and the August 16, 2012 visits to
11 Dr. Jones for urodynamic testing.
12        Is there any reason why you didn't
13 include this one as well?
14   A.   It's in the medical records.  This and I
15 think it's the June 10, 2012, which was a uroflow
16 report, but this just kind of reiterates what the
17 previous doctor had found.
18   Q.   Okay.  At this visit Dr. Jones performed
19 a vaginal exam as reflected under "PE."  Yes?
20   A.   Correct.
21   Q.   And next to rectal exam she noted that
22 Ms. Bayless had poor tone and weak squeeze all
23 around?
24   A.   Correct.

Bruce Rosenzweig, M.D.

Page 74

1    Q.   Was that relevant to any of your
2  opinions?
3    A.   She has no bowel injuries that I am
4  alleging occurred from the -- either of the pelvic
5  floor mesh implants.  So, while it is noted, it is
6  just a finding on medical exam.
7    Q.   Okay.  It's not relevant to any of your
8  opinions, correct?
9    A.   It is not associated with any of the
10  injuries caused by the pelvic organ -- or the mesh
11  products that were placed.
12    Q.   Then it says, "2 centimeter
13  rectal/vaginal defect that goes into PB."
14       Do you know what that means?
15    A.   No.  She had a -- she was able to hold
16  for 2 seconds.  She had a thin perineal body, and
17  there was a finding of the RV defect along -- into
18  the perineal body.
19    Q.   So, that's what that is, the perineal
20  body, the PB?
21    A.   Yes.
22    Q.   Okay.  On the second page of this
23  document, Dr. Jones diagnosed Ms. Bayless with
24  mixed incontinence, rectocele, cystocele midline,

Page 75

1  uterovaginal prolapse incomplete and urinary
2  frequency.
3       Do you see that?
4    A.   Correct.
5    Q.   Rectocele is where the rectum is
6  prolapsing into the vagina, also called a posterior
7  defect, correct?
8    A.   Correct.
9    Q.   And a midline cystocele is where the
10  bladder is prolapsing into the vagina at the apex,
11  an anterior defect.  Yes?
12    A.   Correct.
13    Q.   And Ms. Bayless' uterus was also
14  prolapsing into her vagina; a vaginal vault or
15  apical prolapse, correct?
16    A.   Correct.
17    Q.   Underneath that list of diagnoses
18  Dr. Jones wrote, "Stage II pelvic organ
19  prolapse - leading edge at BA consistent with
20  cystocele/uterine prolapse," correct?
21    A.   Correct.
22    Q.   So, Ms. Bayless had near complete
23  prolapse at that time, didn't she?
24    A.   No.  She had stage II prolapse.  It came

Page 76

1  down to, if you look back at the POP-Q, the lowest
2  point was point B on the anterior and that came
3  down to 1 centimeter past the introitus, which is
4  stage II.  This is not stage III or stage IV.  So,
5  just had an early stage II -- or a stage II
6  prolapse.  It's not complete prolapse.
7    Q.   Okay.  But both the bladder and uterus
8  were herniating into her vagina?
9    A.   Correct.
10    Q.   And --
11    A.   But --
12    Q.   -- enterocele is the only pelvic organ
13  prolapse diagnosis not included here?
14       MR. HABERMAN:  I'm going to also say I don't
15  think the doctor finished his answer previously.
16  BY THE WITNESS:
17    A.   I did discuss that she had a vault
18  prolapse or a uterine prolapse and a rectocele,
19  which is described as the prolapse of the vaginal
20  vault, which is -- but her main -- I mean, her
21  posterior wall was barely stage II and her uterus
22  was also barely stage II based on the POP-Q that
23  was done that day.  Her main prolapse was a
24  cystocele.

Page 77

1       MR. BURNETT:  I think we lost Ray.  Can we go
2  off the record while he gets back on?
3       (WHEREUPON, a recess was had
4         from 10:49 to 10:59 a.m.)
5  BY MR. PERSONS:
6    Q.   Doctor, when I said "complete prolapse,"
7  what I was alluding to was that all of her organs
8  were prolapsing.
9       You have left up here to the rectocele
10  and the enterocele and the cystocele?
11    A.   Correct.  But when you look at the
12  POP-Q, by far cystocele was at a plus 1.  All the
13  rest were at a minus 1.
14    Q.   Okay.  Let's see.  Dr. Jones discussed
15  treatment options with the patient.  Do you see
16  that?  We are still on the --
17    A.   Page 2, yes.
18    Q.   Page 2, yes, of this record.  Where she
19  talks about "Observation, pessary support and
20  surgical intervention."  Do you see that?
21    A.   Yes.
22    Q.   All right.  At the bottom of this --
23  well, the last entry on this page or right before
24  the last entry, "Patient advised," do you see that

Bruce Rosenzweig, M.D.

Page 78

1  paragraph, which says, "Patient advised that
2  tobacco use contributes to risk of urinary
3  incontinence and pelvic organ prolapse."
4      Do you see that?
5  A.   Yes.
6  Q.   And says, "It can also affect the
7  outcome of the surgical intervention with respect
8  to wound healing and risk of pelvic organ prolapse
9  reoccurrence."
10     Do you agree with that statement?
11  A.   Yes.  If she develops upper respiratory
12  issues, that can increase the risk of recurrent
13  prolapse and also can increase the urinary
14  incontinence.
15     There is some data to suggest that all
16  of the products that you alluded to earlier that
17  are in cigarette smoke can irritate the bladder and
18  so, you know, it's always wise to recommend to our
19  patients to quit smoking.
20  Q.   Okay.  Do you agree that this record
21  indicates Dr. Jones counseled Ms. Bayless that she
22  was at a high risk of less than optimal surgical
23  outcome due to her long history of smoking?
24  A.   With respect to wound healing and

Page 79

1  recurrence.
2  Q.   Okay.  Are you aware that -- well,
3  you've read her deposition, so you know that
4  Dr. Jones testified that she thought Ms. Bayless'
5  30-pack-year history of smoking would have delayed
6  healing or improper wound healing at the time she
7  underwent the surgical repair for the urinary
8  incontinence and for pelvic organ prolapse.  Do you
9  agree with that?
10  A.   That's what she stated in her
11  deposition.
12  Q.   All right, sir.  Now, let's look at
13  Tab No. 3, and this is a record dated December the
14  10th of 2012.  I will mark this.  I think we are up
15  to Exhibit 3.  Reflecting a visit Ms. Bayless made
16  to the Brevard Health Department.
17        (WHEREUPON, Rosenzweig Deposition
18        Exhibit No. 3 was marked for
19        identification: 12/10/12 medical
20        record; COL-RBAYLESS-BREVARD-000004
21        - 000006.)
22  BY MR. PERSONS:
23  Q.   That is about nine months before she
24  underwent her hysterectomy and implantation

Page 80

1  procedure, correct?
2  A.   Correct.
3  Q.   And this record states that Ms. Bayless
4  presented with a chief complaint of vaginal
5  discharge, right?
6  A.   With odor, correct.
7  Q.   And under "Onset" the provider wrote,
8  "Ms. Bayless comes in for evaluation on her vaginal
9  odor and discharge."
10  A.   Correct.
11  Q.   And then it says that "She did have a
12  history of gonorrhea in the past on two occasions
13  and wanted to be checked at this time for her
14  problems."
15  A.   Correct.
16  Q.   Your report doesn't discuss the
17  frequency with which Ms. Bayless had been diagnosed
18  with or treated for gonorrhea, correct?
19  A.   I do discuss that she had a history of
20  gonorrhea in the past.  I didn't review and rely
21  upon this.  It is a past history of gonorrhea on
22  two occasions.
23  Q.   All right.  And I don't believe your
24  report discusses any other STD, does it?

Page 81

1  A.   No, it does discuss trichomoniasis.
2  Q.   Okay.  Now, the record goes on --
3  A.   But it is -- it is debated whether
4  trichomoniasis is truly a STD.
5  Q.   Okay.  The record goes on to note that
6  Ms. Bayless was "mentioning urinary and fecal
7  incontinence since having her second child 25 years
8  ago without any interventions," correct?
9  A.   Correct.
10  Q.   Your litigation report doesn't mention
11  any history of fecal incontinence, does it?
12  A.   No, that is not in my report.
13  Q.   You would agree, though, that even minor
14  or infrequent fecal incontinence can put a patient
15  at a higher risk of developing bacterial vaginosis?
16  A.   Not -- no.  Bacterial vaginosis is the
17  normal bacteria inside the vagina.  Fecal
18  incontinence can increase the risk of urinary tract
19  infection.
20  Q.   All right.  On the second page, the
21  provider documented Ms. Bayless admitting to
22  "Urination problems - dribbling, foul smell,
23  urgency."
24     Do you see that entry?

Bruce Rosenzweig, M.D.

Page 82

1    A.    Correct.

2    Q.    So, in addition to urinary incontinence,

3 she was complaining of urinary urgency, wasn't she?

4    A.    Yes, and that was noted by her previous

5 doctor on May 7, 2012, with diagnosis of mixed

6 incontinence.

7    Q.    And also malodorous, that was another

8 entry, a thing that she was complaining of?

9    A.    On this date, correct.

10    Q.    At the bottom of this page under

11 "Genitourinary Systems" -- "Genitourinary Female,"

12 excuse me, the provider also documented, "Anterior

13 and posterior pelvic organ prolapse and yellowish

14 vaginal discharge"?

15    A.    Correct.

16    Q.    At the top of the next page under

17 "Rectal," it says, "Fecal incontinence, decrease

18 sphincter tone."

19        Do you see that?

20    A.    Yes.

21    Q.    And you would agree that decreased

22 sphincter tone is a symptom of rectocele or

23 posterior prolapse?

24    A.    No.

Page 83

1    Q.    Okay.  You don't agree with that?

2    A.    That is correct.  I mean, they are two

3 different things.

4    Q.    All right.  You would agree that

5 decreased sphincter tone can contribute to fecal

6 incontinence?

7    A.    That -- yes.

8    Q.    All right.  Now, further down under

9 "Assessment and Plan," Ms. Bayless was diagnosed

10 with "Vaginitis and vulvovaginitis, unspecified"?

11    A.    Correct.

12    Q.    The comments documented a wet prep for

13 trichomonas was obtained and started on Flagyl 400

14 milligrams orally twice a day for seven days,

15 correct?

16    A.    Correct.

17    Q.    And trichomonas, you say it's debatable

18 whether it's truly an STD, but there is no debate

19 that it's caused by a parasite, correct?

20    A.    Correct.  But -- correct.

21    Q.    And trichomonas can cause foul-smelling

22 vaginal discharge.  Yes?

23    A.    Correct.

24    Q.    And the discharge can be white, gray,

Page 84

1 yellow or green?

2    A.    It's usually yellow and green.  White

3 homogeneous is more bacterial vaginosis.

4    Q.    Trichomonas can also cause vaginal

5 itching, can't it?

6    A.    Not characteristically, but it can.

7    Q.    It can also cause dysuria?

8    A.    Less commonly, but it can.

9    Q.    Can cause painful urination?

10    A.    Less commonly, but it can.

11    Q.    And can also cause dyspareunia?

12    A.    Most women don't want to have

13 intercourse when they have a trichomoniasis

14 infection active.  But it can.

15    Q.    Okay.  Now, patients who have had

16 trichomonas previously are at a higher risk for

17 contracting it again.  Yes?

18    A.    Not necessarily.

19    Q.    Would you agree that patients who have

20 had a history of other STDs such as gonorrhea are

21 at a higher risk of contracting trichomonas?

22    A.    Not necessarily.

23    Q.    But they can?

24    A.    Well, you have to be exposed to the

Page 85

1 trichomonad.  There are a lot of people that feel

2 that it is a contaminant from the stool, so that it

3 wouldn't have any -- sexual intercourse wouldn't

4 have any impact on getting the trichomonad.

5    Q.    Unprotected sex raises the risk of

6 contracting trichomonas, doesn't it?

7    A.    Again, more likely than not, no.  It is

8 more likely than not from a rectal reservoir.

9    Q.    But it can?

10    A.    There is no conclusive data that it is

11 sexually transmitted, but it can.

12    Q.    And you're aware that Ms. Bayless

13 testified that she had one partner for 15 years,

14 but a lot of times they didn't use a condom and a

15 lot of times they did?

16    A.    Correct.

17    Q.    If trichomonas isn't treated properly,

18 it can persist for months or even years, can't it?

19    A.    It could persist as asymptomatic, but

20 she was given the appropriate therapy of Flagyl for

21 seven days twice a day.

22    Q.    But if it's not treated properly, it can

23 persist for months or years?

24    A.    As an asymptomatic harboring, that is

Bruce Rosenzweig, M.D.

Page 86

1  remotely possible.
2  Q.   Now, let's look at Tab No. 4.
3       (WHEREUPON, Rosenzweig Deposition
4       Exhibit No. 4 was marked for
5       identification: 5/28/13 medical
6       record; COL-RBAYLESS-ORLANDO-000015
7       - 000018.)
8  BY MR. PERSONS:
9  Q.   This is a May 28, 2013 record from
10 Dr. Jones' pre-op history and physical, surgical
11 plan.
12      Do you see that?
13 A.   Yes.
14 Q.   And it says Ms. Bayless presented to
15 Dr. Jones for follow-up to discuss surgery.
16      Do you see that?
17 A.   Yes.
18 Q.   And under "HPI," "Follow-up to discuss
19 surgery."
20      And beneath that, under "Problems,"
21 Dr. Jones listed bacterial vaginosis, candidiasis,
22 midline cystocele, incomplete uterovaginal
23 prolapse, prolapse of vaginal vault after
24 hysterectomy, mixed incontinence.

Page 87

1       Do you see all those?
2  A.   Yes.
3  Q.   Do you agree that this reflects that
4  Ms. Bayless had a history of bacterial vaginosis
5  prior to undergoing the August 13 -- August 9, 2013
6  procedure?
7  A.   Well, stating the record but, again,
8  according to the medical records that we have
9  reviewed, we have documented trichomoniasis. I do
10 not specifically recall prior to this record a
11 positive either culture or PCR for bacterial
12 vaginosis.
13 Q.   But according to this record, this
14 entry, bacterial vaginosis was a problem that was
15 identified pre-surgery, pre-August 9, 2013 surgery,
16 correct?
17 A.   According to this record, correct.
18 Q.   All right.  And this record also
19 reflects a history of vaginal candidiasis prior to
20 the August 9, 2013 procedure.  Yes?
21 A.   That's what the record states.
22 Q.   All right.  And there's no mention of
23 that anywhere in your summary, is there?
24 A.   It's in the medical record.

Page 88

1  Q.   But it's not in your summary of the
2  medical record, though, is it, in your report, in
3  the text of your report?
4  A.   It is a remote history that she had
5  prior to the surgery.
6  Q.   Okay.  Let's go to page 3 under
7  "Discussion," and on that page, Dr. Jones wrote
8  that she and Ms. Bayless discussed "abdominal
9  approach, laparoscopic and vaginal approach or
10 total vaginal approach," with regard to surgical
11 treatment of Ms. Bayless' prolapse.
12      Do you see that?
13 A.   Yes.
14 Q.   And she further explained that "Each of
15 these procedures can be combined with graft
16 augmentation either biologic or synthetic mesh,"
17 right?  That's what she says here?
18 A.   Correct.
19 Q.   Then she went on to detail each of these
20 procedures, didn't she?
21 A.   Yes.
22 Q.   No. 1, "Vaginal," options discussed
23 include total vaginectomy, colpocleisis with
24 perineoplasty.  Do you see that?

Page 89

1  A.   Yes.
2  Q.   Now, that's not an option for patients
3  like Ms. Bayless who want to continue having sex,
4  is it?
5  A.   That would not be a good option for
6  someone who wanted to have sexual intercourse.
7  Q.   Because it closes the vagina completely,
8  doesn't it, permanently?
9  A.   The intent is that it would be
10 completely closed permanently.
11 Q.   The other vaginal --
12 A.   There is a way of doing it that women
13 can continue to have intercourse.
14 Q.   Okay.  But the other vaginal options
15 included a cystocele/rectocele repair with graft,
16 right?
17 A.   Correct.
18 Q.   Sacrospinous ligament fixation that
19 would require a 23-hour hospital stay?
20 A.   Correct.
21 Q.   And that is a native tissue repair that
22 doesn't use mesh, right?
23 A.   Well, when you do the repair with a
24 graft, then it would.  But you can do it without.

Bruce Rosenzweig, M.D.

Page 90

1    The way she describes it, it would be
2 with mesh, but it can be done without mesh.
3    Q.   And we'll discuss that later.  But one
4 of the alternatives that you claim would have been
5 a safer option for Ms. Bayless' POP repair or
6 pelvic organ prolapse repair would have been the
7 native tissue repair without mesh, right?
8    A.   Correct.
9    Q.   Now, Dr. Jones then detailed the
10 abdominal approach that she says is the "gold
11 standard for vaginal vault prolapse and uterine
12 prolapse includes abdominal sacral colpopexy with
13 mesh."
14    Do you see that?
15    A.   That's what she states.
16    Q.   Dr. Jones actually referred to the
17 abdominal sacral colpopexy with mesh as the gold
18 standard for surgical correction of vaginal vault
19 prolapse and uterine prolapse, didn't she?
20    A.   That's what the record states.
21    Q.   And Dr. Jones gave Ms. Bayless an
22 explanation on the use of graft augmentation
23 materials and advanced prolapse repair.  Yes?
24    A.   Correct.

Page 91

1    Q.   Including discussing the possible
2 complications with hematoma, delayed healing,
3 exposure and/or extrusion.  Yes?
4    A.   That's what the record states.
5    Q.   And you'd agree the risk/benefit
6 discussion between Ms. Bayless and Dr. Jones is
7 relevant to your opinions?
8    A.   Correct.
9    Q.   But that's not noted anywhere in your
10 summary of this record, is it?
11    MR. HABERMAN:  Objection.
12 BY THE WITNESS:
13    A.   It is.  The doctor discussed abdominal
14 approach, laparoscopic approach, vaginal approach.
15 Each of these procedures can be combined with graft
16 augmentation either biological or synthetic.
17 BY MR. PERSONS:
18    Q.   But you didn't discuss the risk/benefit
19 discussion?
20    MR. HABERMAN:  Objection.
21 BY THE WITNESS:
22    A.   That was in the medical records.
23 BY MR. PERSONS:
24    Q.   All right.  Now, Dr. Jones explained

Page 92

1 that this surgery would be performed via a
2 robotic-assisted laparoscopic approach, didn't she?
3    A.   Correct.
4    Q.   And that it would require a 23-hour
5 hospital stay?
6    A.   Correct.
7    Q.   And that the robotic-assisted
8 laparoscopic approach could be combined with a
9 cystocele repair if necessary?
10    A.   Correct.
11    Q.   And then she, Dr. Jones, went on to
12 describe the traditional open surgery.
13    Do you see that?
14    A.   Yes.
15    Q.   When she talks about a sacral colpopexy
16 with mesh, cystocele repair with a two-to-three-day
17 hospital stay?
18    A.   Correct.
19    Q.   And that's significantly longer than the
20 23-hour stay referenced in regard to the vaginal
21 cystocele/rectocele repair with the graft or the
22 robotic-assisted laparoscopic approach, correct?
23    A.   Correct.
24    Q.   And, lastly, Dr. Jones wrote that the

Page 93

1 recovery period is the same for all reconstructive
2 procedures, about 12 weeks.
3    Do you see that?
4    A.   Yes.
5    Q.   And having read her deposition, you are
6 aware that Dr. Jones testified that she generally
7 orders her patients to refrain from physical and
8 sexual activity following surgery for a period of
9 approximately 12 weeks?
10    A.   That I don't specifically recall that
11 she said refrain from physical or sexual activity
12 for 12 weeks.
13    Most of us say after these procedures
14 four to six weeks of refraining from sexual
15 activity.
16    Q.   All right.  Well, are you saying you
17 don't recall or -- okay.
18    Even though you don't recall it, do you
19 dispute that she said that in her deposition?
20    A.   I do have a general recollection of her
21 discussing the recommendations that she gives to a
22 patient.  What she stated in her deposition is what
23 she stated.
24    Q.   You don't dispute that her testimony was

Bruce Rosenzweig, M.D.

Page 94

1 that she orders her patients to refrain from
2 physical and sexual activity following surgery for
3 a period of 12 weeks?
4     A.   I would say physical activity, yes.  We
5 don't want patients to do heavy lifting after
6 pelvic organ prolapse surgery.
7     Q.   Okay.
8     A.   But I don't specifically recall that she
9 had sexual activity for 12 weeks too.
10     Q.   All right.  Let's look at her
11 deposition.  Starting on page 71, last line.
12     MR. PERSONS:  Can you put that up, Zach.
13     MR. BURNETT:  I need to switch Zoom back to my
14 laptop.  I switched to my iPad because it's better
15 connection, but to screen share I need to get back
16 to my laptop.  I apologize.
17 BY THE WITNESS:
18     A.   If you want to just read it, then I will
19 agree that that's what that page says.
20 BY MR. PERSONS:
21     Q.   All right.  Let me just read it into the
22 record.
23     A.   Okay.
24     Q.   It says:

Page 95

1          "And it says, briefly discussed
2      recovery time of approximately 12
3      weeks plus activity restrictions?
4          "A.   Yes.
5          "Q.   And what activity
6      restrictions would you recommend
7      after surgery?
8          "A.   Generally, no heavy
9      lifting, straining, pushing,
10      pulling, bending, stooping -- that's
11      greater than 10 pounds.  We usually
12      encourage patients to do their
13      grocery shopping with a pulley.  Not
14      to do any housework.  That means
15      flipping mattresses, pushing
16      furniture around, anything that will
17      cause any strain on the abdominal
18      wall.
19          "Q.   And I think you said
20      this, but that would include
21      refraining from sexual intercourse,
22      right?
23          "A.   Correct."
24     A.   Yes.  But she didn't give a time frame

Page 96

1 for sexual intercourse.  I agree with all the
2 physical activity.  Yeah, I tell my patients the
3 same thing.  But she didn't clarify what her normal
4 is for refraining from sexual intercourse, because
5 12 weeks would be the longest that I've heard of
6 someone asking a patient to refrain from sexual
7 intercourse after a pelvic organ prolapse repair.
8          So, I will agree that that was
9 contextually in there, but it could be argued
10 whether or not she truly meant 12 weeks.  But I
11 will agree that's what her deposition stated.
12     Q.   That's what she said.
13          And this is a situation where you're
14 having the patient not only undergoing the pelvic
15 organ prolapse procedure and the stress urinary
16 incontinence procedure but also a hysterectomy?
17     A.   Correct.
18     Q.   So, that could account for why she says
19 12 weeks?
20     A.   No.  I think --
21     MR. HABERMAN:  Objection; calls for
22 speculation.
23 BY THE WITNESS:
24     A.   Again, I have not heard of someone

Page 97

1 asking a patient to refrain for 12 weeks after a
2 hysterectomy and a prolapse repair.
3          But, you know, again, that was added on
4 at the end of, "And you would give a restriction to
5 sexual intercourse," and she said, "Yes."
6          You're tying that to the 12-week mark.
7 She wasn't asked specifically, "At how many weeks
8 do you ask them to refrain from sexual
9 intercourse?"
10          All the other ones, I agree for 12
11 weeks, yes.  We don't want them to do any heavy
12 lifting because that affects the prolapse repair.
13     Q.   All right.  Let's look at page 94 of her
14 deposition.
15     A.   Okay.
16     Q.   And starting on line 8:
17          "Q.   Your form, your consent
18      form, also notes that physical and
19      sexual activity are to be restricted
20      for a period of time after surgery,
21      right?
22          "A.   Yes.
23          "Q.   And I think you said your
24      general restricted period is

Bruce Rosenzweig, M.D.

Page 98

1    approximately 12 weeks, is that
2    right?
3        "A.   Yes."
4        Okay.  So we're clear now that she wanted
5    the patient, Ms. Bayless, to refrain from sexual
6    activity for 12 weeks.  That's what her testimony
7    is.
8        MR. HABERMAN:  Objection.
9    BY THE WITNESS:
10       A.   No.  You're still interpreting that.
11   That is an interpretation because it says
12   "generally."  Okay.  You didn't say "specifically."
13   BY MR. PERSONS:
14       Q.   You dispute that's what the doctor's
15   testimony says on page --
16       A.   I'm not disputing that that -- I'm not
17   disputing that that's what the testimony says.
18   It's just that that's your interpretation of that
19   testimony.
20       Q.   Okay.  All right.  Well, that's your
21   testimony.
22       Now, Dr. Jones referred to the -- those
23   postoperative restrictions are intended to
24   facilitate wound healing after surgery, correct?

Page 99

1        A.   Those restrictions are to prevent --
2    well, sexual intercourse, to allow the vagina to
3    heal.  The restrictions on lifting are to prevent
4    recurrence.
5        Q.   But you would agree that certain
6    physical activities can disrupt the incision site?
7        A.   After the four-week period, more likely
8    than not, no, beside sexual activity within the
9    first four to six weeks.
10       Q.   That can disrupt the incision site.
11   Yes?
12       A.   It can, yes.
13       Q.   You'd agree this record indicates that
14   Ms. Bayless was offered a non-mesh option for each
15   surgical approach, the abdominal, laparoscopic and
16   vaginal and the total vaginal.  Yes?
17       A.   The only non-mesh approach would be the
18   total vaginectomy colpocleisis, because she says
19   cystocele/enterocele repair with mesh; the
20   colposacropexy, mesh; and the traditional open
21   colposacropexy with mesh.
22       So, the only non-mesh procedure she
23   offered for the pelvic organ prolapse repair was
24   the vaginectomy colpocleisis.

Page 100

1        Q.   And she was offered a graft-augmented
2    option for each approach, wasn't she?
3        A.   Well, there is no graft option for a
4    vaginectomy colpocleisis.
5        Q.   Well, setting that aside.
6        A.   Okay.  Well, yes, it was -- the only
7    option she gave her for all the rest was a graft
8    augmentation.
9        Q.   She also offered a sacrospinous ligament
10   fixation, and that doesn't use mesh, does it?
11       A.   No, but the cystocele/rectocele repair
12   with graft is with graft.
13       Q.   Under "Surgical Plan," if you'll turn to
14   that page, it's on the next page, Dr. Jones
15   recorded that Ms. Bayless opted for
16   robotic-assisted total laparoscopic sacral
17   colpopexy with mesh, possible sling, possible
18   cystocele repair, cystoscopy.
19       Do you see that?
20       A.   Yes.
21       Q.   And Dr. Jones documented another
22   discussion regarding the risks and benefits of that
23   procedure, didn't she?
24       A.   Correct.

Page 101

1        Q.   She says, "The patient was informed of
2    the risks and benefits of the surgical procedure
3    noted above.  These risks are noted as but not
4    limited to infection, bleeding, damage to
5    surrounding organs such as bowel, bladder and
6    ureter, prolonged need for urinary catheterization,
7    incomplete bladder emptying, pain with intercourse,
8    poor wound healing, worsening or no change in
9    urinary incontinence and/or recurrence of
10   prolapse."  Correct?
11       A.   Correct.
12       Q.   And the record says that the patient,
13   Ms. Bayless, voiced an understanding of these risks
14   and elected to proceed with the procedure.
15       Do you see that?
16       A.   Yes.
17       Q.   And Dr. Jones references Ms. Bayless
18   signing written consent forms regarding the risks
19   and benefits.
20       Do you see that?
21       A.   Yes.
22       Q.   All right.  Now, you didn't reference
23   any of the consent forms in your litigation report,
24   did you?

Bruce Rosenzweig, M.D.

