# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: COLOPLST CORP. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION <br><br>_____ <br> THIS DOCUMENT RELATES TO: <br><br> All cases | Master File No. 2:12-MD-02387 <br> MDL No. 2387 <br><br><br> JOSEPH R. GOODWIN <br> U.S. DISTRICT JUDGE |

## RULE 26 EXPERT REPORT OF BRUCE ROSENZWEIG, MD

The following report is provided pursuant to Rule 26 of the Federal Rules of Civil Procedure. All of the opinions that I offer in this Report I hold to reasonable degree of medical or scientific certainty. My CV is attached as Exhibit A, my testimony history is attached as Exhibit B and my reliance materials are attached as Exhibit C. The materials I have relied on in forming my opinions in this report are included in this report and included in my reliance list. I have also reviewed and relied on the expert reports of Peggy Pence and Jimmy Mays.

## I.      QUALIFICATIONS.

I am currently an Assistant Professor of Obstetrics and Gynecology at Rush University Medical Center in Chicago, Illinois. I received my MD degree in 1984 from the University of Michigan in Ann Arbor, Michigan. Following graduation from medical school, I completed an Obstetrics and Gynecology Residency at Michael Reese Hospital in Chicago. In 1988, I attended a one year pelvic surgery fellowship at State University of New York in Syracuse, New York. Following that fellowship, I attended a two year Urogynecology and Urodynamics fellowship at UCLA Harbor General Hospital in Torrance, California. After graduating from the Urogynecology fellowship, I became a faculty member at the University of Illinois in Chicago. I started a Urogynecology program at the University of Illinois and also was the residency

program director.  In 1998, I went into private practice, and subsequently established a private practice at Rush University Medical Center. I have also worked at John H. Stroger Hospital here in Chicago from May 2003 until November 2010 and Weiss Memorial Hospital as Associate Chair of Gynecology from February 2011 until July 2012. I have published numerous articles and given numerous lectures on the topics of pelvic organ prolapse, urinary incontinence and repair of pelvic organ prolapse.

Throughout my career, I have performed over a thousand pelvic floor surgical procedures, including abdominal sacrocolpopexy, uterosacral suspensions, sacrospinous ligament fixations, native tissue repairs, biological graft repairs and synthetic mesh repairs. I have also used numerous synthetic pelvic mesh products, including Ethicon's TVT, TVT-Obturator, and Prolift. In addition, I have performed over 350 surgeries dealing with complications related to synthetic mesh, including the removal of Coloplast mesh devices.   I was also invited by Ethicon and attended both its Gynecare Prolift Training Seminar and TVT Obturator Seminar in Belgium. In addition, I was also invited and attended a Bard Avaulta training seminar.


## II.      SUMMARY OF OPINIONS.

In formulating my opinions and preparing this report, I reviewed scientific literature, corporate documents from Coloplast, sample products and depositions of Coloplast employees. The corporate documents, sample products and depositions were supplied to me by counsel.  A list of Coloplast corporate documents, literature and depositions reviewed for this report is attached as Exhibit C; all other materials reviewed are listed at the end of this report. All opinions I have are to a reasonable degree of medical and scientific certainty. I understand discovery is still ongoing in this case, and I reserve my right to amend my opinions if further information is provided in any form including, but not limited to corporate

2

documents, depositions and the expert reports of both Plaintiff and Defense experts.  In general,

my expert opinions can be summarized as follows:

1. THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS ARE NOT SUITABLE FOR THEIR INTENDED APPLICATION AS A PERMANENT PROSTHETIC IMPLANT FOR PELVIC ORGAN PROLAPSE BECAUSE THEY DEGRADE OVER TIME, THEY DEFORM INCLUDING MESH CONTRACTURE/SHRINKAGE AND ROPING/WRINKLING/FOLDING, CAUSE CHRONIC FOREIGN BODY REACTIONS, FIBROTIC BRIDGING, BIOFILM FORMATION AND INFECTIONS, AND THE PORES COLLAPSE UNDER TENSION RESULING IN PERMANENT AND IRREVERSIBLE HARMS.

2. BECAUSE OF THEIR TRANSVAGINAL IMPLANTATION DESIGN, THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS ARE NOT SUITABLE FOR THEIR INTENDED APPLICATION AS A PERMANENT PROSTHETIC IMPLANT FOR PELVIC ORGAN PROLAPSE.

3. THE DESIGN OF THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS IS NOT COMPLIANT WITH VAGINAL TISSUE AND IS FLAWED BECAUSE OF THE EXCESSIVE SURFACE AREA AND SHAPE OF THE MESH KIT PRODUCTS THAT CREATE AN UNACCEPTABLE RISK OF EROSION, TISSUE DAMAGE, CHRONIC PAIN, SHRINKAGE/CONTRACTURE, ENCAPSULATION AND CHRONIC DYSPAREUNIA.

4. THE DESIGN AND USE OF ARMS IN THE COLOPLAST PELVIC ORGAN PROLAPSE MESH KIT PRODUCTS IS INHERENTLY FLAWED AND PLACES PATIENTS AT AN UNACCEPTABLE RISK OF CHRONIC PAIN, EROSION, CHRONIC DYSPAREUNIA AND OTHER COMPLICATIONS.

5. THE BLIND PASSAGE OF THE NEEDLES/TROCARS WITH THE COLOPLAST PELVIC ORGAN PROLAPSE MESH KIT DEVICES IS UNSAFE.

6. THE WARNINGS AND DISCLOSURES OF ADVERSE EVENTS IN THE INSTRUCTIONS FOR USE ("IFU") HAVE BEEN INADEQUATE BASED ON THE ADVERSE REACTIONS AND RISKS ASSOCIATED WITH THE MESH PRODUCTS THAT HAVE BEEN KNOWN FROM THE TIME THE MESH PRODUCTS WERE FIRST DESGINED AND MARKETED, AND COLOPLAST DID NOT DISCLOSE INFORMATION TO PHYSICIANS IN ITS IFUS REGARDING CHARACTERISTICS OF THE MESH THAT MADE THEM UNREASONABLY DANGEROUS AND POTENTIAL HARMS, INCLUDING THE SEVERITY, DURATION AND CHRONICITY OF THE HARMS.

7. THE PRODUCTS WERE MARKETED AS HAVING LOW COMPLICATION RATES, HIGH SUCCESS RATES, OPTIMAL RESULTS, PHYSIOLOGICALLY COMPATIBLE, FIGHTING BACTERIA AND ENCOURAGING COLLAGEN

GROWTH AND OTHER CLAIMS THAT WERE MISLEADING AND COLOPLASTDID NOT CONDUCT ADEQUATE SAFETY TESTING TO DETECT LONG-TERM COMPLICATIONS.

8. THERE WERE SAFER ALTERNATIVE DESIGNS TO THE COLOPLAST TRANSVAGINAL MESH PELVIC ORGAN PROLAPSE PRODUCTS THAT WOULD HAVE ELIMINATED OR GREATLY REDUCED THE PERMANENT AND IRREVERSIBLE HARMS RESULTING FROM THE UNSAFE CHARACTERISTICS OF THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS.

## III:  HISTORY AND BACKGROUND:

Pelvic organ prolapse (POP) occurs when the tissue and muscles of the pelvic floor no longer support the pelvic organs resulting in the drop (prolapse) of the pelvic organs from their normal position. The pelvic organs include the vagina, cervix, uterus, bladder, urethra, and rectum. Thirty to fifty percent of women may experience POP in their lifetime with 2 percent developing symptoms.[1] When POP occurs, the organs bulge (prolapse) into the vagina and sometimes prolapse past the vaginal opening. More than one pelvic organ can prolapse at the same time. Organs that can be involved in POP include the bladder, the uterus, the rectum, the top of the vagina (vaginal apex) after a hysterectomy, and the bowel. The bladder is the most commonly involved organ in pelvic organ prolapse.

POP is often brought about when the supporting muscles and tissue of the pelvic floor become torn or stretched because of labor or childbirth or may weaken with age. Other risk factors for POP include: genetic predisposition, connective tissue disorder, obesity and frequent constipation. Many women have some degree of POP, although not all women have symptoms.

---

[1]http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/UroGynSurgicalMesh/ucm262299.htm#whatis,

http://www.fda.gov/medicaldevices/productsandmedicalprocedures/implantsandprosthetics/urogynsurgicalmesh,

http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm262435.htm

POP can affect the quality of life (QOL) of women, however POP is not a life-threatening condition. Symptoms of POP are usually limited to QOL issues such as the sensation of pelvic fullness, pressure, interference with satisfactory sexual activity, as well as possibly altering normal urination and bowel function.  The most characteristic symptom of POP is a sensation of bulging or fullness in the vagina that worsens throughout the day.  POP is a common condition with up to 50% of women who have had children having some degree of POP.

Pelvic organ prolapse is a problem of increasing frequency and prevalence as women age. United States Census Bureau predicts that the percentage of women in the US greater than 45 years old will continue to increase.  This ever increasing segment of population and potential surgical market creates a desirable target for device manufactures eager to capture a market share for devices used in the treatment of incontinence and pelvic organ prolapse.[2]  Nonsurgical or surgical treatments options are available to patients with POP. Some nonsurgical treatment options, in addition to medication, for POP include:

- *Pelvic Floor Exercises:* A type of exercise to strengthen the pelvic floor by contracting and relaxing the muscles that surround the opening of the urethra, vagina, and rectum. The exercises are commonly referred to as Kegels; and

- *Pessary:* A removable device that is inserted into the vagina to support the pelvic organ(s) that have prolapsed.

Not every woman with POP will need surgery. If surgery is recommended, factors to consider include: which organ(s) have prolapsed, severity of prolapse, desire for future children, age, sexual activity, and severity of symptoms.[3] Surgery to repair POP can be done through

---

[2] Wall L: The perils of commercially driven surgical innovation. Am J of Obstetrics and Gyne Jan 2010; 202.30e1-4.
[3]
http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/UroGynSurgicalMesh/

either the vagina or abdomen, using stitches (sutures) alone as done with traditional POP surgery or with the addition of surgical mesh manufactured by medical device companies. Surgical options include restoring the normal position of the vagina, repairing the tissue around the vagina, permanently closing the vaginal canal with or without removing the uterus (colpocleiesis).[4] It is also possible that women with POP may experience problems with urine leakage (incontinence). During surgery, a procedure to prevent or decrease urine leakage may be performed. In the United States alone, approximately 200,000 women will elect to undergo a surgical procedure for POP.

Traditional POP surgery is performed from either the vagina (termed "transvaginal") or from the abdomen (termed "transabdominal), with the latter group being performed either with an abdominal incision (Abdominal Sacrocolpopexy) or with minimally invasive procedures such as with laparoscopic or robotic technology. Indeed, sacrocolpopexy is considered the "gold standard" for vaginal vault prolapse repair. The primary benefit of sacrocolpopexy is durable anatomic results, which have consistently been reported in scientific literature since the 1980s. Scholars at Duke University wrote one of the first papers documenting the success of this procedure in the early 1980s.

Traditional surgery, also known as native tissue repair with suture, is performed without a synthetic mesh to hold up the prolapsing pelvic organ. Traditional surgery uses only sutures placed into the native tissues surrounding the prolapsing portion of the vagina to repair the POP. In general, there are several differences between traditional, transvaginal non-mesh and transvaginal mesh kit POP surgeries:

---

ucm262299.htm#whatis,
http://www.fda.gov/medicaldevices/productsandmedicalprocedures/implantsandprosthetics/urogynsurgicalmesh,
http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm262435.htm
[4] Id.

- No synthetic, non-absorbable meshes are used in traditional POP surgery;
- No trocars/guides are used to place the mesh into position in traditional POP surgery;
- There is no tensioning of mesh arms with traditional surgery;
- The traditional procedure is performed under direct vision, meaning that the surgeon can see what he/she is doing with no blind passing of trocars/needles.

The use of transvaginal synthetic mesh for POP repair was marketed mainly as claiming to increase the durability of the POP repair relative to traditional, non-mesh transvaginal POP surgery. However, starting in 2008, the FDA issued a Public Health Notification and subsequent safety information on the serious complications associated with surgical mesh placed through the vagina to treat POP.[5] Based on an updated analysis of adverse events reported to the FDA and complications described in the scientific literature, the FDA identified surgical mesh for transvaginal repair of POP as an area of continuing serious concern. The FDA declared the serious complications from transvaginal mesh were "**not rare**" (emphasis in original).  The FDA also concluded "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk." From 2008 – 2010, the most frequent complications reported to the FDA for surgical mesh devices for POP repair included mesh erosion through the vagina, pain, infection, bleeding, pain during sexual intercourse (dyspareunia), organ perforation, and urinary problems. There were also reports of recurrent prolapse, neuro-muscular problems, vaginal scarring/shrinkage, and emotional problems. Many of these complications require additional intervention, including

---

[5]

http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/UroGynSurgicalMesh/ucm262299.htm#whatis,
http://www.fda.gov/medicaldevices/productsandmedicalprocedures/implantsandprosthetics/urogynsurgicalmesh,
http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm262435.htm

medical or surgical treatment and hospitalization. The FDA's systematic review of the relevant scientific literature revealed: mesh used in transvaginal POP repair introduces risks not present in traditional non-mesh surgery for POP repair and mesh placed abdominally for POP repair appears to result in lower rates of mesh complications compared to transvaginal POP surgery with mesh.[6]

My opinions in this report concern the following products with transvaginal indication for the pelvic organ prolapse:

NovaSilk: Synthetic Flat Mesh;
Exair: Prolapse Repair System;
Restorelle (Smartmesh) Transvaginal Products: Restorelle A & P; Restorelle DirectFix A & P;
Restorelle EZA & EZP; Restorelle M, XL.

