# EXHIBIT C

Page 3

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: BOSTON SCIENTIFIC CORP ( Master File
PELVIC REPAIR SYSTEM PRODUCTS ( No. 2:12-MD-02326
LIABILITY LITIGATION       ( PRODUCTS LIABILITY
                           (   LITIGATION
                           (
THIS DOCUMENT RELATES TO   ( MDL 2326
                           (
                           (
                           (
RAEANN BAYLESS v.          ( JOSEPH GOODWIN
BOSTON SCIENTIFIC CORP.    ( U.S. DISTRICT JUDGE
                           (
CASE NO. 2:16-cv-01311     (
                           (

_____

Orlando, Florida
Wednesday, Sept. 12, 2018
9:01 a.m.

VIDEOTAPED
DEPOSITION OF:
KATHY Y. JONES, M.D.

---

Page 3

          I N D E X
                          Page
TESTIMONY OF KATHY Y. JONES, M.D.:
    Direct Examination - By Mr. Haberman      6
    Cross Examination - By Ms. Shub          51
    Cross Examination - By Mr. Scoggan      123
    Redirect Examination - By Mr. Haberman  143
    Recross Examination - By Ms. Shub       144
CERTIFICATE OF OATH                         149
CERTIFICATE OF REPORTER                     150
SUBSCRIPTION OF DEPONENT                    151
READ & SIGN LETTER                          152

          - - - - -

PLAINTIFF'S EXHIBITS MARKED FOR IDENTIFICATION:
No. 1 (Office records)                  11
No. 2 (Coloplast & Boston Scientific brochures)  11
No. 3 (CV)                              13
No. 4 (10/29/13 Orlando Urogynecology letter)  148
No. 5 (5/7/12 Dr. Bukkapatnam office record)  148
No. 6 (5/31/12 visit)                  148
No. 7 (3/10/12 visit)                  148
No. 8 (8/14/12 visit)                  148
No. 9 (8/16/12 visit)                  148
No. 10 (3/21/13 visit)                 148

Page 2

A P P E A R A N C E S:
    JEFFREY L. HABERMAN, ESQUIRE
    Schlesinger Law Offices, P.A.
    1212 SE Third Avenue
    Ft. Lauderdale, FL 33316
    jhaberman@schlesingerlaw.com
        Appearing via video conference on behalf of
        the Plaintiff Raeann Bayless

    LISA HORVATH SHUB, ESQUIRE
    King & Spalding, LLP
    500 West 2nd Street
    Suite 1800
    Austin, Texas 78701
    lshub@kslaw.com
        Appearing on behalf of the Defendant
        Coloplast Corp.

    HEATHER M. HOWARD, ESQUIRE
    King & Spalding, LLP
    1180 Peachtree Street, N.E.
    Atlanta, Georgia 30309-3521
    hhoward@kslaw.com

        Appearing on behalf of the Defendant
        Coloplast Corp.
    STEVEN A. SCOGGAN, ESQUIRE
    Ellis & Winters LLP
    300 North Greene Street
    Suite 800
    Greensboro, North Carolina 27401
    steven.scoggan@elliswinters.com

        Appearing on behalf of the Defendant
        Boston Scientific Corp.
ALSO PRESENT:
    Dawn Bookbinder, Videographer
    Dynamic Legal Video

Page 4

PLAINTIFF'S EXHIBITS MARKED FOR ID (cont'd):
No. 11 (5/28/13 visit)                  148
No. 12 (Hysterectomy consent)           148
No. 13 (Relaxation/repair of organs consent form) 148
No. 14 (Anterior and/or Posterior Colporrhaphy)  148
No. 15 (Augmentation graft consent form)  148
No. 16 (Surgery/Procedure consent form)  148
No. 17 (8/9/13 Operative Report)        148
No. 18 (Hysterectomy Pathology)         148
No. 19 (Discharge Information)          148
No. 20 (9/24/13 visit)                  148
No. 21 (Urethrovesical Suspension consent form)  148

## Page 5

1      The following is the transcript of the
2 videotaped deposition of KATHY Y. JONES, M.D.,
3 taken on behalf of the Plaintiff, at the offices of
4 Landmark Reporting, Inc., 1516 Hillcrest Street,
5 Suite 300, Orlando, Florida 32803, on WEDNESDAY,
6 SEPTEMBER 12, 2018, beginning at 9:01 a.m., before
7 PATRICIA ELDRIDGE, being a Court Reporter and
8 Notary Public, State of Florida at Large.
9      - - - - -
10      VIDEOGRAPHER:  Good morning.  We are now on
11 the video record.  Today is Wednesday, the 12th day
12 of September, 2018.  The time is 9:01 a.m.
13      We are here at 1516 Hillcrest Street, Suite
14 300, Orlando, Florida, for the purpose of taking
15 the video deposition of Kathy Y. Jones, M.D.; taken
16 by the Plaintiff in case No. 2:16-cv-1311; in the
17 case of Raeann Bayless versus Boston Scientific
18 Corp.; which is filed in the United States District
19 Court for the Southern District of West Virginia,
20 Charleston Division.
21      The court reporter is Patty Eldridge of
22 Landmark Reporting.  The videographer is Dawn
23 Bookbinder of Dynamic Legal Video.
24      Will counsel please state their appearances
25 for the record?

## Page 6

1      MR. HABERMAN:  Jeffrey Haberman from
2 Schlesinger Law Offices on behalf of the Plaintiff.
3      COURT REPORTER:  I'm sorry, I couldn't even --
4 on behalf of --
5      MR. HABERMAN:  The Plaintiff.
6      COURT REPORTER:  Thanks.  Sorry.  It's just
7 hard to hear you.
8      Can you guys hear that?
9      MR. HABERMAN:  Okay.  I'll speak up.
10      MS. SHUB:  Hi.  Lisa Shub.  I'm here with
11 Heather Howard on behalf of Coloplast.
12      MR. SCOGGAN:  And Steven Scoggan on behalf of
13 Boston Scientific.
14      VIDEOGRAPHER:  Please swear the witness.
15      COURT REPORTER:  Raise your right hand.  Do
16 you swear or affirm the testimony you're about to
17 give is the truth, the whole truth, and nothing but
18 the truth, so help you God?
19      THE WITNESS:  Yes.
20      - - - - -
21      KATHY Y. JONES, M.D.,
22 having first been duly sworn, testified as follows:
23      DIRECT EXAMINATION
24 BY MR. HABERMAN:
25      **Q   Good morning, Doctor.**

## Page 7

1    A   Good morning.
2    **Q   Please state your full name for the record.**
3    A   Kathy Y. Jones.
4    **Q   And Doctor, what's your date of birth?**
5    A   10/10/64.
6    **Q   What's your business address?**
7    A   2501 North Orange Avenue, Suite 309, Orlando,
8 Florida 32804.
9    **Q   Are you in private practice, Doctor?**
10    A   Yes.
11    **Q   And what's the name of your practice?**
12    A   Orlando Urogynecology.
13    **Q   How many other physicians are in that group?**
14    A   Just myself.
15    **Q   Okay.  How long have you been in private**
16 **practice?**
17    A   In the Orlando area?  Since --
18    **Q   In general.**
19    A   Pardon?
20    **Q   In general.**
21    A   In general?  Since 1997.
22    **Q   Okay.  I want to take a moment to walk through**
23 **your background, and education, and experience, if you**
24 **don't mind.  Did you attend college?**
25    A   I did.

## Page 8

1    **Q   Where did you attend college?**
2    A   Duke University.
3    **Q   When did you graduate?**
4    A   1986.
5    **Q   What year -- what was your major?**
6    A   Chemistry.
7    **Q   After graduating college, did you attend**
8 **medical school?**
9    A   Yes.
10    **Q   Where did you attend medical school?**
11    A   It was called Bowman Gray School of Medicine
12 at the time.  That's now been renamed to Wake Forest
13 University Medical School.
14    **Q   And when did you graduate medical school?**
15    A   1990.
16    **Q   Did you do a residency afterward?**
17    A   Yes.
18    **Q   Where did you do your residency?**
19    A   I completed an internship in internal medicine
20 at Columbia Presbyterian Hospital in New York.  And I
21 did a residency in obstetrics and gynecology at NYU
22 Medical Center.
23    **Q   Following your residency at NYU, did you go on**
24 **to further education and training?**
25    A   Yes.

Page 9

1   Q   And can you describe that?
2   A   I did a fellowship in urogynecology.
3   Q   When did you -- well, where did you do that
4   fellowship?
5   A   Wayne State University, Detroit Medical
6   Center.
7   Q   When did you finish that?
8   A   1997.
9   Q   Okay.  Can you describe for us what that
10  entailed, the fellowship in urogynecology?
11  A   It was a two year post-graduate training that
12  was focused on the treatment of female patients with
13  urinary incontinence, pelvic organ prolapse, painful
14  bladder syndrome, pelvic pain syndromes.
15  Q   Are you board certified?
16  A   Yes.
17  Q   In what areas?
18  A   Obstetrics and gynecology as a generalist.
19  And, also, with subspecialty board certification in
20  female pelvic medicine and reconstructive pelvic
21  surgery, better known as urogynecology.
22  Q   Do you do any work in obstetrics nowadays?
23  A   No.
24  Q   Okay.  How long -- since -- since 1997, have
25  you been focused solely on female pelvic medicine and

Page 10

1   reconstructive surgery?
2   A   Since 1999.
3   Q   Just briefly, Doctor, if you can, tell us, why
4   did you decide to get into that field, the field of
5   urogynecology?
6   A   At the time of my residency, there weren't
7   many physicians or, I would say, practitioners, that
8   were familiar with that particular aspect of women's
9   healthcare.  So it was of interest to me as a resident.
10  At the time, there weren't very many fellowship
11  trainings that were available across the nation, so it
12  was what I'd call a black box.
13  Q   Did you bring anything with you to the
14  deposition today, Doctor?
15  A   Yes, sir.
16  Q   What did you bring?
17  A   I brought all three notices of depositions.  I
18  also brought the invoice of the deposition; plus, a
19  check noting payment for the deposition.
20  I brought my office records for Raeann
21  Bayless, as well as some associated records that
22  were -- I couldn't pull from the electronic medical
23  records, so they had to be pulled separately.
24  I also brought some brochures from the office
25  from Coloplast.

Page 11

1   Q   Okay.  I'd like to mark as Exhibit 1 your
2   office records.
3   (Plaintiff's Exhibit No. 1 was
4   marked for Identification.)
5   BY MR. HABERMAN:
6   Q   Okay.  Just to be clear, the associated
7   records that you mentioned, Doctor, are they part of
8   your office records?
9   A   Yes.
10  Q   Okay.  So all of that, the office records and
11  the associated records, were marked as Exhibit 1?
12  A   Yes.
13  Q   Okay.  I'd like to mark as Exhibit 2 the
14  Coloplast brochures that you brought with you.
15  A   There are three.
16  (Plaintiff's Exhibit No. 2 was
17  marked for Identification.)
18  COURT REPORTER:  Okay.
19  MR. HABERMAN:  Okay.  Thanks.
20  BY MR. HABERMAN:
21  Q   Just going back to your practice, Doctor, can
22  you give us an estimate about how many patients you
23  treat a day?
24  A   On a busy day, 20.
25  Q   How many times a week do you perform surgery?

Page 12

1   A   One and a half.
2   Q   One and a half days a week, or one and a half
3   times a week?
4   A   One and a half days a week.
5   Q   I guess that wouldn't make sense if it was
6   half a time.
7   Okay.  So, Doctor, have you published in the
8   area of urology, urogynecology, and female pelvic
9   medicine and reconstructive surgery?
10  A   I have a publication that's associated with
11  colorectal surgery, as related to combined surgeries
12  with sacral colpopexy and rectopexy.  So for
13  combined -- I would say vaginal vault prolapse and
14  constipation.
15  Q   Have you given presentations on the topics of
16  female pelvic medicine and reconstruction surgery?
17  A   Yes.
18  Q   Did those presentations include discussions on
19  vaginal mesh?
20  A   Yes.
21  Q   How many times have you given presentations?
22  A   I'd have to look at my CV to see.
23  Q   Did you bring your CV with you?
24  A   I did.
25  Q   Okay.  We could maybe look at that during a

Page 13

1  break, but let's -- let's mark the CV as Exhibit 3,
2  please.
3         (Plaintiff's Exhibit No. 3 was
4         marked for Identification.)
5         COURT REPORTER:  Okay.
6  BY MR. HABERMAN:
7      Q   The presentations that you've given on
8  transvaginal mesh, were those on behalf of a medical
9  device manufacturer?
10     A   No.
11     Q   In what context did you give presentations on
12  transvaginal mesh?
13     A   Usually at a CME, or continuing medication --
14  continuing medical education meeting.
15     Q   In those presentations, would you discuss a
16  particular device by a particular manufacturer?
17     A   No.  Several different devices may have been
18  presented, but the focus of the subject was the use of
19  mesh in prolapse surgeries.
20     Q   And did the presentations focus on patient
21  outcomes?  Tell us about them, if you can.
22     A   May I reference my CV?
23     Q   Yes.
24     A   So if I had an invited or a national
25  presentation, the last one that I gave was in reference

Page 14

1  to a patient education forum related to some of the
2  complications associated with mesh placement for
3  prolapse.  And the other meeting -- well, presentation,
4  was also related to vaginal surgery to treat stress
5  urinary incontinence, and it was called Reducing the
6  Mesh Mess.
7         So those last two presentations were related
8  to complications associated with mesh placed for
9  prolapse and/or stress incontinence.
10     Q   In your experience, what are some of the
11  complications associated with mesh?
12     A   Specific to mesh, or specific -- or that are
13  unique to mesh; or in general, complications associated
14  with surgery with prolapse --
15     Q   Complications that are specific to mesh.
16     A   The only complication that's specific to mesh
17  is an exposure, which means it could come into the
18  vagina.  Or an erosion, which means that the actual
19  mesh has gone into a different organ other than what it
20  was placed within.
21     Q   Is mesh -- once implanted, is vaginal mesh
22  supposed to undergo an exposure where it goes into the
23  vagina?
24     A   Let me make sure I understand your question.
25  Are you stating, is it supposed to, or is that a

Page 15

1  possibility of happening?
2      Q   Is it supposed to?
3      A   No, it's not supposed to.
4      Q   And if mesh becomes exposed, and goes into the
5  vagina, or it erodes and goes into another organ, is
6  that indicative of a product failure?
7      A   No.
8      Q   What, in your opinion, is it -- is it
9  indicative of if there is an exposure and erosion?
10     A   I'm not sure what you're asking.  I don't
11  understand your question.
12     Q   Okay.  Well, I -- when I asked if it was
13  indicative of a product failure you said no, right?
14     A   The vaginal erosion or the vaginal exposure?
15     Q   Either.  I mean, would you agree that, in both
16  cases, exposure and erosion is not supposed to happen?
17     A   No, it's not supposed to happen.
18     Q   And so, if it does happen, would you agree
19  that that is indicative of a product failure?
20     A   No.
21     Q   Okay.  What is it indicative of?
22     A   It's indicative that the -- the mesh actually
23  came through the vagina, or the -- the -- or got
24  exposed into a different organ.  It -- there are
25  different factors that can -- can factor into why that

Page 16

1  may have occurred; including surgeon placement,
2  patient's medical conditions -- so there are other
3  contributors to why an exposure or an erosion may
4  occur.
5      Q   What about the design of the product itself --
6  or themselves?  Do they contribute to exposure or
7  erosion?
8         MS. SHUB:  Objection; form.
9         THE WITNESS:  In a -- I'm trying to make sure
10  I understand exactly what your point of your
11  question is.  Are you saying that the design of a
12  mesh can cause it to heal in such a way that a
13  patient is more prone to an exposure or an erosion?
14         Are you -- or are you saying that by default,
15  or its design, that it's the problem?
16  BY MR. HABERMAN:
17     Q   No, I'll take the first one.  The first way
18  you characterized it.  Is it designed in a way -- in
19  your experience, is it designed in a way that, combined
20  with a patient -- however you said it first.  You said
21  it better than I'm saying it now.  But you -- you
22  mentioned two factors that may cause or
23  contribute (sic) an erosion.  You talked about
24  placement and patient's medical condition.
25         And so, I'm asking you, what about -- in your

Page 17

experience, what about the design of the products?
Do -- can the design be a factor in inducing or causing
mesh exposure or erosion?
          MS. SHUB:  Objection; form.
          MR. SCOGGAN:  Same objection.
          THE WITNESS:  I would say, if we were ten
years ago, with the initial products that -- that
had come out on the market, the design of those
meshes were very different than the mesh products
that are available today.
          So with the change in the technology, and the
design of mesh that are present and available
today -- and I would say -- and today means in the
last five years -- the issue of design, I would say
flaw, is not so much of a contributor to a patient
developing a mesh exposure or an erosion.
BY MR. HABERMAN:
     Q   What -- what do you mean by design flaw?  What
in particular are you referring to?
     A   So some of the first meshes that came on the
market, even though they were macroporous, they also
had what they call interstices, which means that in the
sub-makeup of the actual mesh, they were smaller pore
size, and actually was -- I'm trying to make sure you
understand what I'm saying.

Page 18

          So the pore size is designed as the largest
size that's available.  But in some of the older
meshes, the -- they were multifilament, meaning that
they were combined or made up of multiple filaments in
one strand.  And when they were woven, those
subcompartments in the multiple strands then made the
actual pore size much smaller than what it was
presented as.
          With a -- with a smaller pore size, you do not
allow the normal inflammatory responses to occur.
Which means that you don't allow larger inflammatory
cells to be able to enter and exit the area of where
the mesh was placed.  And so, it makes it more likely
then to not become incorporated into the body as it was
intended, and never really heal very well.
          So as I said, with the transitions of newer
meshes, that's not so much of an issue now.
     Q   Okay.  And so, you know, if what you said
occurred, where the healing doesn't happen as expected,
you would expect to see exposure or erosion; is that
right?
     A   I wouldn't necessarily say that you would
expect it, but it's -- it is more likely to occur.  Or
may occur.  I -- I -- I -- it doesn't always occur.
     Q   What meshes in particular, or if any, do you

Page 19

have in mind that have the flaw that you were
discussing, smaller pore size, the multifilament-type
mesh that you were talking about?
     A   So Ethicon had something called Gynecare mesh,
or Gynecare PS, which was one of the first meshes that
was available to be used for prolapse, specifically
with a sacral colpopexy.  That's one.
          There's a -- there's another one, but I don't
necessarily recall the name of it right now.  But
those --
     Q   What about Boston Science's (sic) Advantage?
     A   Advantage Fit is for a sub-urethral sling.  So
are we -- I -- I would need to stay in one category.
That means if we're gonna refer to prolapse surgery
that's associated with sacral colpopexy, that's one
venture.  And then, slings are a different modality.
          So even though the -- they're still using
polypropylene, the -- the mesh is a little bit
different.  And the size of the mesh is also markedly
different.
     Q   Okay.  In your experience, patients who have
had mesh slings have also experienced exposure or
erosion, right?
          MS. SHUB:  Objection; form.
          THE WITNESS:  So you're asking me in -- in the

Page 20

almost 20 years that I've practiced, that I have
placed sub-urethral slings, and I've had patients
have exposures?
BY MR. HABERMAN:
     Q   Right.
     A   Yes, I have.
     Q   Okay.  And in your experience in implanting
transvaginal mesh, the type of transvaginal mesh that's
at issue in this case, have you treated patients who
have experienced exposure or erosion in their vaginal
meshes?
     A   Are you referring to --
     Q   Or mesh slings?
     A   Are you referring to a mesh sling,
specifically?
     Q   Specifically, yes.
     A   Yes, I have.
     Q   Okay.  And are those -- and you talked about
design flaws; do those design flaws also extend to the
slings that have been on the market?
     A   Yes.  One particular sling that's no longer
available was removed from the market because it was
associated with more than 50 percent of mesh exposures
or, actually, extrusions.
     Q   And what sling are you talking about?

