# EXHIBIT E

Bruce Rosenzweig, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                MIDDLE DISTRICT OF FLORIDA

 3                    ORLANDO DIVISION

 4

 5    RAEANN BAYLESS,              )

 6                 Plaintiff,  )

 7       -vs-                      ) Case No.

 8    BOSTON SCIENTIFIC CORP.    ) 6:20-cv-00831-RBD-GHK

 9    and COLOPLAST CORP.,        )

10                 Defendants. )

11

12                    August 17, 2020

13         DEPOSITION OF BRUCE ROSENZWEIG, M.D.

14

15           Remote oral deposition of

16    BRUCE ROSENZWEIG, M.D., conducted at the location

17    of the witness in Chicago, Illinois, commencing at

18    9:04 a.m., on the above date, before CORINNE T.

19    MARUT, C.S.R. No. 84-1968, Registered Professional

20    Reporter, Certified Realtime Reporter and Notary

21    Public.

22

23               GOLKOW LITIGATION SERVICES

             877.370.3377 ph / 917.591.5672 fax

24                   deps@golkow.com
```

Bruce Rosenzweig, M.D.

```
 1    APPEARANCES VIA VIDEOCONFERENCE:
 2      ON BEHALF OF THE PLAINTIFF AND THE DEPONENT:
 3          SCHLESINGER LAW OFFICES, P.A.
            1212 S.E. 3rd Avenue
 4          Fort Lauderdale, FL  33316
            954-467-8800
 5          BY:  JEFFREY L. HABERMAN, ESQ.
                 jhaberman@schlesingerlaw.com
 6
 7
 8      ON BEHALF OF DEFENDANT BOSTON SCIENTIFIC CORP.:
 9          FAEGRE DRINKER BIDDLE & REATH LLP
            2200 Wells Fargo Center
10          90 South 7th Street
            Minneapolis, Minnesota  55402
11          612-766-7000
            BY:  DANIEL J. CONNOLLY, ESQ.
12               daniel.connolly@faegredrinker.com
13
14      ON BEHALF OF DEFENDANT COLOPLAST CORP.
15          KING & SPALDING LLP
            1180 Peachtree Street, NE, Suite 1600
16          Atlanta, Georgia  30309
            404-572-4600
17          BY:  W. RAY PERSONS, ESQ.
                 rpersons@kslaw.com
18
                    -and-
19
            KING & SPALDING LLP
20          500 West 2nd Street, Suite 1800
            Austin, Texas 78701
21          512-457-2000
            BY:  ZACHARY C. BURNETT, ESQ.
22               zburnett@kslaw.com
23
24    REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
```

Bruce Rosenzweig, M.D.

```
 1                    I N D E X
 2  BRUCE ROSENZWEIG, M.D.              EXAMINATION
 3       BY MR. PERSONS................   9
         BY MR. CONNOLLY..............  249
 4       BY MR. HABERMAN..............  301
 5
 6
 7                 E X H I B I T S
 8  ROSENZWEIG DEPOSITION EXHIBIT      MARKED FOR ID
 9   No. 1    5/7/12 medical record;           58
              COL PLTF 000460 RBAYLESS -
10            COL PLTF 000463 RBAYLESS
11   No. 2    5/31/2012 medical record;        73
              COL-RBAYLESS-ORLANDO-000033
12            and 000034
13   No. 3    12/10/12 medical record;         79
              COL-RBAYLESS-BREVARD-000004 -
14            000006
15   No. 4    5/28/13 medical record;          86
              COL-RBAYLESS-ORLANDO-000015 -
16            000018
17   No. 5    Consent Form, "Procedure:       102
              Anterior and/or Posterior
18            Colporrhaphy";
              COL-RBAYLESS-ORLANDO-000024
19
     No. 6    Consent Form, "Augmentation     113
20            Graft Consent Form";
              COL-RBAYLESS-ORLANDO-000026
21
     No. 7    Consent Form, "Hysterectomy     118
22            Surgical Consent Form";
              COL-RBAYLESS-ORLANDO-000023
23
24
```

Bruce Rosenzweig, M.D.

```
 1                   E X H I B I T S
 2   ROSENZWEIG DEPOSITION EXHIBIT        MARKED FOR ID
 3   No. 8     Consent Form, "Informed          124
              Consent and Request for Repair
 4            of Relaxation of Pelvic Organs
              and/or Urinary Incontinence";
 5            COL-RBAYLESS-ORLANDO-000021
              and 000022
 6
     No. 9     8/9/13 Operative Report;          134
 7            COL PLTF 000066 RBAYLESS -
              COL PLTF 000070 RBAYLESS
 8
     No. 10    9/24/13 medical record;           140
 9            COL-RBAYLESS-ORLANDO-000013 -
              000015
10
     No. 11    3/7/14 medical record;            158
11            COL PLTF 000019 RBAYLESS -
              COL PLTF 000022 RBAYLESS
12
     No. 12    7/24/14 medical record;           166
13            COL PLTF 000008 RBAYLESS -
              COL PLTF 000011 RBAYLESS
14
     No. 13    9/5/14 medical record;            173
15            COL PLTF 000376 RBAYLESS -
              COL PLTF 000379 RBAYLESS
16
     No. 14    5/22/15 medical record;           185
17            COL PLTF 000014 RBAYLESS -
              COL PLTF 000017 RBAYLESS
18
     No. 15    6/11/15 medical record;           187
19            COL PLTF 000244 RBAYLESS -
              COL PLTF 000250 RBAYLESS
20
     No. 16    6/18/15 "Cumulative Discharge     199
21            Summary Report";
              COL PLTF 000270 RBAYLESS
22
23
24
```

Bruce Rosenzweig, M.D.

1          MR. PERSONS:  This is a virtual deposition

2     taken in accordance with Federal Rules of Civil

3     Procedure, specifically Rule 30.

4               The deponent, Court Reporter, Counsel

5     examining the deponent and Counsel representing the

6     deponent shall be visible to all participants and

7     their statements shall be audible to all

8     participants at all times while on the record.

9               All other persons attending the

10    deposition shall make their presence known to all

11    other participants and they shall keep their

12    microphones on mute unless and until they wish to

13    speak and after having spoken, they shall go back

14    on mute.

15              Under no circumstances may a person

16    attend the deposition remotely in any manner

17    without identifying themselves on the record at the

18    commencement of the deposition.

19              Each individual participating in the

20    deposition, whether participating in person or

21    remotely, must use an active video stream and phone

22    line for the duration of the deposition.

23              Recognizing that depositions may cover

24    confidential material, each participant shall

Bruce Rosenzweig, M.D.

1   attend from a quiet, private location with a

2   neutral background.

3            No counsel shall engage in any form of

4   private communication with any deponent while the

5   deposition is on the record, including, but not

6   limited to, SMS, text messages, electronic mails or

7   messages sent through any chat feature that may be

8   available through the videoconferencing system used

9   to conduct the deposition remotely.

10           In the event Counsel intends to initiate

11  a private communication with any deponent for

12  purposes of determining whether a privilege should

13  be asserted, Counsel shall state his or her

14  intention on the record before initiating such

15  communication.

16           And nothing that I have said is intended

17  to alter any local rules governing communications

18  with witnesses during a deposition.

19           I just thought I'd put that on there.

20           Another thing I'd like to put on the

21  record is any objection by any party is preserved

22  for all other parties on the same side without the

23  need to join in the same.  So, while any party may

24  assert an objection that the defending counsel does

Bruce Rosenzweig, M.D.

```
 1   not assert, Counsel need to -- can obviate the need

 2   to repeat or join an objection already made by

 3   another lawyer.

 4           And, so, I just wanted to put that.

 5   That's just from the proposed protocol that we had

 6   circulated earlier, but I just wanted to have that

 7   for the record.

 8           Is there anything anyone else would like

 9   to put on the record before we get underway with

10   the examination of this witness?

11           All right.  Has the witness been sworn?

12       THE REPORTER:  No.

13       MR. PERSONS:  Will you swear the witness,

14   please, ma'am.

15               (WHEREUPON, the witness was duly

16                sworn.)

17       THE REPORTER:  All parties to this deposition

18   are appearing remotely and have agreed to the

19   witness being sworn in remotely.

20           Due to the nature of remote reporting,

21   please pause briefly before speaking to ensure all

22   parties are heard completely.

23           Counsel, please state your appearance

24   and your stipulation to the remote swearing in of
```

Bruce Rosenzweig, M.D.

1    the witness.

2        MR. PERSONS:  Ray Persons.  I'm sorry.  Go

3    ahead.

4        MR. HABERMAN:  Sorry.  Jeffrey Haberman from

5    Schlesinger Law Offices on behalf of the Plaintiff

6    and the witness.

7        MR. PERSONS:  Ray Persons from King & Spalding

8    on behalf of Defendant Coloplast.  I agree to the

9    stipulation.

10       MR. BURNETT:  Zach Burnett of King & Spalding

11   on behalf of Coloplast.  I also agree to the

12   stipulation.

13       MR. CONNOLLY:  Dan Connolly on behalf of

14   Boston Scientific, and I also agree to the

15   stipulation.

16       THE REPORTER:  Mr. Haberman, do you also agree

17   to the remote swearing in of the witness?

18       MR. HABERMAN:  Yes.

19       THE REPORTER:  Thank you.

20

21

22

23

24

Bruce Rosenzweig, M.D.

```
 1              BRUCE ROSENZWEIG, M.D.,

 2    called as a witness herein, having been first duly

 3    sworn, was examined and testified as follows:

 4                      EXAMINATION

 5    BY MR. PERSONS:

 6         Q.    Okay.  Dr. Rosenzweig, again, good

 7    morning.  My name is Ray Persons, and I represent

 8    Coloplast.  You and I just met this morning, and I

 9    will have some questions for you.

10              Now, you're familiar with the ground

11    rules for giving a deposition because you've done

12    over 100 depositions I understand.

13         A.    Correct.

14         Q.    What year did you start getting paid to

15    write litigation reports in lawsuits against mesh

16    manufacturers?

17         A.    2012.

18         Q.    All right, sir.  Approximately how many

19    have you written as of today?

20         A.    I don't think I can give you an accurate

21    number.

22         Q.    Is it more than 50?

23         A.    Yes.

24         Q.    It would probably be more than 100,
```

Bruce Rosenzweig, M.D.

1    then, wouldn't it?

2         A.    Correct.

3         Q.    All right.  In the mesh litigation,

4    you've only testified as an expert for Plaintiffs,

5    correct?

6         A.    Correct.

7         Q.    Never as an expert for any mesh

8    manufacturer?

9         A.    Correct.

10        Q.    And never as an expert for Coloplast?

11        A.    Correct.

12        Q.    Have you ever given a deposition as a

13   Defendant in a case?

14        A.    Regarding mesh?

15        Q.    No, more broadly.  Regarding anything.

16        A.    Yes.

17        Q.    And what circumstances were those?

18        A.    That was a med mal case.

19        Q.    Was that just on one occasion?

20        A.    Yes.

21        Q.    And were you the treating physician?

22        A.    Yes.

23        Q.    I assumed as much, but I'd thought I'd

24   ask.

Bruce Rosenzweig, M.D.

 1              Have you ever given a deposition as an

 2    expert in any other kind of case, in a non-mesh

 3    context?

 4         A.    Yes.

 5         Q.    What other kinds of cases have you given

 6    a deposition as an expert in?

 7         A.    Med mal, wrongful death, workmen's comp.

 8         Q.    All right.  What about trial testimony?

 9    Have you ever testified in trial?

10         A.    Yes.

11         Q.    Approximately how many times?

12         A.    In mesh or non-mesh litigation?

13         Q.    Both, and then we'll break it out.

14         A.    Probably 30 to 35 times.

15         Q.    All right, sir.  And how many of those

16    were mesh cases?

17         A.    Approximately 20.

18         Q.    All right.  And what other kinds of

19    cases were they?

20         A.    Med mal, wrongful death and workmen's

21    comp.

22         Q.    Okay.  All right.

23              Now, you mentioned you testified in a

24    case, a med mal case where you were a Defendant.

Bruce Rosenzweig, M.D.

 1    Is that the only time you've ever been sued in a

 2    professional capacity?

 3         A.    Yes.  I was named as a respondent in

 4    discovery in two other cases.

 5         Q.    Do you have your expert report in this

 6    case?

 7         A.    Yes.

 8         Q.    The litigation report.

 9               And this is a case-specific report that

10    you prepared in the Raeann Bayless case.  Yes?

11         A.    Correct.

12         Q.    And if you would, sir -- let's see.

13    Turn to the last page.

14               This says it was signed on the 4th day

15    of June 2018?

16         A.    Correct.

17         Q.    Is that your signature at the bottom?

18         A.    Yes.

19         Q.    All right.  Have you made any changes to

20    this report since you signed it on that date?

21         A.    No, I have not.

22         Q.    All right, sir.

23               You have a list of materials I believe

24    as Exhibit C, which is the very last page of this

Bruce Rosenzweig, M.D.

1    document?

2        A.    Yes.

3        Q.    And it says "Materials Reviewed."  Do

4    you see that?

5        A.    Yes.

6        Q.    And you list medical and billing

7    records, Brevard Health Alliance, Florida Hospital,

8    Orange County Medical Center, Orlando

9    Urogynecology, Dr. Kathy Jones.

10            And you understand Dr. Kathy Jones was

11   the surgeon who performed Ms. Bayless' August 9,

12   2013 hysterectomy and implant procedures?

13       A.    Correct.

14       Q.    And you also list Parrish Hospital.

15            Is that a complete listing?

16       A.    Yes.

17       Q.    Is it fair to say, sir, that if a record

18   or document isn't discussed in your report, you

19   didn't rely on it to reach your case-specific

20   litigation opinions?

21       MR. HABERMAN:  Objection.

22   BY THE WITNESS:

23       A.    At the time that I authored the report.

24   Subsequently I've reviewed both Dr. Jones' and

Bruce Rosenzweig, M.D.

1    Ms. Bayless' deposition and the exhibits that were

2    attached to those depositions.

3    BY MR. PERSONS:

4        Q.    All right.  So, you're aware that

5    Ms. Bayless' deposition -- well, it was given after

6    you wrote your report?

7        A.    Correct.  I think it was June 6, 2018.

8        Q.    All right.  So, it's fair to say you

9    couldn't have relied on Ms. Bayless' deposition

10   testimony to reach any of the opinions contained in

11   your litigation report.  Fair?

12       A.    Correct.

13       Q.    And you're aware obviously that

14   Dr. Jones was deposed subsequent to your report.

15   She was deposed on September the 12th, 2018.

16            So, again, you could not have relied on

17   Dr. Kathy Jones' testimony to reach any of the

18   opinions contained in your litigation report,

19   correct?

20       A.    Correct.

21       Q.    Is there anything in your litigation

22   report you feel that you need to revise or update

23   based on Ms. Bayless' testimony?

24       A.    The only thing would be I would add as

Bruce Rosenzweig, M.D.

```
 1    one of her injuries dyspareunia.

 2         Q.    And I'll ask the same thing with respect

 3    to Dr. Kathy Jones.  Is there anything in your

 4    litigation report that you feel you need to revise

 5    or update based on Dr. Jones' testimony?

 6         A.    No.  I think there are some issues that

 7    I think we'll discuss that were clarified in her

 8    deposition.

 9         Q.    You have not personally examined

10    Ms. Bayless, have you?

11         A.    I have not.

12         Q.    In fact, you've never met her, have you,

13    Doctor?

14         A.    That is correct.

15         Q.    You wouldn't recognize her if she walked

16    into the room right now, would you?

17         A.    Would be unusual.  But, yes, that would

18    be correct.

19         Q.    All right.  Have you talked to her on

20    the phone?

21         A.    No, I have not.

22         Q.    All right.  Have you spoken with any of

23    Ms. Bayless' treating physicians?

24         A.    No, I have not.
```

Bruce Rosenzweig, M.D.

```
 1        Q.    I want to ask you some questions now

 2   that pertain to both vaginal pain and dyspareunia.

 3             To assess or understand a patient's

 4   complaints of either vaginal pain or dyspareunia,

 5   you'd need to know the following things:  You'd

 6   need to know how long she's been experiencing that

 7   vaginal pain or dyspareunia, wouldn't you?

 8        MR. HABERMAN:  Objection.

 9   BY THE WITNESS:

10        A.    That would be a salient factor in the

11   discussion of pain complaint.

12   BY MR. PERSONS:

13        Q.    So, the answer is yes?

14        A.    Well, yes if the patient is able to

15   articulate it.

16        Q.    Let's assume the patient is able to talk

17   and communicate with you.  That's something you'd

18   want to know from the patient, correct?

19        A.    Correct, to the best of their

20   recollection.

21        Q.    All right.  You'd need to know where the

22   vaginal pain or dyspareunia is localized, wouldn't

23   you?

24        A.    To the best that the patient can
```

Bruce Rosenzweig, M.D.

1   articulate that, yes.

2       Q.    You'd need to know whether it's at the

3   introitus or whether it's with deep thrusting,

4   you'd need to know those things?

5       A.    Again, if the patient can be able to

6   localize where they have the maximum amount of

7   pain, yes.

8       Q.    All right.  And specifically with

9   respect to vaginal pain, you'd want to know whether

10  that vaginal pain is associated with any physical

11  activity?

12      A.    Yes, you would want to know factors that

13  worsen the pain or alleviate the pain and what are

14  associated factors.  Again, to the best that the

15  patient can articulate that.

16      Q.    All right.  You would need to know

17  whether any current diagnoses or conditions might

18  influence the vaginal pain or dyspareunia, wouldn't

19  you?

20      A.    Well, that would be part of the history

21  that would be obtained to the best that the patient

22  can articulate that.

23      Q.    So, yes?

24      A.    Again, to the best --

Bruce Rosenzweig, M.D.

```
 1        MR. HABERMAN:  Objection.

 2   BY THE WITNESS:

 3        A.    -- that the patient can articulate that.

 4   BY MR. PERSONS:

 5        Q.    Is the answer yes or no?

 6        MR. HABERMAN:  Objection; asked and answered.

 7   BY MR. PERSONS:

 8        Q.    I'm sorry.  Assume -- let's assume the

 9   patient can talk and the patient can tell you her

10   symptoms and describe them.

11        A.    Well --

12        Q.    Would you want to know whether the

13   patient has any current condition that might

14   influence, in other words, exacerbate her vaginal

15   pain or her dyspareunia?

16        MR. HABERMAN:  Objection.

17   BY THE WITNESS:

18        A.    Again, yes, that would be part of the

19   history that you obtain and to the best that the

20   patient can tell you what are those factors that

21   are associated with her pain complaint.

22   BY MR. PERSONS:

23        Q.    All right.  You'd want to know whether

24   the patient, for instance, whether the patient has
```

Bruce Rosenzweig, M.D.

1    menopause, such as menopause, is that associated

2    with it, did it have its onset with menopause, for

3    instance.  That's something you'd want to know?

4         A.    If the pain started with menopause?

5         Q.    Yes.

6         A.    Well, yes, that would be, you know, the

7    question that you asked before, the timing.

8         Q.    Right.  And, of course, menopause, that

9    can lead to pain with intercourse, can't it?

10        A.    Menopause in and of itself, no.  The

11   associated -- the genitourinary symptoms of

12   menopause can be.

13             And we're talking about dyspareunia, not

14   pelvic pain?

15        Q.    That's right.  That's what we are

16   talking about, pain with intercourse, dyspareunia.

17        A.    Okay.

18        Q.    Yes.  Vaginal infections, you'd want to

19   know whether the patient has suffered from vaginal

20   infections?

21        A.    Suffered from or is currently suffering?

22        Q.    Suffering from and that suffering was

23   associated with the vaginal pain or dyspareunia.

24        A.    Correct, if they had either a vaginal

Bruce Rosenzweig, M.D.

 1    infection or pelvic inflammatory disease.  Usually

 2    women with a vaginal infection or pelvic

 3    inflammatory disease don't want to have intercourse

 4    because they have -- they're in pain, the majority

 5    of them are in pain from that while the disorder is

 6    active.

 7            But, yes, you would want to know if

 8    there was a history of infections that involve the

 9    pelvis.

10       Q.    All right.  You would want to know

11    whether any current behaviors might influence -- of

12    the patient might influence the patient's vaginal

13    pain or dyspareunia?

14       A.    That I don't understand your question.

15    Current behavior.  I mean, that would be the

16    exacerbating or relieving factors that we

17    discussed.

18       Q.    Let me be a little more precise.

19       A.    Okay.

20       Q.    For instance, the frequency of

21    intercourse, whether that's associated with the

22    pain?

23       A.    So, the frequency with which intercourse

24    causes pain or the frequency with which she has

Bruce Rosenzweig, M.D.

1    intercourse, period?

2        Q.    The frequency with which the intercourse

3    causes pain.  That's what I'm trying to get at is

4    things that are related to pain, whether it's

5    dyspareunia or pelvic pain.  That's something you'd

6    want to know?

7        A.    Well, with -- again, this would be the

8    frequency of intercourse that causes pain with

9    intercourse, that would just be the dyspareunia.

10       Q.    Okay.

11       A.    Because the pelvic pain would be

12   something that, you know, if a woman says, "Well, I

13   have intercourse and it exacerbates my pelvic

14   pain," that's dyspareunia.

15       Q.    That's fine.  But that's something you'd

16   want to know?

17       A.    Again, I don't think you clarified the

18   question of whether it's the frequency with which

19   the intercourse causes pain or just the frequency

20   with which she has intercourse, period.

21       Q.    We're talking about things that are

22   pain-related.  The frequency with which intercourse

23   causes pain.

24       A.    Okay.  Yes.

Bruce Rosenzweig, M.D.

1      Q.    That's something you'd -- I'm sorry.  I

2  didn't mean to talk over you.

3            That's something you'd want to know?

4      A.    Correct.

5      Q.    Okay.  You'd want to know the number of

6  partners with whom she's engaging in sexual

7  activity or intercourse, wouldn't you, as it

8  relates to dyspareunia?

9      MR. HABERMAN:  Objection.

10  BY THE WITNESS:

11      A.    The number of sexual partners I don't

12  think is really as salient.  I mean, there -- a

13  woman could have a lot of sexual partners but have

14  very infrequent intercourse or just have one sexual

15  partner and be having intercourse five times a day.

16            So, it would be the frequency -- again,

17  that would go back to your past question -- the

18  frequency with which intercourse causes pain and

19  the frequency that she's having intercourse.

20            If a woman is having intercourse once a

21  month and that always causes pain, that's different

22  from someone that has intercourse three times a

23  week and has this pain once a month.  So, they both

24  say I have pain with intercourse once a month, but

Bruce Rosenzweig, M.D.

1    there are different corollaries associated with it.

2    BY MR. PERSONS:

3         Q.    You would review previous medical

4    records of the patient?

5         A.    If they're available, yes.

6         Q.    Okay.  To assess the cause of a

7    patient's vaginal pain complaints or complaints,

8    painful intercourse or dyspareunia, you'd agree

9    that it's important to consider a patient's medical

10   history, correct?

11        A.    Correct.

12        Q.    Any history of preexisting vaginal pain

13   or dyspareunia.  Yes?

14        A.    Well, that's a difficult question to

15   answer because, again, if you're looking at remote

16   causes that are no longer active, sure, you would

17   want to get that in the history as best as you can.

18             But as far as a remote event that more

19   likely than not had a very acute onset and an acute

20   resolution, I mean, it would be important to know,

21   it would be part of your differential but, you

22   know, again, looking at the current complaint, that

23   wouldn't be nearly as salient.

24        Q.    The patient's other diagnosed medical

Bruce Rosenzweig, M.D.

1  conditions, you'd want to know about those, for

2  instance, vaginal stenosis?

3       A.    Correct.

4       Q.    Reduced vaginal length is something

5  you'd be interested in knowing about, wouldn't it?

6       A.    Well, that would be based on, you know,

7  again, prior exams.  If it was noted to be quite

8  short and the patient states that because of the

9  shortness of her vagina, that's what leads to pain.

10      Q.    So, yes?

11      A.    Again, if that's a salient feature.

12      Q.    Reduced vaginal caliber is something

13 that would be important to know in taking a

14 patient's medical history for assessing vaginal

15 pain or dyspareunia.  Yes?

16      A.    Well, vaginal caliber, vaginal stenosis

17 and vaginal length don't lead to vaginal pain

18 unless there's a corollary associated with that.

19 But that would be more important for looking at

20 dyspareunia if that is part of their complaint.

21      Q.    And vaginal atrophy would be something

22 that you would want to take into account in

23 assessing a patient's complaints of dyspareunia?

24      A.    Particularly the degree of vaginal

Bruce Rosenzweig, M.D.

1    atrophy.

2         Q.    And the same would go -- would be true

3    for vaginal dryness, would it not?

4         A.    Well, vaginal dryness is a symptom, you

5    know, a genitourinary symptom of menopause.  Not

6    all patients with atrophy have dryness.  Not all

7    patients that have dryness have atrophy.  So...

8              But, yes, dryness can be a -- you know,

9    that could be one of the symptoms of a sexual

10   dysfunction, lack of arousal, which would then lead

11   to diminished lubrication.

12        Q.    You would consider a patient's recurrent

13   vaginal infections in assessing the cause of a

14   patient's vaginal pain for complaints of

15   dyspareunia.  Yes?

16        A.    Well, again, that would be one of the

17   corollaries.  Most patients do not engage in

18   intercourse with an active vaginal infection and

19   the type of vaginal infection, whether it's a

20   bacterial vaginosis, which does not lead to

21   inflammation like candidiasis does.  But that would

22   be part of the historical factors.

23        Q.    Okay.  Another historical factor would

24   be a history of sexually transmitted diseases or

Bruce Rosenzweig, M.D.

1   disease or infections.  Yes?

2       A.    Correct, if there were sequelae from

3   that.  If it was an acute infection that resolved

4   without leading to any upper tract disorders, then

5   it would be an historical factor.  But for current

6   complaints, if they don't have an active sexually

7   transmitted disease, it wouldn't be as relevant.

8       Q.    But it would be relevant if they had an

9   active sexually transmitted disease such as

10  gonorrhea or chlamydia?

11      A.    Correct.

12      Q.    You would want to know about the

13  patient's past surgical history, for instance,

14  whether they had prior pelvic surgeries like a

15  tubal ligation.  Yes?

16      A.    Well, tubal ligation wouldn't

17  necessarily be considered a pelvic surgery but it

18  would be an organ of the pelvis since the, you

19  know, the tubes are technically higher than the

20  pelvis.

21          But a tubal ligation history would be

22  important.  There's something called a post-tubal

23  ligation syndrome where women get cysts and those

24  can be painful while the cysts are active.

Bruce Rosenzweig, M.D.

1       Q.    So, that's something you'd want to know

2    about?

3       A.    Correct.

4       Q.    And you'd want to know about previous

5    abdominal surgeries such as gallbladder removal.

6    Yes?

7       A.    That would be an important -- obtaining

8    a surgical history is important.  Again, that

9    wouldn't be relevant in the differential diagnosis

10   of pelvic pain or dyspareunia.

11      Q.    You'd want to know about surgical

12   procedures related to childbirth such as an

13   episiotomy?

14      A.    Again, that would be an important -- or

15   it would be something to obtain in the history.

16   Importance to pelvic pain and dyspareunia, unless

17   there was a significantly difficult repair, which

18   led to some degree of mutilation of the perineum or

19   the vaginal introitus, then it wouldn't be as

20   relevant, no.

21      Q.    But in order to determine those things,

22   you'd want to know about whether there had been a

23   previous episiotomy, wouldn't you?

24      A.    Well, again, the number of women that

Bruce Rosenzweig, M.D.

1   have episiotomies with their first delivery is over

2   60%, so you would want to see the sequelae from it

3   on a pelvic exam.

4        Q.    Okay.  Whether the patient has had a

5   total hysterectomy would be something that would be

6   worthy of note in assessing the cause of a

7   patient's pelvic pain or dyspareunia, wouldn't it?

8        A.    Correct.

9        Q.    A total hysterectomy in which the cervix

10  was also removed can result in reduced vaginal

11  length, can't it, Doctor?

12       MR. HABERMAN:  Objection.

13  BY THE WITNESS:

14       A.    Not a routine hysterectomy.  Radical

15  hysterectomies can, if there is a reason for taking

16  off part of the apex of the vagina, aside from a

17  radical hysterectomy for cervical cancer, such as

18  endometriosis that's present on the apex of the

19  vagina.

20            But the vast majority of hysterectomies,

21  abdominal, laparoscopic or vaginal, don't decrease

22  the vaginal length, because the cervix does come

23  down about 1 to 2 centimeters inside the vagina and

24  when you cut the cervix off at what becomes the

Bruce Rosenzweig, M.D.

1   cuff, then that is 1 or 2 centimeters higher than

2   where the cervix was.

3            So, the length that the patient

4   perceives is fairly equal unless you do a more,

5   again, radical hysterectomy or if there is a

6   specific reason for taking off top of the cuff.

7   BY MR. PERSONS:

8        Q.    And if the top of the cuff is taken off,

9   it can result in reduced vaginal length, correct?

10       A.    If it is -- if there is part of the cuff

11   removed, yes.  But, again, that's not -- but that's

12   not standard for a routine hysterectomy.

13       Q.    And a shortened vagina can result in

14   dyspareunia?  I think we discussed that earlier.

15       A.    Significantly shortened, yes.

16       Q.    Hysterectomies can also lead to scar

17   tissue that forms at the cuff of the vagina, can't

18   they?

19       A.    It can.

20       Q.    And that can elicit pain during

21   intercourse, correct?

22       A.    It can.

23       Q.    And that scar tissue can also elicit

24   pain during physical activity, giving the sensation

Bruce Rosenzweig, M.D.

1    of a stretching or pulling?

2        A.    Well, so, adhesions are scarification

3    that is between two exposed serosal surfaces.  So,

4    it depends on what surface that the adhesions are

5    attached to.

6              The vast majority of adhesions, unless

7    they're put on stretch, so like bowel adhesions,

8    something is going through the bowel, that can lead

9    to expansion and contraction and that can cause

10   pain.

11             Pain -- adhesions at the vaginal cuff

12   being put on stretch during activity is a very

13   unlikely cause of pain because it wouldn't be

14   stretching from a fixed structure unless the bowel

15   is fairly fixed inside the pelvis, and that would

16   be something like, you know, a severe endometriosis

17   or someone that's had severe pelvic inflammatory

18   disease.  So, not really.

19       Q.    Okay.  But you'd agree that scar tissue

20   can under certain circumstances elicit pain during

21   physical activity?

22       A.    Abdominal adhesions, yes, because your

23   abdominal wall could be -- could be fixed.

24       Q.    So, to treat a patient's vaginal pain or

Bruce Rosenzweig, M.D.

1    dyspareunia, you'd want to know about the things we

2    just discussed?

3         A.    To treat it?

4         Q.    To treat, yes, the patient's vaginal

5    pain or dyspareunia, you'd want to know the medical

6    history that we've just talked about?

7         A.    Well, again, before you treat any

8    patient, you want to get a medical history.  You

9    want to do a physical exam.

10             Now, treatment, unfortunately there

11    aren't that many treatment options that you have

12    available.  And, again, you'd start with the least

13    invasive and move up to the most invasive.

14             So, you know, it is -- I mean, if your

15    exam and your history lead to one most likely

16    etiology, then, yes, you can focus on that.

17             But if it -- if you -- let's say you

18    don't see severe vulvovaginal atrophy, which would

19    be treated with an intravaginal hormone

20    preparation.

21             Most of vaginal pain I treat with a

22    topical insertion of a Valium preparation.  So, I

23    mean, the treatments non-surgical are fairly

24    limited, physical therapy, Valium suppositories,

Bruce Rosenzweig, M.D.

1    occasionally Botox injections.

2            Again, if you can target something, you

3    know, you see, again, a shortened vagina, I mean, I

4    wouldn't go to like a Z-plasty or a neovaginal

5    procedure early on in the treatment modalities

6    because those don't usually work very well except

7    if someone is of a young age.  It's important, but

8    there are corollaries associated with it.

9        MR. PERSONS:  Well, with all due respect, move

10   to strike as non-responsive.

11   BY MR. PERSONS:

12       Q.    My question was whether you'd want to

13   know the medical history that we discussed, when we

14   discussed the things that could occasion vaginal

15   pain or dyspareunia, you'd want to know those

16   things in order to prescribe a mode of treatment

17   for the patient.  Yes or no.

18       MR. HABERMAN:  Objection; asked and answered.

19   BY THE WITNESS:

20       A.    Well, yes, you get a history and you do

21   a physical exam.  But, again, the treatment for

22   those entities, there aren't a significant number

23   that are readily available.

24   BY MR. PERSONS:

Bruce Rosenzweig, M.D.

```
1          Q.    Okay.  Let's talk about vaginal

2    infections.

3                To assess the cause of a patient's

4    recurrent vaginal infection, such as bacterial

5    vaginosis, you'd agree that it's important to

6    consider a patient's medical history, including how

7    frequent the patient experiences or contracts an

8    infection?  Yes or no.

9          A.    To diagnose it?

10         Q.    To assess it, yes.  To evaluate it.

11         A.    I mean, to diagnose it, you'd use a

12   culture, and we have very good cultures available

13   that can tell you whether your -- a discharge is

14   associated with gonorrhea, chlamydia,

15   trichomoniasis, mycoplasma, ureaplasma, candidiasis

16   or bacterial vaginosis.

17               To determine the length of therapy, it

18   would -- you know, the frequency becomes important.

19   So, if a woman is getting frequent bacterial

20   vaginosis or frequent candidal infections, you

21   wouldn't just treat a one- or two-day for Candida

22   or a seven-day for bacterial vaginosis.  You would

23   give them a longer, you know, treatment like

24   once-a-month therapy or four-week therapy.
```

Bruce Rosenzweig, M.D.

1           So, frequency will tell you how it's

2    best to, you know, treat that.  But the diagnosis

3    is made on a culture.

4        Q.    My question was a little different.

5             My question was:  To assess the cause of

6    recurrent vaginal infections, such as bacterial

7    vaginosis, you would want to know how frequent the

8    patient experiences or contracted these infections.

9    We are talking about recurrent infections is what I

10   was asking you about.

11       A.    So, you know that the cause of bacterial

12   vaginosis, bacterial vaginosis is an entity that is

13   an overgrowth of the normal bacteria inside the

14   vagina.

15       Q.    Yes.

16       A.    It's caused by the pH of the vagina

17   getting elevated.  That leads to the overgrowth of

18   the bacteria.

19            Now, there are reasons why the pH of the

20   vagina could go up or the good bacteria, the

21   lactobacillus, which makes hydrogen peroxide, goes

22   down.  And that could be related to the semen in

23   the ejaculate.  That can be related to using

24   condoms that are lubricated because lubricant is

Bruce Rosenzweig, M.D.

1    the nonoxynol-9.

2            So, yes, there -- I mean, what -- what

3    causes a candidal infection versus what causes

4    bacterial vaginosis or mycoplasma or a gonorrhea

5    infection, I mean, gonorrhea and chlamydia are

6    sexually transmitted.  Bacterial vaginosis is

7    associated with sexual intercourse because of the

8    rise of pH.  Candida is -- there is some anecdotal

9    evidence that it could be transmitted sexually.

10   Trichomoniasis, there is weak evidence that it's

11   sexually transmitted.

12           I mean, that's why it's -- your question

13   is -- yeah, it's easy for me to diagnose it by

14   doing a culture.  A woman comes in and says, "I

15   have a discharge."  I do a vaginal culture, wait

16   for it to come back and then I treat the patient

17   appropriately.

18           If she says, I'm getting this," you

19   know, "every month," then I would talk to her

20   about, you know, is she cleaning her vagina after

21   intercourse, getting rid of the semen inside of her

22   vagina, is she using a condom that's lubricated and

23   use a non-lubricated condom with a lubricant.

24           If she is getting frequent candidal

Bruce Rosenzweig, M.D.

1   infections, that would be something that you would

2   look at, does she have diabetes that is not very

3   well controlled, does she have poor hygiene.

4          Mycoplasma and ureaplasma, there is

5   really no good evidence of an etiologic factor.

6          So, the assessment, yes, is based -- how

7   you treat it is based on the history but what you

8   treat is based on culture.

9      Q.   Let's put aside treatment.  We are just

10  talking about assessing.

11         The patient comes in and has recurrent

12  vaginal infections.  And wouldn't it be important

13  to consider how frequent the patient experiences or

14  contracts the vaginal infections in assessing the

15  condition?

16     A.   Yes, but that is more based on how

17  you're going to treat it and maybe how you prevent

18  it.

19         Now, again, not all, you know,

20  discharges are the same.  So, that's why culture

21  becomes important.  And most people don't do a very

22  good job of doing a culture on what's, you know --

23  I mean, there are certain characteristics that, you

24  know -- like a mucopurulent discharge is --

Bruce Rosenzweig, M.D.

```
 1                    (WHEREUPON, Zoom videoconference

 2                     unexpectedly terminated.

 3                     Recess was had from

 4                     9:45 to 9:50 a.m.)

 5                    (WHEREUPON, the record was read

 6                     by the reporter as follows:

 7                     A.  Yes, but that is more based on

 8                     how you're going to treat it and

 9                     maybe how you prevent it.

10                        Now, again, not all, you know,

11                     discharges are the same.  So,

12                     that's why culture becomes

13                     important.  And most people don't

14                     do a very good job of doing a

15                     culture on what's, you know -- I

16                     mean, there are certain

17                     characteristics that, you know --

18                     like a mucopurulent discharge

19                     is --)

20    BY THE WITNESS:

21        A.    Like a mucopurulent discharge is

22    associated with chlamydia.  White homogeneous

23    discharge is associated with bacterial vaginosis.

