# EXHIBIT H

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:18-cv-23643-RUIZ/BECERRA

CHARLOTTE SALINERO and
EFREN SALINERO, her husband,

      Plaintiffs,

v.

JOHNSON & JOHNSON, INC. and
ETHICON, INC.,

      Defendants.

_____/

### PLAINTIFFS' RESPONSE IN OPPOSITION
### TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Charlotte Salinero and Efren Salinero, by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(c), hereby respond in opposition to Defendants' Motion for Summary Judgment, stating as follows:

### INTRODUCTION

In their Motion for Summary Judgment, Defendants, Johnson & Johnson ("J&J") and Ethicon, Inc., make no effort to defend their woefully deficient warnings about the dangers of Artisyn mesh. Instead, Defendants seek summary judgment on Plaintiffs' warnings-based claims under the "learned intermediary" doctrine. In support of their "learned intermediary" argument, Defendants rely *entirely* on the biased testimony of Dr. Jaimie Sepulveda, Defendants' long-time paid expert witness, consultant, corporate committee member, and Ethicon sales force lecturer, who happens to also have been Mrs. Salinero's treating physician in this case. The learned intermediary doctrine, however, assumes that the treating physician in question is an "objective" practitioner. Accordingly, federal courts have held that financial ties between a treating physician

and a defendant manufacturer defeat the assumption of objectivity underlying the learned intermediary doctrine and preclude application of the learned intermediary doctrine at the summary judgment stage. *In re: DePuy Orthopedics, Inc.*, 3:13-cv-1071-K, 2016 WL 6268090 (N.D. Tx. Jan. 5, 2016) ("[T]he learned intermediary doctrine does not apply when a manufacturer compensates a physician or incentivizes him or her to use its product."); *see also Murthy v. Abbot Laboratories*, 847 F. Supp. 2d 958, 972 (S.D. Tx. 2012) ("[W]hen a physician receives compensation or gifts from drug companies, his or her role as the neutral decision-maker may be diminished. As such, dismissal of Murthy's failure to warn claim on learned intermediary grounds would not be appropriate at this time."). This is consistent with the Florida Supreme Court's recent decision in *Aubin v. Union Carbide*, 177 So. 3d 489, 515 (Fla. 2015), which expressly recognized that where the manufacturer knows the learned intermediary has a financial "incentive to . . . withhold the necessary information from the consumer," the "manufacturer may not be able to reasonably rely on [such] an intermediary to provide warnings" to the end user. Because of the overwhelming evidence of Dr. Sepulveda's financial ties with Defendants, Defendants' motion for summary judgment as to Plaintiffs' warnings-based claims should be denied.

Defendants' choice-of-law argument is likewise without merit. The sole conflict between Florida law and New Jersey law that Defendants have cited is an inapplicable New Jersey punitive damages statute, N.J.S.A. § 2A:58C-5 ("New Jersey's Conditional Punitive Damages Bar"). That statute precludes punitive damages in product liability cases concerning products that were "approved" or "licensed" by the FDA or otherwise "generally recognized as safe and effective" pursuant to FDA regulations. *Id*. To date, every Court that has examined the interplay between this statute and pelvic mesh products has concluded that the products' "clearance" by the FDA pursuant to the 510(k) process does not constitute an "approval or license" by the FDA and does not

2

otherwise indicate that the products are generally recognized as safe and effective pursuant to FDA regulations. As the Eleventh Circuit recently confirmed, the 501(k) process is not a pre-market "approval," but rather merely an FDA "clearance" that "is focused on equivalence, not safety." *Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304, 1317 (11th Cir. 2017). This Court should reject Defendants' invitation to be the only court nationwide to rule that New Jersey's Conditional Punitive Damages Bar applies to pelvic mesh products approved by the 501(k) process. In sum, because New Jersey's Conditional Punitive Damages Bar does not apply, there is no "true" conflict between New Jersey law and Florida law *in this case.* As a consequence, Florida's choice of law principles dictate that this Court must apply the punitive damages law of the forum.[1]

## STATEMENT OF MATERIAL FACTS

As their defense to Plaintiffs' warnings-based claims, Ethicon argues that Dr. Jaimie Sepulveda, Mrs. Salinero's treating physician, was a "learned intermediary" whose independent knowledge and informed decision-making broke the causal nexus between any deficiency in Defendants' warnings and Mrs. Salinero's harms. In support, Defendants rely entirely on Dr. Sepulveda's testimony. Dr. Sepulveda, however, is no ordinary treating physician. He has long and substantial financial ties with Defendants.

In its internal documents, Ethicon has identified Dr. Sepulveda as a "key surgeon." **Exhibit 1**. Dr. Sepulveda began working as a consultant for Ethicon in the early 2000s, and thereafter began to serve as Ethicon's expert witness. **Exhibit 2**, Jaimie Sepulveda, M.D. Dep. at 126. He charges Ethicon $500 per hour or $3,500 per day for his services. *Id.* at 131.

---

[1] Plaintiffs withdraw their claims for strict liability manufacturing defect and negligent infliction of emotional distress. Therefore, this response will not address those claims.