Page 102

1    A.   They're in the medical records.
2    Q.   So, you did review them?
3    A.   Yes.
4    Q.   All right.  Why didn't you summarize
5  them in your written report?
6    A.   They're in the medical records.
7    Q.   Okay.  So, if something is in the
8  medical records, you didn't summarize them in your
9  report?
10   MR. HABERMAN:  Objection.
11  BY THE WITNESS:
12   A.   Well, they're summarized as the doctor
13  discussed the approach, and those are -- the rest
14  are in the medical records.
15  BY MR. PERSONS:
16   Q.   All right.  Let's look at tab 4-A.
17        (WHEREUPON, Rosenzweig Deposition
18        Exhibit No. 5 was marked for
19        identification: Consent Form,
20        "Procedure: Anterior and/or
21        Posterior Colporrhaphy";
22        COL-RBAYLESS-ORLANDO-000024.)
23  BY MR. PERSONS:
24   Q.   This is the first of the consent forms

Page 103

1  we're going to discuss, and the heading on this
2  one, "Procedure:  Anterior and/or Posterior
3  Colporrhaphy."  Do you see that at the top?
4    A.   Yes.
5    Q.   And at the bottom do you see where this
6  form is signed and dated May 28, 2013?
7        Do you see that?
8    A.   Yes.
9    Q.   That's a little more than two months
10  prior to the August 9, 2013 procedures, right?
11   A.   Correct.
12   Q.   And Dr. Jones and the patient, both
13  Dr. Jones and the patient signed the form?
14   A.   Correct.
15   Q.   And I'll represent to you -- well, I
16  don't have to represent to you.  You've read the
17  depositions.
18        Both Dr. Bayless and Dr. Jones -- both
19  Ms. Bayless and Dr. Jones testified that they
20  discussed this form with one another prior to
21  signing, correct?
22   A.   Correct.
23   Q.   Now, let's see.  The first three
24  sentences state, "Your doctor has determined that

Page 104

1  you have a weakness in the wall of your vagina
2  through which the bladder or bowel may protrude and
3  which requires surgical repair.  This operation is
4  called a colporrhaphy, and when both the front and
5  back walls of the vagina are repaired, it is
6  commonly known as an 'A and P repair.'  The
7  operation involves surgical incisions or 'cuts' in
8  the front and/or back walls of the vagina.
9  Complications from this surgery are uncommon but
10  they do occur."
11        Do you see that?
12        Did I read that correctly?
13   A.   Yes, sir.
14   Q.   All right.  Now, do you agree that this
15  consent form is describing a surgical procedure to
16  treat prolapse that does not use mesh, correct?
17   A.   Correct.
18   Q.   And a non-mesh or native tissue repair
19  is one of the surgical alternatives that you
20  contend is safer than the Restorelle Y, correct?
21   A.   Yes, but we do recall that when
22  Dr. Jones was, from the prior record, when
23  Dr. Jones was discussing the way the anterior and
24  posterior colporrhaphy would be done if she had

Page 105

1  chosen that to be done would be with mesh
2  augmentation.
3    Q.   For the purposes of this discussion,
4  we're talking about what's on this form.  And you
5  agree that this form, this is describing a surgical
6  procedure that does not use mesh.  You agree with
7  that?
8    A.   No.  It doesn't describe nor does it not
9  describe how the procedure is going to be done.
10   Q.   You would agree that mesh isn't
11  mentioned anywhere in this form, though, wouldn't
12  you?
13   A.   That is -- that is correct.
14   Q.   All right.  Now, jump down to the fourth
15  sentence in the first paragraph under
16  "Complications" -- starting with "Complications."
17        Do you see that?
18   A.   Yes.
19   Q.   "Complications from this procedure."
20  Would you read that into the record.
21   A.   "Some of the complications of this
22  operation may require further major surgery; some
23  may cause prolonged illness, permanent deformity,
24  poor healing wounds, scarring; and very rarely some

Bruce Rosenzweig, M.D.

Page 106

1 can be fatal.  Furthermore, there may be
2 alternatives to this surgery available to you, such
3 as other types of surgery or the use of supports.
4 However, these alternative methods carry their own
5 risk of complications and varying degrees of
6 success.  Therefore, in those patients in whom an
7 A and P repair is indicated, the procedure may
8 provide the patient with the best chance of
9 successful treatment and the lowest risk of
10 complications."
11     Q.   Now, you see where it says,
12 "Reoccurrence of the condition occasionally
13 happens"?
14     A.   Yes.
15     Q.   Would you read that.
16     A.   Okay, now, where are we again?
17     Q.   Look up in the first full paragraph and
18 there's a sentence that begins "Reoccurrence."
19     A.   Yes.
20          "Reoccurrence of the condition
21 occasionally happens even after successful repair
22 of the vaginal walls.  It is possible that the
23 operation may not help.  It is even possible that
24 you will be worse after the operation than you are

Page 107

1 right now.  Because of these facts, the doctor can
2 make no guarantees as to the result that might be
3 obtained from this operation.  However, in the vast
4 majority of patients, the result desired is
5 achieved."
6     Q.   Now, you agree that this indicates that
7 non-mesh pelvic organ prolapse surgeries have
8 risks, don't they?
9     A.   Yes.
10     Q.   There's a risk of recurrence of the
11 relapse.  Yes?
12     A.   Of the prolapse, yes.
13     Q.   Failure of the procedure to treat the
14 prolapse, correct?
15     A.   Correct.
16     Q.   And the possibility of worsening
17 prolapse even after the surgery?
18     A.   Correct.
19     Q.   And it is also noted here that non-mesh
20 pelvic prolapse -- pelvic organ prolapse surgeries
21 carry the risk of bleeding and infection?
22     A.   Again, remember, Dr. Jones in her prior
23 discussion said that this operation would be done
24 with mesh.  So, we have to assume that this consent

Page 108

1 form relates to an anterior and posterior
2 colporrhaphy with mesh.
3     Q.   The form doesn't say that, doesn't it?
4     A.   No, but the last note we read said that
5 that's how she performs her anterior and posterior
6 colporrhaphies.
7     Q.   I understand that, but we're talking
8 about the form, 4-A.  The form does not -- doesn't
9 say that?
10     A.   Why would Dr. Jones have her sign a form
11 for an operation that she wasn't recommending?
12     Q.   Well, we're not talking about what
13 Dr. Jones said outside of this form.  I'm talking
14 about what's in the body of this form.  That's what
15 I'm asking you questions about right now.
16     A.   But Dr. Jones --
17     Q.   Pre-admitting --
18     MR. HABERMAN:  Objection.
19          (Simultaneous crosstalk.)
20 BY THE WITNESS:
21     A.   Dr. Jones signed this form, and we saw
22 from the prior record that Dr. Jones does her
23 anterior and posterior colporrhaphies with graft
24 augmentation.

Page 109

1     MR. PERSONS:  Object.  Non-responsive.
2 BY MR. PERSONS:
3     Q.   I'm asking you questions specific about
4 the form.  That's all, sir.
5     MR. HABERMAN:  Again, objection.
6 BY THE WITNESS:
7     A.   But it's specific to the way Dr. Jones
8 does her surgery.
9 BY MR. PERSONS:
10     Q.   This says complications -- a
11 complication of a colporrhaphy could be bleeding
12 and infection.  Would you agree that that is a risk
13 associated with surgery?
14     A.   Yes.
15     Q.   And it can damage the urinary system.
16 Surgery can cause that.  A colporrhaphy can cause
17 that?
18     MR. HABERMAN:  Objection.
19 BY THE WITNESS:
20     A.   The surgical procedure, correct.
21 BY MR. PERSONS:
22     Q.   And a colporrhaphy, surgical procedure,
23 it can cause fistulas, can't it?
24     A.   The surgical procedure, correct.

Bruce Rosenzweig, M.D.

Page 110

1    Q.   And as a consequence you can -- the
2  patient could have difficulty controlling
3  urination?
4    A.   From the surgical procedure, correct.
5    Q.   And from the procedure the patient could
6  have dyspareunia.  That's a possible complication
7  of a colporrhaphy?
8    A.   Rarely when an anterior colporrhaphy is
9  done without mesh.
10   Q.   But it can happen?
11   A.   That's what the data shows.
12   Q.   The fourth paragraph of this form says
13  that some of the complications of a non-mesh pelvic
14  organ prolapse repair may require further major
15  surgery.
16       That's one of the potential
17  complications, isn't it?
18   A.   We already discussed this paragraph.
19   Q.   Whether it's done with or without mesh,
20  it can result in that, can't it?
21   A.   The surgery, correct.
22   Q.   And may cause prolonged illness?
23   A.   The surgery, correct.
24   Q.   May result in permanent deformity?

Page 111

1    A.   Correct.
2        I've already read this into the record.
3  Why -- I mean, we're --
4    Q.   If you'd just answer my questions, we
5  could get through this.  I mean, we really could.
6        I'm limited in terms of time.  There is
7  a purpose for my questions.  I didn't just come up
8  with these things.  I spent a lot of time
9  developing this outline, sir.
10       Will you answer the questions?
11   A.   I'm sure you did.
12   MR. HABERMAN:  Objection; argumentative.
13  Argumentative.  Come on.
14  BY MR. PERSONS:
15   Q.   Just answer the question.
16   MR. HABERMAN:  He is answering the questions.
17  You just don't like his answers.  He is answering
18  the questions.  You just don't like them.
19   MR. PERSONS:  That's not true.
20   MR. HABERMAN:  It is.
21   MR. PERSONS:  If he'd say yes or no, we would
22  move on.
23   MR. HABERMAN:  But these are not yes-or-no
24  questions.  He is allowed to explain his answers.

Page 112

1  BY MR. PERSONS:
2    Q.   This requires no explanation.  That a
3  complication of a colporrhaphy is that it can
4  rarely but sometimes be fatal.
5    MR. HABERMAN:  I'm not going to argue with
6  you.  You ask the questions.  He answers them.
7  BY MR. PERSONS:
8    Q.   Did you hear my question?
9    A.   The surgery can be associated with
10  fatality.
11   Q.   Thank you.  Now, nowhere in this form
12  does this form indicate that any of the
13  complications discussed here are restricted to the
14  postoperative period, correct?
15   A.   No, it says that the surgery.  So, yes,
16  it's related to the surgery.
17   Q.   Right, the surgery.
18   A.   The surgery, correct.
19   Q.   And then the last thing we see here
20  under the last paragraph -- not the last thing, but
21  under the last full paragraph is "Cystocele
22  repair"; and that's written in hand and Dr. Jones
23  testified that this is her handwriting?
24   A.   That it's her handwriting?

Page 113

1    Q.   Her handwriting.
2    A.   Correct.
3    Q.   All right.  Now, let's look at the
4  second form.  We've marked this 4-B.
5        (WHEREUPON, Rosenzweig Deposition
6        Exhibit No. 6 was marked for
7        identification:  Consent Form,
8        "Augmentation Graft Consent Form";
9        COL-RBAYLESS-ORLANDO-000026.)
10   MR. HABERMAN:  You know, I need another break
11  if that's all right.  We've been going quite some
12  time.
13   MR. PERSONS:  What do you need?
14   MR. HABERMAN:  I just need another five
15  minutes or so.
16   MR. PERSONS:  Sure.
17   MR. HABERMAN:  All right.
18   MR. PERSONS:  We'll go off for five.
19   MR. HABERMAN:  Okay.
20       (WHEREUPON, a recess was had
21        from 11:42 to 11:54 a.m.)
22  BY MR. PERSONS:
23   Q.   So, we're back and we're on tab 4-B, and
24  this is the "Augmentation Graft Consent Form."  And

Bruce Rosenzweig, M.D.

**Page 114**

1 at the bottom it's signed and dated by both the
2 patient and the doctor.
3      Do you see that, Dr. Rosenzweig?
4 A.  I'm not sure that one -- okay.  There's
5 6.  Great, thank you.
6      Yes.
7 Q.  Okay.  And in the first paragraph, it
8 explains that the graft material used to augment a
9 pelvic floor reconstructive surgery includes
10 fascia, pig scan, cow skin, human skin and
11 synthetic materials such as mesh.
12      Do you see that?
13 A.  Yes.
14 Q.  And a graft made from donated human
15 tissue is known as an allograft, isn't it?
16 A.  Correct.
17 Q.  And a graft made from pig or cow skin is
18 known as a xenograft?
19 A.  Correct.
20 Q.  And I will represent that Dr. Jones drew
21 a circle around the word "synthetic" and underlined
22 the words that follow that.
23 A.  Correct.
24 Q.  Okay.  Now, the third paragraph begins,

**Page 115**

1 "In the last several years, there have been reports
2 of early surgical failures using donor fascia.
3 This is believed to be related to the rigorous
4 treatment process used to prevent any viral
5 transmission.  The failures were noted as early as
6 six months after surgery.  Thus, recently more of
7 the other materials derived from the pig skin, pig
8 intestine, cow skin and synthetic mesh have been
9 used in pelvic organ prolapse surgeries."
10      Did I read that correctly, Doctor?
11 A.  Yes.
12 Q.  And, so, this consent form disclosed the
13 risk that human allografts have a high failure
14 rate, correct?
15 A.  No.  This consent form highlights that
16 there have been some reports about that.  There
17 have been other reports that show that there is no
18 failure rate.
19      So, it's alerting the patient to that
20 there is a possibility that the allograft may be
21 associated in certain situations with an early
22 recurrence.
23 Q.  But it does say that as early as six
24 months following implant?

**Page 116**

1 A.  Correct.
2 Q.  After surgery that the -- there have
3 been failures of the allograft.  Yes?
4 A.  That there have been some reports.
5 Q.  Okay.
6 A.  But there have been other reports that
7 show there is no difference.
8 Q.  All right.  Now we'll discuss more on
9 this later, but an allograft is one of the
10 alternatives that you contend would have been safer
11 for the treatment of Ms. Bayless' pelvic organ
12 prolapse, correct?
13 A.  Correct.
14 Q.  Now, the fourth paragraph of this
15 document, 4-B, goes on to explain that "When mesh
16 is used in gynecological surgery, there is a 5 to
17 10% chance that this mesh can cause delayed healing
18 and eventually erode into the vagina, requiring a
19 second surgery to remove it."
20      Do you see that?
21 A.  Yes.
22 Q.  All right.  And, again, I'll represent
23 that Dr. Jones testified that she drew the star
24 next to the last sentence and the two stars next to

**Page 117**

1 the sentence below it that said, "Sling material is
2 made of synthetic material/mesh."
3      Do you see that?
4 A.  Yes.
5 Q.  All right.
6 A.  And, so, just to reiterate, this is
7 saying that the mesh causes delayed healing.
8 Q.  There was no question pending, so I'd
9 move to strike that comment.
10      Now, the question is:  This form
11 disclosed a 5 to 10% risk that synthetic mesh
12 would, quote, "erode" into Ms. Bayless' vagina.
13 Yes?
14 A.  Would --
15 Q.  According to this form.
16 A.  -- cause that, yes.
17 Q.  And that if that occurred, that the
18 patient may require a second surgery to remove the
19 mesh?
20 A.  Correct.
21 Q.  And you have no reason to think that
22 Ms. Bayless did not review this form before signing
23 it, do you?
24      MR. HABERMAN:  Objection.

Bruce Rosenzweig, M.D.

Page 118

BY THE WITNESS:
1  A.  I know she was asked that question at
her deposition, and I do not specifically recall
how she answered that question.
5  BY MR. PERSONS:
6  Q.  All right.  If she testified she
wouldn't sign anything without reading it, you have
no reason to dispute that testimony, do you?
9  A.  Correct.
10  Q.  And you don't have any reason to think
that Ms. Bayless did not review this form before
signing it -- I asked you that.  Strike that.
13       You have no reason to think that
Dr. Jones did not discuss this form with
Ms. Bayless before Ms. Bayless signed it?
16  A.  There might have been a double negative
in there.  But according to her deposition,
Dr. Jones stated that she did discuss this with
her.
20  Q.  Thank you.  Now, let's look at the next
document we've marked.  It's under tab 4-C.
22       (WHEREUPON, Rosenzweig Deposition
23        Exhibit No. 7 was marked for
24        identification:  Consent Form,

Page 119

1       "Hysterectomy Surgical Consent
2        Form";
3        COL-RBAYLESS-ORLANDO-000023.)
4  BY MR. PERSONS:
5  Q.  And it says, "Hysterectomy Surgical
Consent Form."  And the third-to-last sentence in
the first paragraph, if you could go there with me,
please, beginning with the words, "It is possible."
9       Do you see that?
10  A.  Yes.
11  Q.  According to this form, this form says,
"It is possible that this operation will not help
you.  It is even possible that you will be worse
after the operation than you are now."
15       Do you see that?
16  A.  Yes, but that wouldn't apply to this
operation because her uterine prolapse wouldn't be
worse because her uterus would be gone.
19  Q.  Well, right now we're just talking about
a hysterectomy.  I mean, I'm just confining my
questions to this form.
22  A.  Right.  But it states that you would be
worse from your condition after the operation, but
she doesn't have a uterus anymore so she can't have

Page 120

1  uterine prolapse anymore.
2  Q.  I understand that.
3       Do you disagree that this statement
regarding risk, that this is an incorrect statement
regarding the risk of a hysterectomy?
6  A.  Well, for prolapse because the uterus
would be gone.
8  Q.  Assume it's not for prolapse.  Just
confining it to this statement, hysterectomy --
10  A.  Sure.  If you have pelvic pain and the
hysterectomy is for pelvic pain, there's a 25%
chance that the pelvic pain won't go away.
13  Q.  Right.  I think that's what this is
talking about.
15  A.  Right, yeah.
16  Q.  Jump down to the third paragraph, and
this is talking about the risks of hysterectomy, if
you would, please, sir.
19       It talks about infection.  Do you see
that?
21  A.  Yes.
22  Q.  Infection, poor healing, formation of
adhesions, damage to surrounding areas, nerve
damage causing weakness, numbness and painness --

Page 121

1  numbness and pain in thighs, legs and feet, blood
clots in legs and lungs, shortening of the vagina.
3       Do you see those?
4  A.  Yes.  That's from the surgery, correct.
5  Q.  And this is particularly so when the
cervix is also removed, isn't it?
7  A.  Yes, that would be a total hysterectomy.
8  Q.  Right.  And shortening of the vagina,
according to this, can even cause loss of -- not
shortening of the vagina.  Hysterectomy can also
cause loss of libido, right?
12  A.  Well, that's what this form states.
Loss of libido hasn't been directly associated with
doing a surgical procedure.  It's usually
associated with medication, psychological
dysfunction.  I mean, women can lose some sexual
desire if they have a concomitant oophorectomy.
So, I mean, it's what this form states.
19       That I might want to challenge a little
bit on its own.  The data shows that a third of
women that have a hysterectomy have more pleasure
with intercourse, a third of women have decreased
pleasure with intercourse and a third have the
same.  So...

Bruce Rosenzweig, M.D.

Page 122

1    Q.   All right.  But you would agree that the
2   uterus helps regulate hormones?
3    A.   No.
4    Q.   Okay.  You disagree with that?
5    A.   Yes.  The uterus is the organ that
6   hormones respond to.
7         Now, there is some blood flow that comes
8   from the uterus to the ovary and sometimes if you
9   disrupt the blood flow to the ovary from the
10  uteroovarian ligament being transected at the time
11  of hysterectomy, you can develop ovarian cysts.
12  But the uterus doesn't do anything to produce
13  hormones.
14   Q.   You would agree that a hormonal
15  imbalance can lead to loss of libido, though?
16   A.   If the ovaries are removed, it could.
17   Q.   Now, the last paragraph, last full
18  paragraph says, "Finally, I understand that it is
19  impossible to list every possible undesirable
20  effect that the surgery may have, that the
21  condition for which surgery is done is not always
22  cured or significantly improved, and that in rare
23  cases the condition may even be worse" -- "may even
24  worsen."

Page 123

1         Did I read that correctly?
2    A.   Yes.
3    Q.   Do you agree with that statement?
4    A.   It depends on why the hysterectomy is
5   done.
6    Q.   That it's impossible to list every risk
7   of every surgery.  You'd agree with that, wouldn't
8   you?
9    A.   Yes.  I mean, the operative light could
10  fall on the patient during the surgical procedure.
11   Q.   And this would be true whether a surgery
12  is done with mesh or without mesh, correct?
13   A.   The risk of surgery, correct, but not
14  the risk of mesh.
15   Q.   We're talking about the risk of surgery.
16   A.   Correct.
17   Q.   That's what this form is talking about.
18   A.   Yes.
19   Q.   And, of course, the surgery that this
20  forms pertains to, the hysterectomy, is one that's
21  not being done -- is one that is not done with
22  mesh, correct?
23   A.   You don't need to use mesh to do a
24  hysterectomy.

Page 124

1    Q.   Right.  Now, are you aware that
2   Ms. Bayless testified that she requested the
3   hysterectomy; that she was not advised that she
4   needed one?
5    A.   I do have a general recollection of that
6   testimony.
7    Q.   All right.  You are aware that she
8   wanted her cervix removed in part because it was
9   causing her pain during intercourse.  You recall
10  that?
11   A.   Yes.
12   Q.   And you're aware also that she testified
13  that she thought removing her cervix would prevent
14  future prolapse?
15   A.   That I have a general recollection of
16  that.  That's what she thought.  You can't --
17   Q.   Pardon?
18   A.   You can't have prolapse of an organ if
19  it's not there.
20   Q.   Right.  Okay.  Let's look at 4-D.
21        (WHEREUPON, Rosenzweig Deposition
22         Exhibit No. 8 was marked for
23         identification:  Consent Form,
24         "Informed Consent and Request for

Page 125

1         Repair of Relaxation of Pelvic
2         Organs and/or Urinary
3         Incontinence";
4         COL-RBAYLESS-ORLANDO-000021 and
5         000022.)
6   BY MR. PERSONS:
7    Q.   Now, this consent form, "Informed
8   Consent and Request for Repair of Relaxation of
9   Pelvic Organs and/or Urinary Incontinence," and the
10  surgery to which Ms. Bayless was consenting is
11  signified by her signature on the second page of
12  this document.
13        Do you see that?
14   A.   Yes.
15   Q.   All right.  Signed 5/28/13.
16        It describes, and this is in
17  handwriting, "Robotic-assisted total laparoscopic
18  hysterectomy, cystocele repair, sacral colpopexy
19  with mesh, sling, cystoscopy repair."
20        Do you see that?
21   A.   Yes.
22   Q.   All right.  And in paragraph that's
23  numbered 1, there are certain letters that are
24  circled, A, D, E and F.

Bruce Rosenzweig, M.D.

Page 126

1    Do you see that?
2    A.   Yes.
3    Q.   Do you agree this accurately describes
4  the various prolapses that Ms. Bayless was
5  experiencing at the time?
6    A.   Well, F is incontinence, so that's not
7  prolapse.  But, yes, she had a cystocele, she
8  had -- well, she really didn't have vault prolapse.
9  That would mean that the uterus was already gone.
10   But she did, you know, have what's
11 described as an enterocele and she did have early
12 stage II uterine prolapse.
13   Q.   Okay.  And you've read her deposition,
14 so you know Dr. Jones testified she circled those
15 letters herself?
16   A.   Correct.
17   Q.   And in Paragraph No. 2 of the form it
18 says, "The nature of the procedure is to surgically
19 strengthen and repair the supporting tissue of the
20 vagina."  Correct?
21   A.   That's what it states.
22   Q.   And you agree with that statement, that
23 accurately describes the purpose of a pelvic floor
24 reconstructive surgery?

Page 127

1    A.   In layman's terms, it's probably as
2  close as you get.  I mean, you're really not
3  strengthening the tissue that's supporting the
4  vagina.  You're creating a fascial bridge to
5  support the structures in the vagina.
6    Q.   Okay.  But -- and this is written for a
7  lay audience, isn't it?
8    A.   Correct.
9    Q.   It's eliciting the patient's consent?
10   A.   Correct.
11   Q.   All right.  Now, Paragraph No. 3 says --
12   A.   But your question was does it accurately
13 reflect what's being done.  In a layman's sense,
14 yes.  But, I mean, you know.
15   Q.   Fair enough.  Okay.
16   No. 3, "The purpose of this procedure,"
17 it goes on to -- it has various letters circled
18 there, doesn't it?
19   A.   Yes.
20   Q.   And Dr. Jones testified that she circled
21 these letters.  And you remember that testimony?
22   A.   Yes.
23   Q.   And this describes in lay terms the
24 procedures for which Ms. Bayless was giving her

Page 128

1  consent to undergo, right?
2    A.   Correct.
3    Q.   All right.  Now, there are material
4  risks listed in Paragraph No. 4, and these are
5  general surgical risks of any surgical procedure
6  performed under anesthesia, correct?
7    A.   From the surgery, correct.
8    Q.   And you look at the -- several of these
9  risks were listed in the other forms that we
10 reviewed just previously, other consent forms, that
11 are a risk of -- just risks of surgery?
12   A.   Of the surgery, correct.
13   Q.   Now, let's look at the first --
14 there's a -- she's got stars next to some of these
15 risks involved in this particular procedure.
16   She said, "Possibly no improvement or
17 only temporary improvement in urine control;
18 worsening urinary incontinence."
19   That's specific to the surgical
20 treatment for Ms. Bayless' SUI, isn't it?
21   A.   More so than the abdominal
22 colposacropexy.
23   Q.   And I mean there is also a risk of
24 worsening urinary incontinence when repairing a

Page 129

1  cystocele, right?
2    A.   Correct.  That's why I said more so with
3  the SUI procedure.
4    Q.   Right.  And that risk is present in any
5  cystocele repair surgery with or without mesh,
6  isn't it?
7    A.   From the surgery, correct.
8    Q.   Now, let's look at the next starred
9  risk.  It says, "Possible prolonged need of a
10 catheter to drain the bladder; incomplete bladder
11 emptying (urinary retention)."
12   That's also specific to the stress
13 urinary incontinence surgery, isn't it?
14   A.   No.  That would be more so for the SUI
15 procedure, but can also be for the prolapse
16 procedure, from the surgery itself.
17   Q.   Okay.  Now, underneath that star, it
18 says, "Possible pain or discomfort with sexual
19 intercourse."
20   Do you see that?
21   A.   Yes, but that's not starred.
22   Q.   No, I said beneath that.  I didn't say
23 it was starred.  I said beneath the last one we
24 discussed is an entry that says, "Possible pain or

Bruce Rosenzweig, M.D.

Page 130

1 discomfort with sexual intercourse."  Isn't that on
2 the form?
3     A.   It's on the form, but it's not starred.
4     Q.   I didn't say it was starred.  I said
5 beneath the last star we discussed is an entry that
6 says, "Possible pain or discomfort with sexual
7 intercourse."
8     A.   Okay.  But, again, it is not starred.
9 But it is on the form.
10     Q.   That's the question.  It's on the form,
11 right?
12     A.   Correct.
13     Q.   And this was also on the first one of
14 these forms that we looked at, the one for
15 colporrhaphy.  Do you remember that?
16     A.   From the surgical procedure, correct.
17     Q.   Right.  Now, the last one of these
18 items, and it's starred, says, "Recurrence of
19 cystocele, rectocele, enterocele or vaginal vault
20 prolapse."
21        Did I read that correctly?
22     A.   Yes.
23     Q.   "Success rate 85%."
24     A.   Yes.