NovaSilk Mesh was submitted to the Food and Drug Administration's ("FDA") Department of Health & Human Services by Mentor Corporation in 2005 for 510(K) clearance to market.[7]  Novasik has a weight of 21g/m². Feola IUJG 2012 NovaSilk is a permanent, synthetic knitted polypropylene mesh that is square in shape.[8]   NovaSilk is indicated for tissue reinforcement of the fascial structures of the pelvic floor in vaginal wall prolapse where surgical treatment is intended.[9] In the clearance documents, it states NovaSilk is substantially similar in material, function, performance and deign as Gynemesh Prolene Soft (Polypropylene) Mesh, also cleared to market through the FDA's 510(K) process.[10]  NovaSilk was cleared in December 2005.[11]

---

[6] Id.
[7] See CP MDL 2387 00088664.
[8] *Id.*
[9] *Id.* at 00088665.
[10] *Id.* at 00088664.
[11] Id.

NovaSilk was designed and marketed for implantation via vaginal approach or abdominal (open or laparoscopic) approach for repair of pelvic organ prolapse.[12]  NovaSilk is packaged in 15cm x 15cm squares and can be cut into the shape or size desired by the physician.[13]

On November 24, 2008 Coloplast submitted to the FDA its 510K Application to market "Shaped Mesh," also known as Exair Anterior and Exair Posterior Prolapse Repair Systems.[14] In its 510(k) submission for Exair products, Coloplast stated Exair Anterior and Exair Posterior Prolapse Repair Systems were substantially equivalent to Coloplast's NovaSilk Mesh and Ethicon Inc.'s Gynecare Prolift Total Pelvic Floor Repair System.[15]

The Exair Anterior Prolapse Repair System ("Exair Anterior") is made of NovaSilk mesh precut into a shape with an enlarged body and four appendages, or mesh arms, extended out from the main body.[16]  Below is a picture of the Exair Anterior device:[17]



The Exair Posterior Prolapse Repair System ("Exair Posterior") is made of NovaSilk mesh precut into a shape with an elongated body and two appendages, or mesh arms, extended out from the main body.[18]  Below is a picture of the Exair Posterior device:[19]

---

[12] See CP MDL 2387 00298517 at 00298524.
[13] *See* CP MDL 2387 00154422 at 00154423.
[14]  See CP MDL 2387 00185950.
[15] *Id.* at CP MDL 2387 00185962.
[16] *Id.*
[17] CP MDL 2387 01021717 at 01021726.
[18] CP MDL 2387 00185950 at CP MDL 2387 00185962.
[19] CP MDL 2387 01021717 at 01021726.

 Exair Posterior Mesh:
Pelvic Floor Repair

The Exair Anterior and Exair Posterior products are indicated for transvaginal placement to correct pelvic organ prolapse.[20]   The mesh arms for both Exair Anterior and Exair Posterior are sleeved in a removable 2-mil thick polyethylene.[21]   The sleeves of the devices are to be removed prior to closing the surgical incisions, after the devices are placed.[22]   The Exair Anterior and Posterior POP kits include a hollow introducer used to create a passage through the tissues and facilitate placement of the mesh arms, and four (4) anterior or two (2) posterior retrieval devices used to guide the mesh arms into place through the tissues for positioning and fixating the mesh body.[23]

Coloplast's Restorelle Polypropylene Mesh received 510K clearance to market by the FDA on Dec. 22, 2010.[24]   Prior to Dec. 22, 2010, Restorelle Polypropylene Mesh was submitted to the FDA for 510K clearance by Mpathy Medical.[25]   All Restorelle pelvic mesh products utilize Coloplast's Smartmesh polypropylene.[26]   Coloplast claims, among other things, that the Smartmesh used in Restorelle is the lightest mesh available in women's health; has uniform 1.8

---

[20] *See* CP MDL 2387 01103148
[21] *Id.* CP MDL 2387 00185950 at CP MDL 2387 00185962.
[22] *See* CP MDL 2387 013557165 at 01355720
[23] CP MDL 2387 00185950 at CP MDL 2387 00185962-3.
[24] *See* CP MDL 2387 00036877 at CP MDL 2387 00036886.
[25] *See* CP MDL 2387 00313391.
[26] *See* CP MDL 2387 00036877 generally.

mm macropores; allows for virginal elasticity to be maintained; has 100 micron interstitial Smartpores; low memory; and multi-dimensional stretch.[27]

The following Restorelle Products use Coloplast's Smartmesh: Restorelle Y and L (transabdominal indication); Restorelle Direct Fix A & P (transvaginal indication); Restorelle A & P (transvaginal indication); Restorelle EZA and EZP (transvaginal indication); and Restorelle M, XL (transvaginal indication).[28] [29]

Below are pictures of the Restorelle DirectFix A & P; Restorelle A & P; Restorelle M & XL; and Restorelle Y & L[30]



---

[27] *Id.* at CP MDL 2387 00036880
[28] *See* CP MDL 2387 00036877.
[29] *See* CP MDL 2387 00001668 at 00001674-75.
[30] *Id.* at 00001675.

Below are pictures of the Restorelle EZA & EZP:[31]

| Description | Procuct Image | D mensions |
|---|---|---|
| Restorelle™ EZA with Smartmesh™ Technology | | 6 x 4cm |
| Restorelle™ EZP with Smartmesh™ Technology | | 6 x 5cm |

The following Restorelle products are indicated for transvaginal placement: Restorelle DirectFix A & P; Restorelle A & P; Restorelle EZA & EZP; Restorelle M, L, XL.[32]

## IV.   EXPERT OPINIONS

Polypropylene mesh, like that contained in the Coloplast transavaginal mesh POP devices, has many well-known characteristics that make it unsuitable for use as a product intended for permanent implantation in the human vaginal floor. These characteristics include the following: (1) degradation of the mesh; (2) chronic foreign body reaction; (3) infections and bio-films; (4) deformation and stiffening of the mesh; (5) loss of pore size with tension; (6) fibrotic bridging leading to scar plate formation and mesh encapsulation; and (7) shrinkage/contraction of the encapsulated mesh.

As a result of these and other inadequacies with the mesh, and for the reasons set forth below, it is my opinion to a reasonable degree of medical certainty that the  polypropylene mesh in the Novasilk, Exair[33] Anterior, Exair Posterior, Restorelle[34] Direct Fix A and P, Restorelle A and P, Restorelle M and XL causes a multitude of injuries, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating and permanent pelvic, vagina, groin and leg pain, recurrence, worsening prolapse, chronic dyspareunia, nerve injury of

---

[31] *See* CP MDL 2387 00032736.
[32] *See* CP MDL 2387 00011678 at 00011685.
[33] Exair uses Novasilk mesh in a POP kit form and was formerly referred to as "shaped mesh" by Coloplast.
[34] Restorelle uses "Smartmesh" in a POP kit form and was formerly referred to as Minimesh.

the obturator, pudendal and other pelvic nerves, wound infection, rejection of the mesh, tissue

necrosis and irritation, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring,

wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the

need for additional surgeries and mesh revision surgery that may not completely resolved the

underlying symptoms, among others.  As a result, Coloplast's mesh is not suitable for its

intended application as a permanent prosthetic implant for pelvic organ prolapse in women.

1. THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH
PRODUCTS ARE NOT SUITABLE FOR THEIR INTENDED APPLICATION AS A
PERMANENT PROSTHETIC IMPLANT FOR PELVIC ORGAN PROLAPSE
BECAUSE THEY DEGRADE OVER TIME, THEY DEFORM INCLUDING MESH
CONTRACTURE/SHRINKAGE AND ROPING/WRINKLING/FOLDING, CAUSE
CHRONIC FOREIGN BODY REACTIONS, FIBROTIC BRIDGING, BIOFILM
FORMATION AND INFECTIONS, AND THE PORES COLLAPSE UNDER
TENSION RESULING IN PERMANENT AND IRREVERSIBLE HARMS.

A.      The Mesh Degrades Over Time

The placement of permanent polypropylene mesh in the human vagina creates problems

because of the chemical composition and structure of the mesh and the physiological conditions

of the vagina and the surrounding tissues. There have been numerous studies over the last 30

years which have shown polypropylene to be chemically reactive and not inert, with flaking and

fissuring demonstrated by scanning electron microscopy, which leads to degradation and release

of toxic compounds into pelvic tissues.  This process enhances the inflammatory and fibrotic

reactions within the tissues in the pelvic floor, causing a multitude of problems.[35]   There have

been studies suggesting that oxidation of the mesh occurs because of the polypropylene and the

conditions in which it is placed.[36] The oxidation causes the mesh to degrade, crack and break

---

[35] Coda A., *Hernia 2003*;7:29; Jongebloed, WL, "*Degradation of Polypropylene in the Human Eye: A SEM Study*," Doc. Ophthalmol., 1986 64(1:143-152); Skrypunch, O.W., "*Giant Papillary Conjunctivitis from an Exposed Prolene Suture*," Can. J Ophthalmology, 198621:(5: 189-192).
[36] Costello C., et al., "*Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants*

apart.[37]   In a recent study, 100 pelvic mesh implants were compared and over 20% showed degradation to mesh fibers.[38]

Because of the structural complexities of the vagina and the nature of the chemicals ordinarily found in the vagina and its surrounding tissues, there are several reasons why polypropylene presents unique problems when placed in the vagina. An Engineering Bulletin from Propex, entitled "*EB-405, The Durability of Polypropylene Geotextiles for Waste Containment Application*," from 2011, states that, "[P]olypropylene is vulnerable to the following substances:  highly oxidized substances such as (peroxide), certain chlorinated hydrocarbons (halogenated hydrocarbons), and certain aromatic hydrocarbons."[39]   It is well known to physicians with expertise in the pelvic floor that vaginal and perivaginal tissues are ready sources for peroxide. The vaginal species lactobacillus produces hydrogen peroxide and lactic acid from collagen that is produced in the squamous cells of the vagina. Estrogen is the catalyst for the production of glycogen from the vaginal cells. It is also well known that hydrogen peroxide produced by the lactobacillus species is important in controlling the vaginal micro-flora. In fact, the vagina is a ready source of hydrogen peroxide production. In a manuscript from M. Strus, "*The In Vitro Effects of Hydrogen Peroxide on Vaginal Microbial Communities*," the authors show the amount of hydrogen peroxide produced by the lactobacillus species.[40]   "Hydrogen Peroxide reached concentrations of from 0.05 to 1.0 mm, which

---

[37] *from a Single Patient*," Surgical Innovation , 2007, 143:168- 176).

[37] *Id.*

[38] Clavé A, Yahi H, Hammou JC, Montanari S, Gounon P, Clavé H, "*Polypropylene as a Reinforcement in Pelvic Surgery is Not Inert: Comparative Analysis of 100 Explants,*" J Biomed Mater Res B Appl Biomater, 2007, Oct 83(1:44-9).

[39] *Citing* Schneider H., *Long Term Performance of Polypropylene Geosynthetics, "Durability and Aging of Geosynthetics, Koerner*, RM, Ed., (Elsevier 1989) 95-109.

[40] Strus, M., et al., *The In Vitro Effect of Hydrgen Peroxide in Vaginal Microbial Communities*, FEMS Immunol Med Microbiol, 2006 Oct; 48(1:56-63).

under intensive aeration increases even up to 1.8 mm."[41] These results confirmed the previous results of M. Strus in the publication, "*Hydrogen Peroxide Produced by Lactobacillus Species as a Regulatory Molecule for Vaginal Micro-flora*," Med Dosw Mikrobiol, 2004: 56(1:67-77).

It is also known that aromatic hydrocarbons can be found in the human body. In a paper from HB Moon entitled, "*Occurrence and Accumulation Patterns of Polycyclic Aromatic Hydrocarbons and Synthetic Musk Compounds in Adipose Tissues of Korean Females*," *Chemosphere* 2012 (86:485-490), these aromatic hydrocarbons were noted to be present in, "[t]otal concentrations of PAHs and SMCs in adipose tissues rang[ing] from 15 to 361 (mean:119) ngg(-1) lipid weight and from 38 to 253 (mean:106) nng(-1) lipid weight respectively . . . . The results of this study provide baseline information on exposure of PAHs and SMCs to the general population in Koreans."

It has also been determined that halogenated hydrocarbons can be found not only in adipose tissue but also the blood stream. A paper entitled, "*Determination of Volatile Purgeable Halogenated Hydrocarbon in Human Adipose Tissue and Blood Stream*," from the *Bulletin of Environmental Contamination and Toxicology*, Volume 23, Issue 1, pp 244 – 249 published in 1979, found halogenated hydrocarbons, pesticide by-products, both in human adipose tissues and the blood stream. In a subsequent paper from 1985 in *Environmental Health Perspectives*, Volume 60, pp. 127-131, Henry Anderson, in his paper entitled, "*Utilization of Adipose Tissue Biopsy and Characterizing Human Halogenated Hydrocarbon Exposure*," also found these pesticide by-products in human adipose tissue. Accordingly, the body location where the polypropylene mesh is being placed can expose it to known chemical degradation

---

[41] *Id.*

agents.  The material safety data sheets supplied for the Coloplast mesh devices state under the "Stability and reactivity" section that strong oxidating agents are to be avoided. (CP MDL 2387 00156124 (Aris); CP MDL 2387 00156127 (Novasilk)) Coloplast did not warn of this to patients or doctors.