Page 21

1    A   Gosh, I'm trying to remember the name of that
2  now.  It's been off the market quite a bit.  I don't
3  recall right now.
4    Q   Okay.  Can you estimate, Doctor, how many
5  slings you've implanted?
6    A   In my career?
7    Q   Yeah.
8    A   Probably close to 500.
9    Q   And how many transvaginal meshes have you
10  implanted to treat pelvic organ prolapse?
11    A   To treat pelvic organ prolapse?  Are you
12  referring to transvaginally-placed mesh or
13  abdominally-placed mesh?
14    Q   Transvaginally-placed mesh.
15    A   I stopped doing that procedure approximately
16  five years ago.  So there was a span of -- let's see.
17  I'm trying to remember the time frame.  Let me just
18  look at my CV real quick.
19       So from 2005 to 2010, the transvaginal mesh
20  kits were available to be used.  So that would have
21  been -- that would have been reflective of the time
22  when I actually placed transvaginal mesh for prolapse.
23  In that time frame, I believe I would have placed, on
24  average, maybe 120, 150 cases.
25    Q   Okay.  Have you removed mesh?  Have you

Page 22

1  removed transvaginal mesh or mesh slings?
2    A   Yes.
3    Q   And in what instances do you remove mesh?
4    A   In the case of a transvaginal sling, it can be
5  because a patient had urinary retention related to the
6  sling being a little too tight.  If they were having
7  pain related to the sling, or if there was a chronic
8  exposure with associated discharge and bleeding, or if
9  there was voiding dysfunction, meaning that the patient
10  did not have issues with urinary tract infections, but
11  felt that her stream was very slow, and she was
12  uncomfortable with that outcome.
13    Q   And in what instances do you explant
14  transvaginal mesh or pelvic organ prolapse mesh?
15    A   Can you restate the question?
16    Q   In what instances do you remove mesh that had
17  been put in to treat pelvic organ prolapse?
18    A   I have -- if I understand your question
19  correctly, I have removed portions of mesh if a patient
20  has a -- if, again, same types of symptoms, pain, and
21  we have isolated it's related to the mesh that was
22  placed in a certain area.  And that's with pelvic organ
23  prolapse.
24       If a patient has a vaginal exposure that has
25  not responded to conservative therapy, or if the

Page 23

1  patient just requests that that area of mesh be
2  removed.
3       In reference to sub-urethral slings, it -- for
4  the same issue; it can be for pain with intercourse;
5  pain that the patient is just aware of, and we have
6  isolated that it could be related to her previous sling
7  placement; or if there is an exposure; or if there is
8  abnormal urination.
9    Q   How do you isolate the pain such that you know
10  that it's related to the mesh?
11    A   We would do what's called a targeted exam.
12  And if I can isolate the patient's source of pain where
13  the mesh was placed, that is what we would use as a
14  leading cause of her discomfort.
15    Q   Doctor, have you ever consulted for a medical
16  device manufacturer?
17    A   I have.
18    Q   Can you name the manufacturer, or
19  manufacturers?
20    A   Ethicon Endo-Surgical, or the other name --
21  the women's health division was called Gynecare.  I
22  also did some work for -- I believe -- let me just make
23  sure.
24       I don't see their name listed here.  So the
25  only ones I have listed on my -- my CV, actually, is

Page 24

1  Gynecare.  But I did do some cadaveric trainings for
2  another company.  But I don't see it listed here.  And
3  I don't recall the name of the company right now.
4    Q   You mentioned cadaveric training.  What is
5  that?
6    A   It is the form in which we use to teach
7  surgeons how to perform the placement of --
8  transvaginally -- mesh procedures for prolapse and/or
9  incontinence.
10    Q   So you were one of the physicians that would
11  teach other physicians how to implant mesh and mesh
12  slings, right?
13    A   Correct.
14    Q   Did you do any consulting for Boston
15  Scientific?
16    A   No.
17    Q   Have you ever done any consulting for
18  Coloplast?
19    A   No.
20    Q   Do you still consult for Ethicon?
21    A   No.
22    Q   When did you stop consulting for Ethicon?
23    A   I believe that was 2010.
24    Q   Is there a reason why you stopped?
25    A   Well, when the FDA put out their statement

Page 25

1  about the concern with vaginally-placed mesh, most of
2  the companies that had any type of kit related to those
3  pretty much halted their teaching forum for any new
4  surgeons.  So at that point, everything was placed on
5  hold.  And thereafter, some companies actually pulled
6  out of the market, and so, those areas of teaching was
7  then completely dissolved.
8      Q   Okay. I want to turn your attention to your
9  care and treatment of Ms. Bayless.  When was the first
10  time you saw her?  Feel free, of course, to look at
11  your records.
12      A   So, according to my records, the first time I
13  saw Ms. Bayless, in consultation, was May 31st, 2012.
14      Q   Okay.  And did she present to your office that
15  day?
16      A   Yes.
17      Q   What was her chief complaint, if any?
18      A   The patient stated she was here to be treated
19  for urinary incontinence.
20      Q   Did Ms. Bayless give you any indication how
21  long she was experiencing incontinence?
22      A   If I have her history form, I would be able to
23  tell you that.  Otherwise, no.
24          And I do not.
25      Q   Okay.  In that office visit, did Ms. Bayless

Page 26

1  complain of dyspareunia?
2      A   No.  I do not have that listed as one of her
3  complaints.
4      Q   Did she complain of vaginal bleeding?
5      A   No.
6      Q   Did she complain of bleeding during
7  intercourse?
8      A   No.
9      Q   Did she complain of pelvic pain?
10      A   No.
11      Q   And did -- did you find any symptoms of pelvic
12  pain when you examined her?
13      A   No.
14      Q   What was your plan for Ms. Bayless that day?
15      A   She was diagnosed with Stage II pelvic organ
16  prolapse, with a leading edge at Ba, consistent with a
17  cystocele, as well as uterine prolapse.  Urinary
18  incontinence was not demonstrated on the exam.  She was
19  told about her options for treatment, which include
20  observation, pessary support, or surgical intervention.
21          The patient was asked to complete a urinary
22  diary and 24-hour urolog.  She was also advised that
23  her tobacco use could contribute to the risk of her
24  incontinence and prolapse.  And it also could affect
25  her surgical outcome with respect to wound healing and

Page 27

1  the risk of prolapse reoccurrences.
2      Q   Okay.  And when was the next time Ms. Bayless
3  presented to you?
4      A   So her next encounter was on July 10th, 2012.
5      Q   Why did she present that day?
6      A   She was here for me to review her urinary
7  diaries, and to undergo what's called a uroflowmetry
8  test.
9      Q   What was your impression of Ms. Bayless'
10  condition that day?
11      A   According to her diaries -- the diaries were
12  not consistent or accurate.  She said that she didn't
13  really understand how to do the diaries.  So I
14  questioned whether her diaries were truly reflective of
15  her urinary habits.
16          She also reviewed her bowel symptoms, which she
17  said were not very bothersome to her at the time, and
18  were improving.  This included fecal soiling and
19  constipation.
20      Q   What was your plan for her?
21      A   I encouraged the patient to avoid bladder
22  irritants.  I encouraged her to stop smoking.  We,
23  again, reviewed her options; which included
24  observation, a trial of a pessary.  But the patient
25  decided that she wanted to have surgical correction.

Page 28

1          I discussed with her the recovery time would
2  be approximately 12 weeks.  Plus, activity
3  restrictions.
4          The patient also wanted to discuss vaginal
5  tightening, and also a repair of her labia, which are
6  considered cosmetic.
7          We then ordered urodynamics and cystoscopy,
8  which were diagnostic testing.
9      Q   Sorry, you cut out there at the end.  You
10  ordered urodynamics and what else?
11      A   And cystoscopy.
12      Q   Okay.  And when did she have that urodynamics
13  and cystoscopy done?
14      A   That was dated August 14th, 2012.  The
15  urodynamics confirmed urinary leakage.  The patient had
16  a normal flow curve as well as a normal post void
17  residual.  The patient was thought not to meet the
18  criteria for ISD, or intrinsic sphincter deficiency.
19          And that was the completion of her testing.
20      Q   At that time, in July of 2012, did you think
21  Ms. Bayless was a candidate for surgery?
22      A   In July?
23      Q   Right.
24      A   When she first came to the office?
25      Q   Well, no, I mean after she completed her -- or

Page 29

1  maybe August.  Whatever the date of her urodynamics
2  exam and the cystoscopy.  Did you think that
3  Ms. Bayless was a candidate for surgery?
4      A   Well, we had already decided that the patient
5  was a candidate for surgery at her last visit.
6      Q   Oh, okay.  I'm sorry, I misunderstood.  Right.
7  Okay.  You -- you offered -- you discussed the
8  treatment of a pessary and other surgical intervention.
9          Can you just -- what is a pessary, Doctor?
10     A   A pessary is a silicone device that is placed
11 into the vagina to mechanically support prolapse, or
12 the neck of the urethra, to prevent incontinence, or
13 support prolapse.
14     Q   Do you offer pessaries today, to treat pelvic
15 organ prolapse or incontinence?
16     A   Yes.
17     Q   How many pessaries have you done?
18     A   How many pessaries have I inserted?
19     Q   Right.
20     A   Over a 20-year career, I would say close to --
21 I don't know.  It's about ten a year, so 250.
22     Q   Okay.  Getting back to Ms. Bayless, when was
23 the next time she presented to you?
24     A   So Ms. Bayless presented on August 16th, 2012
25 to have a cystoscopy.

Page 30

1      Q   And what did the cystoscopy show?
2      A   So the patient had a normal bladder finding.
3  She also had a positive supine stress test, which means
4  that when she was lying down, and was asked to cough,
5  she leaked urine.  She also leaked urine when she was
6  standing.
7          So as far as the bladder was concerned,
8  though, the bladder was normal.  The urethra, however,
9  had what we call poor coaptation, which is the ability
10 of the urethra to collapse upon itself once an
11 instrument is actually inserted or removed.
12         The Q-tip test was not done because the
13 patient expelled it with her cough.
14     Q   Did you have any plan or recommendation for
15 her as of August 13th, 2012?
16     A   No, I did not.
17     Q   Okay.  When was the next time Ms. Bayless
18 presented to you?
19     A   March 12th (sic), 2013.
20     Q   What was Ms. Bayless' complaint then?
21     A   She had the same complaints of incontinence
22 and pressure.  However, she was coming to have her
23 review of her urodynamics.
24     Q   Okay.  Did you do a pelvic examination on her
25 that day?

Page 31

1      A   No, I did not.
2      Q   Okay.  Did Ms. Bayless complain of dyspareunia
3  in August -- in March of 2013?
4      A   No.
5      Q   How about vaginal bleeding?
6      A   No.
7      Q   How about any pelvic pain?
8      A   No.
9      Q   And you didn't diagnose her with any of those
10 issues, right?
11     A   No, I did not.
12     Q   Okay.  So what was your plan for her in March
13 12th, 2013?
14     A   The patient still wanted to have surgical
15 intervention.  She was diagnosed with mixed
16 incontinence with a predominant stress component.  The
17 surgical options were outlined for her, which included
18 a vaginal approach, an abdominal approach by open
19 C-section, or a laparotomy, as well as an abdominal
20 approach with a laparoscopic or robotic assistance.
21         So the surgical -- I specifically said to her
22 that her stress incontinence component could be
23 addressed surgically.  The gold standard was a mid
24 urethral sling using mesh.  And we discussed what those
25 risks and benefits would be.

Page 32

1          Some of those surgeries also could be combined
2  with a hysterectomy, as the patient had completed her
3  childbearing.  She had multifocal -- and what I mean by
4  multifocal, she had multi-compartment prolapse.  So she
5  had uterine prolapse.  She also had a cystocele.  She
6  had a rectocele, but that was not symptomatic from her
7  standpoint.  And she also had mixed incontinence.
8          She was also a smoker.  So on my previous
9  visit I had already advised her how that could affect
10 both her presenting symptoms, and also her recovery as
11 far as wound healing.
12     Q   You mentioned a number of types of surgeries
13 or surgical modalities that you could have performed.
14 Did you have a recommendation of one over another?
15     A   No.  I usually give the patient the option of
16 choosing whether they're comfortable with the use of
17 mesh, because it does have some associated risk.  Which
18 we have already discussed.  Which includes vaginal mesh
19 exposure or erosion.
20         That's the only -- the only component that's
21 unique to the use of mesh, because post-operative
22 bleeding, post-operative pain with intercourse,
23 granulation tissues are associated with any type of
24 surgery in reference to the vagina, including
25 hysterectomy.

Page 33

Q   So in March of 2013, is this when you would have had your risk/benefit conversation about the risks and the benefits of the mesh procedure?

A   Yes.

Q   And what would you -- well, let me ask you this: Doctor, has your -- let me back up.

How do you -- how do you -- have you heard of the concept of informed consent?

A   Yes.

Q   How do you define it?

A   Explain to a patient in their terms -- that means at their level of understanding -- what a procedure will include, if there are going to be -- what specific problems or conditions will be addressed by the surgical intervention.

How long that particular surgery may take, as far as operative time. What the patient can expect from a hospital stay, if that's required. As well as what her recovery will entail. And what restrictions she may have in order to facilitate a good recovery.

We also -- also discuss the risk and benefits. That means what other particular issues can be associated with that surgery. And specifically, that would be pain with intercourse; abnormal wound healing; infection; damage to other organs, such as bowel and

Page 34

bladder; reoccurrence of her prolapse; urinary tract infections; voiding dysfunction -- that means abnormal voiding. Those are, I would say, the most common.

And then, what are her benefits? So do those benefits outweigh the risk of the surgery?

So ideally, you want to perform a surgery that has more benefits than risk.

Q   Right. Has your risk/benefit conversation changed over the years in -- specifically in connection with what you tell patients about vaginal mesh --

A   No.

Q   -- both for pelvic organ prolapse and for slings?

A   No.

Q   So the conversation that you would have with a patient in 2008/2009 was the same that you would have in 2014/2015?

A   My -- the only addition is letting them know about the FDA warning that came out -- I believe, 2011.

Q   If after going over the risks and the benefits of a procedure, if a patient said to you, Doctor, I don't want to undergo the procedure, the patient wouldn't have to undergo the procedure, right?

A   No.

Q   In other words, the patient has the option to

Page 35

refuse treatment, right?

A   Absolutely.

Q   Doctor, are you aware that mesh shrinks after it's implanted?

MS. SHUB: Objection; form.

MR. SCOGGAN: Objection.

BY MR. HABERMAN:

Q   You can answer.

A   Does the mesh undergo changes? Yes, it does.

Q   Okay. Are you -- do you know whether or not the mesh shrinks or contracts after it's implanted?

MS. SHUB: Objection; form.

THE WITNESS: So, as with any surgery, the tissue that's been affected by the surgery undergoes remodeling. Again, there's a whole inflammatory cascade. Cascade means response. And so, since mesh is a foreign body, there is something called a foreign body reaction. And that does happen.

Now, does the actual physical size of the mesh shrink? No.

BY MR. HABERMAN:

Q   Does -- does the mesh contract after it's implanted, to your knowledge?

A   Does the tissue around the mesh contract?

Page 36

Q   Is that your understanding of what happens? That the tissue around the mesh contracts?

A   Yes, because there's scar formation.

Q   Is there a certain amount of the mesh, or a certain percentage of the mesh that you're aware of, that contracts?

A   I -- I think I already answered that question. The mesh itself doesn't necessarily contract. The tissue response around it can -- can change the dimensions of the mesh. But its physical dimensions, as far as what -- when it was placed, doesn't change. It's the tissue response around it.

Q   Okay. So the -- the tissue response causes contraction, in your view?

A   If I understand your -- your question correctly, you're asking me if the dimensions of the mesh changes once it's placed into the subject. What is the causation or contributing factor to that change in dimension?

My answer would be --

Q   Right.

A   -- the tissue response, and that can include scar formation. Scar formation can actually cause the surrounding tissue to become less elastistic -- or elastic. And to -- that would mean, in your terms,

Page 37

1   more of a contracture.  But does the actual mesh
2   contract, no.
3       Q   Is there a certain percentage of the mesh,
4   caused by the tissue response, that contracts?
5       A   I'm not sure how I can answer that question
6   other than what I've already said.
7       Q   Okay.  Do you look to implant the -- do you
8   make sure that the mesh is not too tight when you
9   implant it?
10      A   What do you mean by that?
11      Q   I mean, is the mesh supposed to be put in a
12  tension-free manner?
13      A   Are you referring to the sub-urethral sling?
14      Q   Both, yeah.
15      A   So for a sub-urethral sling -- and it also
16  depends on what type of placement.  So is it a
17  retropubic or transobturator or -- you have to be much
18  more -- because the technique changes for each one of
19  those.
20      Q   Okay.  So for the -- for the mid urethral
21  sling, as in this case, the Advantage product made by
22  Boston Scientific, is that sling supposed to be put in
23  in a tension-free manner?
24      A   Yes.
25      Q   Why is that?