24    A cheesy discharge is associated with Candida.
```

Bruce Rosenzweig, M.D.

1              So, I mean, someone says, "I get

2     frequent vaginal infections," that doesn't really

3     give you an idea of what they are unless she says,

4     yes, they were proven to be, all be BV or Candida

5     or I had, you know, one chlamydial infection and

6     then it turned out to be BV.

7              So, yes, it's a -- the frequency is

8     important but also, you know, what it actually

9     turned out to be is equally important, and that's

10    where culture becomes important.

11    BY MR. PERSONS:

12        Q.    You'd agree that the cause of bacterial

13    vaginosis is often -- recurrent bacterial vaginosis

14    is often unclear?

15        A.    No, it is pretty clear that it's an

16    overgrowth of the normal bacteria of the vagina

17    that is due to an elevated vaginal pH.

18        Q.    But that can be occasioned by many

19    different things; not just one thing that can cause

20    the elevated pH in the vagina?

21        A.    Well, that would be the normal -- either

22    an external source of an alkaline pH or a

23    diminution in the good bacteria, the lactobacillus

24    that is creating an acidic environment.

Bruce Rosenzweig, M.D.

1      Q.    And that can be caused by more than one

2  thing?

3      A.    Correct.

4      Q.    You'd want to know about the patient's

5  social behaviors, whether the patient has engaged

6  in unprotected sex.  Yes?

7      A.    Yes.  The mode of contraception does

8  become important.

9      Q.    You'd want to know the number of sexual

10  partners that the patient has?

11      A.    Again, that is a -- the increase in the

12  number of sexual partners just increases your odds

13  of being exposed to something that can cause an

14  infection.

15      Q.    Right.  To assess or understand a

16  patient's complaints of mesh exposure, you'd need

17  to know where the exposure is.  Yes?

18      A.    Yes.

19      Q.    You'd want to know the patient's history

20  of estrogen use?

21      A.    If they're menopausal.

22      Q.    Yes.  Whether the patient complied with

23  post-op restrictions concerning vaginal

24  intercourse, you'd want to know that?

Bruce Rosenzweig, M.D.

1          A.    Again, if the -- I would say that is

2     important for the timing of the mesh erosion.

3          Q.    Okay.  You'd also want to perform a

4     physical examination of the patient, wouldn't you?

5          A.    Well, that would tell you where the mesh

6     erosion is.

7          Q.    So, yes?

8          A.    Yes.

9          Q.    You would want to review -- medical

10    records?

11         A.    Can I --

12               (Simultaneous crosstalk.)

13    BY MR. PERSONS:

14         Q.    I'm sorry?

15         A.    Yes.  Because the medical records, if

16    the erosion happened prior, you would look at the

17    medical records to see what other people have

18    found.

19         Q.    You'd also want to know all those things

20    before you rendered an opinion about the cause of

21    the exposure, extrusion, erosion of the mesh?

22         MR. HABERMAN:  Objection.

23    BY THE WITNESS:

24         A.    I don't understand your question.

Bruce Rosenzweig, M.D.

1  BY MR. PERSONS:

2      Q.   Well, you'd want to know about the

3  things we just talked about.  You'd want to know

4  where the exposure is?

5      A.   Correct.

6      MR. HABERMAN:  Objection.

7  BY MR. PERSONS:

8      Q.   You'd want to know about the history of

9  estrogen use.  I think you answered yes to that

10  question.

11          You'd want to know whether the patient

12  was compliant with post-op instructions, and the

13  example we used was refraining from engaging in

14  sexual intercourse.  I think you told us you'd want

15  to know that.

16      A.   Correct.

17      Q.   You'd want to know about the previous

18  medical records.

19          And my question was, you'd want to know

20  about those things before you rendered an opinion

21  about the cause of the erosion, exposure or

22  intrusion?  Yes or no.

23      MR. HABERMAN:  Objection.

24  BY THE WITNESS:

Bruce Rosenzweig, M.D.

```
 1        A.    Again, the cause is the mesh.  You're

 2   talking about corollaries that can make an

 3   exposure, erosion or extrusion more likely.

 4   BY MR. PERSONS:

 5        Q.    Yes.

 6        A.    Okay.

 7        Q.    So, you agree, you'd need to know these

 8   things that we talked about that I just enumerated?

 9        MR. HABERMAN:  Asked and answered.

10   BY THE WITNESS:

11        A.    As a corollary, correct.

12   BY MR. PERSONS:

13        Q.    Now, when discussing surgical options

14   for treatment of prolapse with a patient, you agree

15   you should advise the patient that each subsequent

16   surgery can lead to increased complications.  Yes?

17        MR. HABERMAN:  Objection.

18   BY THE WITNESS:

19        A.    I -- again, that question is so broad.

20   It really would be very difficult to answer in a

21   yes-or-no fashion.

22   BY MR. PERSONS:

23        Q.    Well, would you agree that if you

24   undertook surgical treatment, treatment of
```

Bruce Rosenzweig, M.D.

```
1    prolapse, that each subsequent surgery could lead

2    to increased complications, as a general

3    proposition?

4         A.    Again, it all depends on what -- you

5    know, if you do an abdominal procedure and then you

6    followed it up with a Le Fort, no, that really

7    wouldn't increase your risk of surgical

8    complications.

9              If you do an abdominal procedure and you

10   follow that up with an abdominal procedure, then,

11   yes, there could be an increased risk of

12   complications.

13             So, again, it's not -- in a general

14   sense, I would tend to agree with you.  In a

15   specific sense, I would need -- it would be

16   important to know exactly what, you know, the

17   subsequent procedures are going to be.

18        Q.    Okay.  Chronic hypertension can increase

19   the risk of surgery, can't it?

20        A.    Would increase the risk of anesthesia.

21        Q.    And chronic hypertension can impact

22   wound healing, can't it?

23        A.    In and of itself, no.

24        Q.    But it can?
```

Bruce Rosenzweig, M.D.

```
 1        A.    In and of itself, no.

 2        MR. HABERMAN:  Objection.

 3   BY MR. PERSONS:

 4        Q.    Combined with other factors it could, it

 5   could contribute to it?

 6        MR. HABERMAN:  Objection; vague.

 7   BY THE WITNESS:

 8        A.    Now, we are --

 9        MR. HABERMAN:  What other factors?

10   BY THE WITNESS:

11        A.    Right.  I would need to know like what

12   other factors you're talking about.

13   BY MR. PERSONS:

14        Q.    All right.  Well, for instance --

15        A.    First of all, how -- is the hypertension

16   controlled or uncontrolled.

17        Q.    No.  Let's --

18        A.    What medications the patient is taking

19   for the hypertension, you know.  So, again --

20        Q.    Sir.

21        A.    Yes, sir.

22        Q.    Go ahead.  Go ahead.

23              Let's say the patient has uncontrolled

24   hypertension and the patient is a heavy smoker.
```

Bruce Rosenzweig, M.D.

```
 1   Couldn't that affect the healing?
 2        A.    An uncontrolled hypertension, patient
 3   wouldn't get in the operating room because they are
 4   at risk for anesthesia.
 5             So, I mean, there is really an
 6   exceedingly rare number of emergent prolapse cases
 7   that you would operate on someone who is not well
 8   controlled, such as with, you know, pulmonary
 9   issues, hypertension, uncontrolled diabetes.
10             So, you know, I mean, I understand what
11   you're saying, yes.  Someone that has got
12   uncontrolled medical issues would be at risk for
13   surgery, which is why you don't take someone with
14   uncontrolled issues to the operating room.  You get
15   them -- you get them maximized so that they can
16   tolerate being asleep for the length of time that
17   you need to keep them asleep and then you would
18   monitor their medical conditions to keep them under
19   control during the postoperative period.  So...
20        Q.    All right.  Vaginal atrophy, menopause,
21   can increase the risk of pelvic reconstructive
22   surgeries, can't it?
23        MR. HABERMAN:  Objection.
24   BY THE WITNESS:
```

Bruce Rosenzweig, M.D.

```
 1      A.      Depends on the severity and underlying

 2   cause of the atrophy.  Is it medically induced or

 3   is it a natural menopause or a surgically induced

 4   menopause?

 5              A natural menopause, no, we operate on

 6   women that are menopausal all the time.  Someone

 7   that is a surgically induced menopause or a

 8   medically induced menopause such as a woman with

 9   breast cancer who's on an aromatase inhibitor,

10   those are women, yes, I definitely advise them

11   against having surgical procedures on the vagina

12   because of the risk of poor healing.

13              But those are -- you know, I've got

14   maybe a half a dozen women like that in my practice

15   right now that have a surgical condition that I

16   warn against doing surgery because they are on an

17   aromatase inhibitor, which essentially drops their

18   estrogen level down to zero, and you can't treat

19   them with estrogen to try to build up their vaginal

20   tissue or to treat them postoperatively.

21   BY MR. PERSONS:

22      Q.     Do you agree that smoking tobacco can

23   raise the risk of a poor surgical outcome because

24   it contributes to poor wound healing?
```

Bruce Rosenzweig, M.D.

```
 1        A.    It can also lead to upper respiratory

 2   problems due to intubation and can lead to

 3   pneumonia.  But, yes, it can be associated with

 4   poor wound healing.

 5             But you would see a general wound

 6   healing.  You wouldn't see just a poor wound

 7   healing in one location if someone was a smoker.

 8   So, I mean, if they had poor healing, they would

 9   have poor healing generally, not locally.

10        MR. PERSONS:  Move to strike the

11   non-responsive portion of that answer.

12   BY THE WITNESS:

13        A.    Well, sir, you asked me about wound

14   healing and I was explaining to you that, yes, if

15   you're going to have poor wound healing from

16   smoking, it would be on all the surgical wounds,

17   not just one surgical wound.  So, I mean, that's an

18   important part of my answer.

19   BY MR. PERSONS:

20        Q.    Well, you might think it's important.

21   You answered the question.  Generally speaking,

22   does smoking contribute to poor wound healing?

23        MR. HABERMAN:  Objection; asked and answered.

24   BY MR. PERSONS:
```

Bruce Rosenzweig, M.D.

```
 1        Q.    Does the effect of nicotine on the

 2   circulatory system and the 80 compounds in tobacco

 3   smoke inhibit wound healing?

 4        A.    For all --

 5        MR. HABERMAN:  Objection; asked and answered.

 6   BY THE WITNESS:

 7        A.    For all surgical wounds it can, yes.

 8   BY MR. PERSONS:

 9        Q.    That was the question.

10        A.    Okay.

11        Q.    Using illicit drugs can affect

12   cardiovascular health and can also raise the risk

13   of a poor surgical outcome, can it not?

14        MR. HABERMAN:  Objection; vague.

15   BY THE WITNESS:

16        A.    The poor surgical outcome meaning that

17   they can have an event, you know, cardiovascular

18   event, during the surgery.

19   BY MR. PERSONS:

20        Q.    Right.

21        A.    So, you know, yes.  I would prefer to

22   make sure that if I'm going to operate on someone

23   with a history of significant drug use, such as

24   cocaine, that I have a negative tox screen before I
```

Bruce Rosenzweig, M.D.

1    would operate on that patient.

2        Q.    You'd also advise that patient of the

3    importance of disclosing all health-related issues

4    prior to surgery?

5        A.    Correct.

6        Q.    Now, on page 3 of your report, under

7    III, "Findings Related to Raeann Bayless."

8              Do you have your report in front of you?

9        A.    Yes.

10       Q.    Starting there, you go on and you list

11   roughly 12 medical records on pages 3 through 7?

12       A.    Correct.

13       Q.    Now, you reviewed these records for the

14   purpose of writing your report, correct?

15       A.    I reviewed the records, yes, to provide

16   opinions in Ms. Bayless' case, yes.

17       Q.    Was this the totality of the records

18   that you had in your possession at that time?

19       A.    No.

20       Q.    How did you go about selecting these

21   records or determining that these records were

22   pertinent to your opinions and others were not,

23   just generally speaking?

24       A.    Well, this is just a summary of her

Bruce Rosenzweig, M.D.

1    medical treatment.

2         Q.    All right.  Have you requested

3    additional medical records?

4         A.    If there are new medical records that

5    are obtained, I hope that I get sent new medical

6    records.  If new medical records are obtained and

7    they impact my opinion, I would be happy to give

8    you the opportunity to come back and see how any

9    new medical records changed my opinions.

10        Q.    We'd reserve the right to reopen and

11   conduct another deposition.

12               All right.  Is it fair to say that if

13   you didn't include a record, a medical record, on

14   pages 3 through 7, that you didn't think that

15   particular record was pertinent to your opinions?

16        A.    No.

17        MR. HABERMAN:  Objection.

18   BY THE WITNESS:

19        A.    That's not correct.  All the medical

20   records are pertinent to my opinions.  This is a

21   summary of the medical records I reviewed and

22   relied upon, all the medical records that are on my

23   reliance list, and I subsequently reviewed and

24   relied upon the depositions that we discussed

Bruce Rosenzweig, M.D.

1    earlier and the exhibits associated with those.

2    BY MR. PERSONS:

3        Q.    All right.  Now, you understand to the

4    extent you relied on a medical record, it should

5    have been delineated or set forth in your report.

6    You understand that?

7        A.    No, this is a summary of the medical

8    treatment.  If I was to add all the medical

9    records, that would be the -- my report would be as

10   long as the medical records are.

11       Q.    On page 3 of your litigation report,

12   under III, you write, "Ms. Bayless is a current

13   smoker."

14             Do you see that?

15       A.    Right.

16       Q.    And then she has a medical history that

17   includes hepatitis C, heart murmur, gonorrhea,

18   trichomonas and hypertension.

19             Do you see that?

20       A.    Correct.

21       Q.    Now, that's Ms. Bayless' medical history

22   prior to her August 9, 2013 implantation surgery

23   involving the Advantage Fit and the Restorelle Y,

24   correct?

Bruce Rosenzweig, M.D.

1      A.    That was disclosed in the medical

2   records, correct.

3      Q.    But that was medical history prior to

4   the time she underwent the August 9, 2013 surgical

5   procedure.  Yes?

6      A.    As I state on page 4, she also has a

7   history of drug abuse.

8      Q.    All of these things predated the

9   surgery?  Yes or no.

10      A.    Correct.

11      Q.    Okay.  You'd agree that understanding a

12   patient's medical history is critical to a sound

13   differential diagnosis, as a general proposition?

14      A.    Correct.

15      Q.    And that's why you included this

16   paragraph about Ms. Bayless' past medical history

17   in your report?

18      A.    And also throughout the rest of my

19   report, correct.

20      Q.    Do you recall, in terms of the smoking,

21   do you recall for how long Ms. Bayless has been a

22   smoker?  That's not mentioned here in your report.

23      A.    As she stated in her deposition, if I

24   recall, she smoked for approximately 30 years.

Bruce Rosenzweig, M.D.

1        Q.    All right.

2        MR. HABERMAN:  You know, Ray, can we take a

3   five-minute break?  We have been going for about an

4   hour.

5        MR. PERSONS:  Sure.  Absolutely.  Okay.  How

6   long?

7        MR. HABERMAN:  Five, ten minutes.  Just have

8   to use the restroom.

9        MR. PERSONS:  Sure.  We can do that.  That's

10  fine with everybody?

11       THE WITNESS:  Sure, five minutes is great.

12       MR. PERSONS:  All right.  We'll take five.

13  Thank you.

14                 (WHEREUPON, a recess was had

15                  from 10:09 to 10:17 a.m.)

16  BY MR. PERSONS:

17       Q.    Doctor, you'd agree that the longer a

18  patient smokes, the more negatively it affects the

19  patient's health?

20       A.    Correct.

21       Q.    And those negative effects include

22  things like --

23       MR. HABERMAN:  Objection.

24  BY MR. PERSONS:

Bruce Rosenzweig, M.D.

1      Q.    -- poor wound healing?

2      MR. HABERMAN:  Been over this already.

3   BY THE WITNESS:

4      A.    I don't think there is a very good

5   degree of evidence on a cumulative effect on wound

6   healing like there is a cumulative effect on

7   pulmonary function, the risk of lung cancer.

8           So, the fact that a person is a smoker

9   can lead to, you know, microcirculatory factors.

10  But the effect on the lungs would be more of a

11  cumulative effect.

12     Q.    Okay.  Well, setting aside the lungs

13  since this isn't a lung case, poor circulation

14  could be a consequence of long-term cigarette

15  smoking?

16     A.    Cigarette smoking in general, correct.

17     Q.    And worsening hypertension could be one

18  of the long-term effects of cigarette smoking?

19     A.    Hypertension, yes.  The hypertension,

20  diabetes, smoking go hand in hand.

21     Q.    You would agree that if a patient didn't

22  have wound healing issues when they started

23  smoking, they may have experienced those issues

24  after continuing to smoke for a long time, a long

Bruce Rosenzweig, M.D.

1    time being 20, 30 years?

2         A.    It would -- you know, one would need to

3    look at what the event was, you know, earlier in

4    life to see what that was associated with.

5         Q.    But you would agree that smoking,

6    long-term smoking, adversely affects the

7    microcirculatory system; that can impact wound

8    healing?

9         A.    As I state in my report, yes.

10        Q.    Now, in addition to past medical

11   history, you'd also consider a patient's past

12   surgical history to be critical to any differential

13   diagnosis.  Yes?

14        A.    Correct.

15        Q.    So, in the next sentence in this

16   paragraph in your report you point out that

17   Ms. Bayless' surgical history is remarkable for

18   tubal ligation, three abortions,

19   gallbladder/stones, robotic-assisted total

20   laparoscopic hysterectomy, abdominal sacral

21   colpopexy, retropubic midurethral sling using the

22   Advantage Fit and cystoscopy.

23             Do you see that?

24        A.    Yes.

Bruce Rosenzweig, M.D.

1      Q.    Do you know how Ms. Bayless' abortions

2   were performed, whether they were transvaginal?

3      A.    Well, that would be -- the vast majority

4   of an abortion would be surgical.  I mean, it would

5   have been in the record that she would have had a

6   hysterotomy if the termination was done later in

7   the pregnancy for a very specific reason like, you

8   know, severe eclampsia or a uterine infection or,

9   you know, some other obstetrical emergency.

10      Q.    All right.  Other than those three

11   abortions, Ms. Bayless' surgeries were all

12   performed transabdominally, correct?

13      A.    Yes.

14      Q.    And you'd agree that multiple abdominal

15   surgeries can increase the risk for adhesions?

16      A.    Well, if they're open procedures, there

17   is some limited data on the degree of adhesions

18   that multiple surgeries caused.  But with

19   laparoscopic procedures, the amount of adhesions

20   would be limited.

21            Now, the gallbladder surgery, it depends

22   on the severity of the gallbladder disorder and,

23   you know, if there was a preceding infection,

24   severe infection, or a postceding infection.

Bruce Rosenzweig, M.D.

```
 1                 But, no, a laparoscopic surgery, even

 2     multiple laparoscopic surgeries, I wouldn't

 3     anticipate that there would be a significant risk

 4     of adhesion formation.

 5         Q.    All right.  Adhesions can be treated

 6     surgically, right?

 7         A.    Correct.

 8         Q.    And if they aren't treated, they can

 9     become painful.  Yes?

10         A.    Not always but they can.

11         Q.    They can and they can feel like

12     stretching or pulling inside the abdomen, can't

13     they?

14         A.    We already had that discussion

15     previously.

16         Q.    So, yes?

17         A.    Well, all depends on what organs are

18     adhesed to what.

19         Q.    So, yes, it can feel like stretching or

20     pulling?

21         A.    Again, that is such a broad question

22     that would -- the simple answer is there can be a

23     stretch sensation, particularly with adhesions that

24     are to an abdominal wall incision, not a
```

Bruce Rosenzweig, M.D.

1   laparoscopic incision.

2          So, in a very broad and general sense,

3   yes.

4      Q.   All right.  Now, your litigation report

5   goes on to provide a summary of Ms. Bayless'

6   medical care starting on March 7, 2012 and ending

7   June 11, 2015.

8      A.   May 7, 2012, but yes.

9      Q.   I know.  I think it's a typo.  It said

10  2014 in here, but the records say 2012.

11          You'd agree with that?

12     A.   No.  The first record is May 7, 2012

13  through June 2015.

14     Q.   Right.  Okay.  So, let's go to the --

15  those records.

16     MR. PERSONS:  And if we could, Zach, go to tab

17  1, please.

18  BY MR. PERSONS:

19     Q.   And this is -- the first record noted in

20  your report is from May 7, 2012, and let's mark

21  that Exhibit 1.

22          (WHEREUPON, Rosenzweig Deposition

23          Exhibit No. 1 was marked for

24          identification:  5/7/12 medical

Bruce Rosenzweig, M.D.

```
 1              record; COL PLTF 000460 RBAYLESS -
 2              COL PLTF 000463 RBAYLESS.)
 3   BY MR. PERSONS:
 4      Q.    Do you recognize this as a copy of that
 5   record?
 6      A.    As soon as Zach gets it up, I will.
 7      MR. BURNETT:  It should be marked now.  Just
 8   as a reminder, once I introduce a new exhibit, if
 9   you all just hit refresh on your browser, it should
10   pop up.  So, if you have the link open already, hit
11   refresh, you should see Exhibit 001.
12      THE WITNESS:  Now, I've got it.
13   BY THE WITNESS:
14      A.    Yes.
15   BY MR. PERSONS:
16      Q.    Did you receive this record in its
17   entirety?
18      MR. HABERMAN:  I'm sorry.  I'm trying to
19   locate it.
20      MR. BURNETT:  The link is in the chat, in the
21   Zoom chat, if you look at the window.  I sent the
22   link out.  It may have been right before you
23   joined.
24      MR. HABERMAN:  I don't see the -- I don't have
```

Bruce Rosenzweig, M.D.

```
 1   it in my chat.
 2       MR. BURNETT:  Can we go off the record for one
 3   moment.
 4       MR. PERSONS:  Sure.
 5             (WHEREUPON, discussion was had off
 6              the record.)
 7   BY MR. PERSONS:
 8       Q.   All right.  Did you review any records
 9   related to Ms. Bayless' medical treatment that
10   predate May 7, 2012, Doctor?
11       A.   Not that I specifically recall.
12       Q.   Okay.  To the extent any medical
13   treatment or condition is not discussed in the
14   records that you did review, is it fair to say that
15   your opinions in this case could not have accounted
16   for any medical treatment or condition Ms. Bayless
17   may have had prior to May 7, 2012?
18       MR. HABERMAN:  Objection.
19   BY THE WITNESS:
20       A.   Unless it was discussed in her
21   deposition.
22   BY MR. PERSONS:
23       Q.   Okay.  Now, this record reflects that
24   Ms. Bayless' visit to Orlando Health was due to
```

1 complaints of vaginal prolapse and urinary

2 incontinence.  Do you see that?

3     A.    Yes.

4     Q.    And it indicates that Ms. Bayless has

5 been dealing with this for over seven years.

6           Do you see that?

7     A.    Correct.

8     Q.    And having read her deposition, you're

9 aware that Ms. Bayless testified that she began

10 experiencing symptoms of prolapse after the birth

11 of her second child?

12     A.    Correct.

13     Q.    Are you aware that she testified that

14 she was able to see her bladder at the opening of

15 the vagina?

16     A.    Correct.

17     Q.    All right.  Now, in the last line of the

18 first paragraph of Exhibit 1, the provider, I want

19 to say Dr. Bukkapatnam, also noted Ms. Bayless

20 stated that she had some dyspareunia lately?

21     A.    Correct.

22     Q.    And it goes on to describe her OB

23 history.  Do you see that?

24     A.    Yes.

Bruce Rosenzweig, M.D.

```
 1                 And if we can go back to this last line.

 2      She was asked about that in her deposition and she

 3      said when the penis hit the cervix, that was what

 4      was causing her pain.

 5           Q.    Yes.  And she -- in terms of the OB

 6      history, it goes through the nine pregnancies, and

 7      talks about four full term, three abortions and two

 8      miscarriages.  You see that?

 9           A.    Yes.

10           Q.    She delivered all four of her children

11      vaginally, correct?

12           A.    Correct.

13           Q.    And you'd agree that vaginal delivery is

14      a major risk factor for prolapse?

15           A.    And stress incontinence, correct.

16           Q.    You agree that vaginal delivery

17      requiring an episiotomy can also lead to

18      dyspareunia?

19           A.    No.

20           Q.    Okay.  Under --

21           A.    I mean, it can be uncomfortable while

22      the episiotomy is healing.  But unless there was

23      some untoward event with the episiotomy or the

24      repair, no.
```

Bruce Rosenzweig, M.D.

1      Q.    So, if there is some untoward event, it

2    can lead to dyspareunia.  That's your opinion?

3      A.    If there is a poor repair of the

4    episiotomy, it could.

5      Q.    Okay.  Under "Gynecological History,"

6    this record notes that Ms. Bayless had a tubal

7    ligation.  And you noted that in your litigation

8    report, didn't you?

9      A.    Correct.

10     Q.    And that's a procedure that's performed

11   abdominally, isn't it?

12     A.    It is -- can be done either through a

13   telescope.  It can be done through what's called a

14   mini-lap immediately postpartum where there's a 3

15   or 4 centimeter incision made underneath the

16   bellybutton because the tubes are at that level,

17   you know, one to two days after delivery.  Can also

18   be done -- years ago we used to do it

19   transvaginally.

20            But the vast majority are done through a

21   small bellybutton incision.  Almost all of them.

22     Q.    Abdominally?

23     A.    Excuse me?

24     Q.    Abdominally, then, aren't they?

Bruce Rosenzweig, M.D.

 1      A.    Correct.

 2      Q.    And abdominal surgeries can lead to

 3  adhesions?

 4      A.    Abdominal surgeries can.  But, again,

 5  this was more likely than not done laparoscopically

 6  and the chances of this leading to adhesions is

 7  very, very rare.

 8      Q.    But we don't know, do we?

 9      A.    Yeah, we actually do.

10      Q.    Okay.  So, you do know how it was done,

11  the tubal ligations?

12      A.    Oh, no, that it didn't lead to

13  adhesions.  I mean, if you look at Dr. Jones'

14  surgical report, there were some adhesions between

15  the left colon and the sidewall, which she stated

16  were more likely than not due to the findings of

17  diverticulosis.

18      Q.    Further down under "Sexual Activity"

19  next to "Comments," a note that Ms. Bayless

20  represented that she had over 100 partners

21  lifetime.  That's noted here.

22            Do you see that?

23      A.    Yes.

24      Q.    And then you see "STD History" notes

Bruce Rosenzweig, M.D.

1    gonorrhea?

2         A.    Correct.

3         Q.    The symptoms of gonorrhea can include

4    vaginal discharge, correct?

5         A.    Correct.

6         Q.    And foul odor, correct?

7         A.    Usually the gonorrheal discharge is not

8    associated with odor.

9         Q.    Okay.  Can also include dysuria?

10        A.    Yes.

11        Q.    Vaginal itching?

12        A.    No.

13        Q.    Vaginal burning?

14        A.    Not characteristic with gonorrhea.

15        Q.    Okay.  You agree that patients who

16   engage in sexual intercourse with multiple partners

17   are at higher risk for contracting STDs?

18        A.    Correct.

19        Q.    Especially if they don't consistently

20   use protection?

21        A.    Well, the only protection would be a

22   condom.  I mean, cervical caps, diaphragms don't --

23   while they do cover the cervix and do decrease

24   transmission of both chlamydia and gonorrhea, which

Bruce Rosenzweig, M.D.

```
 1   live in the columnar epithelial cells of the

 2   cervix, it wouldn't do anything to decrease the

 3   transmission of something like human papilloma

 4   virus and it would not or it could depending on if

 5   a nonoxynol-9 preparation increased the risk of

 6   bacterial vaginosis.

 7        MR. PERSONS:  Move to strike as

 8   non-responsive.

 9   BY MR. PERSONS:

10        Q.   Going back to the tubal ligation, we

11   don't know how Ms. Bayless' tubal ligation was

12   performed, do we?  Whether it's done

13   laparoscopically or not, we don't know, do we?

14        A.    It is not described in the records,

15   correct.

16        Q.   Okay.  Now, going -- now, coming back to

17   the what we were just discussing about the medical

18   record here under "Sexual History," you'd agree

19   that repeated STDs can lead to longer term health

20   complications?

21        A.    Repeated STDs of gonorrhea and chlamydia

22   can lead to tubal damage, infertility.  But at the

23   time of her hysterectomy, that was not noted.  It

24   can lead to endomyometritis, but on the pathology
```

Bruce Rosenzweig, M.D.

1    report that was not noted.  The only thing that was

2    noted on the pathology report for the hysterectomy

3    was chronic cervicitis.

4         MR. PERSONS:  Move to strike as unresponsive.

5    BY MR. PERSONS:

6         Q.    Repeated STDs can result in a high

7    propensity to develop vaginal infections, can't it?

8    Yes or no.

9         A.    I can't answer that question yes or no.

10        Q.    Okay.  And chronic conditions -- it can

11   lead to a chronic condition like pelvic

12   inflammatory disease, can't it?

13        A.    Yes.

14        Q.    Ms. Bayless' sexual activity also refers

15   to a history of sexual abuse.  Do you see that?

16        A.    Yes.

17        Q.    She was molested at 12 years old by a

18   friend's brothers.

19             Do you see that?

20        A.    Yes.

21        Q.    Patients who have experienced sexual

22   abuse are at a high risk of experiencing chronic

23   pelvic pain, aren't they?

24        A.    That usually starts in the vicinity of

Bruce Rosenzweig, M.D.

1    the sexual abuse, correct.

2        Q.    And they are at a high risk of

3    experiencing chronic dyspareunia, aren't they?

4        A.    That starts after the sexual abuse,

5    correct.

6        Q.    And the relationship between a history

7    of sexual abuse and chronic pelvic pain or

8    dyspareunia is unclear, isn't it?

9        A.    I -- can you repeat the question?

10       Q.    Yes.  The relationship between a history

11   of sexual abuse and pelvic pain and dyspareunia is

12   unclear?

13       A.    Correct, in the general sense.  In

14   Ms. Bayless' case, we know how she testified to

15   that because of the dyspareunia that she was having

16   prior to her hysterectomy, which was the penis

17   hitting the cervix, as she testified to.

18       Q.    But generally it's agreed there's a

19   psychological component between sexual abuse and

20   dyspareunia and pelvic pain?

21       A.    There can be if it manifests that way.

22       Q.    On the second page of this record under

23   "Past Medical History," it's noted that Ms. Bayless

24   has hypertension and positive for hepatitis C.  Do

Bruce Rosenzweig, M.D.

1    you see that?

2         A.    Correct.

3         Q.    And further down under "Psychosocial

4    History," it describes Ms. Bayless' history of

5    smoking and substance abuse?

6         A.    Correct.

7         Q.    She was smoking around a half pack per

8    day at that time and had a history of crack use for

9    25 years, now for clean for two.

10             Do you see that?

11        A.    Correct.

12        Q.    Are you aware that she began using crack

13   cocaine around 1999, according to her deposition?

14        A.    Yes.

15        Q.    And you did not think that was relevant

16   to your opinions?

17        A.    Well, it was in the medical records, so

18   of course I considered it.  But she had been not

19   using it at the present time and it didn't appear

20   again in the records I think until 2014.

21             So, around the time of her surgery she

22   was not using, by what's based on the records,

23   using cocaine; and if I recall, she did not state

24   that she was using it at the time of her surgery.

Bruce Rosenzweig, M.D.

1      Q.    You would agree that long-term crack

2  cocaine use impacts circulation, though, don't you?

3      A.    It can while someone is using it.

4      Q.    And a long-term crack cocaine use also

5  carries other negative health consequences.  You'd

6  agree with that?

7      A.    While someone is using it, correct.

8      Q.    Such as worsening hypertension?

9      A.    While someone is using it, correct.

10      Q.    And impaired neurocognitive function.

11  You'd agree with that?

12      A.    While someone is using it, correct.

13      Q.    So, it's your testimony that if someone

14  uses cocaine for 20 plus years and stops using it,

15  then there are no long-term consequences of the

16  long-term use.  That's your testimony?

17      A.    Well, the acute effects would not be

18  manifesting.

19      Q.    On page 3 of this record, next to

20  "Comment," where it says, "Patient has a moderate

21  cystocele, halfway to the introitus."

22          Do you see that?

23      A.    Yes.

24      Q.    Now, the severity of Ms. Bayless'

Bruce Rosenzweig, M.D.

1    prolapse wasn't noted anywhere in your report, was

2    it?

3         A.    Yes, it was.  That at the time of

4    surgery was a stage II.  On page 5.

5         Q.    The severity of the prolapse is relevant

6    to your opinions or is it not relevant to your

7    opinions?

8         A.    The severity of the prolapse was an

9    indication for the surgery.  She had a stage II

10   prolapse that came down towards the introitus.

11   According to Dr. Bukkapatnam on May 7, 2012, this

12   would be a Baden-Walker classification, which would

13   be a stage I.

14        Q.    Are you aware that she testified that

15   her bladder prolapse was visible at her introitus?

16        A.    Yes, she did testify to that, which

17   would be a stage II, which is what Dr. Jones noted

18   at the time of her surgery.

19        Q.    Under -- at the bottom of page 3 under

20   "Assessment/Plans" it says, "Mixed incontinence,

21   cystocele, hypertension, hep C, a history of ISC,"

22   I assume that's intermittent self-catheterization?

23        A.    No, no, no.  No.  That is laparoscopic

24   cholecystectomy.

Bruce Rosenzweig, M.D.

```
1          Q.    Okay.  So, that's LSC?

2          A.    Yes.

3          Q.    And then a history of the bilateral

4    tubal ligation?

5          A.    Yes.

6          Q.    History of drug abuse.  You see all of

7    that?

8          A.    Yes, correct.

9          Q.    And underneath that it says "Plan," the

10   plan was to conduct a urodynamic study?

11         A.    Correct.

12         Q.    Urine culture?

13         A.    Correct.

14         Q.    And that was in regards to Ms. Bayless'

15   urinary incontinence, correct?

16         A.    Correct.

17         Q.    And then she was given a referral to a

18   Dr. Kathy Jones for evaluation?

19         A.    Correct.

20         Q.    All right.

21         MR. PERSONS:  Let's go to tab 2, Zach, and

22   that's the May 31, 2012 medical record and let's

23   mark this Exhibit 2.

24                   (WHEREUPON, Rosenzweig Deposition
```

Bruce Rosenzweig, M.D.

```
1                    Exhibit No. 2 was marked for

2                    identification:  5/31/2012 medical

3                    record; COL-RBAYLESS-ORLANDO-000033

4                    and 000034.)

5    BY MR. PERSONS:

6         Q.    This particular record is not referenced

7    in your report --

8         A.    Correct.

9         Q.    -- Dr. Rosenzweig, but you did include

10   the August 12 and the August 16, 2012 visits to

11   Dr. Jones for urodynamic testing.

12               Is there any reason why you didn't

13   include this one as well?

14        A.    It's in the medical records.  This and I

15   think it's the June 10, 2012, which was a uroflow

16   report, but this just kind of reiterates what the

17   previous doctor had found.

18        Q.    Okay.  At this visit Dr. Jones performed

19   a vaginal exam as reflected under "PE."  Yes?

20        A.    Correct.

21        Q.    And next to rectal exam she noted that

22   Ms. Bayless had poor tone and weak squeeze all

23   around?

24        A.    Correct.
```

Bruce Rosenzweig, M.D.

1      Q.    Was that relevant to any of your

2   opinions?

3      A.    She has no bowel injuries that I am

4   alleging occurred from the -- either of the pelvic

5   floor mesh implants.  So, while it is noted, it is

6   just a finding on medical exam.

7      Q.    Okay.  It's not relevant to any of your

8   opinions, correct?

9      A.    It is not associated with any of the

10  injuries caused by the pelvic organ -- or the mesh

11  products that were placed.

12     Q.    Then it says, "2 centimeter

13  rectal/vaginal defect that goes into PB."

14           Do you know what that means?

15     A.    No.  She had a -- she was able to hold

16  for 2 seconds.  She had a thin perineal body, and

17  there was a finding of the RV defect along -- into

18  the perineal body.

19     Q.    So, that's what that is, the perineal

20  body, the PB?

21     A.    Yes.

22     Q.    Okay.  On the second page of this

23  document, Dr. Jones diagnosed Ms. Bayless with

24  mixed incontinence, rectocele, cystocele midline,

Bruce Rosenzweig, M.D.

```
 1   uterovaginal prolapse incomplete and urinary

 2   frequency.

 3              Do you see that?

 4       A.    Correct.

 5       Q.    Rectocele is where the rectum is

 6   prolapsing into the vagina, also called a posterior

 7   defect, correct?

 8       A.    Correct.

 9       Q.    And a midline cystocele is where the

10   bladder is prolapsing into the vagina at the apex,

11   an anterior defect.  Yes?

12       A.    Correct.

13       Q.    And Ms. Bayless' uterus was also

14   prolapsing into her vagina; a vaginal vault or

15   apical prolapse, correct?

16       A.    Correct.

17       Q.    Underneath that list of diagnoses

18   Dr. Jones wrote, "Stage II pelvic organ

19   prolapse - leading edge at BA consistent with

20   cystocele/uterine prolapse," correct?

21       A.    Correct.

22       Q.    So, Ms. Bayless had near complete

23   prolapse at that time, didn't she?

24       A.    No.  She had stage II prolapse.  It came
```

Bruce Rosenzweig, M.D.

```
 1    down to, if you look back at the POP-Q, the lowest

 2    point was point B on the anterior and that came

 3    down to 1 centimeter past the introitus, which is

 4    stage II.  This is not stage III or stage IV.  So,

 5    just had an early stage II -- or a stage II

 6    prolapse.  It's not complete prolapse.