As a consultant for Ethicon, Dr. Sepulveda has done "a lot of work," evaluating the adequacy of products and publications and "sitting on committees," among other responsibilities. *Id*. at 126-27. In addition, Ethicon has paid Dr. Sepulveda to train other doctors on how to use polypropylene mesh in surgery. *Id*. at 22-23. Moreover, in September 1994, and then again in December 1994, Dr. Sepulveda taught courses to Ethicon's sales representatives at a seminar titled "Ethicon Endo Surgery Sales Mastery Course," during which he presented on the topics of laparoscopy and transvaginal mesh. *Id*. at 115-19. Dr. Sepulveda has also served, and continues to serve, as Ethicon's expert witness. *Id*. at 125, 141-42. In this capacity, Dr. Sepulveda has reviewed "20, 25" cases for Ethicon, *id*. at 125, and has provided dozens of depositions defending Ethicon's products in court. *Id*. at 107, 125. Dr. Sepulveda admitted that, for his deposition <u>in this case</u>, he was charging Ethicon his "regular rate" of $500 per hour. *Id*. at 134-35.

Dr. Sepulveda further admitted that, since 1994, he has done and continues to do "all sorts of work" for J&J. Id. at 141. His work for J&J has earned him hundreds of thousands of dollars a year. In 2009, for example, J&J awarded Dr. Sepulveda a $388,000 contract, *id*. at 138-142, and in 2010, J&J awarded him a $286,650 contract, *id*. at 142-43. Dr. Sepulveda did not dispute that, through the calendar year of 2010, he had earned "about $2 million" from J&J. *Id*. at 144-45.

## DISCUSSION

## I.  Defendants' Request for Summary Judgment on Plaintiffs' Warning-Based Claims Should be Denied

Defendants seek summary judgment on Plaintiffs' warnings-based claims (Counts I, III, & V) pursuant to the "learned intermediary" doctrine. The learned intermediary doctrine is a legal defense pursuant to which medical device manufacturers may argue that they have discharged their duty to warn about the dangers associated with their products by adequately warning the treating physicians rather than the patients. *Aubin*, 177 So. 3d at 489. The treating physician's

"intermediary" role within the learned intermediary construct has generated various sub-arguments

regarding causation. For example, pursuant to the learned intermediary doctrine, Defendants in

this case argue that Plaintiffs cannot establish causation because, according to Defendants: (1)

prior to Mrs. Salinero's surgery, Dr. Sepulveda was aware that use of the Artisyn mesh had the

risks of each injury alleged by Plaintiffs; (2) Dr. Sepulveda did not rely on Defendants' warnings

(contained in the product's 2012 Instructions for Use ("IFU")) in making his treatment decision;

and (3) Dr. Sepulveda stands by his decision to use the Artisyn mesh in this case. However, as

further explained below, genuine issues of material fact regarding each of these issues preclude

application of the learned intermediary doctrine on summary judgment in this case.

### A. Summary Judgment Standard

Summary judgment is appropriate only "where the pleadings and supporting materials

establish that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." *Gordilis v. Ocean Drive Limousines, Inc.*, 2014 WL 2214274, at

*1 (S.D. Fla. May 28, 2014). In analyzing a motion for summary judgment, "the Court must view

the evidence and resolve all inferences in the light most favorable to the nonmoving party." *Id.*

### B. Dr. Sepulveda's Bias Creates Fact Issues Precluding Application of the Learned Intermediary Doctrine at the Summary Judgment Stage

All three of Defendants' learned intermediary arguments turn exclusively on Dr.

Sepulveda's biased testimony. While the usual rule is that "'self-serving testimony' . . . may not

be disregarded by the district court in determining whether there is a genuine dispute of fact on a

material issue in the case," *Rubesa v. Bull Run Jumpers, LLC*, No. 09-CV-81107, 2010 WL

115004248, at *5 n.4 (S.D. Fla. Apr. 27, 2010), this does not apply where disputed questions of

fact turn *exclusively* on the credibility of a movant's witnesses. Courts have routinely denied

summary judgment where, for example, the movant's "witness is interested in the result of the

suit" because that alone "is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628 (1944) (holding summary judgment inappropriate when it was granted on the basis of uncontradicted opinion testimony of experts because all of the experts were biased or had an interest in the litigation); *Cross v. U.S.*, 336 F.2d 431, 433 (2d Cir. 1964) (holding that "[w]hile . . . ordinarily the bare allegations of the pleadings, unsupported by specific evidentiary data, will not alone defeat a motion for summary judgment, this principle does not justify summary relief where, as here, the disputed questions of fact turn exclusively on the credibility of movants' witnesses") (internal citation omitted); *Chadwick v. Bank of America, N.A.*, 616 Fed. Appx. 944, 950 n.4 (11th Cir. 2015) (leaving open the possibility "the credibility and authenticity of [the moving party's] evidence by itself [may] present[] a jury question"); *see also Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962).