Page 131

1     Q.   So, it's informing the patient of the
2 risk of recurrence.  Yes?
3     A.   Correct.
4     Q.   And the risk of recurrence isn't
5 something that's unique to any particular pelvic
6 organ prolapse surgery, is it?
7     A.   No.  From the surgery itself.
8     Q.   Right.  That can happen with any
9 prolapse, POP surgery?
10     A.   From the surgery, correct.
11     Q.   And then you have got the patient's
12 initials at the bottom of this page we just
13 discussed?
14     A.   Yes.
15     Q.   And let's go to the next page.  On
16 page 2, it says, "The alternative" -- "Practical
17 alternatives to this procedure include."
18        Do you see that language?
19     A.   Yes.
20     Q.   "Do nothing and accept the consequences
21 of the patient's condition.  Use of artificial
22 supports (pessaries)."  Right?
23     A.   Yes.
24     Q.   And then it has, "Exercise (Kegel

Page 132

1 exercises, vaginal weights)."
2     A.   Yes.
3     Q.   And you're aware that Ms. Bayless
4 testified that she was not interested in any of
5 these alternatives, correct?
6     A.   Correct.
7     Q.   That she wanted surgery to, in her
8 words, put everything back in place where it was
9 supposed to go?
10     A.   Correct.
11     Q.   And that she hoped, and to quote her
12 words, that the surgery would tighten her vagina up
13 some?
14     A.   I have a general recollection of that.
15     Q.   Okay.  All right.  And then there's a
16 paragraph in all caps about halfway down, "By
17 signing this form."
18        Do you see that?
19     A.   Yes.
20     Q.   And it says, "By signing this form, I
21 acknowledge that I have read or had this form read
22 and/or explained to me, that I fully understand its
23 contents and that I have been given ample
24 opportunity to ask questions and that any questions

Page 133

1 have been answered satisfactorily.  All blanks are
2 or statements requiring completion were filled in
3 and all statements I do not approve of were
4 stricken before I signed this form.  I also have
5 received additional information, including but not
6 limited to the materials listed below relating to
7 the procedure described herein."
8        Did I read that correctly?
9     A.   Yes.
10     Q.   All right.  And you're aware that this
11 patient testified that she reviewed this form
12 before signing it and that she reviewed all the
13 other consents before signing.  Yes?
14     A.   I have a general recollection of that,
15 yes.
16     Q.   All right, sir.  And you're also aware
17 that Dr. Jones testified that she or someone in her
18 office reviewed all of these forms in detail with
19 Ms. Bayless before they were signed?
20        MR. HABERMAN:  Objection.
21 BY MR. PERSONS:
22     Q.   Yes?
23     A.   Correct.
24     Q.   On this form, before we leave it, this

Bruce Rosenzweig, M.D.

Page 134

1 Exhibit 4-D, at the bottom, there's a "Coloplast
2 Restorelle Y-mesh" is specifically listed here,
3 isn't it?
4     A.   As additional materials used during the
5 consent process.
6     Q.   Right.
7     A.   So, this would imply that she was given
8 product-specific information about the Restorelle
9 Y-mesh and the Advantage Fit as well.
10     Q.   Right.  Okay.  Let's go to Tab No. 5.
11         (WHEREUPON, Rosenzweig Deposition
12          Exhibit No. 9 was marked for
13          identification:  8/9/13 Operative
14          Report; COL PLTF 000066 RBAYLESS -
15          COL PLTF 000070 RBAYLESS.)
16 BY MR. PERSONS:
17     Q.   This is the operative report.  Do you
18 see that record?
19     A.   Yes.
20     Q.   And this is referenced in your report,
21 isn't it, Doctor?
22     A.   Yes.
23     Q.   Now, you don't offer any criticism of
24 Dr. Jones' implantation technique, do you?

Page 135

1     A.   No, I do not.
2     Q.   Nor do you plan to offer any criticism
3 of Dr. Jones' implantation technique, correct?
4     A.   Correct.
5     Q.   You also don't have any critique of
6 Dr. Jones' decision to perform a hysterectomy prior
7 to the mesh implantation procedures, correct?
8     A.   Correct.
9     Q.   And you don't plan to offer any such
10 criticism?
11     A.   Correct.
12     Q.   Now, the postoperative diagnoses listed
13 are the same as the preoperative diagnoses with one
14 exception, isn't it?
15     A.   Yes.
16     Q.   And that being No. 4 under
17 "Postoperative Diagnoses," pelvic adhesions, right?
18     A.   Yes.  Left pelvic sidewall adhesions.
19     Q.   And under "Findings," Dr. Jones
20 describes them, doesn't she?
21     A.   Yes.
22     Q.   Now, pelvic adhesions are fibrous bands
23 of scar tissue that form between the internal
24 organs and tissues in the pelvic region, correct?

Page 136

1     A.   Correct.
2     Q.   And when symptomatic, the patient might
3 experience chronic pelvic pain.  Yes?
4     A.   Where these adhesions were found were
5 not in the pelvis.
6     Q.   But setting that aside, just generally
7 speaking, when symptomatic, pelvic adhesions can
8 cause chronic pelvic pain?
9     A.   In a general sense, yes.  But these were
10 adhesions from the sigmoid colon due to
11 diverticular disease, and that would lead more to
12 bowel irritation.
13     MR. PERSONS:  Move to strike everything after
14 the word "yes."
15 BY MR. PERSONS:
16     Q.   Pelvic adhesions --
17     MR. HABERMAN:  That's uncalled for.
18     MR. PERSONS:  Go ahead.
19     MR. HABERMAN:  I said that's uncalled for.  I
20 disagree.  The doctor is allowed to answer the way
21 he sees fit.
22     MR. PERSONS:  That's not my question.
23 BY MR. PERSONS:
24     Q.   My question is, generally speaking,

Page 137

1 pelvic adhesions can cause bowel obstruction, can't
2 they?
3     MR. HABERMAN:  Objection; asked and answered.
4 BY THE WITNESS:
5     A.   They can, but there is no evidence in
6 this case that they were.
7 BY MR. PERSONS:
8     Q.   They can cause an inability to pass gas?
9     A.   Well, that would be if there is an
10 obstruction.
11     Q.   Right.  And they can cause pain with
12 bowel movements or difficulty with bowel movements,
13 can't they?
14     A.   Pain with bowel movements?  No.
15 Difficulty with bowel movements, if there's an
16 obstruction.
17     Q.   All right.  Pelvic adhesions can cause
18 urinary dysfunction?
19     A.   No.
20     Q.   They can cause bladder dysfunction?
21     A.   No.
22     Q.   Okay.  They can cause pain with walking?
23     A.   Not necessarily.
24     Q.   But they can?

Bruce Rosenzweig, M.D.

Page 138

1   A.   Not necessarily.
2   Q.   They can cause pain when lying down in
3   certain positions?
4   A.   Possibly.
5   Q.   And they can cause pain with intercourse
6   under certain circumstances?
7   A.   Correct.
8   Q.   Now, pelvic adhesions can result -- can
9   develop as a result of any surgery in the pelvic
10  region, can't they?
11  A.   Yes.
12  Q.   And that would include surgeries that
13  don't involve mesh at all?
14  A.   Correct.
15  Q.   In fact, that's what we see here with
16  Ms. Bayless, that she had these adhesions that
17  existed pre-op, correct?
18  A.   Correct.
19  Q.   Now, also under "Findings," Dr. Jones
20  documented evidence of diverticular disease in the
21  sigmoid colon.  I believe you referenced that
22  earlier?
23  A.   Correct.
24  Q.   And you noted that in your report on

Page 139

1   page 5, didn't you?
2   A.   Correct.
3   Q.   Now, diverticular disease can be painful
4   if it isn't treated, can't it?
5   A.   It can lead to painful bowel movements,
6   correct.
7   Q.   It can lead to diverticulitis, can't it?
8   A.   If there is inflammation of the
9   diverticular disease, yes.
10  Q.   And diverticulitis, as it progresses,
11  the symptoms can include abdominal pain?
12  A.   Yes.
13  Q.   Abdominal tenderness?
14  A.   Yes.
15  Q.   Nausea, especially after eating?
16  A.   Yes.
17  Q.   Or engaging in physical activity, you
18  can have nausea if you've got diverticulitis?
19  A.   Correct.
20  Q.   Vomiting?
21  A.   Yes.
22  Q.   Constipation?
23  A.   Yes.
24  Q.   And other bowel discomfort?

Page 140

1   A.   Yes.
2   Q.   All right.  Let's go to Tab No. 7.
3         (WHEREUPON, Rosenzweig Deposition
4         Exhibit No. 10 was marked for
5         identification; 9/24/13 medical
6         record; COL-RBAYLESS-ORLANDO-000013
7         - 000015.)
8   BY MR. PERSONS:
9   Q.   And this is a medical record from
10  September 24, 2013, and under "History" it has,
11  "Six weeks three days post-op."
12        Do you see that?
13  A.   Yes.
14  Q.   So, this is six weeks three days after
15  her status post sacral colpopexy with mesh,
16  cystocele repair with mesh, right?
17  A.   It was an abdominal colposacropexy with
18  mesh.  There was no specific cystocele repair.
19  Q.   But according to this record, it just
20  says -- this record is what I'm reading from.
21  A.   Right.  But we know from the surgical
22  procedure that the mesh was an abdominal sacral
23  colpopexy.  There was no specific mesh that was
24  placed specifically to treat a cystocele.

Page 141

1   Q.   I see.  All right.
2         But, in any event, Ms. Bayless is noted
3   to be "doing well except for occasional discomfort
4   in pelvic and mood swings."
5         Do you see that?
6   A.   Yes.
7   Q.   And occasional pelvic discomfort in six
8   weeks after pelvic surgery, that's to be expected,
9   isn't it?
10  A.   Correct.
11        MR. HABERMAN:  Objection.
12  BY MR. PERSONS:
13  Q.   And mood swings are also not unusual in
14  a patient who has just undergone hysterectomy,
15  right?
16  A.   Not necessarily.
17  Q.   On page 2 under "Social History,"
18  Ms. Bayless was noted to still be smoking five to
19  ten cigarettes per day.  Yes?
20  A.   That's what the record states, but she
21  stated in her deposition that she had quit smoking
22  for two to three months after surgery.
23  Q.   All right.  And then this record,
24  according to this record, Ms. Bayless reported that

Bruce Rosenzweig, M.D.

**Page 142**

1  she wasn't using illicit drugs at that time?

2     A.  Correct.

3     Q.  But if I represent to you that

4  Ms. Bayless reported to other providers around this

5  time that she was still using crack cocaine, would

6  you have any reason to disagree with that?

7     MR. HABERMAN:  Objection.

8  BY THE WITNESS:

9     A.  I don't specifically recall that she was

10  asked if she was using crack cocaine around the

11  time of her surgery at her deposition.

12  BY MR. PERSONS:

13     Q.  But if some other medical record

14  indicated that she was, you wouldn't have any --

15  you wouldn't be in a position to disagree with that

16  medical record?

17     A.  But we could discuss that medical

18  record.  It could just be that she has a history,

19  which I saw in other medical records, of crack

20  cocaine use.  And I do recall that in 2014 there

21  are records that state that she was using crack

22  cocaine again, but around the time of her surgery

23  she wasn't.

24     Q.  All right.  Under "Review of Systems,"

**Page 143**

1  ROS, this record states that she was complaining of

2  abdominal pain, change in appetite, heartburn,

3  difficulty swallowing, nausea and bowel movement

4  changes.

5     Do you see that?

6     A.  Yes.

7     Q.  Those aren't unusual symptoms following

8  a hysterectomy and major pelvic floor

9  reconstructive surgery, are they?

10     A.  Correct.

11     Q.  She's also reporting discharge, vaginal

12  odor, vaginal itching, but no abnormal bleeding, no

13  flank pain, no rash and no lesion.

14     Do you see that?

15     A.  Correct.

16     Q.  And she reported dry vaginal mucosa and

17  decreased libido and orgasmic dysfunction.

18     Do you see that?

19     A.  Yes.

20     Q.  Now, you referenced those symptoms in

21  your summary of this record on page 6 of your

22  report, didn't you?

23     A.  Correct.

24     Q.  Now, Ms. Bayless hadn't reported either

**Page 144**

1  decreased libido or orgasmic dysfunction prior to

2  her August 9, 2013 surgery, had she?

3     A.  Not that I specifically recall from the

4  medical records.

5     Q.  All right.  You agree that the tab 4-C

6  that we discussed earlier, that form discussed loss

7  of libido, didn't it?

8     A.  And what's the exhibit number for that

9  again?

10     Q.  It's 4-C.

11     A.  Oh, the consent form.

12     Q.  Yes.  The consent form.  I'm sorry.

13     A.  Okay.

14     Q.  It mentioned loss of libido.

15     A.  As of -- again, I think we had a

16  discussion about that.

17     Q.  Problems associated with surgery is the

18  way it's described on the form?

19     A.  Correct.

20     Q.  And you would agree that the only way

21  that Ms. Bayless could have reported orgasmic

22  dysfunction is if she had engaged in some sort of

23  sexual activity following her operation?

24     A.  That would be an implication, but that

**Page 145**

1  doesn't mean that she had intravaginal penetration.

2     Q.  But she had some sexual activity.

3  Otherwise, I mean -- if you're having orgasmic

4  dysfunction, I mean, that portends some kind of

5  sexual activity?

6     A.  That would be the implication.  I don't

7  specifically recall when Ms. Bayless testified in

8  her deposition that she resumed sexual intercourse.

9  I have a general recollection that she stated that

10  she resumed sexual intercourse at the time that her

11  doctor told her that she could.

12     Q.  And I want you to assume that Dr. Jones

13  testified that she ordered Ms. Bayless to refrain

14  from any sexual activity for 12 weeks following her

15  surgery?

16     A.  We've had that discussion earlier about

17  that.

18     Q.  If that's the case, then this record

19  would suggest or confirm that Ms. Bayless was

20  non-compliant with postoperative restrictions

21  regarding sexual activity, correct?

22     A.  If -- now, when we see things going

23  together with an "and," that could be the way the

24  medical record auto-populates.

Bruce Rosenzweig, M.D.

Page 146

1    So, if you're clicking off "Decreased
2  libido," you would get "and orgasmic dysfunction"
3  together, which is the way my EMR populates when
4  you click off one of those entities, you get both.
5  If there's a comma, that would be a separator.
6    So, we see up above, "Difficulty
7  swallowing, comma, nausea, comma, and bowel
8  movement changes."  When there's a comma, that is a
9  separate entity.
10    There is no comma here, which would mean
11  that they are an entity together that would
12  populate.
13    So, it would depend on how the EMR
14  populates which, again, one would make the
15  assumption that this saying "orgasmic dysfunction"
16  means that she had some degree of sexual activity.
17  The sexual activity that is -- one needs to refrain
18  upon is intravaginal penetration.
19    Having other non-intravaginal forms of
20  intercourse would not be critical to abstain from
21  in the postoperative period because that has
22  nothing to do with postoperative recovery.
23    Q.  Let me ask you this.  Where in this
24  record does it say anything about what type of

Page 147

1  program that this doctor used or that the absence
2  of a comma signifies that this would somehow
3  populate?  Where is any of that in this form?
4    A.  It says right up top "Athena."  See
5  right on top of the page.
6    Q.  Doesn't it say --
7    A.  See it says, "Athena."  That's the EMR
8  that's used, Athena.
9    Q.  But doesn't this record say, "She," the
10  patient, "reports dry vaginal mucosa"?
11    A.  Yes.
12    Q.  "Impaired memory"?
13    A.  Yes.
14    Q.  "And impaired concentration"?
15    A.  Yes.
16    Q.  "She reports decreased libido and
17  orgasmic dysfunction"?
18    A.  Right.  But there are commas after
19  certain ones and no commas after the other.
20    Q.  Okay.  All right.  Well, if she --
21    A.  But you asked me is there any evidence
22  what medical record it is.  Yes, this is Athena.
23    Q.  Okay.  All right.
24    Now, she did not -- if in fact she did

Page 148

1  have orgasmic dysfunction, if she reported orgasmic
2  dysfunction, that would mean that she engaged in
3  some kind of sexual activity within the 12-week
4  period, correct, following the surgery?
5    A.  That hypothetical?
6    Q.  Yes.
7    A.  That's a hypothetical, but that's not
8  based on what her deposition testimony is.
9    Q.  What deposition testimony are you
10  talking about now?
11    A.  Ms. Bayless' deposition testimony.  She
12  did -- she didn't say -- she did not affirm that
13  she had intravaginal penetration prior to
14  September 23 -- 24, 2013.
15    Q.  All right.  Is it your testimony if one
16  of your patients reported orgasmic dysfunction
17  within six weeks of a hysterectomy and concomitant
18  SUI and POP surgery, you wouldn't raise any
19  concerns about non-compliance with post-op
20  restrictions?
21    A.  I would ask what kind of sexual activity
22  you were having.
23    Q.  All right.  Let me ask you this.  Do you
24  use Athena?

Page 149

1    A.  Yes.
2    Q.  Okay.  And do you know whether Athena
3  auto-populates "orgasmic dysfunction" with
4  "decreased libido"?
5    A.  To my recollection, yes.
6    Q.  Okay.
7    A.  Because we see discussed --
8    Q.  I don't need anything more than that.
9    A.  What's that?
10    Q.  That's your testimony.  That's your
11  testimony.  That's fine.
12    A.  But let's look down at "Discussion."
13  "Discussed postoperative activity and
14  restrictions."
15    We don't see that she -- she says,
16  "Encouraged adherence to stool softener."  It
17  doesn't say, "Encouraged adherence to nothing
18  inside of her vagina."
19    Dr. Jones must not have felt that there
20  was something placed inside of her vagina, which is
21  the restriction that would impact postoperative
22  healing.
23    So, we see what the discussion is.  So,
24  discussed postoperative activity, yes.  And

Bruce Rosenzweig, M.D.

Page 150

1 restrictions, yes. But there's no "Encouraged no
2 intravaginal penetration."
3     MR. PERSONS: Move to strike as unresponsive.
4 BY MR. PERSONS:
5     Q.   Let's go to page 3. Dr. Jones
6 documented performing a physical examination?
7     A.   Correct.
8     Q.   The Words "Physical Examination" appears
9 on the previous page, but this is her physical
10 examination, correct?
11     A.   Correct.
12     Q.   And she notes -- let's see.
13         On "Abdomen," it says, "Well-healed,
14 clean dry intact, non-tender, incisions.
15 Laparoscopic incisions well-healed." We see that?
16     A.   Yes.
17     Q.   We see "No tenderness," right?
18     A.   Correct.
19     Q.   She says, "No tenderness."
20         She did not note any erythema, right?
21     A.   Correct.
22     Q.   Cystocele, rectocele, abdominal --
23 abnormal vaginal discharge or vesicles or ulcers,
24 right?

Page 151

1     A.   Correct.
2     Q.   But she did, Dr. Jones, find, "Minimal
3 separation with foreign body visualized central
4 apical incision."
5     A.   Yes.
6     Q.   Do you see that?
7     A.   Yes.
8     Q.   The incision made at the apex of her
9 vagina was made in the course of removing her
10 cervix, wasn't it?
11     A.   Yes.
12     Q.   And the removal of her cervix was part
13 of her hysterectomy, correct?
14     A.   Correct.
15     Q.   All right. Now, that's not noted
16 anywhere in your report, though, is it?
17     A.   Correct. I mean, the foreign body that
18 was visualized could be the V-Loc suture that she
19 used at the time of cuff closure.
20     Q.   You didn't think the fact that the --
21 that mesh became visible at the apical incision
22 site was relevant to any opinion you're offering in
23 this case?
24     A.   Well, it says, "Minimal separation with

Page 152

1 foreign body visualized." The foreign body could
2 be the V-Loc suture which has -- there are three
3 different kinds of V-Loc suture. There is a
4 permanent, there is a 90-day absorbable and there
5 is 180-day absorbable. In the surgical report it
6 didn't say which one was used.
7         So, reading her deposition, she stated
8 that she used the 180-day absorbable V-Loc suture
9 and at her deposition initially she said, yeah,
10 this could have been suture; but when pressed, she
11 said, yeah, this could be the mesh.
12         So, just reading this did not give me
13 enough information about what she saw. So,
14 therefore, I waited to see what she said in her
15 deposition.
16     Q.   And in her deposition she said it was
17 mesh, didn't she?
18     A.   Well, she said it could be suture too.
19     Q.   Now, when two sides of an incision
20 separate postoperatively, that's referred to as a
21 dehiscence, right?
22     A.   If it separates completely. This is a
23 minimal separation with the sutures still present.
24     Q.   But a wound dehiscence creates a second

Page 153

1 wound, doesn't it?
2     A.   But this isn't a wound dehiscence.
3     Q.   I'm not asking you that. I asked you a
4 simple question.
5         A wound dehiscence creates a separate
6 wound, a second wound? Yes or no.
7     A.   No. It's a dehiscence through the
8 surgical incision meaning the surgical incision
9 completely separates.
10     Q.   And if it separates, you've got two
11 wounds?
12     A.   No. It's through the -- you -- the
13 wound is separated.
14         Now, are you asking me are there two
15 sides to that wound?
16     Q.   Yes.
17     A.   Ah. So, please --
18     Q.   Okay.
19     A.   If you have a circular wound and you
20 close it like this and it opens, yeah, you would
21 have two sides. But it's one wound. It's not a
22 second wound.
23     Q.   All right. Now, Dr. Jones didn't
24 document finding any exposed mesh or other foreign

Bruce Rosenzweig, M.D.

Page 154

1  body material anywhere else in Ms. Bayless' vagina
2  at the time of this examination on September the
3  24th of 2013, did she?
4      A.   Correct.
5      Q.   Now, underneath "Assessment and Plan,"
6  Dr. Jones wrote that she "Discussed post-op
7  activity and restrictions and encouraged
8  adherence."
9          Do you see that?
10     A.   To continue stool softeners.
11         Commas are very important.
12     Q.   And then it talks about --
13     A.   Laser vaginal rejuvenation.
14     Q.   Right.  Now, I'm not going to ask you
15  about that.
16     A.   Okay.
17     Q.   Are you aware that Dr. Jones testified
18  that Ms. Bayless did not return for any follow-ups
19  after the September 24, 2013 visit?
20     A.   Correct.
21     Q.   You'd agree, though, that patients
22  generally should follow up with their surgeon more
23  than once after having sling placement, robotic
24  sacral colpopexy and a then current total

Page 155

1  hysterectomy, right?
2      A.   It would be -- I mean, that's the way I
3  practice.  I've seen physicians that give the
4  go-ahead and return the patient back to the
5  referring physician.
6      Q.   But when a patient -- this would be
7  particularly true where a patient is not seeing a
8  primary care physician or an Ob-Gyn for regular
9  checkups, right?
10     A.   Let's go back to her first.  I mean, she
11  was referred by -- to Dr. Jones by a doctor, and I
12  know it was in the first note that we looked at
13  from Dr. Jones.
14         Sorry.  Taking a while for the --
15     Q.   That's okay.
16     A.   But I don't think it specifically stated
17  the type of doctor that referred her to her.  I
18  know that Dr. -- or I think Dr. Bukkapatnam is a
19  primary care doctor.
20     Q.   All right.
21     A.   So but, yes, I would agree with you that
22  it is important for someone to have a physician
23  that the patient can go back to for follow-up.
24  That could be a primary care provider if there

Page 156

1  aren't a significant number of gynecologists in the
2  area and -- yeah.
3          No, it doesn't say who was the doctor
4  that referred her.
5      Q.   All right.  Okay.
6      A.   And if I recall her deposition, there
7  was like a referral letter that she had signed for
8  the urodynamics, but she said that -- that's how
9  Athena populates urodynamics reports, that there is
10  a referral letter that comes up, but there was
11  nobody that she was sending it to.
12     Q.   Now, before we leave this record, is it
13  your testimony that the encouraged adherence just
14  pertained only to continuing stool softeners?
15     A.   Well, yeah, there is no comma after
16  "encouraged adherence."
17     Q.   That it has absolutely -- there is space
18  that could have gone to something else.  That's not
19  a separate answer.
20         Isn't "Continue stool softener" a
21  separate entry that's on a separate line just like
22  "Patient interested in LVR" is?
23     A.   Well, you know, it would be important to
24  have asked her that, what she meant by this, so

Page 157

1  that we weren't sitting around trying to interpret
2  it after Dr. Jones had two and a half to three
3  hours to give a deposition.
4      Q.   Well, I'm asking you, is it your
5  testimony.  Not what Dr. Jones said in her
6  deposition.  I'm asking you.
7          Is it your testimony that when the
8  patient was encouraged to adhere to the after-care
9  instructions, especially regarding post-op activity
10  and restrictions, that this only pertained to the
11  continuing use of stool softeners?  Is that your
12  testimony?
13         MR. HABERMAN:  Objection.
14  BY THE WITNESS:
15     A.   Again, I don't see a comma after that.
16  So, that could be an interpretation.  I can see how
17  you could interpret it the way you've interpreted
18  it, and there will be other people that will have
19  the opportunity to interpret it how they want to
20  interpret it.
21         But I would think -- I would have typed
22  a comma in there if -- or I wouldn't have put a
23  comma in after "restrictions."  I probably would
24  have hyphenated it or said, "and encourage

Bruce Rosenzweig, M.D.

Page 158

1 adherence." But that's how I use grammar. So, I
2 can only interpret things about how I use grammar.
3 BY MR. PERSONS:
4   Q. All right. Let's look at Tab No. 8.
5 I'm going try to move to through this. This
6 shouldn't take as much time.
7           (WHEREUPON, Rosenzweig Deposition
8           Exhibit No. 11 was marked for
9           identification: 3/7/14 medical
10          record; COL PLTF 000019 RBAYLESS -
11          COL PLTF 000022 RBAYLESS.)
12 BY MR. PERSONS:
13  Q. Are you with me?
14  A. Yes.
15  Q. All right. So, this is a March 7, 2014
16 visit by Ms. Bayless to the Brevard Health
17 Alliance.
18  A. Yes.
19  Q. And she is seen by a Dr. David Magness,
20 a Doctor of Osteopathy. He is not a
21 urogynecologist, right?
22  A. Well, he's just a DO. But I don't see
23 what his specialty is. So, a DO, an M.D., both can
24 practice any specialty if they've had the proper

Page 159

1 training and then credentialing.
2   Q. All right. It doesn't say here whether
3 he's an Ob-Gyn or what specialty, if any, he has?
4   A. Correct.
5   Q. And Ms. Bayless presented to Dr. Magness
6 to discuss hypertension. Yes?
7   A. Yes. Well, actually, the -- she
8 presented to establish a PCP. So, if you look at
9 the very top, that's the reason for the office
10 visit is that she wanted to establish him as a
11 primary care provider.
12  Q. Okay. All right. And, so, in taking
13 her history, there is notation here of
14 hypertension?
15  A. Yes.
16  Q. And yeast vaginitis?
17  A. Yes.
18  Q. And would like to -- and would like
19 Fluconazole?
20  A. Fluconazole.
21  Q. And we know that Ms. Bayless had a yeast
22 infection prior to her implant procedure because
23 she had -- noted on the problem list was
24 Candidiasis, right?