However, chemical degradation is not the only way that polypropylene degrades *in vivo*. In a paper from N Das in the Journal of Biotechnology Research International, Volume 2011, Article ID 941810, entitled, "*Review Article: Microbial Degradation of Petroleum Hydrocarbons Contaminant: An Overview*," found that various bacteria such as Pseudomonas species, Bacillus species, Mycobacterium and Corynebacterium species, which are present in a woman's vagina, can degrade petroleum hydrocarbons.  Also fungi such as the Candida species, also present, can degrade petroleum-based hydrocarbons.[42]  Microbial agents that can be found inside the normal and abnormal flora of the human vagina such as Candida and, with certain pelvic infections such as Bacillus and Pseudomonas, can be a source of biological degradation of polypropylene products.  A paper entitled, "*Health, Safety and Environment Fact Sheet: Hazardous Substances - Plastics*," from CAW/TCA (www.caw.ca), August 2011:343, found that polypropylene degradation products and residues can form carbon monoxide, acrolein, aldehydes and acids, qualifying these health hazards as toxic and irritants.  In a paper from D Lithner in 2011 at 4, entitled, "*Environmental and Health Hazards of Chemicals in Plastic Polymers and Products*," University of Gothenburg, it is stated that, "[n]on-biodegradable polymers can be degraded by heat, oxidation, light, ionic radiation, hydrolysis and mechanical shear, and by pollutants such as carbon monoxide, sulphur dioxide, nitrogen oxide and ozone. This causes the polymer to get brittle, to fragment into small pieces and to release degradation products."

---

[42] Das, N , et al., *Review Article: Microbial Degradadtion of Petroleum Hydrocarbon Contaminants: an Overview*, J Biotech Res Intl, 2011, Article ID 941810, 1-13.

(Citations omitted.)  Lithner continues, "[o]ther substances (besides monomers) are often needed for polymerization to occur, for instance initiators, catalysts, and, depending on manufacturing process, solvents may also be used. The resulting plastic polymer can be blended with different additives, for instance plasticizers, flame retardants, heat stabilizers, antioxidants, light stabilizers, lubricants, acid scavengers, antimicrobial agents, anti-static agents, pigments, blowing agents and fillers, and is finally processed into a plastic product. There are many different plastic polymers and several thousand different additives, which result in an extremely large variation in chemical composition of plastic products." *Id.* at 6 (citations omitted).  "Since plastic products are composed of many different chemicals, and the main part of these [are] broken down into something completely different; this complicates the prediction." *Id.* at 8. "The type and quantity of degradation products formed may also be influenced by degradation mechanisms, presence of polymerization impurities, and surrounding factors, e.g. temperature and oxygen." *Id.* at 9.  "Few studies combining leaching tests with toxicity tests have been performed on plastic products." *Id.* at 12.  The available peer-reviewed literature regarding degradation/oxidation of polypropylene in the human body dates back to the 1960's and has been reported in numerous such publications.[43]  Two of the more important and salient articles regarding reported degradation in explanted surgical meshes (hernia and pelvic floor) are the Costello and Clave articles.

In his paper, "*Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Implants from a Single Patient,*" Prof. C Costello reported that hernia mesh made of polypropylene oxidized and degraded as a result of the metabolites produced by phagocytic cells

---

[43] Liebert, T, et al., *Subcutaneous Implants of Polypropylene Filaments*, J Biomed Mater Res. 1976 (10:939-951); Williams, D., *Review of Biodegradation of Surgical Polymers*, J Materials Sci, 1982 (17:1233-1246); Oswald, H.J., et al., *The Deterioration of Polypropylene By Oxidative Degradation*, Polymer Eng Sci, 1965 (5:152-158).

during the body's inflammatory reaction to the mesh.  High-magnification photographs showed cracking and peeling of the polypropylene fibers.  In 2011, a group of similar researchers consisting of general surgeons, biological engineers and professors stated, polypropylene mesh materials "are prone to degradation due to the body's aggressive foreign body reaction, which may cause pain or complications, forcing mesh removal from the patient."[44]

Another article by A Clave, "*Polypropylene as a Reinforcement in Pelvic Surgery is Not Inert: Comparative Analysis of 100 Explants*," also displayed high magnification photos of polypropylene fibers from explanted meshes and, in this case, the meshes were explanted from women's pelvic floor tissue.[45]  The heavyweight meshes showed even greater cracking than the lower density meshes, but according to Prof/Dr. Clave, ALL 84 of the polypropylene explants examined showed degradation. Oxidation of the implanted mesh due to free radical attack through the synthesis of peroxides, superoxides and hypochlorous acid during the chronic inflammatory phase was listed as just one potential cause for the oxidative degradation within the "septic environment" in which the pelvic meshes are placed. Coloplast had scientific knowledge of this data and discussed this article in a draft clinical evaluation report from 2011. (CP MDL 2387 00188406 (see 2013 CP MDL 2387 01470476) "PP implants degraded more in the presence of an acute infection or chronic inflammation"; see also CP MDL 2387 00464778) Coloplast also had the article in its internal company files (CP MDL 2387 00470333).

Recent literature has confirmed that polypropylene transvaginal mesh undergo qualitative

---

[44] Grant et al., *Conjugation of gold nanoparticles to polypropylene mesh for enhanced biocompatibility*, J Mater Sci: Mater Med (2011) 22:2803–2812

[45] Clave, A., *Polypropylene as a Reinforcement in Pelvic Surgery is Not Inert: Comparative Analysis of 100 Explants*, I Urogynecol J 2010 21:261-270; Petri, *Complicatoins of synthetic slings used in female stress urinary incontinence and applicability of the new IUGA-ICS classification, E*uropean Journal 348 of Obstetrics & Gynecology and Reproductive Biology 165 (2012) 347–351 ("recent studies have shown that polypropylene mesh does undergo degradation....")

and quantitative bioerosion and oxidative degradation in vivo.[46]   The authors, who include chemists, engineers and urologist state not long after mesh use became more popular, an increasing number of mesh-related complications were reported. Mesh used for sling and POP repairs have been associated with degradation and shrinkage, at times causing pain and discomfort to the patients who have had mesh implanted in them. The study found cracking, scaling and peeling of the material implanted in women. Based on the data, the authors concluded these devices undergo oxidative degradation while in vivo. "The significance of these degradation compounds on humans is of major clinical significance. Byproducts that result from degradation of PP meshes may adversely affect the host response, which is further exacerbated by tissue ingrowth and mesh integration." All explants in the study showed bioerosion and showed extensive damage, including scaling, cracking and peeling, confirming bioerosion and degradation in all samples.

The above findings are consistent with what I have seen my own clinical practice. I have personally seen mesh that is broken, cracked and looks different from when it came out of the package. Interestingly, Coloplast's Instructions for Use (IFU) does not mention or warn that polypropylene mesh used in its devices degrades.[47] In fact, in tis IFUs that "Restorelle is not absorbed nor subject to enzymes breakdown." This statement omits appropriate scientific safety information and is misleading to physicians.[48]

It is my opinion to a reasonable degree of medical certainty that the mesh degrades.  The effect of chemical and biological degradation of the mesh in a woman's tissues can lead to a

---

[46] Washington et al, *Bioerosion of Synthetic Sling Explants*, *ACS Biomater. Sci. Eng.*, 2017**,** *3* (10), pp 2598–2605; Imel et al., *In vivo oxidative degradation of polypropylene pelvic mesh*, Biomaterials 73 (2015) 131e141
[47] CP MDL 2387-R 00577159; CP MDL 2387-R 00828330; CP MDL 2387-R 00651943; CP MDL 2387-R 00158461; CP MDL 2387-R 00288495; CP MDL 2387-R 00467646; CP MDL 2387-R 01103150; CP MDL 2387-R 02020726; CP MDL 2387-R 00576819; CP MDL 2387-R 00288604
[48] See e.g. Restorelle IFUs CP MDL 2387 00002062; CP MDL 2387 00004228; CP MDL 2387 00896579; and CP MDL 2387 00406572.

greater foreign body reaction, enhanced inflammatory response and excessive scarring, which can lead to severe complications in patients, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening prolapse, chronic dyspareunia, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the polypropylene in Coloplast mesh is not suitable for its intended application as a permanent prosthetic implant for pelvic organ prolapse in women.

Given the information available in the scientific and medical literature concerning the potential for degradation of polypropylene, it is my opinion to a reasonable degree of medical certainty that Coloplast should have conducted clinically relevant testing to determine if naturally occurring conditions in the vagina could cause polypropylene to degrade and if so, what the quantity and quality of the products of degradation would be, whether they would be released into surrounding tissues and/or migrate in the woman's body, what the clinical implications for the woman would be and whether some women's body's would react differently to the mesh and the degradative process and its by-products. (Deposition of Geoffrey A. Daniel, December 19, 2018, at page 128 "Has Coloplast ever done any testing regarding degradation of the polypropylene resin? No. We rely on literature for the polypropylene performance.") Coloplast should have warned physicians and patients and not misled them regarding mesh degradation.

Coloplast had scientific knowledge of the safety concerns associated with degradation of their mesh products and repeatedly had scientific knowledge of 1) the propensity of polypropylene mesh degradation, and 2) the resulting harm associated with degradation to

patients. Coloplast had scientific knowledge of a 2010 article titled, *Polypropylene Vaginal Mesh Grafts in Gynecology,* that cited to many of the studies I have referenced above that detail findings of mesh degradation and the resulting complications. (CP MDL 2387 00054091; CP MDL 2387 00238733)[49]. Multiple employees in Coloplast's Female Pelvic Health division circulated the article – they discussed the potential marketing implications of the article – but did not discuss the safety considerations and safety ramifications to women. They also did not question the findings, criticize the findings or refute the conclusions based on the available documents produced by Coloplast.  The article discusses the catastrophic harm that can result from transvaginal polypropylene mesh degradation and states, "Polypropylene is not inert within the human body."

Coloplast received articles and correspondence from their consultants and physicians raising safety concerns about mesh degradation. (CP MDL 2387 00238733; CP MDL 2387 01015071).  Coloplast's own consultant stated in 2013, "I agree...the companies have not studied the meshes well enough to understand the long term effects....Mesh degradation is also a real possibility...take a look back at the origin of periurethral injections in 1938 with Murles and later Politano...they were finding PTFE in the lungs, brain etc...." Another mesh company consultant questioned the safety Coloplast mesh products and forwarded two separate articles to the Coloplast Female Pelvic Health division in 2012 that discuss mesh degradation and harm caused by mesh degradation to patients.  (CP MDL 2387 00238733). One of the articles, titled *Polypropylene mesh and the host response*, stated the response to transvaginal polypropylene mesh has not been extensively studied and evidence was lacking and showed images of cracks, fissures, peeling and increased roughness of degraded polypropylene mesh. Another article, titled

---

[49] [49] Ostergard, *Polypropylene Vaginal Mesh Grafts in Gynecology* Obstet Gynecol. 2010 Oct;116(4):962-6

*Post-Implantation Alterations of Polypropylene in the Human*, reviewed data and gprior article discussed herein, and concluded, "Based on the available evidence it is clear the PP alters in vivo after implantation. It undergoes various processes that lead to degradation...PP mesh is not inert."[50]

Coloplast was also circulating information from the 2013 IUGA Meeting in Dublin which including promotion of products that were "more resistant to hydrolysis and degradation that polypropylene." (CP MDL 2387 00994025). In fact, as early as 2011 Coloplast was being advised by a third-party polymer company about polypropylene degradation and stiffening. Coloplast was advised to consider abandoning the use of polypropylene in TVM all together. (CP MDL 2387 00236007) "At Case Western Reserve University, there's some new data from Michael Rosen, an eminent hernia surgeon/researcher, indicating that monofilament polyester has fewer complications (including harboring bacteria) than monofilament polypro. You'd still be leveraging the Mpathy advantage, but the material substitution would be more amenable to a next generation device." Based on a review of the exchange, Coloplast had rejected this idea because of concerns regarding how it would affect the value of their intellectual property. "If the value of the IP acquired from MPathy is in the specific knit of the mesh rather than a unique polypropylene material, it may not be too complicated to simply substitute materials."

## B.    Chronic Foreign Body Reaction

The human body has a natural and fairly predictable "host defense response" to any foreign object placed inside of it.  Whether a splinter or a surgical mesh, the human body will send white blood cells to attack the invader and, if the products of inflammation cannot ward off or destroy the invader, including if the invader is anything from bacteria to prosthetic implants,

---

[50] Patel, *Polypropylene mesh and the host response* Int Urogynecol J. 2012 Jun;23(6):669-7;  Sternschuss, *Post-Implantation Alterations of Polypropylene in the Human* J Urol. 2012 Jul;188(1):27-32

the initial acute inflammatory phase is followed by a chronic inflammatory phase. Therefore, with the placement of something like a permanent surgical mesh in human tissues, there will be a chronic or permanent foreign body reaction to the implant, as well as a chronic inflammatory response by the body.[51] Coloplast internal files reference similar research in a 2013 memo from Mpathy, including Uwe Klinge, concluding "current meshes...have an unwanted foreign body mass" and "Current meshes are over-engineered." (CP MDL 2387 00002711) Coloplast distributed and circulated similar research again in 2012. (CP MDL 2387 00002691-933

This response and process never stops so long as the foreign body or remnants of the foreign body remain in the body.  In a review article from 2018 that included an author who is a defense expert witness for a mesh company, the authors set out to "examine the available data in the literature on the inflammatory response of PP mesh placement on its host. Furthermore, it will detail when the inflammatory response subsides in animals and humans who have been implanted with PP mesh transvaginally." Thomas et al, *Histologic Inflammatory Response to Transvaginal Polypropylene Mesh: A Systemic Review*,   UROLOGY 111: 11–22, 2018. In their systematic review, they "found following the implantation of PP mesh transvaginally there is an immediate and persistent inflammatory response in both female animals and humans. Further, this response was in all cases localized around or near the implantation site. We found a number of studies address the effects of PP when compared with controls, different types of mesh, hosts with different environmental factors and comorbidities, and mesh coated with substances to reduce the inflammatory response. In all these scenarios, PP induced the highest inflammatory

---

[51] Klinge, U., et al., *Shrinking of Polypropylene Mesh In Vivo:  An Experimental Study in Dogs*, Eur J Surg 1998, 164: 965-969; Klinge, U., *Foreign Body reaction to Meshes Used for the Repair of Abdominal Wall Hernias*,Eur J Surg 1998, 164:951–960; Klostherhalfen,B., *The lightweight and large porous mesh concept for hernia repair*, Expert Rev. Med. Devices 2005, 2(1); Binnebosel M, et al., *Biocompatibility of prosthetic meshes in abdominal surgery*, Semin Immunopathol 2011, 33:235-243.

responses...." Another finding of their review was that "the inflammatory response was persistent long after implantation", never disappeared, and "in humans, the mesh was explanted for a variety of reasons such as pain and erosion with inflammatory markers still being present years after implantation." The authors voiced a concern for better data and more studies "due to relatively short follow-up used in many of these studies (12-24 months)." "In conclusion, after a PP mesh is implanted transvaginally, there is a local and immediate inflammatory response. There is a lack of evidence of resolution of this response. Further studies are needed to properly assess PP's long-term clinical implications." UROLOGY 111: 11–22, 2018

In a recent study, Nolfi noted that few studies have been performed that specifically focus on the host response after implantation of urogynecologic meshes, particularly in regard to implantation in the vagina.   While there have been studies of similar meshes that are used in hernia repair, the host response at the vagina is distinct, and the "magnitude and type of [inflammatory] response is associated with the development of complications." Nolfi found that "the 2 major mesh complications (exposure and pain) are associated with a marked proinflammatory response that persists years after mesh implantation." The macrophage is the key cell type that facilitates the foreign body response and can be categorized broadly as M1 proflammatory and M2 proremodeling subtypes. A persistent M1 response can result in the release of strong acids and peroxides that causes tissue damage and destruction, leading to erosion. In contrast, a persistent M2 response can result in tissue deposition and growth, leading to fibrosis and encapsulation of the mesh.  Fibrosis "causes increased rigidity and tightening of the mesh." (CP MDL 2387 00056995).