Page 38

1       A   I'm -- I'm not sure what you're asking.
2       Q   Why do you make sure that it's placed
3   tension-free?  What would be the result if it was too
4   tight?  If it was too tense?
5       A   The patient wouldn't be able to pee.
6       Q   What's that?
7       A   She wouldn't be able to pee.
8       Q   Got it.
9           Is it also because you anticipate that the
10  tissue response causes some contracture, or shrinkage,
11  so you make sure that the mesh is put in in a
12  tension-free manner?
13      A   No.
14      Q   What about with mesh to treat pelvic organ
15  prolapse?  Do you make sure, there, that the mesh is
16  put in in a tension-free manner?
17      A   Are you talking about transvaginally-placed
18  mesh or abdominally-placed mesh?
19      Q   Either.
20      A   So for transvaginally-placed mesh, yes, it's
21  very important to make sure that the mesh is placed
22  flat, without any curvatures and without any tension.
23          For a transabdominally-placed mesh, which in
24  the case of a sacral colpopexy, you try to place that,
25  also, on both walls of the vagina.  But the actual tail

Page 39

1   of the graft, is actually placed very loosely to
2   accommodate for the changes in the dynamics when a
3   patient stands up.
4       Q   Would it have been important to you if the
5   mesh manufacturer told you that the mesh may shrink up
6   to 50 percent after implantation?
7           MR. SCOGGAN:  Objection.
8           MS. SHUB:  Objection; form.
9           THE WITNESS:  Again, are you talking about a
10  mid urethral sling, or are you talking about a
11  transvaginally-placed mesh, or are you talking
12  about transabdominally-placed mesh?
13  BY MR. HABERMAN:
14      Q   All right.  Let's take it one by one.  For a
15  sling, would it have been important to you if Boston
16  Scientific told you before you put the mesh in
17  Ms. Bayless that it could shrink up to 50 percent?
18          MR. SCOGGAN:  Object to form.
19          THE WITNESS:  Would it have been important as
20  far as whether I decided to use the product, or how
21  I place the product?  I'm not sure what question
22  you're asking me to answer.
23  BY MR. HABERMAN:
24      Q   Well, would it have been important in general?
25          MS. SHUB:  Objection; form.

Page 40

1           THE WITNESS:  I would -- I would say it's
2   important to know the dynamics or the
3   characteristics of the product you're using.
4   BY MR. HABERMAN:
5       Q   Okay.  If you were told by Boston Scientific
6   that the mesh may shrink up to 50 percent, would that
7   have had an impact on your decision to implant the
8   mesh?
9           MR. SCOGGAN:  Object to form.
10          MS. SHUB:  Same objection.
11          THE WITNESS:  It would -- again, I don't know
12  if I'm understanding exactly what you're saying.  I
13  think every surgeon has to know the properties
14  of -- of the substances they are placing or using.
15  So I do think that the surgeon has a responsibility
16  to understand what they're -- what they're using.
17          So if you're gonna tell me that a product is
18  going to shrink 50 percent, then that changes how
19  I -- I would place it.  It doesn't necessarily
20  change how I would counsel the patient on the risks
21  associated, because those are the same.
22  BY MR. HABERMAN:
23      Q   I'm sorry, what was the last part?  What did
24  it change?  The way you counsel the patient?
25      A   I said it would not change the way that I

Page 41

1  counsel the patient because the risks of the procedure
2  are the same.  It doesn't change what those risks would
3  be.  They're still the same.
4      Q   If the mesh would shrink up to 50 percent,
5  wouldn't that increase the likelihood of complications?
6      MS. SHUB:  Objection; form.
7      MR. SCOGGAN:  Object to form.
8      THE WITNESS:  I don't know.
9  BY MR. HABERMAN:
10     Q   But it's your testimony that if you were told
11 by Boston Scientific, or Coloplast, that their meshes
12 shrink up to 50 percent, you would not inform the
13 patient of that?
14     MR. SCOGGAN:  Object to form.
15     MS. SHUB:  Objection; form.
16     THE WITNESS:  Again, it wouldn't change what
17 risks were associated with the -- the actual
18 procedure.
19 BY MR. HABERMAN:
20     Q   But you're unaware of whether or not it would
21 change the likelihood of the risks?
22     MS. SHUB:  Objection; form.
23     MR. SCOGGAN:  Object to form.
24     THE WITNESS:  The likelihood of any of those
25 particular complications occurring?

Page 42

1  BY MR. HABERMAN:
2      Q   Right.
3      MS. SHUB:  Same objection.  Objection; form.
4      THE WITNESS:  I don't think that even if it --
5  it would be significant from the standpoint of
6  telling -- having to have a separate conversation
7  with a patient, saying that this particular product
8  is gonna shrink 50 percent.  This is how I'm gonna
9  change my surgical technique to prevent you from
10 having the same complications.
11     MS. SHUB:  Mr. Haberman -- Mr. Haberman --
12     MR. HABERMAN:  What's that?
13     MS. SHUB:  -- you have been going an hour.
14 So, I mean, under the rules, we have an -- we have
15 an opportunity to depose the witness as well, in
16 the time allotted.  She's indicated she's only got
17 a couple hours today, so --
18     MR. HABERMAN:  Right.  I shouldn't be that
19 much longer.
20     MS. SHUB:  I'll give you a little leeway, but
21 we're gonna need some as well.  And we may need to
22 come back.
23     MR. HABERMAN:  Okay.
24     MS. SHUB:  Can you wrap up in five minutes or
25 so?

Page 43

1      MR. HABERMAN:  I -- I don't know.  We'll see.
2  BY MR. HABERMAN:
3      Q   Doctor, in your -- in your understanding, is
4  the transvaginal mesh -- is the polypropylene in
5  transvaginal mesh inert?
6      A   Inert -- the definition of inert means that it
7  doesn't cause any type of tissue response.  I had
8  already alluded to the fact that it is a foreign body,
9  so it does cause a certain amount of tissue response.
10     Q   Doctor, if the medical device manufacturer was
11 told by the company that made the polypropylene not to
12 use the polypropylene in medical applications involving
13 permanent implantation in the human body, or permanent
14 contact with internal body fluids or tissues, is that
15 something you would want to know prior to implanting
16 the mesh?
17     MS. SHUB:  Objection; form.
18     MR. SCOGGAN:  Object to form.
19     THE WITNESS:  So your question is, is if the
20 polypropylene was -- if there was a warning that it
21 should not be used in human subjects?
22 BY MR. HABERMAN:
23     Q   Right.
24     A   I'm just kind of summarizing.
25     Q   Yes.

Page 44

1      A   Certainly, I would want to be -- if there was
2  some type of detrimental problem, yes, I certainly
3  would want to be informed.
4      Q   Okay.  Would that bear on your -- but
5  specifically, if the polypropylene manufacturer told
6  Boston Scientific not to use the polypropylene in
7  medical applications involving permanent implantation
8  in the human body, or permanent contact with internal
9  body fluids or tissues -- that specific statement --
10 would you want to know that prior to implanting mesh in
11 someone like Ms. Bayless?
12     MR. SCOGGAN:  Object to form.
13     THE WITNESS:  Again, if that was going to --
14 if there was an absolute direct causation of harm
15 related to the use of polypropylene -- and
16 that's -- I'm assuming you're talking about all
17 types of polypropylene, not specifically to
18 transvaginal mesh -- then yes, I'd want to be
19 informed.
20 BY MR. HABERMAN:
21     Q   How would that bear on your decision to
22 implant the mesh?
23     MR. SCOGGAN:  Object to form.
24     MS. SHUB:  Objection; form.  Assumes facts not
25 in evidence.

Page 45

1    THE WITNESS:  If a product warning has been
2  placed that it is unsafe for human use, then yes, I
3  would want to be informed.  And I would, then,
4  inform my patient that it's been found not to be
5  safe to be placed in humans.  And I likely would
6  not use that product.
7  BY MR. HABERMAN:
8    Q    Okay.  Take us to when you finally implanted
9  the mesh in Ms. Bayless.  What day was that?
10   A    This is dated August 9th, 2013.
11   Q    Okay.  And can you just tell us what you did
12 for her on this day?
13   A    I performed a robotic-assisted total
14 laparoscopic hysterectomy; an abdominal sacral
15 colpopexy; a retropubic mid urethral sling, using the
16 Advantage Fit incontinence system; and cystoscopy.
17   Q    Did Ms. Bayless have any complications during
18 the surgery?
19   A    No, she did not.
20   Q    Was Ms. Bayless' case an unusual case?
21   A    No, it was not.
22   Q    Did you make sure that you implanted the mesh
23 as you had been trained, and as the companies -- both
24 Boston Scientific and Coloplast instructed?
25   MS. SHUB:  Objection; form.

Page 46

1    MR. SCOGGAN:  Object to form.
2    THE WITNESS:  So there's a specific technique
3  that I have used, and have used for almost 20
4  years, in reference to placement of retropubic
5  slings.  Yes, I did.  As well as the placement of
6  the, what we call, Y graft at the top of the
7  vagina.
8  BY MR. HABERMAN:
9    Q    During the surgery, did you make sure that --
10 we talked -- you talked earlier about the placement of
11 the mesh as a potential cause for later complications.
12 Do you recall that?
13   MS. SHUB:  Objection; form.
14   MR. SCOGGAN:  Object to form.
15   THE WITNESS:  I'm sorry, your question is --
16 BY MR. HABERMAN:
17   Q    My question is, earlier we talked about
18 complications associated with mesh.  And you talked
19 about two factors.  You talked about placement of the
20 mesh and the patient's medical condition; do you recall
21 that?
22   MS. SHUB:  Objection; form.
23   MR. SCOGGAN:  Object to form.
24   THE WITNESS:  I stated that there were other
25 contributors to a patient developing a vaginal

Page 47

1  exposure besides the actual mesh product.
2  BY MR. HABERMAN:
3    Q    Okay.  And I just want to know -- and -- well,
4  what about other complications of mesh?  I mean, other
5  than exposure?
6    A    That's the only complication that's specific
7  to mesh placement.
8    Q    Okay.  Did you place the mesh in a way such
9  that you would guard against future mesh exposure or
10 erosion?
11   A    I'm not sure what you're asking.  Did I use a
12 specific technique to make sure that my patient didn't
13 develop any complication from surgery?
14   Q    Yeah, that's a better way of phrasing it.
15   A    Yes, that -- that's always the goal of a
16 surgeon.
17   Q    Did you do that in this case?
18   A    Yes, I did.
19   Q    When is the last time you saw Ms. Bayless?
20   A    Let's see.  These records are from another
21 EMR, so I don't see her post-surgical visit.  So it
22 would have to have been some time after -- what was the
23 date of her surgery?
24      It would have to have been after August 9th.
25 Let me see if it's in here.

Page 48

1    Q    Do you know whether she returned to you on
2  October 22nd, 2013?
3    A    That's what I'm looking for.  I know we have a
4  noncompliance letter because she did not follow up.
5  But I don't have --
6    Q    Do you have the record where she came to your
7  office on 9/24/2013?  I know that you didn't -- I don't
8  know if you were the provider, but I think it's at your
9  office.
10   A    No, I don't have that with me.  That probably
11 is from another system.  Like I said, we -- this -- the
12 chart that I have here is from our old EMR, and then we
13 converted to a newer one.  And I don't see those
14 records.  I don't have those, I should say.
15   Q    So could it be the last time you saw her was
16 the date of the surgery in August 2013?
17   A    No, she had one post-operative visit.  I just
18 don't know -- I just don't know the date of that.  The
19 date of this letter is 10/29/13, and that's after she
20 had missed several appointments.
21   Q    Okay.  In your recollection, did she have a
22 problem healing after you did the operation on her in
23 August 2013?
24   A    Not in the first two months.
25   Q    And you've not seen her since September or

Page 49

1  October of 2013; is that right?
2      A   No, I have not.
3      Q   So you don't know how she's doing post
4  September or October 2013, right?
5      A   No, I do not.
6      Q   At the time you did the operation, did you
7  have an opinion that she would not heal as you would
8  have expected?
9      A   As a smoker, in general, there's -- there's a
10 multitude of literature that says that those patients
11 have delayed wound healing.  And she was --
12     Q   That she (unintelligible) --
13     A   That she could have delayed wound healing or
14 improper wound healing.  And she was counseled about
15 that her first visit in the office.
16     Q   Did you think that she would have delayed
17 healing or wound -- or improper wound healing at the
18 time you operated on her?
19     A   Someone who has a 30-pack history of smoking,
20 most definitely.
21     MS. SHUB:  Mr. Haberman, how long are you
22 gonna go?  I'm gonna object to not having
23 sufficient time to question the witness.  And I
24 assume Boston Scientific's lawyer is in the same
25 boat.

Page 50

1      MR. SCOGGAN:  Exactly.
2      (Siri cell phone interruption.)
3      MS. SHUB:  Oh.
4      MR. SCOGGAN:  Yes.  We've got two --
5      MR. HABERMAN:  I'm really not -- I'm really
6  just wrapping up, so --
7  BY MR. HABERMAN:
8      Q   But again, Doctor, just to be clear, you've
9  not seen her since October or September of 2013, right?
10     A   No.
11     Q   And you've treated other patients who are
12 smokers, right?
13     A   I have.
14     Q   And -- and in your experience, are each of
15 those patients -- do each of those patients have
16 delayed healing or improper wound healing?
17     A   They can.
18     Q   They can also not -- they can also heal
19 normally, right?
20     A   Yes.
21     Q   All right.  Thank you.
22     MS. SHUB:  Are you passing the witness?
23     MR. HABERMAN:  That's all I have for now.
24 Pass the witness.
25     MS. SHUB:  You ready to keep going, or do you

Page 51

1  need a bio break or anything?
2      THE WITNESS:  No, I'm good.
3      MS. SHUB:  Okay.  Everybody all right?
4              CROSS EXAMINATION
5  BY MS. SHUB:
6      Q   We don't have much time, so I'm gonna try and
7  not repeat.  There's some issues I am gonna need to go
8  over.  I want to talk about some things that you've
9  already discussed, though, in a little more detail, and
10 make sure I fully understand your testimony.
11     I want to talk generally about pelvic surgery.
12 Pelvic reconstructive surgery can be complicated; would
13 you agree?
14     A   Yes.
15     Q   Okay.  It's not simply removing an organ.
16 You're actually trying to reconstruct form and
17 function?
18     A   Correct.
19     Q   And because of that, there can be associated
20 complications with pelvic reconstructive surgery,
21 whether or not a surgical implant is used?
22     A   Yes.
23     Q   Okay.  And those complications from pelvic
24 reconstructive surgery can include things like ongoing
25 pain; would you agree?

Page 52

1      A   Yes.
2      Q   And that would include ongoing pain with
3  intercourse, also called dyspareunia; would you agree?
4      A   Yes.
5      Q   Okay.  And I think I --
6      MR. HABERMAN:  Objection.
7  BY MS. SHUB:
8      Q   I think I heard you say that one of the
9  complications of pelvic reconstructive surgery, even
10 without mesh, could be continued bleeding?
11     A   Usually that's associated with delayed healing
12 at the surgical site as relate -- as related to
13 granulation tissue.
14     Q   Right.  And that can -- and can that occur
15 just around sutures?
16     A   Yes.
17     Q   Okay.  And that's true if no mesh implant is
18 used at all, correct?
19     A   Yes.
20     Q   Okay.  You were talking earlier about
21 different things that could lead to complications with
22 a patient.  Is one of those things that could lead to
23 complications poor tissue quality?
24     A   Yes.
25     Q   Okay.  And how about patient compliance with

Page 53

1    post-operative instructions?  Can that --
2        A   Yes.
3        Q   Okay.  So if a patient fails to comply with
4    post-operative restrictions, for instance, is a patient
5    more likely to have complications than a patient who
6    complies?
7        A   Let me think about how I would answer that
8    question.  I would say that, in general, we --
9    specifically for my practice, I'm very strict about
10   what patients are allowed to do after surgery.  And
11   mainly to make sure that I'm able to evaluate any
12   potential problems that may be developing, so that we
13   can treat those, or intervene early.
14       So yes, the goal is to have a certain set of
15   instructions for patients to follow with the hope that
16   that will decrease their risk of developing
17   complications.
18       Q   Okay.  Now, counsel took you through a couple
19   of records.  I'm gonna try and go back with them a
20   little bit more clearly, and I want to talk a little
21   bit about your file, so the record is clear.
22       MS. SHUB:  The court reporter -- I might be
23   able to expedite time if you would like me to use
24   the stickers, so you can type and I can mark?
25       MR. SCOGGAN:  (Exhibit stickers tendered.)