 7         Q.    Okay.  But both the bladder and uterus

 8    were herniating into her vagina?

 9         A.    Correct.

10         Q.    And --

11         A.    But --

12         Q.    -- enterocele is the only pelvic organ

13    prolapse diagnosis not included here?

14         MR. HABERMAN:  I'm going to also say I don't

15    think the doctor finished his answer previously.

16    BY THE WITNESS:

17         A.    I did discuss that she had a vault

18    prolapse or a uterine prolapse and a rectocele,

19    which is described as the prolapse of the vaginal

20    vault, which is -- but her main -- I mean, her

21    posterior wall was barely stage II and her uterus

22    was also barely stage II based on the POP-Q that

23    was done that day.  Her main prolapse was a

24    cystocele.
```

Bruce Rosenzweig, M.D.

1          MR. BURNETT:  I think we lost Ray.  Can we go

2    off the record while he gets back on?

3                    (WHEREUPON, a recess was had

4                     from 10:49 to 10:59 a.m.)

5    BY MR. PERSONS:

6          Q.    Doctor, when I said "complete prolapse,"

7    what I was alluding to was that all of her organs

8    were prolapsing.

9                You have left up here to the rectocele

10   and the enterocele and the cystocele?

11         A.    Correct.  But when you look at the

12   POP-Q, by far cystocele was at a plus 1.  All the

13   rest were at a minus 1.

14         Q.    Okay.  Let's see.  Dr. Jones discussed

15   treatment options with the patient.  Do you see

16   that?  We are still on the --

17         A.    Page 2, yes.

18         Q.    Page 2, yes, of this record.  Where she

19   talks about "Observation, pessary support and

20   surgical intervention."  Do you see that?

21         A.    Yes.

22         Q.    All right.  At the bottom of this --

23   well, the last entry on this page or right before

24   the last entry, "Patient advised," do you see that

Bruce Rosenzweig, M.D.

1    paragraph, which says, "Patient advised that

2    tobacco use contributes to risk of urinary

3    incontinence and pelvic organ prolapse."

4             Do you see that?

5        A.    Yes.

6        Q.    And says, "It can also affect the

7    outcome of the surgical intervention with respect

8    to wound healing and risk of pelvic organ prolapse

9    reoccurrence."

10            Do you agree with that statement?

11       A.    Yes.  If she develops upper respiratory

12   issues, that can increase the risk of recurrent

13   prolapse and also can increase the urinary

14   incontinence.

15            There is some data to suggest that all

16   of the products that you alluded to earlier that

17   are in cigarette smoke can irritate the bladder and

18   so, you know, it's always wise to recommend to our

19   patients to quit smoking.

20       Q.    Okay.  Do you agree that this record

21   indicates Dr. Jones counseled Ms. Bayless that she

22   was at a high risk of less than optimal surgical

23   outcome due to her long history of smoking?

24       A.    With respect to wound healing and

Bruce Rosenzweig, M.D.

1    recurrence.

2         Q.    Okay.  Are you aware that -- well,

3    you've read her deposition, so you know that

4    Dr. Jones testified that she thought Ms. Bayless'

5    30-pack-year history of smoking would have delayed

6    healing or improper wound healing at the time she

7    underwent the surgical repair for the urinary

8    incontinence and for pelvic organ prolapse.  Do you

9    agree with that?

10        A.    That's what she stated in her

11   deposition.

12        Q.    All right, sir.  Now, let's look at

13   Tab No. 3, and this is a record dated December the

14   10th of 2012.  I will mark this.  I think we are up

15   to Exhibit 3.  Reflecting a visit Ms. Bayless made

16   to the Brevard Health Department.

17                 (WHEREUPON, Rosenzweig Deposition

18                  Exhibit No. 3 was marked for

19                  identification:  12/10/12 medical

20                  record; COL-RBAYLESS-BREVARD-000004

21                  - 000006.)

22   BY MR. PERSONS:

23        Q.    That is about nine months before she

24   underwent her hysterectomy and implantation

Bruce Rosenzweig, M.D.

```
 1   procedure, correct?

 2        A.    Correct.

 3        Q.    And this record states that Ms. Bayless

 4   presented with a chief complaint of vaginal

 5   discharge, right?

 6        A.    With odor, correct.

 7        Q.    And under "Onset" the provider wrote,

 8   "Ms. Bayless comes in for evaluation on her vaginal

 9   odor and discharge."

10        A.    Correct.

11        Q.    And then it says that "She did have a

12   history of gonorrhea in the past on two occasions

13   and wanted to be checked at this time for her

14   problems."

15        A.    Correct.

16        Q.    Your report doesn't discuss the

17   frequency with which Ms. Bayless had been diagnosed

18   with or treated for gonorrhea, correct?

19        A.    I do discuss that she had a history of

20   gonorrhea in the past.  I didn't review and rely

21   upon this.  It is a past history of gonorrhea on

22   two occasions.

23        Q.    All right.  And I don't believe your

24   report discusses any other STD, does it?
```

Bruce Rosenzweig, M.D.

```
1        A.    No, it does discuss trichomoniasis.

2        Q.    Okay.  Now, the record goes on --

3        A.    But it is -- it is debated whether

4   trichomoniasis is truly a STD.

5        Q.    Okay.  The record goes on to note that

6   Ms. Bayless was "mentioning urinary and fecal

7   incontinence since having her second child 25 years

8   ago without any interventions," correct?

9        A.    Correct.

10        Q.    Your litigation report doesn't mention

11   any history of fecal incontinence, does it?

12        A.    No, that is not in my report.

13        Q.    You would agree, though, that even minor

14   or infrequent fecal incontinence can put a patient

15   at a higher risk of developing bacterial vaginosis?

16        A.    Not -- no.  Bacterial vaginosis is the

17   normal bacteria inside the vagina.  Fecal

18   incontinence can increase the risk of urinary tract

19   infection.

20        Q.    All right.  On the second page, the

21   provider documented Ms. Bayless admitting to

22   "Urination problems - dribbling, foul smell,

23   urgency."

24              Do you see that entry?
```

Bruce Rosenzweig, M.D.

1      A.    Correct.

2      Q.    So, in addition to urinary incontinence,

3  she was complaining of urinary urgency, wasn't she?

4      A.    Yes, and that was noted by her previous

5  doctor on May 7, 2012, with diagnosis of mixed

6  incontinence.

7      Q.    And also malodorous, that was another

8  entry, a thing that she was complaining of?

9      A.    On this date, correct.

10     Q.    At the bottom of this page under

11  "Genitourinary Systems" -- "Genitourinary Female,"

12  excuse me, the provider also documented, "Anterior

13  and posterior pelvic organ prolapse and yellowish

14  vaginal discharge"?

15     A.    Correct.

16     Q.    At the top of the next page under

17  "Rectal," it says, "Fecal incontinence, decrease

18  sphincter tone."

19          Do you see that?

20     A.    Yes.

21     Q.    And you would agree that decreased

22  sphincter tone is a symptom of rectocele or

23  posterior prolapse?

24     A.    No.

Bruce Rosenzweig, M.D.

1        Q.    Okay.  You don't agree with that?

2        A.    That is correct.  I mean, they are two

3    different things.

4        Q.    All right.  You would agree that

5    decreased sphincter tone can contribute to fecal

6    incontinence?

7        A.    That -- yes.

8        Q.    All right.  Now, further down under

9    "Assessment and Plan," Ms. Bayless was diagnosed

10   with "Vaginitis and vulvovaginitis, unspecified"?

11       A.    Correct.

12       Q.    The comments documented a wet prep for

13   trichomonas was obtained and started on Flagyl 400

14   milligrams orally twice a day for seven days,

15   correct?

16       A.    Correct.

17       Q.    And trichomonas, you say it's debatable

18   whether it's truly an STD, but there is no debate

19   that it's caused by a parasite, correct?

20       A.    Correct.  But -- correct.

21       Q.    And trichomonas can cause foul-smelling

22   vaginal discharge.  Yes?

23       A.    Correct.

24       Q.    And the discharge can be white, gray,

Bruce Rosenzweig, M.D.

```
1    yellow or green?

2         A.    It's usually yellow and green.  White

3    homogeneous is more bacterial vaginosis.

4         Q.    Trichomonas can also cause vaginal

5    itching, can't it?

6         A.    Not characteristically, but it can.

7         Q.    It can also cause dysuria?

8         A.    Less commonly, but it can.

9         Q.    Can cause painful urination?

10         A.    Less commonly, but it can.

11         Q.    And can also cause dyspareunia?

12         A.    Most women don't want to have

13    intercourse when they have a trichomoniasis

14    infection active.  But it can.

15         Q.    Okay.  Now, patients who have had

16    trichomonas previously are at a higher risk for

17    contracting it again.  Yes?

18         A.    Not necessarily.

19         Q.    Would you agree that patients who have

20    had a history of other STDs such as gonorrhea are

21    at a higher risk of contracting trichomonas?

22         A.    Not necessarily.

23         Q.    But they can?

24         A.    Well, you have to be exposed to the
```

Bruce Rosenzweig, M.D.

1    trichomonad.  There are a lot of people that feel

2    that it is a contaminant from the stool, so that it

3    wouldn't have any -- sexual intercourse wouldn't

4    have any impact on getting the trichomonad.

5        Q.    Unprotected sex raises the risk of

6    contracting trichomonas, doesn't it?

7        A.    Again, more likely than not, no.  It is

8    more likely than not from a rectal reservoir.

9        Q.    But it can?

10       A.    There is no conclusive data that it is

11   sexually transmitted, but it can.

12       Q.    And you're aware that Ms. Bayless

13   testified that she had one partner for 15 years,

14   but a lot of times they didn't use a condom and a

15   lot of times they did?

16       A.    Correct.

17       Q.    If trichomonas isn't treated properly,

18   it can persist for months or even years, can't it?

19       A.    It could persist as asymptomatic, but

20   she was given the appropriate therapy of Flagyl for

21   seven days twice a day.

22       Q.    But if it's not treated properly, it can

23   persist for months or years?

24       A.    As an asymptomatic harboring, that is

Bruce Rosenzweig, M.D.

1  remotely possible.

2      Q.   Now, let's look at Tab No. 4.

3           (WHEREUPON, Rosenzweig Deposition

4            Exhibit No. 4 was marked for

5            identification:  5/28/13 medical

6            record; COL-RBAYLESS-ORLANDO-000015

7            - 000018.)

8  BY MR. PERSONS:

9      Q.   This is a May 28, 2013 record from

10 Dr. Jones' pre-op history and physical, surgical

11 plan.

12          Do you see that?

13     A.   Yes.

14     Q.   And it says Ms. Bayless presented to

15 Dr. Jones for follow-up to discuss surgery.

16          Do you see that?

17     A.   Yes.

18     Q.   And under "HPI," "Follow-up to discuss

19 surgery."

20          And beneath that, under "Problems,"

21 Dr. Jones listed bacterial vaginosis, candidiasis,

22 midline cystocele, incomplete uterovaginal

23 prolapse, prolapse of vaginal vault after

24 hysterectomy, mixed incontinence.

Bruce Rosenzweig, M.D.

1              Do you see all those?

2       A.    Yes.

3       Q.    Do you agree that this reflects that

4  Ms. Bayless had a history of bacterial vaginosis

5  prior to undergoing the August 13 -- August 9, 2013

6  procedure?

7       A.    Well, stating the record but, again,

8  according to the medical records that we have

9  reviewed, we have documented trichomoniasis.  I do

10  not specifically recall prior to this record a

11  positive either culture or PCR for bacterial

12  vaginosis.

13      Q.    But according to this record, this

14  entry, bacterial vaginosis was a problem that was

15  identified pre-surgery, pre-August 9, 2013 surgery,

16  correct?

17      A.    According to this record, correct.

18      Q.    All right.  And this record also

19  reflects a history of vaginal candidiasis prior to

20  the August 9, 2013 procedure.  Yes?

21      A.    That's what the record states.

22      Q.    All right.  And there's no mention of

23  that anywhere in your summary, is there?

24      A.    It's in the medical record.

Bruce Rosenzweig, M.D.

```
1        Q.    But it's not in your summary of the

2   medical record, though, is it, in your report, in

3   the text of your report?

4        A.    It is a remote history that she had

5   prior to the surgery.

6        Q.    Okay.  Let's go to page 3 under

7   "Discussion," and on that page, Dr. Jones wrote

8   that she and Ms. Bayless discussed "abdominal

9   approach, laparoscopic and vaginal approach or

10  total vaginal approach," with regard to surgical

11  treatment of Ms. Bayless' prolapse.

12             Do you see that?

13       A.    Yes.

14       Q.    And she further explained that "Each of

15  these procedures can be combined with graft

16  augmentation either biologic or synthetic mesh,"

17  right?  That's what she says here?

18       A.    Correct.

19       Q.    Then she went on to detail each of these

20  procedures, didn't she?

21       A.    Yes.

22       Q.    No. 1, "Vaginal," options discussed

23  include total vaginectomy, colpocleisis with

24  perineoplasty.  Do you see that?
```

Bruce Rosenzweig, M.D.

1     A.    Yes.

2     Q.    Now, that's not an option for patients

3   like Ms. Bayless who want to continue having sex,

4   is it?

5     A.    That would not be a good option for

6   someone who wanted to have sexual intercourse.

7     Q.    Because it closes the vagina completely,

8   doesn't it, permanently?

9     A.    The intent is that it would be

10  completely closed permanently.

11    Q.    The other vaginal --

12    A.    There is a way of doing it that women

13  can continue to have intercourse.

14    Q.    Okay.  But the other vaginal options

15  included a cystocele/rectocele repair with graft,

16  right?

17    A.    Correct.

18    Q.    Sacrospinous ligament fixation that

19  would require a 23-hour hospital stay?

20    A.    Correct.

21    Q.    And that is a native tissue repair that

22  doesn't use mesh, right?

23    A.    Well, when you do the repair with a

24  graft, then it would.  But you can do it without.

Bruce Rosenzweig, M.D.

 1              The way she describes it, it would be

 2  with mesh, but it can be done without mesh.

 3       Q.    And we'll discuss that later.  But one

 4  of the alternatives that you claim would have been

 5  a safer option for Ms. Bayless' POP repair or

 6  pelvic organ prolapse repair would have been the

 7  native tissue repair without mesh, right?

 8       A.    Correct.

 9       Q.    Now, Dr. Jones then detailed the

10  abdominal approach that she says is the "gold

11  standard for vaginal vault prolapse and uterine

12  prolapse includes abdominal sacral colpopexy with

13  mesh."

14              Do you see that?

15       A.    That's what she states.

16       Q.    Dr. Jones actually referred to the

17  abdominal sacral colpopexy with mesh as the gold

18  standard for surgical correction of vaginal vault

19  prolapse and uterine prolapse, didn't she?

20       A.    That's what the record states.

21       Q.    And Dr. Jones gave Ms. Bayless an

22  explanation on the use of graft augmentation

23  materials and advanced prolapse repair.  Yes?

24       A.    Correct.

Bruce Rosenzweig, M.D.

1      Q.    Including discussing the possible

2  complications with hematoma, delayed healing,

3  exposure and/or extrusion.  Yes?

4      A.    That's what the record states.

5      Q.    And you'd agree the risk/benefit

6  discussion between Ms. Bayless and Dr. Jones is

7  relevant to your opinions?

8      A.    Correct.

9      Q.    But that's not noted anywhere in your

10 summary of this record, is it?

11     MR. HABERMAN:  Objection.

12 BY THE WITNESS:

13     A.    It is.  The doctor discussed abdominal

14 approach, laparoscopic approach, vaginal approach.

15 Each of these procedures can be combined with graft

16 augmentation either biological or synthetic.

17 BY MR. PERSONS:

18     Q.    But you didn't discuss the risk/benefit

19 discussion?

20     MR. HABERMAN:  Objection.

21 BY THE WITNESS:

22     A.    That was in the medical records.

23 BY MR. PERSONS:

24     Q.    All right.  Now, Dr. Jones explained

Bruce Rosenzweig, M.D.

1    that this surgery would be performed via a

2    robotic-assisted laparoscopic approach, didn't she?

3         A.    Correct.

4         Q.    And that it would require a 23-hour

5    hospital stay?

6         A.    Correct.

7         Q.    And that the robotic-assisted

8    laparoscopic approach could be combined with a

9    cystocele repair if necessary?

10        A.    Correct.

11        Q.    And then she, Dr. Jones, went on to

12   describe the traditional open surgery.

13             Do you see that?

14        A.    Yes.

15        Q.    When she talks about a sacral colpopexy

16   with mesh, cystocele repair with a two-to-three-day

17   hospital stay?

18        A.    Correct.

19        Q.    And that's significantly longer than the

20   23-hour stay referenced in regard to the vaginal

21   cystocele/rectocele repair with the graft or the

22   robotic-assisted laparoscopic approach, correct?

23        A.    Correct.

24        Q.    And, lastly, Dr. Jones wrote that the

Bruce Rosenzweig, M.D.

1    recovery period is the same for all reconstructive

2    procedures, about 12 weeks.

3            Do you see that?

4       A.    Yes.

5       Q.    And having read her deposition, you are

6    aware that Dr. Jones testified that she generally

7    orders her patients to refrain from physical and

8    sexual activity following surgery for a period of

9    approximately 12 weeks?

10      A.    That I don't specifically recall that

11   she said refrain from physical or sexual activity

12   for 12 weeks.

13           Most of us say after these procedures

14   four to six weeks of refraining from sexual

15   activity.

16      Q.    All right.  Well, are you saying you

17   don't recall or -- okay.

18           Even though you don't recall it, do you

19   dispute that she said that in her deposition?

20      A.    I do have a general recollection of her

21   discussing the recommendations that she gives to a

22   patient.  What she stated in her deposition is what

23   she stated.

24      Q.    You don't dispute that her testimony was

Bruce Rosenzweig, M.D.

1    that she orders her patients to refrain from

2    physical and sexual activity following surgery for

3    a period of 12 weeks?

4         A.    I would say physical activity, yes.  We

5    don't want patients to do heavy lifting after

6    pelvic organ prolapse surgery.

7         Q.    Okay.

8         A.    But I don't specifically recall that she

9    had sexual activity for 12 weeks too.

10        Q.    All right.  Let's look at her

11   deposition.  Starting on page 71, last line.

12        MR. PERSONS:  Can you put that up, Zach.

13        MR. BURNETT:  I need to switch Zoom back to my

14   laptop.  I switched to my iPad because it's better

15   connection, but to screen share I need to get back

16   to my laptop.  I apologize.

17   BY THE WITNESS:

18        A.    If you want to just read it, then I will

19   agree that that's what that page says.

20   BY MR. PERSONS:

21        Q.    All right.  Let me just read it into the

22   record.

23        A.    Okay.

24        Q.    It says:

Bruce Rosenzweig, M.D.

```
 1              "And it says, briefly discussed

 2         recovery time of approximately 12

 3         weeks plus activity restrictions?

 4              "A.   Yes.

 5              "Q.   And what activity

 6         restrictions would you recommend

 7         after surgery?

 8              "A.   Generally, no heavy

 9         lifting, straining, pushing,

10         pulling, bending, stooping -- that's

11         greater than 10 pounds.  We usually

12         encourage patients to do their

13         grocery shopping with a pulley.  Not

14         to do any housework.  That means

15         flipping mattresses, pushing

16         furniture around, anything that will

17         cause any strain on the abdominal

18         wall.

19              "Q.   And I think you said

20         this, but that would include

21         refraining from sexual intercourse,

22         right?

23              "A.   Correct."

24         A.   Yes.  But she didn't give a time frame
```

Bruce Rosenzweig, M.D.

1    for sexual intercourse.  I agree with all the

2    physical activity.  Yeah, I tell my patients the

3    same thing.  But she didn't clarify what her normal

4    is for refraining from sexual intercourse, because

5    12 weeks would be the longest that I've heard of

6    someone asking a patient to refrain from sexual

7    intercourse after a pelvic organ prolapse repair.

8             So, I will agree that that was

9    contextually in there, but it could be argued

10   whether or not she truly meant 12 weeks.  But I

11   will agree that's what her deposition stated.

12        Q.    That's what she said.

13             And this is a situation where you're

14   having the patient not only undergoing the pelvic

15   organ prolapse procedure and the stress urinary

16   incontinence procedure but also a hysterectomy?

17        A.    Correct.

18        Q.    So, that could account for why she says

19   12 weeks?

20        A.    No.  I think --

21        MR. HABERMAN:  Objection; calls for

22   speculation.

23   BY THE WITNESS:

24        A.    Again, I have not heard of someone

Bruce Rosenzweig, M.D.

1    asking a patient to refrain for 12 weeks after a

2    hysterectomy and a prolapse repair.

3            But, you know, again, that was added on

4    at the end of, "And you would give a restriction to

5    sexual intercourse," and she said, "Yes."

6            You're tying that to the 12-week mark.

7    She wasn't asked specifically, "At how many weeks

8    do you ask them to refrain from sexual

9    intercourse?"

10           All the other ones, I agree for 12

11   weeks, yes.  We don't want them to do any heavy

12   lifting because that affects the prolapse repair.

13       Q.    All right.  Let's look at page 94 of her

14   deposition.

15       A.    Okay.

16       Q.    And starting on line 8:

17           "Q.    Your form, your consent

18        form, also notes that physical and

19        sexual activity are to be restricted

20        for a period of time after surgery,

21        right?

22           "A.    Yes.

23           "Q.    And I think you said your

24        general restricted period is

Bruce Rosenzweig, M.D.

1          approximately 12 weeks, is that

2          right?

3               "A.   Yes."

4               Okay.  So we're clear now that she wanted

5     the patient, Ms. Bayless, to refrain from sexual

6     activity for 12 weeks.  That's what her testimony

7     is.

8          MR. HABERMAN:  Objection.

9     BY THE WITNESS:

10         A.    No.  You're still interpreting that.

11    That is an interpretation because it says

12    "generally."  Okay.  You didn't say "specifically."

13    BY MR. PERSONS:

14         Q.    You dispute that's what the doctor's

15    testimony says on page --

16         A.    I'm not disputing that that -- I'm not

17    disputing that that's what the testimony says.

18    It's just that that's your interpretation of that

19    testimony.

20         Q.    Okay.  All right.  Well, that's your

21    testimony.

22               Now, Dr. Jones referred to the -- those

23    postoperative restrictions are intended to

24    facilitate wound healing after surgery, correct?

Bruce Rosenzweig, M.D.

```
1        A.     Those restrictions are to prevent --
2   well, sexual intercourse, to allow the vagina to
3   heal.  The restrictions on lifting are to prevent
4   recurrence.
5        Q.     But you would agree that certain
6   physical activities can disrupt the incision site?
7        A.     After the four-week period, more likely
8   than not, no, beside sexual activity within the
9   first four to six weeks.
10       Q.     That can disrupt the incision site.
11  Yes?
12       A.     It can, yes.
13       Q.     You'd agree this record indicates that
14  Ms. Bayless was offered a non-mesh option for each
15  surgical approach, the abdominal, laparoscopic and
16  vaginal and the total vaginal.  Yes?
17       A.     The only non-mesh approach would be the
18  total vaginectomy colpocleisis, because she says
19  cystocele/enterocele repair with mesh; the
20  colposacropexy, mesh; and the traditional open
21  colposacropexy with mesh.
22              So, the only non-mesh procedure she
23  offered for the pelvic organ prolapse repair was
24  the vaginectomy colpocleisis.
```

Bruce Rosenzweig, M.D.

1      Q.     And she was offered a graft-augmented

2  option for each approach, wasn't she?

3      A.     Well, there is no graft option for a

4  vaginectomy colpocleisis.

5      Q.     Well, setting that aside.

6      A.     Okay.  Well, yes, it was -- the only

7  option she gave her for all the rest was a graft

8  augmentation.

9      Q.     She also offered a sacrospinous ligament

10  fixation, and that doesn't use mesh, does it?

11      A.     No, but the cystocele/rectocele repair

12  with graft is with graft.

13      Q.     Under "Surgical Plan," if you'll turn to

14  that page, it's on the next page, Dr. Jones

15  recorded that Ms. Bayless opted for

16  robotic-assisted total laparoscopic sacral

17  colpopexy with mesh, possible sling, possible

18  cystocele repair, cystoscopy.

19          Do you see that?

20      A.     Yes.

21      Q.     And Dr. Jones documented another

22  discussion regarding the risks and benefits of that

23  procedure, didn't she?

24      A.     Correct.

Bruce Rosenzweig, M.D.

1      Q.    She says, "The patient was informed of

2   the risks and benefits of the surgical procedure

3   noted above.  These risks are noted as but not

4   limited to infection, bleeding, damage to

5   surrounding organs such as bowel, bladder and

6   ureter, prolonged need for urinary catheterization,

7   incomplete bladder emptying, pain with intercourse,

8   poor wound healing, worsening or no change in

9   urinary incontinence and/or recurrence of

10   prolapse."  Correct?

11      A.    Correct.

12      Q.    And the record says that the patient,

13   Ms. Bayless, voiced an understanding of these risks

14   and elected to proceed with the procedure.

15           Do you see that?

16      A.    Yes.

17      Q.    And Dr. Jones references Ms. Bayless

18   signing written consent forms regarding the risks

19   and benefits.

20           Do you see that?

21      A.    Yes.

22      Q.    All right.  Now, you didn't reference

23   any of the consent forms in your litigation report,

24   did you?

Bruce Rosenzweig, M.D.

```
 1        A.    They're in the medical records.

 2        Q.    So, you did review them?

 3        A.    Yes.

 4        Q.    All right.  Why didn't you summarize

 5   them in your written report?

 6        A.    They're in the medical records.

 7        Q.    Okay.  So, if something is in the

 8   medical records, you didn't summarize them in your

 9   report?

10        MR. HABERMAN:  Objection.

11   BY THE WITNESS:

12        A.    Well, they're summarized as the doctor

13   discussed the approach, and those are -- the rest

14   are in the medical records.

15   BY MR. PERSONS:

16        Q.    All right.  Let's look at tab 4-A.

17              (WHEREUPON, Rosenzweig Deposition

18               Exhibit No. 5 was marked for

19               identification:  Consent Form,

20               "Procedure: Anterior and/or

21               Posterior Colporrhaphy";

22               COL-RBAYLESS-ORLANDO-000024.)

23   BY MR. PERSONS:

24        Q.    This is the first of the consent forms
```

Bruce Rosenzweig, M.D.

```
 1   we're going to discuss, and the heading on this

 2   one, "Procedure:  Anterior and/or Posterior

 3   Colporrhaphy."  Do you see that at the top?

 4       A.    Yes.

 5       Q.    And at the bottom do you see where this

 6   form is signed and dated May 28, 2013?

 7             Do you see that?

 8       A.    Yes.

 9       Q.    That's a little more than two months

10   prior to the August 9, 2013 procedures, right?

11       A.    Correct.

12       Q.    And Dr. Jones and the patient, both

13   Dr. Jones and the patient signed the form?

14       A.    Correct.

15       Q.    And I'll represent to you -- well, I

16   don't have to represent to you.  You've read the

17   depositions.

18             Both Dr. Bayless and Dr. Jones -- both

19   Ms. Bayless and Dr. Jones testified that they

20   discussed this form with one another prior to

21   signing, correct?

22       A.    Correct.

23       Q.    Now, let's see.  The first three

24   sentences state, "Your doctor has determined that
```

Bruce Rosenzweig, M.D.

1    you have a weakness in the wall of your vagina

2    through which the bladder or bowel may protrude and

3    which requires surgical repair.  This operation is

4    called a colporrhaphy, and when both the front and

5    back walls of the vagina are repaired, it is

6    commonly known as an 'A and P repair.'  The

7    operation involves surgical incisions or 'cuts' in

8    the front and/or back walls of the vagina.

9    Complications from this surgery are uncommon but

10   they do occur."

11           Do you see that?

12           Did I read that correctly?

13       A.    Yes, sir.

14       Q.    All right.  Now, do you agree that this

15   consent form is describing a surgical procedure to

16   treat prolapse that does not use mesh, correct?

17       A.    Correct.

18       Q.    And a non-mesh or native tissue repair

19   is one of the surgical alternatives that you

20   contend is safer than the Restorelle Y, correct?

21       A.    Yes, but we do recall that when

22   Dr. Jones was, from the prior record, when

23   Dr. Jones was discussing the way the anterior and

24   posterior colporrhaphy would be done if she had

Bruce Rosenzweig, M.D.

```
1    chosen that to be done would be with mesh

2    augmentation.

3         Q.    For the purposes of this discussion,

4    we're talking about what's on this form.  And you

5    agree that this form, this is describing a surgical

6    procedure that does not use mesh.  You agree with

7    that?

8         A.    No.  It doesn't describe nor does it not

9    describe how the procedure is going to be done.

10        Q.    You would agree that mesh isn't

11   mentioned anywhere in this form, though, wouldn't

12   you?

13        A.    That is -- that is correct.

14        Q.    All right.  Now, jump down to the fourth

15   sentence in the first paragraph under

16   "Complications" -- starting with "Complications."

17              Do you see that?

18        A.    Yes.

19        Q.    "Complications from this procedure."

20   Would you read that into the record.

21        A.    "Some of the complications of this

22   operation may require further major surgery; some

23   may cause prolonged illness, permanent deformity,

24   poor healing wounds, scarring; and very rarely some
```

Bruce Rosenzweig, M.D.

1  can be fatal.  Furthermore, there may be

2  alternatives to this surgery available to you, such

3  as other types of surgery or the use of supports.

4  However, these alternative methods carry their own

5  risk of complications and varying degrees of

6  success.  Therefore, in those patients in whom an

7  A and P repair is indicated, the procedure may

8  provide the patient with the best chance of

9  successful treatment and the lowest risk of

10  complications."

11      Q.    Now, you see where it says,

12  "Reoccurrence of the condition occasionally

13  happens"?

14      A.    Yes.

15      Q.    Would you read that.

16      A.    Okay, now, where are we again?

17      Q.    Look up in the first full paragraph and

18  there's a sentence that begins "Reoccurrence."

19      A.    Yes.

20          "Reoccurrence of the condition

21  occasionally happens even after successful repair

22  of the vaginal walls.  It is possible that the

23  operation may not help.  It is even possible that

24  you will be worse after the operation than you are

Bruce Rosenzweig, M.D.

```
1   right now.  Because of these facts, the doctor can

2   make no guarantees as to the result that might be

3   obtained from this operation.  However, in the vast

4   majority of patients, the result desired is

5   achieved."

6        Q.    Now, you agree that this indicates that

7   non-mesh pelvic organ prolapse surgeries have

8   risks, don't they?

9        A.    Yes.

10       Q.    There's a risk of recurrence of the

11  relapse.  Yes?

12       A.    Of the prolapse, yes.

13       Q.    Failure of the procedure to treat the

14  prolapse, correct?

15       A.    Correct.

16       Q.    And the possibility of worsening

17  prolapse even after the surgery?

18       A.    Correct.

19       Q.    And it is also noted here that non-mesh

20  pelvic prolapse -- pelvic organ prolapse surgeries

21  carry the risk of bleeding and infection?

22       A.    Again, remember, Dr. Jones in her prior

23  discussion said that this operation would be done

24  with mesh.  So, we have to assume that this consent
```

1    form relates to an anterior and posterior

2    colporrhaphy with mesh.

3        Q.    The form doesn't say that, doesn't it?

4        A.    No, but the last note we read said that

5    that's how she performs her anterior and posterior

6    colporrhaphies.

7        Q.    I understand that, but we're talking

8    about the form, 4-A.  The form does not -- doesn't

9    say that?

10        A.    Why would Dr. Jones have her sign a form

11    for an operation that she wasn't recommending?

12        Q.    Well, we're not talking about what

13    Dr. Jones said outside of this form.  I'm talking

14    about what's in the body of this form.  That's what

15    I'm asking you questions about right now.

16        A.    But Dr. Jones --

17        Q.    Pre-admitting --

18        MR. HABERMAN:  Objection.

19                (Simultaneous crosstalk.)

20    BY THE WITNESS:

21        A.    Dr. Jones signed this form, and we saw

22    from the prior record that Dr. Jones does her

23    anterior and posterior colporrhaphies with graft

24    augmentation.

Bruce Rosenzweig, M.D.

```
 1        MR. PERSONS:  Object.  Non-responsive.

 2   BY MR. PERSONS:

 3        Q.    I'm asking you questions specific about

 4   the form.  That's all, sir.

 5        MR. HABERMAN:  Again, objection.

 6   BY THE WITNESS:

 7        A.    But it's specific to the way Dr. Jones

 8   does her surgery.

 9   BY MR. PERSONS:

10        Q.    This says complications -- a

11   complication of a colporrhaphy could be bleeding

12   and infection.  Would you agree that that is a risk

13   associated with surgery?

14        A.    Yes.

15        Q.    And it can damage the urinary system.

16   Surgery can cause that.  A colporrhaphy can cause

17   that?

18        MR. HABERMAN:  Objection.

19   BY THE WITNESS:

20        A.    The surgical procedure, correct.

21   BY MR. PERSONS:

22        Q.    And a colporrhaphy, surgical procedure,

23   it can cause fistulas, can't it?

24        A.    The surgical procedure, correct.
```

Bruce Rosenzweig, M.D.

 1      Q.    And as a consequence you can -- the

 2   patient could have difficulty controlling

 3   urination?

 4      A.    From the surgical procedure, correct.

 5      Q.    And from the procedure the patient could

 6   have dyspareunia.  That's a possible complication

 7   of a colporrhaphy?

 8      A.    Rarely when an anterior colporrhaphy is

 9   done without mesh.

10      Q.    But it can happen?

11      A.    That's what the data shows.

12      Q.    The fourth paragraph of this form says

13   that some of the complications of a non-mesh pelvic

14   organ prolapse repair may require further major

15   surgery.

16            That's one of the potential

17   complications, isn't it?

18      A.    We already discussed this paragraph.

19      Q.    Whether it's done with or without mesh,

20   it can result in that, can't it?

21      A.    The surgery, correct.

22      Q.    And may cause prolonged illness?

23      A.    The surgery, correct.

24      Q.    May result in permanent deformity?

Bruce Rosenzweig, M.D.

```
1         A.    Correct.

2               I've already read this into the record.

3    Why -- I mean, we're --

4         Q.    If you'd just answer my questions, we

5    could get through this.  I mean, we really could.

6               I'm limited in terms of time.  There is

7    a purpose for my questions.  I didn't just come up

8    with these things.  I spent a lot of time

9    developing this outline, sir.

10              Will you answer the questions?

11        A.    I'm sure you did.

12        MR. HABERMAN:  Objection; argumentative.

13   Argumentative.  Come on.

14   BY MR. PERSONS:

15        Q.    Just answer the question.

16        MR. HABERMAN:  He is answering the questions.

17   You just don't like his answers.  He is answering

18   the questions.  You just don't like them.

19        MR. PERSONS:  That's not true.

20        MR. HABERMAN:  It is.

21        MR. PERSONS:  If he'd say yes or no, we would

22   move on.

23        MR. HABERMAN:  But these are not yes-or-no

24   questions.  He is allowed to explain his answers.
```

Bruce Rosenzweig, M.D.

```
 1   BY MR. PERSONS:

 2        Q.    This requires no explanation.  That a

 3   complication of a colporrhaphy is that it can

 4   rarely but sometimes be fatal.

 5        MR. HABERMAN:  I'm not going to argue with

 6   you.  You ask the questions.  He answers them.

 7   BY MR. PERSONS:

 8        Q.    Did you hear my question?

 9        A.    The surgery can be associated with

10   fatality.

11        Q.    Thank you.  Now, nowhere in this form

12   does this form indicate that any of the

13   complications discussed here are restricted to the

14   postoperative period, correct?

15        A.    No, it says that the surgery.  So, yes,

16   it's related to the surgery.

17        Q.    Right, the surgery.

18        A.    The surgery, correct.

19        Q.    And then the last thing we see here

20   under the last paragraph -- not the last thing, but

21   under the last full paragraph is "Cystocele

22   repair"; and that's written in hand and Dr. Jones

23   testified that this is her handwriting?

24        A.    That it's her handwriting?
```

Bruce Rosenzweig, M.D.

```
1        Q.    Her handwriting.

2        A.    Correct.

3        Q.    All right.  Now, let's look at the

4    second form.  We've marked this 4-B.

5                    (WHEREUPON, Rosenzweig Deposition

6                     Exhibit No. 6 was marked for

7                     identification:  Consent Form,

8                     "Augmentation Graft Consent Form";

9                     COL-RBAYLESS-ORLANDO-000026.)

10       MR. HABERMAN:  You know, I need another break

11   if that's all right.  We've been going quite some

12   time.

13       MR. PERSONS:  What do you need?

14       MR. HABERMAN:  I just need another five

15   minutes or so.

16       MR. PERSONS:  Sure.

17       MR. HABERMAN:  All right.

18       MR. PERSONS:  We'll go off for five.

19       MR. HABERMAN:  Okay.

20                   (WHEREUPON, a recess was had

21                    from 11:42 to 11:54 a.m.)