This principle has been applied in the learned intermediary context. "The [learned intermediary] doctrine is premised on the notion that the physician is an *objective* intermediary who will draw an independent judgment about the best course of treatment for his or her patient." *Murthy*, 847 F. Supp. 2d at 971 (emphasis added). In this regard, the learned intermediary doctrine "assumes that physicians do not have an incentive to choose one [prescription product] over another, and thus make an indifferent determination about the proper treatment plan." *Id*. Because the learned intermediary doctrine assumes the prescribing physicians are objective, various learned intermediary defenses turn *exclusively* on the prescribing physician's testimony, giving prescribing physicians a unique ability to insulate manufacturers from liability. In this case, for example, all three of Defendants' learned intermediary arguments turn exclusively on the testimony of Dr. Sepulveda, i.e., that Dr. Sepulveda's testimony establishes that he knew the risks of injury that

Plaintiffs allege; that <u>Dr. Sepulveda's testimony</u> establishes that <u>he</u> relied on the IFU warnings in making his treatment decision for Mrs. Salinero; and that <u>Dr. Sepulveda's testimony</u> establishes that <u>he</u> stands by his prescribing decision.

"Studies have documented . . . that gifts or compensation from drug companies influence medical professionals' treatment decisions," creating "an incentive to prescribe a particular" product. *Id.* at 971-72 (citation omitted). Accordingly, "when a physician is compensated by a drug company . . . the assumption [of objectivity] underlying the learned intermediary doctrine no longer hold[s]." *Id.* at 973. For this reason, Courts have rejected application of the learned intermediary doctrine, including in motions for summary judgment, where the plaintiff's treating physician has a significant financial relationship with the defendant. *See id. at* 972 (S.D. Tx. 2012) (citation omitted) ("Under certain circumstances, when a physician receives compensation or gifts from drug companies, his or her role as the neutral decision-maker may be diminished. As such, dismissal of Murthy's failure to warn claim on learned intermediary grounds would not be appropriate at this time."); *In re: DePuy Orthopedics, Inc.*, 2016 WL 6268090, at *6 ("[T]he learned intermediary doctrine does not apply when a manufacturer compensates a physician or incentivizes him or her to use its product.").[2]

*In re: DePuy Orthopedics, Inc.* is directly on point. 2016 WL 6268090. *DePuy* was a multidistrict litigation involving a medical device called "the Pinnacle," a hip implant

---

[2] The Florida Supreme Court recently echoed this exact concept in *Aubin*, 177 So. 3d at 515, Florida's seminal case on the learned intermediary doctrine. In *Aubin*, the Court noted that where the manufacturer knows the learned intermediary has a financial "incentive to . . . withhold the necessary information from the consumer," the "manufacturer may not be able to reasonably rely on [such] an intermediary to provide warnings" to the end user. *Id.* at 15 (quoting Restatement (Second) of Torts § 388 cmt. l (1965)). In such cases, the Court concluded, "the supplier may well be required to go further than to tell such [an intermediary] of the dangerous character of the article, or, if [the supplier] fails to do so, to take the risk of being subjected to liability if the information is not brought home to those whom the supplier should expect to use the [product]." *Id.*

manufactured by DePuy Orthopaedics, Inc., another subsidiary of Johnson & Johnson. *Id*. at *1. The plaintiffs in that case alleged that they were harmed by defects in the Pinnacle and asserted various claims against DePuy and J&J, among other defendants, including claims for strict liability and negligent failure to warn. DePuy moved for summary judgment pursuant to the learned intermediary doctrine, arguing, like Defendants in this case, that "Plaintiffs cannot meet their burden to demonstrate that their surgeons relied on DePuy's statements in using the Pinnacle Ultamet or that a different representation or warning would have prevented their surgeons from using the Pinnacle Ultamet" and therefore that "Plaintiffs cannot prove causation or reliance in these claims." *Id*. at *4. In support, DePuy, like Defendants in this case, relied on the fact that the treating "physicians testified that they either did not read or did not give weight to advertisement and instead conducted their own research." *Id*. at *5.

The Court denied summary judgment as to three of the plaintiffs because of the financial ties between their treating physicians and the defendants. The Court noted the first physician, Dr. Heinrich: (1) had served since 2005 "in various consulting and promotional roles for DePuy," pursuant to which he "was provided lucrative contracts—including compensation for hundreds of thousands of dollars"; (2) had "serve[d] as an expert [witness] for Defendants"; (3) "was called on by numerous sales representatives" of the defendants; and (4) had "disproportionately used Defendants' products over other manufacturers." *Id*. at *5-*9. The Court noted the second physician, Dr. Goletz "ha[d] received from DePuy thousands of dollars in Honorariums, reimbursements, royalties, and payments for speaking engagements and promotional speaking events, and ha[d] been identified by Defendants as a 'Key DePuy Surgeon.'" *Id*. at *6. "Because of the relationship between DePuy and Drs. Goletz and Heinrich," the Court held "a fact question

exists regarding the legitimacy and objectiveness of Drs. Goletz and Heinrich that precludes application of the learned intermediary doctrine as a basis for summary judgment." *Id.* at *6.

Here, as in Depuy, Defendants seek summary judgment under the learned intermediary doctrine and rely on the testimony of the treating physician, Dr. Sepulveda. Specifically, Defendants argue "Plaintiffs cannot prove causation or reliance in these [warning-based] claims" because Dr. Sepulveda supposedly: (1) did not rely on or give weight to the 2012 IFU in making his treatment recommendation; (2) stands by his decision to prescribe and implant the Artisyn mesh, even knowing what he knows today, such that a different warning not would have changed his treatment; and (3) independently knew the risks of injury that Mrs. Salinero suffered.