Page 160

1   A. Yes, but that's -- that doesn't say a
2 list of active problems. That's a list of the
3 problems that she's had in the past. Okay.
4   Q. Okay.
5   A. That's how problem lists are populated.
6   Q. All right. Now, right below that,
7 Dr. Magness wrote, "Uses cocaine, smoker and drinks
8 alcohol socially."
9      Do you see that?
10  A. Yes.
11  Q. You also recall that Ms. Bayless is
12 positive for hepatitis C?
13  A. Correct.
14  Q. And hep C patients aren't supposed to
15 drink alcohol at all, are they?
16  A. It all depends on if they've recovered
17 from it or not, and I think she stated in her
18 deposition that she had recovered from it.
19      But I would recommend if you've had a
20 history of any liver injury to avoid alcohol.
21  Q. And at this visit Ms. Bayless requested
22 STD testing as well?
23  A. Correct.
24  Q. This would indicate, one could infer

Page 161

1 from this, that she thought she had been exposed to
2 an STD at some point?
3   A. That would be an inference.
4   Q. And --
5   A. But I don't specifically recall if she
6 was asked at her deposition why she wanted STD
7 testing.
8   Q. All right. And we've seen in earlier
9 records that she had been diagnosed with gonorrhea
10 and trichomonas on more than one occasion, right?
11  A. We have seen documented in the record
12 that she was treated for trichomonas on one
13 occasion, and there was reference to her having had
14 gonorrhea on two occasions.
15  Q. Correct. And you would agree that
16 recurrent STDs can lead to pelvic inflammatory
17 disease?
18  A. They could if there's a uterus and
19 cervix. Once a uterus and cervix is removed,
20 gonorrhea and chlamydia have no place to live.
21 They can live in the rectum. They can live in the
22 urinary tract and they can live in the oropharynx.
23 But none of those would lead to pelvic inflammatory
24 disease.

Bruce Rosenzweig, M.D.

Page 162

1    Q.   Now, Dr. Magness also reported
2  Ms. Bayless' tobacco and cocaine abuse under "Risk
3  Factors," right?
4    A.   Correct.
5    Q.   And she was counseled to stop smoking?
6    A.   Correct.
7    Q.   And on page 4 of this record, Problem
8  No. 6 says, "Recommend stopping using crack
9  cocaine," right?
10   A.   It's No. 5 actually.
11   Q.   No. 5.  My eyesight is getting poor.
12 No. 5.  Thanks for the correction.
13        "Stop using crack cocaine."
14        Now, crack cocaine can impact wound
15 healing, can't it?
16   A.   Yes, but we saw that she wasn't using it
17 around the time of her surgery.
18   Q.   And crack cocaine use can influence
19 other decisions a patient makes regarding their
20 health, can't it?
21   A.   Can you repeat that question?
22   Q.   Sure.  Crack cocaine use can influence a
23 patient's decision-making regarding their health?
24   A.   Influence it how?

Page 163

1    Q.   Well, for instance, if a patient is
2  using illicit drugs, especially over a long period
3  of time, it could impact the patient's doctor
4  visits?
5    A.   Impact them how?
6    Q.   Doesn't make visits.
7    A.   Oh, you mean their compliance with
8  office visits?
9    Q.   With office visits, seeking help,
10 medical help promptly, things of that sort.
11   A.   Boy, you're really asking me to make
12 very sweeping generalizations, which, again, I
13 don't know how to answer that question.
14   Q.   Okay.
15   A.   I've got a number of patients who are
16 former or current drug abusers that come in to
17 every single office and I have patients that do not
18 use any illicit substances, caffeine, alcohol, that
19 are rather recalcitrant with their office visits.
20 So, I don't think that that is a generalization I
21 am willing to make.
22   Q.   All right.  Now, going back to Page
23 No. 3, specifically Problem No. 4.
24   A.   Yes.

Page 164

1    Q.   "Sexually transmitted disease, exposure
2  to," and Dr. Magness ordered an HIV and hepatitis
3  screening, correct?
4    A.   Yeah, which is really strange because if
5  you look up above under "Risk Factors," "HIV
6  high-risk factor behavior, no."
7        So, I find that a little bit odd that he
8  then later on orders an HIV antibody screening,
9  but...
10   Q.   But he does?
11   A.   Correct.
12   Q.   And, also, going over to the top of
13 page 4, he also ordered labs for chlamydia and a
14 urinalysis?
15   A.   A urine chlamydia and gonorrhea.  As
16 we've talked about before, chlamydia and gonorrhea
17 both live in columnar cells.  So, you wouldn't take
18 a vaginal culture for chlamydia and gonorrhea.  It
19 would always come back negative.
20        So, after a hysterectomy you would
21 either do an oropharyngeal swab for chlamydia or
22 gonorrhea or check a urine or a stool for gonorrhea
23 and chlamydia.  Those are the only columnar
24 epithelial areas where you would find it.

Page 165

1    Q.   All right.  And under "Medications Added
2  to the Medication List At This Visit" is a
3  prescription for Fluconazole?
4    A.   Correct.
5    Q.   And that's to treat a yeast infection,
6  isn't it?
7    A.   Correct.
8    Q.   And you'd agree that indicates
9  Ms. Bayless was also diagnosed with a yeast
10 infection?
11   A.   That's not correct.
12   Q.   Okay.
13   A.   She came in asking for that medication.
14   Q.   All right.  In any event, it is for the
15 treatment of a yeast infection, whether she was
16 diagnosed with it or not?
17   A.   It is used to treat yeast infections.  I
18 don't see -- yes, the pelvic exam wasn't done to
19 document whether or not there was a yeast
20 infection.
21   Q.   Now, this record doesn't contain any
22 reference to dyspareunia, does it?
23   A.   No.
24   Q.   Or pelvic pain?

Bruce Rosenzweig, M.D.

Page 166

1    A.   Correct.
2    Q.   Or vaginal pain?
3    A.   Correct.
4    Q.   Or abdominal pain?
5    A.   Correct.
6    Q.   Or vaginal bleeding?
7    A.   Correct.
8    Q.   Now, let's turn to Tab No. 9.
9         (WHEREUPON, Rosenzweig Deposition
10        Exhibit No. 12 was marked for
11        identification:  7/24/14 medical
12        record; COL PLTF 000008 RBAYLESS -
13        COL PLTF 000011 RBAYLESS.)
14   BY MR. PERSONS:
15   Q.   And this is a record from another visit
16   Ms. Bayless had with Dr. David Magness.  This one
17   was on July 24, 2014.
18        Do you recognize this as a copy of that
19   record?
20   A.   Yes.
21   Q.   And under "History of Present Illness,"
22   it indicates that the patient presented with
23   hypertension?
24   A.   Correct.

Page 167

1    Q.   And that she had "a foul odor with
2    vaginal discharge"?
3    A.   Yes.
4    Q.   "No pelvic pain or burning with
5    urination"?
6    A.   Yes.
7    Q.   "Wants STD testing."  Right?
8    A.   Yes.
9    Q.   And this is the third time we've seen in
10   the records we've reviewed where Ms. Bayless'
11   records specifically reference a request for STD
12   testing, correct?
13   A.   Correct.  But none of those tests came
14   back positive.
15   Q.   Okay.  No. 4 on the list, Ms. Bayless
16   was "still smoking crack on a daily basis."
17        Do you see that?
18   A.   Yes.
19   Q.   And "sometimes gets chest pressure after
20   she smokes it"?
21   A.   Yes.
22   Q.   Now, you only noted in your report
23   episodic cocaine abuse?
24   A.   Yes.

Page 168

1    Q.   But even if the diagnosis was for
2    episodic abuse, you'd agree that Dr. Magness'
3    documentation of daily crack use is equally
4    relevant?
5    A.   On this visit, as of December 3, 2015,
6    she is affirming that she is using it on a daily
7    basis, which we did not see in the last record.
8    Q.   Still using it on a daily basis and
9    still smoking a half pack of cigarettes a day,
10   right?
11   A.   Correct.
12   Q.   And on page -- I guess this was
13   page 4 -- we see Ms. Bayless was diagnosed with
14   vaginitis?
15   A.   That's what Problem 3 is.
16   Q.   Yes.  Vaginitis and she's prescribed
17   Metronidazole.
18   A.   Yes.
19   Q.   And no etiology is discussed, is there?
20   A.   Well, Metronidazole wouldn't treat a
21   candidal infection.  It wouldn't be the treatment
22   of choice for a mycoplasma or ureaplasma infection.
23   It would be the treatment of choice for a bacterial
24   vaginosis infection or a trichomonal infection, but

Page 169

1    there's no exam that was done to determine what the
2    source of her discharge was.
3    Q.   We don't know what the etiology is --
4    A.   Correct.
5    Q.   -- in this case, do we?  Yeah.
6         Okay.  So, and then we have Problem
7    No. 5, Ms. Bayless -- "Sexually transmitted
8    disease, exposure."  Do you see that?
9    A.   Well, yeah, that's the ICD-10 code to
10   warrant the labs that are being sent off.
11   Q.   And the labs are HIV screening?
12   A.   Yes.
13   Q.   Hepatitis panel?
14   A.   Yes.
15   Q.   And the gonorrhea/chlamydia?
16   A.   And the syphilis test, which is an RPR.
17   Q.   Okay.  And syphilis.  Okay.
18        Now, Ms. Bayless' repeated STD exposures
19   put her at risk of recurring vaginal infections,
20   correct?
21   A.   Remember, none of these tests came back
22   positive.  So, her request for the test does not
23   mean that she had positive tests.
24   Q.   That's not my question.

Bruce Rosenzweig, M.D.

Page 170

1    MR. PERSONS:  Move to strike as unresponsive.
2  BY MR. PERSONS:
3    Q.   My question has to do with repeated STD
4  exposures put her at a higher risk of recurring
5  vaginal infections?
6    A.   You're -- no, comma, the reason for that
7  is you're taking that it says "STD exposure to,"
8  which is an ICD-10 code which allows you to send
9  off the labs, as her coming in and saying my
10  partner tested positive for gonorrhea/chlamydia and
11  therefore I want to be tested.
12    She came in saying she has a foul odor,
13  and she's assuming that that's associated with STDs
14  and says, "Hey, check me for this."  But nothing
15  came back positive.
16    Q.   All right.  Problem No. 6, "Cocaine
17  abuse, episodic," and right beneath that, "Smokes
18  crack daily."
19    That's what the doctor wrote, right?
20    A.   Correct.
21    Q.   And, again, you didn't note that in your
22  report, the daily use of crack cocaine?
23    A.   I noted that she used crack cocaine,
24  yes.

Page 171

1    Q.   But not daily?
2    A.   It's in the medical record.
3    Q.   And the frequency of cocaine use is
4  relevant to whether a patient will have issues with
5  post-surgical healing, doesn't it?
6    MR. HABERMAN:  Object.
7  BY THE WITNESS:
8    A.   Not two and a half years after the
9  surgery.
10  BY MR. PERSONS:
11    Q.   All right.  Dr. Magness also documented
12  discussing with Ms. Bayless that she could smoke
13  crack and have a vasospasm or a heart attack and
14  die, right?
15    A.   That is correct.
16    Q.   And her history of hypertension puts her
17  at an even higher risk of this, doesn't it?
18    A.   That is correct.
19    Q.   And hypertension combined with daily
20  crack use could further raise the risk of
21  suboptimal wound healing?
22    A.   Well, her blood pressure on this date
23  was 128 over 82, which is in the normal range.
24    Q.   It's was pretty good I guess.  I mean,

Page 172

1  she was taking the Lisinopril, right?
2    A.   Correct.
3    Q.   But if someone has uncontrolled
4  hypertension and uses crack cocaine daily, that
5  could put them at suboptimal -- risk of suboptimal
6  wound healing?
7    A.   Well, under that hypothetical, yes.  But
8  that's not the case in Ms. Bayless' case because
9  prior to surgery, we didn't read that into the
10  record, but you saw that Dr. Jones affirmed that
11  she was cleared medically for her surgery.
12    So, if her hypertension was
13  uncontrolled, the doctor wouldn't have cleared her
14  for her surgery.  So, your hypothetical is not
15  based on the facts of Ms. Bayless' case.
16    MR. PERSONS:  Object as unresponsive.  Move to
17  strike.
18  BY MR. PERSONS:
19    Q.   Under "Patient Instructions,"
20  Dr. Magness actually referred Ms. Bayless to a case
21  manager for substance abuse, didn't he?
22    A.   Correct.
23    Q.   And he -- do you have any idea whether
24  Ms. Bayless ever met with that case manager?

Page 173

1    A.   Not that I specifically recall from the
2  medical records or her deposition testimony.
3    Q.   All right.  Also under "Patient
4  Instructions" Dr. Magness ordered Ms. Bayless to
5  complete testing, "Please complete testing."  And
6  you agree that likely refers to the STD testing
7  that he ordered?
8    A.   Yeah, the HIV and the RPR and hepatitis
9  panel are all blood tests.
10    Q.   Any idea whether Ms. Bayless completed
11  that testing?
12    A.   Not that I specifically recall from the
13  medical records.
14    Q.   All right.  She was also ordered to
15  return to the clinic in one month.
16    I'll represent we have no records
17  indicating Ms. Bayless followed up with Dr. Magness
18  in one month.  Do you have any such record?
19    A.   Not that I specifically recall.
20    Q.   All right.  Let's look at Tab No. 10.
21    (WHEREUPON, Rosenzweig Deposition
22    Exhibit No. 13 was marked for
23    identification: 9/5/14 medical
24    record; COL PLTF 000376 RBAYLESS -

Bruce Rosenzweig, M.D.

Page 174

COL PLTF 000379 RBAYLESS.)

BY MR. PERSONS:

3    Q.   This is from a visit of September the
4  5th, 2014.  Do you see that?
5    A.   Yes.
6    Q.   And this is from Parrish Medical Center.
7  And I assume you reviewed this record in full?
8    A.   Yes.
9    Q.   On this day, Ms. Bayless came to the ER
10  complaining of vaginal spotting without pain on
11  three occasions in the past four months when she's
12  had sex, correct?
13    A.   Yes.
14    Q.   And, so, Ms. Bayless was experiencing
15  minor vaginal bleeding or spotting but was not
16  experiencing any vaginal or pelvic pain, correct?
17    A.   Yes.
18    Q.   And according to this, the spotting
19  occurred only after she'd had sex.  It wasn't
20  something that was constant, right?
21    A.   Yes.
22    Q.   And then she states that she can feel
23  mesh at the back of the vaginal wall?
24    A.   Yes.

Page 175

1    Q.   And, again, Ms. Bayless denied pain or
2  dysuria, right?
3    A.   That's what the record states.
4    Q.   Okay.  And she again stated she may have
5  had HIV and STD exposure?
6    A.   That's what she states.
7    Q.   Do you have any idea whether Ms. Bayless
8  ever underwent the STD testing that was ordered by
9  Dr. Magness at her July 24, 2014 visit?
10    A.   Not that I specifically recall from
11  seeing in the medical records.
12    Q.   Now, near the bottom of this list, the
13  provider noted that Ms. Bayless denied vaginal
14  discharge, abdominal pain, nausea or vomiting,
15  fever, chills, headaches, dysuria or shortness of
16  breath, right?
17    A.   Correct.
18    Q.   And, so, the only symptoms she's
19  presenting here with on this occasion is spotting
20  after intercourse?
21    A.   Correct.
22    Q.   And she suspected her mesh was visible
23  at the back of her vaginal wall?
24    A.   Correct.

Page 176

1    Q.   Now, on page 3 under "GU," the provider
2  documented performing a speculum exam, right?
3    A.   Correct.
4    Q.   And noted visualizing "exposed mesh,
5  slight, with no surrounding erythema or
6  excoriation, no bleeding, OS removed."
7         Did I read that correctly?
8    A.   Yes.
9    Q.   And erythema is swelling, correct?
10    A.   No.  It's redness.
11    Q.   Redness.  All right.  So, no redness was
12  noted?
13    A.   Correct.
14    Q.   And excoriation is abrading or wearing
15  off of skin, is that right?
16    A.   Correct.
17    Q.   So, it didn't appear that the tissue was
18  damaged, scraped or abraded, did it?
19    A.   The surrounding tissue, correct.
20    Q.   And no bleeding was noted at that time,
21  correct?
22    A.   Correct.
23    Q.   And the provider also noted that there
24  was only slight mesh visualized?

Page 177

1    A.   Correct.
2    Q.   And you'd agree that mesh was visualized
3  at the apical incision site?
4    A.   Correct.
5    Q.   That's the area that Dr. Jones noted
6  that had separated at Ms. Bayless' September the
7  24th, 2013 postoperative follow-up visit, isn't it?
8    A.   Well, this note doesn't say where the
9  exposed mesh was.
10    Q.   But you would agree that Dr. Jones noted
11  that there had been this separation visualized at
12  the apical incision site when she last saw the
13  patient on September 24, 2013?
14    A.   That's according to Dr. Jones' record,
15  yes.
16    Q.   If mesh is visualized at the apical
17  site, that would indicate that the wound never
18  properly healed from the surgery, wouldn't it?
19    A.   But we don't know where this exposed
20  mesh is.
21    Q.   But if it is at the apical site, it
22  would so indicate, wouldn't it?
23    A.   It would so indicate that there was a
24  continuing erosion/exposure of mesh.

Bruce Rosenzweig, M.D.

Page 178

1    Q.   And mesh can become visible or exposed
2  unrelated to any characteristic or trace of the
3  mesh itself if a wound doesn't properly heal and
4  the mesh is therefore exposed, correct?
5    A.   That's not correct.
6    Q.   So, a wound cannot properly heal and the
7  only way the mesh becomes exposed is if there is
8  some trait or characteristic that's unique to mesh.
9  Is that your testimony?
10   A.   Sir, if you could please move into your
11 frame.
12   Q.   Oh, I'm sorry.
13   A.   That's okay.
14   Q.   You can hear me, can't you?
15   A.   You're breaking in and out.
16   Q.   I'm terribly sorry.  I apologize for
17 that.
18        So, is it your testimony that the only
19 way that mesh can become exposed when a wound does
20 not properly heal is -- strike that.
21        Is it your testimony that the exposure
22 of mesh at a -- at the site of a wound that does
23 not properly heal is occasioned only by or caused
24 by some trait or characteristic unique to mesh?

Page 179

1    A.   You're asking me a hypothetical right
2  now?
3    Q.   No.  I'm just asking you that question,
4  yeah, I mean, just -- yeah, just as a general --
5  general, yeah, that's what I'm asking you.
6        Is that your testimony?
7    A.   We saw that Dr. Jones affirmed that the
8  mesh exposure is caused by the mesh and that would
9  be the characteristics of the mesh that led the
10 mesh to be exposed, correct.
11        There are things that can contribute to
12 it, as I state in my report.  But the reason why
13 the mesh became exposed is because of the mesh.
14   Q.   Well, apical incision, that's the back
15 of the vaginal wall and that's where Ms. Bayless
16 thought that her mesh had become exposed or
17 visible, correct?
18   A.   Sir, please talk into your microphone.
19   Q.   Yes.  Back of the vaginal wall, that's
20 the apical site, and that's where Mrs. Bayless,
21 Ms. Bayless thought that or felt that her mesh had
22 become exposed?
23   A.   That's not correct.  The back wall is
24 the back wall.  The apical wall is the top.  So,

Page 180

1  you're saying that the back wall is the apex.
2  That's not correct.
3        If you want to reframe your question,
4  then I can answer that question.  I'll answer that
5  question.
6    Q.   According to her testimony, the mesh was
7  at the back of her vaginal wall.  Isn't that what
8  she testified to?
9    A.   I have a general recollection of that,
10 but that's not the apex of the vagina.
11   Q.   In any event, the -- you're saying the
12 only way that mesh can become exposed is due to
13 something other than the failure of a wound to
14 properly heal?
15   A.   That's not what I testified to.
16   Q.   Okay.  So, you would agree that the
17 failure of a wound to properly heal can cause the
18 mesh to become exposed?
19   A.   Due to the fact that there's mesh there,
20 correct.
21   Q.   Right.
22   A.   Due to the characteristics of the mesh.
23        But there's no evidence that this
24 incision failed to heal.

Page 181

1    Q.   All right.  You don't have any records
2  regarding any follow-up treatment that Ms. Bayless
3  had for her incisional separation, do you?
4    A.   Which incisional separation?
5    Q.   Well, the only one that was noted by
6  Dr. Jones was at the apical site.  Do you have any
7  record of any treatment that this patient underwent
8  for that wound separation at the apical site noted
9  by Dr. Jones at the September 24, 2013 visit?
10   A.   No.  Dr. Jones did not recommend any
11 treatment at that point.
12   Q.   Have you seen any record of any
13 treatment, irrespective of recommendation by
14 Dr. Jones, but have you seen any record of any
15 treatment for that?
16   A.   For the exposure that Dr. Jones noted in
17 September of 2013?
18   Q.   Yes.
19   A.   No.  But the record that we're looking
20 at right now, August of 2014, that does not state
21 that that is in the same location as what Dr. Jones
22 saw in 2013.
23        (Simultaneous crosstalk and
24        clarification requested by the

Bruce Rosenzweig, M.D.

Page 182

reporter.)

MR. CONNOLLY: I just said the witness
accidentally mischaracterized the document I trust
as August. And it's September of 2014.

THE WITNESS: Thank you. Sorry. September of
2014.

BY THE WITNESS:

A. So, your question was is there any
evidence that the wound healed prior to
September 2013 -- what is the exact date?

BY MR. PERSONS:

Q. No.

A. September 24, 2013?

Q. No. No, that's not my question.

A. Okay.

Q. My question was do you have any evidence
that the incision healed following her surgery on
September the 24th, 2013? That was my question.

A. On September 24 -- oh, prior to
September 23?

Q. Let me start over.

A. Okay.

Q. We're not communicating.

Do you have any evidence that the wound

Page 183

that was noted on September the 24th, 2013 that had
not properly healed, do you have any evidence that
that wound subsequently healed?

A. Not that's documented in the medical
records.

Q. All right. That was my question.

A. Okay.

Q. Now, you would agree that intercourse is
likely to potentiate spotting if the apical
incision related to Ms. Bayless' hysterectomy and
pelvic organ prolapse repair never properly healed?

A. Because of a mesh exposure.

Q. If someone has intercourse and the wound
hadn't properly healed at the apical site, could
that cause spotting?

A. With the mesh exposure, yes.

Q. After that, the record -- we are going
back to this record.

The record notes, "Questionable erosion
of mesh, she has follow-up with her Ob-Gyn."

Do you see that?

A. Yes.

Q. Your report doesn't contain any
reference to any follow-up by Ms. Bayless with an

Page 184

Ob-Gyn after this visit.

Have you seen such a record?

A. No, I have not. And if I recall,
Ms. Bayless testified that she doesn't have
insurance.

Q. All right. Now, it then says
Ms. Bayless "will treat for GC and test for HIV at
her request."

You'd agree the GC likely refers to
gonorrhea/chlamydia?

A. Correct.

Q. All right. And as we've seen,
Ms. Bayless had been treated for those STDs in the
past?

A. Are we talking about since we've looked
at these records or just since 2012?

Q. Yes.

A. No, she hasn't. She's been tested for
it, but she hasn't been treated. This is the first
one where someone suggests that she get treatment
for gonorrhea/chlamydia.

Q. Under tab 11.

(WHEREUPON, Rosenzweig Deposition
Exhibit No. 14 was marked for

Page 185

identification: 5/22/15 medical
record; COL PLTF 000014 RBAYLESS -
COL PLTF 000017 RBAYLESS.)

BY MR. PERSONS:

Q. This is the record of an office visit
from May the 22nd, 2015 to Brevard Health Alliance.
And this is more than eight months after the
September 4, 2014 visit to the Parrish emergency
room record that we've looked at earlier, right?

A. Correct.

Q. And Ms. Bayless presented with the
history, hypertension, complaints of getting angry
early -- "Anger easily, presented with foul odor
with vaginal discharge." Correct?

A. Correct.

Q. "No pelvic pain or burning with
urination." Right?

A. Correct.

Q. "Similar to past when treated with
Flagyl, this worked."

Do you see that?

A. Yes.

Q. And that's likely referring to bacterial
vaginosis, isn't it?

Bruce Rosenzweig, M.D.

Page 186

1    A.   Or the one episode of trichomoniasis
2  that we saw.
3    Q.   Because we saw in earlier records that
4  she treated bacterial vaginosis with Flagyl?
5    A.   No.  We saw a record where she was
6  treated with Flagyl without a diagnosis.
7    Q.   Okay.
8    A.   For vaginal discharge.
9    Q.   Vaginal discharge.  Okay.
10   A.   And the --
11   Q.   On page 3 this records indicates that
12 Ms. Bayless was still smoking at the time and still
13 using cocaine?
14   A.   Correct.
15   Q.   And on the last page, under "Impression
16 and Recommendations," it says, "Use Flagyl as
17 directed."  And this is for the treatment of
18 vaginal discharge, right?
19   A.   Correct.
20   Q.   But no specific diagnosis was given, was
21 there?
22   A.   Correct.
23   Q.   So, we have no indication what the
24 discharge was related to, do we?

Page 187

1    A.   Correct.
2    Q.   We don't know whether it was related to
3  mesh or to something else, do we?
4    A.   Well, a culture was not performed.
5    Q.   So, we don't know whether it was related
6  to mesh or something else, do we?
7    A.   No exam was performed and no culture was
8  taken.
9    Q.   So we don't know --
10   A.   Correct.
11   Q.   -- what it was related to, correct?
12   A.   Correct.
13   Q.   Now, let's go to Tab No. 12.
14         (WHEREUPON, Rosenzweig Deposition
15         Exhibit No. 15 was marked for
16         identification:  6/11/15 medical
17         record; COL PLTF 000244 RBAYLESS -
18         COL PLTF 000250 RBAYLESS.)
19 BY MR. PERSONS:
20   Q.   And this is a record from Parrish
21 Medical Center in Titusville, June the 11th, 2015,
22 and this is the last record discussed in your
23 report.  Yes?
24   A.   Correct.

Page 188

1    Q.   And here Ms. Bayless presents to
2  Dr. Francisco Garcia at the Parrish emergency room
3  with complaints of a rash and vaginal discharge,
4  dysuria and abdominal pain, correct?
5    A.   Yes.
6    Q.   And Dr. Garcia wrote that Ms. Bayless
7  reported "a two-week history of malodorous brown
8  vaginal discharge, status post unprotected sex with
9  some associated dysuria and mild abdominal pain."
10        Do you see that?
11   A.   Yes.
12   Q.   Now, Ms. Bayless presented with these
13 symptoms previously, at the December 10, 2012 visit
14 to the Brevard Health Department.  Do you recall
15 that?
16   A.   Yes.
17   Q.   Do you recall that she was diagnosed
18 with trichomonas at that visit?
19   A.   Correct.
20   Q.   And a wet prep for trichomonas was
21 obtained?
22   A.   On that prior visit.
23   Q.   And she developed these symptoms after
24 engaging in unprotected sex, correct?

Page 189

1    A.   That was not documented.
2    Q.   All right.  But in this instance she
3  reports that she had these symptoms after
4  unprotected sex?
5    A.   This record does state that she affirmed
6  to having had unprotected sex.
7    Q.   Right.  And Dr. Garcia goes on to note
8  that Ms. Bayless has a history of gonorrhea and
9  trichomonas, doesn't he?
10   A.   Correct.
11   Q.   Now, Ms. Bayless said the symptoms are
12 similar but the odor is worse.
13        Do you see that?
14   A.   Yes.
15   Q.   You agree that symptoms of gonorrhea can
16 worsen with subsequent infections?
17   A.   No.
18   Q.   Okay.  You don't agree that the symptoms
19 of gonorrhea can get worse with subsequent
20 symptoms -- infections of gonorrhea, that's your
21 testimony?
22   A.   Vaginal symptoms?
23   Q.   Symptoms of gonorrhea can worsen with
24 subsequent infection?  Yes or no.

Bruce Rosenzweig, M.D.

Page 190

1    A.   Well, without a cervix, you're not going
2 to have a discharge from gonorrhea or chlamydia
3 because there's no place for it to live.
4    Q.   Would you agree that the symptoms of
5 trichomonas can worsen with subsequent infections?
6    A.   No.
7    Q.   Okay.  At the bottom of page 3,
8 Dr. Garcia documented performing a vaginal exam,
9 didn't he?
10   A.   Correct.
11   Q.   And he noted visualizing a "surgical
12 'tack,'" quote-unquote, "from previous bladder lift
13 surgery in Orlando."
14        Do you see that?
15   A.   Yes.
16   Q.   He noted erythema and slight discharge
17 from this?
18   A.   Yes.
19   Q.   But he didn't describe what the surgical
20 tack was, did he?
21   A.   No.
22   Q.   Nor did he describe where the surgical
23 tack was visualized, did he?
24   A.   Correct.