In one test performed by an outside laboratory in 2012 that Coloplast sponsored on their mesh products, "fibrosis and chronic-active foreign body inflammation" was present after being

implanted in the muscle tissue of rabbits for four weeks. (CP MDL 2387 01423818).  Fibrosis "causes increased rigidity and tightening of the mesh." (CP MDL 2387 00056995). In fact, in 2012, at a Coloplast meeting with their industry mesh paid physician consultants under the "FUTURE" heading, it states "look at scarring" and "What we need to prevent = dyspareunia." (CP MDL 2387 02347098)

For the reasons set forth above, it is my opinion to a reasonable degree of medical certainty that the Coloplast transvaginal polypropylene POP mesh creates a chronic foreign body reaction which can lead to severe complications in patients, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening prolapse, chronic dyspareunia, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the polypropylene in Coloplast's transvaginal POP mesh is not suitable for its intended application as a permanent prosthetic implant for pelvic organ prolapse.

### D.    Pore Size and Fibrotic Bridging

Fibrotic bridging occurs when the fibers surrounding the pores of the mesh are too close together to allow the tissue in the pore enough room to recover from the trauma of tissue damage due to implanting a surgical prosthetic device.  Pores that are large enough for good, newly-vascularized tissue tend to be filled with fatty tissue versus small pores that become filled with scarred or fibrotic tissue.  In those instances, the scar forms across the pores or "bridges" from one side of the pore to the other. This can occur either due to the granulomas around the mesh fibers joining together or due to densely-formed fibroblasts between these granulomas. Either way, such bridging can lead to the creation of a rigid, scar plate that can encapsulate the mesh

with scar tissue. Simply put, collapsed mesh pores that cause fibrotic bridging turn the mesh into a solid sheet of scar tissue and there is no space or room for tissue to grow into the mesh, which is the intended purpose of the mesh. The fibrotic bridging and scar plate prevent tissue in-growth and causes complications, including, among other things, pain with the rigid mesh, shrinkage or contraction of the mesh, erosions due to mechanical irritation in the tissue of a rigid, scar-plated mesh, nerve entrapment, chronic pain and dyspareunia.

Coloplast mesh used in their transvaginal POP mesh devices have small pores due to the pores collapsing when implanted and in vivo due to the normal loads and forces applied to the mesh as well as unintended shrinkage/contracture, scar plating and deformation.

"Restorelle (Coloplast) has a square pore." Liang, *Exploring the basic science of prolapse meshes*, Curr Opin Obstet Gynecol. 2016 Oct; 28(5): 413–419. The pore size before both implantation and in vivo is 1.8 mm and 100 micron interstitial pores. Coloplast claims NovaSilk products have pre-implant interstitial pore size of 174 microns.[52]   Notably, when testing the Restorelle mesh under conditions that mimic the forces during implantation and in vivo, the authors found the pores of Restorelle collapsed. "The most striking result at 5N was the finding that Restorelle 45-degree offset...had no pores with a $d_{min} > 1$ mm. In fact, Restorelle 45-degree offset... had >90% of the total pore area remaining from pores with diameters <0.5 mm" Barone, *Textile properties of synthetic prolapse mesh in response to uniaxial loading*, Am J Obstet Gynecol. 2016 Sep; 215(3): 326.e1–326.e9.

A "90% reduction in porosity was observed. Given the importance of pore size and porosity, the reduction in pore size (less than 1 mm), porosity, and effective porosity all potentially decrease the biocompatibility of synthetic mesh. This may also lead to an increased

---

[52] *See* CP MDL 2387 00740446.

risk of bridging fibrosis, inflammation, poor tissue integration, and fibrosis, which may ultimately result in poor patient outcomes." Liang, *Exploring the basic science of prolapse meshes*, Curr Opin Obstet Gynecol. 2016 Oct; 28(5): 413–419.

"Further, this study found that reporting mesh pore size as a single diameter is misleading. On measurement, mesh products contain a range of pore diameters, with "large pore" meshes (diameters >1 mm) also have a large number of small pores that are more likely to evoke a fibrotic immune response... However, the host response to a particular mesh is also dictated by micropores (on the order of ≤0.001 mm), which are very likely to increase in number as pores collapse." Barone, *Textile properties of synthetic prolapse mesh in response to uniaxial loading*, Am J Obstet Gynecol. 2016 Sep; 215(3): 326.e1–326.e9.

"Given the importance of pore size and porosity in the host response, it can be argued that maintaining these properties of a mesh is crucial for biocompatibility and positive patient outcomes. Unfortunately, the majority of current synthetic meshes have unstable geometries when loaded with collapse of pores, nonplanar deformation (buckling and wrinkling) and narrowing at the midportion of the mesh (Poisson's effect). Thus, a future goal of synthetic mesh is the development of a mesh that maintains a stable geometry with loading, does not experience pore collapse or narrowing, regardless of thedirection in which the load is applied." Liang, *Exploring the basic science of prolapse meshes*, Curr Opin Obstet Gynecol. 2016 Oct; 28(5): 413–419. Barone, *Textile properties of synthetic prolapse mesh in response to uniaxial loading*, Am J Obstet Gynecol. 2016 Sep; 215(3): 326.e1–326.e9.

The "deformation at the time of and early after implantation likely dictates the subsequent response and integration of synthetic mesh. It can be hypothesized that decreases in pore diameter enhance the host inflammatory response and possibly increase the fibrous

encapsulation of the mesh. Fibrous encapsulation and its potential contraction by resident myofibroblasts may induce pain after mesh implantation, which is 1 of the most common of mesh-related complications  Barone, *Textile properties of synthetic prolapse mesh in response to uniaxial loading*, Am J Obstet Gynecol. 2016 Sep; 215(3): 326.e1–326.e9.

The authors concluded, "it is believed that preventing the reduction in pore size and loss of porosity in response to loading will allow for adequate tissue in-growth and integration possibly reducing the risk of mesh-related complications." Liang, *Exploring the basic science of prolapse meshes*, Curr Opin Obstet Gynecol. 2016 Oct; 28(5): 413–419. Barone, *Textile properties of synthetic prolapse mesh in response to uniaxial loading*, Am J Obstet Gynecol. 2016 Sep; 215(3): 326.e1–326.e9. "Current polypropylene prolapse meshes are associated with persistent rates of complications; particularly, mesh exposure and pain." Id.

The experience with Prolift (the predicate device), and the use of other meshes marketed by Coloplast should have provided scientific knowledge to Coloplast that pore size is crucial to preventing complications such as erosion and infection, along with other complications. [53] Coloplast had unique scientific knowledge that their mesh devices were substantially equivalent in material, function, performance and design to the Prolift.

Despite above, Coloplast 1) made no changes to the their mesh design to address pore

---

[53] With Obtape, due to the extremely small pore size, capillary penetration had been found to be difficult if occurs at all (Fiefer Int Urogynecol J 2007)  Fiefer concluded these findings could explain the greater rate of extrusion with significant inflammatory reaction seen with Obtape.  Obtape has also been shown to be encapsulated by a fibrous capsule with minimal growth of collagen into mesh pores.  Complications resulted from the stiffness of the ObTape as well. The stiffness or low elasticity of the ObTape limited adherence to surrounding tissue (Ismail Int Urogynecol J 2007).   Obtape on SEM of mesh removed from an animal model showed the polypropylene fibrils are flattened and do not show actual pores, blind pouches are seen which prevent incorporation of mesh into tissue and discourages neovascularization. (Slack Int Urogynecol J 2006, Ostergard Int Urogynecol J 2010).  Another troubling finding on Obtape SEM evaluation is that the interior of the mesh is completed occupied by macrophages.  The Obtape was found to be surrounded by a fibrous capsule and to have no tissue integration between the mesh and adjacent tissue. Without integration there is a greater risk of mechanical irritation due to movement between the sling and capsule (Slack Int Urogynecol J 2006).  This obviously can lead to a greater incidence of mesh erosion and infection.

collapse, 2) did not conduct clinical testing with primary purpose of detecting complications with collapsed pore mesh, and 3) continued to use the collapsed pore mesh in products they marketed for POP.  Making changes, using different mesh and additional clinical testing would have required Coloplast to spend time, money and resources and potentially stop marketing their products as designed. (CP MDL 2387 00250654 "recalls and consent decrees tend to depress sales"). According to an email from James Browning dated May 2011, Coloplast's considerations for developing new products and changing product designs was not focused on the merit of the of design concepts and changes, but rather "we have to make decisions on whether good concepts are those that we feel would be patentable and would make the basis of sellable products without competing with our current range." (CP MDL 2387 00014417).

In summary, for the reasons set forth above, it is my opinion to a reasonable degree of medical certainty that the Coloplast mesh causes fibrotic bridging, stiff scar plating, poor tissue integration in the body, resulting in an increased inflammatory response leading to a multitude of injuries, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic  and debilitating pelvic pain, recurrence, worsening prolapse, dyspareunia that can be chronic, nerve injury, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the Coloplast mesh is not suitable for its intended application as a permanent prosthetic implant for pelvic organ prolapse in women.  Moreover, Coloplast did not inform physicians and patients that its mesh was susceptible to infection, poor tissue integration, fibrotic bridging and stiff scar plate could occur leading to painful erosions, pore collapse, recurrent, late infections, nerve injury and entrapment and the need for mesh removal.  By failing

to do so, Coloplast did not adequately warn physicians about these important risks, nor by extension, provide surgeons with an opportunity to discuss these risks with their patients.

### E.     Mesh Contracture/Shrinkage

By 1998, polypropylene mesh was known to contract or shrink 30-50%.[54]  These findings were later confirmed in numerous papers, such as those by W Cobb.[55]  This also showed that heavier weight meshes like Coloplast mesh led to greater amounts of contraction.   Coloplast included many of the above literature I have relied on above in their own internal presentations and had scientific knowledge of these articles. (CP MDL 2387 0050814) Coloplast cited to Klinge and Cobb in their own materials stating, "All meshes regardless of composition experience 20-50% reduction in initial size (Cobb, 2005)" Id.

Furthermore, contraction or shrinkage is closely related to the pore size in vivo. Small collapsed pore mesh leads to fibrotic bridging which leads to scar plates, mesh encapsulation and shrinkage or contraction of the mesh, which is compounded by the shrinkage effect associated with the normal wound healing process already occurring in the tissue.

Feiner and Maher evaluated 17 women with vaginal mesh contraction to demonstrate that the mesh caused the condition. The patients' presenting complaints included severe vaginal pain, dyspareunia, and focal tenderness over contracted portions of mesh on vaginal examination, mesh erosion, vaginal tightness, and vaginal shortening. The patients underwent surgical intervention with mobilization of mesh from underlying tissue, division of fixation arms of the central graft, and excision of contracted mesh. Fifteen of 17 (88%) patients reported a 'substantial reduction in vaginal pain following explantation, while seven of 11 (64%) reported

---

[54] Klinge, U, *Shrinking of Polypropelen Mesh in Vivo: An Experimental Study in Dogs*, Eur J Surg 1998, 164:965-969.
[55] Cobb, W., et al., *The Argument for Lightweight Polyropylene Mesh in Hernia Repair*, Surgical Innovation 2005, 12(1):T1-T7.

'substantial' reduction in dyspareunia. However, despite Feiner's relative success with mesh explanation, the adverse effects of transvaginal mesh contraction caused permanent life-altering sequelae in 22-46% of patients in this study.

More recently, Letouzey et al. reviewed the long-term changes in pelvic mesh volumes over time using three-dimensional translabial ultrasonography and found mean contraction of 30%, 65%, 85% at follow-up durations of 3, 6, and 8 years, respectively. This study demonstrates that the pathological process that causes mesh shrinkage increases progressive over time and there is a linear correlation of the contraction rate with time, raising the frightening possibility that mesh contraction syndrome continues indefinitely into the future.