Page 54

1        MS. SHUB:  Thanks.  And I think we're on
2    Exhibit No. 3 or 4?
3        COURT REPORTER:  3 was the CV.
4        MS. SHUB:  Okay.  Let's go with No. 4.
5    BY MS. SHUB:
6        Q   In front of you is a letter.  Is this the
7    letter you were referring to indicating a failure to
8    follow up with you?
9        A   Correct.
10       Q   We're gonna mark that as your deposition
11   Exhibit No. 4.
12       And just so the record is clear, Exhibit No. 2
13   were the brochures you brought.  And I see two here,
14   regarding pelvic organ prolapse, that are from
15   Coloplast; and one from Boston Scientific; is that
16   right?
17       A   Correct.
18       Q   Okay.  And you talked about the different
19   pelvic surgeries that you've done over time.
20       COURT REPORTER:  Hold on one second.
21       MS. SHUB:  I think we might have just lost the
22   video feed.
23       Are you there, Mr. Haberman?
24       Let's go off the record.
25       VIDEOGRAPHER:  Off the record.  The time is

Page 55

1    10:18 a.m.
2        (A short break was taken.)
3        VIDEOGRAPHER:  We're back on the video record.
4    The time is 10:26 a.m.
5    BY MR. HABERMAN:
6        Q   Dr. Jones, we're back on the record after a
7    small video snafu.
8        I want to take -- let me just ask you, when
9    you see a patient, is it important to you to have a
10   full and accurate history of that patient?
11       A   Yes.
12       Q   If you have a patient who provides you
13   inconsistent or incomplete information, can that affect
14   your risk/benefit analysis?
15       A   Yes, it can.
16       Q   I want to hand you what we're gonna mark as --
17       MS. SHUB:  Did we lose him again?
18       Off the record.
19       VIDEOGRAPHER:  Off the record.  The time is
20   10:27 a.m.
21       (A short break was taken.)
22       VIDEOGRAPHER:  We are back on the record.  The
23   time is 10:27 a.m.
24   BY MR. HABERMAN:
25       Q   Dr. Jones, I'm gonna mark as Exhibit No. 5

Page 56

1    some records with some Bates numbers at the bottom, COL
2    PLTF 000460 to 463; which I'll represent to you are
3    some records from Dr. Bukkapatnam, or I would like to
4    say Dr. B.  I understand he's -- also, Dr. Xavier
5    Roman-Hernandez.
6        Are you familiar with those physicians at all?
7        A   No.
8        Q   Do you know how Ms. Bayless made her way to
9    find you?
10       A   Made her way to find me?
11       Q   Yes.
12       A   She was part of what we call Orange County --
13   it's some type of contract that Orange County Health
14   Department has with -- to give services to several
15   different people that were actually, I believe,
16   affiliated with one of the hotel chains -- the Rosen.
17   So it's a program that allows patients to have access
18   to specialty physicians.  And then, get whatever care
19   is -- is required.
20       Q   Okay.  I'm gonna hand you what we're marking
21   as Exhibit No. 5; some records from a physician visit
22   dated May 7th, 2012; and ask you if you had ever seen
23   that before today?
24       A   No.
25       Q   Okay.  Let me take you through some of the

Page 57

1   statements on here.  First of all, pelvic organ
2   prolapse and stress urinary incontinence is -- is
3   childbirth a common cause for those conditions?
4       A   It's a contributor.
5       Q   Okay.  And would a -- would difficult
6   childbirths also contribute to those conditions?
7       A   When you say difficult childbirth, you are --
8   I always ask what you mean by that --
9       Q   Okay.
10      A   -- because that's a very broad statement.
11      Q   Sure, sure.  It is broad, and I apologize for
12  that.
13          Say a baby that has to be born with
14  episiotomy, or a large baby for the patient -- would
15  that --
16      A   What constitutes a large baby?
17      Q   Well, I guess it depends on the size of the --
18  the woman, doesn't it?
19          Let me -- let me take it a -- let me ask you a
20  different question.  According to Ms. Bayless' records,
21  she actually had nine pregnancies.  Do you see that?
22      A   Yes.
23      Q   Were you aware she was pregnant nine times?
24      A   Not specifically, no.
25      Q   Okay.  She did give birth to four full-term

Page 58

1   babies, and had pregnancies that terminated either
2   voluntarily or spontaneously five times.  Do you
3   understand that?
4       A   Yes.
5       Q   Okay.
6           MR. HABERMAN:  I object.  This is outside the
7   scope of the doctor's treatment.  She doesn't
8   know --
9           MS. SHUB:  I'm just asking her about her
10  background.
11          MR. HABERMAN:  Yeah, it's still out of scope.
12  The doctor's not here to be an expert witness.
13          MS. SHUB:  You may say objection, form,
14  Counselor.
15          MR. HABERMAN:  And I --
16          MS. SHUB:  Objection, form.
17          MR. HABERMAN:  I'm making my objections for
18  the record.
19          COURT REPORTER:  I'm sorry, I didn't hear your
20  objection.  Just the last one.
21          MR. HABERMAN:  I said I'm making my objection
22  for the record.  It's out of scope.  It's improper.
23  The doctor's here -- not here as an expert witness.
24  BY MS. SHUB:
25      Q   Would a patient's sexual activity be relevant

Page 59

1   to your treatment?
2       A   Relevant to --
3           MR. HABERMAN:  Objection; vague.
4   BY MS. SHUB:
5       Q   Would a patient's tendency -- well, let me put
6   it this way, would activity that affects healing be
7   something that you would counsel your patient, after
8   surgery -- about?
9       A   Yes.
10      Q   And one of the recommendations you make after
11  surgery is a recommendation for pelvic rest; is that
12  right?
13      A   Correct.
14      Q   And pelvic rest would include not having
15  sexual intercourse?
16      A   Correct.
17      Q   If you have a patient with a high number of
18  sexual partners, who has a history of a high number of
19  sexual partners, and a high number of sexually
20  transmitted diseases, is that something that would be
21  concerned about -- you -- would concern you with regard
22  to their ability or willingness to follow instructions
23  for pelvic rest?
24          MR. HABERMAN:  Objection; scope.
25          THE WITNESS:  That past medical history could

Page 60

1   possibly influence it, but -- however, you know,
2   the patient has to understand that the pelvic rest
3   that we are recommending is crucial to the healing
4   at the top of the vagina.  So that was a commitment
5   that she made, that she understood, that should
6   would comply with.
7   BY MS. SHUB:
8       Q   Right.  I'll represent to you that the record
9   we've provided indicates that Ms. Bayless had over a
10  hundred lifetime sexual partners; were you aware of
11  that?
12      A   No.
13          MR. HABERMAN:  Objection; scope.  It has no
14  relevance to Dr. -- this doctor's treatment.
15  BY MS. SHUB:
16      Q   Is that something that you would have been
17  interested in for the purposes of counseling your
18  patient?
19          MR. HABERMAN:  Objection.
20          THE WITNESS:  Not with respect to her -- her
21  surgical treatment, no.
22  BY MS. SHUB:
23      Q   Okay.  One of the things you mentioned
24  regarding her healing was the fact that she was a
25  smoker --

Page 61

1    A   Yes.
2    Q   -- 30-pack-a-day (sic) smoker.
3        Can cocaine use affect healing?
4    A   Yes.
5    Q   How about --
6        MR. HABERMAN:  Objection.
7   BY MS. SHUB:
8    Q   -- crack cocaine use?
9        MR. HABERMAN:  Objection.
10       THE WITNESS:  Any substance abuse can.
11  BY MS. SHUB:
12   Q   Okay.  If Ms. Bayless was a -- had been a
13  substance abuser on and off for 30 years, is that
14  something that you would want to know about?
15   A   Yes.
16   Q   Okay.  Did Ms. Bayless ever explain to you
17  that she was a crack cocaine user?
18   A   No.
19   Q   Okay.  Did she explain to you that she had
20  been in and out of rehab for crack cocaine?
21   A   No.
22       MR. HABERMAN:  Objection; scope.
23  BY MS. SHUB:
24   Q   When Ms. Bayless -- I want to refer you to the
25  History of Present Illness on the referring visit in

Page 62

1   the first paragraph.  History of Present Illness.  Do
2   you see where I am?
3    A   Yes.
4    Q   Last sentence there.  It says, Patient denies
5   issue with vaginally (sic) bleeding, but does state
6   some dyspareunia lately.  Do you see that?
7    A   Yes.
8    Q   So if the patient reported dyspareunia in May
9   of 2012, does that indicate to you she was having pain
10  with intercourse before she came to seek treatment from
11  you?
12   A   Yes.
13   Q   And if a patient provides inconsistent or
14  incomplete information to you, you don't have a full
15  and complete accurate history on a patient, true?
16   A   Correct.
17   Q   Let's go ahead and mark as Exhibit 6, which I
18  understand to be the first consult with you -- it's
19  documents Bates labeled COL-RBAYLESS-ORLANDO-000033 to
20  34; which are records dated May 31st, 2012.
21       I think we looked at these earlier in your
22  bigger stack of materials.
23   A   Yes.
24   Q   Here, Ms. Bayless did admit to being a current
25  everyday smoker; is that right?

Page 63

1    A   Yes, she did.
2    Q   She did not disclose to you her cocaine use,
3   did she?
4    A   No, not as being active, no.
5    Q   Okay.  She did discuss with you her prior
6   pregnancy history, right?
7    A   Yes, she did.
8    Q   Okay.  You did an evaluation on her to
9   evaluate her for prolapse as well as stress urinary
10  incontinence, as I understand it, right?
11   A   Yes.
12   Q   And you did exam -- you did see that she did,
13  in fact, have prolapse, right?
14   A   Correct.
15   Q   And that's reflected in your POPQ score down
16  there?
17   A   Correct.
18   Q   And can you explain for us what that POPQ
19  score means in layman's terms?
20   A   So we take measurements on each side of the
21  vagina.  The vagina has two sides.  One where the
22  bladder sits, the other where the rectum sits.  And at
23  the apex, or the top of the vagina, is where the uterus
24  inserts with the cervix.  So depending on where those
25  numbers measure, we would then get a composite score to

Page 64

1   give a grade from zero to four.  Zero being no
2   prolapse, four being the worst prolapse.
3    Q   Ms. Bayless -- I don't mean to interrupt you.
4   Were you finished?
5    A   (Nodding).
6    Q   Okay.  Ms. Bayless actually has a prolapse
7   that is showing a leading edge, it says, at Ba
8   consistent with Cystocele/Uterine Prolapse; is that
9   right?
10   A   Correct.
11   Q   And that means that she was actually having
12  the tissue beneath her bladder and at the top of her
13  vagina actually start to fall out and descend toward
14  the opening of the vagina, right?
15   A   Correct.
16   Q   Is that a condition, in your experience, that
17  tends to get better all by itself?
18   A   No.
19   Q   Okay.  There are non-surgical options to treat
20  that; is that right?
21   A   Yes.
22   Q   And is one of those the pessary that you were
23  describing earlier?
24   A   Yes.
25   Q   And did you describe use of a pessary with

Page 65

1    Ms. Bayless?
2        A  Yes.
3        Q  And is that a -- a remedy that she desired?
4        A  No.
5        Q  So did you discuss surgical treatment with her
6    for her prolapse at that time?
7        A  Potential options, yes.
8        Q  Okay.  You did advise her that her tobacco use
9    contributed to her risk of urinary incontinence and
10   pelvic organ prolapse; is that right?
11       A  Yes.
12       Q  Would prior cocaine or crack cocaine use also
13   contribute to those things?
14       A  I don't know specifically.
15          MR. HABERMAN:  Objection; scope.
16   BY MS. SHUB:
17       Q  Okay.  Would crack cocaine use contribute to
18   poor healing?
19          MR. HABERMAN:  Objection; scope.
20   BY MS. SHUB:
21       Q  If you know.
22       A  I don't know the percentages, no, not
23   specifically.
24       Q  Is that something you would have liked to have
25   known and researched and -- with -- so that you could

Page 66

1    counsel the patient if that was a -- something that she
2    was doing?
3        A  Yes.
4        Q  The things that you discussed with her is
5    observation, which means doing nothing, right?
6        A  Correct.
7        Q  Pessary support, which we've already talked
8    about, right?
9        A  Yes.
10       Q  As well as surgical intervention, correct?
11       A  Yes.
12       Q  What surgical interventions did you discuss
13   with Ms. Bayless in May of 2012?
14       A  None specifically.
15       Q  Okay.  Did you save that conversation for
16   another day?
17       A  Yes.
18       Q  Is there a reason you waited?
19       A  Yes.
20       Q  And what was that?
21       A  Usually it's overwhelming for patients to
22   understand all the different options.  In general, I've
23   found that patients understand much better when you
24   divide the information and give the -- give it to them
25   in smaller pieces or packets.

Page 67

1        Q  I'm gonna mark as Exhibit No. 7 a visit from
2    July 10th of 2012, which opposing counsel did not
3    discuss with you.  Does that look like a record from
4    your office?
5        A  Yes.
6        Q  And Katherine Puig appears to have consulted
7    with the patient.  Who is Katherine Puig?
8        A  She is a nurse practitioner that was working
9    in my office at the time.
10       Q  Okay.  And what types of services does she
11   perform for you or your patients?
12       A  She does general gynecology, as well as care
13   that's tailored to patients who have urogynecological
14   problems, such as prolapse and incontinence.
15       Q  And do you know her to -- and do you rely upon
16   her to visit with your patients and take information
17   from your patients?
18       A  Yes.
19       Q  And do you rely upon her to take a record of
20   things that patients tell her?
21       A  Correct, yes.
22       Q  And have you known her to provide true and
23   accurate statements of what patients tell -- tell her?
24       A  Yes.
25       Q  And how long have you worked with her?

Page 68

1        A  She worked in my office for nine years.
2        Q  Okay.  I want to refer you to the second page
3    of Exhibit No. 7.  Which at the top describes Patient
4    report.  And it says, patient diaries are accurate --
5    then comma -- are not consistent.  Do you see that?
6        A  Yes.
7        Q  So was there a concern that the patient was
8    reporting her diaries were accurate, but the nurse
9    interpreted those to be inconsistent?
10       A  Correct.
11       Q  And does that give you some concern that the
12   patient is providing you, perhaps, inconsistent or
13   incomplete information regarding her history?
14       A  Regarding the -- the recordings for her
15   diary, yes.
16       Q  Okay.  Now, the patient also -- you -- well,
17   strike that.
18          Exhibit 7 also concerns a review of symptoms
19   the patient is experiencing on the day of her visit,
20   right?
21       A  Correct.
22       Q  And there's a review of symptoms -- is that
23   ROS?
24       A  Yes.
25       Q  What does that -- what does that stand for?

Page 69

1  A  Review of systems.
2  Q  Okay.  And there are certain conditions that
3  she's describing on July 10th of 2012; is that right?
4  A  Correct.
5  Q  The last -- well, she notes things like
6  blurred vision.  Do you see that?  It's the second
7  item.
8  A  Um-hmm.
9  Q  Is that a yes?  I just have to ask you because
10  the court reporter can't take an uh-huh or an uh-uh.
11  A  What was your question again?
12  Q  Blurred vision; second item.  She says light
13  flashes, blurred vision.  Do you see that?
14  A  I do see it.
15  Q  Okay.  Sinus problems, right?
16  A  Correct.
17  Q  I'm gonna go down to the third line.  You see
18  swelling, stiffness, abdominal cramps?  Third line of
19  that paragraph.
20  A  Yes.
21  Q  So does that indicate to you the patient was
22  reporting abdominal cramps in July of 2012?
23  A  Based on the language that precedes those -- I
24  would say the third line --
25  Q  Um-hmm.

Page 70

1  A  -- it says that the patient states symptoms
2  are not bothersome, but occurring infrequently, are
3  improving.  And those include those symptoms that are
4  listed below.
5  Q  Okay.  And that would include abdominal
6  cramps, right?
7  A  Correct.
8  Q  And fecal soiling?
9  A  Correct.
10  Q  And constipation?
11  A  Correct.
12  Q  I'm not gonna read all of these, but at the
13  very last line, she also reports vaginal discharge,
14  doesn't she?
15  A  Yes.
16  Q  And she also reports hot flashes?
17  A  Yes.
18  Q  As well as pain with intercourse?
19  A  Yes.
20  Q  So before you ever performed any surgery on
21  Ms. Bayless, she was actually reporting to your office
22  that she was having pain with intercourse?
23  A  Yes.
24  Q  Okay.  Now, during this visit, you encouraged
25  smoking cessation; is that right?

Page 71

1  A  Correct.
2  Q  If she was a cocaine or crack cocaine user,
3  would you have encouraged cocaine cessation?
4  A  If I knew that she was actively using or
5  abusing any type of substance, I would have actually
6  declined to actually do surgery.
7  Q  Here at this visit, prolapse treatment options
8  were discussed; is that right?
9  A  Yes.
10  Q  Those include, again, observation; is that
11  right?
12  A  Correct.
13  Q  Trial of a pessary?
14  A  Correct.
15  Q  And it says, Patient desirous of definitive
16  surgical correction.  What does that mean?
17  A  It means that she wanted her prolapse
18  surgically corrected.
19  Q  And at this visit were the different types of
20  surgical correction discussed with her?
21  A  No.
22  Q  Okay.  Recovery time was discussed; is that
23  right?
24  A  Yes.
25  Q  And it says, briefly discussed recovery time

Page 72

1  of approximately 12 weeks, plus activity restrictions.
2  Do you see that?
3  A  Yes.
4  Q  And what activity restrictions would you
5  recommend after surgery?
6  A  Generally, no heavy lifting, straining,
7  pushing, pulling, bending, stooping -- that's greater
8  than ten pounds.  We usually encourage patients to do
9  their grocery shopping with a pulley.  Not to do any
10  housework.  That means flipping mattresses, pushing
11  furniture around; anything that will cause any strain
12  on the abdominal wall.
13  Q  Okay.  And I think you said this, but that
14  would also include restraint -- refraining from sexual
15  intercourse, right?
16  A  Correct.
17  Q  The record also indicates that at least 50
18  percent of the visit was spent on counseling.
19  Patient -- that's patient counseling; is that right?
20  A  Yes.
21  Q  Okay.  And it's your usual and customary
22  practice to keep records like the one that we've marked
23  as Exhibit 7; is that right?
24  Q  Okay.  And you would consider this a business

Page 73

1   record of your office, right?
2       A   Correct.
3       Q   I'm gonna mark as Exhibit No. 8 a record that
4   is dated August 14th of 2012, and ask you if this looks
5   like it's from your office.
6       MS. SHUB:  And for the record, Exhibit 8 has
7       the same prefix: COL-RBAYLESS-ORLANDO-000030 to 31.
8   BY MS. SHUB:
9       Q   Is Exhibit 8 a record from your office?
10      A   Yes.
11      Q   It's one of your business records?
12      A   Yes.
13      Q   And this reflects an encounter on August 14th
14  of 2012 in which you saw the patient; is that right?
15      A   No, the actual testing was done by Andie
16  Nation, who was a medical assistant.
17      Q   Oh, okay.  Do you -- you reviewed the record
18  to make sure it's correct?
19      A   Yes.
20      Q   And that's why it contains your electronic
21  signature?
22      A   Correct.
23      Q   All right.  This record indicates that
24  Ms. Bayless was, in fact, incontinent, right?
25      A   She did exhibit incontinence, yes.

Page 74

1       Q   Okay.  One question I had for you, there's a
2   reference here to non-dependent tobacco use disorder;
3   is that different than a dependent tobacco use
4   disorder?
5       A   That is just the ICD 9 code --
6       Q   Okay.
7       A   -- for tobacco use.
8       Q   Okay.  So there's no relevance we should place
9   on the non-dependent language there?
10      A   Not from that specific -- it was just a
11  notation to -- to put in the record that she was an
12  active smoker.
13      Q   Okay.  All right.  I'm gonna go ahead and mark
14  as Exhibit No. 9 a record from August 16th of 2012 and
15  say, is that a record from your office?
16      A   Yes, it is.
17      Q   And is this a review of her evaluation done on
18  the 14th?
19      A   It's a document -- I'm sorry?  Say it again.
20      Q   Is this an opportunity -- was this visit an
21  opportunity to review with the patient what evaluation
22  had been done of her a couple of days earlier?
23      A   No, ma'am.
24      Q   Okay.  Can you explain the purpose of the
25  visit on October -- on August 16th?