22   BY MR. PERSONS:

23       Q.    So, we're back and we're on tab 4-B, and

24   this is the "Augmentation Graft Consent Form."  And
```

Bruce Rosenzweig, M.D.

1   at the bottom it's signed and dated by both the

2   patient and the doctor.

3           Do you see that, Dr. Rosenzweig?

4      A.   I'm not sure that one -- okay.  There's

5   6.  Great, thank you.

6           Yes.

7      Q.   Okay.  And in the first paragraph, it

8   explains that the graft material used to augment a

9   pelvic floor reconstructive surgery includes

10  fascia, pig scan, cow skin, human skin and

11  synthetic materials such as mesh.

12          Do you see that?

13     A.   Yes.

14     Q.   And a graft made from donated human

15  tissue is known as an allograft, isn't it?

16     A.   Correct.

17     Q.   And a graft made from pig or cow skin is

18  known as a xenograft?

19     A.   Correct.

20     Q.   And I will represent that Dr. Jones drew

21  a circle around the word "synthetic" and underlined

22  the words that follow that.

23     A.   Correct.

24     Q.   Okay.  Now, the third paragraph begins,

Bruce Rosenzweig, M.D.

1    "In the last several years, there have been reports

2    of early surgical failures using donor fascia.

3    This is believed to be related to the rigorous

4    treatment process used to prevent any viral

5    transmission.  The failures were noted as early as

6    six months after surgery.  Thus, recently more of

7    the other materials derived from the pig skin, pig

8    intestine, cow skin and synthetic mesh have been

9    used in pelvic organ prolapse surgeries."

10           Did I read that correctly, Doctor?

11      A.    Yes.

12      Q.    And, so, this consent form disclosed the

13   risk that human allografts have a high failure

14   rate, correct?

15      A.    No.  This consent form highlights that

16   there have been some reports about that.  There

17   have been other reports that show that there is no

18   failure rate.

19           So, it's alerting the patient to that

20   there is a possibility that the allograft may be

21   associated in certain situations with an early

22   recurrence.

23      Q.    But it does say that as early as six

24   months following implant?

Bruce Rosenzweig, M.D.

1          A.     Correct.

2          Q.     After surgery that the -- there have

3     been failures of the allograft.  Yes?

4          A.     That there have been some reports.

5          Q.     Okay.

6          A.     But there have been other reports that

7     show there is no difference.

8          Q.     All right.  Now we'll discuss more on

9     this later, but an allograft is one of the

10    alternatives that you contend would have been safer

11    for the treatment of Ms. Bayless' pelvic organ

12    prolapse, correct?

13         A.     Correct.

14         Q.     Now, the fourth paragraph of this

15    document, 4-B, goes on to explain that "When mesh

16    is used in gynecological surgery, there is a 5 to

17    10% chance that this mesh can cause delayed healing

18    and eventually erode into the vagina, requiring a

19    second surgery to remove it."

20                Do you see that?

21         A.     Yes.

22         Q.     All right.  And, again, I'll represent

23    that Dr. Jones testified that she drew the star

24    next to the last sentence and the two stars next to

Bruce Rosenzweig, M.D.

1    the sentence below it that said, "Sling material is

2    made of synthetic material/mesh."

3              Do you see that?

4        A.    Yes.

5        Q.    All right.

6        A.    And, so, just to reiterate, this is

7    saying that the mesh causes delayed healing.

8        Q.    There was no question pending, so I'd

9    move to strike that comment.

10             Now, the question is:  This form

11   disclosed a 5 to 10% risk that synthetic mesh

12   would, quote, "erode" into Ms. Bayless' vagina.

13   Yes?

14       A.    Would --

15       Q.    According to this form.

16       A.    -- cause that, yes.

17       Q.    And that if that occurred, that the

18   patient may require a second surgery to remove the

19   mesh?

20       A.    Correct.

21       Q.    And you have no reason to think that

22   Ms. Bayless did not review this form before signing

23   it, do you?

24             MR. HABERMAN:  Objection.

Bruce Rosenzweig, M.D.

```
1   BY THE WITNESS:

2       A.    I know she was asked that question at

3   her deposition, and I do not specifically recall

4   how she answered that question.

5   BY MR. PERSONS:

6       Q.    All right.  If she testified she

7   wouldn't sign anything without reading it, you have

8   no reason to dispute that testimony, do you?

9       A.    Correct.

10      Q.    And you don't have any reason to think

11  that Ms. Bayless did not review this form before

12  signing it -- I asked you that.  Strike that.

13            You have no reason to think that

14  Dr. Jones did not discuss this form with

15  Ms. Bayless before Ms. Bayless signed it?

16      A.    There might have been a double negative

17  in there.  But according to her deposition,

18  Dr. Jones stated that she did discuss this with

19  her.

20      Q.    Thank you.  Now, let's look at the next

21  document we've marked.  It's under tab 4-C.

22            (WHEREUPON, Rosenzweig Deposition

23             Exhibit No. 7 was marked for

24             identification:  Consent Form,
```

Bruce Rosenzweig, M.D.

```
 1                    "Hysterectomy Surgical Consent

 2                    Form";

 3                    COL-RBAYLESS-ORLANDO-000023.)

 4    BY MR. PERSONS:

 5        Q.    And it says, "Hysterectomy Surgical

 6    Consent Form."  And the third-to-last sentence in

 7    the first paragraph, if you could go there with me,

 8    please, beginning with the words, "It is possible."

 9              Do you see that?

10        A.    Yes.

11        Q.    According to this form, this form says,

12    "It is possible that this operation will not help

13    you.  It is even possible that you will be worse

14    after the operation than you are now."

15              Do you see that?

16        A.    Yes, but that wouldn't apply to this

17    operation because her uterine prolapse wouldn't be

18    worse because her uterus would be gone.

19        Q.    Well, right now we're just talking about

20    a hysterectomy.  I mean, I'm just confining my

21    questions to this form.

22        A.    Right.  But it states that you would be

23    worse from your condition after the operation, but

24    she doesn't have a uterus anymore so she can't have
```

Bruce Rosenzweig, M.D.

1    uterine prolapse anymore.

2         Q.    I understand that.

3               Do you disagree that this statement

4    regarding risk, that this is an incorrect statement

5    regarding the risk of a hysterectomy?

6         A.    Well, for prolapse because the uterus

7    would be gone.

8         Q.    Assume it's not for prolapse.  Just

9    confining it to this statement, hysterectomy --

10        A.    Sure.  If you have pelvic pain and the

11   hysterectomy is for pelvic pain, there's a 25%

12   chance that the pelvic pain won't go away.

13        Q.    Right.  I think that's what this is

14   talking about.

15        A.    Right, yeah.

16        Q.    Jump down to the third paragraph, and

17   this is talking about the risks of hysterectomy, if

18   you would, please, sir.

19              It talks about infection.  Do you see

20   that?

21        A.    Yes.

22        Q.    Infection, poor healing, formation of

23   adhesions, damage to surrounding areas, nerve

24   damage causing weakness, numbness and painness --

Bruce Rosenzweig, M.D.

```
 1   numbness and pain in thighs, legs and feet, blood
 2   clots in legs and lungs, shortening of the vagina.
 3              Do you see those?
 4        A.   Yes.  That's from the surgery, correct.
 5        Q.   And this is particularly so when the
 6   cervix is also removed, isn't it?
 7        A.   Yes, that would be a total hysterectomy.
 8        Q.   Right.  And shortening of the vagina,
 9   according to this, can even cause loss of -- not
10   shortening of the vagina.  Hysterectomy can also
11   cause loss of libido, right?
12        A.   Well, that's what this form states.
13   Loss of libido hasn't been directly associated with
14   doing a surgical procedure.  It's usually
15   associated with medication, psychological
16   dysfunction.  I mean, women can lose some sexual
17   desire if they have a concomitant oophorectomy.
18   So, I mean, it's what this form states.
19              That I might want to challenge a little
20   bit on its own.  The data shows that a third of
21   women that have a hysterectomy have more pleasure
22   with intercourse, a third of women have decreased
23   pleasure with intercourse and a third have the
24   same.  So...
```

Bruce Rosenzweig, M.D.

1          Q.     All right.  But you would agree that the

2     uterus helps regulate hormones?

3          A.     No.

4          Q.     Okay.  You disagree with that?

5          A.     Yes.  The uterus is the organ that

6     hormones respond to.

7                 Now, there is some blood flow that comes

8     from the uterus to the ovary and sometimes if you

9     disrupt the blood flow to the ovary from the

10    uteroovarian ligament being transected at the time

11    of hysterectomy, you can develop ovarian cysts.

12    But the uterus doesn't do anything to produce

13    hormones.

14         Q.     You would agree that a hormonal

15    imbalance can lead to loss of libido, though?

16         A.     If the ovaries are removed, it could.

17         Q.     Now, the last paragraph, last full

18    paragraph says, "Finally, I understand that it is

19    impossible to list every possible undesirable

20    effect that the surgery may have, that the

21    condition for which surgery is done is not always

22    cured or significantly improved, and that in rare

23    cases the condition may even be worse" -- "may even

24    worsen."

Bruce Rosenzweig, M.D.

1                    Did I read that correctly?

2          A.    Yes.

3          Q.    Do you agree with that statement?

4          A.    It depends on why the hysterectomy is

5    done.

6          Q.    That it's impossible to list every risk

7    of every surgery.  You'd agree with that, wouldn't

8    you?

9          A.    Yes.  I mean, the operative light could

10   fall on the patient during the surgical procedure.

11         Q.    And this would be true whether a surgery

12   is done with mesh or without mesh, correct?

13         A.    The risk of surgery, correct, but not

14   the risk of mesh.

15         Q.    We're talking about the risk of surgery.

16         A.    Correct.

17         Q.    That's what this form is talking about.

18         A.    Yes.

19         Q.    And, of course, the surgery that this

20   forms pertains to, the hysterectomy, is one that's

21   not being done -- is one that is not done with

22   mesh, correct?

23         A.    You don't need to use mesh to do a

24   hysterectomy.

Bruce Rosenzweig, M.D.

1      Q.    Right.  Now, are you aware that

2  Ms. Bayless testified that she requested the

3  hysterectomy; that she was not advised that she

4  needed one?

5      A.    I do have a general recollection of that

6  testimony.

7      Q.    All right.  You are aware that she

8  wanted her cervix removed in part because it was

9  causing her pain during intercourse.  You recall

10  that?

11     A.    Yes.

12     Q.    And you're aware also that she testified

13  that she thought removing her cervix would prevent

14  future prolapse?

15     A.    That I have a general recollection of

16  that.  That's what she thought.  You can't --

17     Q.    Pardon?

18     A.    You can't have prolapse of an organ if

19  it's not there.

20     Q.    Right.  Okay.  Let's look at 4-D.

21                (WHEREUPON, Rosenzweig Deposition

22                 Exhibit No. 8 was marked for

23                 identification:  Consent Form,

24                 "Informed Consent and Request for

Bruce Rosenzweig, M.D.

```
 1                    Repair of Relaxation of Pelvic

 2                    Organs and/or Urinary

 3                    Incontinence";

 4                    COL-RBAYLESS-ORLANDO-000021 and

 5                    000022.)

 6   BY MR. PERSONS:

 7        Q.    Now, this consent form, "Informed

 8   Consent and Request for Repair of Relaxation of

 9   Pelvic Organs and/or Urinary Incontinence," and the

10   surgery to which Ms. Bayless was consenting is

11   signified by her signature on the second page of

12   this document.

13            Do you see that?

14        A.    Yes.

15        Q.    All right.  Signed 5/28/13.

16            It describes, and this is in

17   handwriting, "Robotic-assisted total laparoscopic

18   hysterectomy, cystocele repair, sacral colpopexy

19   with mesh, sling, cystoscopy repair."

20            Do you see that?

21        A.    Yes.

22        Q.    All right.  And in paragraph that's

23   numbered 1, there are certain letters that are

24   circled, A, D, E and F.
```

Bruce Rosenzweig, M.D.

1            Do you see that?

2       A.    Yes.

3       Q.    Do you agree this accurately describes

4  the various prolapses that Ms. Bayless was

5  experiencing at the time?

6       A.    Well, F is incontinence, so that's not

7  prolapse.  But, yes, she had a cystocele, she

8  had -- well, she really didn't have vault prolapse.

9  That would mean that the uterus was already gone.

10            But she did, you know, have what's

11  described as an enterocele and she did have early

12  stage II uterine prolapse.

13      Q.    Okay.  And you've read her deposition,

14  so you know Dr. Jones testified she circled those

15  letters herself?

16      A.    Correct.

17      Q.    And in Paragraph No. 2 of the form it

18  says, "The nature of the procedure is to surgically

19  strengthen and repair the supporting tissue of the

20  vagina."  Correct?

21      A.    That's what it states.

22      Q.    And you agree with that statement, that

23  accurately describes the purpose of a pelvic floor

24  reconstructive surgery?

Bruce Rosenzweig, M.D.

1          A.     In layman's terms, it's probably as

2     close as you get.  I mean, you're really not

3     strengthening the tissue that's supporting the

4     vagina.  You're creating a fascial bridge to

5     support the structures in the vagina.

6          Q.     Okay.  But -- and this is written for a

7     lay audience, isn't it?

8          A.     Correct.

9          Q.     It's eliciting the patient's consent?

10         A.     Correct.

11         Q.     All right.  Now, Paragraph No. 3 says --

12         A.     But your question was does it accurately

13    reflect what's being done.  In a layman's sense,

14    yes.  But, I mean, you know.

15         Q.     Fair enough.  Okay.

16                No. 3, "The purpose of this procedure,"

17    it goes on to -- it has various letters circled

18    there, doesn't it?

19         A.     Yes.

20         Q.     And Dr. Jones testified that she circled

21    these letters.  And you remember that testimony?

22         A.     Yes.

23         Q.     And this describes in lay terms the

24    procedures for which Ms. Bayless was giving her

Bruce Rosenzweig, M.D.

```
1    consent to undergo, right?

2         A.    Correct.

3         Q.    All right.  Now, there are material

4    risks listed in Paragraph No. 4, and these are

5    general surgical risks of any surgical procedure

6    performed under anesthesia, correct?

7         A.    From the surgery, correct.

8         Q.    And you look at the -- several of these

9    risks were listed in the other forms that we

10   reviewed just previously, other consent forms, that

11   are a risk of -- just risks of surgery?

12        A.    Of the surgery, correct.

13        Q.    Now, let's look at the first --

14   there's a -- she's got stars next to some of these

15   risks involved in this particular procedure.

16              She said, "Possibly no improvement or

17   only temporary improvement in urine control;

18   worsening urinary incontinence."

19              That's specific to the surgical

20   treatment for Ms. Bayless' SUI, isn't it?

21        A.    More so than the abdominal

22   colposacropexy.

23        Q.    And I mean there is also a risk of

24   worsening urinary incontinence when repairing a
```

Bruce Rosenzweig, M.D.

```
 1    cystocele, right?

 2         A.    Correct.  That's why I said more so with

 3    the SUI procedure.

 4         Q.    Right.  And that risk is present in any

 5    cystocele repair surgery with or without mesh,

 6    isn't it?

 7         A.    From the surgery, correct.

 8         Q.    Now, let's look at the next starred

 9    risk.  It says, "Possible prolonged need of a

10    catheter to drain the bladder; incomplete bladder

11    emptying (urinary retention)."

12              That's also specific to the stress

13    urinary incontinence surgery, isn't it?

14         A.    No.  That would be more so for the SUI

15    procedure, but can also be for the prolapse

16    procedure, from the surgery itself.

17         Q.    Okay.  Now, underneath that star, it

18    says, "Possible pain or discomfort with sexual

19    intercourse."

20              Do you see that?

21         A.    Yes, but that's not starred.

22         Q.    No, I said beneath that.  I didn't say

23    it was starred.  I said beneath the last one we

24    discussed is an entry that says, "Possible pain or
```

Bruce Rosenzweig, M.D.

```
 1    discomfort with sexual intercourse."  Isn't that on

 2    the form?

 3         A.    It's on the form, but it's not starred.

 4         Q.    I didn't say it was starred.  I said

 5    beneath the last star we discussed is an entry that

 6    says, "Possible pain or discomfort with sexual

 7    intercourse."

 8         A.    Okay.  But, again, it is not starred.

 9    But it is on the form.

10         Q.    That's the question.  It's on the form,

11    right?

12         A.    Correct.

13         Q.    And this was also on the first one of

14    these forms that we looked at, the one for

15    colporrhaphy.  Do you remember that?

16         A.    From the surgical procedure, correct.

17         Q.    Right.  Now, the last one of these

18    items, and it's starred, says, "Recurrence of

19    cystocele, rectocele, enterocele or vaginal vault

20    prolapse."

21               Did I read that correctly?

22         A.    Yes.

23         Q.    "Success rate 85%."

24         A.    Yes.
```

Bruce Rosenzweig, M.D.

```
 1        Q.    So, it's informing the patient of the

 2   risk of recurrence.  Yes?

 3        A.    Correct.

 4        Q.    And the risk of recurrence isn't

 5   something that's unique to any particular pelvic

 6   organ prolapse surgery, is it?

 7        A.    No.  From the surgery itself.

 8        Q.    Right.  That can happen with any

 9   prolapse, POP surgery?

10        A.    From the surgery, correct.

11        Q.    And then you have got the patient's

12   initials at the bottom of this page we just

13   discussed?

14        A.    Yes.

15        Q.    And let's go to the next page.  On

16   page 2, it says, "The alternative" -- "Practical

17   alternatives to this procedure include."

18              Do you see that language?

19        A.    Yes.

20        Q.    "Do nothing and accept the consequences

21   of the patient's condition.  Use of artificial

22   supports (pessaries)."  Right?

23        A.    Yes.

24        Q.    And then it has, "Exercise (Kegel
```

Bruce Rosenzweig, M.D.

```
 1   exercises, vaginal weights)."

 2        A.    Yes.

 3        Q.    And you're aware that Ms. Bayless

 4   testified that she was not interested in any of

 5   these alternatives, correct?

 6        A.    Correct.

 7        Q.    That she wanted surgery to, in her

 8   words, put everything back in place where it was

 9   supposed to go?

10        A.    Correct.

11        Q.    And that she hoped, and to quote her

12   words, that the surgery would tighten her vagina up

13   some?

14        A.    I have a general recollection of that.

15        Q.    Okay.  All right.  And then there's a

16   paragraph in all caps about halfway down, "By

17   signing this form."

18              Do you see that?

19        A.    Yes.

20        Q.    And it says, "By signing this form, I

21   acknowledge that I have read or had this form read

22   and/or explained to me, that I fully understand its

23   contents and that I have been given ample

24   opportunity to ask questions and that any questions
```

Bruce Rosenzweig, M.D.

```
 1   have been answered satisfactorily.  All blanks are

 2   or statements requiring completion were filled in

 3   and all statements I do not approve of were

 4   stricken before I signed this form.  I also have

 5   received additional information, including but not

 6   limited to the materials listed below relating to

 7   the procedure described herein."

 8            Did I read that correctly?

 9       A.    Yes.

10       Q.    All right.  And you're aware that this

11   patient testified that she reviewed this form

12   before signing it and that she reviewed all the

13   other consents before signing.  Yes?

14       A.    I have a general recollection of that,

15   yes.

16       Q.    All right, sir.  And you're also aware

17   that Dr. Jones testified that she or someone in her

18   office reviewed all of these forms in detail with

19   Ms. Bayless before they were signed?

20       MR. HABERMAN:  Objection.

21   BY MR. PERSONS:

22       Q.    Yes?

23       A.    Correct.

24       Q.    On this form, before we leave it, this
```

Bruce Rosenzweig, M.D.

1    Exhibit 4-D, at the bottom, there's a "Coloplast

2    Restorelle Y-mesh" is specifically listed here,

3    isn't it?

4         A.    As additional materials used during the

5    consent process.

6         Q.    Right.

7         A.    So, this would imply that she was given

8    product-specific information about the Restorelle

9    Y-mesh and the Advantage Fit as well.

10        Q.    Right.  Okay.  Let's go to Tab No. 5.

11                    (WHEREUPON, Rosenzweig Deposition

12                     Exhibit No. 9 was marked for

13                     identification:  8/9/13 Operative

14                     Report; COL PLTF 000066 RBAYLESS -

15                     COL PLTF 000070 RBAYLESS.)

16    BY MR. PERSONS:

17        Q.    This is the operative report.  Do you

18    see that record?

19        A.    Yes.

20        Q.    And this is referenced in your report,

21    isn't it, Doctor?

22        A.    Yes.

23        Q.    Now, you don't offer any criticism of

24    Dr. Jones' implantation technique, do you?

Bruce Rosenzweig, M.D.

1       A.    No, I do not.

2       Q.    Nor do you plan to offer any criticism

3   of Dr. Jones' implantation technique, correct?

4       A.    Correct.

5       Q.    You also don't have any critique of

6   Dr. Jones' decision to perform a hysterectomy prior

7   to the mesh implantation procedures, correct?

8       A.    Correct.

9       Q.    And you don't plan to offer any such

10  criticism?

11      A.    Correct.

12      Q.    Now, the postoperative diagnoses listed

13  are the same as the preoperative diagnoses with one

14  exception, isn't it?

15      A.    Yes.

16      Q.    And that being No. 4 under

17  "Postoperative Diagnoses," pelvic adhesions, right?

18      A.    Yes.  Left pelvic sidewall adhesions.

19      Q.    And under "Findings," Dr. Jones

20  describes them, doesn't she?

21      A.    Yes.

22      Q.    Now, pelvic adhesions are fibrous bands

23  of scar tissue that form between the internal

24  organs and tissues in the pelvic region, correct?

Bruce Rosenzweig, M.D.

```
1        A.     Correct.

2        Q.     And when symptomatic, the patient might

3   experience chronic pelvic pain.  Yes?

4        A.     Where these adhesions were found were

5   not in the pelvis.

6        Q.     But setting that aside, just generally

7   speaking, when symptomatic, pelvic adhesions can

8   cause chronic pelvic pain?

9        A.     In a general sense, yes.  But these were

10   adhesions from the sigmoid colon due to

11   diverticular disease, and that would lead more to

12   bowel irritation.

13        MR. PERSONS:  Move to strike everything after

14   the word "yes."

15   BY MR. PERSONS:

16        Q.     Pelvic adhesions --

17        MR. HABERMAN:  That's uncalled for.

18        MR. PERSONS:  Go ahead.

19        MR. HABERMAN:  I said that's uncalled for.  I

20   disagree.  The doctor is allowed to answer the way

21   he sees fit.

22        MR. PERSONS:  That's not my question.

23   BY MR. PERSONS:

24        Q.     My question is, generally speaking,
```

Bruce Rosenzweig, M.D.

```
 1    pelvic adhesions can cause bowel obstruction, can't

 2    they?

 3         MR. HABERMAN:  Objection; asked and answered.

 4    BY THE WITNESS:

 5         A.    They can, but there is no evidence in

 6    this case that they were.

 7    BY MR. PERSONS:

 8         Q.    They can cause an inability to pass gas?

 9         A.    Well, that would be if there is an

10    obstruction.

11         Q.    Right.  And they can cause pain with

12    bowel movements or difficulty with bowel movements,

13    can't they?

14         A.    Pain with bowel movements?  No.

15    Difficulty with bowel movements, if there's an

16    obstruction.

17         Q.    All right.  Pelvic adhesions can cause

18    urinary dysfunction?

19         A.    No.

20         Q.    They can cause bladder dysfunction?

21         A.    No.

22         Q.    Okay.  They can cause pain with walking?

23         A.    Not necessarily.

24         Q.    But they can?
```

Bruce Rosenzweig, M.D.

```
1        A.    Not necessarily.

2        Q.    They can cause pain when lying down in

3   certain positions?

4        A.    Possibly.

5        Q.    And they can cause pain with intercourse

6   under certain circumstances?

7        A.    Correct.

8        Q.    Now, pelvic adhesions can result -- can

9   develop as a result of any surgery in the pelvic

10  region, can't they?

11       A.    Yes.

12       Q.    And that would include surgeries that

13  don't involve mesh at all?

14       A.    Correct.

15       Q.    In fact, that's what we see here with

16  Ms. Bayless, that she had these adhesions that

17  existed pre-op, correct?

18       A.    Correct.

19       Q.    Now, also under "Findings," Dr. Jones

20  documented evidence of diverticular disease in the

21  sigmoid colon.  I believe you referenced that

22  earlier?

23       A.    Correct.

24       Q.    And you noted that in your report on
```

Bruce Rosenzweig, M.D.

```
 1   page 5, didn't you?

 2        A.    Correct.

 3        Q.    Now, diverticular disease can be painful

 4   if it isn't treated, can't it?

 5        A.    It can lead to painful bowel movements,

 6   correct.

 7        Q.    It can lead to diverticulitis, can't it?

 8        A.    If there is inflammation of the

 9   diverticular disease, yes.

10        Q.    And diverticulitis, as it progresses,

11   the symptoms can include abdominal pain?

12        A.    Yes.

13        Q.    Abdominal tenderness?

14        A.    Yes.

15        Q.    Nausea, especially after eating?

16        A.    Yes.

17        Q.    Or engaging in physical activity, you

18   can have nausea if you've got diverticulitis?

19        A.    Correct.

20        Q.    Vomiting?

21        A.    Yes.

22        Q.    Constipation?

23        A.    Yes.

24        Q.    And other bowel discomfort?
```

Bruce Rosenzweig, M.D.

1        A.    Yes.

2        Q.    All right.  Let's go to Tab No. 7.

3              (WHEREUPON, Rosenzweig Deposition

4              Exhibit No. 10 was marked for

5              identification:  9/24/13 medical

6              record; COL-RBAYLESS-ORLANDO-000013

7              - 000015.)

8    BY MR. PERSONS:

9        Q.    And this is a medical record from

10   September 24, 2013, and under "History" it has,

11   "Six weeks three days post-op."

12             Do you see that?

13       A.    Yes.

14       Q.    So, this is six weeks three days after

15   her status post sacral colpopexy with mesh,

16   cystocele repair with mesh, right?

17       A.    It was an abdominal colposacropexy with

18   mesh.  There was no specific cystocele repair.

19       Q.    But according to this record, it just

20   says -- this record is what I'm reading from.

21       A.    Right.  But we know from the surgical

22   procedure that the mesh was an abdominal sacral

23   colpopexy.  There was no specific mesh that was

24   placed specifically to treat a cystocele.

Bruce Rosenzweig, M.D.

1        Q.    I see.  All right.

2              But, in any event, Ms. Bayless is noted

3    to be "doing well except for occasional discomfort

4    in pelvic and mood swings."

5              Do you see that?

6        A.    Yes.

7        Q.    And occasional pelvic discomfort in six

8    weeks after pelvic surgery, that's to be expected,

9    isn't it?

10       A.    Correct.

11       MR. HABERMAN:  Objection.

12   BY MR. PERSONS:

13       Q.    And mood swings are also not unusual in

14   a patient who has just undergone hysterectomy,

15   right?

16       A.    Not necessarily.

17       Q.    On page 2 under "Social History,"

18   Ms. Bayless was noted to still be smoking five to

19   ten cigarettes per day.  Yes?

20       A.    That's what the record states, but she

21   stated in her deposition that she had quit smoking

22   for two to three months after surgery.

23       Q.    All right.  And then this record,

24   according to this record, Ms. Bayless reported that

Bruce Rosenzweig, M.D.

1    she wasn't using illicit drugs at that time?

2        A.    Correct.

3        Q.    But if I represent to you that

4    Ms. Bayless reported to other providers around this

5    time that she was still using crack cocaine, would

6    you have any reason to disagree with that?

7        MR. HABERMAN:  Objection.

8    BY THE WITNESS:

9        A.    I don't specifically recall that she was

10   asked if she was using crack cocaine around the

11   time of her surgery at her deposition.

12   BY MR. PERSONS:

13       Q.    But if some other medical record

14   indicated that she was, you wouldn't have any --

15   you wouldn't be in a position to disagree with that

16   medical record?

17       A.    But we could discuss that medical

18   record.  It could just be that she has a history,

19   which I saw in other medical records, of crack

20   cocaine use.  And I do recall that in 2014 there

21   are records that state that she was using crack

22   cocaine again, but around the time of her surgery

23   she wasn't.

24       Q.    All right.  Under "Review of Systems,"

Bruce Rosenzweig, M.D.

1    ROS, this record states that she was complaining of

2    abdominal pain, change in appetite, heartburn,

3    difficulty swallowing, nausea and bowel movement

4    changes.

5              Do you see that?

6    A.    Yes.

7    Q.    Those aren't unusual symptoms following

8    a hysterectomy and major pelvic floor

9    reconstructive surgery, are they?

10   A.    Correct.

11   Q.    She's also reporting discharge, vaginal

12   odor, vaginal itching, but no abnormal bleeding, no

13   flank pain, no rash and no lesion.

14             Do you see that?

15   A.    Correct.

16   Q.    And she reported dry vaginal mucosa and

17   decreased libido and orgasmic dysfunction.

18             Do you see that?

19   A.    Yes.

20   Q.    Now, you referenced those symptoms in

21   your summary of this record on page 6 of your

22   report, didn't you?

23   A.    Correct.

24   Q.    Now, Ms. Bayless hadn't reported either

Bruce Rosenzweig, M.D.

1    decreased libido or orgasmic dysfunction prior to

2    her August 9, 2013 surgery, had she?

3        A.    Not that I specifically recall from the

4    medical records.

5        Q.    All right.  You agree that the tab 4-C

6    that we discussed earlier, that form discussed loss

7    of libido, didn't it?

8        A.    And what's the exhibit number for that

9    again?

10       Q.    It's 4-C.

11       A.    Oh, the consent form.

12       Q.    Yes.  The consent form.  I'm sorry.

13       A.    Okay.

14       Q.    It mentioned loss of libido.

15       A.    As of -- again, I think we had a

16   discussion about that.

17       Q.    Problems associated with surgery is the

18   way it's described on the form?

19       A.    Correct.

20       Q.    And you would agree that the only way

21   that Ms. Bayless could have reported orgasmic

22   dysfunction is if she had engaged in some sort of

23   sexual activity following her operation?

24       A.    That would be an implication, but that

Bruce Rosenzweig, M.D.

1    doesn't mean that she had intravaginal penetration.

2         Q.    But she had some sexual activity.

3    Otherwise, I mean -- if you're having orgasmic

4    dysfunction, I mean, that portends some kind of

5    sexual activity?

6         A.    That would be the implication.  I don't

7    specifically recall when Ms. Bayless testified in

8    her deposition that she resumed sexual intercourse.

9    I have a general recollection that she stated that

10   she resumed sexual intercourse at the time that her

11   doctor told her that she could.

12        Q.    And I want you to assume that Dr. Jones

13   testified that she ordered Ms. Bayless to refrain

14   from any sexual activity for 12 weeks following her

15   surgery?

16        A.    We've had that discussion earlier about

17   that.

18        Q.    If that's the case, then this record

19   would suggest or confirm that Ms. Bayless was

20   non-compliant with postoperative restrictions

21   regarding sexual activity, correct?

22        A.    If -- now, when we see things going

23   together with an "and," that could be the way the

24   medical record auto-populates.

Bruce Rosenzweig, M.D.

1          So, if you're clicking off "Decreased

2    libido," you would get "and orgasmic dysfunction"

3    together, which is the way my EMR populates when

4    you click off one of those entities, you get both.

5    If there's a comma, that would be a separator.

6          So, we see up above, "Difficulty

7    swallowing, comma, nausea, comma, and bowel

8    movement changes."  When there's a comma, that is a

9    separate entity.

10          There is no comma here, which would mean

11    that they are an entity together that would

12    populate.

13          So, it would depend on how the EMR

14    populates which, again, one would make the

15    assumption that this saying "orgasmic dysfunction"

16    means that she had some degree of sexual activity.

17    The sexual activity that is -- one needs to refrain

18    upon is intravaginal penetration.

19          Having other non-intravaginal forms of

20    intercourse would not be critical to abstain from

21    in the postoperative period because that has

22    nothing to do with postoperative recovery.

23    Q.    Let me ask you this.  Where in this

24    record does it say anything about what type of

Bruce Rosenzweig, M.D.

```
1    program that this doctor used or that the absence

2    of a comma signifies that this would somehow

3    populate?  Where is any of that in this form?

4         A.    It says right up top "Athena."  See

5    right on top of the page.

6         Q.    Doesn't it say --

7         A.    See it says, "Athena."  That's the EMR

8    that's used, Athena.

9         Q.    But doesn't this record say, "She," the

10   patient, "reports dry vaginal mucosa"?

11        A.    Yes.

12        Q.    "Impaired memory"?

13        A.    Yes.

14        Q.    "And impaired concentration"?

15        A.    Yes.

16        Q.    "She reports decreased libido and

17   orgasmic dysfunction"?

18        A.    Right.  But there are commas after

19   certain ones and no commas after the other.

20        Q.    Okay.  All right.  Well, if she --

21        A.    But you asked me is there any evidence

22   what medical record it is.  Yes, this is Athena.

23        Q.    Okay.  All right.

24              Now, she did not -- if in fact she did
```

Bruce Rosenzweig, M.D.

```
 1    have orgasmic dysfunction, if she reported orgasmic

 2    dysfunction, that would mean that she engaged in

 3    some kind of sexual activity within the 12-week

 4    period, correct, following the surgery?

 5         A.    That hypothetical?

 6         Q.    Yes.

 7         A.    That's a hypothetical, but that's not

 8    based on what her deposition testimony is.

 9         Q.    What deposition testimony are you

10    talking about now?

11         A.    Ms. Bayless' deposition testimony.  She

12    did -- she didn't say -- she did not affirm that

13    she had intravaginal penetration prior to

14    September 23 -- 24, 2013.

15         Q.    All right.  Is it your testimony if one

16    of your patients reported orgasmic dysfunction

17    within six weeks of a hysterectomy and concomitant

18    SUI and POP surgery, you wouldn't raise any

19    concerns about non-compliance with post-op

20    restrictions?

21         A.    I would ask what kind of sexual activity

22    you were having.

23         Q.    All right.  Let me ask you this.  Do you

24    use Athena?
```

Bruce Rosenzweig, M.D.

1        A.    Yes.

2        Q.    Okay.  And do you know whether Athena

3    auto-populates "orgasmic dysfunction" with

4    "decreased libido"?

5        A.    To my recollection, yes.

6        Q.    Okay.

7        A.    Because we see discussed --

8        Q.    I don't need anything more than that.

9        A.    What's that?

10       Q.    That's your testimony.  That's your

11   testimony.  That's fine.

12       A.    But let's look down at "Discussion."

13   "Discussed postoperative activity and

14   restrictions."

15            We don't see that she -- she says,

16   "Encouraged adherence to stool softener."  It

17   doesn't say, "Encouraged adherence to nothing

18   inside of her vagina."

19            Dr. Jones must not have felt that there

20   was something placed inside of her vagina, which is

21   the restriction that would impact postoperative

22   healing.

23            So, we see what the discussion is.  So,

24   discussed postoperative activity, yes.  And

Bruce Rosenzweig, M.D.

```
1    restrictions, yes.  But there's no "Encouraged no

2    intravaginal penetration."

3         MR. PERSONS:  Move to strike as unresponsive.

4    BY MR. PERSONS:

5         Q.    Let's go to page 3.  Dr. Jones

6    documented performing a physical examination?

7         A.    Correct.

8         Q.    The Words "Physical Examination" appears

9    on the previous page, but this is her physical

10   examination, correct?

11        A.    Correct.

12        Q.    And she notes -- let's see.

13              On "Abdomen," it says, "Well-healed,

14   clean dry intact, non-tender, incisions.

15   Laparoscopic incisions well-healed."  We see that?

16        A.    Yes.

17        Q.    We see "No tenderness," right?

18        A.    Correct.

19        Q.    She says, "No tenderness."

20              She did not note any erythema, right?

21        A.    Correct.

22        Q.    Cystocele, rectocele, abdominal --

23   abnormal vaginal discharge or vesicles or ulcers,

24   right?
```

Bruce Rosenzweig, M.D.

```
1        A.    Correct.

2        Q.    But she did, Dr. Jones, find, "Minimal

3   separation with foreign body visualized central

4   apical incision."

5        A.    Yes.

6        Q.    Do you see that?

7        A.    Yes.

8        Q.    The incision made at the apex of her

9   vagina was made in the course of removing her

10  cervix, wasn't it?

11       A.    Yes.

12       Q.    And the removal of her cervix was part

13  of her hysterectomy, correct?

14       A.    Correct.

15       Q.    All right.  Now, that's not noted

16  anywhere in your report, though, is it?

17       A.    Correct.  I mean, the foreign body that

18  was visualized could be the V-Loc suture that she

19  used at the time of cuff closure.

20       Q.    You didn't think the fact that the --

21  that mesh became visible at the apical incision

22  site was relevant to any opinion you're offering in

23  this case?

24       A.    Well, it says, "Minimal separation with
```

Bruce Rosenzweig, M.D.

```
 1   foreign body visualized."  The foreign body could

 2   be the V-Loc suture which has -- there are three

 3   different kinds of V-Loc suture.  There is a

 4   permanent, there is a 90-day absorbable and there

 5   is 180-day absorbable.  In the surgical report it

 6   didn't say which one was used.

 7            So, reading her deposition, she stated

 8   that she used the 180-day absorbable V-Loc suture

 9   and at her deposition initially she said, yeah,

10   this could have been suture; but when pressed, she

11   said, yeah, this could be the mesh.

12            So, just reading this did not give me

13   enough information about what she saw.  So,

14   therefore, I waited to see what she said in her

15   deposition.

16       Q.   And in her deposition she said it was

17   mesh, didn't she?

18       A.   Well, she said it could be suture too.

19       Q.   Now, when two sides of an incision

20   separate postoperatively, that's referred to as a

21   dehiscence, right?

22       A.   If it separates completely.  This is a

23   minimal separation with the sutures still present.