However, Dr. Sepulveda's financial ties are nearly exactly the same as those of the treating physicians in *DePuy*—except deeper and more substantial. As in DePuy, Dr. Sepulveda has been identified by Ethicon as a "key surgeon," has served for Defendants "in various consulting and promotional roles," has served and continues to serve as Ethicon's expert witness, is a resource to and has served as a lecturer for Ethicon's "sales representatives," has been hired by Defendants "for speaking engagements" and/or "promotional speaking events," such as the "Ethicon Endo Surgery Sales Mastery Course," and "disproportionately use[s] Defendants' products over other manufacturers," **Exhibit 2** at 102-03. Dr. Sepulveda's roles with Defendants have earned him "lucrative contracts." While the *DePuy* Court emphasized that the treating physician had received "compensation for hundreds of thousands of dollars," Dr. Sepulveda has received hundreds of thousands of dollars *per year* from Defendants—and he did not refute that he had received roughly $2 million cumulatively from Johnson & Johnson alone. Indeed, Dr. Sepulveda admitted that, for the testimony on which Defendants are relying *in this case*, he charged Defendants $500 per hour.

9

Thus, as in *DePuy*, "the relationship between [Defendants] and [Dr. Sepulveda]" creates "a fact question . . . regarding the legitimacy and objectiveness of [Dr. Sepulveda] that precludes application of the learned intermediary doctrine as a basis for summary judgment." *See id*. at *6.

### C.   Other Material Questions of Fact Preclude Summary Judgment on Defendants' Learned Intermediary Arguments

#### 1.   There is a Material Question of Fact Regarding Whether Defendants Adequately Warned Dr. Sepulveda Regarding the Risks of Artisyn

As explained above, Defendants argue that, pursuant to the learned intermediary doctrine, they did not have any duty to warn Mrs. Salinero, but instead owed a duty to adequately warn her treating physician, Dr. Sepulveda. "The sufficiency and reasonableness of a manufacturer's warnings are fact questions appropriate for the jury to decide unless such warnings are 'accurate, clear, and unambiguous.'" *Brito v. County of Palm Beach*, 753 So. 2d 109, 112-13 (Fla. 4th DCA 1998) (internal quotation omitted) ("Even assuming that Super Shops was a learned intermediary, we disagree that, as a matter of law, the warnings provided to Super Shops by AEW were sufficient."). Notably, Defendants make no effort to defend the adequacy of their warnings to Dr. Sepulveda or argue that the warnings were accurate, clear, and unambiguous. That is because the evidence reflects that they were anything but adequate, accurate, clear, or unambiguous.

Defendants' warnings regarding the Artisyn Mesh at the time of Mrs. Salinero's surgery were found in the 2012 Instructions for Use ("IFU") for the Artisyn, **Exhibit 3**, 2012 IFU, at 2-3. According to Dr. Michael Margolis, one of Plaintiffs' expert witnesses, the 2012 IFU "is inadequate because it omits and understates the serious complications" and "fails to properly inform a physician how to treat a patient who has presented with" those complications. Margolis **Exhibit 4**, Margolis Report, at 13. *See Barrow v. Bristol-Myers Squibb Co.*, No. 96-689-CIV-ORL-19B, 1998 WL 812318 (M.D. Fla. 1998) (failure to make "clear the extent and probability

of such" complication creates fact issues regarding adequacy of warnings). In his report, Dr.

Margolis specifically listed 20 significant risks of complications omitted from the 2012 IFU. *Id.* at

13. Dr. Margolis also noted that the IFU "uses language that understates the known risks listed in

the IFU such as . . . 'typical'" and that such "language understates the frequency of the adverse

outcomes, the severity of those complications, and the duration of those complications." *Id.* at 14;

*see Zunzuri v. G. D. Searle & Co.*, 748 F. Supp. 1511 (S.D. Fla. 1990) ("qualifying language"

minimizing "true nature of a danger" create fact issues regarding the adequacy of the warnings).

Dr. Margolis also opined that the IFU does not adequately discuss methods to treat complications,

including the safest methods to remove the Artisyn mesh and the dangers and complications

associated with explanting the Artisyn. Margolis Report at 14-15; *see Barrow*, 1998 WL 812318,

at *30-*31 (failing to warn about risks "upon explantation" creates fact issues).[3]

      Accordingly, the adequacy of the warnings must be determined by the jury.

### 2. There is a Triable Issue of Fact Regarding Dr. Sepulveda's Supposed Independent Knowledge of the Risks Associated with Artisyn Mesh

      Defendants' effort to pivot away from the inadequacy of their warnings by suggesting that

Dr. Sepulveda knew all of the risks is unavailing. Fact questions preclude summary judgment on

this issue. For example, Dr. Sepulveda specifically stated that he was **not** aware that chronic

urinary tract or bladder infections were risks associated with ArtisynTM. (*See* **Exhibit** 2, at 44-45

("Q. Were you aware of a potential risk of chronic urinary tract or bladder infections with

ArtisynTM mesh before December 2012? A. No, that's not one of the – of the side effects of

sequelae that I saw with polypropylene or ArtisynTM Y-Mesh.")). Dr. Sepulveda further testified

that he was not aware of the risk that the implant could cause fecal incontinence. (*Id.* at 48 ("Q.