Page 191

1    Q.   It's likely at the same site that the
2 provider visualized at Mrs. -- at Ms. Bayless'
3 September the 5th, 2014 visit to the Parrish
4 emergency room, isn't it?
5    A.   That would be speculation.
6    Q.   All right.  But you don't have any basis
7 for it being any sites other than that, do you?
8    A.   The site of the last exposure and the
9 site of this exposure are not well described in the
10 medical records.
11   Q.   So, we haven't seen any record where
12 Ms. Bayless sought treatment for the slight
13 exposure visualized at the September 15th -- strike
14 that -- at the September 5, 2014 visit to the
15 Parrish ER?
16   A.   Correct.
17   Q.   And as we discussed earlier, we have no
18 records indicating she ever was treated for the
19 incisional separation visualized at her
20 postoperative visit to Dr. Jones on September the
21 24th, 2013, correct?
22   A.   We don't have any evidence that she was
23 treated?
24   Q.   Right.

Page 192

1    A.   Dr. Jones did not recommend any
2 treatment for it on September 24, 2013.
3    Q.   That's not my question.
4    MR. PERSONS:  And I move to strike it as
5 unresponsive.
6 BY MR. PERSONS:
7    Q.   The question was:  We have no records
8 indicating that she ever was treated for the
9 incisional separation that was visualized by
10 Dr. Jones on September the 24th of 2013?
11   A.   And my answer is Dr. Jones did not
12 recommend treatment on September 24, 2013.
13   Q.   All right.  Well, point me to a record
14 that shows that she had treatment subsequent to
15 September 24 of 2013 for an incisional separation
16 that was visualized in her postoperative visit.
17 Can you point me to such a record?
18   A.   No.
19   Q.   Okay.
20   MR. HABERMAN:  Ray.
21   MR. PERSONS:  Yes.
22   MR. HABERMAN:  I'd like to take a break.  We
23 have been going quite a bit of time now.
24   MR. PERSONS:  We have.  Ma'am, how much time

Page 193

1 have we -- can you calculate that while we're off
2 the record, please, Madam Court Reporter, and then
3 when we come back we will have some idea how much
4 time we have got and I am going to try to get
5 through this.
6    MR. HABERMAN:  All right.
7    MR. PERSONS:  How much time do you need?  You
8 take as much time as you need, obviously, but I
9 want to know what time to come back.
10   MR. HABERMAN:  Understood.  Doctor, are you
11 hungry?  Have you eaten?  Do you want to plow
12 through it?
13   THE WITNESS:  I just got to go to the
14 bathroom, but then I'm fine.
15   MR. HABERMAN:  Gotcha.
16   THE WITNESS:  The dogs haven't been barking.
17 That's a good sign.
18   MR. HABERMAN:  Why won't we say five minutes
19 or so.
20   MR. PERSONS:  Sounds good.
21        (WHEREUPON, a recess was had
22         from 1:34 to 1:45 p.m.)
23 BY MR. PERSONS:
24   Q.   Dr. Rosenzweig, you have no evidence

Bruce Rosenzweig, M.D.

Page 194

1 that Ms. Bayless' prior STD testing came back
2 negative, do you?
3    A.   Not that I recall from the medical
4 records.
5    Q.   All right.  You agree that repeated
6 vaginal infections, whether it's bacterial
7 vaginitis or STDs, in the presence of a poorly
8 healed incision could explain Ms. Bayless'
9 recurrent infection?
10   A.   The exposed mesh, yes.
11   Q.   And the mesh could have been exposed as
12 a result of a poorly healed incision, couldn't it?
13   A.   Because of the mesh, yes.
14   Q.   Not that the mesh caused the incision to
15 poorly heal, but the very presence of the mesh, the
16 mesh wouldn't be -- without the poorly healed
17 incision, the mesh would not have become visible.
18 Yes?
19   A.   No, that's not correct.
20   Q.   Well, a poorly healed incision can
21 reveal the presence of mesh, can't it?
22   A.   No, the incision -- the mesh became
23 exposed because of the characteristics of the mesh
24 that lead, as I have -- as I state in my general

Page 195

1 causation report and the general causation reports
2 of Dr. Garely and Dr. Hoyte, the characteristics of
3 the mesh make the vaginal epithelium break down due
4 to the characteristics of the mesh that are
5 described in my general causation report.
6    Q.   So, it's your testimony that in the
7 absence of mesh, the wound would have properly
8 healed.  Is that your testimony?
9    A.   In this case, correct.
10   Q.   All right.  Now, at the bottom of
11 page 6, under "Clinical Impression," Dr. Garcia
12 wrote, "Vaginal erosion due to surgical mesh,
13 bacterial vaginosis, trichomonas vaginitis."
14       Do you see that?
15   A.   Yes.
16   Q.   Again, Dr. Garcia doesn't indicate where
17 the mesh was exposed or visualized, does he?
18   A.   Not in that statement.
19   Q.   And there's no indication that
20 Dr. Garcia has seen the implant report, is there?
21   A.   Correct.
22   Q.   There's no indication that he's aware of
23 the wound dehiscence, is there?
24   A.   Wound never dehisced.

Page 196

1    Q.   Well, he doesn't say -- there is nothing
2 in this record reflecting a wound dehiscence, is
3 there?
4    A.   There is nothing in this record that
5 discusses a wound dehiscence, which did not occur
6 in this case.
7    Q.   There's nothing in this record that
8 discusses separation at the apical incision, is
9 there?
10   A.   At this visit or at another visit?
11   Q.   In this record.
12   A.   Are you referencing an apical separation
13 at this visit or at some other time in Ms. Bayless'
14 history?
15   Q.   No.  I'm talking about Dr. Garcia, in
16 terms of his report as reflected in this record of
17 June the 11th, 2015.  That's what we're talking
18 about.
19   A.   He does describe that there is a mesh
20 exposure.
21   Q.   And he doesn't -- okay.
22       Now, Dr. Garcia also suspected bacterial
23 vaginosis, didn't he?
24   A.   Correct.

Page 197

1    Q.   And because of the symptoms of
2 malodorous discharge, abdominal pain and dysuria,
3 those are all consistent with the diagnosis of
4 bacterial vaginosis and trichomonas, isn't it?
5    A.   That's not correct.  That's not correct.
6    Q.   Okay.  Although this complaint isn't
7 documented here, trichomonas can be associated with
8 dyspareunia, though, can't it?
9    A.   Possibly.
10   Q.   And we know that Dr. Garcia instructed
11 Ms. Bayless to undergo testing for trichomoniasis,
12 didn't he?
13   A.   Well, the testing would be done in the
14 office or at this visit.  I don't understand why
15 the testing wasn't done at this visit.
16   Q.   That's not my question.
17   MR. PERSONS:  And I move to strike it as
18 unresponsive.
19 BY MR. PERSONS:
20   Q.   He instructed her to undergo testing for
21 trichomoniasis?  Yes or no.
22   A.   Testing?
23   Q.   Under "Instructions."
24   A.   Yes.

Bruce Rosenzweig, M.D.

Page 198

1  Q.  He -- here's the entry, "Sexually
2  transmitted diseases, trichomoniasis."
3      Do you see that?
4  A.  It says, "Sexually Transmitted Diseases
5  (ED)," which would be the emergency department, and
6  "Trichomoniasis (ED)."  So, I don't under- -- those
7  aren't instructions to be tested.
8  Q.  All right.  Let's cut to the chase.
9      She was confirmed -- a diagnosis of
10 trichomonas was confirmed, wasn't it, Doctor?
11 A.  No, it wasn't.
12 Q.  All right.  Look at tab 12-A.
13 A.  That's the clinical impression, not a
14 diagnosis.  There's nothing here.  There's not a
15 wet mount.  There is not a PCR test.
16 Q.  Let's go --
17 MR. PERSONS:  Strike everything because there
18 is no question pending.
19 BY MR. PERSONS:
20 Q.  I asked that we go to tab 12-A and then
21 you started testifying.
22 A.  No, you asked me if there was a
23 diagnosis made of trichomoniasis and no.
24 Q.  You said no, and then I went on to 12-A.

Page 199

1  A.  Okay.
2  Q.  I'm on to 12-A.
3  A.  All right.
4  Q.  Get out 12-A.
5      (WHEREUPON, Rosenzweig Deposition
6      Exhibit No. 16 was marked for
7      identification: 6/18/15
8      "Cumulative Discharge Summary
9      Report"; COL PLTF 000270 RBAYLESS.)
10 BY MR. PERSONS:
11 Q.  Do you see that?
12 A.  Yes.
13 Q.  This is June the 11th, 2015.  It says a
14 wet prep for trichomoniasis, doesn't it?
15 A.  Yes.
16 Q.  Trichomonas.  I'm sorry.
17     And this record reflects or confirms
18 Ms. Bayless' trichomonas infection, doesn't it?
19 A.  This record does, correct.
20 Q.  Right.  It says she was positive for
21 trichomonas, doesn't it, Doctor?
22 A.  This record, yes.
23 Q.  And it says her urine culture was
24 negative, correct?

Page 200

1  A.  Correct.
2  Q.  And she was also negative for yeast,
3  wasn't she?
4  A.  Yes.
5  Q.  And for hematuria?
6  A.  Correct.  Well, there are a few red
7  blood cells seen.
8  Q.  Now, this record isn't listed in your
9  report.  Did you review it?
10 A.  Yes.
11 Q.  Now, you'd agree that Ms. Bayless'
12 discharge, abdominal pain, vaginal itching and
13 burning and dysuria were all related to the
14 trichomonas infection?
15 A.  No.  I would agree that a vaginal
16 discharge was.
17 Q.  All right.  And based on the records
18 we've seen today, this is her second trichomonas
19 infection since 2012?
20 A.  Right.
21 Q.  You don't have any basis on which to
22 dispute the possibility that she had other
23 infections too, do you?
24 A.  Again, I do not specifically recall in

Page 201

1  the records any other positive test.
2  Q.  All right.  Unprotected sex raises the
3  risk of contracting trichomonas, doesn't it?
4  A.  Again, that's debatable.
5  Q.  Okay.  But we did see this in the
6  June 11, 2015 visit when she presented with these
7  symptoms, these same symptoms, after engaging in
8  unprotected sex by her own report, correct?
9  A.  Right.  But we've seen other reports
10 where she had unprotected sex, too.
11 Q.  All right.  Let's go to -- okay.
12     Do you have or have you seen any medical
13 records other than the ones we have been discussing
14 thus far?
15 A.  Not that I specifically recall.
16 Q.  Do you have your file there?
17 A.  No.  I think that was electronically
18 transmitted.
19 Q.  All right.  You do have your report
20 handy?
21 A.  Yes.
22 Q.  On pages 7 and 8 of your report you
23 describe Dr. Jones' care and treatment of
24 Ms. Bayless?

Bruce Rosenzweig, M.D.

Page 202

1    A.   Yes.

2    Q.   My question is:  Do you agree that
3  Ms. Bayless was an appropriate candidate for the
4  surgery that Dr. Jones performed on August the 9th
5  of 2013?

6    A.   Yes, she was an appropriate candidate
7  for a surgery to treat her stress urinary
8  incontinence and her pelvic organ prolapse.

9    Q.   And her candidacy for surgery was based
10  on the information that Dr. Jones had available at
11  the time she had the risk/benefit discussion with
12  Ms. Bayless?

13    A.   Correct.

14    Q.   And you're aware that Dr. Jones has
15  testified she was unaware of Ms. Bayless' cocaine
16  crack abuse at the time of her implantation
17  procedure.  You're aware of that, right?

18    A.   That's what she stated.

19    Q.   And you're aware that Dr. Jones has
20  further testified that if she had known of that
21  substance abuse issue, she would not have performed
22  surgery on Ms. Bayless?

23    A.   Well, she was actively using cocaine at
24  the time.

Page 203

1    Q.   But Dr. Jones said that if she had known
2  of that substance abuse issue, she would not have
3  performed surgery on Ms. Bayless.  That is what
4  Dr. Jones testified to, didn't she?

5    A.   Correct.

6    Q.   Now, you're aware that the Restorelle Y
7  is indicated for the treatment of abdominal sacral
8  colpopexy?

9    A.   It's indicated to treat pelvic organ
10  prolapse.  But, yes, it's used as an abdominal
11  colposacropexy, yes.

12    Q.   And that can be either laparoscopically
13  or open, right?

14    A.   Correct.

15    Q.   With or without robotic assistance,
16  correct?

17    A.   Correct.

18    Q.   And Ms. Bayless' pelvic organ prolapse
19  repair with the Restorelle Y was indeed performed
20  as a robotic-assisted abdominal surgery, wasn't it?

21    A.   Yes.

22    Q.   It was not performed as a transvaginal
23  surgery, was it, Doctor?

24    A.   Correct.

Page 204

1    Q.   You're not offering any criticism of
2  Dr. Jones for deciding to use the Restorelle Y
3  augment as -- to augment a surgical repair of
4  Ms. Bayless' pelvic organ prolapse, are you?

5    A.   I do not fault her, correct.

6    Q.   Nor are you criticizing Dr. Jones for
7  continuing to use the Restorelle Y for hundreds of
8  pelvic organ prolapse repair surgeries since
9  Ms. Bayless' August 9, 2013 surgery as Dr. Jones
10  has so testified?

11    MR. HABERMAN:  Objection.  You can answer.
12  But that product, is she able to use that product
13  right now?

14  BY MR. PERSONS:

15    Q.   That's the question.

16    A.   I do not fault her, yes.

17    Q.   Right.  Now, you're aware that she
18  testified that she selected the Restorelle Y to
19  augment Ms. Bayless' pelvic organ prolapse repair
20  due to its very ultra light weight.  Are you aware
21  that she testified to that?

22    A.   Correct.

23    Q.   Are you also aware that one of the
24  reasons that she selected the Restorelle Y was its

Page 205

1  macro pore size?

2    A.   That's what she stated.

3    Q.   Including the fact that Restorelle Y has
4  one of the largest interstitial pore sizes of any
5  POP mesh on the market.  Do you recall her
6  testimony?

7    A.   She did state that, but that's not
8  correct.

9    Q.   All right.  And she also said that one
10  of the characteristics of the Restorelle Y and a
11  basis for her selection of that material to augment
12  the surgery was its very good flexibility?

13    A.   Yes.

14    Q.   In her words, when you look at a
15  product, you look at its ability to stretch in a
16  vertical or an up-and-down fashion as well as a
17  side-to-side fashion.

18    A.   That's what she stated.

19    Q.   All right.  You don't have any basis on
20  which to dispute her understanding of the
21  properties of the Restorelle Y, do you?

22    A.   I do not dispute what she stated in her
23  deposition.

24    Q.   Now, you're also a --

Bruce Rosenzweig, M.D.

Page 206

1    A.   I do dispute some of the facts about the
2  mesh, but that is a more general causation opinion.
3    Q.   You're also aware that Dr. Jones
4  testified that she uses mesh, including the
5  Restorelle Y, to augment pelvic organ prolapse
6  repair surgeries because it achieves a, quote,
7  "more permanent," end quote, repair?
8    A.   That's what she stated.
9    Q.   And you have no basis to disagree with
10 Dr. Jones' statement of her opinion to that effect,
11 do you?
12   A.   The medical literature.
13   Q.   All right.  But you don't dispute that
14 that's what she said?
15   A.   I don't dispute that's what she said.
16 As I stated, the medical literature might dispute
17 the veracity of that statement.
18   Q.   All right.  But you don't dispute that
19 that is a statement of her experience with this
20 material?
21   A.   No.  That is the answer she gave to --
22 at her deposition.
23   Q.   Right.  Now, on page 9, Item No. 1 of
24 your report, you claim that "As a result of the

Page 207

1  implantation of the Advantage Fit and Restorelle
2  Y-mesh products, Ms. Bayless experienced mesh
3  erosions, exposures, vaginal bleeding and
4  infection"?
5    A.   Yes.
6    Q.   Before we go any further, this statement
7  indicates that you're attributing all of
8  Ms. Bayless' alleged symptoms to both the Advantage
9  Fit and the Restorelle Y-mesh, correct?
10   A.   Well, that and based on her deposition
11 testimony I would add dyspareunia.
12   Q.   But you don't differentiate between the
13 two implants whatsoever anywhere in your litigation
14 report, do you?
15   A.   In the medical summary, yes.
16   Q.   You don't attribute specific injuries to
17 one product or the other anywhere in your report,
18 do you?
19   A.   Again, in the medical summary.
20   Q.   Let's look -- let's look in the summary.
21     Where in your report are you referring?
22   A.   Well, the initial exposure that was
23 documented at the -- on September 24, 2013, was
24 the -- at the apex.  More likely than not that was

Page 208

1  the Restorelle Y-mesh.
2       We don't know where the other exposures
3  were noted.  So, therefore, it could be either
4  product, but more likely than not it was from the
5  Restorelle Y-mesh.
6    Q.   But you don't -- in none of the pages
7  between 1 through 15 do you make such a
8  delineation, do you?
9    A.   Specifically in the report, no.
10   Q.   Okay.  Now, you understand that your
11 litigation report should contain a complete
12 statement of your opinions in this case, you
13 understand that, right?
14     MR. HABERMAN:  Objection.
15 BY THE WITNESS:
16   A.   And to what I testify to today at this
17 deposition.
18 BY MR. PERSONS:
19   Q.   Well, have you received any new
20 information since issuing your report that you
21 claim could enable you or would enable you to
22 attribute a specific symptom of Ms. Bayless'
23 complaints to one implant versus another?
24   A.   Well, again, I've reviewed Dr. Jones'

Page 209

1  deposition testimony and I reviewed Mrs. Bayless'
2  deposition testimony.
3       I've not reviewed the deposition
4  testimony of Dr. Garcia nor Dr. Magness to be able
5  to further delineate if they had any additional
6  information that could separate the -- where they
7  found the erosion to be able to specify whether it
8  was more likely than not from the Restorelle or
9  from the Advantage Fit.
10   Q.   So, is it your testimony, then, that you
11 would need additional information in order to
12 attribute specific injuries to one product or the
13 other?
14     MR. HABERMAN:  Objection.
15 BY THE WITNESS:
16   A.   As I stated, more likely than not the
17 erosions, the vaginal discharge and the bleeding is
18 from the Restorelle Y-mesh.
19     The painful intercourse would more
20 likely than not be more likely associated with the
21 Restorelle Y-mesh and a minimal contributor from
22 the Advantage Fit.
23 BY MR. PERSONS:
24   Q.   All right.  Now, you didn't update your

Bruce Rosenzweig, M.D.

Page 210

1  report to reflect what you just told us, though,
2  did you?
3      MR. HABERMAN:  Objection.
4  BY THE WITNESS:
5      A.  No, because --
6      MR. HABERMAN:  In response to your question.
7  BY THE WITNESS:
8      A.  I knew I would be testifying to that
9  today.
10  BY MR. PERSONS:
11      Q.  Okay.  So, you're broadly claiming that
12  because both implants contain polypropylene,
13  they're the cause of Ms. Bayless' injuries?
14      MR. HABERMAN:  Objection.
15  BY MR. PERSONS:
16      Q.  Yes?
17      A.  I have reviewed and relied upon my
18  general causation reports and my prior general
19  causation testimony, and that is a very -- the
20  answer to that question is not a yes-or-no
21  question.  It is a very broad and detailed question
22  that is in my general causation report.
23          I did do a very detailed differential
24  diagnosis, most of which we discussed today, on how

Page 211

1  I ruled out other causes, such as her history of
2  sexual abuse, her episiotomy with a tear, her
3  history of STDs, her smoking, her use of crack
4  cocaine, her hysterectomy and the other medical
5  conditions that I've described in my report, which
6  leads me to the opinion that her injuries were
7  caused by the mesh implants, the Restorelle Y-mesh
8  primarily and the Advantage Fit secondarily.
9      MR. PERSONS:  Move to strike as unresponsive.
10  BY MR. PERSONS:
11      Q.  As part of your differential diagnosis,
12  what did you consider in regards to the cause --
13  let me strike that.
14          Did you consider that only the mesh
15  visualized was localized at the site of her apical
16  incision?  Did you consider that in doing a
17  differential diagnosis?
18      A.  Yes, I did consider that finding on
19  September 24, 2013.  The other -- the other
20  visualization of exposure was not described by the
21  physician in the medical records as to the exact
22  location where it was.
23      Q.  And did you consider the fact that the
24  apical incision that had separated -- that the

Page 212

1  apical incision separated following her August 9,
2  2013 procedure?  Did you consider that in your
3  differential diagnosis?
4      A.  That it healed and then the mesh eroded
5  through?  Yes.
6          Did she have difficulty healing due to
7  her prior history of cocaine use and smoking?  No.
8  In fact, Dr. Jones even testified that she did not
9  note any poor healing in the first two months after
10  surgery.
11          And it's also noted that her other
12  wounds from her robotic surgery had healed
13  completely, and the only finding of separation was
14  where the mesh was, which shows that she did have
15  no problem with wound healing.
16      Q.  Now, where in Dr. Jones' records does it
17  indicate that the wound had healed properly?
18      A.  No.  She was asked --
19      MR. HABERMAN:  Objection.
20  BY THE WITNESS:
21      A.  No.  What she was asked is did she have
22  any problems with wound healing, and Dr. Jones said
23  no.
24  BY MR. PERSONS:

Page 213

1      Q.  Did you -- how did you rule out poor
2  wound healing as cause of the mesh becoming visible
3  at the apical site, then?
4      A.  Well, because she didn't have wound --
5      Q.  The wound had healed and then later
6  separated?
7      A.  More likely than not, yes, because she
8  had no problems healing any other wound.  If you
9  have generalized wound healing problems, your
10  wounds are not going to heal.  She had no problems
11  healing the site where the sling was placed, where
12  the ports were placed for the robotic surgery.  The
13  only place where she did not -- where she had mesh
14  exposure on September 24, 2013 was with the
15  Restorelle Y-mesh.
16      Q.  All right.  Did you take into account
17  Ms. Bayless' non-compliance with the postoperative
18  instructions regarding sexual activity following
19  surgery?  Did you take that into account?
20      A.  Yes, and we discussed that.  There is no
21  evidence that she was non-compliant with
22  intravaginal intercourse.
23          You are making the assumption that
24  saying decreased libido and orgasmic dysfunction is

Bruce Rosenzweig, M.D.

Page 214

1 a sign that she had sexual intercourse, and that's
2 not supported by the medical records or
3 Ms. Bayless' deposition testimony.
4     MR. PERSONS:  Object and move to strike as
5 non-responsive.
6 BY MR. PERSONS:
7     Q.    The question was whether non-compliance
8 with instructions regarding sexual activity, which
9 Dr. Jones herself testified to, about that being
10 one of the restrictions, whether you took that into
11 account in doing the differential diagnosis?
12     A.    Yes, I did.
13     Q.    All right.  Now, such non-compliance
14 could have impacted the wound healing, couldn't it?
15     A.    If there was --
16     Q.    If Doctor said don't have sex for 12
17 weeks and you have sex within the first six weeks,
18 that could impact the healing of the wound, the
19 vaginal wound, couldn't it?
20     A.    Number one, Ms. Bayless testified that
21 she did not have intercourse prior to coming back
22 to see her, that she complied with the instructions
23 that Dr. Jones gave.  That's the best indication
24 that there was not intravaginal penetration prior

Page 215

1 to her visit and therefore could exclude
2 non-compliance as a cause of poor wound healing.
3     Q.    All right.  It's your testimony that any
4 visible mesh that may be present in Ms. Bayless'
5 vagina is permanent in nature?
6     A.    Yes.
7     Q.    Now, wouldn't correcting the wound
8 dehiscence that was never treated resolve the
9 visible mesh issue?
10     A.    If she had a mesh explant, that would
11 remove the mesh and would improve the likelihood of
12 her not having a current or future mesh erosion.
13 But to try to remove all the Y-mesh would be a very
14 difficult surgical procedure.
15     Q.    Well, what about not removing it and
16 treating this -- the wound dehiscence?
17     A.    You mean just simply oversewing it?
18     Q.    Treating the wound dehiscence.
19     Suppose -- couldn't you correct it by
20 treating the wound dehiscence?
21     A.    You mean oversewing the incisions?  At
22 this point, no.  She has a mesh erosion.
23     Q.    All right.
24     A.    What one could -- one could try

Page 216

1 intravaginal estrogen, but there's no indication
2 that she's estrogen-deficient and, therefore, more
3 likely than not, that would not be effective.
4     Q.    But you don't know, do you?
5     A.    It's not documented --
6     Q.    You don't know that for a fact?
7     A.    That philosophy has not been documented
8 in the medical records.
9     Q.    And you haven't examined her, have you?
10     A.    Correct.
11     Q.    So, you can't say it wouldn't have
12 resolved the issue, the estrogen wouldn't resolve
13 the issue for her?
14     A.    Well, Dr. Jones didn't think that
15 because Dr. Jones didn't prescribe it on June 24,
16 2013.
17     Q.    Now, even if Ms. Bayless is experiencing
18 exposure, there are treatments for it, including
19 localized excision of exposed mesh, correct?
20     A.    Correct.  But that's very difficult with
21 an abdominal colposacropexy.
22     Q.    But it is possible, isn't it?
23     A.    It is a very difficult surgery because
24 the top of the vagina is at the -- is attached to

Page 217

1 the sacrum and trying to do a local excision puts
2 you in close proximity to the sacral promontory,
3 the blood vessels, the ureters and the bowel.
4     Q.    Okay.  It's a difficult surgery, but it
5 is a surgery that can be undertaken nevertheless?
6     A.    Correct.
7     Q.    Now, as part of your differential
8 diagnosis, what did you consider in regards to the
9 cause of the periodic spotting that Ms. Bayless is
10 attributing to the Restorelle and the Advantage
11 Fit?
12     A.    Well, first, she doesn't have a uterus
13 and cervix.  Those were removed.  So, that would
14 not cause spotting.
15     The infections that she had and
16 discharge that she had in her vagina, while she did
17 test positive on one occasion post-implant for
18 trichomoniasis, that trichomoniasis would not be
19 associated with vaginal spotting.
20     So, the -- there was no cancer ever
21 found in her vagina.  There were no other lesions
22 found in her vagina.
23     So, the most likely remaining etiologic
24 factor in the vaginal spotting is the mesh erosion.

Bruce Rosenzweig, M.D.