A consistently worrisome statistic is that many of the complications related to mesh contraction such as pelvic pain and dyspareunia are delayed in onset. Given the currently reported complication rates, there are a large number of women around the world who have yet to develop problems but given enough time will. This is especially troubling when you review the FDA's statement that, "mesh contraction may lead to severe pelvic pain, painful sexual intercourse or an inability to engage in sexual intercourse."[56]

In 2009 it was shown that there was a confirmed link between mesh retraction and vaginal tenderness, dyspareunia, pain, and possibly urinary dysfunction.[57] "The concurrent processes of tissue in growth and mesh shrinkage may cause significant pain, particularly in patients who undergo trocar-guided mesh placement. Adherence of the mesh arms in the lateral pelvic wall is a point against which tension increases during the processes of tissue in growth and mesh shrinkage." Significantly, there are several shrinkage related complications that are not

---

[56] http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm262435.htm
[57] Jacquetin, B. & Cosson, M. (2009). Complications of vaginal mesh: our experience. Int Urogynecol J Pelvic Floor Dysfunct, 20(8), 893-896. doi:10/1007/s00192-009-0926-6.

warned about, including sexual impairment, loss of vaginal function due to narrowing/shortening, functional bladder and bowel symptoms, and need for multiple and difficult corrective procedures.[58]

Coloplast's internal documents indicate the POP products shrink at an average rate of 44%.[59]   Coloplast's testing of the mesh used in Coloplat POP products indicate that the mesh permanently deforms when in vivo forces are replicated.[60]   Mesh shrinkage/contraction is associated, or the reason, for overactive bladder. (CP MDL 2387 00994025)

Coloplast employee Erinmarie Carrick, Coloplast's female pelvic health "clinical and education girl" stated in 2012, "We have never given an exact shrinkage number. James Browning has always said we shrink at the amount as any light weight mesh which is published as 20-40%%. Shrinkage is a normal phenomenon. (CP MDL 2387 00056795; CP MDL 2387 00056751; CP MDL 00649778). In a 2008 confidential report prepared exclusively for Coloplast, under the recurrence/erosions/complications heading it was stated transvaginal mesh will "shrink eventually 'feeling like a ball of aluminum foil under the skin' leading to another surgery to remove the mesh." (CP MDL 2387 00014349)

Coloplast had scientific knowledge that their pelvic organ prolapse mesh shrank/contracted/wrinkled/folded after implantation due to large mesh surface area and collapsed pores and this shrinkage varied per patient depending on the amount of fibrosis.[61] Coloplast had scientific knowledge that the vagina can become rigid due to mesh fibrosis and mesh shrinkage, causing difficulty with intercourse and a near impossibility removal of mesh.[62]

---

[58] Rogo-Gupta, L., Raz, S. (2013). Pain Complications of Mesh Surgery. In H.B. Goldman (Ed.), Complications of Female Incontinence and Pelvic Reconstructive Surgery (pp. 87-105): Humana Press.
[59] *Id.* CP MDL 2387 00056995.
[60] *Id.* CP MDL 2387 00803433.
[61] *See generally* CP MDL 2387 00575319 at 00575325.
[62] CP MDL 2387 00575319 at 00575327.

In fact, dog studies with mesh indicated that, after 90 days, Restorelle Mesh shrank 44.7% +/-
20.85.[63] [64] Coloplast also states that their mesh shrinks at the rates of other mesh devices.[65] [66]

Coloplast did not adequately test for detecting complications associated with mesh
contraction and stated do not know the rates of contracture of their mesh in the female pelvis
because "women are not likely to submit to vaginal biopsies."[67] Coloplast states that all meshes,
regardless of composition experience 20-50% reduction in initial size secondary to issue
incorporation.[68] Coloplast positioned that this shrinkage was the consequence of inflammatory
response and a result if inadequate tissue ingrowth to into the mesh.[69] Despite having scientific
knowledge that the Coloplast transvaginal mesh POP products shrank and scientific knowledge
the devastating complications women suffer from due to mesh shrinkage/contraction, no human
studies were performed regarding contraction specific to transvaginal mesh products.[70]

The mesh contracture, deformation and wrinkling up like "aluminum foil" results in the
mesh becoming rigid and stiff after implantation, which can cause injuries to the pelvic floor and
pelvic organs. Coloplast had scientific knowledge that Restorelle causes a 48% reduction of
vaginal contractility following implantation.[71]

The "Joint Terminology and Classification of the Complications Related Directly to the
Insertion of Prostheses (meshes, implants, tapes) & Grafts in Female Pelvic Floor Surgery"
includes the vaginal complication due to contraction (shrinkage) and lists symptoms as pain,

---

[63] *See* CP MDL 2387 00362298 at 00362307.
[64] *See* CP MDL 2387 00056995.
[65] *See* CP MDL 2387 02224841.
[66] *See* CP MDL 2387 00056795 at 00056796.
[67] *See* CP MDL 2387 00888904.
[68] *Id.* CP MDL 2387 00050814 at 00050827.
[69] *Id.*
[70] *Id.* CP MDL 2387 00050814 at 00050827.
[71] A. Feola, et al., Deterioration in biomechanical properties of the vagina following implantation of a high stiffness prolapse mesh. International Journal of Gynecology & Obstetrics, Sept. 2012. DOI: 10.111111471-0528.12077.

infection, abscess, dyspareunia and bleeding. The authors include consultants of mesh companies, including consultants Coloplast paid. Coloplast relied on this mesh complication classification system in their own materials. (CP MDL 2387 00472303; CP MDL 2387 00472314 "Decision to use ICS/IUGA classification definitions...")

It is my opinion to a reasonable degree of medical certainty that as a result of work with by experts and researchers in the late 1990s and the scientific literature as a whole, that the mesh used in Coloplast products not only could, but would shrink and contract, and that this shrinkage could lead to painful complications in women implanted with Coloplast mesh such as multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening prolapse, chronic dyspareunia, nerve injury, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others.

As a result, the Coloplast mesh is not suitable for its intended application as a permanent prosthetic implant for POP in women, and Coloplast failed to warn physicians and patients of the possibility of shrinkage and contraction and the adverse outcomes that could occur as a result.

2. BECAUSE OF THEIR TRANSVAGINAL IMPLANTATION DESIGN, THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS ARE NOT SUITABLE FOR THEIR INTENDED APPLICATION AS A PERMANENT PROSTHETIC IMPLANT FOR PELVIC ORGAN PROLAPSE.

Placing mesh transvaginally "lead[s] to higher rates of exposures, folding and contraction compare to abdominly implanted grafts." (CP MDL 2387 00994025) The host response is more pronounced when the mesh is placed vaginally. Numerous articles and position statements have concluded as much. *See e.g.* ACOG and AUGS Practice Bulletin 176, Female Pelvic Medicine & Reconstructive Surgery • Volume 23, Number 4, July/August 2017. "The use of synthetic mesh

or biologic grafts in transvaginal repair of posterior vaginal wall prolapse does not improve outcomes." It continues, "The use of synthetic mesh or biologic grafts in POP surgery is associated with unique complications not seen in POP repair with native tissue." Regarding posterior repairs, it states, "The use of synthetic mesh or biologic grafts in transvaginal repair of posterior vaginal wall prolapse does not improve outcomes. In addition, there are increased complications (eg, mesh exposure) associated with placement of mesh through a posterior vaginal wall incision....Thus, synthetic mesh or biologic grafts should not be placed routinely through posterior vaginal wall incisions to correct POP for primary repair of posterior vaginal wall prolapse." Regarding anterior repairs it states, "is associated with a higher rate of complications compared with native tissue vaginal prolapse repair."

A long-time mesh consultant has stated, "[t]ransvaginal mesh has a higher reoperation rate than native tissue repair" due to the rate of surgeries for attempted repair of complications.[72] Published literature reflects that there is no functional nor anatomic benefit for armed TVM in the posterior compartment.[73] TVM mesh procedures are also specifically associated with increased morbidity, mesh extrusion, and higher reoperation rates.[74] For example, one study comparing vaginal prolapse repair with and without mesh showed there was no difference in anatomic benefit at three years and that there was a 15% mesh exposure rate after just three months.[75]

---

[72] de Tayrac R et al., Complications of POP Surgery and Methods of Prevention, Int. Urogynecol. J. 2013; 24:1859-1872.
[73] Karram M, Maher C, Surgery for Posterior Wall Prolapse. Int. Urogynecol. J. 2013; 24(11): 1835-41.
[74] Maher C, Anterior Vaginal Compartment Surgery. Int. Urogynocol. J. 2013; 24:1291-1802; Ostergard D, Evidence-based Medicine for Polypropylene Mesh Use Compared with Native Tissue Repair. Urology 79: 12-15, 2012.
[75] Gutman et al., Three-Year Outcomes of Vaginal Mesh for Prolapse. Obstet Gynecol 2013; 122:770-7.

A 2011 Cochrane review evaluated 3,773 participants in 40 trials of different surgical procedures for POP.[76] The review found higher rate of complications associated with vaginal mesh compared with native tissue vaginal repairs, including 10% mesh erosions rate.[77] Another systematic review (Diwadkar, 2009) analyzed the complications and reoperation rates for surgical procedures performed to correct apical POP.[78] Reoperation rates for complications as well as total reoperation rate was highest for vaginal mesh kits compared with vaginal native tissue and abdominal repairs.[79]

**Infections/Bio-films**

The placement of transvaginal POP mesh, violates one of the most basic tenets of surgical teachings in that it is the placement of a permanent implant into the human through a "clean contaminated" surgical field, i.e. the vagina, which is not sterile and can never be completely sterilized, Therefore, implantation through the vagina is contraindicated for every procedure and implantation.

The bacteria can secrete an encasing polysaccharide slime (biofilm), which further serves to shield the bacteria from destruction by white blood cells and macrophages.[80] The effect and consequences of biofilm is to increase the foreign body reaction, resulting in chronic infections, chronic inflammation, erosions, and mesh and scar contracture. Importantly, the biofilm actually serves as a protection for the bacteria surrounding the mesh fibers against the body's host defense response (white blood cells), which are intended to destroy foreign invaders

---

[76] *See* CP MDL 2387 00011538 at 00011544
[77] *Id.*
[78] *Id.*
[79] *Id.* CP MDL 2387 00011538 at 00011544
[80] Osterberg, B., et al., *Effect of Suture Materials on Bacterial Survival in Infected Wounds: An Experimental Study*, Acta. Chir. Scand 1979, 145:7 431-434; Merritt, K., *Factors Influencing Bacterial Adherence to Biomaterials*, J Biomat Appl 1991, 5:185-203; An, Y., *Concise Review of Mechanisms of Bacterial Adhesion to Biomaterial Surfaces*, J Biomed Mater Res (Appl Biomat) 1998, 43:338-348; The TVM Group: J. Berrocal, et al., *Conceptual advances in the surgical management of genital prolapsed*, J Gynecol Obsted Biol Reprod 2004, 33:577-587.

like bacteria. Thus, the weave induces the creation of a shield against the body's defenses to the bacteria entrained in the woven mesh, inhibiting the body's ability to fight off the infective agents within the mesh. The large surface area promotes wicking of fluids and bacteria which provides a safe haven for bacteria which attach themselves to the mesh during the insertion process.[81] Additionally, the size of the mesh placed equates to a large surface area with many places for bacteria to hide while being protected from host defenses leading to numerous complications.[82]

There have been numerous peer-reviewed journal articles regarding secondary-mesh related infections as well as the dangers of implanting surgical mesh in a clean/contaminated field. Of note, at a r e c e n t AUA meeting in San Diego, Dr. Shah and his colleagues reported on the "*Bacteriological Analysis of Explanted Transvaginal Meshes,*" which included explanted samples of both SUI slings and prolapse meshes. Of the 50 explants examined, 52% of those explanted due to patient complaints' of painful mesh were infused with pathogenic organisms, 20% of those explanted due to vaginal erosions had pathogenic organism, and 83% of those explanted due to urinary tract erosions were contaminated with pathogenic organisms.[83]

When polypropylene particles separate from the surface of the mesh fiber due to degradation, see infra, the surface area of the mesh is greatly increased thus providing even greater areas for bacterial adherence to the mesh, more elution of toxic compounds from the polypropylene, and also more of the free toxic polypropylene itself, all of which increases the

---

[81] Klinge, U., et al., *Do Multifilament Alloplastic Meshes Increase the Infection Rate? Analysis of the Polymeric Surface, the Bacteria Adherence, and the In Vivo Consequences in a Rat Model*, J Biomed Mater Res 2002, 63:765-771; Vollebregt, A, et al., *Bacterial Colonisation of Collagen-Coated Polypropylene Vaginal Mesh: Are Additional Intraoperative Sterility Procedures Useful?*, Int Urogyn J 2009, 20:1345-51.
[82] Klinge, *supra* n. 26; Vollebregt, *supra* n. 26.
[83] Shah, K., et al., Bateriological Analysis of Explanted Transvaginal Meshes (Abstract 1144).

inflammatory reaction and intensity of the fibrosis.[84]   Fibrosis "causes increased rigidity and tightening of the mesh." (CP MDL 2387 00056995). This cracking of the  mesh surface also provides safe harbors for infectious bacteria to proliferate.  Coloplast had scientific knowledge that polypropylene mesh harbors bacteria which leads to complications.  (CP MDL 2387 00236007) Mesh exposure and erosion cause the fibers to be further exposed to bacteria that will adhere to and colonize on the mesh surface.

Coloplast never performed any appropriate long-term, clinical studies to determine whether the warnings provided to them through the peer-reviewed literature and by their own consultants were accurate, namely that mesh-related infections are real; that they cause patient injury in the form mesh erosions and recurrent life-long, late infections; and that the transvaginal implantation through and into the non-sterile, septic vagina is below the standard of care for any surgical technique, especially one used to treat non-life threatening conditions, such as pelvic organ prolapse.