Page 75

1       A   The purpose was to do -- perform a second
2   procedure called cystoscopy.
3       Q   Okay.  And what is that procedure?
4       A   Where we take a lighted telescope and look
5   into the bladder.
6       Q   Um-hmm.  And you're evaluating her
7   incontinence?
8       A   Yes.
9       Q   Okay.  And, of course, she's still reporting
10  to be a current, everyday smoker in this --
11      A   Yes.
12      Q   -- visit?
13      Okay.  She did not provide you any information
14  regarding drug use, correct?
15      A   I mean, not during that visit, no.
16      Q   Okay.  She was reporting vaginal discharge at
17  this visit, wasn't she?
18      A   According to the record, yes.
19      Q   Okay.  The next record we have that I'll mark
20  as Exhibit No. 10 is a record dated March 21st, 2013.
21  Is that a record from your office?
22      A   Yes.
23      Q   And what is the purpose of the March 21st,
24  2013 record?
25      A   It was to review the two diagnostic tests that

Page 76

1   the patient had undergone previously.
2       Q   And was this the -- your opportunity to
3   discuss with Ms. Bayless her different surgical
4   options?
5       A   Yes.
6       Q   And you discussed those because -- I see a
7   note that she wanted definitive management of her
8   pelvic organ prolapse; is that right?
9       A   Yes.
10      Q   And I presume she also wanted definitive
11  management of her stress urinary incontinence?
12      A   Yes.
13      Q   Okay.  And when you're making a decision for
14  definitive management, is it your goal to provide the
15  patient the surgical option that's gonna provide the
16  greatest likelihood of a long term solution to her
17  problem?
18      A   Yes.
19      Q   And does that include surgery with a surgical
20  mesh implant for some patients?
21      A   It can.
22      Q   You discussed that -- the options that you had
23  with Ms. Bayless, right, and those are reflected about
24  midway through the page -- bottom half of Exhibit 10;
25  is that right?

Page 77

1    A   Correct.
2    Q   And the surgical options included a vaginal
3  approach, right?
4    A   Yes.
5    Q   That's the transvaginal mesh that I believe
6  opposing counsel was mentioning earlier?
7    A   No.
8    Q   He was -- well, he mentioned transvaginal
9  pelvic organ prolapse mesh.  Ms. Bayless did not
10  receive a transvaginal implantation of mesh for pelvic
11  organ prolapse, did she?
12    A   No, she did not.
13    Q   Okay.  You also discussed with her an
14  abdominal approach; is that right?
15    A   Correct.
16    Q   And you described that in two different ways.
17  A traditional repair that's like a C-section, or an
18  abdominal approach that's done with laparoscopic or
19  robotic assistance; is that right?
20    A   Yes.
21    Q   And did you describe the different risks and
22  benefits with Ms. Bayless of all of those different
23  approaches?
24    A   Yes, I did.
25    Q   What are the risks and benefits of an

Page 78

1  abdominal sacral colpopexy?
2    A   Specifically for the -- the sacral colpopexy
3  with use of mesh -- it includes all of the surgical
4  risks that's associated with any pelvic surgery.  So
5  infection, bleeding, delayed healing, pain with
6  intercourse, voiding dysfunction, or urinary retention.
7      What is unique to the use of mesh placement is
8  mesh exposure.
9    Q   Okay.  And you've treated mesh exposure
10  before?
11    A   Yes.
12    Q   And can that usually be fairly easily treated
13  and remedied in --
14    MR. HABERMAN:  Objection.
15  BY MS. SHUB:
16    Q   -- in most patients?
17    THE WITNESS:  It depends on the presentation.
18  BY MS. SHUB:
19    Q   Right.  It depends on a number of factors --
20    A   Yes.
21    Q   -- would you agree with that?
22      Would you agree that mesh exposure can, in
23  many patients, be treated with a local excision?
24    A   Yes.
25    MR. HABERMAN:  Objection.

Page 79

1    MS. SHUB:  What's the basis for your
2  objection?  Basis?
3    MR. HABERMAN:  What's that?
4    MS. SHUB:  Basis?
5    MR. HABERMAN:  Outside the scope.
6  BY MS. SHUB:
7    Q   You also noted in your record that the
8  surgeries for pelvic organ prolapse can also be
9  combined with hysterectomy?
10    A   Yes.
11    Q   And the patient in this case desired a
12  hysterectomy; is that right?
13    A   Her uterus was part of her prolapse --
14    Q   Okay.
15    A   -- so she wanted to make sure that all of the
16  potential components of her prolapse was addressed with
17  this surgery.
18    Q   And hysterectomy was one of those components
19  that would deal with her uterus, right?
20    A   Yes.
21    Q   Because if you remove the uterus, it's not
22  going to be prolapsing out through the vagina, correct?
23    A   No.
24    Q   Is that correct?
25    A   That is correct.

Page 80

1    Q   Okay.  I just wanted to cure the double
2  negative on the record.
3      You have different options that you describe.
4  The SUI component, the options for treatment.  You
5  noted that a mid urethral sling mesh was the gold
6  standard, right?
7    A   Yes.
8    Q   And that means that's actually the standard of
9  care for doctors to treat that condition, right?
10    A   Correct.
11    Q   And would you agree that abdominal sacral
12  colpopexy was also a standard of care for treatment of
13  pelvic organ prolapse?
14    A   Yes.
15    Q   Okay.  And you mentioned earlier that there
16  were meshes that were available years ago that are no
17  longer available now.  And those earlier meshes had
18  characteristics that current meshes do not?
19    A   Correct.
20    Q   The meshes -- were the surgical implants that
21  you used for Ms. Bayless -- were not the older meshes
22  that caused a lot of controversy at the time, correct?
23    A   No.
24    Q   Okay.  These were the newer improved --
25    A   Correct.

Page 81

1    Q   -- surgical implants; is that right?
2    A   That's correct.
3    Q   In fact, not all surgical mesh implants are
4  alike; would you agree with that?
5    A   No, they are not.
6    Q   Okay.  You would -- you would agree that there
7  are differences?
8    A   Yes, there are differences.
9    Q   Okay.  And you selected the Restorelle Y Mesh
10  for Ms. Bayless' surgery; is that right?
11    A   Yes.
12    Q   And have you used that surgical implant
13  before?
14    A   Yes.
15    Q   About how many surgeries do you think you've
16  performed using the Restorelle for wesh (sic) --
17  Restorelle Y Mesh surgical implant?
18    A   I -- her surgery was in 2012.  It's 2018, so
19  that's at least six years.  In that span --
20    Q   Hundreds?
21    A   Yes.
22    Q   Okay.  And I don't -- I don't need an exact
23  number.
24    A   Okay.
25    Q   I'm just looking for ballpark.

Page 82

1    A   Um-hmm.
2    Q   So before you conducted Ms. Bayless' surgery,
3  had you done -- had you done abdominal sacral colpopexy
4  with a Restorelle Y Mesh before?
5    A   Yes.
6    Q   And had you had good success with that --
7    A   Yes.
8    Q   -- implant?
9    A   Yes.
10    Q   And had patients' tissue responded well to
11  that surgical implant?
12    A   Yes.
13    Q   Are you familiar with the characteristics of
14  the Restorelle Y Mesh?
15    A   Yes.
16    Q   Okay.  You know it to be one of the lightest,
17  if not the lightest, surgical Y mesh available today?
18    A   Yes.
19    Q   You know it to have macropores, or sufficient
20  pore size to allow for tissue ingrowth, and also
21  prevent infection, correct?
22    A   Yes.
23    MR. HABERMAN:  Objection; calls for -- outside
24  the scope --
25  BY MS. SHUB:

Page 83

1    Q   You understand --
2    MR. HABERMAN:  -- no foundation, calls for
3  expert testimony.
4    COURT REPORTER:  I'm sorry, say that again.
5    MR. HABERMAN:  No foundation, calls for expert
6  testimony, outside of scope.
7  BY MS. SHUB:
8    Q   You're familiar -- you analyze the properties
9  of a surgical mesh implant before you select it for use
10  in a patient; is that right?
11    A   Yes.
12    Q   And what were the properties of the
13  Restorelle Y that led you to use that implant for
14  Ms. Bayless' surgery?
15    A   Three main factors.  One, very ultra light.
16  The macropore size.  But also, that interstitial size
17  was also one of the largest.
18    It was very -- it had very good flexibility.
19  Good stretchability.  Meaning, in -- when you look at a
20  product, you look at its ability to stretch in a
21  vertical, or up and down fashion, as well as a side to
22  side fashion.
23    So it had -- all of the properties were --
24  again, when a patient stands up, you have to be able to
25  accommodate the forces of standing, that you are not

Page 84

1  able to subject -- or estimate when they're lying down
2  and you're doing your surgery.
3    Q   Okay.  And is one of the reasons you use a
4  surgical implant the hope that the repair will be more
5  permanent?
6    A   Yes.
7    Q   And is that because a polypropylene surgical
8  mesh implant has a strength that cannot be achieved
9  with a native tissue repair alone?
10    A   Correct.
11    Q   In fact, there are just some -- well, strike
12  that.
13    Let me mark as Exhibit No. 11 a visit from
14  your office.  This one is dated -- I think I did this
15  one already.  Hold on.  I did.
16    VIDEOGRAPHER:  We have five more minutes.
17    MR. HABERMAN:  All right.
18  BY MS. SHUB:
19    Q   Before you talked with --
20    MR. HABERMAN:  How many more minutes?  Five?
21  Why don't we go ahead and change the tape now
22  because I'm getting to a new section.  We can take
23  a quick break.
24    VIDEOGRAPHER:  Okay.  Thank you.
25    MS. SHUB:  Go off the record.

Page 85

1        VIDEOGRAPHER:  This concludes media No. 1.
2    The time is 11:00 o'clock.  Off the record.
3        (A break was taken.)
4        VIDEOGRAPHER:  Okay.  We are now back on the
5    video record.  This is media No. 2 of the
6    deposition of Kathy Y. Jones, M.D.  The time is
7    11:10 a.m.
8    BY MS. SHUB:
9        Q   Dr. Jones, we're back on the record after a
10   brief break to change the videotape.  We were talking
11   about Exhibit No. 10, which was the visit when you were
12   discussing surgical options with Ms. Bayless, correct?
13       A   Yes.
14       Q   The very last -- or second to last paragraph
15   of there it says, Risks and benefits discussed, right?
16       A   Correct.
17       Q   And does that indicate to you that the risks
18   and benefits of the different surgical options were
19   discussed with Ms. Bayless?
20       A   Yes.
21       Q   And it indicates, risks discussed included,
22   but were not limited to the following -- and bleeding
23   was a risk discussed, right?
24       A   Yes.
25       Q   Infections was a risk discussed?

Page 86

1        A   Yes.
2        Q   Damage to surrounding organs, such as bowel
3    and bladder was discussed?
4        A   Yes.
5        Q   Urinary retention was discussed?
6        A   Yes.
7        Q   And mesh exposure was discussed?
8        A   Yes.
9        Q   Okay.  Other -- other risks were discussed,
10   according to this note?
11       A   Yes.
12       Q   Would you also discuss -- can -- can sutures
13   become exposed?  I think you said yes earlier.
14       A   Yes.
15       Q   Okay.  Okay.  Opposing counsel asked you some
16   questions about polypropylene.  If a polypropylene was
17   provided to the -- that was provided to an implant
18   manufacturer was designated as medical grade, would
19   that be important to you?
20       A   Yes.
21       Q   Okay.  And if the polypropylene was
22   specifically designed for medical use in implants,
23   would that be important to you?
24       A   Yes.
25       Q   Okay.  And would that make you feel

Page 87

1    comfortable with the polypropylene that was used for
2    the surgical implant?
3        A   Yes.
4        Q   Okay.  Let's go on to what I have as the next
5    visit.  And I have, actually, a couple of records for
6    this next visit, but -- it's dated May 28th of 2013.
7    And we'll mark as your Exhibit No. 11 pages Bates
8    labeled C -- oh -- pages Bates labeled
9    COL-RBAYLESS-ORLANDO, Pages 15 to 18.
10       Are these records that we've marked as Exhibit
11   11 part of a record from your office?
12       A   Yes.
13       Q   Okay.  And is this the preoperative
14   consultation with Ms. Bayless?
15       A   What's the date of service?
16       Q   May 28th, 2013.
17       A   Yes.  So we're not talking about this
18   (indicating)?
19       Q   Yes, I'm sorry.  Yeah, there's some other
20   records at the top of the page.  I guess it's midway
21   through the first page.
22       A   Um-hmm.
23       Q   Now, Ms. Bayless' chief complaints were
24   incontinence, right?
25       A   Yes.

Page 88

1        Q   And prolapse of the vaginal vault.  That's the
2    top of the vagina?
3        A   Yes.
4        Q   And a cystocele, right?
5        A   Correct.
6        Q   She's also had some problems that were noted.
7    Do you see the problems that were identified?
8        A   Yes, um-hmm.
9        Q   Bacterial vaginosis is a problem.  What is
10   bacterial vaginosis?
11       A   It's the overgrowth of bacteria in the vagina
12   that is not of the lactobacillus type.
13       Q   Can bacterial vaginosis lead to discharge?
14       A   Yes.
15       Q   Okay.  How about candidiasis?  I'm
16   mispronouncing that.
17       A   Candidiasis.
18       Q   Yes.  And what is that?
19       A   It's better known as a yeast infection.
20       Q   Okay.  And can that lead to discharge?
21       A   Yes.
22       Q   And she was prescribed some creams?
23       A   Yes.
24       Q   Was that to deal with those conditions?
25       A   Yes.

Page 89

1      Q   All right.  On the second page of Exhibit 11
2  you have some notes regarding her past medical history;
3  is that right?
4      A   Yes.
5      Q   You noted that she previously had a tubal
6  ligation, right?
7      A   Yes.
8      Q   She had some other surgeries as well,
9  including a gallbladder surgery.  Were you aware of
10  that?  I don't know if that's reflected on here.
11      A   Yes, it's in the middle of the page.
12      Q   Okay.  She's still noted to be a current
13  everyday smoker; is that right?
14      A   Yes.
15      Q   Okay.  She did not report use of illicit drugs
16  though, did she?
17      A   Correct.
18      Q   Okay.  On the third page of Exhibit No. 11 you
19  have a discussion with her about the procedure that
20  you're gonna provide; is that right?
21      A   Yes.
22      Q   The first item -- the first thing you're going
23  to do during her surgery is a total vaginectomy; is
24  that right?
25      A   As far as an option?

Page 90

1      Q   Oh, okay.  Was that the option discussed, or
2  was that part of the procedure?
3      A   Those are options --
4      Q   Okay.
5      A   -- that are discussed.
6      Q   All right.  The second one was, gold standard
7  for vaginal vault prolapse and uterine prolapse,
8  including abdominal sacral colpopexy with mesh; is that
9  right?
10      A   Yes.
11      Q   And that's the Restorelle surgical implant
12  that we've discussed already; is that right?
13      A   It includes, yes, the use of the -- the
14  Restorelle Y Mesh.
15      Q   Okay.  And you would include that Restorelle Y
16  Mesh as -- as a surgical implant that would fall within
17  the gold standard of the standard of care?
18      A   Correct.
19      Q   And again, she was -- potential complications
20  from that surgery were discussed; is that right?
21      A   Yes.
22      Q   All right.  And you chose that over a
23  traditional open surgery; is that right?
24      A   Yeah.
25      Q   And why was sacral colpopexy -- an abdominal

Page 91

1  sacral colpopexy with Y mesh chosen over a traditional
2  open surgery?
3      A   Those -- No. 2 and No. 3 are the same
4  procedure.  It's the access or the route of the
5  procedure that's different.
6      Q   And what is -- what benefits are there from
7  the abdominal procedure over the open procedure?
8      A   They're both abdominal procedures.
9      Q   I'm sorry.  What are the benefits of the
10  abdominal laparoscopic or robotic procedure over the
11  open abdominal procedure?
12      A   It's a shorter hospital stay, and decreased
13  pain requirements.
14      Q   Um-hmm.
15      A   That way the patient can go home within 24
16  hours, as opposed to having a two- to three-day
17  hospital stay.
18      Q   Okay.  At this visit, on the last page of
19  Exhibit No. 11, there's a note regarding the surgical
20  plan.  So does this indicate this was the time when the
21  actual plan was formalized?
22      A   Yes.
23      Q   Okay.  And again, the risks and benefits of
24  the surgical procedures were discussed --
25      A   Yes.

Page 92

1      Q   -- right?
2          And at the very end, it indicates that the
3  patient voiced understanding and would like to proceed
4  with the procedure; is that right?
5      A   Yes.
6      Q   And she signs some written consents to that
7  effect, right?
8      A   Yes.
9      Q   And is that your usual and customary practice
10  to have the patient sign consent forms?
11      A   Yes.
12      Q   And do you describe both consent forms with
13  the patient?
14      A   Do I --
15      Q   Or do you -- or do you -- are you available
16  for questions if the patient has any questions about
17  the consent forms?
18      A   Yes.
19      Q   All right.  Let's go through some of those, if
20  we can.
21          Now, one of the procedures she -- Ms. Bayless
22  was gonna have was a hysterectomy --
23      A   Yes.
24      Q   -- is that right?
25          And that involves removal of the uterus?

Page 93

1   A   Yes.
2   Q   And did it also involve removal of the cervix?
3   A   Yes.
4   Q   All right.  And what I've marked as Exhibit 12
5   is entitled Hysterectomy Surgical Consent Form, with
6   the Bates label COL-RBAYLESS-ORLANDO Page 23.
7       Is it -- is Exhibit No. 12 the surgical
8   consent form that was provided to Ms. Bayless?
9   A   It's a component.  It is one page of the
10  consent form.
11  Q   Right.  In fact, you have multiple pages that
12  deal with her consent --
13  A   Yes.
14  Q   -- for her surgery, right?
15      One of the things your consent form notes, in
16  the middle of the top paragraph -- it's possible the
17  operation will not help the patient, right?
18  A   Yes.
19  Q   And it's even possible that the patient would
20  be worse off after the operation than they were before
21  the operation?
22  A   Yes.
23  Q   And that's contained in the consent form that
24  this patient signed, right?
25  A   Yes.