24       Q.   But a wound dehiscence creates a second
```

Bruce Rosenzweig, M.D.

1  wound, doesn't it?

2      A.    But this isn't a wound dehiscence.

3      Q.    I'm not asking you that.  I asked you a

4  simple question.

5            A wound dehiscence creates a separate

6  wound, a second wound?  Yes or no.

7      A.    No.  It's a dehiscence through the

8  surgical incision meaning the surgical incision

9  completely separates.

10     Q.    And if it separates, you've got two

11  wounds?

12     A.    No.  It's through the -- you -- the

13  wound is separated.

14           Now, are you asking me are there two

15  sides to that wound?

16     Q.    Yes.

17     A.    Ah.  So, please --

18     Q.    Okay.

19     A.    If you have a circular wound and you

20  close it like this and it opens, yeah, you would

21  have two sides.  But it's one wound.  It's not a

22  second wound.

23     Q.    All right.  Now, Dr. Jones didn't

24  document finding any exposed mesh or other foreign

Bruce Rosenzweig, M.D.

```
1    body material anywhere else in Ms. Bayless' vagina

2    at the time of this examination on September the

3    24th of 2013, did she?

4         A.    Correct.

5         Q.    Now, underneath "Assessment and Plan,"

6    Dr. Jones wrote that she "Discussed post-op

7    activity and restrictions and encouraged

8    adherence."

9              Do you see that?

10        A.    To continue stool softeners.

11             Commas are very important.

12        Q.    And then it talks about --

13        A.    Laser vaginal rejuvenation.

14        Q.    Right.  Now, I'm not going to ask you

15   about that.

16        A.    Okay.

17        Q.    Are you aware that Dr. Jones testified

18   that Ms. Bayless did not return for any follow-ups

19   after the September 24, 2013 visit?

20        A.    Correct.

21        Q.    You'd agree, though, that patients

22   generally should follow up with their surgeon more

23   than once after having sling placement, robotic

24   sacral colpopexy and a then current total
```

Bruce Rosenzweig, M.D.

1    hysterectomy, right?

2        A.    It would be -- I mean, that's the way I

3    practice.  I've seen physicians that give the

4    go-ahead and return the patient back to the

5    referring physician.

6        Q.    But when a patient -- this would be

7    particularly true where a patient is not seeing a

8    primary care physician or an Ob-Gyn for regular

9    checkups, right?

10       A.    Let's go back to her first.  I mean, she

11   was referred by -- to Dr. Jones by a doctor, and I

12   know it was in the first note that we looked at

13   from Dr. Jones.

14             Sorry.  Taking a while for the --

15       Q.    That's okay.

16       A.    But I don't think it specifically stated

17   the type of doctor that referred her to her.  I

18   know that Dr. -- or I think Dr. Bukkapatnam is a

19   primary care doctor.

20       Q.    All right.

21       A.    So but, yes, I would agree with you that

22   it is important for someone to have a physician

23   that the patient can go back to for follow-up.

24   That could be a primary care provider if there

Bruce Rosenzweig, M.D.

1    aren't a significant number of gynecologists in the

2    area and -- yeah.

3              No, it doesn't say who was the doctor

4    that referred her.

5         Q.    All right.  Okay.

6         A.    And if I recall her deposition, there

7    was like a referral letter that she had signed for

8    the urodynamics, but she said that -- that's how

9    Athena populates urodynamics reports, that there is

10   a referral letter that comes up, but there was

11   nobody that she was sending it to.

12        Q.    Now, before we leave this record, is it

13   your testimony that the encouraged adherence just

14   pertained only to continuing stool softeners?

15        A.    Well, yeah, there is no comma after

16   "encouraged adherence."

17        Q.    That it has absolutely -- there is space

18   that could have gone to something else.  That's not

19   a separate answer.

20             Isn't "Continue stool softener" a

21   separate entry that's on a separate line just like

22   "Patient interested in LVR" is?

23        A.    Well, you know, it would be important to

24   have asked her that, what she meant by this, so

Bruce Rosenzweig, M.D.

1  that we weren't sitting around trying to interpret

2  it after Dr. Jones had two and a half to three

3  hours to give a deposition.

4      Q.   Well, I'm asking you, is it your

5  testimony.  Not what Dr. Jones said in her

6  deposition.  I'm asking you.

7           Is it your testimony that when the

8  patient was encouraged to adhere to the after-care

9  instructions, especially regarding post-op activity

10  and restrictions, that this only pertained to the

11  continuing use of stool softeners?  Is that your

12  testimony?

13      MR. HABERMAN:  Objection.

14  BY THE WITNESS:

15      A.   Again, I don't see a comma after that.

16  So, that could be an interpretation.  I can see how

17  you could interpret it the way you've interpreted

18  it, and there will be other people that will have

19  the opportunity to interpret it how they want to

20  interpret it.

21           But I would think -- I would have typed

22  a comma in there if -- or I wouldn't have put a

23  comma in after "restrictions."  I probably would

24  have hyphenated it or said, "and encourage

Bruce Rosenzweig, M.D.

1   adherence."  But that's how I use grammar.  So, I

2   can only interpret things about how I use grammar.

3   BY MR. PERSONS:

4        Q.    All right.  Let's look at Tab No. 8.

5   I'm going try to move to through this.  This

6   shouldn't take as much time.

7                    (WHEREUPON, Rosenzweig Deposition

8                     Exhibit No. 11 was marked for

9                     identification:  3/7/14 medical

10                    record; COL PLTF 000019 RBAYLESS -

11                    COL PLTF 000022 RBAYLESS.)

12  BY MR. PERSONS:

13       Q.    Are you with me?

14       A.    Yes.

15       Q.    All right.  So, this is a March 7, 2014

16  visit by Ms. Bayless to the Brevard Health

17  Alliance.

18       A.    Yes.

19       Q.    And she is seen by a Dr. David Magness,

20  a Doctor of Osteopathy.  He is not a

21  urogynecologist, right?

22       A.    Well, he's just a DO.  But I don't see

23  what his specialty is.  So, a DO, an M.D., both can

24  practice any specialty if they've had the proper

Bruce Rosenzweig, M.D.

1    training and then credentialing.

2        Q.    All right.  It doesn't say here whether

3    he's an Ob-Gyn or what specialty, if any, he has?

4        A.    Correct.

5        Q.    And Ms. Bayless presented to Dr. Magness

6    to discuss hypertension.  Yes?

7        A.    Yes.  Well, actually, the -- she

8    presented to establish a PCP.  So, if you look at

9    the very top, that's the reason for the office

10   visit is that she wanted to establish him as a

11   primary care provider.

12       Q.    Okay.  All right.  And, so, in taking

13   her history, there is notation here of

14   hypertension?

15       A.    Yes.

16       Q.    And yeast vaginitis?

17       A.    Yes.

18       Q.    And would like to -- and would like

19   Fluconazole?

20       A.    Fluconazole.

21       Q.    And we know that Ms. Bayless had a yeast

22   infection prior to her implant procedure because

23   she had -- noted on the problem list was

24   Candidiasis, right?

Bruce Rosenzweig, M.D.

```
 1        A.    Yes, but that's -- that doesn't say a
 2   list of active problems.  That's a list of the
 3   problems that she's had in the past.  Okay.
 4        Q.    Okay.
 5        A.    That's how problem lists are populated.
 6        Q.    All right.  Now, right below that,
 7   Dr. Magness wrote, "Uses cocaine, smoker and drinks
 8   alcohol socially."
 9              Do you see that?
10        A.    Yes.
11        Q.    You also recall that Ms. Bayless is
12   positive for hepatitis C?
13        A.    Correct.
14        Q.    And hep C patients aren't supposed to
15   drink alcohol at all, are they?
16        A.    It all depends on if they've recovered
17   from it or not, and I think she stated in her
18   deposition that she had recovered from it.
19              But I would recommend if you've had a
20   history of any liver injury to avoid alcohol.
21        Q.    And at this visit Ms. Bayless requested
22   STD testing as well?
23        A.    Correct.
24        Q.    This would indicate, one could infer
```

Bruce Rosenzweig, M.D.

```
 1   from this, that she thought she had been exposed to

 2   an STD at some point?

 3        A.   That would be an inference.

 4        Q.   And --

 5        A.   But I don't specifically recall if she

 6   was asked at her deposition why she wanted STD

 7   testing.

 8        Q.   All right.  And we've seen in earlier

 9   records that she had been diagnosed with gonorrhea

10   and trichomonas on more than one occasion, right?

11        A.   We have seen documented in the record

12   that she was treated for trichomonas on one

13   occasion, and there was reference to her having had

14   gonorrhea on two occasions.

15        Q.   Correct.  And you would agree that

16   recurrent STDs can lead to pelvic inflammatory

17   disease?

18        A.   They could if there's a uterus and

19   cervix.  Once a uterus and cervix is removed,

20   gonorrhea and chlamydia have no place to live.

21   They can live in the rectum.  They can live in the

22   urinary tract and they can live in the oropharynx.

23   But none of those would lead to pelvic inflammatory

24   disease.
```

Bruce Rosenzweig, M.D.

```
1          Q.    Now, Dr. Magness also reported

2   Ms. Bayless' tobacco and cocaine abuse under "Risk

3   Factors," right?

4          A.    Correct.

5          Q.    And she was counseled to stop smoking?

6          A.    Correct.

7          Q.    And on page 4 of this record, Problem

8   No. 6 says, "Recommend stopping using crack

9   cocaine," right?

10         A.    It's No. 5 actually.

11         Q.    No. 5.  My eyesight is getting poor.

12  No. 5.  Thanks for the correction.

13               "Stop using crack cocaine."

14               Now, crack cocaine can impact wound

15  healing, can't it?

16         A.    Yes, but we saw that she wasn't using it

17  around the time of her surgery.

18         Q.    And crack cocaine use can influence

19  other decisions a patient makes regarding their

20  health, can't it?

21         A.    Can you repeat that question?

22         Q.    Sure.  Crack cocaine use can influence a

23  patient's decision-making regarding their health?

24         A.    Influence it how?
```

Bruce Rosenzweig, M.D.

```
1        Q.    Well, for instance, if a patient is

2   using illicit drugs, especially over a long period

3   of time, it could impact the patient's doctor

4   visits?

5        A.    Impact them how?

6        Q.    Doesn't make visits.

7        A.    Oh, you mean their compliance with

8   office visits?

9        Q.    With office visits, seeking help,

10  medical help promptly, things of that sort.

11       A.    Boy, you're really asking me to make

12  very sweeping generalizations, which, again, I

13  don't know how to answer that question.

14       Q.    Okay.

15       A.    I've got a number of patients who are

16  former or current drug abusers that come in to

17  every single office and I have patients that do not

18  use any illicit substances, caffeine, alcohol, that

19  are rather recalcitrant with their office visits.

20  So, I don't think that that is a generalization I

21  am willing to make.

22       Q.    All right.  Now, going back to Page

23  No. 3, specifically Problem No. 4.

24       A.    Yes.
```

Bruce Rosenzweig, M.D.

1         Q.      "Sexually transmitted disease, exposure

2    to," and Dr. Magness ordered an HIV and hepatitis

3    screening, correct?

4         A.      Yeah, which is really strange because if

5    you look up above under "Risk Factors," "HIV

6    high-risk factor behavior, no."

7               So, I find that a little bit odd that he

8    then later on orders an HIV antibody screening,

9    but...

10        Q.    But he does?

11        A.    Correct.

12        Q.    And, also, going over to the top of

13   page 4, he also ordered labs for chlamydia and a

14   urinalysis?

15        A.    A urine chlamydia and gonorrhea.  As

16   we've talked about before, chlamydia and gonorrhea

17   both live in columnar cells.  So, you wouldn't take

18   a vaginal culture for chlamydia and gonorrhea.  It

19   would always come back negative.

20              So, after a hysterectomy you would

21   either do an oropharyngeal swab for chlamydia or

22   gonorrhea or check a urine or a stool for gonorrhea

23   and chlamydia.  Those are the only columnar

24   epithelial areas where you would find it.

Bruce Rosenzweig, M.D.

```
1        Q.    All right.  And under "Medications Added

2   to the Medication List At This Visit" is a

3   prescription for Fluconazole?

4        A.    Correct.

5        Q.    And that's to treat a yeast infection,

6   isn't it?

7        A.    Correct.

8        Q.    And you'd agree that indicates

9   Ms. Bayless was also diagnosed with a yeast

10  infection?

11       A.    That's not correct.

12       Q.    Okay.

13       A.    She came in asking for that medication.

14       Q.    All right.  In any event, it is for the

15  treatment of a yeast infection, whether she was

16  diagnosed with it or not?

17       A.    It is used to treat yeast infections.  I

18  don't see -- yes, the pelvic exam wasn't done to

19  document whether or not there was a yeast

20  infection.

21       Q.    Now, this record doesn't contain any

22  reference to dyspareunia, does it?

23       A.    No.

24       Q.    Or pelvic pain?
```

Bruce Rosenzweig, M.D.

```
1        A.    Correct.

2        Q.    Or vaginal pain?

3        A.    Correct.

4        Q.    Or abdominal pain?

5        A.    Correct.

6        Q.    Or vaginal bleeding?

7        A.    Correct.

8        Q.    Now, let's turn to Tab No. 9.

9              (WHEREUPON, Rosenzweig Deposition

10             Exhibit No. 12 was marked for

11             identification:  7/24/14 medical

12             record; COL PLTF 000008 RBAYLESS -

13             COL PLTF 000011 RBAYLESS.)

14   BY MR. PERSONS:

15       Q.    And this is a record from another visit

16   Ms. Bayless had with Dr. David Magness.  This one

17   was on July 24, 2014.

18             Do you recognize this as a copy of that

19   record?

20       A.    Yes.

21       Q.    And under "History of Present Illness,"

22   it indicates that the patient presented with

23   hypertension?

24       A.    Correct.
```

Bruce Rosenzweig, M.D.

1        Q.    And that she had "a foul odor with

2    vaginal discharge"?

3        A.    Yes.

4        Q.    "No pelvic pain or burning with

5    urination"?

6        A.    Yes.

7        Q.    "Wants STD testing."  Right?

8        A.    Yes.

9        Q.    And this is the third time we've seen in

10   the records we've reviewed where Ms. Bayless'

11   records specifically reference a request for STD

12   testing, correct?

13       A.    Correct.  But none of those tests came

14   back positive.

15       Q.    Okay.  No. 4 on the list, Ms. Bayless

16   was "still smoking crack on a daily basis."

17             Do you see that?

18       A.    Yes.

19       Q.    And "sometimes gets chest pressure after

20   she smokes it"?

21       A.    Yes.

22       Q.    Now, you only noted in your report

23   episodic cocaine abuse?

24       A.    Yes.

Bruce Rosenzweig, M.D.

```
 1        Q.    But even if the diagnosis was for
 2   episodic abuse, you'd agree that Dr. Magness'
 3   documentation of daily crack use is equally
 4   relevant?
 5        A.    On this visit, as of December 3, 2015,
 6   she is affirming that she is using it on a daily
 7   basis, which we did not see in the last record.
 8        Q.    Still using it on a daily basis and
 9   still smoking a half pack of cigarettes a day,
10   right?
11        A.    Correct.
12        Q.    And on page -- I guess this was
13   page 4 -- we see Ms. Bayless was diagnosed with
14   vaginitis?
15        A.    That's what Problem 3 is.
16        Q.    Yes.  Vaginitis and she's prescribed
17   Metronidazole.
18        A.    Yes.
19        Q.    And no etiology is discussed, is there?
20        A.    Well, Metronidazole wouldn't treat a
21   candidal infection.  It wouldn't be the treatment
22   of choice for a mycoplasma or ureaplasma infection.
23   It would be the treatment of choice for a bacterial
24   vaginosis infection or a trichomonal infection, but
```

Bruce Rosenzweig, M.D.

```
 1    there's no exam that was done to determine what the

 2    source of her discharge was.

 3         Q.    We don't know what the etiology is --

 4         A.    Correct.

 5         Q.    -- in this case, do we?  Yeah.

 6               Okay.  So, and then we have Problem

 7    No. 5, Ms. Bayless -- "Sexually transmitted

 8    disease, exposure."  Do you see that?

 9         A.    Well, yeah, that's the ICD-10 code to

10    warrant the labs that are being sent off.

11         Q.    And the labs are HIV screening?

12         A.    Yes.

13         Q.    Hepatitis panel?

14         A.    Yes.

15         Q.    And the gonorrhea/chlamydia?

16         A.    And the syphilis test, which is an RPR.

17         Q.    Okay.  And syphilis.  Okay.

18               Now, Ms. Bayless' repeated STD exposures

19    put her at risk of recurring vaginal infections,

20    correct?

21         A.    Remember, none of these tests came back

22    positive.  So, her request for the test does not

23    mean that she had positive tests.

24         Q.    That's not my question.
```

Bruce Rosenzweig, M.D.

1        MR. PERSONS:  Move to strike as unresponsive.

2   BY MR. PERSONS:

3        Q.    My question has to do with repeated STD

4   exposures put her at a higher risk of recurring

5   vaginal infections?

6        A.    You're -- no, comma, the reason for that

7   is you're taking that it says "STD exposure to,"

8   which is an ICD-10 code which allows you to send

9   off the labs, as her coming in and saying my

10  partner tested positive for gonorrhea/chlamydia and

11  therefore I want to be tested.

12            She came in saying she has a foul odor,

13  and she's assuming that that's associated with STDs

14  and says, "Hey, check me for this."  But nothing

15  came back positive.

16       Q.    All right.  Problem No. 6, "Cocaine

17  abuse, episodic," and right beneath that, "Smokes

18  crack daily."

19            That's what the doctor wrote, right?

20       A.    Correct.

21       Q.    And, again, you didn't note that in your

22  report, the daily use of crack cocaine?

23       A.    I noted that she used crack cocaine,

24  yes.

Bruce Rosenzweig, M.D.

```
1        Q.     But not daily?

2        A.     It's in the medical record.

3        Q.     And the frequency of cocaine use is

4   relevant to whether a patient will have issues with

5   post-surgical healing, doesn't it?

6        MR. HABERMAN:  Object.

7   BY THE WITNESS:

8        A.     Not two and a half years after the

9   surgery.

10  BY MR. PERSONS:

11       Q.     All right.  Dr. Magness also documented

12  discussing with Ms. Bayless that she could smoke

13  crack and have a vasospasm or a heart attack and

14  die, right?

15       A.     That is correct.

16       Q.     And her history of hypertension puts her

17  at an even higher risk of this, doesn't it?

18       A.     That is correct.

19       Q.     And hypertension combined with daily

20  crack use could further raise the risk of

21  suboptimal wound healing?

22       A.     Well, her blood pressure on this date

23  was 128 over 82, which is in the normal range.

24       Q.     It's was pretty good I guess.  I mean,
```

Bruce Rosenzweig, M.D.

1    she was taking the Lisinopril, right?

2         A.    Correct.

3         Q.    But if someone has uncontrolled

4    hypertension and uses crack cocaine daily, that

5    could put them at suboptimal -- risk of suboptimal

6    wound healing?

7         A.    Well, under that hypothetical, yes.  But

8    that's not the case in Ms. Bayless' case because

9    prior to surgery, we didn't read that into the

10   record, but you saw that Dr. Jones affirmed that

11   she was cleared medically for her surgery.

12             So, if her hypertension was

13   uncontrolled, the doctor wouldn't have cleared her

14   for her surgery.  So, your hypothetical is not

15   based on the facts of Ms. Bayless' case.

16        MR. PERSONS:  Object as unresponsive.  Move to

17   strike.

18   BY MR. PERSONS:

19        Q.    Under "Patient Instructions,"

20   Dr. Magness actually referred Ms. Bayless to a case

21   manager for substance abuse, didn't he?

22        A.    Correct.

23        Q.    And he -- do you have any idea whether

24   Ms. Bayless ever met with that case manager?

Bruce Rosenzweig, M.D.

1        A.    Not that I specifically recall from the

2   medical records or her deposition testimony.

3        Q.    All right.  Also under "Patient

4   Instructions" Dr. Magness ordered Ms. Bayless to

5   complete testing, "Please complete testing."  And

6   you agree that likely refers to the STD testing

7   that he ordered?

8        A.    Yeah, the HIV and the RPR and hepatitis

9   panel are all blood tests.

10       Q.    Any idea whether Ms. Bayless completed

11   that testing?

12       A.    Not that I specifically recall from the

13   medical records.

14       Q.    All right.  She was also ordered to

15   return to the clinic in one month.

16            I'll represent we have no records

17   indicating Ms. Bayless followed up with Dr. Magness

18   in one month.  Do you have any such record?

19       A.    Not that I specifically recall.

20       Q.    All right.  Let's look at Tab No. 10.

21            (WHEREUPON, Rosenzweig Deposition

22             Exhibit No. 13 was marked for

23             identification:  9/5/14 medical

24             record; COL PLTF 000376 RBAYLESS -

Bruce Rosenzweig, M.D.

```
 1                COL PLTF 000379 RBAYLESS.)

 2   BY MR. PERSONS:

 3        Q.    This is from a visit of September the

 4   5th, 2014.  Do you see that?

 5        A.    Yes.

 6        Q.    And this is from Parrish Medical Center.

 7   And I assume you reviewed this record in full?

 8        A.    Yes.

 9        Q.    On this day, Ms. Bayless came to the ER

10   complaining of vaginal spotting without pain on

11   three occasions in the past four months when she's

12   had sex, correct?

13        A.    Yes.

14        Q.    And, so, Ms. Bayless was experiencing

15   minor vaginal bleeding or spotting but was not

16   experiencing any vaginal or pelvic pain, correct?

17        A.    Yes.

18        Q.    And according to this, the spotting

19   occurred only after she'd had sex.  It wasn't

20   something that was constant, right?

21        A.    Yes.

22        Q.    And then she states that she can feel

23   mesh at the back of the vaginal wall?

24        A.    Yes.
```

Bruce Rosenzweig, M.D.

```
1        Q.    And, again, Ms. Bayless denied pain or

2   dysuria, right?

3        A.    That's what the record states.

4        Q.    Okay.  And she again stated she may have

5   had HIV and STD exposure?

6        A.    That's what she states.

7        Q.    Do you have any idea whether Ms. Bayless

8   ever underwent the STD testing that was ordered by

9   Dr. Magness at her July 24, 2014 visit?

10       A.    Not that I specifically recall from

11  seeing in the medical records.

12       Q.    Now, near the bottom of this list, the

13  provider noted that Ms. Bayless denied vaginal

14  discharge, abdominal pain, nausea or vomiting,

15  fever, chills, headaches, dysuria or shortness of

16  breath, right?

17       A.    Correct.

18       Q.    And, so, the only symptoms she's

19  presenting here with on this occasion is spotting

20  after intercourse?

21       A.    Correct.

22       Q.    And she suspected her mesh was visible

23  at the back of her vaginal wall?

24       A.    Correct.
```

Bruce Rosenzweig, M.D.

```
 1        Q.    Now, on page 3 under "GU," the provider

 2   documented performing a speculum exam, right?

 3        A.    Correct.

 4        Q.    And noted visualizing "exposed mesh,

 5   slight, with no surrounding erythema or

 6   excoriation, no bleeding, OS removed."

 7              Did I read that correctly?

 8        A.    Yes.

 9        Q.    And erythema is swelling, correct?

10        A.    No.  It's redness.

11        Q.    Redness.  All right.  So, no redness was

12   noted?

13        A.    Correct.

14        Q.    And excoriation is abrading or wearing

15   off of skin, is that right?

16        A.    Correct.

17        Q.    So, it didn't appear that the tissue was

18   damaged, scraped or abraded, did it?

19        A.    The surrounding tissue, correct.

20        Q.    And no bleeding was noted at that time,

21   correct?

22        A.    Correct.

23        Q.    And the provider also noted that there

24   was only slight mesh visualized?
```

Bruce Rosenzweig, M.D.

```
1        A.    Correct.

2        Q.    And you'd agree that mesh was visualized

3   at the apical incision site?

4        A.    Correct.

5        Q.    That's the area that Dr. Jones noted

6   that had separated at Ms. Bayless' September the

7   24th, 2013 postoperative follow-up visit, isn't it?

8        A.    Well, this note doesn't say where the

9   exposed mesh was.

10       Q.    But you would agree that Dr. Jones noted

11  that there had been this separation visualized at

12  the apical incision site when she last saw the

13  patient on September 24, 2013?

14       A.    That's according to Dr. Jones' record,

15  yes.

16       Q.    If mesh is visualized at the apical

17  site, that would indicate that the wound never

18  properly healed from the surgery, wouldn't it?

19       A.    But we don't know where this exposed

20  mesh is.

21       Q.    But if it is at the apical site, it

22  would so indicate, wouldn't it?

23       A.    It would so indicate that there was a

24  continuing erosion/exposure of mesh.
```

Bruce Rosenzweig, M.D.

```
1        Q.    And mesh can become visible or exposed

2   unrelated to any characteristic or trace of the

3   mesh itself if a wound doesn't properly heal and

4   the mesh is therefore exposed, correct?

5        A.    That's not correct.

6        Q.    So, a wound cannot properly heal and the

7   only way the mesh becomes exposed is if there is

8   some trait or characteristic that's unique to mesh.

9   Is that your testimony?

10       A.    Sir, if you could please move into your

11  frame.

12       Q.    Oh, I'm sorry.

13       A.    That's okay.

14       Q.    You can hear me, can't you?

15       A.    You're breaking in and out.

16       Q.    I'm terribly sorry.  I apologize for

17  that.

18            So, is it your testimony that the only

19  way that mesh can become exposed when a wound does

20  not properly heal is -- strike that.

21            Is it your testimony that the exposure

22  of mesh at a -- at the site of a wound that does

23  not properly heal is occasioned only by or caused

24  by some trait or characteristic unique to mesh?
```

Bruce Rosenzweig, M.D.

```
 1        A.    You're asking me a hypothetical right

 2   now?

 3        Q.    No.  I'm just asking you that question,

 4   yeah, I mean, just -- yeah, just as a general --

 5   general, yeah, that's what I'm asking you.

 6              Is that your testimony?

 7        A.    We saw that Dr. Jones affirmed that the

 8   mesh exposure is caused by the mesh and that would

 9   be the characteristics of the mesh that led the

10   mesh to be exposed, correct.

11              There are things that can contribute to

12   it, as I state in my report.  But the reason why

13   the mesh became exposed is because of the mesh.

14        Q.    Well, apical incision, that's the back

15   of the vaginal wall and that's where Ms. Bayless

16   thought that her mesh had become exposed or

17   visible, correct?

18        A.    Sir, please talk into your microphone.

19        Q.    Yes.  Back of the vaginal wall, that's

20   the apical site, and that's where Mrs. Bayless,

21   Ms. Bayless thought that or felt that her mesh had

22   become exposed?

23        A.    That's not correct.  The back wall is

24   the back wall.  The apical wall is the top.  So,
```

Bruce Rosenzweig, M.D.

1   you're saying that the back wall is the apex.

2   That's not correct.

3           If you want to reframe your question,

4   then I can answer that question.  I'll answer that

5   question.

6       Q.    According to her testimony, the mesh was

7   at the back of her vaginal wall.  Isn't that what

8   she testified to?

9       A.    I have a general recollection of that,

10  but that's not the apex of the vagina.

11      Q.    In any event, the -- you're saying the

12  only way that mesh can become exposed is due to

13  something other than the failure of a wound to

14  properly heal?

15      A.    That's not what I testified to.

16      Q.    Okay.  So, you would agree that the

17  failure of a wound to properly heal can cause the

18  mesh to become exposed?

19      A.    Due to the fact that there's mesh there,

20  correct.

21      Q.    Right.

22      A.    Due to the characteristics of the mesh.

23          But there's no evidence that this

24  incision failed to heal.

Bruce Rosenzweig, M.D.

1      Q.    All right.  You don't have any records

2   regarding any follow-up treatment that Ms. Bayless

3   had for her incisional separation, do you?

4      A.    Which incisional separation?

5      Q.    Well, the only one that was noted by

6   Dr. Jones was at the apical site.  Do you have any

7   record of any treatment that this patient underwent

8   for that wound separation at the apical site noted

9   by Dr. Jones at the September 24, 2013 visit?

10     A.    No.  Dr. Jones did not recommend any

11  treatment at that point.

12     Q.    Have you seen any record of any

13  treatment, irrespective of recommendation by

14  Dr. Jones, but have you seen any record of any

15  treatment for that?

16     A.    For the exposure that Dr. Jones noted in

17  September of 2013?

18     Q.    Yes.

19     A.    No.  But the record that we're looking

20  at right now, August of 2014, that does not state

21  that that is in the same location as what Dr. Jones

22  saw in 2013.

23                 (Simultaneous crosstalk and

24                  clarification requested by the

Bruce Rosenzweig, M.D.

```
 1                    reporter.)

 2        MR. CONNOLLY:  I just said the witness

 3   accidentally mischaracterized the document I trust

 4   as August.  And it's September of 2014.

 5        THE WITNESS:  Thank you.  Sorry.  September of

 6   2014.

 7   BY THE WITNESS:

 8        A.    So, your question was is there any

 9   evidence that the wound healed prior to

10   September 2013 -- what is the exact date?

11   BY MR. PERSONS:

12        Q.    No.

13        A.    September 24, 2013?

14        Q.    No.  No, that's not my question.

15        A.    Okay.

16        Q.    My question was do you have any evidence

17   that the incision healed following her surgery on

18   September the 24th, 2013?  That was my question.

19        A.    On September 24 -- oh, prior to

20   September 23?

21        Q.    Let me start over.

22        A.    Okay.

23        Q.    We're not communicating.

24              Do you have any evidence that the wound
```

Bruce Rosenzweig, M.D.

1    that was noted on September the 24th, 2013 that had

2    not properly healed, do you have any evidence that

3    that wound subsequently healed?

4         A.    Not that's documented in the medical

5    records.

6         Q.    All right.  That was my question.

7         A.    Okay.

8         Q.    Now, you would agree that intercourse is

9    likely to potentiate spotting if the apical

10   incision related to Ms. Bayless' hysterectomy and

11   pelvic organ prolapse repair never properly healed?

12        A.    Because of a mesh exposure.

13        Q.    If someone has intercourse and the wound

14   hadn't properly healed at the apical site, could

15   that cause spotting?

16        A.    With the mesh exposure, yes.

17        Q.    After that, the record -- we are going

18   back to this record.

19              The record notes, "Questionable erosion

20   of mesh, she has follow-up with her Ob-Gyn."

21              Do you see that?

22        A.    Yes.

23        Q.    Your report doesn't contain any

24   reference to any follow-up by Ms. Bayless with an

Bruce Rosenzweig, M.D.

1    Ob-Gyn after this visit.

2              Have you seen such a record?

3        A.    No, I have not.  And if I recall,

4    Ms. Bayless testified that she doesn't have

5    insurance.

6        Q.    All right.  Now, it then says

7    Ms. Bayless "will treat for GC and test for HIV at

8    her request."

9              You'd agree the GC likely refers to

10   gonorrhea/chlamydia?

11       A.    Correct.

12       Q.    All right.  And as we've seen,

13   Ms. Bayless had been treated for those STDs in the

14   past?

15       A.    Are we talking about since we've looked

16   at these records or just since 2012?

17       Q.    Yes.

18       A.    No, she hasn't.  She's been tested for

19   it, but she hasn't been treated.  This is the first

20   one where someone suggests that she get treatment

21   for gonorrhea/chlamydia.

22       Q.    Under tab 11.

23              (WHEREUPON, Rosenzweig Deposition

24              Exhibit No. 14 was marked for

Bruce Rosenzweig, M.D.

```
 1              identification:  5/22/15 medical

 2              record; COL PLTF 000014 RBAYLESS -

 3              COL PLTF 000017 RBAYLESS.)

 4    BY MR. PERSONS:

 5       Q.    This is the record of an office visit

 6    from May the 22nd, 2015 to Brevard Health Alliance.

 7    And this is more than eight months after the

 8    September 4, 2014 visit to the Parrish emergency

 9    room record that we've looked at earlier, right?

10       A.    Correct.

11       Q.    And Ms. Bayless presented with the

12    history, hypertension, complaints of getting angry

13    early -- "Anger easily, presented with foul odor

14    with vaginal discharge."  Correct?

15       A.    Correct.

16       Q.    "No pelvic pain or burning with

17    urination."  Right?

18       A.    Correct.

19       Q.    "Similar to past when treated with

20    Flagyl, this worked."

21             Do you see that?

22       A.    Yes.

23       Q.    And that's likely referring to bacterial

24    vaginosis, isn't it?
```

Bruce Rosenzweig, M.D.

```
1         A.    Or the one episode of trichomoniasis

2    that we saw.

3         Q.    Because we saw in earlier records that

4    she treated bacterial vaginosis with Flagyl?

5         A.    No.  We saw a record where she was

6    treated with Flagyl without a diagnosis.

7         Q.    Okay.

8         A.    For vaginal discharge.

9         Q.    Vaginal discharge.  Okay.

10         A.    And the --

11         Q.    On page 3 this records indicates that

12    Ms. Bayless was still smoking at the time and still

13    using cocaine?

14         A.    Correct.

15         Q.    And on the last page, under "Impression

16    and Recommendations," it says, "Use Flagyl as

17    directed."  And this is for the treatment of

18    vaginal discharge, right?

19         A.    Correct.

20         Q.    But no specific diagnosis was given, was

21    there?

22         A.    Correct.

23         Q.    So, we have no indication what the

24    discharge was related to, do we?
```

Bruce Rosenzweig, M.D.

```
 1        A.    Correct.

 2        Q.    We don't know whether it was related to

 3   mesh or to something else, do we?

 4        A.    Well, a culture was not performed.

 5        Q.    So, we don't know whether it was related

 6   to mesh or something else, do we?

 7        A.    No exam was performed and no culture was

 8   taken.

 9        Q.    So we don't know --

10        A.    Correct.

11        Q.    -- what it was related to, correct?

12        A.    Correct.

13        Q.    Now, let's go to Tab No. 12.

14              (WHEREUPON, Rosenzweig Deposition

15               Exhibit No. 15 was marked for

16               identification:  6/11/15 medical

17               record; COL PLTF 000244 RBAYLESS -

18               COL PLTF 000250 RBAYLESS.)

19   BY MR. PERSONS:

20        Q.    And this is a record from Parrish

21   Medical Center in Titusville, June the 11th, 2015,

22   and this is the last record discussed in your

23   report.  Yes?

24        A.    Correct.
```

Bruce Rosenzweig, M.D.

```
1         Q.     And here Ms. Bayless presents to

2    Dr. Francisco Garcia at the Parrish emergency room

3    with complaints of a rash and vaginal discharge,

4    dysuria and abdominal pain, correct?

5         A.     Yes.

6         Q.     And Dr. Garcia wrote that Ms. Bayless

7    reported "a two-week history of malodorous brown

8    vaginal discharge, status post unprotected sex with

9    some associated dysuria and mild abdominal pain."

10             Do you see that?

11        A.     Yes.

12        Q.     Now, Ms. Bayless presented with these

13   symptoms previously, at the December 10, 2012 visit

14   to the Brevard Health Department.  Do you recall

15   that?

16        A.     Yes.

17        Q.     Do you recall that she was diagnosed

18   with trichomonas at that visit?

19        A.     Correct.

20        Q.     And a wet prep for trichomonas was

21   obtained?

22        A.     On that prior visit.

23        Q.     And she developed these symptoms after

24   engaging in unprotected sex, correct?
```

Bruce Rosenzweig, M.D.

1        A.    That was not documented.

2        Q.    All right.  But in this instance she

3    reports that she had these symptoms after

4    unprotected sex?

5        A.    This record does state that she affirmed

6    to having had unprotected sex.

7        Q.    Right.  And Dr. Garcia goes on to note

8    that Ms. Bayless has a history of gonorrhea and

9    trichomonas, doesn't he?

10       A.    Correct.

11       Q.    Now, Ms. Bayless said the symptoms are

12   similar but the odor is worse.

13             Do you see that?

14       A.    Yes.

15       Q.    You agree that symptoms of gonorrhea can

16   worsen with subsequent infections?

17       A.    No.

18       Q.    Okay.  You don't agree that the symptoms

19   of gonorrhea can get worse with subsequent

20   symptoms -- infections of gonorrhea, that's your

21   testimony?

22       A.    Vaginal symptoms?

23       Q.    Symptoms of gonorrhea can worsen with

24   subsequent infection?  Yes or no.

Bruce Rosenzweig, M.D.

1      A.    Well, without a cervix, you're not going

2   to have a discharge from gonorrhea or chlamydia

3   because there's no place for it to live.

4      Q.    Would you agree that the symptoms of

5   trichomonas can worsen with subsequent infections?

6      A.    No.

7      Q.    Okay.  At the bottom of page 3,

8   Dr. Garcia documented performing a vaginal exam,

9   didn't he?

10      A.    Correct.

11      Q.    And he noted visualizing a "surgical

12   'tack,'" quote-unquote, "from previous bladder lift

13   surgery in Orlando."

14          Do you see that?

15      A.    Yes.

16      Q.    He noted erythema and slight discharge

17   from this?

18      A.    Yes.

19      Q.    But he didn't describe what the surgical

20   tack was, did he?

21      A.    No.

22      Q.    Nor did he describe where the surgical

23   tack was visualized, did he?

24      A.    Correct.

Bruce Rosenzweig, M.D.

1        Q.    It's likely at the same site that the

2  provider visualized at Mrs. -- at Ms. Bayless'

3  September the 5th, 2014 visit to the Parrish

4  emergency room, isn't it?

5        A.    That would be speculation.

6        Q.    All right.  But you don't have any basis

7  for it being any sites other than that, do you?

8        A.    The site of the last exposure and the

9  site of this exposure are not well described in the

10 medical records.

11       Q.    So, we haven't seen any record where

12 Ms. Bayless sought treatment for the slight

13 exposure visualized at the September 15th -- strike

14 that -- at the September 5, 2014 visit to the

15 Parrish ER?

16       A.    Correct.

17       Q.    And as we discussed earlier, we have no

18 records indicating she ever was treated for the

19 incisional separation visualized at her

20 postoperative visit to Dr. Jones on September the

21 24th, 2013, correct?

22       A.    We don't have any evidence that she was

23 treated?

24       Q.    Right.

Bruce Rosenzweig, M.D.