---

[3]The 2015 IFU corrected many of these deficiencies. *See* **Exhibit 5**, 2015 IFU, at 2-4.

Were you aware of the potential risk of urinary and fecal incontinence before implanting the
ArtisynTM Y-Mesh in December 2012? A. Well, urinary and fecal incontinence are part of the
spectrum of the disorder of pelvic organ prolapse. It's not a direct cause of an implant.")).

Finally, Dr. Sepulveda confirmed that Mrs. Salinero experienced a "foreign body reaction,"
*id.* at 99, 100, and a colovesical fistula, *id.* at 86-87. Moreover, Dr. Iakovlev's differential diagnosis
concluded that Mrs. Salinero's fistula was the result of the only foreign object in her body: the
Artisyn. **Exhibit 6**, Vladimir Iakovlev, M.D. Depo. at 61-63. However, Dr. Sepulveda was
apparently **not** aware that the foreign body reaction creates an *independent* risk of causing a
**colovesical fistula**. ("I'm looking for a fistula. I'm looking for a fistulous tract. Then I have the
CAT scan, and I got into the phone because **I could not figure out** how this colovesical fistula –
I've never seen a colovesical fistula after a sacrocolpopexy. So in here **I'm trying to determine
where is this coming from**.") (emphasis added). Notably, Artisyn's 2012 IFU did not warn about
*any* risk of foreign body reaction, while Artisyn's subsequent 2015 IFU warns of a foreign body
reaction <u>and</u> that it creates an independent risk of such fistula formation. (**Exhibit** 5, at 2-3).

Accordingly, there are material questions of fact regarding Dr. Sepulveda's knowledge.

> **3.    There is a Triable Issue of Fact Regarding Whether Dr. Sepulveda
> Relied on the 2012 IFU and the Warnings Therein**

Defendants cite to cases for the proposition that, under the learned intermediary doctrine,
a treating physician's failure to read the warnings breaks the chain of proximate cause. MSJ at 10-
11. Based on these cases, Defendants argue that Plaintiffs' warnings-based claims fail because,
according to Defendants, Dr. Sepulveda's testimony establishes that he did not rely on the IFU in
making his treatment decision for Mrs. Salinero. MSJ at 11. That is not what Dr. Sepulveda's
testimony establishes. Rather, in his deposition, Dr. Sepulveda simply acknowledged that the 2012
IFU was not "the *main* source of information" on which he relied. **Exhibit 2** at 50. But he also

unequivocally confirmed that he read the 2012 IFU, *id.*, and his assertion that the 2012 IFU was not "the *main* source of information" upon which he relied supports the reasonable inference that it was *a* source of information upon which he relied. For this reason, Defendants' argument and citation to the foregoing cases is entirely inapposite. At bottom, there is clearly a triable issue of fact regarding whether Dr. Sepulveda relied on the IFU and the warnings therein.

### 4. There is a Triable Issue of Fact Regarding Whether Dr. Sepulveda Would Have Implanted Artisyn Mesh if He Had Known All of the Risks

There is also a triable issue of fact regarding whether Dr. Sepulveda would have used Artisyn mesh if he had known all of the risks. There is record evidence showing that Artisyn mesh was dangerous. For example, Dr. Margolis explained that polypropylene, which is what the Artisyn is made of, is incompatible with the vaginal ecosystem, and that it should never be implanted into the human body. **Exhibit 4**, at 11-12. In addition, Dr. Iakovlev testified that all Artisyn is defectively designed, **Exhibit 6**, at 144-46, and explained in his report that Ethicon's internal documents show that its R&D department concluded "mesh was not generally recommended for primary repair of pelvic prolapse due to complications" **Exhibit 7**, at 203, and that an Ethicon study "came to the conclusion that Prolene (polypropylene) degrades after implantation, *id.* at 165. Additionally, there is evidence of far safer alternatives to Artisyn. For example, Dr. Margolis explained that "[p]elvic organ prolapse can be successfully treated without synthetic or vagina mesh" and that "[n]umerous studies have shown excellent success rates using standard technique without mesh." **Exhibit 4**, at 16. And Dr. Scott Gelcher explained the advantages of "biologic grafts." **Exhibit 8**, at 24.

This evidence, *coupled* with the evidence of Dr. Sepulveda's bias, creates a triable issue of fact as to whether adequate warnings would have made a difference to a *reasonable* learned intermediary. *Barba v. Carlson*, 2014 WL 1678246, at *3 (Super. Ct. Del. 2014) ("[I]if there is a

genuine issue of material fact about the adequacy of the warnings and information, the analysis

will proceed to the next issue. This issue is whether additional information or warnings would have

made a difference to a *reasonable* learned intermediary.") (emphasis added).