Page 218

1    Q.   Now, did you consider whether she could
2  have experienced postoperative bleeding with
3  intercourse with a hysterectomy alone?
4    A.   Yes, but she didn't have postoperative
5  bleeding in this case.
6    Q.   Or spotting with intercourse?
7    A.   Or spotting.  In this case in the
8  postoperative period.
9    Q.   I got you.
10       Now, patients who undergo pelvic organ
11 prolapse repair surgeries without mesh can also
12 experience postoperative bleeding with intercourse,
13 can't they?
14   A.   In the postoperative period, they can.
15 However, long-term bleeding and spotting, if
16 absorbable sutures are used, would not occur.
17   Q.   As part of your differential diagnosis,
18 what did you consider in regards to the cause of
19 Ms. Bayless' recurrent bacterial vaginosis?
20   A.   Well, again, we don't have an etiology
21 except for the June 18, 2015 as an etiologic factor
22 for her discharge.  So, there were no cultures
23 performed except for the wet prep on June 18, 2015.
24       So, since tests were sent off for STDs,

Page 219

1  more likely than not those came back negative since
2  there was no letter sent or Board of Health --
3  gonorrhea/chlamydia are reportable infections to
4  the Board of Health and there would be follow-up
5  from the Board of Health if those had come back
6  positive.
7        So, more likely than not her vaginal
8  discharge was from the exposed mesh.
9    Q.   Did you even consider her pre-implant
10 history of recurrent bacterial vaginosis?
11   A.   Yes.  And she stated in her deposition
12 that the symptoms of her discharge post-implant
13 were different.  The odor was stronger.  It was
14 more difficult to treat.
15       So, this was her -- the discharge that
16 she had after implant was different according to
17 Ms. Jones' -- excuse me -- Ms. Bayless' testimony
18 than it was pre-implant.
19   Q.   Now, you mentioned something about the
20 Board of Health sending a letter.  Have you seen
21 such a letter from the Board of Health?
22   A.   In Ms. Bayless' case?  No.  I mean, they
23 would send a letter if there was a gonorrhea or
24 chlamydia that's positive.  Those are reportable

Page 220

1  infections to the Board of Health and if she
2  did not document treatment, then the Board of
3  Health would get involved.
4    Q.   But you haven't seen any record one way
5  or the other about the test results for any of the
6  STDs for Ms. Bayless, have you?
7    A.   Correct.  And as I state, if the STDs
8  were positive, more likely than not that would have
9  triggered a letter being sent, which she would have
10 then known about.
11   Q.   As part of your differential diagnosis,
12 what did you consider in regards to the cause of
13 Ms. Bayless' pelvic vaginal pain that she's
14 attributing to the Restorelle Y-mesh and the
15 Advantage Fit?
16   A.   Well, again, I considered all the
17 factors, her prior surgical history.  Both her
18 tubes and ovaries at the time of her hysterectomy
19 looked -- appeared normal, according to Dr. Jones'
20 operative report, which would rule out pelvic
21 inflammatory disease, would rule out any sequelae
22 from her tubal ligation.
23       The only finding was pelvic sidewall,
24 left pelvic sidewall adhesions associated with her

Page 221

1  sigmoid colon and diverticulosis.  She's never been
2  diagnosed with diverticulitis.  The diverticulosis
3  for the vast majority of patients is asymptomatic
4  and would only give abdominal pain with
5  constipation, which I do not see that she
6  complained about in the medical records.
7        There is no finding that there was any
8  problem with the hysterectomy.  The only finding
9  was that there was mesh erosion from the Y-mesh.
10 She did not demonstrate urinary tract infections.
11 She has not been diagnosed with vaginitis -- excuse
12 me -- atrophic vaginitis.
13       So, those are the conditions that I
14 ruled out as a potential cause of her abdominal and
15 pelvic pain.
16       She has had not a recurrence of her
17 pelvic organ prolapse.  That is in the medical
18 records.  So, I also ruled that out as a cause.
19   Q.   Do you know whether Ms. Bayless is
20 currently experiencing dyspareunia?
21   A.   That would be based on her deposition
22 testimony.
23   Q.   So, is that yes or no, do you know?
24   A.   That would -- as she stated in her

Bruce Rosenzweig, M.D.

Page 222

1 deposition, yes.
2    Q.   Is it your opinion that her alleged
3 dyspareunia is related to the mesh implants she
4 received back in August of 2013?
5    A.   Yes.
6    Q.   And you haven't determined whether one
7 implant is the primary cause of any dyspareunia
8 that she might be claiming, right?
9    A.   More likely than not the Restorelle
10 Y-mesh is the primary cause and the Advantage Fit
11 is the secondary cause.
12    MR. HABERMAN:  Objection; form.
13 BY MR. PERSONS:
14    Q.   Did you consider whether Ms. Bayless had
15 a shortened vagina even prior to her hysterectomy?
16    A.   Yes, I -- well, there is no -- you can't
17 consider something that is not documented in the
18 records.
19        So, Dr. Jones who examined her found
20 that she had a total vaginal length of
21 10 centimeters based on her POP-Q on May 31, 2012.
22 So, she had a normal total vaginal length of
23 10 centimeters prior to surgery.  So, that would
24 exclude a pre-surgical shortened vagina.

Page 223

1    Q.   Okay.  Well, are you aware that she
2 testified prior to her hysterectomy that sometimes
3 she would experience pain during intercourse due to
4 her partner hitting her cervix?
5    A.   Yes, because that's -- yes, because she
6 had prolapse.
7    Q.   Would you agree that repeated
8 trichomonas, gonorrhea and chlamydia infections can
9 lead to pelvic inflammatory disease?
10    A.   We have discussed that before.  You
11 cannot have pelvic inflammatory disease when you
12 don't have a uterus connecting the vagina to the
13 tubes and ovaries.
14    Q.   Okay.  All right.  So, your answer to
15 that is no?
16    A.   That in Ms. Bayless' case, after her
17 hysterectomy, the answer is no.
18    Q.   Okay.  Now, on page 9 of your report,
19 the opinions that you have there in No. 2, they are
20 not specific to Restorelle, are they?
21    A.   In what respect?
22    Q.   In any respect.  I mean, they could be
23 applicable to any mesh product?
24    A.   Correct.  Mesh products degrade,

Page 224

1 contract, deform, lead to chronic foreign body
2 reaction, chronic inflammatory reaction, scar plate
3 formation, entrap nerves, correct.
4    Q.   And let's look at -- do you have any
5 evidence that Ms. Bayless' mesh contracted?
6    A.   More likely than not, due to the chronic
7 foreign body reaction, chronic inflammatory
8 reaction, we know that there was -- and I want to
9 pull up the appropriate medical record.
10        On June 11, 2015, there was erythema
11 surrounding the exposed mesh, which would show that
12 there was a chronic foreign body reaction, chronic
13 inflammatory reaction that was taking place, which
14 would lead to mesh contraction.
15    Q.   Is it your testimony --
16    MR. CONNOLLY:  I'm sorry.
17 BY MR. PERSONS:
18    Q.   Going back to pelvic inflammatory
19 disease, is it your information that pelvic
20 inflammatory disease cannot occur following a
21 hysterectomy?
22    A.   Yes, there is -- unless there was
23 previous evidence of a subclinical infection, which
24 was not noted by Dr. Jones at the time of the

Page 225

1 hysterectomy.  There is no organ in the pelvis to
2 become inflamed.  The tubes and ovaries are
3 separated from the vagina.  So, a gonorrheal or
4 chlamydial or trichomonas infection can't ascend to
5 the tubes and ovaries.
6        Now, you can have a postoperative tubal
7 and ovarian infection in the postoperative period
8 from the surgery, but that's not what was found in
9 Ms. Bayless' case.
10    Q.   All right.
11    MR. CONNOLLY:  Just one point of
12 clarification, Ray and Dr. Rosenzweig.  Can you
13 tell me what -- in the last response you referred
14 to a specific medical record.  I just want the date
15 of that.
16    THE WITNESS:  June 11, 2015.
17    MR. CONNOLLY:  Thank you.
18 BY MR. PERSONS:
19    Q.   Now, Restorelle Y, what evidence do you
20 have, I'm sorry, of the shrinkage of the
21 Restorelle Y in Mrs. Bayless?
22    A.   We talked about contraction.
23 Contraction and shrinkage are synonymous.
24    Q.   Okay.  What about degradation, do you

Bruce Rosenzweig, M.D.

Page 226

1  have any evidence of it? Specific to Ms. Bayless,
2  not just generally but specific to Ms. Bayless.
3      A.   Yes.  The erythema seen on June 11, 2015
4  would show that the chronic foreign body reaction,
5  chronic inflammatory reaction is ongoing, which
6  leads to mesh degradation.
7      Q.   All right.  What about evidence of the
8  chronic inflammation?
9      A.   The erythema seen around the mesh
10 erosion.
11     Q.   Now, Restorelle Y doesn't actually have
12 sharp edges, does it?
13     A.   When it undergoes deformation and
14 degradation, yes.
15     Q.   Now, on page 10 of your report, at the
16 top, you wrote that "a combination of these factors
17 caused Ms. Bayless' injuries"?
18     A.   Correct.
19     Q.   All right.  Now, but you didn't
20 elaborate on which factors are present and which
21 are not.  Are you saying that all of them were
22 present in Ms. Bayless' situation?
23     A.   More likely than not, yes.
24     Q.   And you're basing that on the properties

Page 227

1  of polypropylene mesh?
2      A.   And the findings in the medical records,
3  as we just previously discussed.
4      Q.   All right.  Now on pages 10 and 11 of
5  your report, you claim that Ms. Bayless likely
6  still has mesh remaining, right?
7      A.   Correct.
8      Q.   Now, but she hasn't actually undergone
9  any revision surgery whatsoever as you're aware of,
10 has she?
11     A.   No, she has not.
12     Q.   So, you're not suggesting that she's had
13 surgery and there's mesh remaining, are you?
14 You're just saying she still has the mesh from the
15 September operation?
16     A.   From the August operation, correct.
17     Q.   I apologize.  My mistake.  The
18 August 13 -- August 2013 operation.  Yes?
19     A.   Correct.
20     Q.   You also opined that Ms. Bayless'
21 chronic pain could be treated with biofeedback
22 therapy?
23     A.   That is a modality -- yes, that is a
24 modality that can be used.

Page 228

1      Q.   And on what basis are you claiming that
2  she's experiencing chronic pain?
3      A.   Her deposition testimony.
4      Q.   But that's not explained here in the
5  report.
6           The diagnosis symptoms isn't referenced
7  anywhere in the medical records that you reviewed
8  in this case of chronic pain, correct?
9      A.   That's based on her deposition
10 testimony.
11     Q.   Okay.  And not on anything in the
12 medical records?
13     A.   Not that I specifically recall.
14     Q.   And you also claim that her continuum of
15 care can range anywhere from six months to five
16 years.  How did you arrive on six months and five
17 years?
18     A.   That's based on my clinical experience,
19 review of the literature and management of patients
20 that have had mesh complications.
21     Q.   And when are you claiming that her
22 continuum of care began?
23     A.   Well, when she starts to get the
24 appropriate therapy that we have discussed, either

Page 229

1  a mesh revision procedure or the non-surgical
2  procedures, then that's when the clock would start
3  clicking.
4           And I think she stated in her deposition
5  that someone has recommended that she have a mesh
6  removal procedure.
7      Q.   What evidence do you have that
8  Ms. Bayless' Restorelle Y is migrating?
9      A.   Not that I specifically recall from the
10 medical records.
11     Q.   And since her Restorelle Y-mesh hasn't
12 been removed, to your knowledge, you certainly
13 haven't examined any pathology specimens, have you?
14     A.   That's correct.
15     Q.   Nor have you seen any records
16 documenting any such pathology?
17     A.   That's correct.
18     Q.   All right.  You also claim that
19 Ms. Bayless wasn't able to make a fully informed
20 medical decision regarding her implant procedure?
21     A.   Correct.
22     Q.   But you're aware that Ms. Bayless
23 testified that she reviewed the consent forms
24 before she signed them.  We talked about that

Bruce Rosenzweig, M.D.

Page 230

1 earlier?
2    A.   Correct.  But Dr. Jones testified that
3 there were characteristics of the mesh that she did
4 not know about.  If I recall correctly, she did not
5 know about contraction, degradation and I think
6 there is another.  But what she stated in her
7 deposition is what she stated in her deposition.
8    Q.   Okay.  And you're claiming also that
9 Dr. Jones -- is that the basis for your contention
10 that Dr. Jones wasn't provided the necessary and
11 required information to obtain Ms. Bayless'
12 informed consent?
13    A.   Correct.
14    Q.   All right.  Are you aware that Dr. Jones
15 has testified that she's used the same technique to
16 implant Y grafts for almost 20 years, you know
17 that, right?
18    A.   That's what she stated, yes.
19    Q.   And are you claiming she's been
20 performing these surgeries for 20 years without
21 full knowledge of the risk?  Is that your
22 testimony?
23    A.   That's my testimony with all doctors
24 that still use polypropylene mesh, because they are

Page 231

1 told that the only unique risk of mesh is erosion
2 where there are -- as we talked about, there are
3 risks from doing the surgery itself but there are
4 risks from the mesh.
5         And the risks of mesh is contraction,
6 deformation, degradation, chronic foreign body
7 reaction, chronic inflammatory reaction, that leads
8 to mesh contracting, trapping nerves, pain,
9 dyspareunia, erosion and the litany of things that
10 I discuss in my general causation report.
11    Q.   Now, where in Dr. Jones' deposition does
12 she state that she was unaware of the fact that
13 mesh could erode or become exposed or there could
14 be extrusion with mesh?  Where does she say that in
15 her deposition?
16    A.   That the cause --
17    Q.   Can you direct me to a page?
18    A.   That the cause of that is due to the
19 chronic foreign body reaction, chronic inflammatory
20 reaction, the induction of proinflammatory
21 macrophages.
22         And I will refer you to the Nolfi
23 report, the Feola report and the effects that mesh
24 has on causing -- those characteristics of the mesh

Page 232

1 that cause the erosion process.  That is what she
2 didn't know and, therefore, she couldn't explain
3 that to the patient.
4    Q.   But you're aware that Dr. Jones
5 testified that at the time she performed
6 Ms. Bayless' surgery she, Dr. Jones, was aware of
7 the risks of exposure?
8    A.   Correct, but not -- but not the risk of
9 the mesh that leads to the chronic foreign body
10 reaction, chronic inflammatory reaction, that leads
11 to the induction of pro-inflammatory macrophages,
12 that leads to the erosion or the -- that the
13 cellular effect that it has on the vaginal
14 epithelium that leads to the destruction of the
15 vaginal epidemiology that I discuss in my general
16 causation report.
17         MR. PERSONS:  Move to strike as non-responsive
18 and it's repetitive.
19 BY MR. PERSONS:
20    Q.   Without engaging in that refrain, can
21 you answer this question for me:  Are you aware
22 that Dr. Jones testified that at the time she
23 performed Ms. Bayless' surgery she was aware of the
24 risks of the need for repeat surgery?

Page 233

1    A.   That's what she stated.
2    Q.   And that she was aware of the risk of
3 dyspareunia?
4    A.   From the surgery itself.  Not from the
5 characteristics of the device.
6    Q.   And Dr. Jones testified, did she not,
7 that she didn't need Coloplast to give her
8 instructions or warnings to advise her of those
9 risks to the patient?
10    A.   Those risks, but not to the
11 characteristics of the device that make it
12 unreasonably dangerous.
13    Q.   Dr. Jones also --
14         MR. PERSONS:  Move to strike as unresponsive.
15 BY MR. PERSONS:
16    Q.   Dr. Jones also testified she was aware
17 of the FDA safety communication that issued in 2008
18 regarding the use of mesh in gynecologic surgery,
19 didn't she?
20    A.   Yes.
21    Q.   And that was five years before
22 Ms. Bayless' surgery, wasn't it?
23    A.   Correct.
24    Q.   And Dr. Jones testified she was aware of

Bruce Rosenzweig, M.D.

Page 234

1  the 2011 FDA safety communication regarding
2  gynecologic mesh surgeries, didn't she?
3      A.   Correct.
4      Q.   And that, of course, was two years
5  before Ms. Bayless' surgery, wasn't it?
6      A.   Correct.
7      Q.   And Dr. Jones stated, and I quote, "She
8  didn't need Coloplast to repeat," end quote, the
9  information contained in those communications in
10 order for her to understand the risk of surgery
11 with mesh, didn't she?
12     A.   Well, that's what she stated, but then
13 what was not communicated to her were the
14 characteristics of the device that make it
15 unreasonably dangerous, which are in the general
16 causation reports including my own.
17     Q.   All right.  Now, you also say in your
18 report that these complications have caused a
19 significant impact on Ms. Bayless' quality of life.
20          Can you describe Ms. Bayless' activities
21 prior to her August 9, 2013 surgery, her activities
22 of daily living?
23     A.   Those were described in her deposition
24 testimony.

Page 235

1      Q.   But you don't have them anywhere in your
2  report, do you?
3      A.   Correct, because she wasn't deposed
4  until after I completed my report.
5      Q.   Well, do you know what they were?
6      A.   They are described in her deposition
7  testimony.
8      Q.   So, you can't describe them without
9  referring to what she said, without referring to
10 the transcript?
11     A.   Correct.
12     Q.   Now, what about after surgery, her
13 activities of daily living, can you describe those?
14     A.   That's in her deposition testimony also.
15     Q.   Okay.  And I assume your answer would be
16 the same if you were asked can you describe all the
17 ways in which her activities have been, quote,
18 "significantly reduced and/or altered"?
19     A.   Correct.  That would be in her
20 deposition testimony.
21     Q.   Now, on page 13 of your litigation
22 report, you reference four surgical procedures that
23 you claim would have been safer alternatives -- a
24 safer alternative than the Restorelle Y for

Page 236

1  treating Ms. Bayless' POP surgically.
2      A.   Correct.
3      Q.   On page 14 of your report, the seventh
4  line from the top, you say if Ms. Bayless had
5  undergone any of these safer alternatives for
6  treating her POP surgically, she would not have
7  suffered the injuries that were caused by the
8  Advantage Fit and the Restorelle Y.
9          My question is, to clarify, is it your
10 testimony that there was a zero percent chance that
11 Ms. Bayless would be experiencing any of the
12 symptoms that she's currently claiming had she
13 undergone one of the four alternatives you outline
14 on page 13?
15     A.   Yes, because there would not have been
16 mesh placed in her vagina.
17     Q.   All right.  You first reference --
18     A.   And we are talking the injuries that she
19 is suffering from the mesh, correct?
20     Q.   Well, that's not what you say here.  I
21 mean, in your report it says that she wouldn't be
22 suffering --
23     A.   No, no.  That was the question you
24 asked, and I'm clarifying the question that you

Page 237

1  asked.
2          I don't say in my report she would have
3  a zero percent risk of not having a complication.
4  You asked me would she have a zero percent risk of
5  having a complication from the mesh, and that is
6  correct.
7      Q.   Okay.  That was my question.
8          All right.  Now, you first reference the
9  native tissue repair for SUI and POP, and you talk
10 about the colposuspension procedure that you
11 reference here that would be for the treatment of
12 SUI and not POP, correct?
13     A.   Correct.
14     Q.   So, in regards to the Restorelle Y,
15 you're claiming that a suture-based native tissue
16 POP repair would have been a safer alternative,
17 right?
18     A.   Correct.
19     Q.   And you don't specify what type of
20 sutures would be used in this proposed alternative,
21 do you?
22     A.   Delayed absorbable suture.
23     Q.   Is that what it would be?
24     A.   Yes.

Bruce Rosenzweig, M.D.

Page 238

1    Q.   Okay.  Now, this procedure could still
2  cause scarring, though, couldn't it?
3    A.   In the postoperative period, correct.
4    Q.   And it could also result in adhesions,
5  couldn't it?
6    A.   There is no -- adhesions are between two
7  peritoneal surfaces.  A native tissue repair would
8  be done extraperitoneally.
9    Q.   Now, what in Ms. Bayless' medical record
10  supports your opinion that she was a good candidate
11  for a native tissue repair in August of 2013?
12    A.   That she was a good candidate for a
13  pelvic organ prolapse repair.
14    Q.   Is that it?
15    A.   That she was a candidate for a pelvic
16  organ prolapse repair surgery.
17    Q.   Okay.  Now, she was actually given the
18  option, though, of having a native tissue repair,
19  wasn't she?
20    MR. HABERMAN:  Objection; asked and answered.
21  BY THE WITNESS:
22    A.   A native tissue repair with mesh
23  augmentation.
24  BY MR. PERSONS:

Page 239

1    Q.   And she decided she didn't want to have
2  that procedure, right?
3    A.   A native tissue repair with mesh
4  augmentation.
5    Q.   The risks and benefits of that procedure
6  were described to her.  Yes?
7    A.   With mesh augmentation, yes.
8    Q.   And she declined that procedure to have
9  the augmentation with surgical mesh, didn't she?
10    A.   No.  She declined the cystocele repair
11  with cervical mesh to have an apical support with
12  Coloplast Y-mesh.
13    Q.   All right.  And I believe the doctor
14  also discussed with her an autologous POP repair,
15  correct?
16    A.   Correct.
17    Q.   And that requires harvesting a large
18  piece of fascia to create the autologous graft,
19  doesn't it?
20    A.   Large, not necessarily.
21    Q.   Okay.  But it does require a piece of
22  fascia to create the graft?
23    A.   Correct.
24    Q.   And that's a more morbid surgery than a

Page 240

1  native tissue repair, isn't it?
2    A.   The surgery, correct.
3    Q.   And it's more morbid than the repair
4  augmented with the Restorelle Y that Ms. Bayless
5  consented to undergo, isn't it?
6    A.   That's not correct.
7    Q.   If the surgeon needs to -- well, strike
8  that.
9         The autologous repair is a much older
10  procedure, isn't it?
11    A.   No, it's the same procedure.
12    Q.   Well, it predates the use of mesh,
13  doesn't it?
14    A.   That's correct.
15    Q.   And, in fact, it's fallen out of favor
16  with most surgeons, hasn't it?
17    A.   That's not correct.
18    Q.   All right.  Do you still perform
19  autologous repairs?
20    A.   Yes.
21    Q.   How often?
22    A.   Not very often.
23    Q.   But even there you still have to use
24  sutures to support the autologous graft, don't you?

Page 241

1    A.   Correct.
2    Q.   And autologous grafts for POP repair
3  have a higher failure rate than mesh augmented
4  repairs, don't they?
5    A.   No.
6    Q.   All right.  And what do you base that
7  on?
8    A.   The medical literature.
9    Q.   Okay.  What medical literature?  That's
10  a broad statement.  What?  What in the medical
11  literature?
12    A.   There is the -- there have been
13  meta-analysis of the Maher and Feiner meta-analysis
14  on POP repair that shows a fairly equivalent
15  success rate.
16    Q.   Is that cited anywhere in your reliance
17  materials?
18    A.   In my general causation report and the
19  general causation reports of Dr. Garely and
20  Dr. Hoyte.
21    Q.   And the third alternative that you list
22  in your report --
23    MR. PERSONS:  How much time have we used so
24  far?  I don't want to use all of Dan's time.

Bruce Rosenzweig, M.D.

Page 242

1    MR. HABERMAN:  I have you have about an hour
2  left.
3    THE REPORTER:  Exactly an hour.
4    MR. PERSONS:  Dan, is that good with you?
5    MR. CONNOLLY:  That works for me.
6    MR. PERSONS:  Thank you, ma'am.
7  BY MR. PERSONS:
8    Q.   The third alternative you list is an
9  allograft such as Repliform?
10   A.   Correct.
11   Q.   And an allograft is biologic graft made
12 from donated human tissue, isn't it?
13   A.   Correct.
14   Q.   Now, can you point me to any medical
15 literature that supports your claim that Repliform
16 or other allografts are safer than Restorelle Y?
17   A.   Yes, they don't have the risks that are
18 associated with mesh.  While there might be a, as
19 we discussed earlier, a decrease in the short-term
20 efficacy, there are -- there is an obviation of the
21 long-term risk associated with having a
22 polypropylene mesh product.
23   Q.   Now, allograft material also has a
24 higher failure rate than synthetic graft material,

Page 243

1  doesn't it?
2    A.   We just discussed that.
3    Q.   My apologies.  Now, the allograft can
4  also become exposed, though, can't it?
5    A.   It can.
6    Q.   Now, in Item No. 4 in your report on
7  page 13, you discuss pelvic organ prolapse repair
8  with Ultrapro?
9    A.   Yes.
10   Q.   Now, Ultrapro is not indicated as a
11 treatment option for pelvic organ prolapse, is it?
12   A.   As an abdominal colposacropexy, yes.  As
13 a transvaginal mesh, there is nothing that's
14 approved for transvaginal mesh since August of
15 19 -- excuse me -- 2019.
16   Q.   Now, Ultrapro was not indicated for the
17 treatment of pelvic organ prolapse at the time of
18 Ms. Bayless' surgery in August of 2013, was it?
19   A.   That's not correct.
20   Q.   All right.  So, your testimony is
21 Ultrapro was FDA cleared for use in pelvic organ
22 prolapse repair surgery in August of 2013, is that
23 your testimony?
24   A.   Yes.

Page 244

1    Q.   Okay.  Now, Restorelle Y versus
2  Ultrapro, both are made of polypropylene, correct?
3    A.   Correct.
4    Q.   What is the pore size of Restorelle Y?
5    A.   2.5 millimeters.
6    Q.   And what's the pore size of Ultrapro?
7    A.   After the Monocryl absorbs,
8  5 millimeters.
9    Q.   What medical literature supports your
10 understanding of the pore sizes that you've just
11 referred to?
12   A.   The Shepherd, Moalli data.  Also the
13 Shepherd data shows that compared with Restorelle,
14 that the Ultrapro is less stiffer and the stiffness
15 of the mesh is what leads to complications such as
16 erosion, pain, dyspareunia, increased foreign body
17 reaction, increased inflammatory reaction.  That's
18 based on the Nolfi paper.
19   Q.   So, Shepherd data and then what paper?
20   A.   The Moalli data.  There is Feola,
21 Abramowitch, Liang, Brown and Nolfi.
22   Q.   All right.  Now, you do know -- you're
23 aware that the Brown and Liang studies measured the
24 Ultrapro pore size after the absorbable component

Page 245

1  had been absorbed, right?
2    A.   Correct.
3    Q.   Now, I think you just talked about the
4  flexibility of Restorelle Y compared to Ultrapro?
5    A.   That's the Shepherd study that looked at
6  their stiffness, yes.
7    Q.   Are you aware of the Feola study
8  published in 2011 that found that Ultrapro
9  underwent in vivo contraction of 91% compared to
10 Restorelle's 43%?  You're aware of that?
11   A.   Correct.
12   Q.   And you're basing your claims regarding
13 the potential causes of Ms. Bayless' current
14 symptoms partially on the hypothetical contraction
15 of her Restorelle Y and her Advantage Fit, correct?
16   MR. HABERMAN:  Objection.
17 BY THE WITNESS:
18   A.   That and the chronic foreign body
19 reaction, chronic inflammatory reaction.
20 BY MR. PERSONS:
21   Q.   And, so, under your hypothesis, even if
22 the Ultrapro had been available in August of 2013,
23 it would have -- and we contend that it was not.
24   A.   You've never heard of Artisyn Y-mesh?

Bruce Rosenzweig, M.D.