Therefore, it is my opinion to a reasonable degree of medical certainty that the Coloplast transvaginal POP mesh is susceptible to biofilm formation due to the weave  and design of the mesh allowing the infiltration, harboring, and protection of bacterial contaminants; the degraded mesh surface harboring bacteria; the passage through and into a clean/contaminated field; and after exposure/erosion of the mesh into the vagina or other organs, further contamination of the mesh with a multitude of vaginal flora that further increases the risk of harmful and recurrent infections in women.  Accordingly, the Coloplast transvaginal technique, as well as the Coloplast mesh itself, are not safe for their intended purpose of implantation into a woman's pelvic tissues and can lead to severe  complications in patients, including the possibility of multiple erosions

---

[84] Jongebloed, *supra*, n. 1; Sternschuss, G, et al., *Post-Implantation Alterations of Polypropylene in the Human*, J Urol 2012, 188:27-32; Clave, *supra*, at 6.

that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening prolapse, chronic dyspareunia, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the transvaginal polypropylene Coloplast POP mesh is not suitable for its intended application as a permanent prosthetic implant for pelvic organ prolapse.

3. THE DESIGN OF THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS IS NOT COMPLIANT WITH VAGINAL TISSUE AND IS FLAWED BECAUSE OF THE EXCESSIVE SURFACE AREA AND SHAPE OF THE MESH KIT PRODUCTS THAT CREATE AN UNACCEPTABLE RISK OF EROSION, TISSUE DAMAGE, CHRONIC PAIN, SHRINKAGE/CONTRACTURE, ENCAPSULATION AND CHRONIC DYSPAREUNIA.

Coloplast had scientific knowledge that large surface-area polypropylene vaginal mesh along with the shaping of the mesh, like the Coloplast Transvaginal POP Products, are associated with greater bacterial contamination, more polypropylene degradation, increased inflammatory response, fibrous tissue stimulation, and erosion.[85]  Coloplast showed concern internally about other POP mesh products have less surface area and how it would affect sales but did not conduct testing to detect complications associated with mesh surface area of their products. Coloplast failed to warn doctors that these risks can be potentially severe and chronic in nature leading to vaginal pain, dyspareunia, vaginal scarring, nerve entrapment, and revision surgeries that may or may not provide relief.

Coloplast had scientific knowledge of the safety issues of marketing transvaginal mesh for POP. In a 2007 Urogynecology conference held Canada with Vince Lucente, the meeting

---

[85] *See* CP MDL 00054091, citing Ostergard D., Polypropylene Vaginal Mesh Grafts in Gynecology. Am Coll Obstet Gyn. Vo. 116, No. 4, Oct 2010.

minutes stated:

> Mesh is still a concern for most of these doctors.  Tissue engineering was discussed
> a lot between different docs.  They think it is the future; mesh is just here in the
> interim.

(CP MDL 2387 00234708).

It is my opinion to a reasonable degree of medical certainty that the Coloplast transvaginal POP mesh is highly susceptible to complicatoinsformation due to the shape and surface area of the mesh.  Accordingly, the Coloplast POP mesh products are not safe for their intended purpose of implantation into a woman's pelvic tissues and can lead to severe complications in patients, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening prolapse, chronic dyspareunia, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the transvaginal polypropylene Coloplast POP mesh is not suitable for its intended application as a permanent prosthetic implant for pelvic organ prolapse.

4.   THE DESIGN AND USE OF ARMS IN THE COLOPLAST PELVIC ORGAN PROLAPSE MESH KIT PRODUCTS IS INHERENTLY FLAWED AND PLACES PATIENTS AT AN UNACCEPTABLE RISK OF CHRONIC PAIN, EROSION, CHRONIC DYSPAREUNIA AND OTHER COMPLICATIONS.

The arms of are not compliant with the patients' tissues, cause chronic inflammation, migrate, are especially prone to erosions and irritation of surrounding nerves, tissues and muscles, are fixated in a manner and in a location in the anatomy that poses unreasonable risk of pain, nerve irritation, tissue and muscle damage, and are unreasonably dangerous to women who have the mesh implanted in them.  Moreover, Coloplast did not design a method of implantation allowing for an accurate and safe placement of the arms in the patient by physicians.

Coloplast had scientific knowledge that the arms of their POP kits could cause tissue damage due to "arm roping" and or cause damage due to the arms damaging and destroying tissue from the mesh.[86] [87] "Part of the arms is usually left 'dangling' and it can cause irritation." (CP MDL 2387 00014349). As early as 2008, Coloplast was warned in a confidential report prepared exclusively for Coloplast about changing the design of their mesh kits to include absorbable mesh arms. (CP MDL 2387 00014349 at 66)

The arms of the Restorelle DirectFix A & P, Restorelle P, and Exair Anterior and Posterior can cause tissue damage during implantation, carry bacteria through the vagina, rope and/or deform during and after implantation.  This can cause intractable pain, chronic dyspareunia, revision, and potential for multiple revision surgeries. The mesh arms damage tissue, cause pain, and exacerbate inflammation and shrinkage. These vaginal mesh arms are placed using trocars and a suture delivery system to ligaments deep within the pelvis.[88]

One of Coloplast's Key Opinion Leaders on its POP products, Dr. Red Alinsod, informed Coloplast that, despite claiming to have "soft and pliable mesh," Coloplast's products continue to cause dyspareunia due to scar and banding that results from anchoring of these meshes to the sacrospinous ligament, levator muscles, and arcus tendineus.[89]  The surgical technique and inherent mesh properties contribute to pelvic pain caused by Restorelle and NovaSilk.[90] When the mesh arms contract, pull, stress, rope and curl they cause pain and dyspareunia. [91] The center portion of the implant is intended to remain flat between the bladder and the vagina and/or

---

[86] *See* CP MDL 2387 00168175.
[87] CP MDL 2387 00227675 – Use Risk Assessment for Transvaginal Mesh Pelvic Organ Prolapse Mesh.
[88] CP MDL 2387 00227675 – Use Risk Assessment for Transvaginal Mesh Pelvic Organ Prolapse Mesh
[89] CP MDL 2387 00014395 at 00014396.
[90] *Id.*
[91] CP MDL 2387 00227675 – Use Risk Assessment for Transvaginal Mesh Pelvic Organ Prolapse Mesh

between the rectum and the vagina.[92] The arms pulling on and deforming the central mesh from their anchoring points in the pelvic sidewall muscles also causes pain during daily activities which necessarily exert forces on the pelvic muscles and tissues.

Moreover, Coloplast did not conduct any clinical studies to examine whether the fixation elements cause tissue damage and other long-term complications. Nor did Coloplast study how this fixation mechanism would affect patients with specific medical conditions. This despite Coloplast having scientific knowledge from its prior experience and medical literature, that mesh could migrate, deform, contract and cause chronic inflammation.

Moreover, whenever excessive scar plating occurs on the, roped, curled, folded and otherwise, deformed mesh arms, the arms shrink and pull unevenly on the central portion of the mesh.  This occurs because the placement of the mesh and the arms, as well as the amount of scar tissue that develops, is never completely symmetric from one arm, across the central mesh portion, to the other arm.  This asymmetry is due to the different amounts of curling, roping and other deformations that occur on each arm during surgery and post-operative scarring tissue in growth.   These scar formations also pull inwardly and unevenly on the anchoring points in the pelvic sidewall muscles (obturator and levatorani), forcing these anchoring points and the muscles to which the arms are attached out of their normal positions and asymmetrically toward the midline, while simultaneously pulling the central portion of the mesh asymmetrically away from the midline.

It is my opinion the arms of the Coloplast transvaginal POP mesh devices were poorly designed for the reasons listed above. The arms, the implantation of the arms, and placement of the arms cause life-altering complications women including , among others, erosion(s), chronic

---

[92] *See*  CP MDL 2387 00002324 at 00002325.

pain, nerve entrapment, pain syndromes, sexual dysfunction, chronic dyspareunia, mesh

contraction, organ dysfunction, voiding dysfunction, muscle and nerve damage, vaginal scarring,

the need for multiple surgeries, inability to remove the mesh and irreversible life-long

complications.


5.  **THE BLIND PASSAGE OF THE NEEDLES/TROCARS WITH THE COLOPLAST PELVIC ORGAN PROLAPSE MESH KIT DEVICES IS UNSAFE.**

Another unreasonably dangerous design flaw is the requirement that the surgeon cut

channels with the needles through a blind passage where the surgeon cannot see where the

needle is penetrating and what it has cut.   It creates an inherently, unreasonably dangerous risk

of causing perforated and/or lacerated organs and excessive damage to nerves, vascular

structures and other tissues.  Safer designs that do not depend on the surgeon using the blind

passage of the trocars would eliminate, if not reduce, this unnecessary risk.

6.  **THE WARNINGS AND DISCLOSURES OF ADVERSE EVENTS IN THE INSTRUCTIONS FOR USE ("IFU") HAVE BEEN INADEQUATE BASED ON THE ADVERSE REACTIONS AND RISKS ASSOCIATED WITH THE MESH PRODUCTS THAT HAVE BEEN KNOWN FROM THE TIME THE MESH PRODUCTS WERE FIRST DESGINED AND MARKETED, AND COLOPLAST DID NOT DISCLOSE INFORMATION TO PHYSICIANS IN ITS IFUS REGARDING CHARACTERISTICS OF THE MESH THAT MADE THEM UNREASONABLY DANGEROUS AND POTENTIAL HARMS, INCLUDING THE SEVERITY, DURATION AND CHRONICITY OF THE HARMS.**

The purpose of the IFU is for a medical device manufacturer to provide physicians with

the information necessary for them to make decisions regarding the used a medical device for a

particular patient. The purpose is not a business purpose or related to what risks a company can

live with when drafting the IFU. (CP MDL 2387 00250654) In addition, the IFU should disclose

adverse reactions and risks known to the medical device manufacturer to the physician so that

the risks can be relayed to the patient and an informed decision regarding the use of the product

can be reached. Throughout my education, training, surgical and clinical practice, I have reviewed numerous IFUs for a variety of products, including mesh products in order to understand the proper way to use the device and to gain knowledge about the complications and adverse events associated with a device. I have extensive clinical experience with IFUs and instructing patients about the adverse events/risks contained in the IFU.   I have gained expertise in IFUs through my extensive clinical experience reviewing IFUs, and consenting patients regarding IFUs. I have also drafted IFUs for devices and manufacturers.

1. **The IFUs Did Not Include All Known Risks, Was Inaccurate and Downplayed Risks.**

In my opinion, to a reasonable degree of medical certainty, these warnings are inadequate for the following reasons: Coloplast IFUs do not include sufficient information to advise physicians on the permanence, frequency and severity of the complications that can arise from the use of the devices. Specifically, the IFU does not advise physicians that the potential complications can be permanent; that future procedures and surgeries may not resolve the complications; that the complete removal of the devices may not be surgically possible. In addition, the IFU does not inform the physician that the devices can chemically and biologically degrade, shrink, contract, rope, curl, fold, flake, crack, embrittle, stiffen / harden, or otherwise alter. All of these facts are relevant to a physician's determination of the appropriate use of these devices and none of them are commonly or well known in the medical community. Internally, Coloplast was saying, "These are permanent meshes and shouldn't realistically fail." (CP MDL 2387 00870647). The IFUs do not warn of stress shielding, slippage, tissue death from the mesh characteristics, inability to have intercourse, inability to fully and safely remove the entirety of the mesh, formation of a rigid scar plate and fibrotic bridging, permanent leg, groin, thigh, vaginal and pelvic pain, never ending foreign body response, permanent dyspareunia and

inability to enjoy intercourse, reduced efficacy of any repeat future SUI surgeries and treatments, and the lack of appropriate long-term clinical safety studies and complex erosions that may recur for the rest of the patient's life.

**The IFU did not include all known risks.**

Coloplast initial IFU read as follows. The Warnings and Precautions sections read:[93]

It is the responsibility of the surgeon to advise the prospective patients or their representatives, prior to surgery, of the possible warnings associated with the use of this product.

- Do not use product that has damaged or opened packaging, as sterility may be compromised.
- This device is sold sterile for single use only, and should never be resterilized. In the event the product becomes contaminated prior to use, the device should be returned to Coloplast for replacement.
- Each device should be carefully examined prior to surgery and continuously monitored throughout the surgical procedure to ensure the structural integrity of the device is not compromised in any way. A device which has been damaged or on which repairs have been attempted should not be implanted.
- Do not use Novasilk in patients with an infection in the affected surgical area.
- Do not use Novasilk on patients who are on anticoagulation therapy.
- The risks and benefits of using Novasilk on patients with compromised immune systems or any other conditions that affect healing should be carefully considered.
- This product should only be used by surgeons who are qualified to perform this type of surgery and who are familiar with the use of non-absorbable mesh and the surgical techniques for pelvic organ prolapse.
- Good surgical practice must be complied with during Novasilk insertion.
- The patient should be informed that any future pregnancy will negate the benefits of this surgical procedure.
- Standard post-operative protocols should be followed.
- Patients should be advised to avoid physical strain, sexual intercourse and heavy lifting for one month, but can resume other normal activities after two weeks.
- Patients should immediately report any onset of bleeding or dysuria.
- Proper surgical practice should be followed for management of contaminated or infected wounds.
- If infection occurs, a portion of the entire mesh may have to be removed or revised.

The Adverse Events Section reads:

No undesirable effects that could be directly attributed to polypropylene fibers have been

---

[93] CP MDL 2387-R 00577159 Novasilk 2007; CP MDL 2387-R 00828330 Novasilk 2007

reported in the literature. As with all foreign bodies, Novasilk is likely to trigger any existing infection. Transitory local irritation at the wound site and a foreign body response may occur. The resulting response could lead to wound dehiscence, extrusion, erosion, inflammation or fistula formation.

Coloplast initial IFU read as follows. The Warnings and Precautions sections read:[94]

Users should be familiar with surgical procedures utilizing non-absorbable meshes before employing Restorelle. Restorelle appropriately qualified and properly trained medical practitioners.