Page 94

1   Q   Your consent form advises patients that all
2   surgeries can have complications ranging from minor to
3   fatal, right?
4   A   Yes.
5   Q   And fatal means the patient could actually die
6   during surgery?
7   A   Yes.
8   Q   Your consent form also notes that physical and
9   sexual activity are to be restricted for a period of
10  time after surgery, right?
11  A   Yes.
12  Q   And I think you said your general restricted
13  period is approximately 12 weeks; is that right?
14  A   Yes.
15  Q   I'm gonna mark as Exhibit 13 some additional
16  consent forms.  This one is Bates labeled
17  COL-RBAYLESS-ORLANDO, Pages 21 and 22.  Is this part of
18  the consent process from your office?
19  A   Yes.
20  Q   Now, what we've marked as Exhibit 13 is an
21  Informed Consent and Request for Repair of Relaxation
22  of Pelvic Organs and/or Urinary Incontinence; is that
23  right?
24  A   Yes.
25  Q   This -- Exhibit 12 specifically deals with the

Page 95

1   surgery that was going to involve surgical mesh
2   implants, correct?
3   A   It's one of.
4   Q   Okay.  So your consent's actually broader than
5   13, right?
6   A   So this consent is a summary of multiple
7   procedures.
8   Q   Okay.
9   A   The previous consent was just specific to a
10  hysterectomy.  This is a summary of the combined
11  procedures and the combined risk.  And I also have a
12  consent form that's very specific for the use of mesh
13  or any type of augmentation product.
14      COURT REPORTER:  Any type of what product?
15      THE WITNESS:  Augmentation.
16  BY MS. SHUB:
17  Q   Okay.  We'll get to that one in just a second.
18      On Exhibit 13, you do describe the material
19  risks of the different -- of the procedures in No. 4,
20  right?  We've got some numbered paragraphs.  1, 2 --
21  A   Yes.
22  Q   -- 3 and 4.
23      No. 4 describes material risks.  And 5 also
24  describes risks?
25  A   Yes.

Page 96

1   Q   All right.  And just like the form for the
2   hysterectomy, some of the risks you note are that there
3   may not be improvement, or there may be a worsening,
4   right?
5   A   Yes.
6   Q   You might -- your consent form also notes the
7   potential for pain or discomfort with sexual
8   intercourse; is that right?
9   A   Yes.
10  Q   And that includes the term that you -- we've
11  been using in this deposition called dyspareunia?
12  A   Yes.
13  Q   Which means pain with intercourse, right?
14  A   Yes.
15  Q   It talks about possible formation of blood
16  clots, success rates.  You've also discussed the -- the
17  consent form also addresses that the patient has been
18  provided information regarding alternatives, right?
19  A   Yes.
20  Q   And the patient could have refused to sign
21  this consent form, right?
22  A   Yes.
23  Q   And could have refused to go forward with the
24  surgery?
25  A   Yes.

25  (Pages 97 to 100)

Page 97

1    Q   You actually specifically identify, on the
2    form that Ms. Bayless signed off, the type of surgical
3    implants that you would be using?
4    A   Yes.
5    Q   Okay.  And that's on the bottom of the second
6    page.  You identify the Coloplast Restorelle Y Mesh, as
7    well as the Boston Scientific sling, right?
8    A   Yes.
9    Q   That wasn't hidden from Ms. Bayless, right?
10   A   No.
11   Q   Okay.  And -- okay.  If she had any questions
12   about that consent form, you would have been willing
13   and able to answer them, right?
14   A   One of the corollaries on the top includes --
15   it says, do not sign unless you understand the
16   contents.
17   Q   Okay.  And so, if she signed on those, you
18   relied on the fact that she was representing to you she
19   understood?
20   A   Yes.
21   Q   All right.  I'm gonna mark as your Exhibit 14
22   one of the consent forms that I think you may have
23   mentioned earlier that deals with the procedure for
24   Anterior and/or Posterior Colporrhaphy.  Do you see
25   that?

Page 98

1    A   Yes.
2    Q   Exhibit 14 notes particular risks that may
3    deal with any repair of the vaginal walls, right?
4    A   Yes.
5    Q   Okay.  And one of the complications noted is
6    potential for pain during intercourse, right?
7    A   Yes.
8    Q   And one of the complications noted is that the
9    patient may require future surgery?
10   A   Yes.
11   Q   And that would be to repair a complication for
12   the first surgery, right?
13   A   Yes.
14   Q   That colporrhaphy is often a surgery without a
15   mesh augmentation, correct?
16   A   It can be done.
17   Q   It can be done with sutures all by themselves?
18   A   Yes.
19   Q   And that suture surgery still has the risk of
20   need for future surgery and pain with intercourse?
21   A   Yes.
22   Q   Now, Exhibit 15 is also part of your consent
23   form.  This is Augmentation Graft Consent Form.  Is
24   this the one involving synthetic materials that you
25   were mentioning earlier?

Page 99

1    A   It includes any augmentation graft that can be
2    synthetic; cow skin, human skin.
3    Q   Right.  Grafts come in different forms.  Some
4    are biologic material and some are synthetic material,
5    right?
6    A   Yes.
7    Q   Okay.  And in your experience, is a synthetic
8    graft typically stronger than a biologic graft?
9    A   It can be.
10   Q   Okay.  Is that why you use it?
11   A   Yes.
12   Q   All right.  And in fact, in the consent form
13   that was provided to Ms. Bayless, the term "synthetic
14   materials such as mesh" -- synthetic is actually
15   circled.  Do you see that?
16   A   Yes.
17   Q   Would that circling have been done during a
18   description of the consent form for Ms. Bayless?
19   A   Yes.
20   Q   All right.  So it sounds like somebody just
21   didn't hand it to her; somebody actually went through
22   and talked with her about these risks before she signed
23   this form, right?
24   A   Yes.
25   Q   Is that your usual and customary practice?

Page 100

1    A   It is.
2    Q   And again, like the surgery without mesh, this
3    consent form notes that there may be a need for a
4    surgery after the implant surgery to address a problem
5    that might occur with the first surgery?
6    A   Correct.
7    Q   All right.  This form also specifically makes
8    reference to the fact that mesh can become exposed in
9    the vagina, right?
10   A   Yes.
11   Q   And that there might be delayed healing,
12   right?
13   A   Yes.
14   Q   And if a patient is a smoker, that patient can
15   have delayed healing --
16   A   Yes.
17   Q   -- as well, right?
18       In fact, that increases the risk for delayed
19   healing, doesn't it?
20   A   Yes.
21   Q   Those consent forms were signed May 28th of
22   2013, which was not the day of surgery; is that right?
23   A   No, it was not.
24   Q   In fact, it was a couple of months before
25   Ms. Bayless had surgery, right?

Page 101

1    A  Yes.
2    Q  And so, Ms. Bayless had some opportunity after
3  she met with you, and discussed the process with you,
4  to decide later that she didn't want to go forward with
5  the surgery, right?
6    A  Yes.
7    Q  She had an opportunity to do some research on
8  her own, if she wanted to, right?
9    A  Yes.
10    Q  Okay.  You weren't trying to rush Ms. Bayless
11  into a surgery, were you?
12    A  No.
13    Q  Now, I'm gonna hand you what we've marked as
14  Exhibit 16; a Surgery/Procedure Consent Form.  I'm not
15  sure if this one's from your hospital.  It may -- or
16  from you, or from the hospital -- Exhibit 16.  It's
17  Bates labeled COL PLTF 32 through 33 -- RBAYLESS.
18      Is what we've marked as Exhibit 16 a consent
19  form from your office?
20    A  No.
21    Q  Okay.  Is this from the hospital?
22    A  Yes.
23    Q  Nonetheless, is it the usual and customary
24  practice for a patient who has surgery from you to have
25  an opportunity to review and consent to the procedure,

Page 102

1  again, immediately before the surgery occurs?
2    A  Yes.
3    Q  And does that appear to be what happened here?
4    A  Yes.
5    Q  All right.  And again, the consent form
6  advises that the patient has been made aware of the
7  risks of surgery; is that right?
8    A  Yes.
9    Q  All right.  We're gonna mark as Exhibit 17
10  what I understand to be your operative report for
11  Ms. Bayless.  I have Bates number COL-RBAYLESS-ORLANDO
12  Pages 7 through 12.
13      Does Exhibit 17 appear to be your operative
14  report?
15    A  Yes, it does.
16    Q  And this is a document that is created through
17  your dictation?
18    A  Yes.
19    Q  All right.  This indicates that the surgeries
20  to be performed -- first of all, the surgery was to be
21  performed on August 9th of 2013; is that right?
22    A  The surgery was performed on August 9th, 2013.
23    Q  Okay.  And the operations that were performed
24  included the hysterectomy, right?
25    A  Yes.

Page 103

1    Q  As well as the abdominal sacral colpopexy to
2  correct prolapse, correct?
3    A  Yes.
4    Q  As well as the mid urethral sling, right?
5    A  Yes.
6    Q  And then, cystoscopy to check the bladder and
7  her urinary tract, right?
8    A  Correct.
9    Q  Now, it appears that one of the first things
10  you did when you began the surgery was to examine the
11  physical characteristics once you got into her pelvic
12  space.  You wanted to see what you were dealing with,
13  right?
14    A  Yes.
15    Q  Ms. Bayless had had prior surgeries.  And can
16  prior surgeries lead to adhesions?
17    A  Yes.
18    Q  And what is an adhesion?
19    A  An abnormal connection between two surfaces.
20    Q  And is a patient who has adhesions more
21  difficult than a patient who does not have adhesions?
22    A  Depending on the severity of adhesive disease
23  and where it's located.
24    Q  Okay.  And Ms. Bayless, in fact, did have
25  adhesions, did she not?

Page 104

1    A  She did.
2    Q  Okay.  Likely from her -- her prior abdominal
3  surgeries, do you think?
4    A  I could not say for sure.
5    Q  Okay.  Just that they were present?
6    A  Yes.
7    Q  She also had evidence of diverticular disease
8  in the Sigmoid colon.  Was that relevant to her
9  surgical course?
10    A  It may have been the reasons why she developed
11  left sidewall adhesions.  Because diverticulosis or
12  diverticular disease is -- can become inflamed --
13    Q  Um-hmm.
14    A  -- and patients can have bouts of that,
15  causing pain, before they realize or are diagnosed with
16  it.
17    Q  Inflammatory diseases in the pelvis can happen
18  from all sorts of reasons; is that right?  I mean --
19    A  I'm not sure what you're asking me.
20    Q  Can sexually transmitted diseases lead to
21  inflammatory responses in the pelvic area?
22    A  It can.
23    Q  Okay.  Can gonorrhea?
24    A  Yes.
25    Q  Can bacterial vaginosis?

Page 105

1    A  No.
2    Q  Okay.  Now, as I understand, and I'm not gonna
3  go through the whole record -- but as I understand,
4  this surgery was done in -- I'm gonna say in order.
5  I'm gonna go through the order of procedures.
6       You did the hysterectomy first; is that right?
7    A  Yes.
8    Q  And then you did the sacral colpopexy to
9  address her prolapse, second?
10   A  Yes.
11   Q  And then you did the sling?
12   A  Correct.
13   Q  Okay.  With hysterectomy, even if you do not
14  follow hysterectomy with a surgical implant -- I think
15  we've discussed hysterectomy all by itself has some
16  complications, true?
17   A  Yes.
18   Q  One of the complications of hysterectomy can
19  be vaginal shortening; is that right?
20   A  Yes.
21   Q  If you do a hysterectomy, you have to sew, or
22  suture together, the top of the vagina, right?
23   A  Correct.
24   Q  Okay.  And there is a suture line at the top
25  of the vagina after a hysterectomy, right?

Page 106

1    A  Yes.
2    Q  Is that sometimes called the vaginal cuff?
3    A  Yes.
4    Q  Okay.  You closed the vaginal cuff with a
5  running stitch or a V-Loc suture; is that right?
6    A  Yes.
7    Q  Is that a -- can you describe that process?
8    A  The process of closing the cuff?
9    Q  Yes, ma'am.
10   A  A V-Loc is a special suture that is what we
11  call delayed absorbable.  In particular, it lasts
12  approximately 180 days.  It's a running suture, meaning
13  that it's placed at one end of the vaginal incision,
14  and then it is -- multiple loops are then placed across
15  the vaginal incision until it's closed to the opposite
16  end.
17   Q  Okay.  If you do -- is it your normal practice
18  to do single layer closure of tissue, or a double layer
19  closure of tissue?
20   A  Single layer.
21   Q  Okay.  Are you aware that some people do a
22  double layer closure?
23   A  Yes.
24   Q  Do you know why some people do a double layer
25  closure?

Page 107

1    A  Their premise is that it may -- well, let me
2  ask you this: Are you talking about with just a
3  hysterectomy, or are you talking about with a
4  concomitant prolapse procedure?
5    Q  Either way.
6    A  I would say for most -- most people do a
7  single layer closure with a traditional hysterectomy.
8  That's very standard.
9       COURT REPORTER:  A what kind of hysterectomy?
10  I'm sorry, I didn't understand you.
11      THE WITNESS:  They do a single layer closure
12  of the cuff in a hysterectomy alone.  They may do a
13  double layer if they have some concerns about the
14  strength or the integrity of the first layer.
15  BY MS. SHUB:
16   Q  Okay.  If you do a hysterectomy followed by a
17  concomitant sacral colpopexy procedure, does that
18  change the analysis of whether to do a single layer
19  closure or a double layer closure for you?
20   A  For me, no.
21   Q  Okay.  Does it for some other surgeons of
22  which you're aware?
23   A  I believe that is their -- certain surgeons'
24  preference.
25   Q  Okay.  And do you understand the reason that

Page 108

1  other surgeons might do a double layer closure?
2    A  The premise, again, is to take the first
3  suture line further away from where you're placing the
4  graft.
5    Q  And is that with the hope of strengthening
6  that suture line?
7    A  No.
8    Q  Okay.  What would you understand to be the
9  purpose of the second layer?
10   A  As I just --
11   Q  I'm not sure I understand, so --
12   A  Okay.
13   Q  -- I apologize.
14   A  So, the first layer -- if you place a second
15  layer, what you're doing is placing the first layer
16  further away from where you had actually attached the
17  graft to the vagina.  Usually, if you have a mesh
18  exposure it usually occurs at the suture line.
19      So the premise or the theory is, if I -- if I
20  place a second layer, then my primary suture line,
21  which is still the one that's going to be in the
22  vagina, and exposed to the stresses of the vagina with
23  intercourse, won't be exposed to a direct application
24  of the mesh.
25   Q  Okay.  If you do a double layer closure, would

Page 109

1  the sutures at the apex for the sacral colpopexy also
2  be, I guess, a little farther away from the actual
3  internal apex of the vagina?
4      I think what you're saying is there's a
5  distance reason to do a double closure.
6      A  So -- I'm sorry, what are you asking me?
7      Q  Well, I wanted to ask about the sutures,
8  because you talked about the -- the location of the
9  mesh.  And I guess if you do a double layer closure,
10  the suture is what actually goes deeper into the tissue
11  than the mesh itself, correct?
12      A  No.
13      Q  Okay.  Well, you -- you've got to suture --
14  you sew it -- it's a -- it's a surgical sewing?
15      A  You place the sutures, yes.
16      Q  Okay.  And you sew into -- I guess, from the
17  top, you're sewing into tissue, correct?  The mesh
18  itself doesn't get sewn into the tissue?
19      A  Yes, it does.
20      Q  Well -- okay.  Let me back up.
21      It's -- well, it's underneath the mesh, right?
22  So you're sewing it like you might sew a button, but
23  there's a thread?  It's essentially a thread?  A suture
24  would be equivalent to a thread -- surgically?
25      A  Yes.

Page 110

1      Q  Okay.  You measured the anterior wall; is that
2  your normal practice?
3      A  During the initial examination?
4      Q  It looks like in your surgical report -- if I
5  can refer you to 17, on Page 2.  The one with the Bates
6  label 9 at the bottom.  The second to the last
7  paragraph.
8      Paragraph beginning:  Then a tunnel --
9      It says, Then a tunnel in the peritoneal space
10  was then created down to the level of the vaginal cuff.
11  Did I read that correctly?
12      A  Yes.
13      Q  Okay.  And you said, At this point, I measured
14  the anterior wall -- do you see that?
15      A  Yes.
16      Q  Okay.  And I -- I guess -- and you said, and
17  the vaginal length was measured to be approximately
18  four centimeters.  Do you see that?
19      A  Yes.
20      Q  Did I read that correctly?
21      A  Yes.
22      Q  Okay.  And so, you -- I just wanted to
23  confirm, you actually measured the vaginal wall, or you
24  get a sense -- to record the length of the anterior
25  vaginal wall?

Page 111

1      A  So, just so you understand what that means --
2      Q  Um-hmm.
3      A  -- it's the portion of the anterior vaginal
4  wall that was available for graft application.
5      Q  Okay.  Got it.
6      You secured the graft to the anterior vaginal
7  wall with Gore-Tex sutures?
8      A  Yes.
9      Q  And you used six; is that right?
10      A  Yes.
11      Q  And you did the same thing on the posterior
12  side?
13      A  Correct.
14      Q  Okay.  Do you do any sutures at the apex?
15      A  No.
16      Q  Okay.  That's probably why we had the
17  disconnect earlier.  I was trying to understand that.
18      After that, you then -- it wasn't until after
19  the sacral colpopexy was complete that you did the
20  sling; is that right?
21      A  Yes.
22      Q  And did you feel the surgery was successful?
23      A  Yes.
24      Q  You did send the explanted hysterectomy
25  material for pathology; is that normal?  Is that your

Page 112

1  usual and customary practice?
2      A  Any -- anything that's removed from the
3  patient is usually sent to pathology for evaluation.
4      Q  Okay.  And I'm gonna mark as your Exhibit 18,
5  Bates labeled COL PLTF 86 and 87 -- which I understand
6  to be the pathology report; is that --
7      A  (No audible response.)
8      Q  Do you review the pathology report?
9      A  Yes.
10      Q  Okay.  We noticed the pathology report notes
11  that Ms. Bayless had marked acute and chronic
12  cervicitis.  Do you see that?
13      A  Yes.
14      Q  Is that inflammation?
15      A  Yes.
16      Q  And can that kind of inflammation result in
17  pain for a patient -- abdominal pain?
18      A  Possibly.
19      Q  Was a cause of the cervicitis identified?
20      A  No.
21      Q  Okay.  After surgery, Ms. Bayless was given
22  discharge instructions, right?  I assume you gave her
23  some oral instructions, right?
24      A  So we give our patients discharge instructions
25  prior to surgery.

Page 113

1    Q   Okay.  Let me mark as your Exhibit 19 a series
2  of documents.  They're Bates labeled COL PLTF 49 to 62.
3  These are discharge instructions.
4      Were these from you or from the hospital?
5    A   This is from the hospital.
6    Q   Okay.  Have you read them before?
7    A   I have.
8    Q   Okay.  You rely upon the hospital to, also,
9  give them these discharge instructions that are
10 reflected in Exhibit 19?
11   A   They're reinforced.
12   Q   So these are repetitive of the type of
13 restrictions that you would provide your patient,
14 correct?
15   A   Yeah.  It may not be in the same detail, but
16 yes.
17   Q   Okay.  On Page -- it's got a Bates label at
18 the bottom of 51.  I just want to refer you -- up at
19 the top it says, Additional Care Instructions: Diet as
20 tolerated, pelvic rest until seen by Dr. Jones.
21   A   Yes.
22   Q   You wanted Ms. Bayless to refrain from sexual
23 intercourse until you had a chance to examine her?
24   A   Yes.
25   Q   Okay.  And did you convey that to Ms. Jones?