```
1        A.    Dr. Jones did not recommend any

2   treatment for it on September 24, 2013.

3        Q.    That's not my question.

4        MR. PERSONS:  And I move to strike it as

5   unresponsive.

6   BY MR. PERSONS:

7        Q.    The question was:  We have no records

8   indicating that she ever was treated for the

9   incisional separation that was visualized by

10  Dr. Jones on September the 24th of 2013?

11       A.    And my answer is Dr. Jones did not

12  recommend treatment on September 24, 2013.

13       Q.    All right.  Well, point me to a record

14  that shows that she had treatment subsequent to

15  September 24 of 2013 for an incisional separation

16  that was visualized in her postoperative visit.

17  Can you point me to such a record?

18       A.    No.

19       Q.    Okay.

20       MR. HABERMAN:  Ray.

21       MR. PERSONS:  Yes.

22       MR. HABERMAN:  I'd like to take a break.  We

23  have been going quite a bit of time now.

24       MR. PERSONS:  We have.  Ma'am, how much time
```

Bruce Rosenzweig, M.D.

```
1   have we -- can you calculate that while we're off
2   the record, please, Madam Court Reporter, and then
3   when we come back we will have some idea how much
4   time we have got and I am going to try to get
5   through this.
6        MR. HABERMAN:  All right.
7        MR. PERSONS:  How much time do you need?  You
8   take as much time as you need, obviously, but I
9   want to know what time to come back.
10       MR. HABERMAN:  Understood.  Doctor, are you
11  hungry?  Have you eaten?  Do you want to plow
12  through it?
13       THE WITNESS:  I just got to go to the
14  bathroom, but then I'm fine.
15       MR. HABERMAN:  Gotcha.
16       THE WITNESS:  The dogs haven't been barking.
17  That's a good sign.
18       MR. HABERMAN:  Why won't we say five minutes
19  or so.
20       MR. PERSONS:  Sounds good.
21              (WHEREUPON, a recess was had
22              from 1:34 to 1:45 p.m.)
23  BY MR. PERSONS:
24       Q.   Dr. Rosenzweig, you have no evidence
```

Bruce Rosenzweig, M.D.

1    that Ms. Bayless' prior STD testing came back

2    negative, do you?

3         A.    Not that I recall from the medical

4    records.

5         Q.    All right.  You agree that repeated

6    vaginal infections, whether it's bacterial

7    vaginitis or STDs, in the presence of a poorly

8    healed incision could explain Ms. Bayless'

9    recurrent infection?

10        A.    The exposed mesh, yes.

11        Q.    And the mesh could have been exposed as

12   a result of a poorly healed incision, couldn't it?

13        A.    Because of the mesh, yes.

14        Q.    Not that the mesh caused the incision to

15   poorly heal, but the very presence of the mesh, the

16   mesh wouldn't be -- without the poorly healed

17   incision, the mesh would not have become visible.

18   Yes?

19        A.    No, that's not correct.

20        Q.    Well, a poorly healed incision can

21   reveal the presence of mesh, can't it?

22        A.    No, the incision -- the mesh became

23   exposed because of the characteristics of the mesh

24   that lead, as I have -- as I state in my general

Bruce Rosenzweig, M.D.

1    causation report and the general causation reports

2    of Dr. Garely and Dr. Hoyte, the characteristics of

3    the mesh make the vaginal epithelium break down due

4    to the characteristics of the mesh that are

5    described in my general causation report.

6         Q.   So, it's your testimony that in the

7    absence of mesh, the wound would have properly

8    healed.  Is that your testimony?

9         A.    In this case, correct.

10        Q.    All right.  Now, at the bottom of

11   page 6, under "Clinical Impression," Dr. Garcia

12   wrote, "Vaginal erosion due to surgical mesh,

13   bacterial vaginosis, trichomonas vaginitis."

14             Do you see that?

15        A.    Yes.

16        Q.    Again, Dr. Garcia doesn't indicate where

17   the mesh was exposed or visualized, does he?

18        A.    Not in that statement.

19        Q.    And there's no indication that

20   Dr. Garcia has seen the implant report, is there?

21        A.    Correct.

22        Q.    There's no indication that he's aware of

23   the wound dehiscence, is there?

24        A.    Wound never dehisced.

1        Q.    Well, he doesn't say -- there is nothing

2   in this record reflecting a wound dehiscence, is

3   there?

4        A.    There is nothing in this record that

5   discusses a wound dehiscence, which did not occur

6   in this case.

7        Q.    There's nothing in this record that

8   discusses separation at the apical incision, is

9   there?

10       A.    At this visit or at another visit?

11       Q.    In this record.

12       A.    Are you referencing an apical separation

13  at this visit or at some other time in Ms. Bayless'

14  history?

15       Q.    No.  I'm talking about Dr. Garcia, in

16  terms of his report as reflected in this record of

17  June the 11th, 2015.  That's what we're talking

18  about.

19       A.    He does describe that there is a mesh

20  exposure.

21       Q.    And he doesn't -- okay.

22            Now, Dr. Garcia also suspected bacterial

23  vaginosis, didn't he?

24       A.    Correct.

Bruce Rosenzweig, M.D.

1        Q.    And because of the symptoms of

2    malodorous discharge, abdominal pain and dysuria,

3    those are all consistent with the diagnosis of

4    bacterial vaginosis and trichomonas, isn't it?

5        A.    That's not correct.  That's not correct.

6        Q.    Okay.  Although this complaint isn't

7    documented here, trichomonas can be associated with

8    dyspareunia, though, can't it?

9        A.    Possibly.

10       Q.    And we know that Dr. Garcia instructed

11   Ms. Bayless to undergo testing for trichomoniasis,

12   didn't he?

13       A.    Well, the testing would be done in the

14   office or at this visit.  I don't understand why

15   the testing wasn't done at this visit.

16       Q.    That's not my question.

17       MR. PERSONS:  And I move to strike it as

18   unresponsive.

19   BY MR. PERSONS:

20       Q.    He instructed her to undergo testing for

21   trichomoniasis?  Yes or no.

22       A.    Testing?

23       Q.    Under "Instructions."

24       A.    Yes.

Bruce Rosenzweig, M.D.

1      Q.    He -- here's the entry, "Sexually

2   transmitted diseases, trichomoniasis."

3            Do you see that?

4      A.    It says, "Sexually Transmitted Diseases

5   (ED)," which would be the emergency department, and

6   "Trichomoniasis (ED)."  So, I don't under- -- those

7   aren't instructions to be tested.

8      Q.    All right.  Let's cut to the chase.

9            She was confirmed -- a diagnosis of

10  trichomonas was confirmed, wasn't it, Doctor?

11     A.    No, it wasn't.

12     Q.    All right.  Look at tab 12-A.

13     A.    That's the clinical impression, not a

14  diagnosis.  There's nothing here.  There's not a

15  wet mount.  There is not a PCR test.

16     Q.    Let's go --

17     MR. PERSONS:  Strike everything because there

18  is no question pending.

19  BY MR. PERSONS:

20     Q.    I asked that we go to tab 12-A and then

21  you started testifying.

22     A.    No, you asked me if there was a

23  diagnosis made of trichomoniasis and no.

24     Q.    You said no, and then I went on to 12-A.

Bruce Rosenzweig, M.D.

```
 1        A.     Okay.

 2        Q.     I'm on to 12-A.

 3        A.     All right.

 4        Q.     Get out 12-A.

 5                      (WHEREUPON, Rosenzweig Deposition

 6                      Exhibit No. 16 was marked for

 7                      identification:  6/18/15

 8                      "Cumulative Discharge Summary

 9                      Report"; COL PLTF 000270 RBAYLESS.)

10   BY MR. PERSONS:

11        Q.     Do you see that?

12        A.     Yes.

13        Q.     This is June the 11th, 2015.  It says a

14   wet prep for trichomoniasis, doesn't it?

15        A.     Yes.

16        Q.     Trichomonas.  I'm sorry.

17               And this record reflects or confirms

18   Ms. Bayless' trichomonas infection, doesn't it?

19        A.     This record does, correct.

20        Q.     Right.  It says she was positive for

21   trichomonas, doesn't it, Doctor?

22        A.     This record, yes.

23        Q.     And it says her urine culture was

24   negative, correct?
```

Bruce Rosenzweig, M.D.

```
 1        A.    Correct.

 2        Q.    And she was also negative for yeast,

 3   wasn't she?

 4        A.    Yes.

 5        Q.    And for hematuria?

 6        A.    Correct.  Well, there are a few red

 7   blood cells seen.

 8        Q.    Now, this record isn't listed in your

 9   report.  Did you review it?

10        A.    Yes.

11        Q.    Now, you'd agree that Ms. Bayless'

12   discharge, abdominal pain, vaginal itching and

13   burning and dysuria were all related to the

14   trichomonas infection?

15        A.    No.  I would agree that a vaginal

16   discharge was.

17        Q.    All right.  And based on the records

18   we've seen today, this is her second trichomonas

19   infection since 2012?

20        A.    Right.

21        Q.    You don't have any basis on which to

22   dispute the possibility that she had other

23   infections too, do you?

24        A.    Again, I do not specifically recall in
```

Bruce Rosenzweig, M.D.

```
 1    the records any other positive test.

 2         Q.    All right.  Unprotected sex raises the

 3    risk of contracting trichomonas, doesn't it?

 4         A.    Again, that's debatable.

 5         Q.    Okay.  But we did see this in the

 6    June 11, 2015 visit when she presented with these

 7    symptoms, these same symptoms, after engaging in

 8    unprotected sex by her own report, correct?

 9         A.    Right.  But we've seen other reports

10    where she had unprotected sex, too.

11         Q.    All right.  Let's go to -- okay.

12              Do you have or have you seen any medical

13    records other than the ones we have been discussing

14    thus far?

15         A.    Not that I specifically recall.

16         Q.    Do you have your file there?

17         A.    No.  I think that was electronically

18    transmitted.

19         Q.    All right.  You do have your report

20    handy?

21         A.    Yes.

22         Q.    On pages 7 and 8 of your report you

23    describe Dr. Jones' care and treatment of

24    Ms. Bayless?
```

1      A.    Yes.

2      Q.    My question is:  Do you agree that

3  Ms. Bayless was an appropriate candidate for the

4  surgery that Dr. Jones performed on August the 9th

5  of 2013?

6      A.    Yes, she was an appropriate candidate

7  for a surgery to treat her stress urinary

8  incontinence and her pelvic organ prolapse.

9      Q.    And her candidacy for surgery was based

10 on the information that Dr. Jones had available at

11 the time she had the risk/benefit discussion with

12 Ms. Bayless?

13     A.    Correct.

14     Q.    And you're aware that Dr. Jones has

15 testified she was unaware of Ms. Bayless' cocaine

16 crack abuse at the time of her implantation

17 procedure.  You're aware of that, right?

18     A.    That's what she stated.

19     Q.    And you're aware that Dr. Jones has

20 further testified that if she had known of that

21 substance abuse issue, she would not have performed

22 surgery on Ms. Bayless?

23     A.    Well, she was actively using cocaine at

24 the time.

Bruce Rosenzweig, M.D.

1      Q.    But Dr. Jones said that if she had known

2   of that substance abuse issue, she would not have

3   performed surgery on Ms. Bayless.  That is what

4   Dr. Jones testified to, didn't she?

5      A.    Correct.

6      Q.    Now, you're aware that the Restorelle Y

7   is indicated for the treatment of abdominal sacral

8   colpopexy?

9      A.    It's indicated to treat pelvic organ

10   prolapse.  But, yes, it's used as an abdominal

11   colposacropexy, yes.

12      Q.    And that can be either laparoscopically

13   or open, right?

14      A.    Correct.

15      Q.    With or without robotic assistance,

16   correct?

17      A.    Correct.

18      Q.    And Ms. Bayless' pelvic organ prolapse

19   repair with the Restorelle Y was indeed performed

20   as a robotic-assisted abdominal surgery, wasn't it?

21      A.    Yes.

22      Q.    It was not performed as a transvaginal

23   surgery, was it, Doctor?

24      A.    Correct.

Bruce Rosenzweig, M.D.

1      Q.    You're not offering any criticism of

2  Dr. Jones for deciding to use the Restorelle Y

3  augment as -- to augment a surgical repair of

4  Ms. Bayless' pelvic organ prolapse, are you?

5      A.    I do not fault her, correct.

6      Q.    Nor are you criticizing Dr. Jones for

7  continuing to use the Restorelle Y for hundreds of

8  pelvic organ prolapse repair surgeries since

9  Ms. Bayless' August 9, 2013 surgery as Dr. Jones

10  has so testified?

11      MR. HABERMAN:  Objection.  You can answer.

12  But that product, is she able to use that product

13  right now?

14  BY MR. PERSONS:

15      Q.    That's the question.

16      A.    I do not fault her, yes.

17      Q.    Right.  Now, you're aware that she

18  testified that she selected the Restorelle Y to

19  augment Ms. Bayless' pelvic organ prolapse repair

20  due to its very ultra light weight.  Are you aware

21  that she testified to that?

22      A.    Correct.

23      Q.    Are you also aware that one of the

24  reasons that she selected the Restorelle Y was its

Bruce Rosenzweig, M.D.

```
 1   macro pore size?

 2        A.    That's what she stated.

 3        Q.    Including the fact that Restorelle Y has

 4   one of the largest interstitial pore sizes of any

 5   POP mesh on the market.  Do you recall her

 6   testimony?

 7        A.    She did state that, but that's not

 8   correct.

 9        Q.    All right.  And she also said that one

10   of the characteristics of the Restorelle Y and a

11   basis for her selection of that material to augment

12   the surgery was its very good flexibility?

13        A.    Yes.

14        Q.    In her words, when you look at a

15   product, you look at its ability to stretch in a

16   vertical or an up-and-down fashion as well as a

17   side-to-side fashion.

18        A.    That's what she stated.

19        Q.    All right.  You don't have any basis on

20   which to dispute her understanding of the

21   properties of the Restorelle Y, do you?

22        A.    I do not dispute what she stated in her

23   deposition.

24        Q.    Now, you're also a --
```

```
1        A.    I do dispute some of the facts about the
2   mesh, but that is a more general causation opinion.
3        Q.    You're also aware that Dr. Jones
4   testified that she uses mesh, including the
5   Restorelle Y, to augment pelvic organ prolapse
6   repair surgeries because it achieves a, quote,
7   "more permanent," end quote, repair?
8        A.    That's what she stated.
9        Q.    And you have no basis to disagree with
10  Dr. Jones' statement of her opinion to that effect,
11  do you?
12       A.    The medical literature.
13       Q.    All right.  But you don't dispute that
14  that's what she said?
15       A.    I don't dispute that's what she said.
16  As I stated, the medical literature might dispute
17  the veracity of that statement.
18       Q.    All right.  But you don't dispute that
19  that is a statement of her experience with this
20  material?
21       A.    No.  That is the answer she gave to --
22  at her deposition.
23       Q.    Right.  Now, on page 9, Item No. 1 of
24  your report, you claim that "As a result of the
```

Bruce Rosenzweig, M.D.

1    implantation of the Advantage Fit and Restorelle

2    Y-mesh products, Ms. Bayless experienced mesh

3    erosions, exposures, vaginal bleeding and

4    infection"?

5         A.    Yes.

6         Q.    Before we go any further, this statement

7    indicates that you're attributing all of

8    Ms. Bayless' alleged symptoms to both the Advantage

9    Fit and the Restorelle Y-mesh, correct?

10        A.    Well, that and based on her deposition

11   testimony I would add dyspareunia.

12        Q.    But you don't differentiate between the

13   two implants whatsoever anywhere in your litigation

14   report, do you?

15        A.    In the medical summary, yes.

16        Q.    You don't attribute specific injuries to

17   one product or the other anywhere in your report,

18   do you?

19        A.    Again, in the medical summary.

20        Q.    Let's look -- let's look in the summary.

21              Where in your report are you referring?

22        A.    Well, the initial exposure that was

23   documented at the -- on September 24, 2013, was

24   the -- at the apex.  More likely than not that was

Bruce Rosenzweig, M.D.

1    the Restorelle Y-mesh.

2           We don't know where the other exposures

3    were noted.  So, therefore, it could be either

4    product, but more likely than not it was from the

5    Restorelle Y-mesh.

6       Q.    But you don't -- in none of the pages

7    between 1 through 15 do you make such a

8    delineation, do you?

9       A.    Specifically in the report, no.

10      Q.    Okay.  Now, you understand that your

11   litigation report should contain a complete

12   statement of your opinions in this case, you

13   understand that, right?

14      MR. HABERMAN:  Objection.

15   BY THE WITNESS:

16      A.    And to what I testify to today at this

17   deposition.

18   BY MR. PERSONS:

19      Q.    Well, have you received any new

20   information since issuing your report that you

21   claim could enable you or would enable you to

22   attribute a specific symptom of Ms. Bayless'

23   complaints to one implant versus another?

24      A.    Well, again, I've reviewed Dr. Jones'

Bruce Rosenzweig, M.D.

1    deposition testimony and I reviewed Mrs. Bayless'

2    deposition testimony.

3            I've not reviewed the deposition

4    testimony of Dr. Garcia nor Dr. Magness to be able

5    to further delineate if they had any additional

6    information that could separate the -- where they

7    found the erosion to be able to specify whether it

8    was more likely than not from the Restorelle or

9    from the Advantage Fit.

10    Q.    So, is it your testimony, then, that you

11    would need additional information in order to

12    attribute specific injuries to one product or the

13    other?

14    MR. HABERMAN:   Objection.

15    BY THE WITNESS:

16    A.    As I stated, more likely than not the

17    erosions, the vaginal discharge and the bleeding is

18    from the Restorelle Y-mesh.

19            The painful intercourse would more

20    likely than not be more likely associated with the

21    Restorelle Y-mesh and a minimal contributor from

22    the Advantage Fit.

23    BY MR. PERSONS:

24    Q.    All right.  Now, you didn't update your

 1    report to reflect what you just told us, though,

 2    did you?

 3         MR. HABERMAN:  Objection.

 4    BY THE WITNESS:

 5         A.    No, because --

 6         MR. HABERMAN:  In response to your question.

 7    BY THE WITNESS:

 8         A.    I knew I would be testifying to that

 9    today.

10    BY MR. PERSONS:

11         Q.    Okay.  So, you're broadly claiming that

12    because both implants contain polypropylene,

13    they're the cause of Ms. Bayless' injuries?

14         MR. HABERMAN:  Objection.

15    BY MR. PERSONS:

16         Q.    Yes?

17         A.    I have reviewed and relied upon my

18    general causation reports and my prior general

19    causation testimony, and that is a very -- the

20    answer to that question is not a yes-or-no

21    question.  It is a very broad and detailed question

22    that is in my general causation report.

23              I did do a very detailed differential

24    diagnosis, most of which we discussed today, on how

Bruce Rosenzweig, M.D.

1    I ruled out other causes, such as her history of

2    sexual abuse, her episiotomy with a tear, her

3    history of STDs, her smoking, her use of crack

4    cocaine, her hysterectomy and the other medical

5    conditions that I've described in my report, which

6    leads me to the opinion that her injuries were

7    caused by the mesh implants, the Restorelle Y-mesh

8    primarily and the Advantage Fit secondarily.

9         MR. PERSONS:  Move to strike as unresponsive.

10   BY MR. PERSONS:

11        Q.    As part of your differential diagnosis,

12   what did you consider in regards to the cause --

13   let me strike that.

14             Did you consider that only the mesh

15   visualized was localized at the site of her apical

16   incision?  Did you consider that in doing a

17   differential diagnosis?

18        A.    Yes, I did consider that finding on

19   September 24, 2013.  The other -- the other

20   visualization of exposure was not described by the

21   physician in the medical records as to the exact

22   location where it was.

23        Q.    And did you consider the fact that the

24   apical incision that had separated -- that the

Bruce Rosenzweig, M.D.

```
 1   apical incision separated following her August 9,

 2   2013 procedure?  Did you consider that in your

 3   differential diagnosis?

 4       A.    That it healed and then the mesh eroded

 5   through?  Yes.

 6             Did she have difficulty healing due to

 7   her prior history of cocaine use and smoking?  No.

 8   In fact, Dr. Jones even testified that she did not

 9   note any poor healing in the first two months after

10   surgery.

11             And it's also noted that her other

12   wounds from her robotic surgery had healed

13   completely, and the only finding of separation was

14   where the mesh was, which shows that she did have

15   no problem with wound healing.

16       Q.    Now, where in Dr. Jones' records does it

17   indicate that the wound had healed properly?

18       A.    No.  She was asked --

19       MR. HABERMAN:  Objection.

20   BY THE WITNESS:

21       A.    No.  What she was asked is did she have

22   any problems with wound healing, and Dr. Jones said

23   no.

24   BY MR. PERSONS:
```

Bruce Rosenzweig, M.D.

```
1        Q.    Did you -- how did you rule out poor

2   wound healing as cause of the mesh becoming visible

3   at the apical site, then?

4        A.    Well, because she didn't have wound --

5        Q.    The wound had healed and then later

6   separated?

7        A.    More likely than not, yes, because she

8   had no problems healing any other wound.  If you

9   have generalized wound healing problems, your

10  wounds are not going to heal.  She had no problems

11  healing the site where the sling was placed, where

12  the ports were placed for the robotic surgery.  The

13  only place where she did not -- where she had mesh

14  exposure on September 24, 2013 was with the

15  Restorelle Y-mesh.

16       Q.    All right.  Did you take into account

17  Ms. Bayless' non-compliance with the postoperative

18  instructions regarding sexual activity following

19  surgery?  Did you take that into account?

20       A.    Yes, and we discussed that.  There is no

21  evidence that she was non-compliant with

22  intravaginal intercourse.

23             You are making the assumption that

24  saying decreased libido and orgasmic dysfunction is
```

Bruce Rosenzweig, M.D.

1    a sign that she had sexual intercourse, and that's

2    not supported by the medical records or

3    Ms. Bayless' deposition testimony.

4        MR. PERSONS:  Object and move to strike as

5    non-responsive.

6    BY MR. PERSONS:

7        Q.    The question was whether non-compliance

8    with instructions regarding sexual activity, which

9    Dr. Jones herself testified to, about that being

10   one of the restrictions, whether you took that into

11   account in doing the differential diagnosis?

12       A.    Yes, I did.

13       Q.    All right.  Now, such non-compliance

14   could have impacted the wound healing, couldn't it?

15       A.    If there was --

16       Q.    If Doctor said don't have sex for 12

17   weeks and you have sex within the first six weeks,

18   that could impact the healing of the wound, the

19   vaginal wound, couldn't it?

20       A.    Number one, Ms. Bayless testified that

21   she did not have intercourse prior to coming back

22   to see her, that she complied with the instructions

23   that Dr. Jones gave.  That's the best indication

24   that there was not intravaginal penetration prior

Bruce Rosenzweig, M.D.

1   to her visit and therefore could exclude

2   non-compliance as a cause of poor wound healing.

3         Q.    All right.  It's your testimony that any

4   visible mesh that may be present in Ms. Bayless'

5   vagina is permanent in nature?

6         A.    Yes.

7         Q.    Now, wouldn't correcting the wound

8   dehiscence that was never treated resolve the

9   visible mesh issue?

10         A.    If she had a mesh explant, that would

11   remove the mesh and would improve the likelihood of

12   her not having a current or future mesh erosion.

13   But to try to remove all the Y-mesh would be a very

14   difficult surgical procedure.

15         Q.    Well, what about not removing it and

16   treating this -- the wound dehiscence?

17         A.    You mean just simply oversewing it?

18         Q.    Treating the wound dehiscence.

19               Suppose -- couldn't you correct it by

20   treating the wound dehiscence?

21         A.    You mean oversewing the incisions?  At

22   this point, no.  She has a mesh erosion.

23         Q.    All right.

24         A.    What one could -- one could try

Bruce Rosenzweig, M.D.

1    intravaginal estrogen, but there's no indication

2    that she's estrogen-deficient and, therefore, more

3    likely than not, that would not be effective.

4         Q.    But you don't know, do you?

5         A.    It's not documented --

6         Q.    You don't know that for a fact?

7         A.    That philosophy has not been documented

8    in the medical records.

9         Q.    And you haven't examined her, have you?

10        A.    Correct.

11        Q.    So, you can't say it wouldn't have

12   resolved the issue, the estrogen wouldn't resolve

13   the issue for her?

14        A.    Well, Dr. Jones didn't think that

15   because Dr. Jones didn't prescribe it on June 24,

16   2013.

17        Q.    Now, even if Ms. Bayless is experiencing

18   exposure, there are treatments for it, including

19   localized excision of exposed mesh, correct?

20        A.    Correct.  But that's very difficult with

21   an abdominal colposacropexy.

22        Q.    But it is possible, isn't it?

23        A.    It is a very difficult surgery because

24   the top of the vagina is at the -- is attached to

1    the sacrum and trying to do a local excision puts

2    you in close proximity to the sacral promontory,

3    the blood vessels, the ureters and the bowel.

4         Q.    Okay.  It's a difficult surgery, but it

5    is a surgery that can be undertaken nevertheless?

6         A.    Correct.

7         Q.    Now, as part of your differential

8    diagnosis, what did you consider in regards to the

9    cause of the periodic spotting that Ms. Bayless is

10   attributing to the Restorelle and the Advantage

11   Fit?

12        A.    Well, first, she doesn't have a uterus

13   and cervix.  Those were removed.  So, that would

14   not cause spotting.

15             The infections that she had and

16   discharge that she had in her vagina, while she did

17   test positive on one occasion post-implant for

18   trichomoniasis, that trichomoniasis would not be

19   associated with vaginal spotting.

20             So, the -- there was no cancer ever

21   found in her vagina.  There were no other lesions

22   found in her vagina.

23             So, the most likely remaining etiologic

24   factor in the vaginal spotting is the mesh erosion.

Bruce Rosenzweig, M.D.

1      Q.    Now, did you consider whether she could

2   have experienced postoperative bleeding with

3   intercourse with a hysterectomy alone?

4      A.    Yes, but she didn't have postoperative

5   bleeding in this case.

6      Q.    Or spotting with intercourse?

7      A.    Or spotting.  In this case in the

8   postoperative period.

9      Q.    I got you.

10         Now, patients who undergo pelvic organ

11  prolapse repair surgeries without mesh can also

12  experience postoperative bleeding with intercourse,

13  can't they?

14     A.    In the postoperative period, they can.

15  However, long-term bleeding and spotting, if

16  absorbable sutures are used, would not occur.

17     Q.    As part of your differential diagnosis,

18  what did you consider in regards to the cause of

19  Ms. Bayless' recurrent bacterial vaginosis?

20     A.    Well, again, we don't have an etiology

21  except for the June 18, 2015 as an etiologic factor

22  for her discharge.  So, there were no cultures

23  performed except for the wet prep on June 18, 2015.

24         So, since tests were sent off for STDs,

Bruce Rosenzweig, M.D.

1    more likely than not those came back negative since

2    there was no letter sent or Board of Health --

3    gonorrhea/chlamydia are reportable infections to

4    the Board of Health and there would be follow-up

5    from the Board of Health if those had come back

6    positive.

7             So, more likely than not her vaginal

8    discharge was from the exposed mesh.

9    Q.    Did you even consider her pre-implant

10   history of recurrent bacterial vaginosis?

11   A.    Yes.  And she stated in her deposition

12   that the symptoms of her discharge post-implant

13   were different.  The odor was stronger.  It was

14   more difficult to treat.

15            So, this was her -- the discharge that

16   she had after implant was different according to

17   Ms. Jones' -- excuse me -- Ms. Bayless' testimony

18   than it was pre-implant.

19   Q.    Now, you mentioned something about the

20   Board of Health sending a letter.  Have you seen

21   such a letter from the Board of Health?

22   A.    In Ms. Bayless' case?  No.  I mean, they

23   would send a letter if there was a gonorrhea or

24   chlamydia that's positive.  Those are reportable

Bruce Rosenzweig, M.D.

```
1    infections to the Board of Health and if someone

2    did not document treatment, then the Board of

3    Health would get involved.

4        Q.    But you haven't seen any record one way

5    or the other about the test results for any of the

6    STDs for Ms. Bayless, have you?

7        A.    Correct.  And as I state, if the STDs

8    were positive, more likely than not that would have

9    triggered a letter being sent, which she would have

10   then known about.

11       Q.    As part of your differential diagnosis,

12   what did you consider in regards to the cause of

13   Ms. Bayless' pelvic vaginal pain that she's

14   attributing to the Restorelle Y-mesh and the

15   Advantage Fit?

16       A.    Well, again, I considered all the

17   factors, her prior surgical history.  Both her

18   tubes and ovaries at the time of her hysterectomy

19   looked -- appeared normal, according to Dr. Jones'

20   operative report, which would rule out pelvic

21   inflammatory disease, would rule out any sequelae

22   from her tubal ligation.

23           The only finding was pelvic sidewall,

24   left pelvic sidewall adhesions associated with her
```

Bruce Rosenzweig, M.D.

```
 1   sigmoid colon and diverticulosis.  She's never been

 2   diagnosed with diverticulitis.  The diverticulosis

 3   for the vast majority of patients is asymptomatic

 4   and would only give abdominal pain with

 5   constipation, which I do not see that she

 6   complained about in the medical records.

 7            There is no finding that there was any

 8   problem with the hysterectomy.  The only finding

 9   was that there was mesh erosion from the Y-mesh.

10   She did not demonstrate urinary tract infections.

11   She has not been diagnosed with vaginitis -- excuse

12   me -- atrophic vaginitis.

13            So, those are the conditions that I

14   ruled out as a potential cause of her abdominal and

15   pelvic pain.

16            She has had not a recurrence of her

17   pelvic organ prolapse.  That is in the medical

18   records.  So, I also ruled that out as a cause.

19       Q.   Do you know whether Ms. Bayless is

20   currently experiencing dyspareunia?

21       A.   That would be based on her deposition

22   testimony.

23       Q.   So, is that yes or no, do you know?

24       A.   That would -- as she stated in her
```

Bruce Rosenzweig, M.D.

1    deposition, yes.

2         Q.    Is it your opinion that her alleged

3    dyspareunia is related to the mesh implants she

4    received back in August of 2013?

5         A.    Yes.

6         Q.    And you haven't determined whether one

7    implant is the primary cause of any dyspareunia

8    that she might be claiming, right?

9         A.    More likely than not the Restorelle

10   Y-mesh is the primary cause and the Advantage Fit

11   is the secondary cause.

12        MR. HABERMAN:   Objection; form.

13   BY MR. PERSONS:

14        Q.    Did you consider whether Ms. Bayless had

15   a shortened vagina even prior to her hysterectomy?

16        A.    Yes, I -- well, there is no -- you can't

17   consider something that is not documented in the

18   records.

19             So, Dr. Jones who examined her found

20   that she had a total vaginal length of

21   10 centimeters based on her POP-Q on May 31, 2012.

22   So, she had a normal total vaginal length of

23   10 centimeters prior to surgery.  So, that would

24   exclude a pre-surgical shortened vagina.

Bruce Rosenzweig, M.D.

1       Q.    Okay.  Well, are you aware that she

2   testified prior to her hysterectomy that sometimes

3   she would experience pain during intercourse due to

4   her partner hitting her cervix?

5       A.    Yes, because that's -- yes, because she

6   had prolapse.

7       Q.    Would you agree that repeated

8   trichomonas, gonorrhea and chlamydia infections can

9   lead to pelvic inflammatory disease?

10       A.    We have discussed that before.  You

11   cannot have pelvic inflammatory disease when you

12   don't have a uterus connecting the vagina to the

13   tubes and ovaries.

14       Q.    Okay.  All right.  So, your answer to

15   that is no?

16       A.    That in Ms. Bayless' case, after her

17   hysterectomy, the answer is no.

18       Q.    Okay.  Now, on page 9 of your report,

19   the opinions that you have there in No. 2, they are

20   not specific to Restorelle, are they?

21       A.    In what respect?

22       Q.    In any respect.  I mean, they could be

23   applicable to any mesh product?

24       A.    Correct.  Mesh products degrade,

Bruce Rosenzweig, M.D.

```
1    contract, deform, lead to chronic foreign body
2    reaction, chronic inflammatory reaction, scar plate
3    formation, entrap nerves, correct.
4         Q.    And let's look at -- do you have any
5    evidence that Ms. Bayless' mesh contracted?
6         A.    More likely than not, due to the chronic
7    foreign body reaction, chronic inflammatory
8    reaction, we know that there was -- and I want to
9    pull up the appropriate medical record.
10             On June 11, 2015, there was erythema
11   surrounding the exposed mesh, which would show that
12   there was a chronic foreign body reaction, chronic
13   inflammatory reaction that was taking place, which
14   would lead to mesh contraction.
15        Q.    Is it your testimony --
16        MR. CONNOLLY:  I'm sorry.
17   BY MR. PERSONS:
18        Q.    Going back to pelvic inflammatory
19   disease, is it your information that pelvic
20   inflammatory disease cannot occur following a
21   hysterectomy?
22        A.    Yes, there is -- unless there was
23   previous evidence of a subclinical infection, which
24   was not noted by Dr. Jones at the time of the
```

Bruce Rosenzweig, M.D.

1   hysterectomy.  There is no organ in the pelvis to

2   become inflamed.  The tubes and ovaries are

3   separated from the vagina.  So, a gonorrheal or

4   chlamydial or trichomonas infection can't ascend to

5   the tubes and ovaries.

6              Now, you can have a postoperative tubal

7   and ovarian infection in the postoperative period

8   from the surgery, but that's not what was found in

9   Ms. Bayless' case.

10      Q.    All right.

11      MR. CONNOLLY:  Just one point of

12   clarification, Ray and Dr. Rosenzweig.  Can you

13   tell me what -- in the last response you referred

14   to a specific medical record.  I just want the date

15   of that.

16      THE WITNESS:  June 11, 2015.

17      MR. CONNOLLY:  Thank you.

18   BY MR. PERSONS:

19      Q.    Now, Restorelle Y, what evidence do you

20   have, I'm sorry, of the shrinkage of the

21   Restorelle Y in Mrs. Bayless?

22      A.    We talked about contraction.

23   Contraction and shrinkage are synonymous.

24      Q.    Okay.  What about degradation, do you

Bruce Rosenzweig, M.D.

1   have any evidence of it?  Specific to Ms. Bayless,

2   not just generally but specific to Ms. Bayless.

3        A.    Yes.  The erythema seen on June 11, 2015

4   would show that the chronic foreign body reaction,

5   chronic inflammatory reaction is ongoing, which

6   leads to mesh degradation.

7        Q.    All right.  What about evidence of the

8   chronic inflammation?

9        A.    The erythema seen around the mesh

10   erosion.

11        Q.    Now, Restorelle Y doesn't actually have

12   sharp edges, does it?

13        A.    When it undergoes deformation and

14   degradation, yes.

15        Q.    Now, on page 10 of your report, at the

16   top, you wrote that "a combination of these factors

17   caused Ms. Bayless' injuries"?

18        A.    Correct.

19        Q.    All right.  Now, but you didn't

20   elaborate on which factors are present and which

21   are not.  Are you saying that all of them were

22   present in Ms. Bayless' situation?

23        A.    More likely than not, yes.

24        Q.    And you're basing that on the properties

Bruce Rosenzweig, M.D.

```
 1    of polypropylene mesh?

 2         A.    And the findings in the medical records,

 3    as we just previously discussed.

 4         Q.    All right.  Now on pages 10 and 11 of

 5    your report, you claim that Ms. Bayless likely

 6    still has mesh remaining, right?

 7         A.    Correct.

 8         Q.    Now, but she hasn't actually undergone

 9    any revision surgery whatsoever as you're aware of,

10    has she?

11         A.    No, she has not.

12         Q.    So, you're not suggesting that she's had

13    surgery and there's mesh remaining, are you?

14    You're just saying she still has the mesh from the

15    September operation?

16         A.    From the August operation, correct.

17         Q.    I apologize.  My mistake.  The

18    August 13 -- August 2013 operation.  Yes?

19         A.    Correct.

20         Q.    You also opined that Ms. Bayless'

21    chronic pain could be treated with biofeedback

22    therapy?

23         A.    That is a modality -- yes, that is a

24    modality that can be used.
```

Bruce Rosenzweig, M.D.

```
 1          Q.     And on what basis are you claiming that

 2   she's experiencing chronic pain?

 3          A.     Her deposition testimony.

 4          Q.     But that's not explained here in the

 5   report.

 6                 The diagnosis symptoms isn't referenced

 7   anywhere in the medical records that you reviewed

 8   in this case of chronic pain, correct?

 9          A.     That's based on her deposition

10   testimony.

11          Q.     Okay.  And not on anything in the

12   medical records?

13          A.     Not that I specifically recall.

14          Q.     And you also claim that her continuum of

15   care can range anywhere from six months to five

16   years.  How did you arrive on six months and five

17   years?

18          A.     That's based on my clinical experience,

19   review of the literature and management of patients

20   that have had mesh complications.

21          Q.     And when are you claiming that her

22   continuum of care began?

23          A.     Well, when she starts to get the

24   appropriate therapy that we have discussed, either
```

Bruce Rosenzweig, M.D.

```
 1    a mesh revision procedure or the non-surgical

 2    procedures, then that's when the clock would start

 3    clicking.

 4              And I think she stated in her deposition

 5    that someone has recommended that she have a mesh

 6    removal procedure.