## II. New Jersey Law Does Not Apply to Plaintiffs' Request for Punitive Damages Because There is no "True" Conflict Between Florida Law and New Jersey Law

In their Motion for Summary Judgment, Defendants also seek court-sponsored refuge for

their punitive conduct in this case. Defendants do not argue that Plaintiffs are unable to show the

requisite clear and convincing evidence of intentional misconduct or gross negligence. *See* §

768.72, Fla. Stat. (2019). Rather, Defendants mount their punitive damages defense by way of a

choice-of-law argument that has been rejected by every Court that has analyzed it. Specifically,

Defendants contend that New Jersey law—and more specifically New Jersey's conditional

punitive damages bar, N.J.S.A. § 2A:58C-5 ("New Jersey's Conditional Punitive Damages

Bar")—rather than Florida law, governs the punitive damages analysis in this case. However,

because New Jersey's Conditional Punitive Damages Bar does not apply to these facts, application

of Florida law and New Jersey law would result in the same outcome, such that there is no "true

conflict" between New Jersey law and Florida law in this case. Accordingly, Florida's choice-of-

law principles require this Court to apply the law of the forum.

This case is before the Court on diversity jurisdiction. Accordingly, the Court utilizes

Florida's conflict of law principles in determining which state's law applies. *Chiles v. Novartis*

*Pharms. Corp.*, 923 F. Supp. 2d 1330, 1332 (M.D. Fla. 2013). In *Bishop v. Fla. Specialty Paint*

*Co.*, 389 So. 2d 999, 1001 (Fla. 1980), Florida adopted the "significant relationship test" to resolve

choice of law issues arising from tort claims. The first step in this test is to determine which

sovereigns have an interest in applying their laws. *Judge v. Am. Motors Corp.*, 908 F.2d 1565,

1568 (11th Cir. 1990). In this case, the two sovereigns at issue are Florida and New Jersey.

Once the interested sovereigns have been identified, the court must then consider the
threshold issue of whether there is a "true conflict" among the jurisdictions or merely a "false
conflict." *Pycsa Panama, S.A. v. Tensar Earth Tech., Inc.*, 625 F. Supp. 2d 1198, 1219 (S.D. Fla.
2008). If a "true conflict" exists, further comprehensive choice of law analysis is required. *Id*. But
if only a "false conflict" is presented, the court must apply the law of the forum. *See Tune v. Philip
Morris, Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000).

A true conflict exists only when "two or more states have a legitimate interest in a particular
set of facts in litigation and the laws of those states differ or would produce a different result."
*Walker v. Paradise Hotel, Ltd.*, No. 01-3564, 2003 WL 21361662, at *2-*3 (S.D. Fla. Apr. 24,
2003). A "false conflict," on the other hand, exists where the laws of the interested jurisdictions
are: (1) the same; (2) different but would produce the same outcome; or (3) when the policies of
one jurisdiction would be furthered by the application of its laws while the policies of the other
jurisdiction would not be advanced by the application of its laws. *See Tune*, 766 So. 2d at 352.

Here, the conflict identified by Defendants is a "false conflict." The only conflict identified
by Defendants between New Jersey law and Florida law is New Jersey's Conditional Punitive
Damages Bar, which plainly does not apply to this case. N.J.S.A. § 2A:58C-5 provides that:

> [p]unitive damages shall not be awarded if a drug or device . . . subject to
> **premarket approval or licensure** by the [FDA] under the "Federal Food, Drug,
> and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. § 301 et seq. . . . **and was approved
> or licensed**; or is **generally recognized as safe and effective** pursuant to
> conditions established **by the [FDA]** and applicable regulations, including
> packaging and labeling regulations.

This statute therefore prohibits punitive damages only where the products were: (1) approved or
licensed by the FDA, or (2) generally recognized as safe and effective pursuant to FDA regulations.
N.J. STAT. 2A:58C-5. The Artisyn does satisfy either condition.

15

First, it is uncontested that the Artisyn did not undergo the FDA's premarket "approval"

process, which is the FDA's "federal safety review." *Eghnayem v. Boston Scientific Corp.*, 873

F.3d 1304, 1317 (11th Cir. 2017) (emphasis added). Rather, the Artisyn merely received

"clearance" under the FDA's 510(k) process. To understand the distinction, a brief background of

the governing FDA regulations is necessary. As the Eleventh Circuit recently explained:

> Under the [Medical Device Amendments of 1976 ("MDA")], certain
> devices must complete a thorough premarket approval (PMA) process with the
> FDA before they may be marketed, including all devices that cannot "provide
> reasonable assurance of the[ir] safety and effectiveness" under less stringent
> scrutiny, and that are "purported or represented to be for a use in supporting or
> sustaining human life or for a use which is of substantial importance in preventing
> impairment of human health" or "present[ ] a potential unreasonable risk of illness
> or injury." The PMA process requires the applicant to demonstrate a "reasonable
> assurance" that the device is both "safe ... [and] effective under the conditions of
> use prescribed, recommended, or suggested in the proposed labeling thereof."
>
> An exemption to the PMA requirement exists for medical devices that were
> already on the market prior to the MDA's enactment in 1976; these devices are
> allowed to remain on the market until the FDA initiates and completes PMA review
> for them. In order to ameliorate the monopolistic consequences of this exemption,
> the MDA also allows other manufacturers to market devices that are shown to be
> "substantially equivalent" to pre–1976 devices that are exempt from the PMA
> requirement. The 510(k) process is the method by which a manufacturer
> demonstrates substantial equivalence.
>
> Notably, the PMA and 510(k) processes have distinct requirements and
> different goals. PMA "is federal safety review," whereas "**the 510(k) process is
> focused on equivalence, not safety**." Indeed, "devices that enter the market
> through § 510(k) have never been formally reviewed ... for safety or efficacy."
> Rather, the 510(k) exemption is "intended merely to give manufacturers the
> freedom to compete, to a limited degree, with and on the same terms as
> manufacturers of medical devices that existed prior to 1976."