Page 246

1 Q. It would have been more likely to cause
2 the same symptoms that you're attributing to the
3 Restorelle Y?
4 A. Based on the data from Brook, Shepherd
5 and Nolfi, no.
6 Q. But based on the Feola paper, it would
7 have, correct?
8 A. Well, contraction is only one of the
9 dynamic features of the mesh. The other is the
10 inflammatory reaction and chronic foreign body
11 reaction which leads to the induction of
12 proinflammatory macrophages.
13 Q. So, the answer to my question is yes,
14 assuming that those other traits or characteristics
15 are common to all mesh?
16 A. No, based on the Shepherd that the --
17 there is a greater stiffness, and stiffness leads
18 to a greater inflammatory reaction, which will then
19 lead to tissue destruction, based on the Nolfi
20 paper.
21 Q. All right. Are you also aware that
22 Feola, that Feola 2011 study, concluded that the
23 porosity of Restorelle mesh was found to be
24 significantly greater than Ultrapro? A porosity of

Page 247

1 78% compared to 67%, are you aware of that?
2 A. Yes.
3 Q. Okay. Now, in your report on pages 13
4 and 14 you say, "Finally, I have reviewed
5 Ms. Bayless' past medical bills as set forth in my
6 reliance list. It is my opinion that they were
7 reasonable and necessary."
8 As you sit here today can you identify
9 any of Ms. Bayless' medical bills contained within
10 the five sets of records provided on your reliance
11 list?
12 A. Not that I specifically recall.
13 Q. Okay. And you don't know whether they
14 have been paid or not, do you?
15 A. No, I don't.
16 Q. So, on what basis are you opining that
17 the charges are reasonable?
18 A. Based on my clinical experience.
19 Q. Okay.
20 A. And having done medical billing for my
21 own practice for the last going on 20 years, they
22 looked like they are -- were standard charges for
23 standard procedures.
24 Q. All right. I've got two more questions

Page 248

1 for you.
2 You're not a life care planner, are you?
3 A. No.
4 Q. All right. And you're not an insurance
5 billing specialist?
6 MR. HABERMAN: Objection.
7 BY THE WITNESS:
8 A. Again, I have been doing insurance
9 billing for 18 years.
10 BY MR. PERSONS:
11 Q. That's not my question.
12 Have you ever worked for an insurance
13 company reviewing medical bills and approving
14 bills?
15 MR. HABERMAN: Objection; argumentative.
16 BY THE WITNESS:
17 A. I have not worked for an insurance
18 company, but I've submitted bills to insurance
19 companies for over 18 years in a private practice
20 setting.
21 MR. PERSONS: That's all I have for now. I
22 tender the witness. Thank you.
23 THE WITNESS: Thank you, sir.
24 MR. PERSONS: You're welcome.

Page 249

1 MR. CONNOLLY: You guys want to take a
2 five-minute break or do you want to proceed?
3 THE WITNESS: We can go.
4 MR. PERSONS: We can do whatever you want to.
5 MR. CONNOLLY: How much time we got, about 45
6 minutes left or is it two hours?
7 MR. HABERMAN: I got you at 52 minutes and 5
8 seconds, 4 seconds, 3 seconds.
9 MR. CONNOLLY: Hey, hey, hey.
10 MR. PERSONS: You better go ahead and take
11 that break, Dan.
12 THE WITNESS: If we take a break, it's going
13 to be an hour break so I can go walk the dogs.
14 That's why we don't want to take a break.
15 MR. CONNOLLY: Bring back the dogs of war.
16 Okay.
17 EXAMINATION
18 BY MR. CONNOLLY:
19 Q. Quick question, Doctor. As Mr. Persons
20 indicated earlier today, at the time you prepared
21 your report you had not seen the deposition of
22 Dr. Jones. True?
23 A. Correct.
24 Q. And you had also not seen the deposition

Bruce Rosenzweig, M.D.

Page 250

1  of the Plaintiff, right?
2      A.   Correct.
3      Q.   So, I'd like to ask you just a few
4  questions about Dr. Jones' testimony, which I
5  understand you've read, correct?
6      A.   Correct.
7      Q.   So, do you agree with Dr. Jones that if
8  a patient provides an incomplete history, it can
9  affect the warnings that she provides or the
10  decision regarding surgery?
11      MR. HABERMAN:  Objection.
12  BY THE WITNESS:
13      A.   I wouldn't disagree with her statement.
14  BY MR. CONNOLLY:
15      Q.   Okay.  And you would agree with me that
16  at least insofar as what the Plaintiff told
17  Dr. Jones, she did not admit to any cocaine use at
18  the time that she sought treatment by Dr. Jones.
19  True?
20      A.   Correct.
21      Q.   Okay.  She did acknowledge that she was
22  smoking, right?
23      A.   Correct.
24      Q.   And as you stated, she said that she had

Page 251

1  ceased smoking for a period of time during the
2  healing process, right?
3      A.   Correct.
4      Q.   And I believe that you testified earlier
5  today that you understood that that will have been
6  two months, right?
7      A.   I think she said two to three months,
8  but something of that nature.
9      Q.   Okay.  And you'll agree that from the
10  discussion that we've had with Mr. Persons today
11  that there is ample record in the testimony that
12  Dr. Jones viewed the healing period in which she
13  put restrictions on the patient as 12 weeks, right?
14      A.   For lifting and those kind of things,
15  correct.
16      Q.   Well, and you in fact stated to
17  Mr. Persons that you understood how reading the
18  testimony, it would be reasonable to assume that
19  that 12-week period could apply as well to the
20  sexual restriction.  One didn't ask that
21  specifically of the doctor.  True?
22      A.   I would not agree that that -- that
23  would be a reasonable assumption, because most of
24  us -- I think every both deposition I've read and

Page 252

1  doctor that I have talked to would say six weeks of
2  restricted intercourse is ample after a repair
3  procedure.
4      Q.   Okay.  I'm not -- so, what I'm asking
5  you, Doctor, is a little different.
6      You and I, neither one of us was present
7  when Dr. Jones gave the caution to the -- to
8  Ms. Bayless, right?
9      A.   Correct.
10      Q.   And in her testimony she says
11  restrictions are 12 weeks, right?
12      A.   Correct.
13      Q.   That's three months, right?
14      A.   Correct.
15      Q.   So, you're quarreling with whether or
16  not it's reasonable to have a 12-week restriction.
17  You're not disputing the fact that she may have
18  said 12 weeks to Ms. Bayless.  Right?
19      A.   Oh, I'm --
20      MR. HABERMAN:  Objection.
21  BY THE WITNESS:
22      A.   I have a three-month restriction on
23  heavy lifting on my patients when I do prolapse
24  surgery.

Page 253

1  BY MR. CONNOLLY:
2      Q.   Okay.  Okay.  So, you would agree at
3  least with the three-month restriction on lifting
4  for the prolapse surgery that Ms. Bayless had?
5      A.   Correct.
6      Q.   Okay.  And the only question that you
7  quarrel with is whether or not the sexual
8  limitation should be as long as three months?
9      A.   Or was communicated to Ms. Bayless as
10  being 12 weeks.
11      Q.   Okay.  For the procedure that
12  Ms. Bayless had, hysterectomy, a stress urinary
13  incontinence sling and a prolapse repair, how long
14  would you restrict sexual intercourse for the
15  patient?  How long would you tell them to refrain
16  from sexual intercourse?
17      A.   Six weeks.
18      Q.   Six weeks?
19      A.   Yes.
20      Q.   Okay.  So, now the report that we have
21  talked about at length, which is Exhibit 10, that
22  is the report where Dr. Jones discovered that there
23  was the incisional separation, right?
24      A.   Correct.

Bruce Rosenzweig, M.D.

Page 254

1    Q.   And she also talked about the orgasmic
2  symptoms that Ms. Bayless is discussing, right?
3    A.   Correct.
4    Q.   And the date of that report is
5  September 24, 2013?
6    A.   Correct.
7    Q.   So, that is six weeks and three days
8  post-op?
9    A.   Correct.
10    Q.   So, if one were to conclude that
11  Ms. Bayless was having sex such that she recognized
12  that she was having an orgasmic dysfunction, in
13  order not to violate your restriction, she would
14  have three days in which to find that out, right?
15    A.   You know, it would have been really good
16  to have asked that specific question of Ms. Bayless
17  so we're not all speculating on whether or not she
18  had intercourse in the first six weeks after
19  surgery, because she said at her deposition, if I
20  recall, that she complied with the instructions
21  that she was given about having intercourse.
22    Q.   Let me ask you this, Doctor.  Is it
23  possible that the incisional separation that is
24  discussed in Exhibit 10 was the result of sexual

Page 255

1  penetration?
2    MR. HABERMAN:  Objection.
3  BY THE WITNESS:
4    A.   If she had sexual intercourse, then
5  there is -- I mean, it would have to be within like
6  the first two weeks after surgery.
7  BY MR. CONNOLLY:
8    Q.   Okay.  I just asked you if it's
9  possible.  So, your answer is yes to that?
10    A.   It could be possible.
11    Q.   Okay.  All right.  So, now let me turn
12  to a couple different propositions.
13         Now, as I understand it, from the
14  records that we have, Plaintiff, Ms. Bayless, has
15  been a regular cocaine user for a considerable
16  period of time, since 1999, right?
17    A.   She started using cocaine, as we know,
18  in 1999.
19    Q.   Right.
20    A.   There was a time when she stated in her
21  deposition that she went into, I think in the early
22  2000s, into a rehab program.
23    Q.   Right.
24    A.   We don't know whether or not she was

Page 256

1  using it at the time of surgery.  There is no
2  indication that she was.  She had medical
3  clearance, but medical clearance would not have
4  been obtained if she was using it.  Then we --
5    Q.   Let me stop just you right there.
6         Medical clearance.  Is there any
7  indication that Dr. Jones gave her a drug test?
8    A.   Not that I specifically recall from the
9  medical records.
10    Q.   Okay.  So, when you say "medical
11  clearance," the only medical clearance that
12  Dr. Jones provided was to ask her, "Are you using
13  drugs," and Ms. Bayless denied it, right?
14    A.   No, that's not correct.
15    Q.   What other -- so, I mean, as to the
16  issue of drugs, was there any other clearance that
17  was obtained other than asking her whether she was
18  using drugs?
19    A.   There was a notation in her medical
20  record about sending medical clearance over to the
21  surgery center where she was doing the surgery.
22    Q.   Okay.  So, is there any indication that
23  the surgical center did any drug testing?
24    A.   Not that I specifically recall from the

Page 257

1  medical records.
2    Q.   So, the only clearance relative to the
3  issue of her compliance with not taking drugs at
4  the time of surgery was her statement that she
5  wasn't.  True?
6    A.   Again, I don't -- I didn't see anything
7  in the medical records that was indicative of a
8  drug test.
9    Q.   So, the answer to my question is "True,"
10  right?
11    A.   Correct.
12    Q.   Okay.  So, now, do you agree that it
13  would be reasonable for Dr. Jones to want to know
14  about prior cocaine use?
15    A.   It would not be unreasonable.
16    Q.   Do you ask your patients whether they
17  have used drugs before you do surgery?
18    A.   I ask them about drug use, yes.
19    Q.   Okay.  And it's reasonable also for
20  patients -- I mean, for the doctor to rely on what
21  the patient tells them, right?
22    A.   Correct.
23    Q.   Okay.  There are studies out there that
24  say that cocaine use, either before surgery or

Bruce Rosenzweig, M.D.

Page 258

1 during the recuperative period, is detrimental to
2 the recuperation or detrimental to surgery. True?
3    MR. HABERMAN: Objection and asked and
4 answered. We went over this today.
5    MR. CONNOLLY: Okay. I'm -- okay.
6 BY MR. CONNOLLY:
7    Q. Do you understand the question, Doctor?
8    A. Yes.
9    Q. Okay. Can you answer it?
10    A. Yes.
11    Q. Okay.
12    A. Can you repeat the question?
13    Q. Okay. Rather than have the Court
14 Reporter read it, I'll try it again.
15       There are studies that say that it is
16 detrimental to the surgery and the healing process
17 to be taking cocaine either before the surgery or
18 during recuperation period, right?
19    A. There are studies that show that cocaine
20 use can have a detrimental effect on patients even
21 if they're having surgery.
22    Q. Okay. And that's both before the
23 surgery and during the recuperation period, right?
24    A. Well, no. Before the surgery, I mean,

Page 259

1 somebody could have done cocaine six years before
2 the surgery. That would not have as much of an
3 effect as if someone did cocaine the day before the
4 surgery.
5    Q. Fair enough. Let's keep it within the
6 approximate time frame 12 weeks before, 12 weeks
7 after. That's detrimental to the surgery, right?
8    A. The 12 weeks before, not so much. But I
9 would agree with you in the 12 weeks after surgery,
10 it would have an impact. Just like cocaine use can
11 have a detrimental impact even without surgery.
12    Q. Detrimental impact on the recuperation
13 from the surgery due to the cocaine use, right?
14    A. Correct.
15    Q. Okay. That is, it prevents some of the
16 healing that's necessary, right?
17    A. No. You can have cardiovascular events,
18 heart attacks, strokes, those kind of things.
19    Q. Right. Okay. I understand that
20 detrimental effect. But there's also a detrimental
21 effect to the healing process itself from cocaine
22 use, right?
23    A. It does cause vasospasm. I don't think
24 there is any prospective randomized controlled

Page 260

1 trial that looked at people using cocaine and
2 people not using cocaine and showing a diminution
3 in healing. There's probably anecdotal evidence
4 that of patients not healing well from their
5 surgery incisions who use cocaine postoperatively.
6    Q. There is evidence that cocaine use
7 causes vasoconstriction, right?
8    A. Yes, I just said that.
9    Q. Okay. I didn't understand it because I
10 don't speak medical as well as you do.
11    A. Okay.
12    Q. All right. But vasoconstriction, if
13 there is vasoconstriction, that would be damaging
14 to the healing process. True?
15    A. I mean --
16    Q. Yes or no.
17    A. It's a difficult question to answer yes
18 or no.
19    Q. Cigarette smoking causes
20 vasoconstriction, right?
21    A. The smoking itself or the nicotine?
22    Q. The nicotine.
23    A. The nicotine can.
24    Q. Yeah. And you recognize and even put in

Page 261

1 your report that smoking during the recuperation
2 period is damaging to the healing process. True?
3 Generally.
4    A. That it can delay the healing process.
5    Q. Right. And, so, similarly, cocaine
6 could delay the healing process. True?
7    A. Again, are you talking like every day?
8 I mean, most smokers smoke every day. Again, you
9 would be talking about daily cocaine use?
10    Q. I'm talking about any cocaine use after
11 you've had a serious surgery like this would --
12 could delay the healing process?
13    A. Any cocaine use, no.
14    Q. Okay.
15    A. More frequent cocaine use, probably.
16    Q. Okay. And the frequent kind of cocaine
17 use that Ms. Bayless admitted to a year
18 post-surgery in 2014. True?
19    A. If she's using it daily, yes.
20    Q. And, in fact, we know that a year
21 post-surgery she was using it daily, right?
22    A. Was documented in the medical records.
23    Q. Okay. So, within a year of the
24 surgery -- within six months of the surgery she

Bruce Rosenzweig, M.D.

Page 262

1  admits to cocaine use and within a year she admits
2  to daily use of crack cocaine.  True?
3      A.  Correct.
4      Q.  And within six weeks of the surgery, she
5  is found to have an incision that has -- that has
6  delayed healing, right?
7      A.  It has separated.
8      Q.  It's a separation, an incision that has
9  separated within six weeks, right?
10     A.  One of her incisions.
11     Q.  Right.
12     A.  Your hypothesis saying that --
13     Q.  No, no.
14     A.  -- these factors are having a delayed
15  healing, that should be on all of her incisions.
16  Not just one.
17         So, I mean, that's why, you know, you
18  keep going back to this and saying, well, look, she
19  has delayed healing in one of her incisions so it's
20  got to be due to these factors.  No, because then
21  it would have been in all her incisions, and we
22  know that Dr. Jones said all of her other incisions
23  were well healed.
24     Q.  We'll get back to that in a second.  I

Page 263

1  would just point out that there wasn't a question
2  that I asked you about that.  And so I move to
3  strike your response.
4         You can answer the questions that I ask
5  you.  You know the process well.  You have been in
6  hundreds of the deposition.  Let me ask you the
7  next question.
8         Here's the question I want to ask you
9  and, that is, do you know of any study, any study
10  at all, that says that cocaine use will delay the
11  healing of only -- or every single incision in the
12  body as opposed to might be localized?
13     A.  No.
14     Q.  Okay.  It's possible that delayed
15  healing could be localized.  True?
16     A.  No.
17     Q.  So, whenever a person injures
18  themselves, all the healing occurs simultaneously
19  across all cuts?
20     A.  Well, no.  If you're talking about due
21  to vasoconstriction due to a foreign substance,
22  that should be global, not local.
23     Q.  Okay.  It should be.
24         Let me ask you this.  Vasoconstriction.

Page 264

1  Just so we are talking on the same term.  What does
2  that mean?  That means the blood vessels are
3  constricted?
4      A.  Yes.
5      Q.  Okay.  So, it means decreased blood
6  flow, right?
7      A.  Yes.
8      Q.  Okay.  And blood flow is necessary to
9  heal the body when it's been injured, right?
10     A.  Correct.
11     Q.  Okay.  And, so, there may be some parts
12  of the body that need more blood than others in the
13  healing process, right?
14     A.  No.  All healing needs, you know, or
15  your analogy of decreasing blood flow impacting
16  incisions would be the same for the -- for all the
17  incisions.
18     Q.  I'm sorry.  I lost you there.  It says
19  my Internet connection isn't stable.  I'm glad it
20  doesn't say that I'm unstable.
21         So, I didn't hear the answer.  Let me
22  ask that again.
23         Does vasoconstriction affect all wounds
24  in the body equally?

Page 265

1      A.  It should.
2      Q.  Okay.  But it's possible that some parts
3  of the body that are in the healing process need
4  more blood, right?
5      A.  No.  They're all epithelial.
6      Q.  Well, let me put it to you this way.
7  Some plants need more water than others?
8      A.  Right, but that's because they're a
9  different species.
10     Q.  Okay.  So, you're saying, just so we're
11  clear, that every single wound that Ms. Bayless had
12  should have been affected exactly the same way by
13  the vasoconstriction that may have resulted from
14  her smoking and drug use?
15     A.  More likely than not, yes.
16     Q.  Okay.
17     A.  If you're saying that it's a global
18  effect, it should have a global effect.
19     Q.  Right.  But --
20     A.  If you're saying that it's just -- I
21  mean, she wasn't just putting cocaine inside her
22  vagina.  Then it would have just a local effect.
23  She is smoking it.
24     Q.  But there is --

Bruce Rosenzweig, M.D.

Page 266

1    A.   That's how you ingest crack cocaine.
2    Q.   I understand.  But there is also the --
3 there are some parts of the body that need more
4 blood than others.  True?
5    A.   Your brain, yes.  Your heart, yes.
6    Q.   And your vagina.  True?  Right?
7    A.   During pregnancy.
8    Q.   And also at other times, right?  No?
9    A.   I mean, if you're saying that there is a
10 diminution in blood flow, it would affect all
11 incisions to the same degree.
12    Q.   So, but you're not aware of any study
13 that says if you're having -- if you're smoking and
14 the vasoconstriction occurs, that that would affect
15 all injuries of the same type.  True?
16    A.   Nor is there a study that disputes that.
17    Q.   Okay.  So, what you're telling me about
18 that it should have a global effect is based upon a
19 guess as a doctor, but it's an educated guess?
20    A.   A guess?  It's from taking care of
21 patients for 30 years.
22    Q.   Okay.  And are you aware of any study
23 about the effect of cigarette smoking on delayed
24 healing?

Page 267

1    A.   We've talked about this.  Yes.
2    Q.   Okay.  But none of those studies says
3 one way or the other whether the vasoconstriction
4 would be localized or would be general?
5    A.   Well, you ingest the tobacco in your
6 lungs, so that you would have a primary pulmonary
7 effect.  So, anything that happens from cigarette
8 smoking would be a generalized effect.
9    Q.   Okay.  So, let me ask you a different
10 question, Doctor.
11         In connection with your work on this
12 case, did you do any research on the effects on
13 wounds of cocaine use?
14    A.   Not specifically, no.
15    Q.   Okay.  Have you ever treated a patient
16 who admitted to using cocaine during the healing
17 process after you had performed a pelvic floor
18 surgery on her?
19    A.   Unfortunately, yes.
20    Q.   Okay.  And has any of those patients had
21 adverse reactions to the treatment while they also
22 had -- were using cocaine?
23    A.   No.
24    Q.   Okay.  How many patients have you had

Page 268

1 that have had -- that have been using cocaine
2 during the treatment process?
3    A.   I don't know an exact number.  Over 30
4 years I would probably say, you know, particularly
5 in the obstetrical population back when I was doing
6 OB, we had a number of patients that would come in
7 in labor, need a C-section, they were cocaine
8 positive and, you know, they did quite well.
9    Q.   Okay.  And as to each one of them, any
10 patient that you have who uses cocaine during the
11 healing process for any pelvic floor surgery, you
12 would recommend that they discontinue it
13 immediately because it will affect their healing,
14 right?
15    A.   I -- if I knew about it beforehand, I
16 would not have done surgery.
17    Q.   Okay.
18    A.   If I find out in the postoperative
19 period, I tell them to stop.
20    Q.   Okay.  And we have seen in these
21 records, right, that Ms. Bayless comes in six weeks
22 post-surgery and she has an incision that's
23 reopening, right, and three months later she is
24 admitting to cocaine use.

Page 269

1         You would agree that that cocaine use
2 observed to have that kind of an incisional wound
3 is detrimental to the healing.  True?
4    A.   Boy, we have gone back from a year to
5 six months to three months.
6    Q.   Well, let's look at the exact records,
7 then.
8         If you look at Exhibit 10, Exhibit 10 is
9 the examination where the separation was
10 visualized, right?
11    A.   Right.
12    Q.   That is six weeks and three days because
13 they note it post-surgery, right?
14    A.   Right.
15    Q.   Okay.  And then the next examination --
16    A.   Is March 2014.
17    Q.   March 2014, right?
18    A.   Right.
19    Q.   And the surgery was in August, right?
20    A.   Right.
21    Q.   So, March is six months post-surgery,
22 right?
23    A.   August, September, October, November,
24 December, January, February, March.  Seven months.

Bruce Rosenzweig, M.D.

Page 270

1  Q.  Okay.  Seven months.  I'm sorry.
2  A.  You keep moving me back like three
3  months.  Then you're going to have it like, okay,
4  and we know from the record she did cocaine two
5  days after surgery.
6  Q.  Hold, hold, hold.  We'll redo it.  Okay.
7  Now we have that.
8      It's seven months --
9  A.  Okay.
10  Q.  -- post-surgery.  Okay.  Six months
11  post-examination of the incision or less than six
12  months --
13  A.  Right.
14  Q.  -- that she is admitting to regular
15  cocaine use.  True?
16  A.  That's what the records state.
17  Q.  And that you would agree is detrimental
18  to the healing process.  True?
19  A.  By that time she should have already
20  healed.
21  Q.  Not if she is doing cocaine, though,
22  right?
23  A.  But we don't know that she did it before
24  March.

Page 271

1  Q.  Okay.  So, you're thinking that she just
2  does the regular use the day that she goes to see
3  the doctor?
4  A.  Well, again, we are speculating.  And
5  this would have been a great question to have asked
6  her at the time of her deposition.
7  Q.  Okay.  Well, let me ask you this,
8  Doctor.  Would you agree that her testimony in her
9  deposition and the statements she provides to the
10  doctor are different?
11  MR. HABERMAN:  Objection; calls for
12  speculation.
13  BY THE WITNESS:
14  A.  No.
15  MR. CONNOLLY:  No, it doesn't.
16  BY THE WITNESS:
17  A.  I didn't see -- I thought she was fairly
18  forthright in her deposition.
19  BY MR. CONNOLLY:
20  Q.  It froze again, but I think you said you
21  thought she was forthright?
22  A.  Yes.
23  Q.  Okay.  You recognize that there was one
24  medical record that Mr. Persons showed you where

Page 272

1  she acknowledged having over 100 sexual partners,
2  right?
3  A.  Correct.
4  Q.  And in her deposition she denied having
5  that many.  True?
6  A.  Not that I specifically recall.
7  Q.  Okay.  And, so, if -- you would agree
8  with us that if that were the count, that she had a
9  different count about the number of sexual partners
10  between the medical records and the deposition,
11  right?
12  A.  I don't think she gave an exact number
13  of how many sexual partners that she had.  I don't
14  think she said she, you know, only had five.
15  Q.  You read the deposition, right?
16  A.  Yes.
17  Q.  She didn't acknowledge 100, did she?
18  A.  I don't specifically recall that she
19  affirmed that number, but I don't think that she
20  tried to downplay the number of sexual partners
21  that she had.
22  Q.  You don't think?
23  A.  I don't specifically recall that.
24  Q.  But you do remember seeing that she

Page 273

1  acknowledged to 100 sexual partners to the
2  medical -- to her medical provider?
3  A.  That is what's documented in that
4  medical record.
5  Q.  And you don't have any criticism of the
6  Athena system that it adds an extra zero to the
7  number of sexual partners?
8  A.  No.  Actually, I've seen with Athena
9  that I've looked at patients' weights and they'll
10  come back with prior weights of like 57 pounds when
11  it should have been 157 pounds.  So, either I typed
12  wrong or it dropped a 1.
13  Q.  Okay.  But there is no indication here
14  that such lapse and lackadaisical typing occurred,
15  is there?
16  A.  Well, that we don't know.
17  Q.  Okay.  All right.  Doctor, let's go back
18  to what Dr. Jones said.
19      Would you agree with Dr. Jones that if a
20  patient engages in sexual activity before they're
21  fully healed it can increase the risk of an
22  exposure along the suture line?
23  A.  It all depends on when the sexual
24  intercourse is.

Bruce Rosenzweig, M.D.

Page 274

1    Q.   The statement -- her statement doesn't
2 make it dependent.  Her statement -- I'll read it
3 to you again.
4    A.   You asked me if I agreed with it or not,
5 and I put the caveat it depends on when the sexual
6 intercourse is.
7    Q.   Well, let me just --
8    A.   I wouldn't give a blank statement like
9 that.
10        I would say if you ask me that question,
11 "Dr. Rosenzweig, does having sexual intercourse
12 before the six weeks, can that have impact on the
13 wound," I would say it all depends on when sexual
14 intercourse is.
15    Q.   But that's -- first of all, she didn't
16 say six weeks as you know.  She said 12 weeks.
17        But the other thing is the statement
18 that I read to you was different than that.  I'll
19 read it to you again, and I'd like to have you to
20 tell me whether you'd change your answer.
21        Do you agree with Dr. Jones that if a
22 patient engages in sexual activity before they're
23 fully healed, it can increase the risk of an
24 exposure along the suture line?

Page 275

1    A.   And what do you mean by "fully healed"?
2    Q.   Well, that would have been -- that's
3 what Dr. Jones testified.  If your -- can you
4 answer that or no?
5    A.   My question would be what do you mean by
6 "fully healed"?
7    Q.   Okay.  So, what do you mean by "fully
8 healed"?  What would you expect to be fully healed
9 such that they can engage in sexual activity and
10 not risk an exposure along the suture line?
11    A.   Well, again, I have seen patients that
12 have had sexual intercourse two weeks after surgery
13 that had no problems and I've had seen women that
14 have sexual intercourse months after surgery and
15 had problems.  So, I wouldn't be able to answer
16 that question.
17    Q.   So, what's your response?  Do you just
18 need to examine every patient to find out if they
19 are fully healed?
20    A.   Correct.
21    Q.   Okay.  And in this case, six weeks and
22 three days after the surgery, we found that there
23 was an incision that wasn't healing.  So, that
24 would indicate that the patient was --

Page 276

1    A.   Or the -- no, no.  Now you're making --
2 you're assuming that the patient had sexual
3 intercourse --
4    Q.   No, no.
5    A.   -- and obstructed the --
6    Q.   I'm assuming that the patient wasn't
7 fully healed six weeks and three days after.  True?
8    A.   Or that she had healed and then the mesh
9 exposed.
10    Q.   The incision -- so, are you saying that
11 the mesh caused the incision to rupture?
12    A.   No, the mesh caused the incision -- the
13 exposure.
14    Q.   I understand.  You can't have exposure
15 without mesh, but you can't -- she had an incision
16 that didn't heal, right?
17    A.   No.  She had an incision that was found
18 to be separated on September 24, 2013.
19    Q.   Right.
20    A.   You guys have been saying all day that
21 it was because the incision didn't fully heal.  I'm
22 saying that there was no evidence that she had poor
23 healing, so that there's a reasonable -- with a
24 reasonable degree of medical certainty, that

Page 277

1 incision healed and then opened up because of the
2 mesh.
3    Q.   Okay.  We agree, though, that the
4 incision separated, right?
5    A.   That there was mesh exposed, correct.
6    Q.   Well, the incision separated is what you
7 just testified to.  Are you disagreeing with that
8 now?
9    A.   That there was mesh exposed, correct,
10 and the edges were separate, correct.
11    Q.   The edges of the incision?
12    A.   Correct.
13    Q.   Okay.  So, we agree that there was
14 exposed mesh and an incision that had separated,
15 right?
16    A.   Well, it wouldn't -- whenever there is
17 exposure, the edges of the incision are not
18 together.
19    Q.   Would you agree that the patient was not
20 fully healed at that period of time?
21    MR. HABERMAN:  Objection.
22 BY THE WITNESS:
23    A.   What is "fully healed"?  I don't
24 understand what you mean by "fully healed."