If this mesh is used in infants or children who have not completed their growth, the surgeon should be aware that this product may not stretch as the patient grows.

The patient is usually advised to refrain from heavy work or exercise for a number of weeks. If she has any unusual symptoms or bleeding, a medical practitioner should be consulted. Following prolapse repair surgery, the patient should be counseled that future pregnancies may negate the effects of surgical procedure and the patient may again have symptoms of prolapse. Accepted surgical practice should be followed for the management of infected or contaminated wounds. Mesh should be used with caution in such cases. Restorelle should only be used in contaminated wounds with the understanding that subsequent infection may require removal of the material. The use of non-absorbable Restorelle in a wound that is contaminated or infected can lead to fistula formation and / or extrusion of the mesh. There should be an appropriate margin of mesh extending beyond a suture line.

The Adverse Events Section reads:

A transient local wound irritation, foreign body inflammatory response, hematoma, adhesions, pain, infection, wound dehiscence, erosion, extrusion, exposure, nerve damage, contracture and procedure failure may occur. Like all foreign bodies Restorelle may potentiate an existing infection.

Coloplast initial IFU read as follows. The Warnings and Precautions sections read[95]:

It is the responsibility of the surgeon to advise the prospective patients or their representatives, prior to surgery, of the possible warnings associated with the use of this product.

- Do not use product that has damaged or opened packaging, as sterility may have been compromised.

---

[94] CP MDL 2387-R 00467646 Restorelle 2011
[95] CP MDL 2387-R 00288495 Exair 2010.

- This device is sold sterile for single use only, and should never be resterilized. In the event the product becomes contaminated prior to use, the device should be returned to Coloplast for replacement.
- Each device should be carefully examined prior to surgery and continuously monitored throughout the surgical procedure to ensure the structural integrity of the device is not compromised in any way. A device which has been damaged or on which repairs have been attempted should not be implanted.
- This product should not be used in patients with an infection in the affected surgical area.
- Due to the bleeding risks associated with any surgical implant, appropriate precautions should be taken when implanting this device in patients that are actively anticoagulated at the time of surgery or during the immediate post-operative period.
- The risks and benefits of using the Exair Prolapse Repair System on patients with compromised immune systems or any other conditions that affect healing should be carefully considered.
- This product should only be used by surgeons who are qualified to perform this type of surgery.
- Comply with good surgical practice while using the Exair Prolapse Repair System.
- The patient should be informed that any future pregnancy may negate the benefits of this surgical procedure.
- Standard post-operative protocols should be followed.
- Patients should be advised to avoid physical strain, sexual intercourse and heavy lifting for a minimum of one month after surgery; patients may resume other normal activities after two weeks or at the surgeon's discretion.
- Patients should immediately report any onset of bleeding or dysuria.
- Proper surgical practice should be followed for post-operative management of contaminated or infected wounds.
- If infection occurs, partial or full mesh removal or revision may be necessary, per physician discretion.
- As anatomy of individual patients may vary greatly, for each procedure it is important that the intended planes for device advancement and the intended place for mesh placement are planned and known for each individual patient. Employment of imaging methods before and after mesh placement may aid in proper mesh placement and confirm absence of injury to non-target anatomical structures.
- A digital rectal exam should be performed to detect possible rectal perforation.
- Cystoscopy may be performed to confirm bladder and ureteral integrity.
- Avoid placing excessive tension on the mesh implant during placement.

The Adverse Events Section reads:

- Potential adverse reactions are those associated with surgery using implantable mesh materials of this type, including hematoma, urinary in continence, urinary retention/obstruction, ureteral obstruction, voiding dysfunction, pain, infection

potentiation, wound dehiscence, nerve damage, recurrent prolapse, inflammation, adhesion formation, fistula formation, contracture, scarring, and mesh exposure, erosion, or extrusion.

- Punctures or laceration of vessels, nerves, bladder, urethra or bowel may occur during mesh placement and may require surgical repair.
- Potential adverse reactions are those associated with pelvic organ prolapse repair procedures, including pelvic pain, pain with intercourse, and narrowing of the vaginal wall. These may resolve with time.
- Dissection for pelvic floor repair procedures may impair normal voiding for a variable length of time.

The IFUs downplays the risks, along with omitting other risks, by stating there is may be a transitory foreign body response that could lead to complications indicating the risks are only temporary or transitory.  It downplays risk by categorizing them as risks of pelvic surgical procedures when internally Coloplast stated otherwise.   (CP MDL 2387 02332890 Coloplast states Allograft advantage is "decreased risk of graft erosion and infection compared to synthetic material"). But most misleading to doctors and patients' in the informed consent process is the statement, "No undesirable effects that could be directly attributed to the polypropylene fibers have been reported in the literature" which is listed first and all other language falls underneath.

Coloplast updated their IFUs with additional safety language in 2009, 2012, 2013, 2014, 2015.[96]

While this was an improvement over the old IFUs and includes safety information that Coloplast should have included in their initial IFUs and includes risks omitted from prior IFUs, it still does not include all known risks and give an accurate portrayal of the risk prolife of the devices. The IFUs do not include sufficient information to advise physicians on the permanence,

---

[96] CP MDL 2387-R 00651943; CP MDL2387-R 00158461; CP MDL 2387-R 00961705; CP MDL 2387-R 01103150; CP MDL-R 2387 02020726; CP MDL 2387-R 00860514; CP MDL 2387-R 00283376; CP MDL 2387-R 00295227; CP MDL 2387-R 01579036; CP MDL 2387-R 00576819; CP MDL 2387-R 00288604.

frequency and severity of the complications that can arise from the use of the devices. Specifically, the IFU does not advise physicians that the potential complications can be permanent; *new or de novo* infections, biofilms, that future procedures and surgeries may not resolve the complications; that the complete removal of the devices may not be surgically possible. In addition, the IFU does not inform the physician that the devices can chemically and biologically degrade, rope, curl, fold, flake, crack, embrittle, stiffen / harden, or otherwise alter in vivo and cause complications because of the design of the device, among others as listed throughout my report. All of these facts are relevant to a physician's determination of the appropriate use of these devices and none of them are commonly or well known in the medical community.

The IFUs do not inform the physician that the use of these meshes in a woman's tissues can lead to a greater foreign body reaction; poor tissue integration of the mesh, that the mesh was susceptible to life-long recurring infections, enhanced inflammatory response; excessive scarring, fibrotic bridging, scar plating; the possibility of multiple erosions that can occur throughout one's lifetime; new pain syndromes in the vagina, pelvis, groin, thigh, and leg; permanent dyspareunia and inability to engage in intercourse, permanent sexual dysfunction, among others as discussed throughout my report. Nor do the IFUs inform physicians of the collapsing pores and other unique mesh characteristics of the Coloplast mesh that increased the risk of complications in patients.

7.  THE PRODUCTS WERE MARKETED AS HAVING LOW COMPLICATION RATES, HIGH SUCCESS RATES, OPTIMAL RESULTS, PHYSIOLOGICALLY COMPATIBLE, FIGHTING BACTERIA AND ENCOURAGING COLLAGEN GROWTH AND OTHER CLAIMS THAT WERE MISLEADING AND COLOPLAST DID NOT CONDUCT ADEQUATE SAFETY TESTING TO DETECT LONG-TERM COMPLICATIONS.

In addition to excluding certain known risks, Coloplast significantly downplayed the risks that it actually listed in its IFU and made misleading statements about the safety and performance of their devices. Coloplast marketing included statements of "low complications and high success" and other specific statements of their mesh being "physiologically compatible", being "non-palpable" "high safety profile" and fighting bacteria, "inserted through a small incision", "held in place by narrow portions of the mesh", "is not considered to be a major procedure", "low incidence of de novo dyspareunia" and "maintain[s] vaginal elasticity of natural tissue" among others.[97]

Coloplast's "Code of Conduct " detailed the standards Coloplast set internally for itself in operating a medical device company that marketed devices that were intended to permanently implanted in a woman's body. (CP MDL 2387 02355172). The document instructs Coloplast employees that the information contained in the document is "All you need to know."  It states, "In Coloplast, we believe in honest business... the stakes for not behaving ethically are high.  If we try to cut corners, we risk jeopardizing not only the credibility of our company, but the credibility of all our employees and everybody doing business with us." The CEO's personal message, "Better no business than bad business." (CP MDL 2387 02355172).

When Coloplast did attempt to gather clinical data for their products, they concealed the true nature of complications and were concerned with "another ObTape scandal" so they did not publish or skewed the data.    Doctors and patients were not given an honest depiction of the safety and clinical data. Instead, Coloplast concealed the truth and exchanged patient safety with marketing concerns.

---

[97] *See e.g. CP MDL 2387 00959327, CP MDL 2387 01160246, CP MDL 2387 02214836, CP MDL 2387-R 00158369,* CP MDL 2387 00641100, CP MDL 2387 00877098, *CP MDL 2387-R 00795745, CP MDL 2387-R 00989897, www.coloplast.us*

In a 2007 email, the Scientific Manager, Clinical Development, Global R&D at Coloplast wrote, "Any news on the complications? I am afraid I do not have any news on the abstract side. Right now this is not my decision to make. Honestly, I am completely torn about what we should do. **But the reality is, that with erosion rates as they appear to be now in this study, we will not be submitting abstracts for the November deadlines. We just can't afford another Obtape scandal, so we have to come up with a serious and acceptable explanation for the results.** If that means personal interviews with each of the investigators who did the procedures, then that's the way it will have to be. The "between a rock and a hard place" doesn't begin to express how I feel right now." (CP MDL 2387 02349573) (emphasis added).

The memo goes on to state how Coloplast can minimize the flags and find ways to report lower complication rates to the public that what was reported to Coloplast. (CP MDL 2387 02349572).

In a 2008 Women's Health Advisory Board Meeting in Barcelona following an earlier meeting in Rome and group dinner the night before, the introduction by Coloplast stated the purpose of advisory boards were for marketing strategy and to "prioritise our products." (CP MDL 2387 00992456). "We see great potential in the US Short term we want to create awareness around our urethral sling. Another product we want to create awareness about is Novasilk. We are looking to build a shaped mesh kit next year."

**Threats**: Competitive technologies will surpass our technology platform. Stronger clinical proof needed for market entry.
**Weakness**: Negative perception of Mentor/porges from previous slings. Low market awareness of Aris. Lack of strong clinical proof. Lack of product innovation.

In a May 2008 memo to Elsebeth Aagaard and the US Clinical Department and others, which included the "current industry cost standard for conducting a high quality clinical study."

(CP MDL 2387 00478075).  Coloplast listed the benefits associated with high quality clinical studies, which included "Design validation in humans to guarantee product safety and quality." Coloplast also listed the risks of improperly conducting a study or meeting only the minimum regulatory requirements:

**Risks associated with improperly conducting a study or meeting only the minimum regulatory requirements (see further details on Mentor experience below:**

- Tarnish Coloplast's reputation with customers. (i.e. Aris 1 & 2 Experience)
- Legal implications (i.e. ObTape Experience).
- Physician resistance to adopting products or new indications of products. (i.e. Novasilk Experience)
- Unable to gain market share.
- Unable to support marketing claims.
- Adequate reimbursement unattainable.
- Lack of reputable publications. (i.e. Aris and Novasilk)
- Compromising scientific validity and integrity of data; unusable data due to poor study design and mismanagement. (i.e. Aris 1 & 2, [Redacted: ] Redacted: Male Non-Mesh)
- Unable to adapt to ever-changing global regulatory environment. (e.g. FDA states that data used for any submissions is expected to be conducting under GCP standards).

Coloplast discussed the advantages and disadvantages of using a third-party to conduct a study, which included the costs being 2-3 times higher than if Coloplast conducted the study itself. Coloplast then gave its assessment of the current status of clinical data on their products:

**Experience from Mentor Clinical Studies**

Aris 1 & 2

- Two studies designed for marketing purposes after Aris launch in absence of any data available to support the safety and efficacy of the product. Studies had similar design and inclusion criteria.
- Minimal funding and resources resulted in lack of sponsor oversight (no monitoring done, no data management system, no investigator meetings, newsletters, publication plan/abstracts etc.)
- Poorly written protocol – lack of continuity/ability to pool data between sites
- Lack of training and support (resulting in one physician who had several adverse events due to procedural issues – physician no longer uses Aris, speaks negatively about the product in scientific meetings, and negative results impact the overall study results)
- Very slow enrollment rate – resulted in combining two studies in hopes to have enough data to publish results.
- Overall study had a very negative impact on the Mentor (and now Coloplast) reputation and the perception of the Aris product.

ObTape – Clinical data was not required for regulatory approval, so no studies were conducted by Mentor. Complications/side effects of this product in patients has resulted in litigation and significant damage to the Mentor reputation (and the Aris product that followed ObTape). Coloplast did not acquire this product in the acquisition, however some of the backlash in the market has followed ObTape to Aris and therefore to Coloplast.

Novasilk – Mentor opted not to conduct any clinical trials to support the safety and efficacy of this product. As a result adoption of the product has been low and surgical technique used has been varied with no evidence supporting the efficacy of any specific technique. In addition, since the Novasilk material will be used in next generation products (POP kit) there is a desperate need in the market for data on the safety and efficacy of the mesh prior to launch of the next generation. This has resulted in significant resource and investment in retrospective study grants to physicians who have used the product in order to have this data (though lower class of evidence) in time for the next generation launch.

(CP MDL 2387 00478075).

Coloplast had scientific knowledge, or should have, of the importance of safety data and the fact doctors relied on Coloplast to accurately report safety to data.