Page 114

1    A   To Ms. Bayless.
2    Q   I mean -- sorry.
3    A   Yes.
4    Q   Dr. Jones, did you convey that to Ms. Bayless?
5    A   Yes.
6    Q   Now, typically, how quickly after surgery
7  would you like to see a patient?
8    A   Within ten days.
9    Q   Okay.  Ms. Bayless did not return to you in
10 ten days, did she?
11   A   I don't think so.
12   Q   Okay.  I'll represent to you that we have one
13 more surgical visit with Ms. Bayless, dated September
14 24th, 2013.  And I'll mark for you as Exhibit 20 the
15 records we have from that visit.  Bates labeled
16 COL-RBAYLESS-ORLANDO 13 through 15.
17      Does Exhibit 20 appear to be records from your
18 office?
19   A   Yes.
20   Q   Okay.  Now, here the patient appeared to be
21 doing well, except for some occasional discomfort in
22 the pelvic area, and mood swings.  Is that what --
23   A   Yes.
24   Q   -- you understand?
25      All right.  And she was six weeks, three days

Page 115

1  post-operative, right?
2    A   Yes.
3    Q   And this would have been the first time she
4  came back to your office, right?
5    A   Yes.
6    Q   Okay.  Katherine Puig's name is on here?
7    A   Yes.
8    Q   And she's the nurse practitioner that has
9  worked with you for nine years?
10   A   Yes.
11   Q   And who you rely on and who you trust?
12   A   Yes.
13   Q   On the second page of that post-operative
14 visit, there is a section on review of symptoms?
15   A   Yes.
16   Q   And there's a fairly long paragraph there; do
17 you see that?
18   A   Yes.
19   Q   I'm not gonna read them all, but some of the
20 items in this paragraph are in bold.  Does the bold
21 indicate to you that was, in fact, a complaint made by
22 Ms. Bayless at this --
23   A   Yes.
24   Q   Okay.  I'm gonna go about halfway -- I won't
25 spend our time going through all of it.  But she -- one

Page 116

1  of the things Ms. Bayless reported to your office was
2  dry vaginal mucosa.  Do you see that?
3    A   Is it bolded?
4    Q   Yeah.  Hold on.
5    A   Oh.  I see vaginal odor and discharge up here.
6    Q   Okay, yeah.  She had discharge and vaginal
7  odor, right?
8    A   Um-hmm.
9    Q   Here it is (indicating).
10   A   Okay, um-hmm.
11   Q   Dry vaginal mucosa; is that right?
12   A   Yes.
13   Q   And then she -- the next line down, she
14 reports decreased libido and orgasmic dysfunction.  Do
15 you see that?
16   A   Um-hmm.
17   Q   Is that a yes?
18   A   Yes.
19   Q   Orgasmic dysfunction indicates problems with
20 orgasm; is that right?
21   A   Yes.
22   Q   Orgasm dysfunction would typically be
23 discovered through having a sexual encounter, correct?
24   A   Yes.
25   Q   Okay.  If somebody was having an orgasmic

Page 117

1  dysfunction before they saw you, that would be
2  noncompliant with the instruction to engage in pelvic
3  rest after surgery until they came to your office; is
4  that right?
5      A  Yes.
6      Q  Okay.  Now, one of the things that was
7  discovered -- if we can go to the next page with the
8  Bates label 15.  There's an examination at the top
9  regarding female genitalia.  Do you see that section?
10     A  Yes.
11     Q  There's some information described, but in
12 bold again is: minimal separation with foreign body
13 visualized central apical incision.  Do you see that?
14     A  Yes.
15     Q  Does that indicate to you that Ms. Bayless has
16 an exposure along the suture line?
17     A  It means that there was a separation, and that
18 she could see behind the incision line what would
19 appear to be either a suture or -- something.
20     Q  There was something that she could see along
21 that suture line?
22     A  Behind the suture line.
23     Q  Okay.  If a patient engages in sexual activity
24 before they're fully healed, can that increase the risk
25 of an exposure along the suture line?

Page 118

1      A  Yes.
2      Q  If that occurs, does that indicate that
3  there's any defect or problem with the surgical mesh
4  implant?
5      A  No.
6      Q  And in fact, mesh exposure was something you
7  specifically warned Ms. Jones -- Ms. Bayless about?
8      A  Yes.
9      Q  I'm sorry, Dr. Jones.  I've got both your
10 names in my head.
11        Now, the separation along the suture line, the
12 decision was to treat that conservatively; is that
13 right?
14     A  Yes.
15     Q  Okay.  You didn't rush her back into surgery,
16 did you?
17     A  No.
18     Q  Okay.  Because an exposure at that location
19 can heal, sometimes, with conservative management?
20     A  Yes.
21     Q  I assume that you would have wanted to
22 evaluate Ms. Bayless over time to see how she
23 responded, right?
24     A  Yes, that's standard and customary.
25     Q  Okay.  And, in fact, you tried to reach out to

Page 119

1  Ms. Bayless to have her come back in so you could
2  evaluate her, right?
3      A  Yes.
4      Q  Did Ms. Bayless ever return?
5      A  No.
6      Q  Okay.  And I think that's what we marked as
7  your deposition Exhibit No. 4 -- was a letter that you
8  actually sent to her, encouraging her to reach back out
9  to you; is that right?
10     A  Yes.
11     Q  Did any other doctor of Ms. Bayless' ever
12 reach back out to you to discuss her care after her
13 last visit to your office in September of 2013?
14     A  No.
15     Q  If Ms. Bayless did not heal at the vaginal
16 cuff over time, does that indicate that there's any
17 defect or problem with her surgical implants?
18     A  No.
19     Q  The fact that Ms. Bayless is complaining of
20 dyspareunia, does that indicate any defect or problem
21 with her surgical implants?
22     A  As I stated before, dyspareunia --
23        MR. HABERMAN:  Objection.
24        THE WITNESS:  -- is not specific to a mesh.
25 BY MS. SHUB:

Page 120

1      Q  Okay.  So does that indicate that either --
2  does the fact that Ms. Bayless is complaining of
3  dyspareunia indicate that there's a defect with her
4  surgical implants?
5      A  No.
6        MR. HABERMAN:  Objection.
7  BY MS. SHUB:
8      Q  If Ms. Bayless had an exposure at the vaginal
9  apex, along the suture line, would you have recommended
10 continued pelvic rest?
11     A  Yes.
12     Q  So, would you have recommended that she
13 continue to refrain from sexual intercourse until that
14 exposure was completely healed?
15     A  Yes.
16     Q  If Ms. Bayless did not refrain from sexual
17 intercourse while the exposure was occurring, is it
18 likely that it is going to be more difficult for that
19 exposure to heal?
20     A  Yes.
21     Q  And is that especially true if she's a smoker?
22     A  Yes.
23     Q  And can that be, also, true if she continues
24 to smoke crack cocaine?
25     A  I do not know.

Page 121

1   Q   Okay.
2       MR. SCOGGAN:  Counsel, just briefly, I know
3   the Plaintiff's counsel questioned Dr. Jones for a
4   little over an hour.  I think you've been going for
5   a little over an hour of on-the-record time.
6       I understand Dr. Jones has a hard conflict at
7   12:30, so obviously, we'd like -- Boston
8   Scientific would like an opportunity to ask
9   Dr. Jones a few questions as well.
10      I just wanted to note that for the record.
11  Thanks.
12      MS. SHUB:  Yes.  Thank you.  I'll just be real
13  brief.
14      MR. SCOGGAN:  Thank you.
15  BY MS. SHUB:
16      Q   Have you reviewed Colo -- the instructions for
17  use that the company -- the Coloplast Restorelle Y Mesh
18  implant?
19      A   Yes.
20      Q   Do you recall the last time you did that
21  before you operated on Ms. Bayless?
22      A   The last time I reviewed the IFU?
23      Q   Yes, ma'am.
24      A   That would probably be at least a year and a
25  half ago.

Page 122

1       Q   Okay.  Do you believe that you needed any
2   information in the Coloplast Restorelle Y instructions
3   for use that you didn't already have?  In other
4   words -- let me -- strike that.  That was a bad
5   question.
6       You've already testified that you're aware of
7   the risks of exposure?
8       A   Yes.
9       Q   You're aware of the risk of the need for
10  repeat surgery, right?
11      A   Yes.
12      Q   You're aware of the risk of dyspareunia,
13  right?
14      A   Yes.
15      Q   You didn't need Coloplast's instruction or
16  warning to tell you that, did you?
17      A   No.
18      Q   Okay.  You were also aware of the FDA notices
19  regarding surgeries with pelvic mesh in 2008 and 2011?
20      A   Yes.
21      Q   Okay.  You didn't need Coloplast to repeat
22  those things to you, did you?
23      A   No.
24      Q   Finally, did you -- the brochures that you
25  brought with you as Exhibit 2, did -- were those

Page 123

1   provided to Ms. Bayless?
2       A   I'm not sure if that specific brochure was
3   provided, but I had my own specific laminated documents
4   from the FDA warning that I did review with the
5   patient.
6       Q   Okay.  So you had an additional warning -- in
7   fact, a laminated paper that you would go through with
8   each of your patients for whom you recommended pelvic
9   surgery?
10      A   Specifically if they were gonna need some type
11  of synthetic mesh, yes.
12      Q   Okay.  And you did that with Ms. Bayless?
13      A   Yes.
14      MS. SHUB:  I'll pass the witness.
15      CROSS EXAMINATION
16  BY MR. SCOGGAN:
17      Q   Dr. Jones, do you need to take a break or --
18      A   No.  I'm good.
19      Q   Okay.  My name is Steven Scoggan.  I'm an
20  attorney from North Carolina, and I represent Boston
21  Scientific Corporation.  I'll -- I've got a few
22  questions for you, okay?
23      A   Yes.
24      Q   I would like to start -- now, you're -- you're
25  a urogynecologist, correct?

Page 124

1       A   Yes.
2       Q   And you've practiced in that specialty, or in
3   an OB/GYN practice, basically since residency --
4   continuously?
5       A   Yes.
6       Q   And so, have you treated stress urinary
7   incontinence that enter time?
8       A   Yes.
9       Q   And in your experience, does stress urinary
10  incontinence typically cause a negative impact on a
11  woman's quality of life?
12      A   It does.
13      Q   Can you tell -- give me some examples of how
14  that's the case?
15      A   Embarrassment, having to take frequent trips
16  to the bathroom, cost of incontinence pads, fear of
17  urine odor.  Those are usually the most common things
18  that patients will complain.
19      Q   Does stress urinary incontinence typically
20  improve without any sort of treatment?
21      A   No.
22      Q   Does it usually get worse over time?
23      A   It can.
24      Q   And what are the treatments that you use,
25  currently, for stress urinary incontinence?

Page 125

1   A   For primary stress urinary incontinence with
2   no -- well, even with those patients who have
3   overactive bladder components, the gold standard is
4   considered a mid urethral sling.  There are some other
5   modalities that are available, which include bulking
6   agents, as well as pessaries, and also physical
7   therapy.
8       So I went from the most invasive to the least
9   invasive in that description.
10      Q   Okay.  And you mentioned that mid urethral
11  slings are the gold standard treatment; is that --
12      A   Yes.
13      Q   -- is that right?
14      A   Yes.
15      Q   And did you believe that in August of 2013?
16      A   Yes.
17      Q   And do you consider mid urethral polypropylene
18  mesh slings to be a safe and effective treatment option
19  for stress urinary incontinence?
20      A   Yes.
21      Q   And do you know what -- what types of slings
22  you currently use to treat stress urinary incontinence?
23      A   I have used, in my career, the first
24  generation retropubic.  I have used transobturator
25  slings.  And I've also used what they call mini-slings,

Page 126

1   which is now the third generation.  Specifically, now,
2   what I use more often is a retropubic sling.
3       Q   And -- now, in August of 2013, did you feel
4   that Boston Scientific's Advantage Fit sling was an
5   appropriate treatment option for Ms. Bayless?
6       A   Yes.
7       Q   And I think earlier you mentioned that you've
8   implanted around 500 slings; was that accurate?
9       A   Yes.
10      Q   And do you track your complication rate?
11      A   I do.
12      Q   Do you know what your complication rate is for
13  polypropylene mesh slings?
14      A   With respect to voiding dysfunction, or mesh
15  exposure, or pain?
16      Q   All of the above.
17      A   All of those?  I have had to -- I would say I
18  have had a complication rate with my slings that runs
19  anywhere from 3 to 5 percent.  That would incorporate
20  all complications, including mesh exposures, voiding
21  dysfunction, pain.
22      Q   Do you know how many Advantage Fit slings
23  you've implanted out of those 500?
24      A   No, I do not.
25      Q   And there are risks in transvaginal placement

Page 127

1   of a polypropylene mesh sling, correct?
2       A   Yes, there are.
3       Q   And you educate -- as a surgeon who implants
4   those -- those slings, how do you educate yourself
5   about those risks?
6       A   How -- how have I educated myself?
7       Q   Yes, ma'am.
8       A   Well, in the past, I actually was a -- what's
9   the word they used?  I used to teach surgeons how to
10  actually put the slings in, so -- but I also attend my
11  society meetings where we discuss different
12  technologies and how things have changed over years as
13  far as complication rates with the products that we use
14  most commonly.
15      Q   And so, that -- that would include, like,
16  continuing medical education?
17      A   Yes.
18      Q   Discussion with your -- your other practicing
19  urogynecologists and OB/GYNs?
20      A   Yes.
21      Q   And certainly, your -- your past experience
22  and your residency training would be another source,
23  correct?
24      A   Yes.
25      Q   Now, earlier you were talking about the unique

Page 128

1   possible complications of mesh.  And you mentioned
2   erosure (sic) -- exposure or erosion of mesh, right?
3       A   Yes.
4       Q   And you testified that that's the only
5   complication that's unique to mesh, correct?
6       A   Correct, yes.
7       Q   And is that for both slings and pelvic organ
8   prolapse repair kits?
9       A   Yes.
10      Q   And some of the other possible complications
11  of female pelvic reconstructive surgery would be pain,
12  infection, failure of the procedure, reoccurring
13  incontinence, urinary retention, and bleeding, correct?
14      A   Yes.
15      Q   And were you aware of all of those risks in
16  August of 2013?
17      A   Yes.
18      Q   Were you aware in August of 2013 that pain
19  with intercourse could be a possible complication of
20  the surgery of the type that Ms. Bayless had?
21      A   Yes.
22      Q   And as part of your informed consent
23  discussions with Ms. Bayless, you would have talked
24  with her about those risks before she agreed to have
25  the procedure, correct?

Page 129

1    A  Yes.
2    Q  And we've talked a lot about that process
3  already, so I'm not gonna delve into it again.
4    Doctor, can you take a look at, I think,
5  Exhibit 2, which are the records that you brought from
6  your office for me.
7    A  This is --
8    MS. SHUB:  It's 1.
9    THE WITNESS:  -- Exhibit 1.
10    MR. SCOGGAN:  It's 1?  Okay.  Exhibit 1.
11  Thank you.
12  MR. SCOGGAN:
13    Q  I think there's a March 21st, 2013 visit.
14  That's the visit I'd like to ask a couple of questions
15  about.  That's also Exhibit 10, if you -- if you want
16  to --
17    A  Let's see.  It may be easier to go back that
18  way.
19    Q  Yeah.  If you can find Exhibit 10.
20    A  Yes.
21    Q  Do you have it in front of you?
22    A  Yes, I do.
23    Q  All right.  So, if you'll look with me at
24  about the middle of that page; it says AP -- the
25  section -- the AP section.

Page 130

1    A  Yes.
2    Q  It notes that Ms. Bayless had mixed urinary
3  incontinence, and she was most bothered by SUI
4  component.  Which I assume means stress urinary
5  incontinence, correct?
6    A  It does.
7    Q  And so, does that indicate that Ms. Bayless
8  expressed that the stress urinary incontinence was the
9  most frustrating or troublesome aspect of her
10  incontinence symptoms --
11    A  Yes.
12    Q  -- before the -- before the surgery?
13    A  Yes.
14    Q  And she wanted treatment for that condition,
15  correct?
16    A  Yes.
17    Q  And here, at the bottom of this note it says,
18  SUI component, options for treatment; gold standard,
19  mid urethral sling using mesh, correct?
20    A  Yes.
21    Q  And that's consistent with your testimony
22  earlier that mid urethral polypropylene mesh slings are
23  and were the gold standard treatment for stress urinary
24  incontinence, correct?
25    A  Yes.