 7        Q.    What evidence do you have that

 8    Ms. Bayless' Restorelle Y is migrating?

 9        A.    Not that I specifically recall from the

10    medical records.

11        Q.    And since her Restorelle Y-mesh hasn't

12    been removed, to your knowledge, you certainly

13    haven't examined any pathology specimens, have you?

14        A.    That's correct.

15        Q.    Nor have you seen any records

16    documenting any such pathology?

17        A.    That's correct.

18        Q.    All right.  You also claim that

19    Ms. Bayless wasn't able to make a fully informed

20    medical decision regarding her implant procedure?

21        A.    Correct.

22        Q.    But you're aware that Ms. Bayless

23    testified that she reviewed the consent forms

24    before she signed them.  We talked about that
```

Bruce Rosenzweig, M.D.

1    earlier?

2         A.    Correct.  But Dr. Jones testified that

3    there were characteristics of the mesh that she did

4    not know about.  If I recall correctly, she did not

5    know about contraction, degradation and I think

6    there is another.  But what she stated in her

7    deposition is what she stated in her deposition.

8         Q.    Okay.  And you're claiming also that

9    Dr. Jones -- is that the basis for your contention

10   that Dr. Jones wasn't provided the necessary and

11   required information to obtain Ms. Bayless'

12   informed consent?

13        A.    Correct.

14        Q.    All right.  Are you aware that Dr. Jones

15   has testified that she's used the same technique to

16   implant Y grafts for almost 20 years, you know

17   that, right?

18        A.    That's what she stated, yes.

19        Q.    And are you claiming she's been

20   performing these surgeries for 20 years without

21   full knowledge of the risk?  Is that your

22   testimony?

23        A.    That's my testimony with all doctors

24   that still use polypropylene mesh, because they are

Bruce Rosenzweig, M.D.

1    told that the only unique risk of mesh is erosion

2    where there are -- as we talked about, there are

3    risks from doing the surgery itself but there are

4    risks from the mesh.

5              And the risks of mesh is contraction,

6    deformation, degradation, chronic foreign body

7    reaction, chronic inflammatory reaction, that leads

8    to mesh contracting, trapping nerves, pain,

9    dyspareunia, erosion and the litany of things that

10   I discuss in my general causation report.

11        Q.    Now, where in Dr. Jones' deposition does

12   she state that she was unaware of the fact that

13   mesh could erode or become exposed or there could

14   be extrusion with mesh?  Where does she say that in

15   her deposition?

16        A.    That the cause --

17        Q.    Can you direct me to a page?

18        A.    That the cause of that is due to the

19   chronic foreign body reaction, chronic inflammatory

20   reaction, the induction of proinflammatory

21   macrophages.

22              And I will refer you to the Nolfi

23   report, the Feola report and the effects that mesh

24   has on causing -- those characteristics of the mesh

Bruce Rosenzweig, M.D.

1    that cause the erosion process.  That is what she

2    didn't know and, therefore, she couldn't explain

3    that to the patient.

4         Q.    But you're aware that Dr. Jones

5    testified that at the time she performed

6    Ms. Bayless' surgery she, Dr. Jones, was aware of

7    the risks of exposure?

8         A.    Correct, but not -- but not the risk of

9    the mesh that leads to the chronic foreign body

10   reaction, chronic inflammatory reaction, that leads

11   to the induction of pro-inflammatory macrophages,

12   that leads to the erosion or the -- that the

13   cellular effect that it has on the vaginal

14   epithelium that leads to the destruction of the

15   vaginal epidemiology that I discuss in my general

16   causation report.

17        MR. PERSONS:  Move to strike as non-responsive

18   and it's repetitive.

19   BY MR. PERSONS:

20        Q.    Without engaging in that refrain, can

21   you answer this question for me:  Are you aware

22   that Dr. Jones testified that at the time she

23   performed Ms. Bayless' surgery she was aware of the

24   risks of the need for repeat surgery?

Bruce Rosenzweig, M.D.

1      A.    That's what she stated.

2      Q.    And that she was aware of the risk of

3  dyspareunia?

4      A.    From the surgery itself.  Not from the

5  characteristics of the mesh.

6      Q.    And Dr. Jones testified, did she not,

7  that she didn't need Coloplast to give her

8  instructions or warnings to advise her of those

9  risks to the patient?

10     A.    Those risks, but not to the

11 characteristics of the device that make it

12 unreasonably dangerous.

13     Q.    Dr. Jones also --

14     MR. PERSONS:  Move to strike as unresponsive.

15 BY MR. PERSONS:

16     Q.    Dr. Jones also testified she was aware

17 of the FDA safety communication that issued in 2008

18 regarding the use of mesh in gynecologic surgery,

19 didn't she?

20     A.    Yes.

21     Q.    And that was five years before

22 Ms. Bayless' surgery, wasn't it?

23     A.    Correct.

24     Q.    And Dr. Jones testified she was aware of

Bruce Rosenzweig, M.D.

1    the 2011 FDA safety communication regarding

2    gynecologic mesh surgeries, didn't she?

3         A.    Correct.

4         Q.    And that, of course, was two years

5    before Ms. Bayless' surgery, wasn't it?

6         A.    Correct.

7         Q.    And Dr. Jones stated, and I quote, "She

8    didn't need Coloplast to repeat," end quote, the

9    information contained in those communications in

10   order for her to understand the risk of surgery

11   with mesh, didn't she?

12        A.    Well, that's what she stated, but then

13   what was not communicated to her were the

14   characteristics of the device that make it

15   unreasonably dangerous, which are in the general

16   causation reports including my own.

17        Q.    All right.  Now, you also say in your

18   report that these complications have caused a

19   significant impact on Ms. Bayless' quality of life.

20             Can you describe Ms. Bayless' activities

21   prior to her August 9, 2013 surgery, her activities

22   of daily living?

23        A.    Those were described in her deposition

24   testimony.

Bruce Rosenzweig, M.D.

1      Q.    But you don't have them anywhere in your

2   report, do you?

3      A.    Correct, because she wasn't deposed

4   until after I completed my report.

5      Q.    Well, do you know what they were?

6      A.    They are described in her deposition

7   testimony.

8      Q.    So, you can't describe them without

9   referring to what she said, without referring to

10   the transcript?

11      A.    Correct.

12      Q.    Now, what about after surgery, her

13   activities of daily living, can you describe those?

14      A.    That's in her deposition testimony also.

15      Q.    Okay.  And I assume your answer would be

16   the same if you were asked can you describe all the

17   ways in which her activities have been, quote,

18   "significantly reduced and/or altered"?

19      A.    Correct.  That would be in her

20   deposition testimony.

21      Q.    Now, on page 13 of your litigation

22   report, you reference four surgical procedures that

23   you claim would have been safer alternatives -- a

24   safer alternative than the Restorelle Y for

Bruce Rosenzweig, M.D.

1    treating Ms. Bayless' POP surgically.

2         A.    Correct.

3         Q.    On page 14 of your report, the seventh

4    line from the top, you say if Ms. Bayless had

5    undergone any of these safer alternatives for

6    treating her POP surgically, she would not have

7    suffered the injuries that were caused by the

8    Advantage Fit and the Restorelle Y.

9              My question is, to clarify, is it your

10   testimony that there was a zero percent chance that

11   Ms. Bayless would be experiencing any of the

12   symptoms that she's currently claiming had she

13   undergone one of the four alternatives you outline

14   on page 13?

15        A.    Yes, because there would not have been

16   mesh placed in her vagina.

17        Q.    All right.  You first reference --

18        A.    And we are talking the injuries that she

19   is suffering from from the mesh, correct?

20        Q.    Well, that's not what you say here.  I

21   mean, in your report it says that she wouldn't be

22   suffering --

23        A.    No, no.  That was the question you

24   asked, and I'm clarifying the question that you

Bruce Rosenzweig, M.D.

1    asked.

2            I don't say in my report she would have

3    a zero percent risk of not having a complication.

4    You asked me would she have a zero percent risk of

5    having a complication from the mesh, and that is

6    correct.

7        Q.    Okay.  That was my question.

8            All right.  Now, you first reference the

9    native tissue repair for SUI and POP, and you talk

10   about the colposuspension procedure that you

11   reference here that would be for the treatment of

12   SUI and not POP, correct?

13       A.    Correct.

14       Q.    So, in regards to the Restorelle Y,

15   you're claiming that a suture-based native tissue

16   POP repair would have been a safer alternative,

17   right?

18       A.    Correct.

19       Q.    And you don't specify what type of

20   sutures would be used in this proposed alternative,

21   do you?

22       A.    Delayed absorbable suture.

23       Q.    Is that what it would be?

24       A.    Yes.

Bruce Rosenzweig, M.D.

1      Q.    Okay.  Now, this procedure could still

2    cause scarring, though, couldn't it?

3      A.    In the postoperative period, correct.

4      Q.    And it could also result in adhesions,

5    couldn't it?

6      A.    There is no -- adhesions are between two

7    peritoneal surfaces.  A native tissue repair would

8    be done extraperitoneally.

9      Q.    Now, what in Ms. Bayless' medical record

10   supports your opinion that she was a good candidate

11   for a native tissue repair in August of 2013?

12     A.    That she was a good candidate for a

13   pelvic organ prolapse repair.

14     Q.    Is that it?

15     A.    That she was a candidate for a pelvic

16   organ prolapse repair surgery.

17     Q.    Okay.  Now, she was actually given the

18   option, though, of having a native tissue repair,

19   wasn't she?

20     MR. HABERMAN:  Objection; asked and answered.

21   BY THE WITNESS:

22     A.    A native tissue repair with mesh

23   augmentation.

24   BY MR. PERSONS:

Bruce Rosenzweig, M.D.

```
1        Q.    And she decided she didn't want to have

2   that procedure, right?

3        A.    A native tissue repair with mesh

4   augmentation.

5        Q.    The risks and benefits of that procedure

6   were described to her.  Yes?

7        A.    With mesh augmentation, yes.

8        Q.    And she declined that procedure to have

9   the augmentation with surgical mesh, didn't she?

10       A.    No.  She declined the cystocele repair

11  with cervical mesh to have an apical support with

12  Coloplast Y-mesh.

13       Q.    All right.  And I believe the doctor

14  also discussed with her an autologous POP repair,

15  correct?

16       A.    Correct.

17       Q.    And that requires harvesting a large

18  piece of fascia to create the autologous graft,

19  doesn't it?

20       A.    Large, not necessarily.

21       Q.    Okay.  But it does require a piece of

22  fascia to create the graft?

23       A.    Correct.

24       Q.    And that's a more morbid surgery than a
```

1    native tissue repair, isn't it?

2         A.    The surgery, correct.

3         Q.    And it's more morbid than the repair

4    augmented with the Restorelle Y that Ms. Bayless

5    consented to undergo, isn't it?

6         A.    That's not correct.

7         Q.    If the surgeon needs to -- well, strike

8    that.

9               The autologous repair is a much older

10   procedure, isn't it?

11        A.    No, it's the same procedure.

12        Q.    Well, it predates the use of mesh,

13   doesn't it?

14        A.    That's correct.

15        Q.    And, in fact, it's fallen out of favor

16   with most surgeons, hasn't it?

17        A.    That's not correct.

18        Q.    All right.  Do you still perform

19   autologous repairs?

20        A.    Yes.

21        Q.    How often?

22        A.    Not very often.

23        Q.    But even there you still have to use

24   sutures to support the autologous graft, don't you?

Bruce Rosenzweig, M.D.

1      A.    Correct.

2      Q.    And autologous grafts for POP repair

3  have a higher failure rate than mesh augmented

4  repairs, don't they?

5      A.    No.

6      Q.    All right.  And what do you base that

7  on?

8      A.    The medical literature.

9      Q.    Okay.  What medical literature?  That's

10  a broad statement.  What?  What in the medical

11  literature?

12      A.    There is the -- there have been

13  meta-analysis of the Maher and Feiner meta-analysis

14  on POP repair that shows a fairly equivalent

15  success rate.

16      Q.    Is that cited anywhere in your reliance

17  materials?

18      A.    In my general causation report and the

19  general causation reports of Dr. Garely and

20  Dr. Hoyte.

21      Q.    And the third alternative that you list

22  in your report --

23      MR. PERSONS:  How much time have we used so

24  far?  I don't want to use all of Dan's time.

Bruce Rosenzweig, M.D.

```
 1        MR. HABERMAN:  I have you have about an hour

 2   left.

 3        THE REPORTER:  Exactly an hour.

 4        MR. PERSONS:  Dan, is that good with you?

 5        MR. CONNOLLY:  That works for me.

 6        MR. PERSONS:  Thank you, ma'am.

 7   BY MR. PERSONS:

 8        Q.   The third alternative you list is an

 9   allograft such as Repliform?

10        A.   Correct.

11        Q.   And an allograft is biologic graft made

12   from donated human tissue, isn't it?

13        A.   Correct.

14        Q.   Now, can you point me to any medical

15   literature that supports your claim that Repliform

16   or other allografts are safer than Restorelle Y?

17        A.   Yes, they don't have the risks that are

18   associated with mesh.  While there might be a, as

19   we discussed earlier, a decrease in the short-term

20   efficacy, there are -- there is an obviation of the

21   long-term risk associated with having a

22   polypropylene mesh product.

23        Q.   Now, allograft material also has a

24   higher failure rate than synthetic graft material,
```

Bruce Rosenzweig, M.D.

```
1    doesn't it?

2         A.    We just discussed that.

3         Q.    My apologies.  Now, the allograft can

4    also become exposed, though, can't it?

5         A.    It can.

6         Q.    Now, in Item No. 4 in your report on

7    page 13, you discuss pelvic organ prolapse repair

8    with Ultrapro?

9         A.    Yes.

10        Q.    Now, Ultrapro is not indicated as a

11   treatment option for pelvic organ prolapse, is it?

12        A.    As an abdominal colposacropexy, yes.  As

13   a transvaginal mesh, there is nothing that's

14   approved for transvaginal mesh since August of

15   19 -- excuse me -- 2019.

16        Q.    Now, Ultrapro was not indicated for the

17   treatment of pelvic organ prolapse at the time of

18   Ms. Bayless' surgery in August of 2013, was it?

19        A.    That's not correct.

20        Q.    All right.  So, your testimony is

21   Ultrapro was FDA cleared for use in pelvic organ

22   prolapse repair surgery in August of 2013, is that

23   your testimony?

24        A.    Yes.
```

1    Q.    Okay.  Now, Restorelle Y versus

2    Ultrapro, both are made of polypropylene, correct?

3    A.    Correct.

4    Q.    What is the pore size of Restorelle Y?

5    A.    2.5 millimeters.

6    Q.    And what's the pore size of Ultrapro?

7    A.    After the Monocryl absorbs,

8    5 millimeters.

9    Q.    What medical literature supports your

10   understanding of the pore sizes that you've just

11   referred to?

12   A.    The Shepherd, Moalli data.  Also the

13   Shepherd data shows that compared with Restorelle,

14   that the Ultrapro is less stiffer and the stiffness

15   of the mesh is what leads to complications such as

16   erosion, pain, dyspareunia, increased foreign body

17   reaction, increased inflammatory reaction.  That's

18   based on the Nolfi paper.

19   Q.    So, Shepherd data and then what paper?

20   A.    The Moalli data.  There is Feola,

21   Abramowitch, Liang, Brown and Nolfi.

22   Q.    All right.  Now, you do know -- you're

23   aware that the Brown and Liang studies measured the

24   Ultrapro pore size after the absorbable component

Bruce Rosenzweig, M.D.

1    had been absorbed, right?

2         A.    Correct.

3         Q.    Now, I think you just talked about the

4    flexibility of Restorelle Y compared to Ultrapro?

5         A.    That's the Shepherd study that looked at

6    their stiffness, yes.

7         Q.    Are you aware of the Feola study

8    published in 2011 that found that Ultrapro

9    underwent in vivo contraction of 91% compared to

10   Restorelle's 43%?  You're aware of that?

11        A.    Correct.

12        Q.    And you're basing your claims regarding

13   the potential causes of Ms. Bayless' current

14   symptoms partially on the hypothetical contraction

15   of her Restorelle Y and her Advantage Fit, correct?

16        MR. HABERMAN:  Objection.

17   BY THE WITNESS:

18        A.    That and the chronic foreign body

19   reaction, chronic inflammatory reaction.

20   BY MR. PERSONS:

21        Q.    And, so, under your hypothesis, even if

22   the Ultrapro had been available in August of 2013,

23   it would have -- and we contend that it was not.

24        A.    You've never heard of Artisyn Y-mesh?

Bruce Rosenzweig, M.D.

```
1        Q.    It would have been more likely to cause

2   the same symptoms that you're attributing to the

3   Restorelle Y?

4        A.    Based on the data from Brook, Shepherd

5   and Nolfi, no.

6        Q.    But based on the Feola paper, it would

7   have, correct?

8        A.    Well, contraction is only one of the

9   dynamic features of the mesh.  The other is the

10  inflammatory reaction and chronic foreign body

11  reaction which leads to the induction of

12  proinflammatory macrophages.

13       Q.    So, the answer to my question is yes,

14  assuming that those other traits or characteristics

15  are common to all mesh?

16       A.    No, based on the Shepherd that the --

17  there is a greater stiffness, and stiffness leads

18  to a greater inflammatory reaction, which will then

19  lead to tissue destruction, based on the Nolfi

20  paper.

21       Q.    All right.  Are you also aware that

22  Feola, that Feola 2011 study, concluded that the

23  porosity of Restorelle mesh was found to be

24  significantly greater than Ultrapro?  A porosity of
```

Bruce Rosenzweig, M.D.

```
 1    78% compared to 67%, are you aware of that?

 2         A.    Yes.

 3         Q.    Okay.  Now, in your report on pages 13

 4    and 14 you say, "Finally, I have reviewed

 5    Ms. Bayless' past medical bills as set forth in my

 6    reliance list.  It is my opinion that they were

 7    reasonable and necessary."

 8              As you sit here today can you identify

 9    any of Ms. Bayless' medical bills contained within

10    the five sets of records provided on your reliance

11    list?

12         A.    Not that I specifically recall.

13         Q.    Okay.  And you don't know whether they

14    have been paid or not, do you?

15         A.    No, I don't.

16         Q.    So, on what basis are you opining that

17    the charges are reasonable?

18         A.    Based on my clinical experience.

19         Q.    Okay.

20         A.    And having done medical billing for my

21    own practice for the last going on 20 years, they

22    looked like they are -- were standard charges for

23    standard procedures.

24         Q.    All right.  I've got two more questions
```

Bruce Rosenzweig, M.D.

```
1    for you.

2              You're not a life care planner, are you?

3         A.   No.

4         Q.   All right.  And you're not an insurance

5    billing specialist?

6         MR. HABERMAN:  Objection.

7    BY THE WITNESS:

8         A.   Again, I have been doing insurance

9    billing for 18 years.

10   BY MR. PERSONS:

11        Q.   That's not my question.

12             Have you ever worked for an insurance

13   company reviewing medical bills and approving

14   bills?

15        MR. HABERMAN:  Objection; argumentative.

16   BY THE WITNESS:

17        A.   I have not worked for an insurance

18   company, but I've submitted bills to insurance

19   companies for over 18 years in a private practice

20   setting.

21        MR. PERSONS:  That's all I have for now.  I

22   tender the witness.  Thank you.

23        THE WITNESS:  Thank you, sir.

24        MR. PERSONS:  You're welcome.
```

Bruce Rosenzweig, M.D.

1        MR. CONNOLLY:  You guys want to take a

2   five-minute break or do you want to proceed?

3        THE WITNESS:  We can go.

4        MR. PERSONS:  We can do whatever you want to.

5        MR. CONNOLLY:  How much time we got, about 45

6   minutes left or is it two hours?

7        MR. HABERMAN:  I got you at 52 minutes and 5

8   seconds, 4 seconds, 3 seconds.

9        MR. CONNOLLY:  Hey, hey, hey.

10       MR. PERSONS:  You better go ahead and take

11  that break, Dan.

12       THE WITNESS:  If we take a break, it's going

13  to be an hour break so I can go walk the dogs.

14  That's why we don't want to take a break.

15       MR. CONNOLLY:  Bring back the dogs of war.

16  Okay.

17                      EXAMINATION

18  BY MR. CONNOLLY:

19       Q.   Quick question, Doctor.  As Mr. Persons

20  indicated earlier today, at the time you prepared

21  your report you had not seen the deposition of

22  Dr. Jones.  True?

23       A.   Correct.

24       Q.   And you had also not seen the deposition

Bruce Rosenzweig, M.D.

```
1    of the Plaintiff, right?

2         A.    Correct.

3         Q.    So, I'd like to ask you just a few

4    questions about Dr. Jones' testimony, which I

5    understand you've read, correct?

6         A.    Correct.

7         Q.    So, do you agree with Dr. Jones that if

8    a patient provides an incomplete history, it can

9    affect the warnings that she provides or the

10   decision regarding surgery?

11        MR. HABERMAN:  Objection.

12   BY THE WITNESS:

13        A.    I wouldn't disagree with her statement.

14   BY MR. CONNOLLY:

15        Q.    Okay.  And you would agree with me that

16   at least insofar as what the Plaintiff told

17   Dr. Jones, she did not admit to any cocaine use at

18   the time that she sought treatment by Dr. Jones.

19   True?

20        A.    Correct.

21        Q.    Okay.  She did acknowledge that she was

22   smoking, right?

23        A.    Correct.

24        Q.    And as you stated, she said that she had
```

1    ceased smoking for a period of time during the

2    healing process, right?

3        A.    Correct.

4        Q.    And I believe that you testified earlier

5    today that you understood that that will have been

6    two months, right?

7        A.    I think she said two to three months,

8    but something of that nature.

9        Q.    Okay.  And you'll agree that from the

10   discussion that we've had with Mr. Persons today

11   that there is ample record in the testimony that

12   Dr. Jones viewed the healing period in which she

13   put restrictions on the patient as 12 weeks, right?

14       A.    For lifting and those kind of things,

15   correct.

16       Q.    Well, and you in fact stated to

17   Mr. Persons that you understood how reading the

18   testimony, it would be reasonable to assume that

19   that 12-week period could apply as well to the

20   sexual restriction.  One didn't ask that

21   specifically of the doctor.  True?

22       A.    I would not agree that that -- that

23   would be a reasonable assumption, because most of

24   us -- I think every both deposition I've read and

Bruce Rosenzweig, M.D.

```
 1   doctor that I have talked to would say six weeks of
 2   restricted intercourse is ample after a repair
 3   procedure.
 4        Q.    Okay.  I'm not -- so, what I'm asking
 5   you, Doctor, is a little different.
 6              You and I, neither one of us was present
 7   when Dr. Jones gave the caution to the -- to
 8   Ms. Bayless, right?
 9        A.    Correct.
10        Q.    And in her testimony she says
11   restrictions are 12 weeks, right?
12        A.    Correct.
13        Q.    That's three months, right?
14        A.    Correct.
15        Q.    So, you're quarreling with whether or
16   not it's reasonable to have a 12-week restriction.
17   You're not disputing the fact that she may have
18   said 12 weeks to Ms. Bayless.  Right?
19        A.    Oh, I'm --
20        MR. HABERMAN:  Objection.
21   BY THE WITNESS:
22        A.    I have a three-month restriction on
23   heavy lifting on my patients when I do prolapse
24   surgery.
```

Bruce Rosenzweig, M.D.

```
 1    BY MR. CONNOLLY:

 2         Q.    Okay.  Okay.  So, you would agree at

 3    least with the three-month restriction on lifting

 4    for the prolapse surgery that Ms. Bayless had?

 5         A.    Correct.

 6         Q.    Okay.  And the only question that you

 7    quarrel with is whether or not the sexual

 8    limitation should be as long as three months?

 9         A.    Or was communicated to Ms. Bayless as

10    being 12 weeks.

11         Q.    Okay.  For the procedure that

12    Ms. Bayless had, hysterectomy, a stress urinary

13    incontinence sling and a prolapse repair, how long

14    would you restrict sexual intercourse for the

15    patient?  How long would you tell them to refrain

16    from sexual intercourse?

17         A.    Six weeks.

18         Q.    Six weeks?

19         A.    Yes.

20         Q.    Okay.  So, now the report that we have

21    talked about at length, which is Exhibit 10, that

22    is the report where Dr. Jones discovered that there

23    was the incisional separation, right?

24         A.    Correct.
```

Bruce Rosenzweig, M.D.

1      Q.    And she also talked about the orgasmic

2   symptoms that Ms. Bayless is discussing, right?

3      A.    Correct.

4      Q.    And the date of that report is

5   September 24, 2013?

6      A.    Correct.

7      Q.    So, that is six weeks and three days

8   post-op?

9      A.    Correct.

10      Q.    So, if one were to conclude that

11   Ms. Bayless was having sex such that she recognized

12   that she was having an orgasmic dysfunction, in

13   order not to violate your restriction, she would

14   have three days in which to find that out, right?

15      A.    You know, it would have been really good

16   to have asked that specific question of Ms. Bayless

17   so we're not all speculating on whether or not she

18   had intercourse in the first six weeks after

19   surgery, because she said at her deposition, if I

20   recall, that she complied with the instructions

21   that she was given about having intercourse.

22      Q.    Let me ask you this, Doctor.  Is it

23   possible that the incisional separation that is

24   discussed in Exhibit 10 was the result of sexual

Bruce Rosenzweig, M.D.

```
 1    penetration?

 2         MR. HABERMAN:  Objection.

 3    BY THE WITNESS:

 4         A.    If she had sexual intercourse, then

 5    there is -- I mean, it would have to be within like

 6    the first two weeks after surgery.

 7    BY MR. CONNOLLY:

 8         Q.    Okay.  I just asked you if it's

 9    possible.  So, your answer is yes to that?

10         A.    It could be possible.

11         Q.    Okay.  All right.  So, now let me turn

12    to a couple different propositions.

13              Now, as I understand it, from the

14    records that we have, Plaintiff, Ms. Bayless, has

15    been a regular cocaine user for a considerable

16    period of time, since 1999, right?

17         A.    She started using cocaine, as we know,

18    in 1999.

19         Q.    Right.

20         A.    There was a time when she stated in her

21    deposition that she went into, I think in the early

22    2000s, into a rehab program.

23         Q.    Right.

24         A.    We don't know whether or not she was
```

Bruce Rosenzweig, M.D.

1   using it at the time of surgery.  There is no

2   indication that she was.  She had medical

3   clearance, but medical clearance would not have

4   been obtained if she was using it.  Then we --

5        Q.   Let me stop just you right there.

6             Medical clearance.  Is there any

7   indication that Dr. Jones gave her a drug test?

8        A.   Not that I specifically recall from the

9   medical records.

10       Q.   Okay.  So, when you say "medical

11  clearance," the only medical clearance that

12  Dr. Jones provided was to ask her, "Are you using

13  drugs," and Ms. Bayless denied it, right?

14       A.   No, that's not correct.

15       Q.   What other -- so, I mean, as to the

16  issue of drugs, was there any other clearance that

17  was obtained other than asking her whether she was

18  using drugs?

19       A.   There was a notation in her medical

20  record about sending medical clearance over to the

21  surgery center where she was doing the surgery.

22       Q.   Okay.  So, is there any indication that

23  the surgical center did any drug testing?

24       A.   Not that I specifically recall from the

Bruce Rosenzweig, M.D.

```
 1   medical records.

 2        Q.   So, the only clearance relative to the

 3   issue of her compliance with not taking drugs at

 4   the time of surgery was her statement that she

 5   wasn't.  True?

 6        A.   Again, I don't -- I didn't see anything

 7   in the medical records that was indicative of a

 8   drug test.

 9        Q.   So, the answer to my question is "True,"

10   right?

11        A.   Correct.

12        Q.   Okay.  So, now, do you agree that it

13   would be reasonable for Dr. Jones to want to know

14   about prior cocaine use?

15        A.   It would not be unreasonable.

16        Q.   Do you ask your patients whether they

17   have used drugs before you do surgery?

18        A.   I ask them about drug use, yes.

19        Q.   Okay.  And it's reasonable also for

20   patients -- I mean, for the doctor to rely on what

21   the patient tells them, right?

22        A.   Correct.

23        Q.   Okay.  There are studies out there that

24   say that cocaine use, either before surgery or
```

Bruce Rosenzweig, M.D.

1    during the recuperative period, is detrimental to

2    the recuperation or detrimental to surgery.  True?

3          MR. HABERMAN:  Objection and asked and

4    answered.  We went over this today.

5          MR. CONNOLLY:  Okay.  I'm -- okay.

6    BY MR. CONNOLLY:

7          Q.    Do you understand the question, Doctor?

8          A.    Yes.

9          Q.    Okay.  Can you answer it?

10         A.    Yes.

11         Q.    Okay.

12         A.    Can you repeat the question?

13         Q.    Okay.  Rather than have the Court

14   Reporter read it, I'll try it again.

15              There are studies that say that it is

16   detrimental to the surgery and the healing process

17   to be taking cocaine either before the surgery or

18   during recuperation period, right?

19         A.    There are studies that show that cocaine

20   use can have a detrimental effect on patients even

21   if they're having surgery.

22         Q.    Okay.  And that's both before the

23   surgery and during the recuperation period, right?

24         A.    Well, no.  Before the surgery, I mean,

Bruce Rosenzweig, M.D.

1    somebody could have done cocaine six years before

2    the surgery.  That would not have as much of an

3    effect as if someone did cocaine the day before the

4    surgery.

5         Q.    Fair enough.  Let's keep it within the

6    approximate time frame 12 weeks before, 12 weeks

7    after.  That's detrimental to the surgery, right?

8         A.    The 12 weeks before, not so much.  But I

9    would agree with you in the 12 weeks after surgery,

10   it would have an impact.  Just like cocaine use can

11   have a detrimental impact even without surgery.

12        Q.    Detrimental impact on the recuperation

13   from the surgery due to the cocaine use, right?

14        A.    Correct.

15        Q.    Okay.  That is, it prevents some of the

16   healing that's necessary, right?

17        A.    No.  You can have cardiovascular events,

18   heart attacks, strokes, those kind of things.

19        Q.    Right.  Okay.  I understand that

20   detrimental effect.  But there's also a detrimental

21   effect to the healing process itself from cocaine

22   use, right?

23        A.    It does cause vasospasm.  I don't think

24   there is any prospective randomized controlled

Bruce Rosenzweig, M.D.

1    trial that looked at people using cocaine and

2    people not using cocaine and showing a diminution

3    in healing.  There's probably anecdotal evidence

4    that of patients not healing well from their

5    surgery incisions who use cocaine postoperatively.

6         Q.    There is evidence that cocaine use

7    causes vasoconstriction, right?

8         A.    Yes, I just said that.

9         Q.    Okay.  I didn't understand it because I

10   don't speak medical as well as you do.

11        A.    Okay.

12        Q.    All right.  But vasoconstriction, if

13   there is vasoconstriction, that would be damaging

14   to the healing process.  True?

15        A.    I mean --

16        Q.    Yes or no.

17        A.    It's a difficult question to answer yes

18   or no.

19        Q.    Cigarette smoking causes

20   vasoconstriction, right?

21        A.    The smoking itself or the nicotine?

22        Q.    The nicotine.

23        A.    The nicotine can.

24        Q.    Yeah.  And you recognize and even put in

Bruce Rosenzweig, M.D.

1    your report that smoking during the recuperation

2    period is damaging to the healing process.  True?

3    Generally.

4          A.    That it can delay the healing process.

5          Q.    Right.  And, so, similarly, cocaine

6    could delay the healing process.  True?

7          A.    Again, are you talking like every day?

8    I mean, most smokers smoke every day.  Again, you

9    would be talking about daily cocaine use?

10         Q.    I'm talking about any cocaine use after

11   you've had a serious surgery like this would --

12   could delay the healing process?

13         A.    Any cocaine use, no.

14         Q.    Okay.

15         A.    More frequent cocaine use, probably.

16         Q.    Okay.  And the frequent kind of cocaine

17   use that Ms. Bayless admitted to a year

18   post-surgery in 2014.  True?

19         A.    If she's using it daily, yes.

20         Q.    And, in fact, we know that a year

21   post-surgery she was using it daily, right?

22         A.    Was documented in the medical records.

23         Q.    Okay.  So, within a year of the

24   surgery -- within six months of the surgery she

Bruce Rosenzweig, M.D.

```
 1   admits to cocaine use and within a year she admits

 2   to daily use of crack cocaine.  True?

 3        A.    Correct.

 4        Q.    And within six weeks of the surgery, she

 5   is found to have an incision that has -- that has

 6   delayed healing, right?

 7        A.    It has separated.

 8        Q.    It's a separation, an incision that has

 9   separated within six weeks, right?

10        A.    One of her incisions.

11        Q.    Right.

12        A.    Your hypothesis saying that --

13        Q.    No, no.

14        A.    -- these factors are having a delayed

15   healing, that should be on all of her incisions.

16   Not just one.

17              So, I mean, that's why, you know, you

18   keep going back to this and saying, well, look, she

19   has delayed healing in one of her incisions so it's

20   got to be due to these factors.  No, because then

21   it would have been in all her incisions, and we

22   know that Dr. Jones said all of her other incisions

23   were well healed.

24        Q.    We'll get back to that in a second.  I
```

Bruce Rosenzweig, M.D.

1    would just point out that there wasn't a question

2    that I asked you about that.  And so I move to

3    strike your response.

4              You can answer the questions that I ask

5    you.  You know the process well.  You have been in

6    hundreds of the deposition.  Let me ask you the

7    next question.

8              Here's the question I want to ask you

9    and, that is, do you know of any study, any study

10   at all, that says that cocaine use will delay the

11   healing of only -- of every single incision in the

12   body as opposed to might be localized?

13        A.   No.

14        Q.   Okay.  It's possible that delayed

15   healing could be localized.  True?

16        A.   No.

17        Q.   So, whenever a person injures

18   themselves, all the healing occurs simultaneously

19   across all cuts?

20        A.   Well, no.  If you're talking about due

21   to vasoconstriction due to a foreign substance,

22   that should be global, not local.

23        Q.   Okay.  It should be.

24              Let me ask you this.  Vasoconstriction.

Bruce Rosenzweig, M.D.

1    Just so we are talking on the same term.  What does

2    that mean?  That means the blood vessels are

3    constricted?

4         A.   Yes.

5         Q.   Okay.  So, it means decreased blood

6    flow, right?

7         A.   Yes.

8         Q.   Okay.  And blood flow is necessary to

9    heal the body when it's been injured, right?

10        A.   Correct.

11        Q.   Okay.  And, so, there may be some parts

12   of the body that need more blood than others in the

13   healing process, right?

14        A.    No.  All healing needs, you know, or

15   your analogy of decreasing blood flow impacting

16   incisions would be the same for the -- for all the

17   incisions.

18        Q.   I'm sorry.  I lost you there.  It says

19   my Internet connection isn't stable.  I'm glad it

20   doesn't say that I'm unstable.

21             So, I didn't hear the answer.  Let me

22   ask that again.

23             Does vasoconstriction affect all wounds

24   in the body equally?

Bruce Rosenzweig, M.D.

```
1         A.    It should.

2         Q.    Okay.  But it's possible that some parts

3    of the body that are in the healing process need

4    more blood, right?

5         A.    No.  They're all epithelial.

6         Q.    Well, let me put it to you this way.

7    Some plants need more water than others?

8         A.    Right, but that's because they're a

9    different species.

10        Q.    Okay.  So, you're saying, just so we're

11   clear, that every single wound that Ms. Bayless had

12   should have been affected exactly the same way by

13   the vasoconstriction that may have resulted from

14   her smoking and drug use?

15        A.    More likely than not, yes.

16        Q.    Okay.

17        A.    If you're saying that it's a global

18   effect, it should have a global effect.

19        Q.    Right.  But --

20        A.    If you're saying that it's just -- I

21   mean, she wasn't just putting cocaine inside her

22   vagina.  Then it would have just a local effect.

23   She is smoking it.

24        Q.    But there is --
```

Bruce Rosenzweig, M.D.

```
 1         A.    That's how you ingest crack cocaine.

 2         Q.    I understand.  But there is also the --

 3    there are some parts of the body that need more

 4    blood than others.  True?

 5         A.    Your brain, yes.  Your heart, yes.

 6         Q.    And your vagina.  True?  Right?

 7         A.    During pregnancy.

 8         Q.    And also at other times, right?  No?

 9         A.    I mean, if you're saying that there is a

10    diminution in blood flow, it would affect all

11    incisions to the same degree.

12         Q.    So, but you're not aware of any study

13    that says if you're having -- if you're smoking and

14    the vasoconstriction occurs, that that would affect

15    all injuries of the same type.  True?

16         A.    Nor is there a study that disputes that.

17         Q.    Okay.  So, what you're telling me about

18    that it should have a global effect is based upon a

19    guess as a doctor, but it's an educated guess?

20         A.    A guess?  It's from taking care of

21    patients for 30 years.