*Eghnayem*, 873 F.3d 1304, 1317 (11th Cir. 2017) (internal citations omitted).

Accordingly, the FDA itself has plainly stated that "[a] premarket notification submitted

under 510(k) is. . . entirely different from a [premarket approval]." *Horn v. Thortec*, 376 F.3d 163,

167 (3rd Cir., 2004) (citing amicus brief filed by the FDA). Indeed, FDA regulations make clear

that 510k clearance "does not in any way denote official approval of the device" and that "[a]ny

16

representation that creates an impression of official approval of a device because of complying

with the [510k process] is misleading and constitutes misbranding." 21 C.F.R. § 807.97. Because

the FDA legally prohibits Defendants from representing or even creating a false impression that

Artisyn has received official approval from the FDA, the Artisyn clearly has not received

"approval or licensure" by the FDA

Second, Artisyn has not been generally recognized as safe and effective by virtue of its

510(k) clearance. Courts across the country have confirmed that the 510(k) process does not

involve a determination of safety or efficacy. *Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304,

1317 (11th Cir. 2017) (emphasis added) (confirming a "510(k) does not go to a product's safety

and efficacy").[4] In fact, the Fourth Circuit recently noted that "[t]he 510(k) process allows some

medical devices to **avoid** the strict safety testing requirements imposed by [MDA], so long as the

device is 'substantially equivalent" to a pre–1976 device already in use at that time." *In re C.R.*

*Bard, Inc.*, MDL No. 2187, Pelvic Repair Sys. Products Liability Litig., 810 F.3d 913, 920 (4th

Cir. 2016) (noting that "the clear weight of persuasive and controlling authority favors a finding

that the 510(k) procedure is of little or no evidentiary value" to showing safety or effectiveness).[5]

Defendants' arguments to the contrary are unavailing. Defendants state that the FDA's

placement of Artisyn in "Class II," titled "Special Controls," means the FDA believes there is

---

[4] Defendants reluctantly acknowledge that "some courts" have declined to apply the New Jersey statute to pelvic mesh devices. But this is an understatement. While thousands of pelvic mesh lawsuits have been litigated nationwide, Defendants have not cited, and Plaintiffs have not been able to locate, even a single one in which a court applied New Jersey's Conditional Punitive Damages Bar to a pelvic mesh product "cleared" under the 510(k) process. This Court should reject Defendants' invitation to be the only Court ever to do so.
[5] *Medtronic v. Lohr*, 518 U.S. 470, 478-79 (1996); *Smith v. Depuy Orthopedics, Inc.*, 2013 WL 1108555, *4 (D.N.J. 2013); *Healey v. I-Flow, LLC*, 853 F. Supp. 2d 868, 877 (D. Minn. 2012); *Goodlin v. Medtronic, Inc.*, 167 F.3d 1367, 1369 n.1 (11th Cir. 1999).

reasonable assurance of Artisyn's safety and efficacy, and that it does not present a potential unreasonable risk of illness or injury that would require it to be placed in "Class III."

The pertinent FDA regulation states that a "[Class II] device [is one] which cannot be classified as a class I device because the general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device . . . ." 21 U.S.C. §360c(a)(1)(B). The Fourth Circuit analyzed this language *In re C.R. Bard, Inc.*, 810 F.3d 913, 920 (4th Cir. 2016), and then rejected the precise argument Defendants raise here. In doing so, the Fourth District acknowledged that Class II devices approved under the 510(k) process "are subject to 'special controls'. . . that are necessary to provide adequate assurance of safety and effectiveness," and that, accordingly, the process was "certainly not a rubber stamp program for device approval." However, despite this language, the Fourth Circuit rested its ultimate decision on the fact that the process "does operate to exempt devices from rigorous safety review procedures." This is in line with the fact that every appellate court decision finding FDA evidence in pelvic mesh is not relevant to safety or effectiveness concerned a Class II mesh product, such as Artisyn, which utilized polypropylene. *See Eghayem*, 873 F.3d at 1304; *Huskey v. Ethicon, Inc.*, 848 F.3d 151 (4th Cir. 2017); *In re C.R. Bard, Inc.*, 810 F.3d at 913.

Finally, Defendants quote FDA 2011 FDA Advisory Committee statements alluding to the "safety" and "effectiveness" of pelvic mesh products. Numerous district and appellate courts have analyzed these statements and rejected the proposition that such statements confirm that the 510(k) process is concerned with safety. The Fourth Circuit in *In re C.R. Bard* was tasked with examining whether the district court abused its discretion by granting the plaintiff's motion in limine (pursuant to Fed. R. Evid 402 and 403) requesting that the court to exclude all evidence that the defendant (a pelvic mesh manufacturer) complied with the FDA's 510(k) process. 810 F.3d at 919.