Bruce Rosenzweig, M.D.

Page 278

BY MR. CONNOLLY:

1  BY MR. CONNOLLY:

2  Q.  She has an open incision.  Would you

3  agree that that is not fully healed?

4  A.  She's got a mesh exposure.

5  Q.  She has an incision separation.  Would

6  you agree that that's fully healed or not?

7  A.  In 2015 she had --

8  Q.  I'm asking you about in September 2014

9  as reflected in Exhibit 10.  Is she fully healed at

10  that time or not?

11  MR. HABERMAN:  The Doctor is allowed to answer

12  the way he sees fit.

13  MR. CONNOLLY:  But I'd like him to answer the

14  question I'm asking.

15  BY THE WITNESS:

16  A.  And I can't answer that question yes or

17  no.

18  BY MR. CONNOLLY:

19  Q.  Okay.  All right.  Well, then let's move

20  on.

21  So, you will agree, though, that at

22  particular time, so, with exposure and an incision

23  that separated, Dr. Jones recommends conservative

24  treatment, right?

Page 279

1  A.  Can you point me to the record where she

2  recommends conservative treatment?

3  Q.  Well, she -- in that same exhibit, 10,

4  rather than -- sorry.  I inadvertently dialed

5  somebody's phone.

6  In that Exhibit 10, as you pointed out

7  to Mr. Persons a number of times, she didn't

8  prescribe any -- she didn't recommend any surgical

9  procedure at that particular time, right?

10  A.  Correct.

11  Q.  And, in fact, in her deposition she

12  testified that she recommended conservative

13  treatment for separation along the suture line as

14  reflected on page 118 of her deposition, right?

15  A.  Well, that's what she stated in her

16  deposition.

17  Q.  Right.  And, in fact, if you look at the

18  last page of Exhibit 10, she prescribes a vaginal

19  cream, right?

20  A.  No.

21  Q.  Well, look at it.  Exhibit 10.

22  A.  Of her deposition or of the --

23  Q.  The exhibit.  Exhibit 10, last page.

24  She says vaginal cream, Cleocin.

Page 280

1  A.  Oh.  Well, that's -- well, first of all,

2  what exhibit from my deposition are you on?

3  Q.  So, it's Exhibit 10 and I believe it was

4  tab 7.

5  A.  The tabs --

6  THE WITNESS:  Zach, do you know which exhibit

7  he is talking about?  The post-op --

8  MR. BURNETT:  It's Exhibit 10.  Yes.  It's

9  September 24, 2013 post-op follow-up.

10  THE WITNESS:  That's right because we had all

11  the -- let me go to Exhibit 10.

12  BY THE WITNESS:

13  A.  Okay.  So, you're saying that she

14  prescribed Cleocin cream on September 4, 2013,

15  right?

16  BY MR. CONNOLLY:

17  Q.  Well, it actually says September --

18  "October 1, 2013," right next to it, "prescribed"?

19  A.  The Cleocin down at the bottom of the

20  page was prescribed on October 8, 2013.

21  Q.  Okay.  Next to it on the right-hand side

22  it says, "October 1, 2013 prescribed."  I don't

23  know.

24  A.  Right.

Page 281

1  Q.  In October.  So, the beginning of the

2  next month she had prescribed this cream for the

3  patient, right?

4  A.  Right.

5  Q.  And that's --

6  A.  It wasn't at that visit.

7  Q.  Right.  But it's within days of the --

8  of this, right?

9  A.  And also she was given Diflucan.

10  Cleocin is to treat bacterial vaginosis and

11  Diflucan is to treat Candida.

12  Q.  Okay.  Well, you --

13  A.  That's not to treat the mesh erosion.

14  Q.  Okay.  In any event, she says she --

15  A.  That's not -- that's not conservative

16  treatment for mesh erosion.

17  Q.  She said in her deposition, page 118,

18  she's recommending conservative treatment, which

19  means no surgery, right?

20  A.  No.  She did not recommend surgery.

21  That we can agree upon.

22  Q.  So, if you had a patient six weeks and

23  three days after a surgery, would you -- and who

24  had just had an incision that had separated and has

Bruce Rosenzweig, M.D.

Page 282

1 got exposed mesh, would you recommend that they
2 engage in sex?
3    A.   No.
4    Q.   Okay.  Would you recommend that they use
5 cocaine?
6    A.   No.
7    Q.   Would you recommend that they smoke?
8    A.   No.
9    Q.   And we know that she was smoking, right?
10   A.   She said in her deposition that she quit
11 for two to three months.
12   Q.   And we know within less than six months
13 of this date that she is using cocaine regularly,
14 right?
15   A.   Correct.
16   Q.   And we also know that within six months
17 of this time period she's engaging in sexual
18 activity, right?
19   A.   Six months?  Correct.
20   Q.   Yeah.  Okay.  So, she is not doing
21 everything she can to promote her healing.  True?
22   A.   Six months after, she should have been
23 healed completely.
24   Q.   True or not true?

Page 283

1    A.   Six months after her surgery she should
2 be healed completely.
3    Q.   I see.  But as you said, she doesn't go
4 from zero to 60 in cocaine use in one day or do you
5 believe that?
6    A.   She wasn't -- I don't -- she wasn't
7 asked that at her deposition.
8    Q.   And you don't have that information?
9    A.   Because she wasn't asked that at her
10 deposition.
11   Q.   You could ask your counsel to ask her,
12 couldn't you?  If that were important information,
13 you could ask your counsel to find out from her,
14 couldn't you?
15   MR. HABERMAN:  Objection; argumentative.
16 BY THE WITNESS:
17   A.   But it would be important as a fact of
18 this -- for this case for that to have been in her
19 deposition.
20 BY MR. CONNOLLY:
21   Q.   Well, let me just ask you this:  At that
22 visit in September of 2013, the doctor asked the
23 patient to come back for further evaluation because
24 she wants to see how she's doing, right?  Page 119

Page 284

1 of Dr. Jones deposition.
2    A.   I don't see a follow-up visit scheduled
3 in the medical record.  So, I mean...
4    Q.   Doctor, are you saying that after she
5 has an incision that separated that you wouldn't
6 ask the patient to come back for another visit?
7    A.   I would, correct.
8    Q.   Okay.  And, in fact, you know from the
9 deposition testimony by Dr. Jones that she did ask
10 the patient to come back and the patient didn't
11 comply.  True?
12   A.   Correct.
13   Q.   Okay.  So, the patient isn't doing
14 everything to advance her treatment during this
15 period of time.  True?  True?
16   A.   She was not complying with her
17 follow-up.
18   Q.   Okay.  And she's not --
19   A.   But I did not -- I don't see in the
20 record where she was given a follow-up appointment.
21   Q.   But you have read Dr. Jones' deposition,
22 and Dr. Jones even put forward a letter to the
23 patient saying, "You didn't come," right?
24   A.   Correct.

Page 285

1    Q.   So, it was clear that Dr. Jones expected
2 the patient to come back and the patient wasn't
3 doing everything to advance her healing.  True?
4    A.   She did not come back for follow-up.
5    Q.   Okay.  And, in fact, the letter that's
6 Exhibit 4 to Dr. Jones' deposition, she says she
7 would have recommended continued pelvic rest?
8    A.   If we could put that up.
9    Q.   I don't have it.  It's Exhibit 4 to
10 Dr. Jones' deposition.
11   A.   Okay.  I'm going to assume that you're
12 reading everything that is on that.
13   Q.   I'm reading from page 120 of her
14 deposition.
15        She said she would have recommended
16 continued pelvic rest at that point in time or when
17 she returned.  And you would agree with that
18 recommendation, right?
19   A.   I wouldn't disagree with it, correct.
20   Q.   She would have recommended delay in
21 sexual activity.  And you would have agreed with
22 that, right?
23   A.   Correct.
24   Q.   Okay.  And that would be -- she would --

Bruce Rosenzweig, M.D.

Page 286

1 and continued sexual activity would have meant it
2 would be harder for the exposure to heal, right?
3     A.   I don't think the exposure was going to
4 heal whether or not she had intercourse.
5     Q.   It would have made it harder had she had
6 continued sexual activity.  True?
7     A.   There is no data on that.
8     Q.   Okay.  So, you're disagreeing with
9 Dr. Jones on that?
10     A.   There is no data on that.
11     Q.   Okay.  Well, I'm just saying.  So,
12 Dr. Jones testified to that.  Do you disagree?
13     A.   There is no data on that.
14     Q.   Okay.  So, I take that's a no.  If she
15 says --
16     A.   I didn't say yes or no.  I said there is
17 no data on it.  So, it's hard to give an answer if
18 there's no data.
19     Q.   All right.  So, you'll agree that there
20 is no data.  But as a doctor who has been in the
21 field for 30 years, do you think that continued
22 sexual activity when you have that incision that's
23 separated is not going to help the incision heal?
24 True?

Page 287

1     A.   No, when you have a mesh exposure.
2     Q.   And an incision that's separated?
3     A.   That's the mesh exposure.
4     Q.   Okay.  Now, you stated, as I understood
5 your testimony to Mr. Persons, that the Advantage
6 Fit was a minimum contributor to the dyspareunia;
7 and that's the only injury that you link to the
8 Advantage Fit.  True?
9     A.   Correct.
10     Q.   Okay.  And the dyspareunia is the
11 painful sex, right?
12     A.   Correct.
13     Q.   And what is the evidence that the
14 Advantage Fit, the specific evidence that the
15 Advantage Fit had any connection to the painful sex
16 that Ms. Bayless complained of?
17     A.   That would be based on my general
18 causation report.
19     Q.   Okay.  So it's just the general overall
20 mesh is bad for you view?
21     A.   No, it's the chronic foreign body
22 reaction, chronic inflammatory reaction, mesh
23 deformation, degradation and contraction.
24     Q.   And you know that Dr. Jones specifically

Page 288

1 denied, when Mr. Haberman asked her, that mesh
2 contracts?
3     A.   Well, she really needs to look at the
4 literature and look at explant data.
5     Q.   Well, did you see that in her testimony?
6     A.   Yes.
7     Q.   Okay.  And, so, you would -- she said
8 that the mesh doesn't contract.  It's the scar that
9 brings the mesh together.  You disagree with that?
10     A.   The outcome is the same, that the mesh
11 is narrower and more tense.
12     Q.   So, the question was at Dr. Jones'
13 deposition page 35:
14          "Do you know whether or not the
15      mesh shrinks or contracts after it's
16      implanted?"
17          And then she says:
18          "So, with any surgery there is
19      scar tissue, et cetera."
20          Then she says, "Now, does the
21      actually physical size of the mesh
22      shrink?  No."
23          Do you agree with her?
24     A.   No.

Page 289

1     Q.   Okay.  You believe that she's wrong in
2 that?
3     A.   Correct.
4     Q.   Okay.  And in not knowing the same
5 answer that you have about mesh contraction, is she
6 providing her patients with a deficient standard of
7 care in treatment?
8     A.   Well, it's -- unfortunately, the --
9     MR. HABERMAN:  The thing is you don't tell the
10 doctor that, so she doesn't know.
11     MR. CONNOLLY:  Are you testifying,
12 Mr. Haberman?
13 BY THE WITNESS:
14     A.   No.  He --
15     MR. HABERMAN:  It's been a long day.
16 BY THE WITNESS:
17     A.   That's in my general causation report.
18 So, it's a well-known answer that I've given
19 before.
20 BY MR. CONNOLLY:
21     Q.   I understand, but you can supply it
22 yourself without his kibitzing.
23     A.   Okay.  That it is very difficult if this
24 information is not passed on to doctors for them to

Bruce Rosenzweig, M.D.

Page 290

1  pass it on to the patients.  This is information
2  that has been known about mesh by the manufacturers
3  and has not been espoused to doctors.
4     Q.   Now, you said in your answers to some of
5  Mr. Persons' questions that there was no healing
6  problem where the sling was placed.  Do you
7  remember that?
8     A.   The incision, correct.
9     Q.   And, so, if there was no healing problem
10 where the sling was placed, what evidence is there
11 that the sling was even a minimum contributor to
12 the pain that she had with sex?
13    A.   Okay.  So, when I said that there was
14 no -- the incision from the sling healed.  That was
15 what that statement meant.  I'm sorry if you had
16 any confusion that that was just based on the
17 September 28, 2013 office visit.
18        So, the mesh is going to continue to
19 undergo contraction, deformation and degradation,
20 which traps nerves and leads to pain.
21    Q.   By what point in time did -- at what
22 point in time and in which medical record did
23 Plaintiff complain of painful sex that you
24 attribute to the Advantage Fit even as a minimum

Page 291

1  contributor?
2     A.   That would be based on her deposition
3  testimony.
4     Q.   And I mean what visit?  Because, as you
5  know, she complains about painful sex before she
6  ever has the surgery.
7     A.   That was due to her -- the penis hitting
8  the cervix.
9     Q.   Okay.
10    A.   That was treated with her hysterectomy.
11    Q.   And, so, when -- the question that I'm
12 asking you is when does the -- when does the part
13 of the painful sex that -- when does -- sorry.  I
14 was just looking at the time I had left.
15        When is -- when do you say that the
16 Advantage Fit begins to cause her, even as a
17 minimal contributor, painful sex?
18    A.   That's based on Ms. Bayless' deposition
19 testimony.
20    Q.   Yeah.  But when?
21    A.   When she stated that her dyspareunia
22 started post-op.  I don't recall the specific
23 answer she gave.
24    Q.   Okay.  So, it's not in the first visit.

Page 292

1  It's not six weeks after, right, because she's not
2  having sex then, right?
3     A.   I'm glad we both agree that she didn't
4  have sex within the first six weeks.
5     Q.   No, but that's what you said.
6     A.   Correct.
7     Q.   Okay.  She doesn't describe dyspareunia
8  at that time.  She just says that she has problems
9  with her orgasm, right?
10    A.   That is what's in the medical record.
11    Q.   Okay.  So, when do you -- so, you don't
12 have a specific time frame in which you believe the
13 painful sex started being -- that she presented
14 with painful sex that's related to either of the
15 mesh implants?
16    A.   That would be based on her deposition
17 testimony.
18    Q.   But right now as you sit here you don't
19 have a specific date?
20    A.   That would be based on her deposition
21 testimony.
22    Q.   Now, you indicated that contraction was
23 evidenced by the June 11, 2015 medical record with
24 the arrhythmia, right?

Page 293

1     A.   With the arrhythmia?
2     Q.   Yeah.
3     A.   The erythema.
4     Q.   Excuse me.  Erythema.
5        You said that that was an indication of
6  contraction in response to some questions that
7  Mr. Persons asked, correct?
8     A.   The chronic foreign body reaction,
9  chronic inflammatory reaction that leads to
10 scar-plating and mesh contraction, yes.
11    Q.   I understood that you were specifically
12 saying contraction.  Right?  Wrong?
13    A.   That that was the process that we used
14 to contraction, correct.
15    Q.   And the erythema that's reflected in
16 that exhibit is at the site of the surgical tack,
17 right?
18    A.   Correct.
19    Q.   And the surgical tack, as I understood
20 your testimony, is located in the area where the
21 Restorelle Y was, right?
22    A.   More likely than not, yes.  But, again,
23 that is not a question that has been asked of the
24 provider either on that visit, I think that was

Page 294

1 Dr. Garcia, or the prior examiner where exactly
2 that was found, whether it was at the apex, the
3 upper anterior, upper posterior wall or on the
4 anterior wall 2 centimeters in from the introitus.
5    Q.   So, you would agree with me, Doctor,
6 that more likely than not that erythema is related
7 to the Restorelle Y and not the Advantage Fit,
8 right?
9    A.   Well, that same process would be going
10 on with the Advantage Fit. The Advantage Fit is
11 smaller pore, heavier weight than the Restorelle,
12 so it's more likely than not undergoing a chronic
13 foreign body reaction, chronic inflammatory
14 reaction.
15    Q.   But no doctor, no doctor has examined
16 and found any swelling of any type in relation to
17 the Advantage Fit, have they?
18    A.   Well, we don't know where the -- exactly
19 where Dr. Garcia and Dr. Magness, I think it was,
20 the prior doctor, where they found the erosion.
21    Q.   Well, and the patient doesn't describe
22 any difficulty with urination. In fact, she's
23 quite satisfied with the sling surgery, right?
24    A.   Correct.

Page 295

1    Q.   Okay. So, there's no indication by the
2 patient or by any doctor that there has been any
3 adverse effect by the sling. True?
4    A.   The dyspareunia.
5    Q.   The dyspareunia. But the dyspareunia
6 you say is related to the general causation report.
7 There is no specific medical record or testimony
8 that links the dyspareunia to the Advantage Fit.
9 True?
10    A.   Not that I specifically recall from the
11 medical records.
12    Q.   Okay. So, just a quick couple of
13 questions here on Dr. Jones.
14       We went through a number of her
15 exhibits, and she provides a very extensive
16 category of consent, doesn't she?
17    A.   Yes.
18    Q.   Okay. And, in fact, the one -- she goes
19 through consent documents, and Mr. Persons marked
20 them all, relative to each one of the procedures,
21 right?
22    A.   Yes.
23    Q.   And, in fact, you'll recall from her
24 deposition testimony that when she talked about

Page 296

1 some additional material that she presents to the
2 patient which was attached to one of the consent
3 forms, she actually shows the patient the material
4 that she plans to implant, right?
5    A.   Yes.
6    Q.   And that's more likely than not the
7 document that is referred to in that consent
8 document, right?
9    A.   That's a possibility, but I think she
10 also stated that she gave out brochures.
11    Q.   Right. Sure. She shows them brochures
12 and presents them the actual implanting device that
13 she plans to implant, right?
14    A.   I have a general recollection of that,
15 correct.
16    Q.   And it's unambiguous that she warns the
17 patient that there is a possibility of erosion,
18 right?
19    A.   Correct.
20    Q.   It is unambiguous that she tells the
21 patient that the implants are permanent, right?
22       MR. HABERMAN:  Objection.
23 BY THE WITNESS:
24    A.   To the best of my recollection.

Page 297

1       MR. HABERMAN:  By my stopwatch, your time is
2 up.
3       MR. CONNOLLY:  If you give me two minutes, I
4 will be done on my own. Is that all right?
5       MR. HABERMAN:  That's fine.
6       MR. CONNOLLY:  Okay.
7 BY MR. CONNOLLY:
8    Q.   I didn't hear the answer to the last
9 question. Maybe I was just -- go ahead.
10    A.   Can you repeat the question again?
11       MR. CONNOLLY:  Madam Court Reporter.
12       (WHEREUPON, the record was read
13       by the reporter as requested as
14       follows: Q. It is unambiguous
15       that she tells the patient that the
16       implants are permanent, right?
17           A. To the best of my
18       recollection.)
19 BY MR. CONNOLLY:
20    Q.   And she fully informs the patient of the
21 risks of the surgery other than what's in your
22 general causation report. True?
23    A.   She informs the patient of the risks
24 that we saw in the consent forms.

Bruce Rosenzweig, M.D.

Page 298

1    Q.   Okay.  And you know that Dr. Jones has
2  been performing these procedures for many years,
3  right?
4    A.   That's what she stated.
5    Q.   And she's testified as an expert, right?
6    A.   I think that was brought up in her
7  deposition.
8    Q.   Right.  Or she's been hired as an
9  expert, right?
10    A.   I think that was brought up in her
11  deposition.
12    Q.   And she's acted as a proctor for
13  companies, right?
14    A.   I think that was brought up in her
15  deposition.
16    Q.   And so you don't specifically know that
17  she is not aware of your views on degradation and
18  contraction, are you?
19    A.   I think she stated that in her
20  deposition.
21    Q.   She stated what in her deposition, that
22  she's unaware of your views?
23    A.   Well, she's probably unaware of my
24  views, but the fact that mesh contracts, degrades

Page 299

1  and deforms.
2    Q.   The word "degrade" never came up in her
3  deposition.
4    A.   Okay.
5    Q.   The word "deformed" didn't either.
6       The only word that came up was
7  "contract" and she said it didn't, and we've talked
8  about that?
9    A.   Right, but that doesn't mean that she
10  knows about degradation and deformation.
11    Q.   But you don't know that she doesn't
12  know, do you?
13    A.   That, as you say, wasn't asked at her
14  deposition.
15    Q.   So, she may be aware of your views and
16  just feels that they are unimportant as far as
17  getting a consent from a patient to share your
18  specific views about degradation and deformation,
19  right?
20    A.   That would be speculation.
21    Q.   Okay.  But you're not saying that a
22  doctor, in order to get meaningful consent from a
23  patient, has to inform them, quote, "your specific
24  views" relative to degradation and deformation, are

Page 300

1  you?
2    MR. HABERMAN:  Objection.
3  BY THE WITNESS:
4    A.   Yes.
5  BY MR. CONNOLLY:
6    Q.   Okay.  So, would that be below the
7  standard of care for them not to inform a patient
8  of your particular views?
9    MR. HABERMAN:  Objection.
10  BY THE WITNESS:
11    A.   Again, if they are not informed about
12  it, they can't inform a patient about something
13  they don't know about.
14    MR. HABERMAN:  All right.  I think we have
15  gone above and beyond.
16  BY MR. CONNOLLY:
17    Q.   You're aware that there are reasonable
18  experts who don't agree with you on deformation --
19  on your general causation reports, right?
20    MR. HABERMAN:  Objection.  This is a general
21  causation deposition which he's been deposed on
22  numerous times?
23    MR. CONNOLLY:  I'm just asking just two
24  questions and then I'm done.

Page 301

1    MR. HABERMAN:  This is your second two
2  questions.  You guys never let me go over my time.
3  BY THE WITNESS:
4    A.   You're asking me if there are --
5  BY MR. CONNOLLY:
6    Q.   There are credentialed experts who don't
7  agree with your general causation reports?
8    MR. HABERMAN:  Objection.
9  BY THE WITNESS:
10    A.   The simple answer would be more likely
11  than not, yes.
12    MR. CONNOLLY:  Okay.  That's it.  I did it in
13  one.
14    MR. HABERMAN:  I have some follow-up
15  questions, Doctor.
16    THE WITNESS:  Okay.
17         EXAMINATION
18  BY MR. HABERMAN:
19    Q.   The opinions that you expressed in your
20  report and the opinions that you expressed here
21  today, are those held within a reasonable degree of
22  medical probability?
23    A.   Yes.
24    Q.   And scientific certainty?

Bruce Rosenzweig, M.D.

Page 302

1   A.   Yes.

2   Q.   Can you describe what you did, what

3   methodology you employed to reach the opinions that

4   you have in this case?

5   A.   Well, I used my clinical experience.  I

6   used the medical literature.  I used the internal

7   documents from the company and the deposition

8   testimony.

9       The differential diagnosis that I did is

10  the same differential diagnosis that I do for

11  patients that I treat.

12      I consider their medical history, their

13  physical findings, this would be based on their

14  medical records and their testimony that was given,

15  to arrive at the more likely causes of the

16  complaints that they have and then rule out the

17  other causes to come up with the most likely cause.

18      Again, there is no absolute test that

19  can be done to prove or disprove complaints of pain

20  and painful intercourse, but one can use the things

21  that I've been discussing today to make the

22  etiology that's the most likely.

23  Q.   And in this case, can you tell us what

24  etiology is the most likely cause of the symptoms

Page 303

1   that Ms. Bayless alleges in her Complaint?

2   A.   The characteristics of the mesh that

3   makes it unreasonably dangerous.

4   Q.   Okay.  And I think this afternoon we

5   spent a long time considering alternative causes of

6   those symptoms, did we not, Doctor?

7   A.   Yes.

8   Q.   And do you feel like you explained why

9   those alternative causes were not the most likely

10  cause of the symptoms that Ms. Bayless complains of

11  in her Complaint?

12  MR. CONNOLLY:  Leading.

13  BY THE WITNESS:

14  A.   Yes.

15  MR. CONNOLLY:  Leading question.  But go

16  ahead.

17  BY MR. HABERMAN:

18  Q.   Were there any alternative causes that

19  you feel were not discussed by Mr. Persons earlier

20  today?

21  A.   No.

22  MR. HABERMAN:  Okay.  That's all I have.

23  Thank you.

24  MR. PERSONS:  Okay.

Page 304

1   MR. HABERMAN:  Dr. Rosenzweig will read.

2       (Time Noted:  3:58 p.m.)

3       FURTHER DEPONENT SAITH NAUGHT.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 305

1

2   I, CORINNE T. MARUT, C.S.R. No. 84-1968,
Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:

3       That previous to the commencement of the
examination of the witness, the witness was duly

4   sworn to testify the whole truth concerning the
matters herein;

5       That the foregoing deposition transcript
was reported stenographically by me, was thereafter

6   reduced to typewriting under my personal direction
and constitutes a true record of the testimony

7   given and the proceedings had;

8       That the said deposition was taken
before me at the time and place specified;

9       That the reading and signing by the
witness of the deposition transcript was agreed

10  upon as stated herein;

11      That I am not a relative or employee or
attorney or counsel, nor a relative or employee of

12  such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in

13  the outcome of this action.

14  _____

CORINNE T. MARUT, Certified Reporter

15

16      (The foregoing certification of this
transcript does not apply to any

17  reproduction of the same by any means, unless under
the direct control and/or supervision of the

18  certifying reporter.)

19

20

21

22

23

24

Bruce Rosenzweig, M.D.

Page 306

1       INSTRUCTIONS TO WITNESS
2
3           Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the errata sheet for any corrections that are made.
7           After doing so, please sign the errata
8    sheet and date it.
9           You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12          It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the
15   deposition transcript by you.  If you fail to do
16   so, the deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

Page 308

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4           I, BRUCE ROSENZWEIG, M.D., do hereby
5    certify under oath that I have read the foregoing
6    pages, and that the same is a correct transcription
7    of the answers given by me to the questions therein
8    propounded, except for the corrections or changes
9    in form or substance, if any, noted in the attached
10   Errata Sheet.
11
12
13   _____
14   BRUCE ROSENZWEIG, M.D.              DATE
15
16
17   Subscribed and sworn
     to before me this
18   _____ day of _____, 20_____.
19   My commission expires:_____
20
     _____ Notary Public
21
22
23
24

Page 307

1           - - - - - -
         E R R A T A
2           - - - - - -
3
4    PAGE  LINE  CHANGE
5    _____  _____  _____
6           REASON: _____
7    _____  _____  _____
8           REASON: _____
9    _____  _____  _____
10          REASON: _____
11   _____  _____  _____
12          REASON: _____
13   _____  _____  _____
14          REASON: _____
15   _____  _____  _____
16          REASON: _____
17   _____  _____  _____
18          REASON: _____
19   _____  _____  _____
20          REASON: _____
21   _____  _____  _____
22          REASON: _____
23   _____  _____  _____
24          REASON: _____

Page 309

1       LAWYER'S NOTES
2    PAGE  LINE
3    _____  _____  _____
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____