"Many physicians, individually and as part of organizations, have complained that while industry continues to bring new products to market, there is usually a dearth of meaningful scientific information (typically considered to be prospective randomized clinical trials) to support the use of the product...." (CP MDL 2387 00649778) "No product should be launched without market feedback and clinical understanding..." CP MDL 2387 00999636

53

Coloplast also did not adequately track and monitor the safety of these devices once the products were marketed and implanted in patients. In 2013. Christine Buckvold stated , "I continue to be the sole employee of the complaint dept- handling all surgical, legal, clinical, healthcare & Mankato complaints independently - back-up is provided occasionally, but is not a reliable support system." (CP MDL 00191672).  Her manager agreed and stated she had "little backup and support" for managing the complaint process. Enhancing her knowledge and expertise of the female pelvic health products Coloplast sold was something she was attempting to make progress on but her manager's review comments included that this was still an unmet objective and she needed to have a better understanding of especially female pelvic health products.. Both Christine and her manager acknowledged an increase and "high volume of complaints." Her manager commented that developing instructions for the product evaluation and investigation of mesh complaints had not been completed. (CP MDL 00191672).  Of note, according to Ashwini Keswani, Director Global Marketing, there are no medical doctors employed by Coloplast in the US surgical Urology unit from 2006 through 2014. There can, therefore, be no medical directors to add insight into the medical or surgical aspects of their devices.   Jennifer Englund, who was not a medical doctor was the head of the Clinical Department. If Coloplast needed medical information regarding a mesh product, such as Aris, they needed to ask an Advisory Board member.

Despite scientific knowledge about problems with their POP transvaginal mesh products Coloplast never developed or communicated a contingency plan for managing them after the devices were implanted. Coloplast stated its Goals in 2012 as it related to its POP mesh products were to, "increase sales," "grow market share" and "address concerns and negative perceptions based on FDA activity." (CP MDL 2387 00050814).

Coloplast had scientific knowledge of problems with erosion, infection, scarification, and other life altering problems that their products and the method of implantation for these products could create. Yet, Coloplast prepared no documents, or reports advising doctors on how to treat these complications should they occur.  Despite knowledge that removal of the mesh may be necessary under certain circumstances, Coloplast never developed a way to fully and safely remove the mesh after it was implanted. The scars, especially those around the arms, surround the mesh so completely that it is virtually impossible to excise it at all and may result in additional complications to the patient.  Despite knowledge of these many complications caused by the mesh, Coloplast never even considered how to remove the mesh after implantation, whether in whole or in part.  Unfortunately even when removal of all or some of the mesh, is practical, this can cause further complications and new complications including increasing the presence of scar tissue which can itself increase chronic and permanent pain, among other complications.

Rogo-Gupta and Raz have described the difficulty of removing armed mesh. "To successfully remove armed mesh segments in their entirety, the obturator membrane must be perforated and dissection carried out laterally. Additional incisions in the thighs may be required to adequately free the arms from the surrounding soft tissues. We suggest preoperatively marking the lateral puncture sites to facilitate intraoperative dissection. If the lateral incisions cannot be identified by patient symptoms or scarring, gentle traction on the medial portion of the mesh arms may be used as a guide. The mesh should be followed from skin incision to the intersection of the adductor muscles and dissected free in a circumferential fashion. Muscle fibers often must be dissected when mesh has become incorporated into the surrounding fibers. Large defects in the vaginal wall may occur with mesh removal and surgeons ought to be prepared to utilize

rotational vaginal flaps, labial flaps, or skin flaps for reconstruction. Following complete healing and resolution of other symptoms such as pain, infection, bleeding, urinary or defecatory dysfunction, evaluation for additional surgery for persistent incontinence or prolapse can begin if clinically indicated."[98]

In 2009, Blandon also described the difficulty of removal surgery: "The vaginal surgeon is faced with the challenges of very complex surgical dissections. If mesh excision is warranted, tissue fibrosis, scarring, bleeding, and urinary tract and anorectal injury are easily encountered, which add to patient morbidity … Moreover, whereas minor complications such as small vaginal mesh erosions are simple and easy to manage, incapacitating pelvic pain, dyspareunia, and large-scale erosions can be exceedingly complex and not easily resolved."[99]

Simply put, a permanent device that cannot be safely and fully removed when complications occur is an unsafe product.

Coloplast used its paid consultants to help lead the "pushback" after public health notifications and concerns were raised regarding the safety of mesh and to further the misleading information Coloplast included in its marketing materials. (CP MDL 2387 00002692) Coloplast paid consultants millions of dollars to further the misleading claims regarding the safety of transvaginal mesh and used these consultants, as well as their membership in mesh advocacy groups like the "Mesh Special Interest Group" and AUGS/SIG to create a public relations campaign to mislead the public. (CP MDL 2387 01540717;

---

[98] Rogo-Gupta, L., Raz, S. (2013). Pain Complications of Mesh Surgery. In H.B. Goldman (Ed.), Complications of Female Incontinence and Pelvic Reconstructive Surgery (pp. 87-105): Humana Press.
[99] Blandon, R.E., Gebhart, J.B., Trabuco, E.C., & Klingele, C.J. (2009). Complications from vaginally placed mesh in pelvic reconstructive surgery. Int. Urogynecol J Pelvic Floor Dysfunct, 20(5), 523-531. doi: 10/1007/s00192-009-0818-9.

https://openpaymentsdata.cms.gov/company/100000011212/general-payments)[100]

In one exchange between long-time Coloplast paid consultant Drew Cassidenti and Mr. Keswani, mesh consultants communicated and then shared with Coloplast , "we should have task force titles in place with leaders assigned before the meeting. Possible task forces could include: 1. public relations (write the article reassuring the public on mesh)" and "counter all the negative publications on mesh." Coloplast consultant Vince Lucente had been paid over a million dollars as of 2014 by other mesh companies and between 2013-2017 Coloplast paid him at least 876,000. In 2016, Coloplast paid at least 275,000 to Vince Lucente for consulting services related to the Altis and Restorelle products. Coloplast consultant Mickey Karram had been paid over a million dollars by one mesh company and was paid more by Coloplast and other mesh companies. Other mesh consultants Coloplast paid, like Ty Erikson, have been paid hundreds of thousands of dollars as well. Coloplast stated its Goals in 2012 as it related to its POP mesh products were to, "increase sales," "grow market share" and "address concerns and negative perceptions based on FDA activity." (CP MDL 2387 00050814).

In an October 2012 Advisory Board Meeting, where some of the highest paid mesh industry physician consultants were paid to attend, notes included:[101]

- "Need to get out our voice out to stop the legal blitz"

- "What can industry do? – smear campaign"

- "Primary care doc dinners"

- "Social media has to play a role in this environment"

- "Industry should gather together to stand up for the environment we are in – maybe

[100] Coloplast's Code of Conduct and CEO state, "To us, bribes, excessive wining and dining and lavish resorts aren't OK." (CP MDL 2387 02355172). "The mere appearance of a conflict can have negative consequences...."
[101] (CP MDL 2387 02347098)

advamed is the platform"

- "referral dinners to implanters"

- "partner with physicians and have them speak out on results"

Despite these efforts, money spent and tactics by Coloplast, medical societies have concluded the risks outweigh the benefits with transvaginal POP mesh like Coloplast devices.(See e.g. ACOG and AUGS Practice Bulletin 176, Female Pelvic Medicine & Reconstructive Surgery • Volume 23, Number 4, July/August 2017.)"The use of synthetic mesh or biologic grafts in transvaginal repair of posterior vaginal wall prolapse does not improve outcomes." It continues, "The use of synthetic mesh or biologic grafts in POP surgery is associated with unique complications not seen in POP repair with native tissue." At the ACOG Annual Meeting in 2012 a "Panel Presentation" 'Where Have We Meshed Up?" was conducted. It stated, "The FDA announcements in July and September 2011 regarding the use of trans-vaginal mesh in the surgical treatment of pelvic organ prolapse and urinary incontinence created a firestorm for gynecologic surgeons, urologic surgeons, affected patients, lawyers and the public. This series of events have highlighted gaps in our scientific understanding, challenges to assessment of surgical outcomes, and the flaws in the regulatory processes." It continued, "An overview of the FDA clearance for marketing of surgical devices will show that most devices reach the market with grossly inadequate clinical data to support their use."

Notably, at the same Advisory Board meeting in 2012 with the industry mesh physician consultants discussed above, Coloplast was warned, "Watch you back in regards to next gen technology. Mesh may be displaced." (CP MDL 2387 02347098)

Finally, a continuing theme seen in Coloplast documents is Coloplast explaining, deflecting and excusing safety concerns with its mesh devices, specifically alarming safety data,

by blaming surgeons and never their devices. This stands in contrast to the manner in which Coloplast marketed their devices  and  the marketing materials Coloplast distributed to doctors that state how easy and simple their devices were to implant safely in patients due to the design of the devices.  Coloplast repeatedly told the public, and specifically surgeons they were marketing their devices to, that the surgical approaches Coloplast instructed surgeons to follow to implant their mesh devices were "simplified," "easy and fast" and "easy to implant." [102] Internally, the company was attributing failures of complications caused by their products to surgeons.[103]

8. THERE WERE SAFER ALTERNATIVE DESIGNS TO THE COLOPLAST TRANSVAGINAL MESH PELVIC ORGAN PROLAPSE PRODUCTS THAT WOULD HAVE ELIMINATED OR GREATLY REDUCED THE PERMANENT AND IRREVERSIBLE HARMS RESULTING FROM THE UNSAFE CHARACTERISTICS OF THE COLOPLAST TRANSVAGINAL PELVIC ORGAN PROLAPSE MESH PRODUCTS.

The lack of reliance and validated clinical data to support the use of a device is a major concern.  This is especially true given that traditional surgeries like anterior and posterior colporrhaphy,  enterocele repair, and sacrospinous ligament suspension are not associated with the frequency or extent of these life changing complications.

The efficacy of the Coloplast transvaginal POP mesh devices are not  equivalent to the traditional surgeries are not associated with the severe, chronic and debilitating  mesh based

---

[102] CP MDL 2387 01428034 ("TOT offers surgeons a more simplified and effective means of performing incontinence sling procedures"), CP MDL 2387 01428336, CP MDL 2387 01428341, CP MDL 2387 00875408 (Restorelle "Mesh is easy to handle during surgery"), CP MDL 2387 02344871 - Supris - "Easy access. Easy placement. An ideal sling."), CP MDL 2387 02346022 - Restorelle Direct Fix - "Easy and fast procedure performed with high safety profile.", CP MDL 2387 02335411 Aris "easy passage" Novasilk "designed for ease of placement", CP MDL 2387 02343619 Altis "simplifies the technique".

[103] Internally, the company was being warned in 2007 by its mesh consultants that the TOT procedure is a "blind passage, safety concerns, not a procedure of the new Docs" and was being chided for way Coloplast marketed their devices to the "holy grail" of all pelvic surgeons and told "Due to complication possibilities, slings should move back to urogynecologists" (CP MDL 2387 00992503)

complications as discussed above.  Traditional surgeries are not associated with Coloplast mesh based complications and the excessive risks they carry.  And, further, although traditional surgeries can cause symptoms such as pain following surgery, including dyspareunia, the risk, duration, extent and severity of chronic pain including dyspareunia following the Coloplast mesh products is much greater than with traditional surgeries, and of course those surgeries do not result in the often untreatable complications and symptoms that result from the Coloplast mesh

Safer alternative designs, rather than the Coloplast polypropylene mesh transvaginal POP products, existed.  I have experience with many of these safer alternative designs, and based on my experience and review of medical literature and other materials, it is my opinion that these alternative designs were safer and feasible.  For example, colporrhaphy and/or sacrospinous ligament suspension would have been safer and effective treatments.  These procedures eliminate the risks specifically associated with the mesh devices described above. Other safer alternative designs include:

(1)    the use of sutures, including delayed absorbable sutures like PDS, in a colporrhaphy and/or sacrospinous ligament suspension

(2)    an allograft such as Repliform[104]

(3)    a mesh with less polypropylene, different shape (i.e. without the flawed mesh arms of Coloplast TVM POP  devices) and surface area and larger pores not subject to collapses and deformation; and

(4)    a mesh with a different shape and surface area implanted transabdominally that is not subject to the risk profile of transvaginal POP

## CONCLUSION

---

[104] CP MDL 2387 02332890 Coloplast states Allograft advantage is "decreased risk of graft erosion and infection compared to synthetic material"

Coloplast has marketed and sold their transvaginal mesh POP devices despite the fact that they contain numerous characteristics that make them unsuitable for implantation in a woman's vagina. These characteristics have been detailed throughout my report.

Not only does Coloplast sell products which should never be transvaginally implanted, it failed to inform physicians and their patients about numerous risks associated with the products despite the fact that these risks were known before the product was launched and/or should have been known to any reasonably medical device manufacturer. Coloplast has removed the ability of physicians to appropriately inform their patients of the risks and benefits of these devices and made it impossible for women to consent to the procedure. Coloplast has concealed important safety information based on a review of their internal materials. Finally, while keeping this information from women, Coloplast marketed its product with promotional pieces that did not disclose key conflict of interest information or the true complication rates of its products – simply put, Coloplast misled patients and physicians by concealing important safety information, exaggerating the benefits and performance of their devices and downplaying the risks and harms associated with their products.

As a result of these failures as fully set forth in this report, these devices have caused and will continue to cause a multitude of injuries in women, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, nerve injury, recurrence, worsening prolapse, chronic dyspareunia, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others.

It is my opinion, based on my training, experience and extensive review of the literature

and Coloplast's internal documents that the benefits of these devices are outweighed by the severe, debilitating and life changing complications associated with the medical devices.  It is clear that a substantial number of women who are implanted with these devices have already and will continue to suffer chronic, debilitating erosions or pain, among other complications, and these life changing complications outweigh the benefits of these devices, devices used to treat a quality of life issue.

Signed this 10th day of March 2019.

X _____

Bruce Rosenzweig M.D.