Page 131

1    Q  Now, you also mentioned bulking agents as
2  another possible treatment, and physical therapy?
3    A  Yes.
4    Q  And would you have discussed those treatment
5  options with Ms. Bayless before she had the surgery?
6    A  Yes.
7    Q  Do you have Exhibit 11 in front you, Doctor?
8  I'll ask you a couple questions about that visit.
9    So Exhibit 11, again, is a record --
10    (Interruption.)
11    COURT REPORTER:  Can you hear us?
12    MS. SHUB:  Mr. Haberman, are you there?
13    MR. SCOGGAN:  Let's -- let's go off for a
14  moment.
15    VIDEOGRAPHER:  Off the record.  The time is
16  12:05 p.m.
17    (Discussion off the record.)
18    VIDEOGRAPHER:  Back on the record.  12:05.
19    MS. SHUB:  Mr. Haberman, are you still there?
20    He's there.
21    MR. SCOGGAN:  Okay.  Great.
22  BY MR. SCOGGAN:
23    Q  All right, Doctor, I was gonna ask you a
24  couple of questions about the -- the final pre-surgical
25  visit that you had with Ms. Bayless, which was on May

Page 132

1  28th, 2013.
2    I think earlier you mentioned that you were
3  aware of an FDA warning that came out in 2011 about
4  polypropylene mesh, correct?
5    A  Yes.
6    Q  Would you have discussed that warning,
7  specifically, with Ms. Bayless at this visit?
8    A  Yes.
9    Q  And if you will look at the third page of that
10  exhibit for me, Doctor.  Near the bottom, surgical
11  treatment for stress urinary incontinence is noted.
12  And it also reflects that you discussed some of the
13  other treatment options for stress urinary incontinence
14  at this visit, including bulking agents and
15  radiofrequency treatments; is that correct?
16    A  Yes.
17    Q  And after explaining those two alternative
18  treatments, and then physical therapy, which was
19  another treatment option you mentioned earlier, and the
20  sling procedure, and outlining the risks and benefits
21  of all those treatment options, Ms. Bayless asked you
22  to perform the surgical procedure where that Advantage
23  Fit sling would be implanted, correct?
24    A  Yes.
25    Q  And you told her that both of the mesh

Page 133

1  devices, including the Advantage Fit sling would be
2  permanently implanted, correct?
3      A   Yes.
4      Q   Would you have explained your history using
5  mid urethral slings to her at that visit?
6      A   Yes.
7      Q   Would you have given her an opportunity to ask
8  questions about that product, the sling, or your
9  surgical history, or the surgery that she was going to
10  undergo at that visit?
11      A   Yes, I actually demonstrate. I actually have
12  a sample of each of those products, which I actually
13  show and demonstrate to the patient during the
14  counseling session.
15      Q   And that would be both the Advantage Fit sling
16  and the Coloplast Y Mesh?
17      A   Yes.
18      Q   And so, you would have brought those out and
19  shown them to Ms. Bayless?
20      A   Yes.
21      Q   And do -- did you feel like Ms. Bayless
22  understood the risks of the procedure by the end of
23  this visit?
24      A   Yes.
25      Q   Do you --

Page 134

1          MR. HABERMAN:  Objection; speculation.
2          COURT REPORTER:  I'm sorry, I didn't hear you.
3  Say that again.
4          MR. HABERMAN:  Speculation.
5          COURT REPORTER:  Thank you.
6          MR. HABERMAN:  Speculation.
7          COURT REPORTER:  Thank you.
8  BY MR. SCOGGAN:
9      Q   Did you feel like Ms. Bayless understood the
10  possible complications of the surgery, the sling, and
11  the -- the Coloplast product by the end of this visit?
12      A   Yes.
13      Q   Would you have scheduled the surgery if you
14  felt like she did not?
15      A   No.
16          MR. HABERMAN:  Objection.
17  BY MR. SCOGGAN:
18      Q   Doctor, do you have Exhibit 13 in front of
19  you? It's the informed consent for the pelvic repair
20  surgery, generally. It's a two-page consent form.
21          There are some stars that appear to have been
22  written by the -- by some of the bullet points in No. 5
23  there, that outlined the risks. Who made those
24  notations?
25      A   I did.

Page 135

1      Q   And does that reflect that you actually walked
2  through this form, line by line, with Ms. Bayless --
3      A   Yes.
4      Q   -- before you let her sign it?
5      A   Yes.
6      Q   Will you look at item No. 7, which is on the
7  second page of that form for me, Doctor.
8          So item No. 7 lists out, in concrete form,
9  some of the alternatives to having the surgery and
10  receiving the two mesh products, correct?
11      A   Yes.
12      Q   And the first alternative is to do nothing,
13  and accept the consequences of the patient's condition,
14  correct?
15      A   Yes.
16      Q   And with respect to stress urinary
17  incontinence, you testified earlier that that is a
18  condition that generally does not got better without
19  treatment, correct?
20      A   Yes.
21      Q   The second option mentioned is pessaries,
22  right?
23      A   Yes.
24      Q   And we talked about those already, so I won't
25  go into -- won't make you go through that again. And

Page 136

1  then, the last is -- is exercise. Kegel exercises and
2  vaginal weights, correct?
3      A   Yes.
4      Q   And those also would have been
5  alternative -- alternative treatment options that you
6  talked about with Ms. Bayless, correct?
7      A   Yes.
8      Q   And, now, down at the very bottom, it
9  identifies the Coloplast Restorelle Y Mesh and the
10  Boston Scientific Advantage Fit sling as the specific
11  products that would be implanted in Ms. Bayless,
12  correct?
13      A   Yes.
14      Q   Doctor, I've handed you a document that's
15  marked as Exhibit 21. And that is a -- one of the
16  consent forms that Ms. Bayless signed, correct?
17      A   Yes.
18      Q   And it is entitled Uro (sic) -- Urethrovesical
19  Suspension, and then has "sling" written in
20  parentheses --
21      A   Yes.
22      Q   -- next to it, correct?
23      A   Yes.
24      Q   And so, this would have been a consent form
25  that was specific to the sling aspect of the surgical

Page 137

1  procedure that you were -- that you did perform on
2  Ms. Bayless, correct?
3      A  Correct.
4      Q  Okay.  And the middle of the first paragraph
5  says, It is possible that this operation will not help
6  you control -- to control your urine.  It is even
7  possible that you will be worse after the operation
8  than you are right now.
9          Did I read that correctly?
10     A  Yes.
11     Q  And then, there are some possible
12  complications listed on this form as well, correct?
13     A  Yes.
14     Q  And among others, they are bleeding,
15  infection, damage to the urinary system, repeated
16  urinary infections, correct?
17     A  Yes.
18     Q  And it looks like you drew a little -- there's
19  a -- there's some drawing down near the bottom,
20  correct?
21     A  Yes.
22     Q  Did you make that?
23     A  Yes.
24     Q  And so, there, were you drawing roughly where
25  the incisions would be for the surgery?

Page 138

1      A  Yes.
2      Q  And so, you walked through, in detail, how the
3  sling surgery would be performed with Ms. Bayless,
4  correct?
5      A  Yes.
6      Q  And is that your signature at the bottom?
7      A  It is.
8      Q  And then, Ms. Bayless' signature as well?
9      A  Yes.
10     Q  Doctor, earlier Ms. Bayless' attorney was
11  asking you some questions about -- that implied that
12  the polypropylene material may have been advised not to
13  be implanted in the human body.  Do you remember those
14  questions?
15     A  I remember the reference.
16     Q  Now, you understand that -- that pelvic floor
17  devices, such as the Coloplast product and the Boston
18  Scientific sling, are regulated by the FDA, correct?
19     A  Yes.
20     Q  And you understand that a medical device
21  manufacturer has to make certain showings to the FDA
22  before it can sell those devices for use?
23     A  Yes.
24     Q  And as a surgeon, you rely on the FDA to do
25  its job in that regard, correct?

Page 139

1      A  Yes.
2      Q  And --
3          MR. HABERMAN:  Objection.
4  MR. SCOGGAN:
5      Q  -- do you know what a material safety data
6  sheet is?
7      A  Not specifically, no.
8      Q  Have you ever read a material safety data
9  sheet to check on the composition of raw materials in
10  medical devices that you use?
11     A  No.
12     Q  Do you rely on the FDA, or other governmental
13  authorities, to ensure that proper materials are being
14  used in medical devices?
15     A  Yes.
16     Q  Do you have -- have you ever asked a medical
17  device manufacturer to provide you with a material
18  safety data sheet for the materials used in a device?
19     A  No, I have not.
20     Q  Do you have any personal knowledge about why a
21  supplier of raw materials might include statements or
22  restrictions on the use of its materials?
23     A  For a --
24     Q  For a medical device.
25     A  Only if they thought that it was going to be

Page 140

1  unsafe.
2      Q  Now, if the FDA inquired with Boston
3  Scientific about any sort of cautionary statement in a
4  material safety data sheet, and Boston Scientific
5  provided information that satisfied the FDA that the
6  product was safe and effective, would that satisfy any
7  concerns you had about that statement?
8      A  Yes.
9          MR. HABERMAN:  Objection.
10  BY MR. SCOGGAN:
11     Q  And -- okay.  Would you like to know if the
12  manufacturer that made the cautionary statement had any
13  scientific basis for making it?
14     A  Yes.
15     Q  And if that manufacturer had no scientific
16  basis for making that statement, would you put any
17  stock in it in deciding whether to use the medical
18  device in which that polypropylene was used?
19     A  So if I understand you correctly --
20          MR. HABERMAN:  Objection.
21          THE WITNESS:  -- if there was no scientific
22  data to prove that the use of those raw materials
23  was unsafe, would I be comfortable with use of that
24  product?
25  BY MR. SCOGGAN:

Page 141

1    Q   Correct.
2    A   Yes.
3    Q   Before today's deposition, did any attorney --
4  any attorney representing Ms. Bayless contact you, at
5  all, other than to schedule the deposition?
6    A   No.
7    Q   Have you discussed Ms. Bayless' lawsuit  with
8  -- with Ms. Bayless or anyone from her family?
9    A   No.
10   Q   Have you spoken to or communicated with anyone
11 who you understand is a consultant, or an expert
12 witness, for Ms. Bayless or her attorneys?
13   A   No.
14   Q   Have you ever served as an expert witness or
15 consultant for, generally, vaginal mesh litigation?
16   A   I have.
17   Q   Tell me more about that.
18   A   I was asked to review some cases to see if
19 there was an issue with the product, or product design,
20 as opposed to a surgical inconsistency, or surgeon
21 technique, in reference to how a complication occurred.
22   Q   When was that?
23   A   That was approximately -- I would say two and
24 a half, three years ago.
25   Q   Was it -- who hired you?

Page 142

1    A   Who hired me?
2    Q   Yes, ma'am.
3    MS. SHUB:  If you can say.
4  BY MR. SCOGGAN:
5    Q   If you can say.
6    MS. SHUB:  I don't -- I don't know if you can
7  say if you weren't disclosed.
8    MR. SCOGGAN:  Yeah.  Well --
9    THE WITNESS:  I would probably not want to say
10 that.
11 BY MR. SCOGGAN:
12   Q   Let me -- did you testify in court or in a
13 deposition --
14   MR. HABERMAN:  That (unintelligible) -- that's
15 not -- that's not accurate.
16   COURT REPORTER:  Hold on.
17   MR. HABERMAN:  She can -- no, no, no, that's
18 not accurate.  That's improper.  She can say who
19 hired her.  Who -- who gave her a case to consult.
20   MS. SHUB:  If she was --
21   COURT REPORTER:  Hang on --
22   MR. SCOGGAN:  Counsel, let me -- let me ask it
23 this way.  It's my opportunity to ask questions
24 right now, so --
25 BY MR. SCOGGAN:

Page 143

1    Q   Doctor, did you ever testify in a deposition
2  or in a courtroom in connection with that work?
3    A   No.
4    Q   Okay.  I don't have any further questions.
5    REDIRECT EXAMINATION
6  BY MR. HABERMAN:
7    Q   Doctor, I have a couple follow-ups.  Was it --
8  when you reviewed that case, did you review it on
9  behalf of a medical device manufacturer?
10   A   No.
11   Q   Was it on behalf of a plaintiff?
12   A   Yes.
13   Q   Were you able to give an opinion in that
14 matter?
15   A   I -- there were five cases that I reviewed, so
16 I gave an opinion on all of those.
17   Q   And in all of those cases did you say that the
18 mesh, more likely than not, caused the pain that the
19 plaintiff had?
20   MS. SHUB:  Objection; form.
21   THE WITNESS:  Each case was -- was different.
22 The complication for each case was different.  The
23 question was whether the complication was a result
24 of a design flaw with the -- the mesh that was
25 used, as opposed to some other contributing factor.

Page 144

1  BY MR. HABERMAN:
2    Q   And were you able to give opinions in all five
3  cases?
4    A   I was.
5    Q   Were you able to say, in all five cases, that
6  the pain that -- or any of the adverse events that the
7  plaintiff was claiming, was a result of, or was caused
8  by, or substantially -- that the -- that the cause
9  was -- or the substantial contributing cause was the
10 mesh?
11   MR. SCOGGAN:  Objection.
12   MS. SHUB:  Objection; form.
13   THE WITNESS:  Of the five cases -- one, I
14 concluded that there was a possibility of the
15 design flaw.
16 BY MR. HABERMAN:
17   Q   And in that one case, was there an erosion or
18 exposure of the mesh?
19   A   No.
20   Q   Okay.  Thank you.
21   RECROSS EXAMINATION
22 BY MS. SHUB:
23   Q   Dr. Jones, I have just a few questions.
24   A   Um-hmm.
25   Q   Counsel took -- we took you through a lot of

Page 145

1  consents today. I didn't ask you about your signature.
2  If your -- if your name is handwritten on those consent
3  forms, is that your signature?
4      A   May I review those?
5      Q   Yes, absolutely.
6      A   In reference to the consent that says
7  Urethrovesical Suspension, this is my signature.
8      Q   Um-hmm.
9      A   This particular consent form does not require
10 the surgeon's signature, so it does not have my
11 signature, but this is my handwriting.
12     Q   Okay.
13     A   The hysterectomy does have a physician line,
14 which is my signature. And this is also my
15 handwriting.
16     Q   That's Exhibit 12?
17     A   Yes.
18     Q   Okay.
19     A   There is one other component of this. The
20 cystocele and the -- the graft.
21     Q   It may be in that next stack.
22     A   So, for the anterior cystocele repair, this is
23 my signature. For the consent graft, yes, this is my
24 circle, my star, and my signature.
25     Q   Great.

Page 146

1        Real quickly, Restorelle Y surgical mesh has
2  not been recalled, has it?
3      A   Not to my knowledge.
4      Q   Okay. In fact, do you believe that Restorelle
5  Y surgical implants are safe and effective treatment
6  for prolapse repair in an appropriate patient?
7      A   Yes.
8      Q   In fact, would you still --
9          MR. HABERMAN: Objection.
10 BY MS. SHUB:
11     Q   Would you still use --
12         MR. HABERMAN: Out of scope.
13 BY MS. SHUB:
14     Q   -- Restorelle Y in an appropriate patient
15 today?
16     A   Yes.
17     Q   Do -- are you still -- when is the last time
18 you implanted a Restorelle Y?
19     A   Probably six months ago.
20     Q   Okay. And as -- do you have any -- if -- if a
21 patient came in today, who needed one, and needed an
22 augmented repair, might you still use the Restorelle Y?
23     A   Yes.
24     Q   And we're sitting here -- what day is today?
25         MR. SCOGGAN: September 12th.

Page 147

1  BY MS. SHUB:
2      Q   September 12th in 2018. This is roughly five
3  years after the surgery on Ms. Bayless in 2013?
4      A   Yes.
5      Q   In patients where you have used Restorelle Y,
6  has it helped your patients?
7      A   Yes.
8      Q   Okay. Has it helped -- strike that.
9          MS. SHUB: Pass the witness.
10         MR. SCOGGAN: No questions. No questions.
11         MR. HABERMAN: No questions.
12         MR. SCOGGAN: So I think we're done.
13         MR. HABERMAN: Okay. Yeah, we're done.
14         MS. SHUB: Oh, one question. Are you going to
15 want to read and sign?
16         THE WITNESS: Yes.
17         MS. SHUB: Okay. And the only other thing I
18 would ask is, you mentioned you had some additional
19 records that pertained to Ms. Bayless that may be
20 on another system; when -- if --
21         THE WITNESS: You actually have these.
22         MS. SHUB: Okay.
23         THE WITNESS: That's -- where it specifically
24 says Orlando Urogynecology --
25         MS. SHUB: Okay.

Page 148

1          THE WITNESS: -- this is the system that I was
2  referring to.
3          MS. SHUB: Okay. Okay. I was just gonna say,
4  if you knew if there were any, if at the time you
5  returned your deposition, if you could include any
6  additional records you're aware of.
7          THE WITNESS: No, I just didn't bring that
8  with my -- my set.
9          MS. SHUB: Okay. So you think we've got
10 everything?
11         THE WITNESS: Yes.
12         MS. SHUB: All right.
13         VIDEOGRAPHER: This concludes today's
14 deposition. The time is 12:25 p.m. Off the
15 record.
16         (Exhibit Nos. 4 through 21 were
17         marked for Identification.)
18         (This deposition was concluded at
19         12:25 p.m., and the witness reserved
20         her right to read and sign her deposition
21         transcript.)
22              - - - - -
23
24
25

38 (Pages 149 to 152)



Page 149

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF ORANGE:
    I, the undersigned authority, certify that KATHY Y.
JONES, M.D. personally appeared before me and was duly
sworn on September 12, 2018.
    WITNESS my hand and official seal this 18th day of
September, 2018.



            /s/ Patricia Eldridge
            ------------------------------
            Patricia Eldridge
            Notary Public-State of Florida
            My Commission No.:  FF 924241
            Expires:  October 18, 2019

Page 151

SUBSCRIPTION OF DEPONENT
Raeann Bayless vs. Boston Scientific Corp.
Date of Deposition:  September 12, 2018
    I, KATHY Y. JONES, M.D., do hereby certify
that I have, this day, exercised my express right to
read and sign this true and correct record of the
proceedings, had at the time and place herein
designated, with the following corrections:
Page  Line                    Correction









            Under the penalties of perjury, I declare that
I have read my deposition and that it is true and
correct subject to any changes in form or substance
entered here.


_____        _____
KATHY Y. JONES, M.D.            DATE

Page 150

CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF ORANGE:
    I, PATRICIA ELDRIDGE, being a Court Reporter and
Notary Public, certify that I was authorized to and did
stenographically report the deposition of KATHY Y.
JONES, M.D.; that a review of the transcript was
requested; and that the transcript is a true and
complete record of my stenographic notes.

    I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorneys or counsel connected with the action, nor am
I financially interested in the action.

    DATED this 18th day of September, 2018.



            /s/ Patricia Eldridge
            ------------------------------
            Patricia Eldridge
            Notary Public-State of Florida
            My Commission No.:  FF 924241
            Expires:  October 18, 2019

Page 152

SEPTEMBER 18, 2018
KATHY Y. JONES, M.D.
Orlando Urogynecology
2501 North Orange Avenue, Suite 309
Orlando, Florida 32804

Re:  Raeann Bayless vs. Boston Scientific Corp.

Dear Dr. Jones:

Attached you will find a courtesy copy of your
deposition transcript taken on September 12, 2018, by
Jeffrey L. Haberman, Esquire.

Please read your copy of the deposition, making any
corrections only on the subscription page.  Upon
completion, sign at the bottom of the subscription page
on the line provided.
Please forward the original, signed subscription page
to United Reporting, Inc.

If you do not complete the reading and signing within
30 days, your transcript will be processed without a
signed errata sheet.

Your prompt attention to this matter is appreciated.

Sincerely,

Patricia Eldridge, Court Reporter

United Reporting, Inc.
1218 S.E. 3rd Avenue
Ft. Lauderdale, FL 33316

954-525-2221
954-525-0511 (fax)
transcripts@unitedreporting.net
cc: Jeffrey L. Haberman, Esquire
    Lisa Horvath Shub, Esquire
    Steven A. Scoggan, Esquire

United Reporting, Inc.
954.525.2221