22         Q.    Okay.  And are you aware of any study

23    about the effect of cigarette smoking on delayed

24    healing?
```

Bruce Rosenzweig, M.D.

1        A.    We've talked about this.  Yes.

2        Q.    Okay.  But none of those studies says

3   one way or the other whether the vasoconstriction

4   would be localized or would be general?

5        A.    Well, you ingest the tobacco in your

6   lungs, so that you would have a primary pulmonary

7   effect.  So, anything that happens from cigarette

8   smoking would be a generalized effect.

9        Q.    Okay.  So, let me ask you a different

10  question, Doctor.

11              In connection with your work on this

12  case, did you do any research on the effects on

13  wounds of cocaine use?

14       A.    Not specifically, no.

15       Q.    Okay.  Have you ever treated a patient

16  who admitted to using cocaine during the healing

17  process after you had performed a pelvic floor

18  surgery on her?

19       A.    Unfortunately, yes.

20       Q.    Okay.  And has any of those patients had

21  adverse reactions to the treatment while they also

22  had -- were using cocaine?

23       A.    No.

24       Q.    Okay.  How many patients have you had

Bruce Rosenzweig, M.D.

1    that have had -- that have been using cocaine

2    during the treatment process?

3        A.    I don't know an exact number.  Over 30

4    years I would probably say, you know, particularly

5    in the obstetrical population back when I was doing

6    OB, we had a number of patients that would come in

7    in labor, need a C-section, they were cocaine

8    positive and, you know, they did quite well.

9        Q.    Okay.  And as to each one of them, any

10   patient that you have who uses cocaine during the

11   healing process for any pelvic floor surgery, you

12   would recommend that they discontinue it

13   immediately because it will affect their healing,

14   right?

15       A.    I -- if I knew about it beforehand, I

16   would not have done surgery.

17       Q.    Okay.

18       A.    If I find out in the postoperative

19   period, I tell them to stop.

20       Q.    Okay.  And we have seen in these

21   records, right, that Ms. Bayless comes in six weeks

22   post-surgery and she has an incision that's

23   reopening, right, and three months later she is

24   admitting to cocaine use.

Bruce Rosenzweig, M.D.

1                You would agree that that cocaine use

2    observed to have that kind of an incisional wound

3    is detrimental to the healing.  True?

4        A.    Boy, we have gone back from a year to

5    six months to three months.

6        Q.    Well, let's look at the exact records,

7    then.

8                If you look at Exhibit 10, Exhibit 10 is

9    the examination where the separation was

10   visualized, right?

11       A.    Right.

12       Q.    That is six weeks and three days because

13   they note it post-surgery, right?

14       A.    Right.

15       Q.    Okay.  And then the next examination --

16       A.    Is March 2014.

17       Q.    March 2014, right?

18       A.    Right.

19       Q.    And the surgery was in August, right?

20       A.    Right.

21       Q.    So, March is six months post-surgery,

22   right?

23       A.    August, September, October, November,

24   December, January, February, March.  Seven months.

Bruce Rosenzweig, M.D.

1       Q.    Okay.  Seven months.  I'm sorry.

2       A.    You keep moving me back like three

3  months.  Then you're going to have it like, okay,

4  and we know from the record she did cocaine two

5  days after surgery.

6       Q.    Hold, hold, hold.  We'll redo it.  Okay.

7  Now we have that.

8             It's seven months --

9       A.    Okay.

10      Q.    -- post-surgery.  Okay.  Six months

11  post-examination of the incision or less than six

12  months --

13      A.    Right.

14      Q.    -- that she is admitting to regular

15  cocaine use.  True?

16      A.    That's what the records state.

17      Q.    And that you would agree is detrimental

18  to the healing process.  True?

19      A.    By that time she should have already

20  healed.

21      Q.    Not if she is doing cocaine, though,

22  right?

23      A.    But we don't know that she did it before

24  March.

Bruce Rosenzweig, M.D.

```
1        Q.    Okay.  So, you're thinking that she just
2   does the regular use the day that she goes to see
3   the doctor?
4        A.    Well, again, we are speculating.  And
5   this would have been a great question to have asked
6   her at the time of her deposition.
7        Q.    Okay.  Well, let me ask you this,
8   Doctor.  Would you agree that her testimony in her
9   deposition and the statements she provides to the
10  doctor are different?
11       MR. HABERMAN:  Objection; calls for
12  speculation.
13  BY THE WITNESS:
14       A.    No.
15       MR. CONNOLLY:  No, it doesn't.
16  BY THE WITNESS:
17       A.    I didn't see -- I thought she was fairly
18  forthright in her deposition.
19  BY MR. CONNOLLY:
20       Q.    It froze again, but I think you said you
21  thought she was forthright?
22       A.    Yes.
23       Q.    Okay.  You recognize that there was one
24  medical record that Mr. Persons showed you where
```

Bruce Rosenzweig, M.D.

```
1    she acknowledged having over 100 sexual partners,

2    right?

3         A.    Correct.

4         Q.    And in her deposition she denied having

5    that many.  True?

6         A.    Not that I specifically recall.

7         Q.    Okay.  And, so, if -- you would agree

8    with us that if that were the count, that she had a

9    different count about the number of sexual partners

10   between the medical records and the deposition,

11   right?

12        A.    I don't think she gave an exact number

13   of how many sexual partners that she had.  I don't

14   think she said she, you know, only had five.

15        Q.    You read the deposition, right?

16        A.    Yes.

17        Q.    She didn't acknowledge 100, did she?

18        A.    I don't specifically recall that she

19   affirmed that number, but I don't think that she

20   tried to downplay the number of sexual partners

21   that she had.

22        Q.    You don't think?

23        A.    I don't specifically recall that.

24        Q.    But you do remember seeing that she
```

Bruce Rosenzweig, M.D.

1    acknowledged to 100 sexual partners to the

2    medical -- to her medical provider?

3         A.    That is what's documented in that

4    medical record.

5         Q.    And you don't have any criticism of the

6    Athena system that it adds an extra zero to the

7    number of sexual partners?

8         A.    No.  Actually, I've seen with Athena

9    that I've looked at patients' weights and they'll

10   come back with prior weights of like 57 pounds when

11   it should have been 157 pounds.  So, either I typed

12   wrong or it dropped a 1.

13        Q.    Okay.  But there is no indication here

14   that such lapse and lackadaisical typing occurred,

15   is there?

16        A.    Well, that we don't know.

17        Q.    Okay.  All right.  Doctor, let's go back

18   to what Dr. Jones said.

19              Would you agree with Dr. Jones that if a

20   patient engages in sexual activity before they're

21   fully healed it can increase the risk of an

22   exposure along the suture line?

23        A.    It all depends on when the sexual

24   intercourse is.

Bruce Rosenzweig, M.D.

```
1        Q.    The statement -- her statement doesn't

2    make it dependent.  Her statement -- I'll read it

3    to you again.

4        A.    You asked me if I agreed with it or not,

5    and I put the caveat it depends on when the sexual

6    intercourse is.

7        Q.    Well, let me just --

8        A.    I wouldn't give a blank statement like

9    that.

10             I would say if you ask me that question,

11   "Dr. Rosenzweig, does having sexual intercourse

12   before the six weeks, can that have impact on the

13   wound," I would say it all depends on when sexual

14   intercourse is.

15       Q.    But that's -- first of all, she didn't

16   say six weeks as you know.  She said 12 weeks.

17             But the other thing is the statement

18   that I read to you was different than that.  I'll

19   read it to you again, and I'd like to have you to

20   tell me whether you'd change your answer.

21             Do you agree with Dr. Jones that if a

22   patient engages in sexual activity before they're

23   fully healed, it can increase the risk of an

24   exposure along the suture line?
```

Bruce Rosenzweig, M.D.

```
 1        A.    And what do you mean by "fully healed"?

 2        Q.    Well, that would have been -- that's

 3   what Dr. Jones testified.  If your -- can you

 4   answer that or no?

 5        A.    My question would be what do you mean by

 6   "fully healed"?

 7        Q.    Okay.  So, what do you mean by "fully

 8   healed"?  What would you expect to be fully healed

 9   such that they can engage in sexual activity and

10   not risk an exposure along the suture line?

11        A.    Well, again, I have seen patients that

12   have had sexual intercourse two weeks after surgery

13   that had no problems and I've had seen women that

14   have sexual intercourse months after surgery and

15   had problems.  So, I wouldn't be able to answer

16   that question.

17        Q.    So, what's your response?  Do you just

18   need to examine every patient to find out if they

19   are fully healed?

20        A.    Correct.

21        Q.    Okay.  And in this case, six weeks and

22   three days after the surgery, we found that there

23   was an incision that wasn't healing.  So, that

24   would indicate that the patient was --
```

Bruce Rosenzweig, M.D.

1        A.    Or the -- no, no.  Now you're making --

2   you're assuming that the patient had sexual

3   intercourse --

4        Q.    No, no.

5        A.    -- and obstructed the --

6        Q.    I'm assuming that the patient wasn't

7   fully healed six weeks and three days after.  True?

8        A.    Or that she had healed and then the mesh

9   exposed.

10       Q.    The incision -- so, are you saying that

11  the mesh caused the incision to rupture?

12       A.    No, the mesh caused the incision -- the

13  exposure.

14       Q.    I understand.  You can't have exposure

15  without mesh, but you can't -- she had an incision

16  that didn't heal, right?

17       A.    No.  She had an incision that was found

18  to be separated on September 24, 2013.

19       Q.    Right.

20       A.    You guys have been saying all day that

21  it was because the incision didn't fully heal.  I'm

22  saying that there was no evidence that she had poor

23  healing, so that there's a reasonable -- with a

24  reasonable degree of medical certainty, that

Bruce Rosenzweig, M.D.

1    incision healed and then opened up because of the

2    mesh.

3        Q.    Okay.  We agree, though, that the

4    incision separated, right?

5        A.    That there was mesh exposed, correct.

6        Q.    Well, the incision separated is what you

7    just testified to.  Are you disagreeing with that

8    now?

9        A.    That there was mesh exposed, correct,

10   and the edges were separate, correct.

11       Q.    The edges of the incision?

12       A.    Correct.

13       Q.    Okay.  So, we agree that there was

14   exposed mesh and an incision that had separated,

15   right?

16       A.    Well, it wouldn't -- whenever there is

17   exposure, the edges of the incision are not

18   together.

19       Q.    Would you agree that the patient was not

20   fully healed at that period of time?

21       MR. HABERMAN:  Objection.

22   BY THE WITNESS:

23       A.    What is "fully healed"?  I don't

24   understand what you mean by "fully healed."

Bruce Rosenzweig, M.D.

```
 1   BY MR. CONNOLLY:

 2       Q.   She has an open incision.  Would you

 3   agree that that is not fully healed?

 4       A.   She's got a mesh exposure.

 5       Q.   She has an incision separation.  Would

 6   you agree that that's fully healed or not?

 7       A.   In 2015 she had --

 8       Q.   I'm asking you about in September 2014

 9   as reflected in Exhibit 10.  Is she fully healed at

10   that time or not?

11       MR. HABERMAN:  The Doctor is allowed to answer

12   the way he sees fit.

13       MR. CONNOLLY:  But I'd like him to answer the

14   question I'm asking.

15   BY THE WITNESS:

16       A.   And I can't answer that question yes or

17   no.

18   BY MR. CONNOLLY:

19       Q.   Okay.  All right.  Well, then let's move

20   on.

21            So, you will agree, though, that at

22   particular time, so, with exposure and an incision

23   that separated, Dr. Jones recommends conservative

24   treatment, right?
```

Bruce Rosenzweig, M.D.

```
 1        A.    Can you point me to the record where she

 2   recommends conservative treatment?

 3        Q.    Well, she -- in that same exhibit, 10,

 4   rather than -- sorry.  I inadvertently dialed

 5   somebody's phone.

 6              In that Exhibit 10, as you pointed out

 7   to Mr. Persons a number of times, she didn't

 8   prescribe any -- she didn't recommend any surgical

 9   procedure at that particular time, right?

10        A.    Correct.

11        Q.    And, in fact, in her deposition she

12   testified that she recommended conservative

13   treatment for separation along the suture line as

14   reflected on page 118 of her deposition, right?

15        A.    Well, that's what she stated in her

16   deposition.

17        Q.    Right.  And, in fact, if you look at the

18   last page of Exhibit 10, she prescribes a vaginal

19   cream, right?

20        A.    No.

21        Q.    Well, look at it.  Exhibit 10.

22        A.    Of her deposition or of the --

23        Q.    The exhibit.  Exhibit 10, last page.

24   She says vaginal cream, Cleocin.
```

Bruce Rosenzweig, M.D.

```
1        A.    Oh.  Well, that's -- well, first of all,

2   what exhibit from my deposition are you on?

3        Q.    So, it's Exhibit 10 and I believe it was

4   tab 7.

5        A.    The tabs --

6        THE WITNESS:  Zach, do you know which exhibit

7   he is talking about?  The post-op --

8        MR. BURNETT:  It's Exhibit 10.  Yes.  It's

9   September 24, 2013 post-op follow-up.

10        THE WITNESS:  That's right because we had all

11   the -- let me go to Exhibit 10.

12   BY THE WITNESS:

13        A.    Okay.  So, you're saying that she

14   prescribed Cleocin cream on September 4, 2013,

15   right?

16   BY MR. CONNOLLY:

17        Q.    Well, it actually says September --

18   "October 1, 2013," right next to it, "prescribed"?

19        A.    The Cleocin down at the bottom of the

20   page was prescribed on October 8, 2013.

21        Q.    Okay.  Next to it on the right-hand side

22   it says, "October 1, 2013 prescribed."  I don't

23   know.

24        A.    Right.
```

Bruce Rosenzweig, M.D.

```
1        Q.    In October.  So, the beginning of the
2   next month she had prescribed this cream for the
3   patient, right?
4        A.    Right.
5        Q.    And that's --
6        A.    It wasn't at that visit.
7        Q.    Right.  But it's within days of the --
8   of this, right?
9        A.    And also she was given Diflucan.
10  Cleocin is to treat bacterial vaginosis and
11  Diflucan is to treat Candida.
12       Q.    Okay.  Well, you --
13       A.    That's not to treat the mesh erosion.
14       Q.    Okay.  In any event, she says she --
15       A.    That's not -- that's not conservative
16  treatment for mesh erosion.
17       Q.    She said in her deposition, page 118,
18  she's recommending conservative treatment, which
19  means no surgery, right?
20       A.    No.  She did not recommend surgery.
21  That we can agree upon.
22       Q.    So, if you had a patient six weeks and
23  three days after a surgery, would you -- and who
24  had just had an incision that had separated and has
```

Bruce Rosenzweig, M.D.

```
1    got exposed mesh, would you recommend that they

2    engage in sex?

3         A.    No.

4         Q.    Okay.  Would you recommend that they use

5    cocaine?

6         A.    No.

7         Q.    Would you recommend that they smoke?

8         A.    No.

9         Q.    And we know that she was smoking, right?

10        A.    She said in her deposition that she quit

11   for two to three months.

12        Q.    And we know within less than six months

13   of this date that she is using cocaine regularly,

14   right?

15        A.    Correct.

16        Q.    And we also know that within six months

17   of this time period she's engaging in sexual

18   activity, right?

19        A.    Six months?  Correct.

20        Q.    Yeah.  Okay.  So, she is not doing

21   everything she can to promote her healing.  True?

22        A.    Six months after, she should have been

23   healed completely.

24        Q.    True or not true?
```

Bruce Rosenzweig, M.D.

1      A.    Six months after her surgery she should

2   be healed completely.

3      Q.    I see.  But as you said, she doesn't go

4   from zero to 60 in cocaine use in one day or do you

5   believe that?

6      A.    She wasn't -- I don't -- she wasn't

7   asked that at her deposition.

8      Q.    And you don't have that information?

9      A.    Because she wasn't asked that at her

10  deposition.

11      Q.    You could ask your counsel to ask her,

12  couldn't you?  If that were important information,

13  you could ask your counsel to find out from her,

14  couldn't you?

15      MR. HABERMAN:  Objection; argumentative.

16  BY THE WITNESS:

17      A.    But it would be important as a fact of

18  this -- for this case for that to have been in her

19  deposition.

20  BY MR. CONNOLLY:

21      Q.    Well, let me just ask you this:  At that

22  visit in September of 2013, the doctor asked the

23  patient to come back for further evaluation because

24  she wants to see how she's doing, right?  Page 119

Bruce Rosenzweig, M.D.

```
 1   of Dr. Jones deposition.
 2        A.    I don't see a follow-up visit scheduled
 3   in the medical record.  So, I mean...
 4        Q.    Doctor, are you saying that after she
 5   has an incision that separated that you wouldn't
 6   ask the patient to come back for another visit?
 7        A.    I would, correct.
 8        Q.    Okay.  And, in fact, you know from the
 9   deposition testimony by Dr. Jones that she did ask
10   the patient to come back and the patient didn't
11   comply.  True?
12        A.    Correct.
13        Q.    Okay.  So, the patient isn't doing
14   everything to advance her treatment during this
15   period of time.  True?  True?
16        A.    She was not complying with her
17   follow-up.
18        Q.    Okay.  And she's not --
19        A.    But I did not -- I don't see in the
20   record where she was given a follow-up appointment.
21        Q.    But you have read Dr. Jones' deposition,
22   and Dr. Jones even put forward a letter to the
23   patient saying, "You didn't come," right?
24        A.    Correct.
```

Bruce Rosenzweig, M.D.

1    Q.   So, it was clear that Dr. Jones expected

2  the patient to come back and the patient wasn't

3  doing everything to advance her healing.  True?

4    A.   She did not come back for follow-up.

5    Q.   Okay.  And, in fact, the letter that's

6  Exhibit 4 to Dr. Jones' deposition, she says she

7  would have recommended continued pelvic rest?

8    A.   If we could put that up.

9    Q.   I don't have it.  It's Exhibit 4 to

10  Dr. Jones' deposition.

11    A.   Okay.  I'm going to assume that you're

12  reading everything that is on that.

13    Q.   I'm reading from page 120 of her

14  deposition.

15         She said she would have recommended

16  continued pelvic rest at that point in time or when

17  she returned.  And you would agree with that

18  recommendation, right?

19    A.   I wouldn't disagree with it, correct.

20    Q.   She would have recommended delay in

21  sexual activity.  And you would have agreed with

22  that, right?

23    A.   Correct.

24    Q.   Okay.  And that would be -- she would --

Bruce Rosenzweig, M.D.

1   and continued sexual activity would have meant it

2   would be harder for the exposure to heal, right?

3        A.    I don't think the exposure was going to

4   heal whether or not she had intercourse.

5        Q.    It would have made it harder had she had

6   continued sexual activity.  True?

7        A.    There is no data on that.

8        Q.    Okay.  So, you're disagreeing with

9   Dr. Jones on that?

10       A.    There is no data on that.

11       Q.    Okay.  Well, I'm just saying.  So,

12  Dr. Jones testified to that.  Do you disagree?

13       A.    There is no data on that.

14       Q.    Okay.  So, I take that's a no.  If she

15  says --

16       A.    I didn't say yes or no.  I said there is

17  no data on it.  So, it's hard to give an answer if

18  there's no data.

19       Q.    All right.  So, you'll agree that there

20  is no data.  But as a doctor who has been in the

21  field for 30 years, do you think that continued

22  sexual activity when you have that incision that's

23  separated is not going to help the incision heal?

24  True?

Bruce Rosenzweig, M.D.

1      A.    No, when you have a mesh exposure.

2      Q.    And an incision that's separated?

3      A.    That's the mesh exposure.

4      Q.    Okay.  Now, you stated, as I understood

5  your testimony to Mr. Persons, that the Advantage

6  Fit was a minimum contributor to the dyspareunia;

7  and that's the only injury that you link to the

8  Advantage Fit.  True?

9      A.    Correct.

10     Q.    Okay.  And the dyspareunia is the

11  painful sex, right?

12     A.    Correct.

13     Q.    And what is the evidence that the

14  Advantage Fit, the specific evidence that the

15  Advantage Fit had any connection to the painful sex

16  that Ms. Bayless complained of?

17     A.    That would be based on my general

18  causation report.

19     Q.    Okay.  So it's just the general overall

20  mesh is bad for you view?

21     A.    No, it's the chronic foreign body

22  reaction, chronic inflammatory reaction, mesh

23  deformation, degradation and contraction.

24     Q.    And you know that Dr. Jones specifically

Bruce Rosenzweig, M.D.

```
 1   denied, when Mr. Haberman asked her, that mesh

 2   contracts?

 3        A.   Well, she really needs to look at the

 4   literature and look at explant data.

 5        Q.   Well, did you see that in her testimony?

 6        A.   Yes.

 7        Q.   Okay.  And, so, you would -- she said

 8   that the mesh doesn't contract.  It's the scar that

 9   brings the mesh together.  You disagree with that?

10        A.   The outcome is the same, that the mesh

11   is narrower and more tense.

12        Q.   So, the question was at Dr. Jones'

13   deposition page 35:

14             "Do you know whether or not the

15          mesh shrinks or contracts after it's

16          implanted?"

17             And then she says:

18             "So, with any surgery there is

19          scar tissue, et cetera."

20             Then she says, "Now, does the

21          actually physical size of the mesh

22          shrink?  No."

23             Do you agree with her?

24        A.   No.
```

Bruce Rosenzweig, M.D.

```
1        Q.    Okay.  You believe that she's wrong in

2   that?

3        A.    Correct.

4        Q.    Okay.  And in not knowing the same

5   answer that you have about mesh contraction, is she

6   providing her patients with a deficient standard of

7   care in treatment?

8        A.    Well, it's -- unfortunately, the --

9        MR. HABERMAN:  The thing is you don't tell the

10  doctor that, so she doesn't know.

11       MR. CONNOLLY:  Are you testifying,

12  Mr. Haberman?

13  BY THE WITNESS:

14       A.    No.  He --

15       MR. HABERMAN:  It's been a long day.

16  BY THE WITNESS:

17       A.    That's in my general causation report.

18  So, it's a well-known answer that I've given

19  before.

20  BY MR. CONNOLLY:

21       Q.    I understand, but you can supply it

22  yourself without his kibitzing.

23       A.    Okay.  That it is very difficult if this

24  information is not passed on to doctors for them to
```

Bruce Rosenzweig, M.D.

1    pass it on to the patients.  This is information

2    that has been known about mesh by the manufacturers

3    and has not been espoused to doctors.

4        Q.    Now, you said in your answers to some of

5    Mr. Persons' questions that there was no healing

6    problem where the sling was placed.  Do you

7    remember that?

8        A.    The incision, correct.

9        Q.    And, so, if there was no healing problem

10   where the sling was placed, what evidence is there

11   that the sling was even a minimum contributor to

12   the pain that she had with sex?

13       A.    Okay.  So, when I said that there was

14   no -- the incision from the sling healed.  That was

15   what that statement meant.  I'm sorry if you had

16   any confusion that that was just based on the

17   September 28, 2013 office visit.

18            So, the mesh is going to continue to

19   undergo contraction, deformation and degradation,

20   which traps nerves and leads to pain.

21       Q.    By what point in time did -- at what

22   point in time and in which medical record did

23   Plaintiff complain of painful sex that you

24   attribute to the Advantage Fit even as a minimum

Bruce Rosenzweig, M.D.

```
 1   contributor?

 2        A.    That would be based on her deposition

 3   testimony.

 4        Q.    And I mean what visit?  Because, as you

 5   know, she complains about painful sex before she

 6   ever has the surgery.

 7        A.    That was due to her -- the penis hitting

 8   the cervix.

 9        Q.    Okay.

10        A.    That was treated with her hysterectomy.

11        Q.    And, so, when -- the question that I'm

12   asking you is when does the -- when does the part

13   of the painful sex that -- when does -- sorry.  I

14   was just looking at the time I had left.

15             When is -- when do you say that the

16   Advantage Fit begins to cause her, even as a

17   minimal contributor, painful sex?

18        A.    That's based on Ms. Bayless' deposition

19   testimony.

20        Q.    Yeah.  But when?

21        A.    When she stated that her dyspareunia

22   started post-op.  I don't recall the specific

23   answer she gave.

24        Q.    Okay.  So, it's not in the first visit.
```

Bruce Rosenzweig, M.D.

```
 1    It's not six weeks after, right, because she's not
 2    having sex then, right?
 3         A.    I'm glad we both agree that she didn't
 4    have sex within the first six weeks.
 5         Q.    No, but that's what you said.
 6         A.    Correct.
 7         Q.    Okay.  She doesn't describe dyspareunia
 8    at that time.  She just says that she has problems
 9    with her orgasm, right?
10         A.    That is what's in the medical record.
11         Q.    Okay.  So, when do you -- so, you don't
12    have a specific time frame in which you believe the
13    painful sex started being -- that she presented
14    with painful sex that's related to either of the
15    mesh implants?
16         A.    That would be based on her deposition
17    testimony.
18         Q.    But right now as you sit here you don't
19    have a specific date?
20         A.    That would be based on her deposition
21    testimony.
22         Q.    Now, you indicated that contraction was
23    evidenced by the June 11, 2015 medical record with
24    the arrhythmia, right?
```

Bruce Rosenzweig, M.D.

```
1        A.    With the arrhythmia?

2        Q.    Yeah.

3        A.    The erythema.

4        Q.    Excuse me.  Erythema.

5              You said that that was an indication of

6    contraction in response to some questions that

7    Mr. Persons asked, correct?

8        A.    The chronic foreign body reaction,

9    chronic inflammatory reaction that leads to

10   scar-plating and mesh contraction, yes.

11       Q.    I understood that you were specifically

12   saying contraction.  Right?  Wrong?

13       A.    That that was the process that we used

14   to contraction, correct.

15       Q.    And the erythema that's reflected in

16   that exhibit is at the site of the surgical tack,

17   right?

18       A.    Correct.

19       Q.    And the surgical tack, as I understood

20   your testimony, is located in the area where the

21   Restorelle Y was, right?

22       A.    More likely than not, yes.  But, again,

23   that is not a question that has been asked of the

24   provider either on that visit, I think that was
```

Bruce Rosenzweig, M.D.

1    Dr. Garcia, or the prior examiner where exactly

2    that was found, whether it was at the apex, the

3    upper anterior, upper posterior wall or on the

4    anterior wall 2 centimeters in from the introitus.

5        Q.    So, you would agree with me, Doctor,

6    that more likely than not that erythema is related

7    to the Restorelle Y and not the Advantage Fit,

8    right?

9        A.    Well, that same process would be going

10   on with the Advantage Fit.  The Advantage Fit is

11   smaller pore, heavier weight than the Restorelle,

12   so it's more likely than not undergoing a chronic

13   foreign body reaction, chronic inflammatory

14   reaction.

15       Q.    But no doctor, no doctor has examined

16   and found any swelling of any type in relation to

17   the Advantage Fit, have they?

18       A.    Well, we don't know where the -- exactly

19   where Dr. Garcia and Dr. Magness, I think it was,

20   the prior doctor, where they found the erosion.

21       Q.    Well, and the patient doesn't describe

22   any difficulty with urination.  In fact, she's

23   quite satisfied with the sling surgery, right?

24       A.    Correct.

Bruce Rosenzweig, M.D.

1      Q.    Okay.  So, there's no indication by the

2   patient or by any doctor that there has been any

3   adverse effect by the sling.  True?

4      A.    The dyspareunia.

5      Q.    The dyspareunia.  But the dyspareunia

6   you say is related to the general causation report.

7   There is no specific medical record or testimony

8   that links the dyspareunia to the Advantage Fit.

9   True?

10     A.    Not that I specifically recall from the

11  medical records.

12     Q.    Okay.  So, just a quick couple of

13  questions here on Dr. Jones.

14           We went through a number of her

15  exhibits, and she provides a very extensive

16  category of consent, doesn't she?

17     A.    Yes.

18     Q.    Okay.  And, in fact, the one -- she goes

19  through consent documents, and Mr. Persons marked

20  them all, relative to each one of the procedures,

21  right?

22     A.    Yes.

23     Q.    And, in fact, you'll recall from her

24  deposition testimony that when she talked about

Bruce Rosenzweig, M.D.

1    some additional material that she presents to the

2    patient which was attached to one of the consent

3    forms, she actually shows the patient the material

4    that she plans to implant, right?

5         A.    Yes.

6         Q.    And that's more likely than not the

7    document that is referred to in that consent

8    document, right?

9         A.    That's a possibility, but I think she

10   also stated that she gave out brochures.

11        Q.    Right.  Sure.  She shows them brochures

12   and presents them the actual implanting device that

13   she plans to implant, right?

14        A.    I have a general recollection of that,

15   correct.

16        Q.    And it's unambiguous that she warns the

17   patient that there is a possibility of erosion,

18   right?

19        A.    Correct.

20        Q.    It is unambiguous that she tells the

21   patient that the implants are permanent, right?

22        MR. HABERMAN:  Objection.

23   BY THE WITNESS:

24        A.    To the best of my recollection.

Bruce Rosenzweig, M.D.

```
 1        MR. HABERMAN:  By my stopwatch, your time is

 2   up.

 3        MR. CONNOLLY:  If you give me two minutes, I

 4   will be done on my own.  Is that all right?

 5        MR. HABERMAN:  That's fine.

 6        MR. CONNOLLY:  Okay.

 7   BY MR. CONNOLLY:

 8        Q.   I didn't hear the answer to the last

 9   question.  Maybe I was just -- go ahead.

10        A.   Can you repeat the question again?

11        MR. CONNOLLY:  Madam Court Reporter.

12                  (WHEREUPON, the record was read

13                   by the reporter as requested as

14                   follows:  Q.  It is unambiguous

15                   that she tells the patient that the

16                   implants are permanent, right?

17                        A.  To the best of my

18                   recollection.)

19   BY MR. CONNOLLY:

20        Q.   And she fully informs the patient of the

21   risks of the surgery other than what's in your

22   general causation report.  True?

23        A.   She informs the patient of the risks

24   that we saw in the consent forms.
```

Bruce Rosenzweig, M.D.

```
1        Q.    Okay.  And you know that Dr. Jones has

2   been performing these procedures for many years,

3   right?

4        A.    That's what she stated.

5        Q.    And she's testified as an expert, right?

6        A.    I think that was brought up in her

7   deposition.

8        Q.    Right.  Or she's been hired as an

9   expert, right?

10        A.    I think that was brought up in her

11   deposition.

12        Q.    And she's acted as a proctor for

13   companies, right?

14        A.    I think that was brought up in her

15   deposition.

16        Q.    And so you don't specifically know that

17   she is not aware of your views on degradation and

18   contraction, are you?

19        A.    I think she stated that in her

20   deposition.

21        Q.    She stated what in her deposition, that

22   she's unaware of your views?

23        A.    Well, she's probably unaware of my

24   views, but the fact that mesh contracts, degrades
```

Bruce Rosenzweig, M.D.

```
1   and deforms.

2        Q.    The word "degrade" never came up in her

3   deposition.

4        A.    Okay.

5        Q.    The word "deformed" didn't either.

6              The only word that came up was

7   "contract" and she said it didn't, and we've talked

8   about that?

9        A.    Right, but that doesn't mean that she

10  knows about degradation and deformation.

11       Q.    But you don't know that she doesn't

12  know, do you?

13       A.    That, as you say, wasn't asked at her

14  deposition.

15       Q.    So, she may be aware of your views and

16  just feels that they are unimportant as far as

17  getting a consent from a patient to share your

18  specific views about degradation and deformation,

19  right?

20       A.    That would be speculation.

21       Q.    Okay.  But you're not saying that a

22  doctor, in order to get meaningful consent from a

23  patient, has to inform them, quote, "your specific

24  views" relative to degradation and deformation, are
```

Bruce Rosenzweig, M.D.

```
1   you?

2        MR. HABERMAN:  Objection.

3   BY THE WITNESS:

4        A.    Yes.

5   BY MR. CONNOLLY:

6        Q.    Okay.  So, would that be below the

7   standard of care for them not to inform a patient

8   of your particular views?

9        MR. HABERMAN:  Objection.

10  BY THE WITNESS:

11       A.    Again, if they are not informed about

12  it, they can't inform a patient about something

13  they don't know about.

14       MR. HABERMAN:  All right.  I think we have

15  gone above and beyond.

16  BY MR. CONNOLLY:

17       Q.    You're aware that there are reasonable

18  experts who don't agree with you on deformation --

19  on your general causation reports, right?

20       MR. HABERMAN:  Objection.  This is a general

21  causation deposition which he's been deposed on

22  numerous times?

23       MR. CONNOLLY:  I'm just asking just two

24  questions and then I'm done.
```

Bruce Rosenzweig, M.D.

```
 1        MR. HABERMAN:  This is your second two

 2   questions.  You guys never let me go over my time.

 3   BY THE WITNESS:

 4        A.    You're asking me if there are --

 5   BY MR. CONNOLLY:

 6        Q.    There are credentialed experts who don't

 7   agree with your general causation reports?

 8        MR. HABERMAN:  Objection.

 9   BY THE WITNESS:

10        A.    The simple answer would be more likely

11   than not, yes.

12        MR. CONNOLLY:  Okay.  That's it.  I did it in

13   one.

14        MR. HABERMAN:  I have some follow-up

15   questions, Doctor.

16        THE WITNESS:  Okay.

17                    EXAMINATION

18   BY MR. HABERMAN:

19        Q.    The opinions that you expressed in your

20   report and the opinions that you expressed here

21   today, are those held within a reasonable degree of

22   medical probability?

23        A.    Yes.

24        Q.    And scientific certainty?
```

Bruce Rosenzweig, M.D.

1       A.     Yes.

2       Q.     Can you describe what you did, what

3   methodology you employed to reach the opinions that

4   you have in this case?

5       A.     Well, I used my clinical experience.  I

6   used the medical literature.  I used the internal

7   documents from the company and the deposition

8   testimony.

9              The differential diagnosis that I did is

10  the same differential diagnosis that I do for

11  patients that I treat.

12             I consider their medical history, their

13  physical findings, this would be based on their

14  medical records and their testimony that was given,

15  to arrive at the more likely causes of the

16  complaints that they have and then rule out the

17  other causes to come up with the most likely cause.

18             Again, there is no absolute test that

19  can be done to prove or disprove complaints of pain

20  and painful intercourse, but one can use the things

21  that I've been discussing today to make the

22  etiology that's the most likely.

23      Q.     And in this case, can you tell us what

24  etiology is the most likely cause of the symptoms

Bruce Rosenzweig, M.D.

1    that Ms. Bayless alleges in her Complaint?

2         A.    The characteristics of the mesh that

3    makes it unreasonably dangerous.

4         Q.    Okay.  And I think this afternoon we

5    spent a long time considering alternative causes of

6    those symptoms, did we not, Doctor?

7         A.    Yes.

8         Q.    And do you feel like you explained why

9    those alternative causes were not the most likely

10   cause of the symptoms that Ms. Bayless complains of

11   in her Complaint?

12        MR. CONNOLLY:  Leading.

13   BY THE WITNESS:

14        A.    Yes.

15        MR. CONNOLLY:  Leading question.  But go

16   ahead.

17   BY MR. HABERMAN:

18        Q.    Were there any alternative causes that

19   you feel were not discussed by Mr. Persons earlier

20   today?

21        A.    No.

22        MR. HABERMAN:  Okay.  That's all I have.

23   Thank you.

24        MR. PERSONS:  Okay.

Bruce Rosenzweig, M.D.

```
 1           MR. HABERMAN:  Dr. Rosenzweig will read.

 2                   (Time Noted:  3:58 p.m.)

 3              FURTHER DEPONENT SAITH NAUGHT.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Bruce Rosenzweig, M.D.

1
      I, CORINNE T. MARUT, C.S.R. No. 84-1968,
2  Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:
3       That previous to the commencement of the
examination of the witness, the witness was duly
4  sworn to testify the whole truth concerning the
matters herein;
5       That the foregoing deposition transcript
was reported stenographically by me, was thereafter
6  reduced to typewriting under my personal direction
and constitutes a true record of the testimony
7  given and the proceedings had;
       That the said deposition was taken
8  before me at the time and place specified;
       That the reading and signing by the
9  witness of the deposition transcript was agreed
upon as stated herein;
10       That I am not a relative or employee or
attorney or counsel, nor a relative or employee of
11  such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in
12  the outcome of this action.
13
             _Corinne T Marut_
        _____
14       CORINNE T. MARUT, Certified Reporter
15
       (The foregoing certification of this
16  transcript does not apply to any
reproduction of the same by any means, unless under
17  the direct control and/or supervision of the
certifying reporter.)
18
19
20
21
22
23
24

Bruce Rosenzweig, M.D.

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.  You

 5    should state the reason in the appropriate space on

 6    the errata sheet for any corrections that are made.

 7                    After doing so, please sign the errata

 8    sheet and date it.

 9                    You are signing same subject to the

10    changes you have noted on the errata sheet, which

11    will be attached to your deposition.

12                    It is imperative that you return the

13    original errata sheet to the deposing attorney

14    within thirty (30) days of receipt of the

15    deposition transcript by you.  If you fail to do

16    so, the deposition transcript may be deemed to be

17    accurate and may be used in court.

18

19

20

21

22

23

24
```

Bruce Rosenzweig, M.D.

```
 1                    -   -   -   -   -   -

                          E R R A T A

 2                    -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____   _____

 6                   REASON: _____

 7    _____  _____   _____

 8                   REASON: _____

 9    _____  _____   _____

10                   REASON: _____

11    _____  _____   _____

12                   REASON: _____

13    _____  _____   _____

14                   REASON: _____

15    _____  _____   _____

16                   REASON: _____

17    _____  _____   _____

18                   REASON: _____

19    _____  _____   _____

20                   REASON: _____

21    _____  _____   _____

22                   REASON: _____

23    _____  _____   _____

24                   REASON: _____
```

Bruce Rosenzweig, M.D.

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I, BRUCE ROSENZWEIG, M.D., do hereby

 5   certify under oath that I have read the foregoing

 6   pages, and that the same is a correct transcription

 7   of the answers given by me to the questions therein

 8   propounded, except for the corrections or changes

 9   in form or substance, if any, noted in the attached

10   Errata Sheet.

11

12

13         _____

14         BRUCE ROSENZWEIG, M.D.              DATE

15

16

17   Subscribed and sworn
     to before me this
18   _____ day of _____, 20_____.
19   My commission expires:_____
20
     _____ Notary Public
21

22

23

24
```

Bruce Rosenzweig, M.D.

```
 1                        LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```