18

The defendant in that case highlighted the same 2011 Advisory Committee statements. In response, the Court stated that "[b]ald assertions by the FDA do little to alter the analysis of the basic question: How much information does 510(k) clearance provide a jury about the safety of the underlying product, and is the value of this information substantially outweighed by the possibility of prejudice in a particular case?" *Id*. at 921. The *In re C.R. Bard* Court answered this question by affirming the exclusion of such evidence.

The Defendants in this case have made previous attempts to introduce the same 2011 FDA Advisory Committee evidence in other cases. This evidence was rejected. *See Huskey*, 848 F.3d at 159-61. In *Huskey*, the Fourth Circuit, for the second time, analyzed the admissibility of FDA regulatory evidence in pelvic mesh cases and, specifically, the admissibility of the 2011 FDA Advisory Committee "findings." *Id*. The *Huskey* court noted that "[t]he FDA did not use its own analysis of the [Artisyn] to reach a conclusion regarding the device's safety and efficacy. Rather, it simply opined on the work others had done." *Id*. at 161. In further analyzing the 2011 FDA Advisory Committee findings, the *Huskey* court stated that "another risk of introducing the FDA Advisory Committee evidence" was that:

> The FDA's use of the 510(k) process to approve the [Artisyn Mesh] layers on another risk of introducing the FDA Advisory Committee evidence. As discussed above, the 510(k) process focuses on a particular device's equivalence to an older device. Thus, the FDA's only original conclusion regarding the [Artisyn Mesh] did not address its safety. This dynamic creates a potentially confusing disjunction for the jury between what the FDA deems other literature has to say about the [Artisyn Mesh]'s safety and what the FDA itself found about the [Artisyn Mesh]'s equivalence to an earlier device.

*Id*. Accordingly, the statements cited by Defendants do not demonstrate that Artisyn was generally recognized by the FDA as safe or effective.

Because the Artisyn has not received "approval or licensure" by the FDA and is not otherwise generally recognized as safe and effective by FDA regulations, New Jersey's

Conditional Punitive Damages Bar does not apply. For this reason, application of Florida law or

New Jersey law "would produce the same outcome" on this issue such that no "true conflict" exists.

Accordingly, this Court must apply the law of the forum.

## II.  Plaintiffs Have Presented Admissible Causation Testimony

Defendants argue that Plaintiffs have no admissible expert testimony to establish causation

in this case. In support, Defendants note that Dr. Michael Margolis is one of[6] Plaintiffs' case-

specific causation experts, and argue that his opinions should be excluded for the reasons

articulated in their Motion to Exclude Dr. Margolis, including that his opinions are supposedly

unreliable, speculative, and unsupported by scientific literature. For the reasons which will be fully

articulated in Plaintiffs' forthcoming Response to Defendants' Motion to Exclude Dr. Margolis,

Dr. Margolis's testimony is admissible, reliance, non-speculative, and supported by scientific

literature. Thus, Defendants' request for summary judgment on this ground should be denied.

---

[6]Defendants attempt undermine the significance of Dr. Vladimir Iakovlev, a pathologist, as one of
Plaintiffs' case-specific experts. Defendants' sole basis for doing so is that Dr. Iakovlev stated that,
on the question of "how exactly [*the symptoms*] presented in Ms. Salinero, I would defer to a
urogynecologist." **Exhibit 6** at 80. In making this statement, Dr. Iakovlev was simply
distinguishing what he believed Mrs. Salinero's "*main* injury" was, a fistula, and how the
associated *symptoms* of that injury presented in Mrs. Salinero. *Id*. at 80. He did not state, as
Defendants claim, that he would defer "*any* opinion concerning injury to urogynecologists." *See
id*. at 119:5-22 ("Q. Will you be testifying [regarding the whole record of the entire procedure,
including how the mesh was placed], or are you going to defer to others about that? A. Well, if
I'm asked specific questions where I can find an answer in this report, I will answer the question.
To me, I can see evidence of what was placed, where it was placed, how it was placed. Then I can
interpret my specimen.'); *id*. at 30 (stating he will testify regarding the physical evidence which
shows that the mesh in Mrs. Salinero's body contracted); *id*. at 60 (performing a differential
diagnosis regarding the cause of Mrs. Salinero's fistula).  Moreover, Defendants argue that Dr.
Iakovlev's opinions concerning clinical effects of mesh are unreliable, speculative, and beyond his
expertise, for the reasons they articulate in their Motion to Exclude Opinions and Testimony of
Dr. Vladimir, Iakovlev. For the reasons which will be fully articulated in Plaintiffs' Response to
Defendants' Motion to Dr. Vladimir, Iakovlev, Dr. Vladimir, Iakovlev's testimony is admissible,
reliance, non-speculative, and supported by scientific literature.

Dated: June 4, 2019     Respectfully submitted,

           */s/ Mathew D. Gutierrez, Esq.*
           THE FERRARO LAW FIRM, P.A.
           600 Brickell Ave., Suite 3800
           Miami, Florida 33131
           Telephone: (305) 375-0111
           Fax: (305) 379-6222
           Mathew D. Gutierrez
           Florida Bar No. 94014
           E-mail: MDG@ferrarolaw.com

           *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via the CM/ECF filing system on June 4, 2019, thereby sending notice of the filing to all counsel of record in this matter.

           */s/ Mathew D. Gutierrez, Esq.*
           Counsel for Plaintiffs